# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al., | ) ) ) |
|  | ) Civil Action |
| Plaintiffs, | ) No. 07-0841 (JR) |
|  | ) |
| v. | ) |
|  | ) |
| GEORGE WASHINGTON UNIVERSITY, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## <u>DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

Dated:  June 4, 2007

**ARNOLD & PORTER LLP**
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000

# <u>TABLE OF CONTENTS</u>

I.    RICHMAR DOES NOT HAVE A SUBSTANTIAL LIKELIHOOD OF
      PREVAILING ON THE MERITS OF ITS COPYRIGHT INFRINGEMENT
      CLAIM...................................................................................................................13

      A.    GW May Be A Joint Author and Co-Owner of the Work Registered as
            DCMS .........................................................................................................14

      B.    Defendant Acted In Accordance With Section 117 of the Copyright Act
            And Did Not Infringe Plaintiff's Copyright............................................17

      C.    Defendant Has an Implied License to Use and Modify the DCMS
            Computer Program....................................................................................28

      D.    Plaintiff Should Be Estopped From Asserting Copyright Infringement...............30

      E.    There Are Several Additional Reasons Why It Is Unlikely that Richmar
            Will Prevail on Its Copyright Infringement Claim .................................33

            1.    There are Substantial Doubts That A Significant Portion of the
                  DCMS Computer Program Code Is Copyrightable ...................................33

            2.    If DCMS and DCMS Scan Are Separate Works Then They Must
                  be Registered Separately...........................................................................35

II.   PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM .........................36

III.  THE BALANCE OF HARM IN THIS CASE FAVORS DEFENDANT.........................39

**DEFENDANT'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant The George Washington University ("GW") respectfully submits this

memorandum of law in opposition to Plaintiff CUS4 d/b/a Richmar & Associates' ("Richmar")

motion for a preliminary injunction.

**PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

This case is a contract payment dispute being pursued as a copyright claim.  The crux of

Richmar's complaint is that GW did not pay it for scanning services performed by Richmar and

its subcontractor.  In seeking to collect for work that was not satisfactorily completed, Richmar is

seeking to leverage the parties' failure to address clearly in the contract between GW and

Richmar the scope of intellectual property rights in certain computer programs prepared by a

Richmar subcontractor for GW, programs tailored to GW's needs and specifications and for

which Richmar was paid nearly $1.5 million dollars.  Richmar asserts that GW is infringing its

copyrights in what Richmar registered with the Copyright Office as the "Document and Case

Management System," alternatively "DCMS."[1]  Richmar asks that GW be enjoined from, among

other things, "engaging in, or supporting, any commercial marketing or use of the DCMS

Computer Program in either its original or altered form," "providing access to DCMS Computer

Program source code to any third parties," and "any copying, altering or modification" of the

DCMS Computer Program.  Pls.' Mot. at 2.  Richmar additionally seeks a return of the DCMS

---

[1] As described in more detail below, there may be two different computer programs that Plaintiff
calls the "DCMS Computer Program" in its Complaint and moving papers.  The first is a custom
user interface to two other computer programs used by GW called Documentum and Banner.
The second is a custom user interface to a computer program used at GW called eInput.  None of
Documentem, Banner or eInput are proprietary to Richmar.  For clarity, this memorandum will
refer to the interface with Banner and Documentum as "DCMS" and the interface with eInput as
"DCMS Scan."  When referencing Plaintiff's arguments which do not differentiate between the
two, this memorandum will refer to the "DCMS Computer Program."

Computer Program source code and "access and/or oversight of the removal" of the document only search function from GW's copy of the DCMS Computer Program. *See id.*

GW contracted with Richmar to assist GW in improving the document management capabilities of GW's Human Resources/Personnel department. At the time the contract was signed, there was no contemplation by the parties that Richmar would create work subject to copyright protection, and hence there was no discussion or negotiation concerning intellectual property rights. Declaration of James W. Thomas, Jr., Exhibit 1 (Transcript of Deposition of Richard Gordon at 30:2-5 (May 31, 2007) ("Gordon Tr.")).[2] The scope of the project increased over time, and eventually Richmar was paid nearly $1.5 million to create the DCMS and DCMS Scan computer programs for GW.

The first two items that Richmar seeks to address, display of the code to third parties and competitive marketing, are easily dispatched. First, as the owner of a lawfully obtained copy of the DCMS Computer Program, copyright law does not prevent GW from providing access to third parties. *See* 17 U.S.C. §§ 196, 109(c), 117. Second, GW has no plans to and will not engage in or support any commercial marketing or use of the DCMS Computer Program in either its original or altered form. Ex. 3 (Declaration of Christina L. Griffin ("Griffin Decl.") ¶ 8); Ex. 4 (Declaration of Marcella Day ("Day Decl.") ¶ 15); Ex. 5 (Declaration of Richard Gilchrist ("Gilchrist Decl.") ¶ 43); Ex. 6 (Declaration of Ronald Bonig ("Bonig Decl.") ¶ 4). As explained in more detail below, none of Richmar's additional claims of infringement have merit and Richmar is not entitled, under any legal or equitable principle, to its requested relief.

---

[2] Exhibits attached to the Declaration of James W. Thomas, Jr. will be referred to as "Ex." for the remainder of this memorandum.

First, it appears that GW jointly authored the computer program registered with the Copyright Office as "DCMS." Richard Gordon, President and CEO of Richmar, and James Gearing, Richmar's former chief technical officer and project manager on the GW contract, both testified that the DCMS Computer Program contains integral elements authored by GW. *See below* Part I.A.

Second, if GW is not a joint author, it is an owner of a lawful copy of the DCMS and DCMS Scan computer programs. Any modifications to the DCMS and DCMS Scan computer programs by GW have been consistent with Section 117 of the Copyright Act, 17 U.S.C. § 117, which is a complete bar to a claim of copyright infringement. GW paid Richmar substantial consideration to develop the DCMS and DCMS Scan computer programs customized to GW's operations and needs and Richmar delivered a copy to GW. GW has modified its copy of the DCMS Computer Programs only to meet its internal business needs, not for commercial purposes, and the modifications were necessary to suit GW's document management needs. Richmar did not limit GW's rights to modify its copy of the DCMS and DCMS Scan computer programs by contract or otherwise. *See below* Part I.B.

Third, if GW's modifications of the DCMS and DCMS Scan computer programs do not fall within the protections of Section 117, the parties' conduct – including Richmar's express representations – make clear that GW possesses an irrevocable license to use and modify the DCMS and DCMS Scan computer programs. GW has not exceeded the scope of this license in making modifications necessary to fix and enhance the programs for the University's use. *See below* Part I.C.

Further, Richmar should be estopped from asserting its infringement claim where the parties did not address intellectual property ownership at the time of contract formation and

3

Richmar knew GW was going to make modifications to the DCMS and DCMS Scan computer programs but never warned GW that this action would result in copyright infringement. Indeed, Richmar's actions were to the contrary, such as coding into the DCMS Scan program a statement that GW owned the copyright. It would be inequitable to sanction GW for copyright infringement under these circumstance. *See below* Part I.D.

Finally, there are several additional reasons why it is unlikely Richmar will prevail on its copyright infringement claim. For instance, it is not clear that plaintiff has created anything copyrightable, or assuming it has, that it has registered appropriately that copyrightable material. Indeed, it is unclear what in fact Richmar has registered is original expression; Mr. Gordon and Mr. Gearing do not agree, as a factual matter, about whether certain parts of the code created by Richmar are original. *Compare* Ex. 2 (Transcript of Phillip J. Gearing at 27:10-21 (June 1, 2007) ("Gearing Tr.")) *with* Ex. 1 (Gordon Tr. at 47:3-51:12). Alternatively, if DCMS and DCMS Scan are separate computer programs, Richmar has improperly made a single copyright registration for two distinct works and withheld from the Copyright Office information material to its examination of Richmar's copyright claim.

Richmar's concerns of imminent irreparable harm are also easily disposed of. In addition to the fact that GW has no intent to market the DCMS Computer program, Richmar itself has actively marketed the DCMS Computer Program from September 2006 to the present. Further, in addition to being within its rights as an owner of a copy of the computer program, to the extent GW has displayed the DCMS Computer Program source code to Crown Partners, a third party consultant, it was done pursuant to a nondisclosure agreement that circumscribes Crown Partner's ability to utilize the information (as would the copyright laws). *See below* Part II.

For all these reasons, each discussed in more detail below, Richmar's request for preliminary injunction should be denied.

## FACTUAL BACKGROUND

GW is a congressionally-chartered nonprofit educational institution. As a large institution, GW has significant administrative and document management needs and seeks to maximize technology to meet those needs. Otherwise, the University's ability to deliver seamless services to its students, faculty and staff would be hindered. To achieve these ends, GW has purchased and utilizes various enterprise-wide computer software solutions, such as Banner and Documentum.

Banner is a suite of applications widely used for information management in the higher education community. Banner is used by GW to, among other things, maintain student information, faculty and personnel employment, and financial information. *See* Ex. 7 (Declaration of Vijay Padmanabhan ("Padmanabhan Decl.") ¶ 4). Documentum is a suite of applications that allows for centralized storing, tracking, sharing, and modifying of University forms and documents, in this case Human Resources/Personnel ("HR Personnel") documents. *See* Ex. 5 (Gilchrist Decl. ¶¶ 5-8).

In order to ensure that individual users would be able to access in Documentum only the personnel documents they were authorized to see, given privacy concerns and legal limitations such as The Family Educational Rights and Privacy Act and the Health Insurance Portability and Accountability Act, GW required a user interface to Documentum that also interfaced to Banner. This interface would eventually be called the Document & Content Management System. *See* Ex. 5 (Gilchrist Decl. ¶ 8).

*Background Concerning Richmar's Contract with the University*

GW entered into a contract with Richmar in January 2006 to provide certain technical services. *See* Ex. 8 (Contract dated January 4, 2006). At the time the contract was entered into, it was the parties understanding that Richmar would merely install and implement the Documentum product without customization. *See* Ex. 1 (Gordon Tr. at 29:20-30:1). There was no contemplation by the parties at the time the contract was entered that copyrightable expression would be created. *See id.* Accordingly, there was no need to discuss intellectual property rights, and the contract does not explicitly address intellectual property rights. *See* Ex. 1 (Gordon Tr. at 31:10-20). Richmar drafted the contract. *See* Ex. 1 (Gordon Tr. at 29:4-6).

In late-March 2006, Richmar proposed creating a custom user interface, or "front-end wrapper," that GW users of the system would see and behind which the interaction between the Banner and Documentum systems would take place. *See* Ex. 9 (GW Document and Case Management System (DCMS) Recommendation dated March 29, 2006). In early April 2006, the parties agreed upon a change request to the scope of Richmar's activities to include the DCMS user interface. *See* Ex. 10 (April 5, 2006 Change Request Form). At this time there was no discussion between the parties concerning who owned any intellectual property rights that may result from this change in the work under the contract. *See* Ex. 1 (Gordon Tr. at 41:17-42:1).

GW and Richmar agreed that Richmar would prepare the user interface, as well as the code (called a "web service application") to handle the interactions between the user interface and Documentum, while GW would prepare the web service application to handle the interactions between the user interface and Banner. Ex. 5 (Gilchrist Decl. ¶ 10); Ex. 7 (Padmanabhan Decl. ¶ 4). Richmar subcontracted with a company called Impact Innovations Systems, Inc. ("Impact") to write the computer code for it. Ex. 5 (Gilchrist Decl. ¶ 11). Richmar

6

itself did not write any of the computer code for the DCMS Computer Program. Ex. 5 (Gilchrist Decl. ¶ 11). GW consulted closely with Richmar and Impact to design the user interface screens, *see* Ex. 1 (Gordon Tr. at 106:4-12), and the search structure and business logic of the computer program. Ex. 5 (Gilchrist Decl. ¶¶ 11-12).

Richmar also was requested to configure eInput, a computer program developed and distributed by a third party (Captiva) and purchased by the University. eInput is a program that allows users to scan hard copy documents into the Documentum document repository system. Ex. 7 (Padmanabhan Decl. ¶ 11). Richmar's work involved creating a user interface with eInput that customized in certain respects the way the program functioned to address GW's business needs. Ex. 7 (Padmanabhan Decl. ¶ 11); Ex. 1 (Gordon Tr. at 58:6-17). Richmar's subcontractor Impact also wrote the computer code to accomplish this customization. Ex. 7 (Padmanabhan Decl. ¶ 12). eInput, as configured, is known at GW as DCMS Scan. Finally, Richmar was hired to scan into the system several hundred boxes of hard copy personnel documents that had been in storage. *See* Ex. 4 (Day Decl. ¶ 5).

### *Structure of the DCMS Project*

During 2006, GW communicated its requirements, business logic, and institutional specifications to Richmar, and Impact implemented these requirements in the code of the DCMS Computer Program except for the Banner web services component. The GW Enterprise Management group, lead by Richard Gilchrist, functioned as lead architect for the project, providing solution design as well as quality assurance and testing. *See* Ex. 5 (Gilchrist Decl. ¶ 13.)

Throughout this process, GW reviewed and tested code deliveries, identified errors and failures to meet GW's requirements, and suggested how the code could be enhanced to further increase its business functionality for GW's needs. *See* Ex. 7 (Padmanabhan Decl. ¶ 14).

The University paid Richmar $1,472,228.16 for its work, and the work of Impact, on the DCMS and DCMS computer programs. *See* Ex. 4 (Day Decl. ¶ 7); Ex. 3 (Griffin Decl. ¶ 5). The computer code for the versions of the programs that first went into production at GW was provided to GW on December 5, 2006. *See* Ex. 5 (Gilchrist Decl. ¶ 15). Shortly thereafter, GW instructed Richmar not to make any additional changes to the DCMS and DCMS Scan computer programs, *see* Ex. 1 (Gordon Tr. at 91:10-13). The DCMS and DCMS Scan programs began to be used by HR Personnel employees on December 18, 2006. *See* Ex. 1 (Gordon Tr. at 66:4-11); Ex. 5 (Gilchrist Decl. ¶15). DCMS and DCMS Scan were thereafter made available to other departments in HR Personnel in January and February 2007 pending planned fixes and enhancements. *See* Ex. 11 (Transcript of Deposition of Tanya Bell at 16:6-12 (May 23, 2007) ("Bell Tr.")).

***Problems with Richmar's Final Deliverable and GW's Resolution Thereof***

There were many problems with the DCMS and DCMS Scan programs as delivered by Richmar. A major problem was that the "document only" search function was not designed, and accordingly did not work, in a way that suited GW's business needs. Ex. 5 (Gilchrist ¶¶ 21-23). The document only search was to allow the user to input document search criteria and retrieve a list of all employees that have documents responding to those criteria. Ex. 5 (Gilchrist ¶ 21). Richmar knew as early as July 2006 that the document only search was not functioning in an optimal way and the parties discussed possible fixes for several months. *See* Ex. 2 (Gearing Tr. at 39:14-42:1); Ex. 5 (Gilchrist Decl. ¶ 24). It was determined that the document only search

would not be fixed in the December 2006 version of DCMS and would be included

subsequently.  Ex. 12 (DCMS Application Walkthrough 11/16/2006).  It was also determined

that the fixes for certain other items would be delayed for a new release and that the addition of

certain features (known as planned product improvements) desired by GW for the DCMS and

DCMS Scan programs to work as needed to meet its business needs would be included at a later

date.  Ex. 13 (DCMS and DCMS Scan Priority List for Fixes, Modifications, and

Enhancements); Ex. 2 (Gearing Tr. at 43:11 ("No system is ever complete on the first release.");

Ex. 1 (Gordon Tr. at 78:16-79:22).  Additional problems with the computer programs as well as

enhancements to increase user functionality were identified once the DCMS and DCMS Scan

computer programs were used outside of the testing environment.  Ex. 7 (Padmanabhan Decl. ¶

22).

GW proceeded to fix known errors, such as the document only search, the employee plus

document critera search, and the inability to distinguish between active and inactive employees,

and make enhancements to increase the functionality of DCMS.  Ex. 5 (Gilchrist Decl. ¶¶ 24-

33); Ex. 7 (Padmanabhan Decl. ¶¶ 21-22).  A revised version of DCMS Scan subsequently was

put into use for GW users.  This version fixed bugs in the DCMS Scan/eInput product delivered

by Richmar.  Ex. 5 (Gilchrist Decl. ¶ 41).  In early April, GW put into use Release 2.0, which

made changes to both DCMS and DCMS Scan.  These changes included cosmetic changes,

fixing bugs, improving or extending some features, and adding certain functions that had been

planned to be included in DCMS and DCMS Scan but not incorporated as of December 2006.

Ex. 5 (Gilchrist Decl. ¶ 41).

In order to assist GW in determining how best to modify DCMS and DCMS Scan to suit

its needs, GW engaged a technical consultant, Crown Partners, to evaluate the computer code

against best practices and coding standards and make suggestions for improvement. Ex. 5 (Gilchrist Decl. ¶¶ 35-36). Crown Partners was not engaged to do any modification of the code, and has made no modifications to the DCMS and DCMS Scan computer code. Ex. 14 (Transcript pf Deposition of Vijay Padmanabhan at 37:15-40:3; 122:13-123:18 (May 31, 2007) ("Padmanabhan Tr."). Crown Partners' work for GW is being performed pursuant to a nondisclosure agreement, *see* Ex. 5 (Non-Disclosure Agreement, attached as Ex. A to Gilchrist Decl.), which prohibits Crown Partners from using or disclosing the information provided to it by GW for any purpose and in any fashion outside its engagement for GW.

### It Was Always Clear That GW Would Maintain, Correct, and Enhance the Code

It was clear in the discussions between Richmar and GW that GW would ultimately be responsible for maintaining and enhancing the code provided by it. For example, in its response to a July 2006 code audit performed by Sun Microsystems, Richmar stated that, "Richmar recognizes the *application will be maintained and operated by GW*." *See* Ex. 15 (July 10 Responses to DCMS Code Audit). To maintain an application, GW must take possession of the code and implement any updates or business modifications that arise while the application is in use. Ex. 7 (Padmanabhan Decl. ¶¶ 17-18).

Moreover, Richmar delivered to GW the "source code" for the DCMS Computer Program. Ex. 7 (Padmanabhan Decl. ¶¶ 17-18). The source code is the version of the program as written by its programmers. It is necessary to have access to the source code to be able to modify the software. *Id.* Customers do not generally receive source code. Most software is distributed only in the form of "executable code," which does not readily reveal the workings of the software. The fact that Richmar delivered the source code to GW without reservation and free of encryption that Richmar expected GW to modify the software.

Once delivered, the source code was, with Richmar's knowledge and consent, loaded into GW's Concurrent Versions System ("CVS") – a code storage system that allows management of code and tracking of modifications.  Ex. 5 (Gilchrist Decl. ¶ 33); Ex. 7 (Padmanabhan Decl. ¶ 18); Ex. 1 (Gordon Tr. at 100:21-101:7).  No limitations on GW's use of the source code was communicated by Richmar.  *See* Ex. 1 (Gordon Tr. at 103:5-12).  Gearing agreed to "schedule time with developer(s) to deliver all source code, and provide a face-to-face turnover to walk through deliverables."  Ex. 16 (Richmar Closeout Meeting 12/14/06); Ex. 4 (Day Decl. ¶ 9).  As it turns out, that knowledge transfer is one of the many deliverables Richmar failed to provide.

***Events Leading to Present Suit***

On March 23, 2007, Richmar was contacted by GW regarding GW's dissatisfaction with Richmar's work in developing the DCMS.  Gordon Decl. ¶ 23 at 7.  Given the problems outlined above and others, as well as the time and expense require for GW to make DCMS and DCMS Scan workable for its needs, GW withheld payment on the final invoices for Richmar's scanning work.  On April 16, 2007, Richmar applied for a certificate of copyright registration for the DCMS computer program.  Shortly thereafter, on May 7, 2007, Richmar filed this action for copyright infringement and various state law claims.  First Am. Compl. at pp. 8-13.  Richmar's motion for a temporary restraining order was denied on May 8, 2007.

## STANDARD OF REVIEW

"[I]nterim injunctive relief is an extraordinary form of judicial relief, [and] courts should grant such relief sparingly."  *Mylan Labs. v. Leavitt*, __ F. Supp. 2d __, 07-579 (RMU), 2007 WL1241884, *5 (D.D.C. Apr. 30, 2007); *see also Marine Transp. Lines, Inc. v. Lehman*, 623 F. Supp. 330, 334 (D.D.C. 1985).  Further, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a

clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Issuance of a preliminary injunction is appropriate only if the movant clearly demonstrates that: (1) there is a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted and (4) the public interest will be furthered by the injunction. *Health Ins. Ass'n of America v. Novelli*, 211 F. Supp.2d 23, 28 (D.D.C. 2002) (denying preliminary injunctive relief where plaintiff was not likely to prevail on claim of copyright ownership and balance of harms and public interest were not in its favor). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* Nevertheless, although it is a flexible standard, the moving party must "must demonstrate at least *some* irreparable injury because 'the basis for injunctive relief in the federal courts has always been irreparable harm.'" *Id.* (quoting *Sociedad Anonima Vina Santa Rita v. Dep't of the Treasury*, 193 F. Supp.2d 6, 13-14 (citation omitted)) (emphasis added).

The requirement to demonstrate *some* irreparable injury remains true notwithstanding the fact that a copyright holder "*may be* presumed to suffer irreparable harm as a matter of law when his right to the exclusive use of copyrighted material is invaded." *Id.* (quoting *Hart v. Sampley*, No. CIV.A.91-3068, 1992 WL 100135, at *3 (D.D.C. Feb.4, 1992) (emphasis added)). "[I]f the Court finds that plaintiff has demonstrated a substantial likelihood of success on the merits of either its copyright or trademark infringement claims, it is not necessary for plaintiff to provide *overwhelming* evidence in support of its showing of irreparable injury." *Id.* (emphasis added).

## ARGUMENT

Plaintiff cannot meet its substantial burden on any of the elements necessary for obtaining extraordinary, preliminary injunctive relief.

**I.    RICHMAR DOES NOT HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS OF ITS COPYRIGHT INFRINGEMENT CLAIM**

"In order to prevail in a copyright infringement action, a plaintiff must show two elements: First, that he is the rightful owner of the copyright at issue, and second, that the defendant infringed his copyright." *Staggers v. Real Authentic Sound*, 77 F. Supp.2d 57, 61 (D.D.C. 1999) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C.Cir.1998); *Nelson v. Grisham*, 942 F. Supp. 649, 651 (D.D.C.1996)). Registration of the copyright in accordance with the Copyright Act is a prerequisite to instituting a lawsuit. *See* 17 U.S.C. § 411(a). This registration requirement is jurisdictional. *See Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 115 (2d Cir. 2003); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 283 (4th Cir. 2003). Even in these nascent stages of litigation, it is apparent that Richmar will be unable to meet its burden as to these elements. As to the first element, Richmar may not be the exclusive copyright owner in what it describes as the DCMS Computer Program. As to the second element, even if Richmar is the exclusive copyright holder in the DCMS Computer Program, GW has not infringed Richmar's copyrights because its actions have been consistent with Section 117 of the Copyright Act, which allows owners of a copy of a computer program to make modifications to that program. Additionally, from the parties' actions GW has an irrevocable nonexclusive license to use and modify the DCMS Computer Program and Richmar is otherwise estopped from asserting infringement against GW.

**A.    GW May Be A Joint Author and Co-Owner of the Work Registered as DCMS**

Based upon the testimony of Richard Gordon, Richmar's President and CEO, and Jim Gearing, a former Richmar employee who served as project lead on the GW/DCMS project, it appears that GW is a joint author of the work registered with the Copyright Office as "DCMS." During his deposition, Richard Gordon described the computer program registered as DCMS as having three interrelated components:

> Q:    What is your understanding of what comprises DCMS?
>
> A:    There are a number of core components, there is the scanning standing component which is a custom solution or wrapper built around the e-input application.  There's the document management or repository component which is a custom application built around documentum repository and document management services and there is a custom application that is built around Banner, Banner I guess which is the ERP system for GW. So there are three components, two of which we have the copyright for.
>
> . . . .
>
> Q:    So is the custom application wrapped around Banner a part of the DCMS?
>
> A:    It is integrated, yes.
>
> Q:    And who created the custom application wrapped around Banner?
>
> A:    My understanding is GW IMAG.  I don't know what IMAG stands for.

*See* Ex. 1 (Gordon Tr. at 43:22-44:11; 44:16-44:22).  Mr. Gearing testified similarly, although he suggested there were four integrated components to DCMS:

> Q.    You mentioned DCMS.  What is your understanding of what DCMS is, what is involved in the DCMS?
>
> A.    DCMS is a custom application devised by Richmar with a – it is a Web-based application, which means that people use it by using an Internet browser such as Internet Explorer or Fire Fox.

Behind that screen, that browser screen is put up on the screen by a Web service program. In this case, it was a set of Web service programs. . . . Basically what DCMS does is provide the functionality of Documentum and Banner but it hides those applications. We put up a set of screens that were specifically tailored to what the GW users of HR services needed to do to store documents and find people and their documents.

Q. And you mentioned that there are a couple of Web service programs that are in the DCMS?

A. Dozens. And each one handles a particular function.

Q. And so one of the Web service programs in the DCMS may, from the user screen, access Banner?

A. Correct.

. . . .

**Q. Are these various Web services programs that you're describing, or applications that you're describing, a part of the DCMS source code?**

**A. Absolutely.**

Q. How does the DCMS Scan – is it fair to call it a function or a program?

A. I would call it a function because there are a number of programs behind it. It's a – a subsystem would be the common term in software to describe it.

Q. So the DCMS Scan E input would be a subsystem?

A. Yes. And DCMS would be – the DCMS employee search screens would be a subsystem. That's two. And then DCMS Web services would be a subsystem for a third one **and then Banner Web services, *which GW wrote*, would be a fourth subsystem. And the four of those subsystems taken together would constitute the DCMS system**.

*See* Ex. 2 (Gearing Tr. at 18:2-20:21 (emphasis added)). This deposition testimony is reinforced

by Richmar's assertion in the affidavit of Mr. Gordon that he had conversations with GW to

market the "DCMS" program jointly. Gordon Decl. ¶ 9 ("I had numerous conversations with GW employees exploring possible ways to co-market the system once operational.").[3]

Further evidence that GW may be a co-owner of the copyright in the DCMS Computer program is hard coded into the source code for the DCMS Computer Program as delivered by Richmar. The source code for the DCMS contains the following copyright statement: "© 2006 Developed by RICHMAR & Associates for George Washington University". *See* Ex. 23 (Copyright Statements). The copyright disclaimer for DCMS Scan is even more clear and is prominently displayed on the opening screen: "Copyright © 2006 The George Washington University. All Rights Reserved." *Id.*

A work will have joint authors if the work was "prepared by two or more authors with the intention that their contributions be merged into inseparable *or interdependent* parts of a unitary whole." 17 U.S.C. § 101 (1994 & Supp. 1999) (emphasis added). Joint authors are co-owners of the copyright in a work. 17 U.S.C. § 201(a) (1994). Unless the joint authors have agreed otherwise – and there is no such agreement evident in this case – each author is entitled to exploit the copyright itself. *Weissmann v. Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989) ("Thus, an action for infringement between joint owners will not lie because an individual cannot infringe his own copyright.").[4] If GW is a joint author, as suggested by the testimony of Messrs. Gordon

---

[3] It is apparent that any such conversations did not take place with anyone at GW with the authority to agree to jointly market the product. *See* Ex. 1 (Gordon Tr. at 109:8-111:7).

[4] Plaintiff makes much of the letter sent from Ronald C. Bonig to Richard Gordon, Jr. on January 5, 2007, arguing that GW acknowledged that "Richmar was under no obligation to send GW the DCMS Computer Program codes, requirement and design documents." First Am. Compl. ¶ 21. However, Richmar already *had* delivered the codes to GW--many times and many different iterations thereof. Ex. 7 (Padmanabhan Decl. ¶¶ 16-18). Mr. Bonig's letter is simply an acknowledgement that GW cannot cause Richmar to delete its own intellectual property. The letter does not, however, enumerate what that intellectual property is or purport to assign or otherwise limit the rights that GW may have in the DCMS Computer Program by way of being a joint author, the holder of an implied license, or under the Copyright Act or any other applicable law.

and Gearing, GW would be entitled to modify, reproduce, or distribute copies of the work.  17

U.S.C. §§ 201(a); 106(1)-(3); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir. 1989).[5]

> **B.     Defendant Acted In Accordance With Section 117 of the Copyright Act And Did Not Infringe Plaintiff's Copyright**

Even if GW is not a joint author and co-owner of copyright in the DCMS Computer

Program as described and registered by Plaintiff, the modifications that GW has made to DCMS

and DCMS Scan (and the copies of those programs made in order to make modifications) do not

infringe the copyrights of Richmar because GW's actions otherwise fall within the protection of

17 U.S.C. §117.  While Section 106 of the Copyright Act grants certain exclusive rights to

copyright owners, including the right to make copies and derivative works, Section 117 limits

these exclusive rights for computer programs by allowing the owner of a copy of a computer

program to modify the program for certain purposes without incurring liability for copyright

infringement.  Section 117, entitled "Limitations on exclusive rights:  Computer Programs,"

provides in relevant part that:

> (a) Making of additional copy *__or adaptation__* by owner of copy. –- Notwithstanding the provisions of section 106 [which set forth the exclusive rights in copyrighted works, including to prepare derivative works based upon the copyrighted work], *__it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided__*:
>
> (1) *__that such new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner__*[.]

---

[5] The modified work itself is entitled to protection.  *See* 17 U.S.C. § 101 ("the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.").  It follows that the modifications made to the DCMS Computer Program by GW do not infringe any copyright interest of Richmar.  Rather, GW's modifications may represent a separate copyrightable work by GW that is itself subject to protection.

17 U.S.C. § 117(a)(1) (emphasis added).  Thus, there is no liability for infringement if an adaptation or copy was:  (1) made or authorized by an owner of a copy of the computer program; (2) created as an essential step in the utilization of the computer program; and (3) used in no other manner.  Here, GW has not infringed any copyright of Richmar in the DCMS and DCMS Scan computer programs – to the extent such rights exist – because GW is the lawful owner of a copy of the DCMS and DCMS Scan computer programs; it made modifications to those programs as an essential step in the utilization of the programs for the purposes they were commissioned; and the modifications were consistent with the program's use (i.e., managing GW's documents) and not prohibited by any term or condition of a license agreement. Accordingly, GW has not infringed, and Richmar is not entitled to preliminary injunction on its copyright claim.  *See Foresight Res. Corp. v. Pfortmiller*, 719 F. Supp. 1006 (D. Kan.1989) (denying preliminary injunction in light of Section 117).

### a.    GW Owns a Copy of The Computer Programs

There can be no question that GW was and is a lawful owner of a copy of the DCMS Computer Program registered by Plaintiff.  Not only did GW pay Richmar nearly $1.5 million to create and deliver the DCMS Computer Program, but the fact that GW owns a copy of the computer programs is also established by Richmar's copyright registration.  "DCMS" is registered as a computer program that was published on December 18, 2006, *see* Pl.'s Ex. 5 (Copyright Registration for "DCMS" dated April 16, 2007), the date on which the DCMS computer program went into production at GW, *see* Ex. 1 (Gordon Tr. at 67:4-11).  Under the Copyright Act, "publication" is defined as the "distribution of copies . . . of a work to the public by *sale or other transfer of ownership* or by rental, lease, or lending."  17 U.S.C. §101 (emphasis added).  Here, the computer code was delivered to GW without any limitation on its use –

> Q:  When Richmar delivered the source code for what would have
> been become the December 18th, 2006 production to GW did you
> communicate any limitations on GW's use of that code to GW?
>
> A:  We told them it was for maintenance, I mean we didn't
> actually impose any restrictions, but we knew the software was
> needed for maintenance, bug fixes.

Ex. 1 (Gordon Tr. at 103:5-12).  *See also* Pl.'s Ex. 4 (DCMS Closeout List) (noting agreement to

deliver source code to GW).  There were no provisions made for rental, lease or lending of the

computer program to GW upon transfer; accordingly, for there to have been "publication" of the

software to support Richmar's copyright registration there must have been a "sale or transfer of

ownership" of a copy of the computer programs from Richmar to GW.[6]

Even if there had not been a sale or transfer of ownership of a copy of the DCMS

computer programs to GW – and there assuredly was – Section 117(a)'s requirement of

ownership does not require formal title in a computer program copy.  Rather it depends on a

party's possession of sufficient functional "incidents of ownership" over a copy of the program.

*Krause v. Titleserv, Inc.,* 402 F.3d 119, 124 (2d Cir. 2005); *Aymes v. Bonelli*, 47 F.3d 23, 25 (2d

Cir. 1995) ("even as an independent contractor, [plaintiff] was paid by [defendants] to design a

program specifically for [defendants'] use," and so there can be no dispute that defendants are

"the rightful owners of the program."); *see also* 2-8 Melville B. Nimmer & David Nimmer,

Nimmer on Copyright § 8.08 (2004) ("What matters instead is whether the erstwhile 'licensee'

---

[6]    The alternative is that the DCMS computer program has not in fact been published.  Where
computer "programs were created for the limited purpose of servicing defendants, and in fact
were tailored specifically for defendants' specific business needs" they cannot be "the subject of
'publications' as statutorily defined."  *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, 2004 WL
1781009, * 6 (S.D.N.Y. August 10, 2004) (referring to 17 U.S.C. § 101).  While the Copyright
Act presumes the validity of "the certificate of a registration made before or within five years
after first *publication* of the work," 17 U.S.C. § 410(c), no such validity should be presumed for
an *unpublished* work.  *Id.*  Accordingly, at the very least Plaintiff should bear the burden proving
that the DCMS Computer Program contains copyrightable expression and specifically
identifying the new copyrightable expression in the DCMS computer program as registered.

owns a copy of the computer program. If so, then Section 117 comes into play."). Factors for the Court to consider in determining ownership of a copy of a computer program under Section 117 include: (1) compensation for development of the software; (2) customization of the software for the buyer's business; (3) where the copies of the software were stored; (4) whether the software developer reserved the right to repossess the copies of the software used by the buyer and the extent of the buyer's rights to use the software and (5) whether the buyer could destroy the software. *Id. See also Weitzman, LLC v. Micro Computer Res., Inc.*, 2007 WL 744649 at * 3-4 (S.D. Fla. Mar. 6, 2007) (adopting *Krause* factors to determine ownership under Section 117(a)).

Here, GW paid a substantial sum to Richmar to develop the DCMS and DCMS Scan computer programs, nearly $1.5 million. Ex. 3 (Griffin Decl. ¶ 5); Ex. 4 (Day Decl. ¶ 7). The programs were conceptualized and specifically designed for GW and customized to GW's document management needs. Ex. 5 (Gilchrist Decl. ¶¶ 8-9, 11-13); *see also* Gordon Decl. ¶ 2 at 1 ("Our task was to develop a custom computer system that would initially manage electronic documents for several departments of GW[.]"), ¶ 3 at 2 ("Our task was to design a computer system architecture which would permit GW to convert its hard copy records to digital form, and to be able to retrieve information in these digitized documents by certain searches, including by name, subject matter and classification. Under the Agreement, Richmar was to help GW define the requirements of the system.")). GW's copy of the DCMS Computer Program was stored on the GW system in its CVS repository, and GW had an undisputed right to possess and use the program. Ex. 5 (Gilchrist Decl.¶ 33); Ex. 7 (Padmanabhan Decl. ¶¶ 17-18); *see also* Gordon Decl. ¶ 32 ("In January 2007, Richmar also agreed to allow GW to retain and use the DCMS source code in order to adjust or fix any small remaining defects in the First Version."); Ex. 1

20

(Gordon Tr. at 100:21-101:17). Accordingly, GW is the owner of a copy of the DCMS

Computer Program for purposes of applying Section 117(a). *Krause,* 402 F.3d at 124

(concluding that defendant owned copies of the disputed programs within the meaning of §

117(a)).

> **b.      The Modifications Made By GW To The DCMS Computer**
> **Program Were Permitted Under 17 U.S.C. § 117**

Any modifications to the copy of the DCMS and DCMS Scan computer programs owned

by GW were essential steps in the utilization of the computer program and do not constitute a

copyright violation. Modifications that are "an essential step in the utilization of the computer

program in conjunction with a machine" within the meaning of Section 117(a)(1) include

adaptations that are necessary to allow the use of the program for the purpose for which they

were purchased. *Krause,* 402 F.3d at 125 (citing *Aymes v. Bonelli*, 47 F.3d 23, 27 (2d Cir.

1995)). Indeed, the Final Report of the National Commission on New Technological Uses of

Copyrighted Works 32 (July 31, 1978) ("CONTU Report," excerpts attached hereto as Ex. 17),[7]

recognized that under Section 117 the right of adaptation includes the right to "add features to

the program that were not present at the time of rightful acquisition." Ex. 17 (CONTU Report at

13-14). Indeed, the CONTU Report recognizes that it is customary that owners of a copy will

"modify their copies to suit their own needs, and that this should be reflected in the law":

---

[7] Congress established CONTU in December 1974 to study computer uses of copyrighted works
and to advise Congress on existing copyright law. As part of its report, CONTU recommended
the statutory text of what would become Section 117 -- adopted by Congress from the statutory
text suggested in the Report. *Compare* Ex. 17 (CONTU report at 12) *with* 17 U.S.C. § 117(a). It
is widely accepted that Congress followed the recommendations contained in the CONTU
Report when it enacted Section 117. *See Aymes*, 47 F.2d at 26 (citing H.R. Rep. No. 1307, 96th
Congr., 2d Sess., Pt. I, at 23 (1980)); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260-61
(5th Cir. 1988) ("The absence of an extensive legislative history and the fact that Congress
enacted proposed section 117 with only one change have prompted courts to rely on the CONTU
Report as an expression of legislative intent."); 2 Melville B. Nimmer & David Nimmer, *Nimmer
on Copyright* § 8.08.

> The conversion of a program from one higher-level language to another to facilitate use would fall within this right [of adaption], ***as would the right to add features to the program that were not present at the time of rightful acquisition***....  Again, it is likely that many transactions involving copies of programs are entered into with ***full awareness that users will modify their copies to suit their own needs, and this should be reflected in the law***....  Should proprietors feel strongly that they do not want rightful possessors of copies of their programs to prepare such adaptations, they could, of course, make such desires a contractual matter.

Ex. 17 (CONTU Report at 13-14 (emphasis added)).  *See also Aymes*, 47 F.2d at 26-27 (quoting same); *Foresight Res. Corp.*, 719 F. Supp. at 1009 (quoting same).  These rights to add features are especially important when an organization such as GW has commissioned and paid substantial sums for a computer program to be created to respond to the needs of its particular business over time, as GW did here.  As the organization's needs change and/or as the organization determines ways to better make the computer program respond to the needs of the organization in carrying out its mission, there must be flexibility to make this happen.

The need for the flexibility to modify a computer program and to add features that suit an organization's needs has been recognized by a majority of Courts that have considered the issue in circumstances such as the present case.  Indeed, the Second Circuit in *Krause v. Titleserv, Inc.,* 402 F.3d 119, 124 (2d Cir.), *cert. denied*, 126 S. Ct. 622 (2005), rejected plaintiff's contention that Section 117(a)(1)'s use of the word "essential" could apply only to modifications to keep the program operating, and interpreted the meaning of the phrase to include adaptations that improve the functionality of the system but are not required to keep it operational.  *Krause,* 402 F.3d at 126-29.  "The meaning of the phrase 'an essential step in the utilization of the computer program' is equally dependent on the word 'utilization.' …. "[U]tilization might refer more broadly to "***mak[ing] [the program] useful' to the owner of the copy***, in which case more extensive modifications that involved adding new program features to enhance functionality

might qualify as an 'essential step' in making the program useful." *Id.* at 127 (emphasis added). This interpretation of the statutory language is consistent with the legislative history of Section 117 quoted above.[8]

     *Krause* is a factually similar case. The *Krause* defendant, Titleserv, was a title insurance agency who hired plaintiff Krause, a computer programmer, to help Titleserv develop a customized computer program to run its operations. *Id.* at 121-22, 124. Krause created numerous computer programs for Titleserv and was paid substantial amounts to develop them. *Id.* The programs at issue were designed to enable Titleserv to track and report on the status of client requests and other aspects of its operations. The programs were installed on Titleserv's computer network and were accessible to Titleserv employees. *Id.* There was no written license agreement in place between Krause and Titleserv and no restrictions on Titleserv's right to use and modify the program. *Id.* After Krause terminated his relationship with Titleserv, he took with him the passwords, and for two programs the source code and then applied for and obtained certificates of copyright registration for those programs. *Id.* at 120-121. Krause told Titleserv that it was free to continue using the executable code as it existed on the day Krause left, but asserted Titleserv had no right to modify the source code. Subsequently, Titleserv circumvented the lock Krause had placed on the code and made modifications for: (1) correction of bugs in the program; (2) changes to the source code to keep the programs up-to-date; (3) incorporation of the programs into a new computer system; and (4) addition of capabilities to the system to make the programs more responsive to the needs of Titleserv's business. *Krause*, 402 F.3d at 121, 125.

---

[8] Plaintiff's deposition questions to GW witnesses appear aimed at establishing that the DCMS and DCMS Scan programs "worked" or "functioned" when they went into production on December 18, 2006 with the limited functionality included as of that date. This completely misses the point.

The Second Circuit affirmed the district court's finding that all of the modifications were protected by Section 117.  *Id.*[9]

GW's modifications to the DCMS Computer program fall broadly into two categories recognized by *Kraus* as falling under the protection of Section 117:  (1) fixing bugs and features in the original version of DCMS; and (2) adding increased functionality and making enhancements to make the computer program work better and more efficiently for GW users. (Ex. 18 (Release 2 Issue Detail as of 1/12/07).

Fixing the document only search, and employee plus document criteria search was the most important aspect of moving from Release 1 to Release 2.  Ex. 18 (Release 2 Issue Detail as of 1/12/07 at GW004064-65).  However, there were other bugs that needed to be fixed as well, such as that users with read-only access should not have been allowed to modify document attributes and that users should be allowed to print all documents, not just Acrobat and Word documents.  Ex. 18 (Release 2 Issue Detail as of 1/12/07 at GW004067-68).  Several changes to the search screen were made expressly for "increased functionality," such as changing search labels for greater clarity, being able to distinguish between active and inactive employees when searching, reviewing and fixing any misleading or inaccurate error messages that present themselves to the user while using DCMS, and eliminating search fields to which the user would not have access.  Ex. 18 (Release 2 Issue Detail as of 1/12/07 *passim*).

The document only search function identified in Plaintiff's complaint did not work as required by GW on December 18, 2007.  Ex. 7 (Padmanabhan Decl. ¶¶ 20-21).  This was known

---

[9] The D.C. Circuit has not addressed modifications under Section 117, not have we found any district court opinion within this Circuit addressing Section 117.

both to Richmar and to GW.  Ex. 12 (DCMS Application Walkthrough 11/16/2006)[10]  Without

the document only search feature the DCMS application was not optimal or efficient for GW.

The head of GW's HR Personnel department, Tanya Bell, explained the document only search

function was required "[i]n order for the system to operate in an optimal way" and "to make it as

user friendly and as useful for the user as possible."  Ex. 11 (Transcript of Deposition of Tanya

Bell at 36:5-21 (May 23) ("Bell Tr.")).  She separately acknowledged this in an internal email at

the time – "I am prepared to okay the initial implementation, but with the understanding that we

will not be fully operational for some [to be decided] period of time."  Ex. 19 (E-mail from

Tanya Bell to Marcy Day sent Dec. 12, 2006)

Both parties expected that modifications would be needed and made after December 18,

2006 for GW's utilization of the computer programs.  Ex. 12 (DCMS Application Walkthrough

11/16/2006).  And, until this lawsuit, Richmar never sought to prohibit GW from making

modifications to the DCMS or DCMS Scan computer programs to improve functionality and

utilization.  Ex. 3 (Griffin Decl. ¶ 7).[11]

Moreover, GW used its modified copy of the computer program for internal purposes

only and has no plans to distribute or market the modified program.  Ex. 5 (Gilchrist Decl. ¶ 43);

Ex. 3 (Griffin Decl. ¶ 8); Ex. 4 (Day Decl. ¶¶ 13, 15); Ex. 6 (Bonig Decl. ¶ 4).  *Aymes*, 47 F.2d at

27 (affirming finding that defendants properly modified their copy of computer program under

---

[10] There is a factual dispute as to whether the document only search worked as described in the
requirements for the DCMS program as designed as of December 18, 2006.  It is undisputed,
however, that GW had expressed displeasure with it and that GW and Richmar were exploring
design alternatives to be incorporated subsequent to the December release.  Ex. 12 (DCMS
Application Walkthrough (11/16/2006); Ex. 13 (DCMS and DCMS Scan Priority List for Fixes,
Modifications and Enhancements); Ex. 2 (Gearing Tr. 38:11-14-40:12 (there were problems with
the document only search "[r]oughly from May to December" of 2006)).

[11] GW is planning a Release 3.0 that will further modify the DCMS Scan to allow scanning and
indexing in bulk.  It is expected that as of Release 3.0 no computer code prepared by Richmar or
its subcontractors will remain.  Ex. 5 (Gilchrist Decl. ¶ 43).

Section 117 where there was no evidence that modified program was marketed, manufactured, distributed, transferred or used for any purpose other than defendant's own internal business needs).  *See also Evolution, Inc. v. Suntrust Bank*, 342 F.Supp.2d 943, 957 (D. Kan. 2004) (concluding that defendants' creation of software from elements of plaintiff's source code was a permissible adaptation under Section 117 where defendant did not develop software for commercial benefit, but rather to add desired features to plaintiff's software).

c.    **GW Used the DCMS Computer Program in a Manner For Which The Code Was Intended**

Section 117(a) requires as a final element that the adaptation of a computer program be "used in no other manner."  17 U.S.C. § 117(a)(1); *Krause*, 402 F.3d at 129.  The programs at issue here were designed for GW's document management, and the modifications allow the programs to better achieve that end.  *Krause,* 402 F.3d at 129-30 (finding that adaptation constituted use in the same manner with the benefit of the adaptation increasing versatility).  Providing access to the source code to a third part does not change this.

GW was within its rights to provide access to the DCMS Computer Code to a third party consultant in order to assist GW with its modifications to its copy of the computer program and advise on changes to improve the systems functionality.  Section 106 of the Copyright Act provides no exclusive right of access.  As the owner of a copy, GW may display it to a third party, just as someone who has purchased a book from the bookstore need not hide his or her copy.  *See* 17 U.S.C. § 109(c).  Further, Section 117 allows the owner of a copy of a computer program to "authorize the making of a copy or adaptation" insofar as necessary in the utilization of the computer program.  *See* 17 U.S.C. §117(a).[12]  The right to authorize a consultant to make

---

[12] GW has in place with Crown Partners a non-disclosure that, among other things, states that upon GW's Request Crown Partners would promptly return all copies of confidential

Footnote continued on next page

copies and modifications would be meaningless if the owner of the copy could not provide the

consultant access to the copy in question.  Moreover, a prohibition on computer program owners

from seeking skilled computer programmer assistance with permissible modifications to their

programs would have the effect of making the adaptation right under Section 117 an illusory

promise.  *Foresight Res. Corp.*, 719 F. Supp. at 1010 ("[S]cholarly commentary suggests that §

117 should not be restricted to prohibit owners from authorizing custom-made enhancements to

their copies of copyrighted programs[.]") (citing Stern, *Section 117 of the Copyright Act:*

*Charter of Software Users' Rights or an Illusory Promise?*, 7 W. New Eng. L. Rev. 459, 468

(1985)).  Here, Crown Partners has not in fact made modifications to the DCMS Code, but rather

has merely advised GW how changes may be made to make the system work better for GW.  Ex.

14 (Padmanabhan Tr. at 37:18-39:19); Ex. 5 (Gilchrist Decl. ¶¶ 35-36).[13]

Finally, Richmar did not have a license agreement which prevented GW from modifying

the DCMS Computer Program it created for GW or seeking third party consultant's assistance.

Ex. 1 (Gordon Tr. 91:14-17).[14]

---

Footnote continued from previous page
information and destroy any "notes, abstracts or other documents containing" such information."
Ex. 5 (Non-Disclosure Agreement ¶ 6, attached to Gilchrist Decl as Ex. A).

[13]  There are additional reasons why GW's consultation with Crown Partners is not infringement.
In order to view the code for evaluation, Crown Partners came to GW's offices in early February.
(Padmanabhan Tr. at 36:19-37:1).  Crown Partners was given access to the machine loaded with
the code via GW's Virtual Private Network and viewed the code on their computer.  To the
extent code was displayed on Crown Partners' machines this display was not public.  *See* 17
U.S.C. § 101 (definition of "publicly").  To the extent any copy would have been made
temporarily on the memory of Crown Partners' computers, such copies were transient.  17
U.S.C. § 512, and otherwise permitted incidental to the right to display copies to third parties
under Section 109(c) and to authorize the making of a copy under Section 117.

[14]  If Richmar wished to restrict the manner in which its computer program is to be used by its
customer, it should have employed a written license agreement spelling out the parties' rights in
connection with the program.  As the CONTU Report states, "[s]hould proprietors feel strongly
that they do not want rightful possessors of copies of their programs to prepare such adaptations,
they could, of course, make such desires a contractual matter."  Ex. 17 (CONTU Report at 13-
Footnote continued on next page

### C.    Defendant Has an Implied License to Use and Modify the DCMS Computer Program

If GW is not a joint owner and the modifications GW made do not fall within the § 117 exception, then GW certainly has an irrevocable, nonexclusive, implied license to use the DCMS code and thus cannot have committed copyright infringement.[15]  A nonexclusive license to use copyrighted material may be granted orally or arise from the conduct of the parties.  *Atkins v. Fischer,* 331 F.3d 988, 991 (D.C. Cir. 2003).  "Such an implied license will arise where '(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.'"  *Id.* at 991-92 (quoting *Lulirama Ltd., Inc. v. Axcess Broad. Servs.*, 128 F.3d 872, 879 (5th Cir. 1997)).  Here, it is apparent that an oral or implied license to use and modify the DCMS and DCMS Scan computer programs as needed was granted to GW.

First, it is undisputed that GW requested the creation of the code at issue.  Richmar not only created the code according to GW's specifications, but delivered several versions of the code into GW's possession, to be inputted into GW's CVS.  Ex. 1 (Gordon Tr. at 101:5-17); Ex. 7 (Padmanabhan Decl. ¶ 18).  Thus not only did Richmar deliver the code in a fashion that would

---

Footnote continued from previous page

14).  The contract is silent as to limitations on GW's ability to adapt the DCMS and DCMS Scan programs or to display them to third parties.

[15]   A nonexclusive license bars a suit for copyright infringement by the licensor, unless the licensee's use goes beyond the scope of the nonexclusive license.  *See, e.g., Atkins v. Fischer*, 331 F.3d 988, 991-92 (D.C. Cir. 2003); *Evolution*, 342 F. Supp.2d at 953 ("A copyright licensee's remedy against a licensor that violates the terms of the copyright license generally is a claim for breach of contract rather than copyright infringement.") (citing *Sun Microsys., Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) and *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)).

enable the software to go into production for document management purposes, it did so in a form that would allow GW to maintain and manipulate the code as necessary going forward.

Second, GW paid Richmar nearly $1.5 million to have access to both the executable computer programs and the underlying source code. Ex. 3 (Griffin Decl. ¶ 5); Ex. 4 (Day Decl. ¶¶ 6, 7). Taking away GW's access to use, maintain, update and modify the code to suit evolving business needs would lead to an absurd result–the University would have paid nearly $1.5 million for software developed specifically for it that it could not keep current, adapt to its needs, or use in the most efficient manner. The only logical inference is that Richmar knew that in exchange for receiving that sum it was providing GW a license to use and modify the computer code as it needed to.

Third, Plaintiff knew that GW intended to modify and maintain the code, and that there is no way to maintain the code without distributing internal copies of it. Richmar agreed that GW could do so, stating in its pricing proposal at the very outset of the project that GW will own and operate the system. Ex. 20 (Richmar Price Proposal at 2 (December 19, 2005)). Indeed, Mr. Gordon understood that part of the project involved assisting GW in its endeavor to maintain and modify the code. Ex. 1 (Gordon Tr. at 90:12-16 ("I know that we were originally supposed to sit down with them and go through . . . some [ ]information about the code.")). Mr. Gordon testified to this fact: "We told them [the code] was for maintenance, I mean we didn't actually impose any restrictions, but we knew the software was needed for maintenance, bug fixes." Ex. 1 (Gordon Tr. at 100:9-12). Richmar also stated in its System Design Documents to GW that the computer program would be "scalable," which Mr. Gordon defined in his deposition as meaning "allow[ing] the system to grow" or "adding users and functions." Ex. 21 (Richmar System Design Document); Ex. 1 (Gordon Tr. at 106:13-107:8). Having not imposed any restrictions on

GW's use of the code, an implied license to distribute and copy the code internally to allow the web developers to access and manipulate it was created.  This is especially true because by the time Richmar delivered the code to GW, it had no expectation that it would play any role gong forward.  Ex. 16 (12/14/06 Richmar Closeout Meeting).  The contract was to end on January 8, 2007 and there was no reasonable basis for Richmar to believe that he would continue to work on the coding for the DCMS Computer Program for any period after the expiration of the contract.

It is similarly clear based on the above that GW's modifications of the DCMS system do not exceed the scope of the implied license agreement as they were made in order to fix problems, operate the system as required, and add features and functions that the parties knew were planned to be included subsequent to December 2006.  The document only search function is but a single example.  Richmar knew that the document only search feature was not operational.  This fact had been reflected as early as July 2006.  Ex. 22 (MANTIS Tick #228).  There is no point in paying a hefty sum to store documents electronically if those documents are not searchable in a way that is responsive to the business's needs.  It is undisputed, however, that as of December 18, 2006, when the software went live, that the search function still did not work and Richmar knew that subsequent to that release the document only search problems would be corrected.  Ex. 1 (Gordon Tr. at 77:17-78:19).

### D.    Plaintiff Should Be Estopped From Asserting Copyright Infringement

If GW is not a joint owner or licensee, and the modifications it made do not fall within the § 117 exception, Richmar should nevertheless be equitably estopped from bringing a copyright infringement action against GW.  In the context of a copyright action, the holder's rights to assert infringement may be limited if the defendant shows that "the party to be estopped had knowledge of the defendant's infringing conduct, and either intended that his conduct be

relied upon or acted so that the party asserting estoppel has a right to believe it was so intended. Additionally, the defendant must be ignorant of the true facts and must rely on plaintiff's conduct to his detriment." *Keane Dealer Serv., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *Lottie Joplin Thomas Trust v. Crown Publs., Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978)); *DeCarlo v. Archie Comic Publications, Inc.*, 127 F. Supp.2d 497, 509 (S.D.N.Y. 2001) (same). *See generally* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.07 (2004).

As set forth in more detail above, here Richmar knew that GW would be making modifications to the DCMS Computer Program and GW has relied on Richmar's conduct to its detriment in several ways:

(1)  Richmar knew that there were functions that were not included in the December release of DCMS that were intended to be included subsequently, including the Document Only Search Function of which Plaintiff specifically complains. *See* Ex. 16 (DCMS Closeout Meeting 12/14/2006) (noting that some items would be included in subsequent release); Ex. 2 (Gearing Tr. at 42:15-43:11, 44:4-44:17).

(2)  Richmar delivered the source code to GW with no restrictions.  Ex. 1 (Gordon Tr. at 103:5-12), knew and expected that GW would make changes. *See* Ex. 1 (Gordon Tr. at 78:11-19), and never told GW that the DCMS Computer Program could not be modified by GW. *See* Ex. 1 (Gordon Tr. at 91:14-17). *See, e.g., Carson v. Dynegy*, *Inc.,* 344 F.3d 446, 454-55 (5th Cir. 2003) (holding that employee was estopped from asserting copyright infringement claim); Nimmer on Copyright § 13.07 (finding that estoppel may be accomplished by a plaintiff's silence and inaction).

31

(3)  Richmar delivered the DCMS Scan computer program with a copyright notice that indicated GW held the copyright.  Ex. 23 (Copyright Notices).

(4)  As represented to GW by Richmar, the DCMS "front end wrapper" around Documentum would be based on open source software, the primary benefits of which were to "eliminate licensing fees as an impediment" and "avoid[ ] vendor lock-in."  Ex. 10 (Document Management System Change Request Form at 2).  Perversely, Richmar is now seeking to assert a vendor lock-in by claiming copyright over the programs.

Given these circumstances, it was GW's understanding, based upon Richmar's conduct and consistent with its historical experience with numerous other consultants and industry practice, that GW would own the DCMS Computer Program for which it had paid nearly $1.5 million dollars to be created specially for the University and be able to modify it to suit the University's needs.  Ex. 3 (Griffin Decl. ¶¶ 5-6).  Richmar should be estopped from asserting a copyright infringement claim.[16]  Where a "defendant was plainly ignorant of the facts now alleged by [plaintiff], i.e., that he claims ownership in the [material]" plaintiff is "equitably estopped from claiming that [defendant] has violated his rights . . . whether those claims are couched in terms of copyright, contract or some other legal theory."  *DeCarlo*, 127 F. Supp.2d at 511; *see also Keane Dealer Serv., Inc. v. Harts*, 968 F. Supp. at 947 (holding that owner of software copyright was equitably estopped from bringing infringement action); *Armento v. City*

---

[16] Richmar cannot rely on the failure of contract between Richmar and GW to address intellectual property rights because there was no intent at time of contract formation that any copyrightable expression would be created, *See* Ex. 1 (Gordon Tr. at 31:10-20), and no discussion of ownership of intellectual property rights when the parties subsequently decided that the custom DCMS user interface product would be created.  *See* Ex. 1 (Gordon Tr. at 41:17-42:10).  "[C]ontracts, however, must be read as a whole, and should be construed against the drafter."  *Regency Communications, Inc. v. Cleartel Communications, Inc.*, 212 F. Supp.2d 1, 4 (D.D.C. 2002).  Richmar drafted the contract, and to the extent it is silent about future ownership, copyrights, or licenses, this silence must be construed against Richmar in favor of GW rather than used as a sword as Richmar is attempting to do here.

*of Ashville Downtown Dev. Office*, No. 1:94CV57, 1996 WL 677119, *7-8 (W.D.N.C. March 26, 1996) (holding plaintiff equitably estopped from bringing copyright suit against defendant where agreed defendant could use map and did not stop defendant from doing so).[17]

E.    **There Are Several Additional Reasons Why It Is Unlikely that Richmar Will Prevail on Its Copyright Infringement Claim**

1.    **There are Substantial Doubts That A Significant Portion of the DCMS Computer Program Code Is Copyrightable**

Plaintiff has offered a certificate of registration from the Copyright Office for the DCMS as prima facie evidence of its ownership of a valid copyright. *See* Pl.'s Ex. 6; 17 U.S.C. § 410(c). Plaintiff has not, however, enumerated with specificity – and it is unclear from the limited factual record – those elements of the DCMS and DCMS Scan computer programs that constitute original expression – if any – and that are thereby covered by its registration. *See above* Part I.A; *Compare* Ex. 2 (Gearing Tr. at 27:10-27:21 (claiming he "would be surprised" if the Grievance Electronic Tracking System were included in the DCMS Computer Program source code because "[i]n the code part of it, there's very little overlap") *with* Ex. 1 (Gordon Tr. at 47:3-51:12 (explaining that he was not sure which code is duplicated, but the functions are the same). There are several examples in the limited record of parts of the software that are not original in their inclusion in the DCMS computer program and therefore cannot be infringed:

- the copyright registration disavows copyright in portions of the DCMS program that are based upon prior works titled "Grievance Electronic Trading System"[18] and

---

[17] The basis for estoppel in this case is especially compelling here since apparently Richmar did not possess the purported intellectual property rights it is asserting against GW until recently. The Copyright Registration identifies Impact Innovation Systems, Inc. as the author of the DCMS and states that the works was both a work for hire and had been assigned to Richmar, which is somewhat inconsistent. Pl.'s Ex. 6 (Copyright Registration at 1). Apparently, however, the written agreement required to accomplish the assignment of these rights under the Copyright Act was not entered between Richmar and Impact until 2007 in anticipation of Richmar filing the copyright registration that serves as the basis of the current lawsuit. Ex. 1 (Gordon Tr. at 53:4-22). Until that time, Richmar had no rights/limitations in the DCMS and DCMS Scan computer programs it could assert (assuming it has any now).

"Memorandum of Agreement System" created by Richmar for the Federal Aviation Administration. Mr. Gordon described the functions and presentation of the DCMS as substantially similar in form and function to those works; for example, both "sort rows and columns on the search result screen." Ex. 1 (Gordon Tr. at 47:3-51:12 ("there are many functions that are [in DCMS] that come from this system" )). This is not original copyrightable expression. *See, e.g. Computer Access Technology Corp. v. Catalyst Enters., Inc.*, No. C-00-4852-DLJ, 2001 WL 34118030 (June 13, 2001) (noting use of horizontal bars to depict data and results derived from USB standards and industry practice unprotectible as unoriginal).

- Logging events in DCMS are based on commons-logging and Log4j, open source software available from the Apache Software Foundation (www.Apache.org). Ex. 7 (Padmanabhan Decl. ¶ 7). *Cf. Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992) ("[M]aterial found in the public domain ... is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work.").

- The code that comprises the system architecture (i.e. the blueprint) of DCMS is also open source software, Struts, also obtained from the Apache Software Foundation. Ex. 7 (Padmanabhan Decl. ¶¶ 5-6); Ex. 1 (Gordon Tr. at 70:4-6).

A significant portion of the DCMS computer program may likewise be uncopyrightable under the doctrine of *scenes a faire*.

> In the computer-software context, the "doctrine of scenes a faire" means that the elements of a program dictated by practical realities, such as by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices, may not obtain copyright protection.

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004); *See Altai*, 982 F.2d at 709-10; *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295-96 (D.C. Cir. 2002) (noting that copyright protection does not extend to scenes a faire, or "incidents, characters or settings which are  . . . standard" or "dictated by external factors such as particular business

---

Footnote continued from previous page
[18] During his deposition Mr. Gordon clarified that the correct title of the program is the "Grievance Electronic Tracking System." Ex. 1 (Gordon Tr. at 45:12-19).

practices" (internal quotation marks and citations omitted)). As one leading commentator has recognized, "Perhaps the most significant external factors influencing program design are the business practices and technical requirements of the end user." 4 Nimmer on Copyright § 13.03[F][3][d], at 13-136.

Here, Richmar's expression was constrained at least by two external factors suggesting significant amounts of the DCMS computer program is not subject to copyright protection under the *scenes a faire* doctrine. First, while Plaintiff's use of Struts to interface with Documentum and Banner is by no mean an industry best practice, the Struts blueprint dictates how the system must be structured, where certain files have to go, and how certain items are required to be coded and processed. Second, the computer code is constrained to be consistent with and accomplish GW's defined business parameters and technical functions (for example, that the program call on Banner to obtain security clearance prior to accessing Documentum).

It is difficult on the current record to determine what of the DCMS Computer Program constitutes original copyrightable expression. It is certainly premature to enjoin GW from using and modifying the Computer Program until that has been established by Plaintiff.

## 2.    **If DCMS and DCMS Scan Are Separate Works They Must be Registered Separately**

If the various components described by Messrs. Gearing and Gordon that make up the DCMS Computer Program, which includes a component authored by GW, cannot be called a work of joint authorship, that must be because each of its components is considered a distinct work. *See above* Part I.A (describing components of DCMS). As such, Richmar cannot claim a copyright infringement for DCMS Scan – a program for which Richmar has not registered a copyright. Richmar has registered a copyright in a computer program named "DCMS." It has not registered a copyright in a DCMS Scan computer program. Pl. Ex. 6 (Copy of Copyright

35

Register).  Accordingly, Richmar cannot assert a copyright infringement claim based upon

modifications by GW to DCMS Scan.  "[N]o action for infringement of the copyright in any

United States work shall be instituted until preregistration or registration of the copyright claim

has been made in accordance with this title."  17 U.S.C. § 411(a); *Well-Made Toy Mfg. Corp. v.

Goffa Int'l Corp.*, 354 F.3d 112, 115 (2d Cir.2003) ("This registration requirement is

jurisdictional."); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 283 (4th Cir. 2003) (same).

The Copyright Office has recognized a "long-standing principle of one registration per

work."  53 Fed. Reg. 21817-01, 21819 (June 10, 1988).  While regulations issued pursuant to the

Copyright Act allow for the registration of multiple works as a single work, in the case of a

published work all elements must have "been contained in a single publication."  37 C.F.R. §

202.3(b)(3)(i) (2005), or "published together as a unit."  53 Fed. Reg at 21819.  Here, DCMS and

DCMS Scan cannot be considered a single publication.[19]

## II.     PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

Richmar has offered no evidence that it has or is likely to suffer any harm – much less

irreparable harm – based on GW's continued use and necessary modification of the DCMS and

DCMS Scan computer programs.  The *sine qua non* of harm in the copyright context is that the

exclusive rights of a copyright holder are infringed to the detriment of the copyright owner's

ability to exploit his or her intellectual property for the period of time prescribed by statute.  *See,*

---

[19] Given the foregoing, Richmar's copyright registration is defective on its face.  Richmar failed
to identify DCMS as being a derivative work of Struts, that the logging functions in the DCMS
computer program are derivative of commons-logging/Log4J, and that GW was a joint author.  It
may be premature to question motives, but if Richmar's omission were intentional it would serve
as fraud on the copyright office in which case Richmar would be estopped from asserting
infringement.  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir. 1989) (inaccuracies in
copyright action do not bar suits for infringement, but an "intent to defraud and prejudice" does);
*Lapham v. Porach*, No. 06-Civ-6861 (CM), 2007 WL 1224924, *4 (Apr. 25, 2007) (denying
preliminary injunction and noting that plaintiff may have committed fraud on the Copyright
Office, "which could lead to the invalidation of his copyright registration.")

*e.g., Harper & Row, Publs., Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985) ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors.").  Moreover, any presumption of irreparable harm to Plaintiff that may flow from GW's purported infringement – and as demonstrated above, Plaintiff cannot meet its burden to show infringement – is rebutted by the undisputed facts that (1) GW has not and will not market a DCMS computer program (either as delivered by Richmar or modified by GW); Ex. 5 (Gilchrist Decl. ¶43); Ex. 3 (Griffin Decl. ¶ 8); Ex. 4 (Day Decl. ¶ 15); (2) Crown Partners has not and will not market a product based upon any copyrightable element of the DCMS code; Ex. 5 (Gilchrist Decl. ¶ 43); *see also* Ex. 5 (Non-Disclosure Agreement, attached as Ex. A to Gilchrist Decl.); and (3) Richmar's ability to obtain a fair return for whatever intellectual property rights it possesses in the DCMS Computer Program has in no way been diminished by GW:

(1) Richmar was paid a significant amount of money by GW – $1,472,228.16 – to assist GW in developing the DCMS and DCMS Scan computer programs, Ex. 4 (Day Decl. ¶ 7);

(2) Richmar has actively marketed the DCMS computer program to other universities and organizations.  "[F]rom September or October, 2006 through March, 2007," Richmar, or persons acting on its behalf, marketed the DCMS computer program to American University, University of Mary Washington, Howard University, Clemson University, University of Georgia, University of Alabama, Georgia State University, Morehouse College, University of Maryland and others."  *See* Ex. 24 (Plaintiff Richmar's Answers to Defendant's First Set of Interrogatories No. 3).  Richmar's efforts to market the DCMS computer program are continuing.  As recently as last week, Richmar met with the Small Business Administration concerning DCMS.  Ex. 1 (Gordon Tr. at 93:19-94:5).

37

Given that Richmar has been able to market the DCMS computer product widely – to at least nine universities and others –it is readily apparent Plaintiff's concerns that there is "an immediate and irreparable threat to Richmar's exclusive right[] . . . to exclusively market the DCMS to universities and colleges," First Am. Compl. ¶ 33, are baseless.  Moreover, although plaintiff asserts that he had conversations with GW about possibly marketing the DCMS software jointly with the University, presumably to suggest the University has the means and intent to offer a competing DCMS product to the market, Mr. Gordon admitted during his deposition that neither of the women with whom he spoke in this regard, one of whose name he cannot recall, "had the authority to make that decision." Ex. 1 (Gordon Tr. at 109:8-110:18.)

As discussed above, plaintiff's concerns concerning Crown Partners viewing the source code are similarly misplaced. *See above* Part I.B.

This is not a case where an injunction is necessary to stop an alleged infringer from continuing to promote, distribute or sell a competitive work derived from the copyright owner's intellectual property.  GW has not done so and does not intend to do so.  GW's only intention concerning the DCMS and DCMS Scan programs is to utilize them for the purposes they were originally conceived by GW and for GW – to assist GW in furtherance of its educational mission by enhancing the University's document management systems. Ex. 3 (Griffin Decl. ¶¶ 2, 4). None of GW's actions respecting the DCMS and DCMS Scan source code have had, or will have, an effect on the potential market – if such a market exists – for the DCMS Computer Program.  If Richmar is unable to capitalize on the computer program, either because the products are not marketable or because Richmar lacks the expertise or resources to exploit the market, that is not damage to Richmar that flows from GW's use or modification of the computer source code and does not warrant an injunction. *Health Ins. Ass'n of America*, 211 F. Supp.2d at

33 (denying injunction to copyright infringement plaintiff where it failed to offer evidence that it suffered any irreparable harm).

## III.    THE BALANCE OF HARM IN THIS CASE FAVORS DEFENDANT

As described by Tanya Bell, GW undertook the project to "reduce the amount of space taken up by paper files," because "[s]pace equals money, and we don't have the money to keep that square footage on K street. . . ." Ex. 11 (Bell Tr. at 61:4-16).  Moreover, GW needed "to create a central repository, to be able to organize the documents in a coherent fashion, logical order, [and way that was] segregable based upon business necessity in a secured way."  Ex. 11 (Bell Tr. at 63:1-6.)  To suddenly have insufficient access to these documents, or be precluded from accessing them in an efficient manner would not only slow down the delivery of services to the University greatly, but it would cost GW additional time and money to accomplish routine administrative tasks.  Ex. 3 (Griffin Decl. ¶ 6); Ex. 4 (Day Decl. ¶ 14).  This would be in addition to the nearly $1.5 million the University paid Richmar, and numerous additional hours by GW developers to make the computer programs more responsive to GW's needs.  Ex. 3 (Griffin Decl. ¶ 6); Ex. 4 (Day Decl. ¶¶ 13-14).

The balance of harm calculus must tip in favor of GW in this instance, as Richmar has been wholly unable to prove that it has been or is likely to be harmed, or even inconvenienced, by GW's use of systems it purchased and developed.

## <u>CONCLUSION</u>

For the above stated reasons, this Court should deny Plaintiff's Motion For Preliminary Injunction.

Dated this 4th of June, 2007

Respectfully submitted,

By:    /s/ James W. Thomas, Jr.

James W. Thomas, Jr. (DC Bar #468670)
Kavita Kumar Puri (pro hac pending)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-6421
Facsimile: (202) 942-5999

*Counsel for The George Washington University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of Defendant George Washington University's

Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction to be transmitted on

June 4, 2007, in the following manner to:


*By ECF to the following counsel registered to receive electronic service*

Geoffrey Paul Gitner
The Law Offices of Geoffrey P. Gitner
600 New Hampshire Avenue, NW
12th Floor
Washington, DC 20037
(202) 572-5926
Email:  ggitner@gitnerlaw.com
Counsel for Plaintiff Richmar & Associates

*By Overnight Delivery*

Leslie J. Polt, Esq.
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202-1612
Counsel for Plaintiff Federal National


By:    /s/ James W. Thomas, Jr.
　　　　　　James W. Thomas, Jr.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ――――――――――――――――― ) |  |  |
| CUS4, INC. d/b/a RICHMAR & ) |  |  |
| ASSOCIATES et al., ) | Civil Action |  |
| ) | No. 07-0841 |  |
| Plaintiffs, ) |  |  |
| ) |  |  |
| v. ) |  |  |
| ) |  |  |
| George Washington University, ) |  |  |
| ) |  |  |
| Defendant. ) |  |  |
| ――――――――――――――――― ) |  |  |

**DECLARATION OF JAMES W. THOMAS JR.**

James W. Thomas, Jr. deposes and states, pursuant to 28 U.S.C. § 1746:

1.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the transcript of the deposition of Richard Gordon, Jr., taken May 31, 2007.

2.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript of the deposition of Phillip J. Gearing, taken June 1, 2007.

3.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Christina L. Griffin, sworn to on June 4, 2007.

4.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Marcella Day, sworn to on June 4, 2007.

5.      Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Richard Gilchrist, sworn to on June 4, 2007.

6.      Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of Ronald Bonig, sworn to on June 4, 2007.

7.      Attached hereto as Exhibit 7 is a true and correct copy of the Declaration of Vijay Padmanabhan, sworn to on June 4, 2007.

8.      Attached hereto as Exhibit 8 is a true and correct copy of the Contract between Richmar & Associates ("Richmar") and George Washington University ("GW"), dated January 4, 2006 (Defendant's Deposition Exhibit 2).

9.      Attached hereto as Exhibit 9 is a true and correct copy of the GW Document and Case Management System (DCMS) Recommendation, dated March 29, 2006 (Defendant's Deposition Exhibit 3).

10.      Attached hereto as Exhibit 10 is a true and correct copy of the Change Request Form, dated April 5, 2006 (Defendant's Deposition Exhibit 4).

11.      Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the transcript of the deposition of Tanya Bell, taken May 23, 2007.

12.      Attached hereto as Exhibit 12 is a true and correct copy of minutes from the DCMS Application Walkthrough, held November 16, 2006 (Defendant's Deposition Exhibit 7).

13.      Attached hereto as Exhibit 13 is a true and correct copy of the DCMS and DCMS Scan Priority List for Fixes, Modifications, and Enhancements.

14.      Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the transcript of the deposition of Vijay Padmanabhan, taken May 31, 2007.

15.      Attached hereto as Exhibit 15 is a true and correct copy of the July 10 Responses from Richmar to the DCMS Code Audit.

16.     Attached hereto as Exhibit 16 is a true and correct copy of the minutes from the Richmar Closeout Meeting, held December 14, 2006 (Defendant's Deposition Exhibit 8).

17.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts from the Final Report of the National Commission on New Technological Uses of Copyrighted Works (July 31, 1978).

18.     Attached hereto as Exhibit 18 is a true and correct copy of Release 2 Issue Detail as of 1/12/07.

19.     Attached hereto as Exhibit 19 is a true and correct copy of E-mail from Tanya Bell to Marcy Day sent December 12, 2006.

20.     Attached hereto as Exhibit 20 is a true and correct copy of the Richmar Price Proposal, dated December 19, 2006 (Defendant's Deposition Exhibit 1).

21.     Attached hereto as Exhibit 21 is a true and correct copy of the Richmar System Design Document, Version 3.0, dated May 14, 2006.

22.     Attached hereto as Exhibit 22 is a true and correct copy of MANTIS Ticket No. 228.

23.     Attached hereto as Exhibit 23 is a true and correct copy of the Copyright Notices for DCMS and DCMS Scan embedded in the code.

24.     Attached hereto as Exhibit 24 is a true and correct copy of Plaintiff Richmar's Answers to Defendant's First Set of Interrogatories No. 3 (Defendant's Deposition Exhibit 9).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Washington, D.C.

/s/ James W. Thomas, Jr.
_____
James W. Thomas, Jr.

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 1

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3   -------------------------------------------------

 4   CUS4, INC. D/B/A         :

 5   RICHMAR & ASSOCIATES,    :

 6   et al.,                  :

 7             Plaintiffs:

 8   v.                       :    No.1:CV-07-0841 (JR)

 9   GEORGE WASHINGTON        :

10   UNIVERSITY,              :

11             Defendant.  :

12   -------------------------------------------------

13                     CONFIDENTIAL

14          Deposition of RICHARD GORDON, JR., a

15   witness herein, taken by Defendant, at the offices of

16   Arnold & Porter, 555 Twelfth Street, Northwest,

17   Washington, D.C., at 8:47 a.m., Thursday, May 31,

18   2007, and the proceedings being taken down by

19   Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and

20   transcribed under her direction.

21

22
```

Richard Gordon, Jr.                    CONFIDENTIAL                    May 31, 2007
                                       Washington, DC

Page 26

1   production delivering to plaintiff today.
2   Mr. Gordon, I'm going to ask you to look at what has
3   been marked as Defendant Exhibit 1, and tell me if
4   you recognize this document?
5       A   It appears to be our proposal to GW.
6       Q   This is a document that had been prepared
7   by Richmar & Associates?
8       A   That's correct.
9       Q   Is this a document that had been prepared
10  in the ordinary course of business of Richmar &
11  Associates?
12      A   That's correct.
13      Q   What's the purpose of this document?
14      A   It's a technical proposal. It is
15  providing a ROM, which is a rough order of magnitude,
16  of what it would take to develop the system GW was
17  asking for, based on our limited knowledge.
18      Q   What was your understanding of the system
19  that GW was asking for?
20      A   They wanted Documentum out of the box.
21  Stood up.
22      Q   And in layperson's terms, that means they

Page 27

1   wanted Documentum implemented?
2       A   Correct. But again, no customization,
3   just Documentum turned on, made available for use.
4       Q   And this is a pricing proposal to make
5   that happen?
6       A   That's correct.
7       Q   So was it contemplated by GW and Richmar
8   at that time that Richmar would be preparing source
9   code in order to make that happen?
10      A   No.
11      Q   Would you look to what's been marked as
12  GW4083, the bottom right hand corner.
13      A   Okay, I have it.
14      Q   It's appendix A, it's a statement of work
15  for records management system upgrades and
16  enhancements, do you see that?
17      A   Yes.
18      Q   Now, is this a document prepared by
19  Richmar & Associates?
20      A   That's correct.
21      Q   And this is a statement of work to stand
22  up the Documentum system?

Page 28

1       A   This is a statement of work that would
2   allow us to do whatever GW wants us to do, including
3   standing up the Documentum application.
4           (Defendant's Exhibit Number 2 was marked
5   for identification.)
6   BY MR. THOMAS:
7       Q   Mr. Gordon, I'm handing you what's been
8   marked as Defendant Exhibit 2, a document that's
9   labeled PPI260 to 268. Take a moment to review this
10  document and tell me if you recognize it.
11      A   I do recognize this document, yes.
12      Q   What is this document?
13      A   This is the contract and a statement of
14  work, the same statement of work that is attached to
15  the technical and cost proposal.
16      Q   From December 19th, the date of the
17  pricing proposal, to January 6th, which is
18  the -- strike that, to January 4th, which is the date
19  that the contract was signed by -- strike that.
20          If you could turn to page PPI263, which is
21  page 3 of 3 of the contract. Is that your signature?
22      A   Yes, it is.

Page 29

1       Q   And you signed this document December
2   22nd, 2005?
3       A   Yes.
4       Q   And was this contract, this contract was
5   drafted by Richmar; is that correct?
6       A   That's correct.
7       Q   And you signed on December 22nd, 2005 and
8   delivered it to GW for their review and signature?
9       A   Yes.
10      Q   Did anything about the scope of the
11  project for GW, in your understanding, change between
12  December the 19th, when you offered the price
13  proposal, and December the 22nd, when you signed the
14  contract?
15      A   I don't know if that -- I don't know if I
16  could answer that, GW would have to. We had numerous
17  discussions, but in terms of formalizing, no, we had
18  no requirements at the time, so I don't know what GW
19  was thinking.
20      Q   But your thinking at the time was that you
21  would, pursuant to this contract, be standing up
22  Documentum, correct?

8 (Pages 26 to 29)

Richard Gordon, Jr.

CONFIDENTIAL
Washington, DC

May 31, 2007

Page 30

1     A   Correct.
2     Q   Did you have any discussions between
3  December 22nd, 2005 and January 4th, 2006 concerning
4  intellectual property rights?
5     A   Not that I recall.
6     Q   And that's because at that time, you had
7  no understanding that Richmar would be creating any
8  product that would be subject to intellectual
9  property rights, correct?
10    A   No.
11       MR. GITNER: Object to form.
12       THE WITNESS: The contract was clear on
13  its face. I'm sorry.
14       MR. GITNER: That's okay.
15  BY MR. THOMAS:
16    Q   When you say the contract was clear on its
17  face concerning intellectual property rights, what
18  are you referring to?
19    A   There's no transfer of intellectual
20  property rights, or any other rights in the contract.
21    Q   And you had discussions with George
22  Washington University or representatives at George

Page 31

1  Washington University that you would be creating
2  copyrightable, trademarkable, or patentable work
3  under this contract, and that all those rights would
4  belong to Richmar and not GW; is that correct?
5       MR. GITNER: Objection to form. The
6  question is also cumulative.
7       THE WITNESS: Could you ask me one
8  question at a time?
9  BY MR. THOMAS:
10    Q   The question is, what discussions did you
11  have with GW to make clear that under this contract,
12  as you understood it, Richmar would be preparing
13  intellectual property to which it would have the sole
14  and exclusive rights?
15       MR. GITNER: Objection, you're referring
16  to as of January 4th or ever after?
17       MR. THOMAS: As of the date of the
18  contract.
19       MR. GITNER: Okay.
20       THE WITNESS: None.
21       (Defendant's Exhibit Number 3 was marked
22  for identification.)

Page 32

1  BY MR. THOMAS:
2     Q   Mr. Gordon, I've handed you what's been
3  marked as Defendant Exhibit 3, review that, it's a
4  document Bates labeled PP1207 through 214. Review
5  that document and tell me if you recognize it.
6     A   Yes, I do.
7     Q   And what is this document?
8     A   This is a recommendation for a custom
9  wrapper for Documentum similar to what was being done
10  at the EPA.
11    Q   And this document is dated March 29, 2006?
12    A   Correct.
13    Q   Who is this document prepared by?
14    A   By myself and Natraj -- let me try to get
15  his name right -- Thudutaphy, who was one of my
16  engineers. N-A-T-R-A-J is the first name,
17  T-H-U-D-U-T-A-P-H-Y, I believe, is the last name.
18    Q   When you say one of your engineers, this
19  was an individual employed by Richmar?
20    A   Natraj works for Quest America.
21    Q   And he assisted you in preparing this
22  document?

Page 33

1     A   That's correct.
2     Q   And in what way did he assist you in
3  preparing this document?
4     A   In laying out the screen shots, and as we
5  discussed about what could be done with respect to
6  custom development in terms of changing the interface
7  to make it more user friendly, simple, easier to use
8  for GW.
9     Q   Did you present this document in a meeting
10  with individuals from GW?
11    A   Yes, I did.
12    Q   Do you recall who was at that meeting?
13    A   Rick Gilchrist, Marcy Day, and I believe
14  Jennifer I think is the person's name, who actually
15  left GW. I'm not sure when she left. I'm not sure
16  she was there, but I know Rick and Marcy were both in
17  this meeting.
18    Q   When you say a custom wrapper around
19  Documentum, what is a custom wrapper?
20    A   It basically replaces the Documentum
21  screens or interface with a custom developed screen
22  where the Documentum application is hidden.

9 (Pages 30 to 33)



Page 38

1    A  As far as I know.  I'm not a technical
2  person, but as far as I know, they are.
3    Q  You also mentioned ERP, what is an ERP?
4    A  Enterprise resource planning.  Banner is
5  an ERP system.
6    Q  And that's just a system that's used
7  across an organization?
8    A  As far as I understand it, yes.
9    Q  And Defendant Exhibit 4 is a document you
10  said that you prepared dated April 5, 2006, is that
11  right?
12    A  That's correct.
13    Q  And it's a change request form, which is a
14  request by Richmar to change, for lack of a better
15  word, the scope of the project?
16    A  No.
17    Q  No.
18    A  It's a request by GW to Richmar.  It's an
19  odd process, but GW often asked us to write the
20  change request forms, even though the requests were
21  being made by them.
22    Q  Okay.

Page 39

1    A  I didn't quite understand that part of the
2  process.
3    Q  Okay.  So this was a request by GW for
4  Richmar to prepare for GW a custom wrapper around
5  Documentum?
6    A  That's correct.
7    Q  And GW was compensating Richmar to do
8  that?
9    A  To do?
10    Q  To prepare a custom wrapper around
11  Documentum?
12    A  That was the plan, yes.
13    Q  And did, in fact, GW compensate Richmar
14  for preparing a wrapper around Documentum?
15    A  We were paid for the development, yes.
16  Just for the record, Documentum's AD Plus products.
17    Q  Did Richmar develop a service oriented
18  architecture for GW?
19    A  That's my understanding, yes.
20    Q  And what's that understanding based on?
21    A  Based on my technical team accomplishing
22  the work that we were asked to do.

Page 40

1    Q  What is open source solutions that's
2  referenced at the bottom of page 1, top of page 2?
3    A  Open sources code is not owned by anyone.
4    Q  So that's code anyone can use, right?
5    A  Correct.
6    Q  Is open source code used in preparing the
7  DCMS product?
8    A  I'm assuming -- I'm not a developer, but
9  I'm assuming there was.  It makes it repeatable,
10  reusable.  There's a description in this document
11  about open source on page 2.
12    Q  And it says the reasons for using open
13  source code is that it eliminates licensing fees as
14  impediments; is that correct?
15    A  Correct.
16    Q  And avoids vendor lock in and is typically
17  vendor neutral?
18    A  Correct.
19    Q  It also says that open source "has the
20  advantage that if a given commercial vendor does not
21  have a feature that is required by GW, it can be
22  integrated and potentially offered back to the OSS

Page 41

1  community at no additional costs"?
2    A  Correct.  And Documentum didn't have many
3  of the features GW wanted.
4    Q  What discussions did you have with
5  representatives from GW -- strike that.
6        Look at page 3 of 4 of this document,
7  there's several signatures there.  Is one of these
8  signatures yours?
9    A  Yes, it is.
10    Q  Would that be the third in the --
11    A  Yes, sir, it is.
12    Q  Would you turn to page 4 of 4, that's the
13  estimated cost to implement this change request?
14    A  Yes, it is.
15    Q  And that cost is $154,500?
16    A  That's correct.
17    Q  What discussions did you have with
18  representatives from GW at or about April 5th, 2006
19  concerning intellectual property rights and the
20  custom wrapper that replaced the Documentum web top?
21    A  None, other than we previously deployed
22  similar solutions before for other clients.  It was

11 (Pages 38 to 41)

Richard Gordon, Jr.                    CONFIDENTIAL                    May 31, 2007
                                       Washington, DC

Page 42

1  based upon the existing system we had at FAA.
2      Q   Was there any discussion about how this
3  change request factored into the contract dated in
4  early January?
5      MR. GITNER:  I'm sorry, could you ask it
6  again, or could I hear it again?
7      THE REPORTER:  "Question:  Was there any
8  discussion about how this change request factored
9  into the contract dated in early January?"
10     THE WITNESS:  No.
11     (Defendant's Exhibit Number 5 was marked
12  for identification.)
13 BY MR. THOMAS:
14     Q   Mr. Gordon, I've had the court reporter
15  mark as Defendant Exhibit 5, a certificate of
16  registration from the United States Copyright Office
17  that was attached to the complaint in this matter.
18  Take a moment to review that, and let me know if
19  you've seen this document before?
20     A   Yes, I have.
21     Q   When did you see this document?
22     A   As soon as it was produced by the

Page 43

1  Copyright Office, I believe I got a copy sent from my
2  attorney.
3      Q   And did you review the document prior to
4  it being filed with the United States Copyright
5  Office?
6      A   That's correct.  I wrote the description
7  of the system for the purposes of the copyright.
8      Q   When you say you wrote the description of
9  the system, where would that be in this document?
10     A   It's not in this document.
11     Q   That's a separate document that was
12  attached to the certificate of registration?
13     A   I sent that to my attorney for the
14  purposes of filing the copyright.
15     Q   What was the description -- let's take a
16  step back.
17     The title of the work is a document and
18  case management system, is that correct?
19     A   That's correct.
20     Q   Also DCMS.
21     A   That's correct.
22     Q   What is your understanding of what

Page 44

1  comprises DCMS?
2      A   There are a number of core components.
3  There's the scanning component, which is a custom
4  solution or wrapper built around the eInput
5  application.  There's the document management or
6  repository component, which is a custom application
7  built around Documentum repository and document
8  management services, and there's a custom application
9  that is built around banner.  Banner, I guess, which
10  is the ERP system for GW.  So there are three
11  components, two of which we have the copyright for.
12     Q   And which two of those three components is
13  Richmar asserting a copyright of?
14     A   The scanning component and the document
15  management component.
16     Q   So is the custom application wrapped
17  around banner a part of the DCMS?
18     A   It is integrated, yes.
19     Q   And who created the custom application
20  wrapped around banner?
21     A   My understanding is GW IMAG.  I don't know
22  what IMAG stands for.

Page 45

1      Q   If you look at page 2 of this document,
2  there's in the right column, a large number 6, titled
3  derivative work or compilation.  Do you see that?
4      A   Yes.
5      Q   There's no reference to custom application
6  wrapped around banner there, is it?
7      A   No.
8      Q   But you're not asserting a copyright claim
9  over the custom application wrapped around banner
10  prepared by GW?
11     A   No.
12     Q   So if you look at number 6 still, it says,
13  certain code from preexisting computer programs,
14  grievance electronic trading system and memorandum of
15  agreement system are incorporated.  What is the
16  grievance electronic trading system?
17     A   Should be tracking.  That's the system we
18  developed for the Federal Aviation Administration and
19  we're still enhancing.
20     Q   And that would be code written by Quest
21  America?
22     A   Yes.

12 (Pages 42 to 45)

Richard Gordon, Jr.                    CONFIDENTIAL                    May 31, 2007
                                       Washington, DC

Page 46

1    Q   All right.  Do you know if Quest America
2  has filed a copyright registration respecting that
3  code?
4    A   They have not, and I have an unrestricted
5  use or license to the code.
6    Q   And that's in the contract with the FAA?
7    A   And with Quest America, yes.
8    Q   But the memorandum of agreement system,
9  what is that?
10   A   It's the same, it's a part of, it's a part
11 of the whole system, it's part of DCMS for FAA.
12 There are several components that we're developing,
13 the grievance component, the memorandum of agreement
14 component.  There's a directives component that has
15 yet to be implemented.  There are various components
16 to this system.
17   Q   And there are components to that system
18 that -- let me step back.  Richmar doesn't own a
19 copyright to the code resident in the grievance
20 electronic trading system; is that correct?
21   A   No one does.
22   Q   No one does.  And the same is true in the

Page 47

1  code of the memorandum of agreement system?
2    A   Correct.
3    Q   Okay.  Which code from these two systems
4  is in the DCMS code?
5    MR. GITNER:  Objection to form.  Do you
6  understand the question?
7    THE WITNESS:  I do.  That I don't know,
8  but I know what functions are there.  For example,
9  the export to Excel, there's a function that was
10 derived from my intellectual property when we
11 developed the grievance system.  The sort rows and
12 columns on the search result screen also comes from
13 that system.
14   The use of attributes and text in the
15 terms of a combination type search, whether the code
16 is there, I don't know.  The functions are there.
17 The code may have been reviewed to distill how to
18 develop the functions.  I don't know, I'm not a
19 developer.  But there are many functions that are
20 there that come from this system.
21 BY MR. THOMAS:
22   Q   And you've named a couple of those

Page 48

1  functions.  What other functions come from this
2  grievance electronic trading system or memorandum of
3  agreement system that you're aware of that are in the
4  DCMS?
5    A   The pop-up window which allows you to move
6  attributes from one side to the other, so you can
7  reorder the search result screen for the purposes of
8  reporting.  Those are all I can think of.  There may
9  be more, but those are all the ones I can think of at
10 the moment.
11   Q   Is there a document that you have in your
12 possession that you could reference that would
13 contain a list of other functionalities from these
14 two systems listed in item 6 that are incorporated in
15 the DCMS?
16   A   There's a user guide which we developed
17 for the systems that would have those functions that
18 are similar, yes.
19   Q   What are the additional functions in DCMS
20 that are not resident in the grievance electronic
21 trading system and memorandum of agreement system?
22   A   I can speak with certainty that none of

Page 49

1  the scanning functions are in the grievance or
2  memorandum of agreement system.
3    Q   When you say none of the scanning
4  function, that's none of the functions related to the
5  eInput software?
6    A   Related to the code we developed around
7  eInput.  Again, eInput, like Documentum, is hidden
8  from the user.
9    Q   Okay.  You're not aware, sitting here
10 today, of any additional functions that are not in
11 the grievance electronic trading system and
12 memorandum of agreement system that are in the web
13 wrapper around Documentum?
14   A   Well, the screen presentations are
15 different.  There is a function that is contained --
16 yes, that is the add/retrieve function in DCMS where
17 the user is able to put in either a Social Security
18 number or a PIDM for an employee, and then retrieve
19 their records.  And that's located at the top of the
20 screen.  That is completely different.
21   The presentation, again, is different.
22 For example, on the search result screen, when you

13 (Pages 46 to 49)

Page 50

1   get employee information and job titles, it shows
2   previous jobs held by the individual employee, and
3   some other functions that made the coding difficult
4   in order to make it sort. So there are some things
5   that are distinctly different, yes.
6        Q   So the differences are then the
7   presentation of the results of a search, I understood
8   you to be saying?
9        A   Presentation is different, yes.
10       Q   The screen presentation of the search
11  screen, is that what I understand you to describe?
12       A   Right. Functions are functions. For
13  example, to be able to sort by columns is to be able
14  to sort by columns. Then how it is presented is
15  going to be different, depending upon the
16  application.
17       Q   And are you claiming a copyright in the
18  function to sort by columns?
19       A   We're claiming whatever is in the
20  copyright application as contained in Exhibit 5.
21       Q   Does the grievance electronic trading
22  system or memorandum of agreement system sort results

Page 51

1   by columns?
2        A   Yes.
3        Q   And in the search result screen of the
4   grievance electronic trading system or the memorandum
5   of agreement system, are the -- strike that.
6            How are the results of searches in the
7   grievance electronic trading system and memorandum of
8   agreements system presented?
9        A   In column format.
10       Q   And are the results in the DCMS presented
11  in column format?
12       A   That's correct.
13       Q   Ask you to turn to the first page of
14  Defendant Exhibit 5, certificate of registration.
15  Item 2A is the name of the authors identified as
16  Impact Innovation Systems Incorporated?
17       A   That's correct.
18       Q   What is Impact Innovation Systems,
19  Incorporated?
20       A   They were our subcontractors on the GW
21  project.
22       Q   When was Impact Innovation Systems

Page 52

1   Incorporated subcontracted to Richmar?
2        A   I don't recall the exact date, but it was
3   after the contract was signed.
4        Q   And why did Richmar subcontract Impact
5   Innovation Systems?
6        A   Because the scope of the project grew
7   considerably with this change, and we needed
8   additional resources.
9        Q   Because Richmar lacked the expertise to
10  complete this change?
11       A   No.
12           MR. GITNER: Objection to form.
13           THE WITNESS: No, we needed additional
14  resources. The scope changed.
15  BY MR. THOMAS:
16       Q   Is there a written agreement between
17  Richmar & Associates and Impact Innovation Systems?
18       A   Yes.
19       Q   Was that agreement prepared by Richmar or
20  Impact?
21       A   By Richmar.
22       Q   And does that agreement provide that any

Page 53

1   work created by Impact be owned by Richmar?
2        A   We have several agreements and the answer
3   is yes.
4        Q   Is there a written agreement between
5   Richmar and Impact providing that an assignment of
6   Impact's intellectual property rights in the DCMS to
7   Richmar?
8        A   There is an agreement that does that, yes.
9        Q   A written agreement?
10       A   Yes.
11       Q   What's the date of that agreement?
12       A   I don't recall the date.
13       Q   What's your best estimate of the date of
14  that agreement?
15       A   It was before the copyright was applied
16  for.
17       Q   So the agreement would have been in 2007?
18       A   It could have been 2007, yes.
19       Q   Was the agreement signed in anticipation
20  of Richmar filing this certificate of registration
21  for copyright?
22       A   Yes.

14 (Pages 50 to 53)



Page 58

1   absolute. Java versus C++ versus C. Java and HTML,
2   I guess, would be the correct way to describe it.
3      Q   Ever heard of a language called dot net?
4      A   Yes. Okay, I'm mistaken. The scanning
5   function is written in dot net. That was one of the
6   complications of the system. So I stand corrected.
7      Q   Dot net is a different computer language
8   than Java?
9      A   That's correct.
10     Q   How does the scan -- the scan function
11   doesn't connect directly to the document function in
12   DCMS, does it?
13     A   I believe it does.
14     Q   How so?
15     A   Once the document's scanned in, you
16   select -- first, you can select the attributes that
17   are resident in the document management function, you
18   scan the document and then it automatically populates
19   the document management side with those attributes
20   and the document.
21     Q   When you say it populates the document
22   management side, that's in the Documentum product?

Page 59

1      A   Correct. Also eInput is a Documentum
2   product from my understanding, I'm not a developer.
3      Q   Right. EInput is a product that allows
4   you to scan documents into Documentum?
5      A   Correct. As far as I understand it.
6      Q   And so what -- and the scan function of
7   the DCMS product is a configuration of the eInput?
8      A   No. It's actually -- it's code. So it's
9   not just configuration. The problem with eInput, my
10   understanding is that eInput is a very immature
11   product. It's version 1.0, so you're not using the
12   raw eInput product. You're using an interface
13   developed by Richmar and Impact Innovations to call
14   the functions of eInput.
15     Q   What do you mean to call the functions of
16   the eInput?
17     A   It's a wrapper around eInput.
18     Q   So you've -- you're asserting that
19   copyright in a wrapper created around eInput?
20     A   That's correct.
21     Q   And the source code for that wrapper?
22     A   That's correct.

Page 60

1      Q   If you could just describe for me again
2   how the document search function of DCMS, I mean, the
3   copyright -- the portion of that function that you're
4   asserting a copyright in interfaces with the portion
5   of the DCMS scan function that you're asserting a
6   copyright in?
7      A   The document search function?
8      Q   The document, the Documentum wrapper.
9      A   I can only speak from the standpoint of
10   user.
11        MR. GITNER: Hold on, objection to form.
12   Could you ask that one more time? It's unclear, the
13   question is, because of the second question.
14   BY MR. THOMAS:
15     Q   The question is, as I understand it,
16   you're asserting a copyright in at least some portion
17   of a wrapper around Documentum?
18     A   Yes.
19     Q   You were also asserting a copyright and a
20   wrapper around eInput?
21     A   Yes.
22     Q   My question is, how did those two wrappers

Page 61

1   interact at all except through the Documentum
2   product?
3      A   I can't speak to the technical aspects of
4   it. I can only speak to the functional aspects, so I
5   can tell you about from a layman's perspective how it
6   works. In terms of the code, I can't answer that
7   question.
8      Q   Tell me if I'm correct in how it works.
9      A   Okay.
10     Q   A user would use the DCMS scan eInput
11   function to scan and place a document into the
12   Documentum repository?
13     A   They would use the DCMS scan or the
14   wrapper we developed, correct, to scan.
15     Q   To access eInput?
16     A   Right.
17     Q   To scan a document into the Documentum
18   repository?
19     A   I believe that's correct.
20     Q   A user then would use the DCMS document
21   wrapper to access documents or search for documents
22   that have been scanned into the Documentum

16 (Pages 58 to 61)



Richard Gordon, Jr.                    CONFIDENTIAL                    May 31, 2007
                                      Washington, DC

**Page 66**

1  search?
2      A  Yes.
3      Q  What is your understanding of what a
4  document only search is?
5      A  A search that would retrieve documents
6  without employee names associated with it.  The way
7  the search function was to work was you could search
8  on an employee, and retrieve that employee and all of
9  their associated documents.  You could search on an
10  employee and a document and retrieve that single
11  document.  You could search on a document and
12  retrieve that type of document.
13      Q  Were each of those search functions
14  included in the version of DCMS that went live on
15  December the 18th, 2006?
16      A  Yes.
17      Q  Let me ask you to refer back to Exhibit
18  Number 5, Defendant Number 5.  This is a copyright
19  registration.
20      A  Okay.
21      Q  If you look under 3B, as for the date and
22  nation of first publication of this particular work,

**Page 68**

1  you familiar with a concept of known errors, do you
2  know what a known error is?
3      A  Yes.
4      Q  What is that?
5      A  Things that we know that are wrong.
6      Q  Okay.
7      MR. GITNER:  Are you asking this as a
8  legal concept, what are you asking him here?  Does he
9  understand those words?  Obviously, it identified a
10  concept.
11      MR. THOMAS:  He's answered the question.
12      MR. GITNER:  Objection to the form of the
13  question.  Move to strike.
14  BY MR. THOMAS:
15      Q  Known errors are errors that are known to
16  be in the software, the software is not -- bugs,
17  items that aren't working correctly in a software, is
18  that fair?
19      A  When the parties agree, yes.  There could
20  be a disagreement as to what is or what is not an
21  error.
22      Q  But in your business there's an -- known

**Page 67**

1  and the date there is December 18th, 2006, do you see
2  that?
3      A  Yes.
4      Q  What was the first publication of the DCMS
5  computer program?
6      A  December 18th, 2006.
7      Q  Okay, but what was that -- how was it
8  published?
9      A  It was placed in production.
10      Q  And that was placed in production at GW?
11      A  At GW, correct.
12      Q  Was it placed into production anywhere
13  else?
14      A  Not that I'm aware of.
15      Q  Has it been placed into production
16  anywhere else other than GW?
17      A  No, it has not.
18      Q  And what do you mean by placed into
19  production, just so the record is clear?
20      A  It was used -- being used for whatever it
21  was designed for.
22      Q  As of December the 18th, 2006 -- well, are

**Page 69**

1  error is a concept that is not unfamiliar to you?
2      A  That is correct.
3      Q  Were there known errors in the DCMS code
4  as of December the 18th, 2006?
5      A  I don't know the answer to that.  Not that
6  I recall.  We had a priority list of known errors
7  that we were to fix by that date.  My understanding
8  is they were all fixed.
9      Q  You're saying there was a priority list of
10  known errors, are you familiar with the Mantis
11  system?
12      A  Yes.
13      Q  What is the Mantis system?
14      A  It's a system used by GW to track bugs,
15  fixes, enhancements, pretty much anything that they
16  want to do with the system.
17      Q  And was Mantis utilized as part of the
18  DCMS project?
19      A  It was by GW, yes.
20      Q  And was it utilized by Richmar?
21      A  We were given access, and we did use it.
22      Q  Was it a way for Richmar to know what bugs

18 (Pages 66 to 69)

CONFIDENTIAL
Washington, DC

Page 70

1  or problems there were in the DCMS product?
2      A  It was a means of GW to inform us of what
3  they believed to be bugs and problems, yes.
4      Q  And so when items were entered into the
5  Mantis system, that information would be communicated
6  to Richmar?
7      A  Often it was, yes.
8          (Defendant's Exhibit Number 6 was marked
9  for identification.)
10 BY MR. THOMAS:
11     Q  Mr. Gordon, before I ask you about
12 Defendant's Exhibit 6, we were speaking earlier about
13 computer languages, the dot net and Java languages?
14     A  Yes.
15     Q  Are you familiar with DFC?
16     A  DFC. That doesn't sound familiar to me,
17 no.
18     Q  How about struts?
19     A  Yes.
20     Q  What is struts?
21     A  My understanding is struts is a type of
22 technology or a method, I'm not really certain.

Page 71

1      Q  Do you know if struts is an open source
2  software?
3      A  I don't know that.
4      Q  Do you know if struts was used in the DCMS
5  product?
6      A  That's correct, yes.
7      Q  One of the functions of the DCMS is that
8  it logs certain events; is that correct?
9      A  That's my understanding.
10     Q  Are you asserting a copyright over the
11 source code to log events in DCMS?
12     A  Whatever is contained in the copyright
13 application.
14     Q  Heard of a software called log4J?
15     A  I am not familiar with it.
16     Q  Turn to Defendant's Exhibit 6. Tell me if
17 you've seen this document before.
18     A  I'm sure I have.
19         MR. GITNER: Have you had a chance to take
20 a look at it?
21         THE WITNESS: I have, yes.
22         MR. GITNER: All right.

Page 72

1  BY MR. THOMAS:
2      Q  And just for the record, it is marked
3  GW188 through 189. Mr. Gordon, what do you
4  understand this document to be?
5      A  A record of meeting minutes.
6      Q  And were minutes typically prepared for
7  various committee meetings as part of the DCMS
8  product?
9      A  Yes.
10     Q  Project, excuse me.
11     A  Yes.
12     Q  And these are minutes for the steering
13 committee meeting; is that correct?
14     A  Yes.
15     Q  What's the steering committee?
16     A  It was comprised of both the Richmar and
17 GW development teams, and also the human resource
18 representative, which would be Tanya Bell, and the
19 CIO, deputy CIO. And at some point, the vice
20 president for human resources was added.
21     Q  And listed among the attendees are
22 yourself and Jim Gearing. There's also an individual

Page 73

1  there listed as Chris McDermott. Who's Chris
2  McDermott?
3      A  Chris McDermott was a project manager for
4  Richmar on site at GW.
5      Q  So that's another Richmar employee. What
6  was Chris McDermott's background?
7      A  She's a PMP, PMI certified project
8  manager.
9      Q  And what is PMP or PMI?
10     A  Project management professional, some
11 certification that's granted, she got it from GW, one
12 of their programs. But it means that she is
13 certified to manage projects.
14     Q  So if you look at the meeting notes, would
15 you have reviewed the meeting notes?
16     A  Quite possibly, yes. Not all of them, but
17 most, I did.
18     Q  And this is for a meeting dated September
19 11th, 2006?
20     A  Yes.
21     Q  Do you recall attending this meeting?
22     A  Yes, I'm sure I did. My name is there as

19 (Pages 70 to 73)

Page 74

1   an attendee.
2       Q   And it mentions in this document that all
3   Mantis tickets have been prioritized as follows,
4   immediate needed for UAT, urgent need for go live,
5   high post go live.
6       A   Correct.
7       Q   What does immediate needed for UAT mean?
8       A   It means it has to be fixed before UAT can
9   be held, before it can continue.
10      Q   And what is UAT?
11      A   User acceptance testing, so the problem
12  has to be fixed in order for testing to be completed.
13      Q   And what is user acceptance testing?
14      A   That's when users come in and exercise the
15  functions of the software to make sure it works the
16  way it's supposed to work.
17      Q   And as part of the user acceptance
18  testing, there may be circumstances where bugs are
19  identified or particular functionality is not working
20  the way a user may prefer; is that correct?
21      A   That's correct.
22      Q   And there may be a process after that in

Page 75

1   which those bugs were fixed or other items would be
2   changed?
3       A   That's correct.
4       Q   And so Mantis tickets were prioritized for
5   items that would need to be fixed before that user
6   acceptance testing could take place?
7       A   That's correct.  But these were not
8   prioritized in Mantis, there was a separate document
9   associated with these.
10      Q   Right.  But you took the items that were
11  in Mantis?
12      A   Correct.
13      Q   Those were numbered ticket items in
14  Mantis?
15      A   Correct.
16      Q   And those would have been prioritized?
17      A   Right.  We categorized them into three
18  categories, one was UAT, the other was PRO for
19  production, the third was PPI for planned product
20  improvement.
21      Q   Okay.  And the planned product
22  improvement, what does that mean?

Page 76

1       A   Future things, things that are nice to
2   have, things GW would like to have, but if there's
3   not enough funding to develop them, they simply
4   wouldn't be developed.
5       Q   But there was -- but GW wanted those
6   items, the PPI items, GW wanted and expected if it
7   had funding to be included in the DCMS at a later
8   date?
9       A   That's correct.
10      Q   If you look a little further down these
11  notes, there's application/development challenges, do
12  you see that?
13      A   Yes.
14      Q   And the first bullet there is document
15  only search?
16      A   Yes.
17      Q   And there's two sub-bullets there, there's
18  a short term solution and long term solution?
19      A   Right.
20      Q   Do you see that?
21      A   Yes.
22      Q   And the -- what was the short term

Page 77

1   solution?
2       A   I have to explain a little bit of
3   information before I can tell you what that is, so
4   you'll understand it.  The document only search
5   worked and it returned more documents than IMAG, I
6   guess -- which is GW's development arm -- wanted to
7   produce for a user.
8           So for example, if you search for I-9s,
9   you get every I-9 in the system.  IMAG wanted a cap
10  of, I believe, 2,000 documents, max, which meant that
11  you would never see any results.  So we were trying
12  to get the cap raised to at least 6,000.  So in some
13  cases we could give instructions to the user to say,
14  if you put in various attributes, you reduced the
15  number of documents returned, so you will get
16  results.
17      Q   Okay.  And so when you say that the
18  document only search worked in the December 18th,
19  2006 version of DCMS, that's what's listed here as
20  the short term solution; is that correct?
21      A   No, the cap was never listed, it still
22  returns all documents, so it works as designed, as

20 (Pages 74 to 77)

Richard Gordon, Jr.                          CONFIDENTIAL                          May 31, 2007
                                             Washington, DC

Page 78

1  specified in the requirements document.
2      Q   So it's your testimony that it works as
3  designed?
4      A   That's correct.
5      Q   Right.  And it was designed pursuant to
6  GW's requirements?
7      A   That's correct.
8      Q   There was discussion of a long term
9  solution at that meeting, correct?
10     A   That's correct.
11     Q   And the long term solution was an
12 expectation that a document only search would be
13 changed to work in a different manner; is that
14 correct?
15     A   That's correct, yes.
16     Q   So is the expectation that subsequent to
17 the first release of the DCMS, that the document only
18 search would be changed?
19     A   Yes.
20     Q   Were there any other functionalities that
21 were not included in the DCMS computer program as of
22 December the 18th, 2006, where it was expected that

Page 79

1  they would be a fixture enhanced in future releases?
2          MR. GITNER:  Objection to form.
3          THE WITNESS:  The only other thing I can
4  think of is there was a late breaking request from
5  Tanya Bell concerning a -- and I don't know exactly
6  how to describe this, so I may get it wrong, but
7  scanning multiple documents at one time versus a
8  single document.
9  BY MR. THOMAS:
10     Q   When you say that was a late breaking
11 request, did Richmar attempt to include -- and that
12 would be a function -- strike that.
13         What you're describing would be a function
14 of the DCMS scan eInput product?
15     A   Yes.
16     Q   Did Richmar attempt to include an option
17 for bulk scanning in DCMS scan eInput as of December
18 18th, 2006?
19     A   No.
20     Q   Bulk scanning would increase the
21 efficiency of a department, is that fair to say?
22     A   Oh, of course, of course, yes.

Page 80

1          MR. GITNER:  Objection to form.
2  BY MR. THOMAS:
3      Q   Because the alternative is to scan
4  documents one by one?
5      A   Yes.
6      Q   The contract between Richmar and GW
7  terminated in early January, except for some portion
8  of the back scanning project; is that correct?
9      A   No, the contract did terminate in early
10 January, but it was extended subsequent to that
11 termination.
12     Q   And it was extended with respect to the
13 back scan project?
14     A   That was my understanding.
15     Q   We were discussing just a moment ago that
16 Mantis tickets were prioritized.  Was it your
17 understanding subsequent to December 18th, 2006 that
18 tickets that were not prioritized to be included in
19 the first release on December 18th, 2006 would be
20 included in a subsequent release of DCMS?
21     A   I don't know the answer to that question.
22     Q   So you don't know whether there was an

Page 81

1  intention to include planned product, the PPI, the
2  planned product enhancements?
3      A   Planned product improvements.
4      Q   You don't have an understanding whether
5  planned product improvements would be included in the
6  DCMS?
7      A   Oh, well, yes, I do.  But we didn't work
8  on any of the Mantis tickets or anything else after
9  December 18th.  But there was always a plan to
10 include those things, yes.
11         (Defendant's Exhibit Number 7 was marked
12 for identification.)
13 BY MR. THOMAS:
14     Q   Mr. Gordon, I'm handing you a document
15 that's been marked by the court reporter as Defense
16 Exhibit 7.  It's Bates labeled GW83 to 84, titled
17 DCMS application walk through dated November 16th,
18 2006.  Let me know when you've had a chance to review
19 the document.
20     A   Yes.
21     Q   Do you recognize this document?
22     A   It looks familiar.

21 (Pages 78 to 81)

Richard Gordon, Jr.                    CONFIDENTIAL                                May 31, 2007
                                        Washington, DC

---

Page 90

1  system. And that would create inefficiencies for us,
2  to train them while we were trying to develop the
3  system.
4      Q  Have you heard of a concept called
5  knowledge transfer?
6      A  I've heard of it, yes. Knowledge transfer
7  is training.
8      Q  Is there any knowledge transfers as part
9  of this contract between GW and Richmar?
10     A  Is there? Or was there?
11     Q  Was there.
12     A  I'm not sure. I know that we were
13 originally supposed to sit down with them and go
14 through and let them know what -- I guess some, find
15 out information about the code. But as far as I
16 know, that was the extent of it.
17         MR. GITNER: Could we take a break, James?
18         MR. THOMAS: Sure.
19         (Recess.)
20 BY MR. THOMAS:
21     Q  You said that you -- previously that you
22 had discussed a new contract with Mr. Bonig?

---

Page 91

1      A  I didn't discuss a new contract, no, we
2  discussed putting a new contract in place.
3      Q  And was that contract for on site DCMS
4  developer resources?
5      A  It could have included that, yes. The
6  plan was to place resources on site.
7      Q  And for how long?
8      A  We didn't talk about a period of time.
9  But I knew it was a very important issue for him.
10     Q  You were instructed in early or
11 mid-December to discontinue work on the DCMS and
12 eInput documentation and programs, correct?
13     A  Yes.
14     Q  Did you tell GW at that time that it would
15 be infringing Richmar copyrights to the DCMS program
16 if GW made modifications to the DCMS system?
17     A  No. As a matter of fact, GW was planning
18 on maintaining the system on their own, but we
19 relinquished that. We talked about actually putting
20 people on site for the maintenance which would have
21 been bugs, fixes, et cetera.
22     Q  But GW decided to do that itself?

---

Page 92

1      A  Correct.
2         (Defendant's Exhibit Number 9 was marked
3  for identification.)
4  BY MR. THOMAS:
5      Q  Mr. Gordon, I've marked as Defense Exhibit
6  9, Plaintiff Richmar's answers to defendant's first
7  set of interrogatories. Take a moment to review that
8  document.
9      A  Okay.
10     Q  Have you seen this document before?
11     A  Yes.
12     Q  If you turn to page 5 of the document, is
13 that your signature?
14     A  Not on page 5, no. There's more than one
15 page 5. Yes, page 5.
16     Q  On the second page 5?
17     A  On the second page 5.
18     Q  That's your signature, yes. I'm going to
19 ask you to turn to what I believe is the only page 4?
20     A  Yes, I have it.
21     Q  Interrogatory number 4 asks to describe
22 efforts that Richmar has made to market the DCMS

---

Page 93

1  computer program. If you turn to page 5, there's an
2  answer to that interrogatory. Let's go off the
3  record.
4         (Discussion off the record.)
5  BY MR. THOMAS:
6      Q  The answer says, "Richmar's DCMS marketing
7  efforts occurred, extended from September or October
8  2006 through March 2007." Is that accurate?
9      A  Yes, as a matter of fact, they're
10 continuing. I had a meeting yesterday with the Small
11 Business Administration's headquarters.
12         MR. GITNER: He didn't ask you that. He
13 just asked you exactly --
14         THE WITNESS: Well, yes, yes.
15 BY MR. THOMAS:
16     Q  And I should probably ask the following
17 question.
18     A  Okay.
19     Q  Are your marketing efforts of the DCMS
20 product continuing?
21     A  Yes.
22     Q  And you just mentioned that you had a

---

24 (Pages 90 to 93)



Richard Gordon, Jr.                    CONFIDENTIAL                                   May 31, 2007
                                       Washington, DC

**Page 98**

1    A   No, we have not.  We were not prepared at
2  the time to do that.  We had talked about, with our
3  subcontractor, Jae Lim, EMC also has a similar type
4  forum.  We were looking at displaying at the EMC
5  forum as well, which is annual.
6    Q   Okay.  And when was the EMC forum?
7    A   It was occurring during the time we were
8  developing DCMS, so the product was not ready.  I'm
9  not sure when the next one comes up, but it's
10 sometime this year.
11   Q   But you intend to attend the EMC forum to
12 present the DCMS product?
13   A   That decision has not been made yet.
14 Probably wouldn't be a good time now.
15   Q   How much of your time has been spent
16 marketing the DCMS product from September through the
17 present?
18   A   Pretty much most of my time, because my
19 initial involvement in DCMS was in the requirements
20 gathering and analysis.  Once those were set, and
21 once the scope of the project was clearly defined,
22 once the operational concept was clearly defined and

**Page 99**

1  once everyone had the shared -- had my shared vision
2  for the project, then I focused primarily on
3  marketing.
4         So much of my time has been in marketing.
5  I put little time on the development side of things.
6    Q   Okay.  And who have you personally spoken
7  with to market the DCMS product?
8    A   I was involved in giving the presentation
9  at American University.  I was also involved in
10 giving the presentation at Howard University.  And
11 the others, we have not -- I actually met with a
12 representative from -- actually, I was planning on
13 having a meeting with the editor of The Chronicle,
14 which is a university publication.  And we had
15 arranged that through the, I believe it's the
16 brother, who is Tommy McMillan of the editor of The
17 Chronicle.  And the purpose was to tell our story
18 about the success at GW.  That didn't happen.
19        So since the letter from Mr. Bonig, I
20 forget which letter it was, I've pretty much stopped
21 my efforts on marketing the DCMS.
22   Q   And what about the letter from Mr. Bonig

**Page 100**

1  made you stop your efforts to market DCMS?
2    A   We were accused of a number of
3  improprieties concerning both the contract and the
4  system itself.
5    Q   Do you recall the date of that letter?
6    A   No, I do not.  It was after we completed
7  -- I believe after we completed the work, the back
8  scanning.  So it would have been after the middle of
9  February.
10   Q   What marketing efforts were made from
11 September through December 2006, prior to the DCMS
12 going in production?
13   A   We pretty much focused at that time on
14 Howard University and American University, because
15 they were local.  And my consultant, Mr. Simpson,
16 needed to have a finished product in order to
17 convince his clients, of course, that the product
18 would be useful to them, and a reference from GW.
19        So very little prior to the system being
20 placed in production.
21   Q   Richmar delivered the DCMS source code to
22 GW, correct?

**Page 101**

1    A   That's correct.
2    Q   And that's the source code that went into
3  production on December 18th, 2006, correct?
4    A   That's correct.
5    Q   And Richmar was aware that that code would
6  be put into the CVS repository?
7    A   That's correct.
8    Q   What's a CVS repository?
9    A   What is it?
10   Q   Yeah.
11   A   I'm not really, again, a technical person,
12 but I believe that's a means of tracking various
13 versions of a particular software.  So for example,
14 if you put in build 1 and then put in build 1.0, in
15 CVS, you can always go back to build 1.  It's a means
16 of tracking changes, I'm going to say.  I don't know
17 if that's correct or not.
18   Q   Let me ask you a question that goes back
19 to earlier in the morning.  You indicated that you
20 had prepared a description of the DCMS for the
21 copyright registration, but in some of your answers,
22 you expressed the lack of familiarity with what's in

26 (Pages 98 to 101)

Richard Gordon, Jr.                    CONFIDENTIAL                    May 31, 2007
                                        Washington, DC

Page 102

1  the code. And my question is, how did you write that
2  description if you're not familiar with what's in the
3  code for the DCMS product?
4       A  A very general description. For example,
5  if you go back to, if you go back to Defendant's
6  Exhibit 3 and 4, there's a description of what the
7  software does.
8       Q  So your description was similar to the
9  descriptions in Exhibits 3 and 4?
10      A  Right. I create, and then of course the
11 code was attached as part of the copyright. The code
12 itself.
13      Q  Did you attempt to segregate the code
14 that -- as part of the grievance system with the
15 other system identified in the copyright
16 registration?
17      A  Did we attempt to segregate it?
18      Q  Uh-huh.
19      A  I don't believe we used any of the
20 grievance code. I believe the code was reviewed to
21 see how it worked, and then it was actually, I guess
22 derived, DCMS was derived from this particular

Page 103

1  system. You'd have to ask the developers about that.
2  Since I'm not a developer, I don't know how they did
3  it. It was only a couple of items, I know one in
4  particular was the export to Excel, I believe.
5       Q  When Richmar delivered the source code for
6  what would have become the December 18th, 2006
7  production to GW, did you communicate any limitations
8  on GW's use of that code to GW?
9       A  We told them it was for maintenance. I
10 mean, we didn't actually impose any restrictions, but
11 we knew the software was needed for maintenance, bug
12 fixes.
13      Q  Are you aware of any competitive products
14 to DCMS that are being offered in the market?
15      A  No, as far as I know, it's the first of
16 its kind. As a matter of fact, Jae Lim, again, who
17 has about 15 years of experience as a Documentum
18 developer, was not familiar with that type of
19 development concept. Many of the people whom we had
20 on board who were experienced in Documentum were not
21 familiar with that kind of development as a
22 Documentum concept. They were used to developing

Page 104

1  simply using Documentum, and using Documentum
2  screens.
3          This was completely different.
4       Q  Okay.
5       A  It was unique.
6       Q  And this was unique in Jae Lim's
7  experience?
8       A  Correct. It was my design.
9       Q  What was your design?
10      A  The DCMS.
11      Q  What about the DCMS was your design?
12      A  In terms of the functions, the screens,
13 and how it all worked. We had some requirements from
14 GW, which were general, and then we -- we then made
15 those into a set of specifications. For example, the
16 search function, GW didn't have any idea about the
17 type of search functions they wanted.
18          Based on my working with a developer in my
19 office, whose name is Amitabh, and I can't pronounce
20 his last name, we devised a set of screens to show
21 what the user would see. Once we were able to get
22 GW's agreement on those screens, then I gave those to

Page 105

1  the developers to begin developing the code.
2       Q  And this Mr. Amitabh?
3       A  Yes.
4       Q  He's a Richmar employee?
5       A  He was, yes.
6       Q  Okay. And when did he leave Richmar?
7       A  He left in, I want to say August, I don't
8  know, maybe August, September of '06.
9       Q  What were the circumstances of his
10 leaving?
11      A  He took a leave of absence and went back
12 to India for three months. The way we perform our
13 work is we will develop a set of user screens before
14 any code is written. Those screens will define how
15 the system works. You can exercise all of the
16 functions as if it were a live system, but it's not.
17 Once the user is satisfied with the presentation, we
18 then give those to the developers and we tell them to
19 develop the code to make these functions happen or
20 make these screens work the way they see them.
21      Q  And you would have developed those screens
22 in consultation with GW?

27 (Pages 102 to 105)

Page 106

1    A  Correct.
2    Q  To meet GW's requirements for the product?
3    A  Correct.
4    Q  So that the product would function the way
5  GW wanted and needed the product to function?
6    A  Correct.  They described what they needed
7  in terms of an overall, I guess, business process
8  management change.  They needed to be more efficient.
9  And then we gave them what we thought would
10  accomplish that.  And we agreed, so we did
11  collaborate on the screens, they went back and forth,
12  back and forth, back and forth.
13    Q  What does it mean for a product to be
14  scaleable?
15    A  I don't know the technical meaning of
16  that, but I'm assuming it means easy to expand.  For
17  example, whether you have five users or 5,000 users,
18  5 million users, it doesn't really matter.  For
19  example, using a web browser makes a system easy
20  to -- makes it scaleable.  You don't need any
21  additional software just a web browser, so adding
22  users becomes relatively easy.

Page 107

1        (Defendant's Exhibit Number 10 was marked
2  for identification.)
3        THE WITNESS:  They'll be adding users and
4  functions.
5  BY MR. THOMAS:
6    Q  What's that?
7    A  Scaleable, it's adding users and
8  functions, basically.  It allows the system to grow.
9    Q  Mr. Gordon, I've handed you what's been
10  marked as Defense Exhibit 10, which is the first
11  amended complaint in this case.  Without the attached
12  exhibits.
13    A  Yes.
14    Q  Have you seen this document before?
15    A  I have.
16    Q  Is that your signature on page 21 of this
17  document?
18    A  Yes, it is.
19    Q  Page 4, paragraph 13, it says, Richmar
20  recognized the copyrighted DCMS computer program
21  would have broad applications to other universities
22  and colleges, do you see that?

Page 108

1    A  Yes.
2    Q  What's the basis that there would be a
3  broad application to other universities and colleges?
4    A  I'm sorry, the word broad?
5    Q  What's the basis for this statement?  What
6  would be the DCMS computer program's application to
7  other universities and colleges?
8    A  Because my understanding is all -- most if
9  not all the universities use banner.  Many of the
10  universities use Documentum, but if not, it doesn't
11  matter, because DCMS was written to be portable.  So
12  it doesn't matter what is behind it, whether it's
13  Oracle or anything else.  So you could use the system
14  with banner and any other database, repository,
15  document management system, et cetera, which gives it
16  a broad application.
17    Q  And can you use DCMS with other
18  applications beyond banner or Documentum without
19  configuration?
20    A  Probably not.
21    Q  Is there any source code hard coded for
22  GW's specific environment?

Page 109

1    A  I don't know the answer to that question.
2    Q  Paragraph 14 states that GW engaged in
3  discussions with Richmar regarding the possibility of
4  hosting the copyrighted DCMS program at GW, leasing
5  the system to third parties and sharing in the
6  revenues developed by Richmar, do you see that?
7    A  Yes.
8    Q  With whom at GW did Richmar have
9  discussions concerning the possibility of hosting the
10  copyrighted computer program at GW?
11    A  I don't remember the lady's name, but she
12  worked for Ron Bonig, and her responsibility, I
13  guess, was for the data center.  And she worked with
14  another African-American gentleman as well, and we
15  talked, as we toured the data center, we talked about
16  that as a possibility.
17        She didn't have any authority over that
18  particular question, and it would have to be raised
19  with Ron Bonig.  After we reviewed the data center,
20  we realized that GW's costs for hosting were not
21  competitive, so we didn't even look at pursuing it
22  because we didn't think we'd get a good deal out of

28 (Pages 106 to 109)

Richard Gordon, Jr.

CONFIDENTIAL
Washington, DC

May 31, 2007

Page 110

1  it.

2     Q  And you don't remember the woman's name
3  with whom you spoke?

4     A  No, she was referred to me by Anne-Marie
5  Taylor.

6     Q  Do you remember her first name?

7     A  No, all I remember is she was tall and her
8  office was -- she had a -- rather than a cubicle, she
9  had an office.

10     Q  And is she also the person with whom
11  Richmar discussed leasing the system to third parties
12  and sharing the revenues?

13     A  We talked to her about that.  We also
14  talked to Ms. Taylor about that as well.

15     Q  Okay.  And what do you recall of those
16  conversations?

17     A  Neither of them had the authority to make
18  that decision.

19     Q  When did those conversations take place?

20     A  I don't know.  It was well before the
21  system was placed in production.

22     Q  And do you recall specifically telling

Page 111

1  them that, discussing the possibility of hosting your
2  copyrighted program, that this would be a copyrighted
3  Richmar program to be hosted by GW?

4     A  We didn't speak as to whether it would be
5  copyrighted or not, no.

6     Q  Let's go off the record for a couple
7  minutes.

8     (Discussion off the record.)

9     (Defendant's Exhibit Number 11 was marked
10  for identification.)

11  BY MR. THOMAS:

12     Q  Mr. Gordon, I hand you what's been marked
13  as Defense Exhibit 11.  Take a moment to review that
14  document.

15     A  Yes.

16     Q  Do you recognize this document?

17     A  I do, yes.

18     Q  What is it?

19     A  It's an agreement that allows my
20  receivables to be financed by Federal National.

21     Q  And so it's a security agreement as well
22  as a master factoring agreement?

Page 112

1     A  Correct.

2     Q  And this is an agreement between yourself
3  and Federal National Services and certain of its
4  other companies dated February 13th, 2004?

5     A  Yes.

6     Q  Turn to page 8 of this document.  Is that
7  your signature on behalf of Richmar & Associates?

8     A  That is.

9     Q  Let me ask you to turn to page 2 of the
10  security agreement, page 2 of 8.  As part of the
11  security agreement, Richmar grants a security
12  interest in certain of its property in interest; is
13  that correct?

14     A  I'm not sure if I understand the question,
15  property in interest.

16     Q  Let me rephrase the question.  In this
17  security agreement, Richmar granted to Federal
18  National Services security in certain of Richmar's
19  property?

20     A  Okay.

21     Q  Is that correct?

22     A  I believe that's correct, yes.

Page 113

1     Q  And that includes any of Richmar's
2  copyrights, correct?

3     A  I'm not certain, but I would imagine that
4  would be correct.

5     Q  And so Federal National has a security
6  interest in Richmar's copyrights?

7     A  Trade secrets, trademarks, service marks,
8  it appears so, yes.

9     Q  But copyrights as well, yes?

10     A  Yes.

11     Q  Have you had any discussions with Federal
12  National Services concerning a security agreement in
13  Richmar's copyright -- purported copyright in the
14  DCMS computer program?

15     A  Not that I recall.

16     Q  Has Federal National Services asserted a
17  right to any proceeds that may be received by Richmar
18  & Associates in asserting its copyrights in the DCMS
19  computer program?

20     A  I don't know if I understand that
21  question.

22     Q  Has Federal National asserted any right to

29 (Pages 110 to 113)

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 2

Philip J. Gearing, Jr.                                                          June 1, 2007
Washington, DC

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF COLUMBIA

 3                       CIVIL DIVISION

 4       - - - - - - - - - - - - - - -   X

 5       CUS4, INC. d/b/a RICHMAR &        :

 6       ASSOCIATES, et al.,               :

 7            Plaintiffs,                   :    Civil Action No.

 8                 v.                       :    07-0841 (JR)

 9       GEORGE WASHINGTON                  :

10       UNIVERSITY,                        :

11            Defendant.                    :

12       - - - - - - - - - - - - - - -   X

13                              Washington, D.C.

14                              Friday, June 1, 2007

15

16            Deposition of PHILIP J. GEARING, JR., a
    witness herein, called for examination by counsel for
17  Defendant in the above-entitled matter, pursuant to
    notice, the witness being duly sworn by MARY GRACE
18  CASTLEBERRY, a Notary Public in and for the District
    of Columbia, taken at the offices of Arnold & Porter,
19  555 12th Street, N.W., Washington, D.C., at
    9:00 a.m., Friday, June 1, 2007, and the proceedings
20  being taken down by Stenotype by MARY GRACE
    CASTLEBERRY, RPR, and transcribed under her
21  direction.

22
```

Philip J. Gearing, Jr.                                                                                      June 1, 2007

Washington, DC

**Page 18**

1   A.   Java.
2   Q.   You mentioned DCMS.  What is your
3   understanding of what DCMS is, what is involved in
4   the DCMS?
5   A.   DCMS is a custom application devised by
6   Richmar with a -- it is a Web-based application,
7   which means that people use it by using an Internet
8   browser such as Internet Explorer or Fire Fox.
9         Behind that screen, that browser screen is
10   put up on the screen by a Web service program.  In
11   this case, it was a set of Web service programs that
12   would put a screen up on a browser, and then when the
13   user made requests through the screen, the Web
14   services programs would make other calls either to
15   the Banner system, which is George Washington
16   University's human resources computer system -- that
17   was one place the calls went.
18         Another place the calls went were to
19   Documentum itself.  Basically what DCMS does is
20   provide the functionality of Documentum and Banner,
21   but it hides those applications.  We put up a set of
22   screens that were specifically tailored to what the

**Page 19**

1   GW users of HR services needed to do to store
2   documents and find people and their documents.
3   Q.   And you mentioned that there are a couple
4   of Web service programs that are in the DCMS?
5   A.   Dozens.  And each one handles a particular
6   function.
7   Q.   And so one of the Web service programs in
8   the DCMS may, from the user screen, access Banner?
9   A.   Correct.
10   Q.   And another Web service may access DCMS --
11   I mean, the Documentum repository?
12   A.   Yes.
13   Q.   What other Web service programs are part
14   of the DCMS?
15   A.   There is a scanning part of DCMS that is
16   called DCMS Scan, and that uses another part of
17   Documentum called eInput.  And again, we customized
18   the screen to only present the information that a
19   user would need and then wrote Web services that
20   reside behind the screens to handle direct
21   interaction with Documentum.
22   Q.   And the scanning part of DCMS, was that

**Page 20**

1   known as DCMS Scan?
2   A.   Yes.
3   Q.   Are these various Web services programs
4   that you're describing, or applications that you're
5   describing, a part of the DCMS source code?
6   A.   Absolutely.
7   Q.   How does the DCMS Scan -- is it fair to
8   call it a function or a program?
9   A.   I would call it a function because there
10   are a number of programs behind it.  It's a --
11   subsystem would be the common term in software to
12   describe it.
13   Q.   So the DCMS Scan eInput would be a
14   subsystem?
15   A.   Yes.  And DCMS would be -- the DCMS
16   employee search screens would be a subsystem.  That's
17   two.  And then DCMS Web services would be a subsystem
18   for a third one, and then Banner Web services, which
19   GW wrote, would be a fourth subsystem.  And the four
20   of those subsystems taken together would constitute
21   the DCMS system.
22   Q.   How does the DCMS Scan subsystem interact

**Page 21**

1   with the document search screen system?
2   A.   It doesn't.  And DCMS Scan is for putting
3   new paper documents -- converting them to electronic
4   documents and putting them in the system.  There is a
5   search function there, but it's for employees, not
6   for documents, as far as I'm aware.
7   Q.   And when you say it's a search function in
8   DCMS Scan for employees, where does it search for
9   employees?
10   A.   Through Banner.  DCMS Scan calls DCMS Web
11   services to say, give me a list of employees who are
12   in this department.  DCMS Web service then formats a
13   call to Banner Web services.  Banner Web services
14   then makes a call to the Banner system and comes back
15   with a list of employees that the DCMS user is
16   entitled to see.
17   Q.   Let me go back, if I could, to your prior
18   engagements with or subcontracting engagements with
19   Richmar & Associates.  We had discussed the programs
20   with the FAA.  Could you describe for me what you had
21   done on the EPA project that you mentioned?
22   A.   For EPA, Richmar built a small prototype

6 (Pages 18 to 21)



Philip J. Gearing, Jr.

June 1, 2007

Washington, DC

Page 26

1    A.  I have not seen it.  I have not seen it at
2  all.
3    Q.  Are you familiar with a company called
4  Impact Innovation Systems?
5    A.  Yes.
6    Q.  What is Impact Innovation Systems?
7    A.  They are a Documentum software services
8  company.
9    Q.  And they were subcontracted to Richmar to
10  assist on the GW contract?
11    A.  Yes.
12    Q.  Do you recall when Impact Innovation
13  Systems was subcontracted to GW?
14    A.  March or April.  Well, they were
15  subcontracted to Richmar, not to GW.
16    Q.  Pardon me.
17    A.  March or April 2006.
18    Q.  And what were the circumstances under
19  which they were subcontracted?  Why were they
20  subcontracted to Richmar?
21    A.  Basically to write the Web services.
22    Q.  When you say the Web services, for DCMS?

Page 27

1    A.  For DCMS, yes.
2    Q.  At least the Web service that communicates
3  with Documentum?
4    A.  And the screens.  Not Banner Web services.
5  GW wanted to write that itself.
6    Q.  Are you familiar with a computer program
7  known as the grievance electronic trading system?
8    A.  Tracking system.  That's the second FAA
9  project that Richmar did.
10    Q.  Are you aware that code from the grievance
11  electronic tracking system was included in the DCMS
12  source code?
13    A.  I would be surprised if that were the
14  case.  Not to my knowledge.
15    Q.  And why would you be surprised if that was
16  the case?
17    A.  Because the grievance system talks to
18  Oracle and DCMS talks to Documentum.  In the code
19  part of it, there is very little overlap.  If you
20  look at the screens, you might say they were similar
21  but that's where the similarity ends.
22    Q.  Is DCMS limited to talking to Documentum?

Page 28

1    A.  No.  That's the beauty of it.  That was
2  part of the design was to put screens up for the
3  users to use and they would not know -- they didn't
4  know for a fact that Banner was behind it or that
5  Documentum was behind it.  Documentum could be
6  swapped out and the interface could remain the same.
7  That was one of the strengths of what we did there.
8  That was conscious.
9    Q.  And are you familiar with a computer
10  program, the Memorandum of a Agreement system?
11    A.  Yes, that was the first FAA project
12  Richmar did.
13    Q.  Are you aware whether code from the
14  Memorandum of Agreement system is included in the
15  DCMS?
16    A.  It is not.  We used the Memorandum of
17  Agreement system code to build the grievance system
18  but it, like the agreement system, bears very
19  little -- basically it has no use with respect to
20  DCMS, other than the look and feel of the screens
21  which we used.
22    Q.  Have you heard of a software or computer

Page 29

1  program called struts?
2    A.  That's a software methodology.  Yes, I'm
3  aware of it.
4    Q.  When you say it's a software methodology,
5  what does that mean?
6    A.  It is a method that has been devised in
7  the Java community as a way to design Web-based
8  applications.
9    MR. GITNER:  Can I have the answer read
10  back?
11    THE REPORTER:  "Answer:  It is a method
12  that has been devised in the Java community as a way
13  to design Web-based applications."
14    THE WITNESS:  That's correct.
15    BY MR. THOMAS:
16    Q.  And when you say it's a method, what is
17  involved in the method?
18    A.  I don't know it in detail because I've
19  quit writing code, but when you use the struts
20  methodology, it requires that you put certain control
21  operations in a single file, I believe, and the flow
22  of the application is controlled by that control

8 (Pages 26 to 29)



Philip J. Gearing, Jr.                                                                June 1, 2007

Washington, DC

Page 38

1    us -- they were asking us not to -- they told us not
2    to do anything else to the system.
3        Q.    So you expected GW to make that fix, is
4    that correct?
5        A.    To fix the error. However, in a more
6    normal relationship, we would have continued to work
7    on the software and would have done the fix. That
8    was the first system I worked on in 20 years where,
9    as developers, we were not allowed access to the
10    production system when it went into production.
11        Q.    Do you recall at some point there were
12    discussions with GW concerning problems with the
13    document-only search function in DCMS?
14        A.    Roughly from May to December, yes.
15        Q.    And what do you recall of those
16    discussions from May until December?
17        A.    The first computer code we delivered for
18    document-only search conformed to the requirements we
19    were given. There was an issue from the GW side with
20    it that it pulled too many people back from Banner.
21    And we were told not to do that, we couldn't do it
22    that way.

Page 39

1        Q.    And so the issue -- there was a design
2    problem in how the document-only search had been
3    designed?
4        MR. GITNER: Objection to form. You can
5    answer.
6        THE WITNESS: I think it was a conflict
7    between what we were told to do and then what it
8    looked like after it started running. And we told
9    them quite clearly, this is how we're going to do it,
10    and then when it went in -- when they started seeing
11    the software, they said, that's not going to work for
12    us. And that's fairly common.
13        BY MR. THOMAS:
14        Q.    And do you recall at what period of time
15    it was that GW had identified to Richmar that the
16    document-only search, as designed, would not work for
17    GW's organization?
18        A.    I would have to look in the e-mails and
19    the documents, but that would be sometime in the
20    summer. The deadlines for production started out --
21    they moved a lot. So the document-only search, when
22    it was revealed in the code, was about -- that time

Page 40

1    was four or five or six weeks before the system was
2    to go into production.
3        And generally, when you get that close to
4    the end, if you've got simple problems, you fix them
5    and if you've got problems that are not necessarily
6    simple, you defer them. And the production deadline
7    shifted from early June to early July to early August
8    to mid-October to mid-December. In the document-only
9    search, there was never enough lead time given for us
10    to revise the method. And in fact, the thing would
11    work. They just didn't like the fact that we could
12    bring back a thousand people.
13        Q.    Because bringing back a thousand people
14    made it difficult for users to utilize the system
15    efficiently?
16        A.    Well, but that's an inherent risk in a
17    document-only search. You say, I want to see all the
18    I-9s, there is going to be an I-9 for every employee
19    so that could bring back 40,000 people. That's
20    inherent in the document-only searches, is the danger
21    that you're going to get too many results.
22        Q.    And did you discuss with GW possible ways

Page 41

1    to redesign or modify the document-only search to
2    make it more manageable?
3        A.    Yes.
4        Q.    What do you recall of those discussions?
5        A.    Those are --
6        MR. GITNER: I'm sorry, what or when? Go
7    ahead and answer it if you heard it.
8        MR. THOMAS: He answered yes and my
9    question was, "What do you recall of those
10    discussions?"
11        THE WITNESS: What I recall is it took us
12    about three or four months to convince GW that the
13    solution we proposed was probably the way to go. And
14    it required a two or three-step process in order to
15    apply Banner security -- actually, find documents,
16    apply Banner security and then go back and fetch
17    documents.
18        And we exchanged e-mails in
19    September/October. We were supposed to have a
20    meeting to finalize it. The meeting never happened.
21    And again, the deadline for production was looming so
22    the decision was made, which is quite common, is we

11 (Pages 38 to 41)

Philip J. Gearing, Jr.

June 1, 2007

Washington, DC

Page 42

1  can run without it, we'll get to it later.
2      BY MR. THOMAS:
3      Q.   And so in your experience, it's common
4  that certain functions will not be included in the
5  first production of a software program with the
6  expectations that they would be incorporated later,
7  is that fair to say?
8      A.   Yes.  There are always issues of scope.
9  And when the client cannot control scope, the
10  deadlines slip and then when you can finally enforce
11  scope, you can put up a system that works that
12  fulfills the basic requirements, which is what the
13  December release did.  HR was able to use the system.
14  There are always bells and whistles you can add.
15      Q.   You say there are bells and whistles you
16  can add.  You can --
17      A.   That's a little bit of a denigrating
18  statement.  There are always features you can add to
19  the system.
20      Q.   And those are features that can be added
21  to enhance the usability of a system, for example?
22      A.   For example, yes.  But almost by

Page 43

1  definition, the first release has enough vital
2  functions that it is usable.  Otherwise, you would
3  not install it.
4      Q.   But it's typically the case that it is
5  installed with the expectation that changes would be
6  made, correct?
7      MR. GITNER:  Objection to the form of the
8  question.  You can answer it if you understand.  You
9  can answer.
10      THE WITNESS:  That's typically the case.
11  No system is ever complete on the first release.
12      BY MR. THOMAS:
13      Q.   And that happened in the case with the GW
14  project, right?  Are you familiar with the Mantis
15  system?
16      A.   Yes.
17      Q.   And what is the Mantis system?
18      A.   The Mantis system is a problem tracking
19  system.
20      Q.   And in that system, as problems would be
21  identified, tickets would be created, is that
22  correct?

Page 44

1      A.   Yes.  They were not only problems.
2  Sometimes there were wishes.  Wishes and problems.
3      Q.   And those tickets would be numbered?
4      A.   Yes.
5      Q.   And so in that way, you would be able to
6  identify what particular problem or wish, as you
7  describe it, would go with a particular ticket?
8      A.   Yes.
9      Q.   A system tracking those issues?
10      A.   Right.
11      Q.   And the Mantis system and the various
12  tickets were used to identify and prioritize those
13  issues, correct?
14      A.   That's correct.
15      Q.   So there was some iterative process
16  between Richmar and GW to determine which particular
17  Mantis tickets would be included in the release that
18  went into production in December and those that would
19  not, correct?
20      MR. GITNER:  Objection to the form.
21      THE WITNESS:  GW made most of those
22  decisions about what was in and what was out.  In

Page 45

1  fact, they made all those decisions.  Sometimes we
2  were asked about it and sometimes we were not.
3      BY MR. THOMAS:
4      Q.   Do you recall consulting with GW to
5  determine which Mantis tickets would be included in
6  the production -- in the DCMS program that went into
7  production?
8      A.   Sure.  And we had a spreadsheet that
9  showed which tickets were going to go into the first
10  release.
11      Q.   And did that spreadsheet contain any
12  additional information?
13      A.   It probably had future features, too.
14      Q.   At some point in December, Richmar was
15  instructed not to make any additional changes to the
16  DCMS code, is that correct?
17      A.   That's correct.
18      Q.   Richmar delivered the DCMS code to GW,
19  didn't it?
20      A.   On or about December 10 or 11.
21      Q.   What is a transition plan in your
22  experience?

12 (Pages 42 to 45)

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al., ) ) ) Plaintiffs, ) ) v. ) ) George Washington University, ) ) Defendant. ) ) | Civil Action No. 07-0841 |

## DECLARATION OF CHRISTINA L. GRIFFIN

Christina L. Griffin deposes and states, pursuant to 28 U.S.C. § 1746:

1.    I am employed by The George Washington University ("GW") as Assistant Director, ISS Portfolio Management Office. I make this declaration based on personal knowledge of the facts set forth herein.

2.    In my capacity as Assistant Director, I have been, and continue to be, directly involved in GW's efforts to enhance the University's document management systems.

3.    As of about October 2006, I began actively managing the GW project in connection with which GW contracted with Richmar & Associates ("Richmar"). Prior to this time, I provided more minimal oversight over Richmar's engagement with GW.

4.    Richmar was hired to assist GW in managing its documents efficiently and effectively, in order to better deliver service to its personnel and student body.

5.      GW paid Richmar $1,472,228.16 for the preparation and delivery of DCMS code and DCMS Scan code.  GW also paid Richmar $1,415,519.28 for back scanning, which involved scanning hard copies of Human Resources documents into the system.

6.      If GW were not able to utilize the DCMS software, it would slow down the delivery of services to the University, and would cost GW additional time and money to perform routine administrative tasks and functions.  This would be in addition to the near $1.5 million paid to Richmar to develop DCMS and DCMS Scan, and the cost and time it has taken to fix DCMS and DCMS Scan to enhance them to better suit GW's needs.

7.      Until this lawsuit, Richmar never sought to prohibit GW from using, maintaining, or modifying DCMS or DCMS Scan.

8.      GW has no current or future plans to engage in or support any commercial marketing of the DCMS or DCMS Scan computer programs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Ashburn, Virginia

Christina L. Griffin

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al.,<br><br>     Plaintiffs,<br><br>    v.<br><br>George Washington University,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action
No. 07-0841

### DECLARATION OF MARCELLA DAY

Marcella Day deposes and states, pursuant to 28 U.S.C. § 1746:

1. I am employed by The George Washington University ("GW") as Applications Project Manager, Strategic Planning Office, and previously the Administrative Applications Project Office. I make this declaration based on personal knowledge of the facts set forth herein.

2. In my capacity as Applications Project Manager, I have been, and continue to be, directly involved in GW's efforts to enhance the University's document management systems.

3. I served as project manager for the GW project in connection with which GW contracted with Richmar & Associates ("Richmar").

4. The contract with Richmar identified several deliverables required to be provided by Richmar under the contract. Richmar failed to deliver certain of the required deliverables, and those that were delivered did not work properly.

5.      Richmar was also hired to scan hard copy documents in the system. Richmar was unable to do this within the originally contemplated time frame.

6.      In those instances in which Richmar did deliver software, copies were provided to GW and/or the software was installed on computers owned by GW. It is my understanding that GW owns the copies of the software in its possession.

7.      GW paid Richmar $1,472,228.16 under the contract for development and delivery of the software.

8.      It was contemplated by the parties to the contract that the software to be provided by Richmar could be deployed throughout the university – not just for its initial application. It was also contemplated that such deployment could be accomplished with minimal additional configuration. However, it was understood that GW would need to, and would be able to, modify the software as needed in order to deploy it and further enhance the University's computerized document management systems.

9.      Indeed, Jim Gearing, the project manager at Richmar, agreed to deliver all the source code and walk through it with the developers at the close-out meeting.

10.     The software delivered by Richmar required customization and configuration in order for GW to use it as expected and required.

11.     The "DCMS Scan" software delivered by Richmar did not work as expected or required.

12.     The DCMS access interface to Documentum had numerous problems which made it unable to function as expected or required without modification.

13.     In order to make the software delivered by Richmar function as expected and required, GW was forced to expend significant time and expense to fix and modify it.

- 2 -

14.    GW's Human Resources department would face significant difficulty if it were not able to utilize the DCMS software because it would not be able to access the University's personnel files, without the delay and expense of configuring and customizing an alternate software product.

15.    GW has no current or future plans to market any part of the DCMS or DCMS Scan software.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Ashburn, Virginia

_____
Marcella Day

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al., | ) ) ) | Civil Action No. 07-0841 (JR) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| George Washington University, | ) ) | |
| Defendant. | ) ) ) | |

### DECLARATION OF RICHARD GILCHRIST

Richard Gilchrist deposes and states, pursuant to 28 U.S.C. § 1746:

1.     I am employed by The George Washington University ("GW") as Director of Enterprise Management (previously Director of Solution Designs and Analysis) in the Information Systems and Services department.  I make this declaration based on personal knowledge of the facts set forth herein.

2.     In my capacity as Director of Enterprise Management, I have been, and continue to be, directly involved in GW's efforts to enhance the University's computerized document management systems.

3.     I served as Senior Manager for the GW project to enhance the University's Human Resources Personnel department's record management in connection with which GW contracted with Richmar & Associates ("Richmar").

4.     GW purchased Documentum to allow for centralized storing, tracking, and sharing of University forms and documents for all GW departments and, specifically, its

Human Resources ("HR") Personnel documents. GW has a license for use from EMC, the company which owns Documentum.

5.    Documentum is document management software that provides management of document content and attributes such as check-in, check-out, workflow, and version management. It is essentially "Document Management" software, which means that it provides an electronic vault in which to store documents; rather than keeping their important files on a fileserver, companies put them in Document Management systems.

6.    To maintain the security of these documents, GW uses Banner. Banner is an administrative software application developed specifically for higher education institutions by Sungard Higher Education. Student, alumni, financial aid, and human resources data is stored in an Oracle database, and Banner acts as an interface, with specific security measures to ensure that only authorized individuals have to access to certain data.

7.    GW also purchased the eInput product from Captiva, another EMC company. eInput enables users to capture and submit scanned document images and electronic files from remote locations via an internet connection. Documents scanned into eInput are processed by Captiva's InputAccel product and stored in Documentum by InputAccel.

8.    One of the tasks Richmar undertook was to configure an interface between Documentum, the document storing system, and Banner, the HR system of record, to enable documents to be electronically stored and ensure they are retrieved and viewed only by authorized personnel. This interface is called the Document & Content Management System ("DCMS").

9.      Richmar also undertook to customize eInput, which became known at GW as "DCMS Scan."

10.      GW was responsible for writing the computer instructions and web services application to accomplish the interface with Banner, and Richmar was responsible for writing the computer instructions and web services application to accomplish the interface with Documentum.

11.      Richmar subcontracted Impact Innovations Systems, Inc. ("Impact") to prepare the computer code for which it was responsible.  GW did not have substantial involvement with respect to the actual computer code that Impact wrote.  GW did, however, have significant input into the requirements, business logic, and design of the program.

12.      Certain requirements for the project were outlined at the outset, and include, but are not limited to, scanning hard copy files to be imported into Documentum; designing basic system abilities such as defining document types, attributes, users and user capabilities; allowing for identification of certain access and security needs; importing documents into Documentum and creating new documents in Documentum; revising document attributes; reviewing documents; distributing documents; designing a user-friendly interface; locating documents; viewing documents; exporting documents; creating and viewing reports by specified parameters or filters; running particular searches to retrieve documents; and designing to incorporate HR and Banner specifications.

13.      My group functioned as the lead architect and provided solution design for the project, as well as providing quality assurance and testing.  As lead architect, my

group specified the overall requirements of the system based on GW's specific needs and set up the servers and network on which the program would operate (for example, Unix servers). Richmar's team worked to refine the requirements and overall structure for the software in consultation with GW.

14.     The DCMS Scan product was delivered with many errors and problems. After substantial modification by GW, the program finally works relatively well but without the full capabilities GW had expected or been lead to believe was possible. For example, as delivered by Richmar, it is only possible to scan a single document at a time as opposed to multiple documents or bulk scanning.

15.     Between December 5, 2007, when the final code prepared by Impact was provided to GW and December 18, 2007, when GW personnel began to use DCMS, GW made at least one change in the computer code to a security function with the knowledge of Richmar and Impact.

16.     Problems with code provided by Richmar are identified in MANTIS and assigned a ticket number. MANTIS is a software used by GW that tracks "bugs" in software systems, including the DCMS and DCMS Scan computer programs. These tickets are ranked by the severity of the problem.

17.     As of January 2007, there were several problems with DCMS documented in the Mantis system. Many of them had been identified prior to December 18, 2006 and not included in initial release, with full understanding of GW and Richmar that fixes and enhancements would be included in a subsequent release.

18.    Additional problems and enhancements were identified after the DCMS and DCMS Scan systems began to be used more widely by University personnel as opposed to the testing environment.

19.    One of the requirements for DCMS was that it contain a document only search feature.

20.    GW stores documents by a personal identification number ("PIDM"). This PIDM is used in Banner system to tie records together. The DCMS system allows a user to input a search, which goes into the webserver and returns a list of responsive documents or information to which that user has access. The DCMS product also allows the user to select an employee and search for all documents related to that employee against the Documentum database. Richmar provided the front-end interface through which the user could run the searches against Documentum, and the searches against Banner were implemented by code written by GW.

21.    The search capability was to have three options: to be able to search by (1) Banner employee information and return a list of employees that the user has security access to; (2) Banner employee information and document search criteria and bring back a list of employees that have documents that meet both employee and document search criteria and restrict the documents returned when clicking on the employee to only the documents meeting the document search criteria; and (3) document only search criteria and bring back a list of employees that have documents that meet the document search criteria and to which that the user has security access.

22.    Of the three search options, the Richmar code only worked as desired by GW for the first option. When the second option was selected the search brought back a list

- 5 -

of employees meeting the employee search criteria and restricted the documents to those meeting the document search criteria. This would result in a high percentage of the employees in the list not having any documents responsive to the search, even though those employees should have been excluded from the search result.

23.    The third option always failed since Richmar code retrieved results from all employees in the Banner system, since no Banner search criteria was added. There is only enough memory to retrieve results for a limited number of employees, but because of the way the code was designed the search inevitably exceeded that number. The user would receive an error message stating that the query returned too many employees.

24.    Problems with the document only search feature were identified as early as July 28, 2006 in testing early versions of the DCMS software. At that time, a ticket (ID #228) was created in the MANTIS system to identify the problem such that it could be monitored and fixed going forward.

25.    Richmar was provided with access to MANTIS tickets so that it could fix problems identified and would have reviewed and printed a copy of information in ticket #228 concerning the document only search function.

26.    Richmar delivered version 1.5 of the DCMS software in early December, and despite having known since July 2006 that the document only search function was not operable, it remained inoperable in version 1.5. Richmar's version 1.5 is what became the first production release of DCMS.

27.    I had several conversations with Jim Gearing, Richmar's project manager and analyst, and Jae Lim of Impact that the document only search function was not designed properly by Richmar's subcontractors to work as GW needed.

- 6 -

28.    To resolve the problems associated with the document only search function, I, with assistance from GW developers, detailed the specifications and Mr. Padmanabhan wrote the code. The vast majority of the code enabling the document only search function without error was rewritten by GW.

29.    In addition to adapting the DCMS program to make the document only search function work as required, GW also needed to change the employee search design in order to make the employee search function work in a manner that best suited GW's needs. Some of the code written by Impact for the employee search is still utilized.

30.    It was always the intention that Richmar would turn over the code for GW to maintain. There was to be a knowledge transfer from Richmar to GW to enable GW to maintain it and make any modifications as required and to enhance the product for GW's use. Because the project took Richmar longer than anticipated and it was getting late in the delivery process, certain items in the requirements were not included in the first production release because Richmar would not be able to deliver them.

31.    Richmar knew, however, that GW would be implementing the requirements that had been left incomplete in a subsequent release that was planned.

32.    In December, GW informed Richmar to cease development of DCMS and to turn over the source code to GW.

33.    Concurrent Versions System (or "CVS") is a product that allows one to do configuration management of code, so that you can roll back to original versions after you have made changes. Richmar knew that GW was putting code in CVS and would be maintaining and modifying the code.

34.    An initial review of the DCMS code was done by Sun Microsystems in July 2006.  Richmar did not object to Sun Microsystems audit of the code.  Richmar responded to the first audit report by Sun Microsystems.  A second code review and report was performed by Sun in September 2006.

35.    Crown Partners was engaged by GW to provide production support and advice concerning DCMS in order to assist GW in preparing a version of DCMS which would work as GW originally intended.  In doing so, Crown Partners reviewed the DCMS code to determine how it conformed with Documentum best practices in order to decide whether GW should remediate the code or replace DCMS altogether.

36.    Crown Partners was not engaged to do any modifications to the DCMS source code and has made no modifications.  Crown has provided advice to GW on how the DCMS code may be modified to improve the program for GW's purposes.

37.    In order to review the code, Kevin Burns from Crown Partners was given access to GW's Virtual Private Network on which Mr. Burns was able to review the code on his computer.

38.    All work by Crown has been performed pursuant to a non-disclosure agreement that prohibits Crown from disclosing or utilizing the information provided to it by GW in any manner and to maintain its confidentiality.  *See* NDA, attached hereto as Exhibit A.  Crown Partners has not and will not market any product based upon any element of the DCMS code.

39.    GW, with assistance from Crown Partners, intends to move business logic from DCMS to a new Documentum application based on Documentum's web development kit, or WDK.

40.     Changes to DCMS and DCMS Scan are identified in MANTIS and also described in release notes to version 2.0. Release 1.6, issued on several dates as detailed in MANTIS, primarily made modification to fix bugs in the DCMS Scan eInput product.

41.     Release 2.0 makes changes to DCMS, eInput, relabels screens, and extends some features. Release 2 also includes a fix to the advanced search capability. Changes that were made to the code delivered by Richmar were to fix bugs in the program as delivered by Richmar, to extend capabilities that were original requirements in the contract, or have been identified by users as ways to increase productivity.

42.     GW is planning a Release 3.0 that will further modify DCMS Scan to allow scanning and indexing in bulk. It is expected that none of the computer code prepared by Richmar or Impact for DCMS Scan will remain at this time.

43.     GW does not intend to market - or jointly market with any third party - the DCMS program as delivered by Richmar or as modified by GW.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Ashburn, Virginia

Richard Gilchrist

**A**

DEC. 22. 2006  9:45AM    BANNER-APPLICATIONS                    NO. 6652    P. 2

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is executed as of December 5, 2006, by and between Crown Partners, LLC, a Delaware limited liability company with a principal place of business at 7750 Paragon Road, Dayton, Ohio 45459, and The George Washington University, a ~~CONGRESSIONALLY~~ CREATED NOT FOR PROFIT CORPORATION with a principal place of business at 2 1 2 1 I STREET, N. W. SUITE 601, WASHINGTON, DC 20052. As used this Agreement, the party disclosing Confidential Information is referred to as the "Disclosing Party" and the party receiving the Confidential Information is referred to as the "Receiving Party."

1. **Purpose.** The parties wish to explore a business opportunity of mutual interest (the "Opportunity"). In connection with exploring the Opportunity, each party may disclose to the other confidential and proprietary information which the Disclosing Party desires the Receiving Party hold in confidence and not to disclose or use except as expressly permitted by this Agreement.

2. **Confidential Information.** "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects, that the Disclosing Party identifies as confidential at the time of disclosure or that a reasonable person would understand to be of a confidential nature. Confidential Information shall not include any information that (a) is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, generally known or available in the public domain, (b) the Receiving Party can demonstrate was rightfully in its possession prior to its disclosure to the Receiving Party by the Disclosing Party, (c) is obtained by the Receiving Party from a third party without a breach of any obligation to the Disclosing Party or (d) is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Confidential Information.

3. **Obligations.** The Receiving Party agrees (a) to hold the Disclosing Party's Confidential Information in strict confidence, (b) not to disclose the Disclosing Party's Confidential Information to any third party; provided, however, the Receiving Party may disclose the Disclosing Party's Confidential Information to its employees, agents and affiliates who have a bona fide need to know such Confidential Information, but only for the purpose of evaluating the Opportunity and only if such employee, agents and affiliates are advised of the confidential nature of such Confidential Information and the terms of this Agreement and are bound by a written agreement to protect the confidentiality of such Confidential Information, and (c) not to use the Disclosing Party's Confidential Information for any purpose other than to evaluate the Opportunity. The Receiving Party agrees to be responsible for any breach of this Agreement by any of its employee, agents and affiliates to whom the Receiving Party discloses the Disclosing Party's Confidential Information.

4. **Maintenance of Confidentiality.** The Receiving Party agrees to exercise the same degree of care in protecting the Disclosing Party's Confidential Information that the Receiving Party uses in protecting its own Confidential Information, but in no event less than a reasonable degree of care. The Receiving Party shall promptly notify the Disclosing Party in the event of any unauthorized use or disclosure of the Disclosing Party's Confidential Information.

5. **Required Disclosure.** The Receiving Party may disclose the Disclosing Party's Confidential Information if and only to the extent that such disclosure is required by any request or order of any governmental authority or by applicable law; provided, however, that the Receiving Party shall notify the Disclosing Party in writing of such required disclosure prior to disclosing the Confidential Information and provide the Disclosing Party a reasonable opportunity to (a) review the disclosure and to interpose its own objection to the disclosure or (b) seek a protective order or other appropriate relief.

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use only.
—Page 1

CONFIDENTIAL                                                    GW004102

6.  **Return of Confidential Information.** Upon the Disclosing Party's request, the Receiving Party will (a) promptly return to the Disclosing Party all copies of the Disclosing Party's Confidential Information, (b) destroy all notes, abstracts and other documents containing the Disclosing Party's Confidential Information and (c) provide to the Disclosing Party a written certification of an officer of the Receiving Party that it has done so.

7.  **No License.** Nothing in this Agreement is intended to grant any rights to the Receiving Party in or to (a) any of the Disclosing Party's Confidential Information except as expressly set forth in this Agreement or (b) any patent, copyright, trade secret or other intellectual property right of the Disclosing Party.

8.  **No Obligation.** Nothing in this Agreement shall obligate either party to proceed with any contemplated transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity.

9.  **Term.** The term of this Agreement shall end on the three-year anniversary of the date first set forth above. This Agreement shall only apply to information disclosed during the term. The confidentiality obligations set forth in this Agreement shall expire five years after the end of the term of this Agreement.

10.  **Injunctive Relief.** The Receiving Party acknowledges that the unauthorized use or disclosure of the Disclosing Party's Confidential Information would cause irreparable harm to the Disclosing Party and that monetary damages would be inadequate to compensate the Disclosing Party for any such unauthorized use or disclosure. Accordingly, the Receiving Party agrees that the Disclosing Party will have the right to obtain immediate injunctive relief against any breach or threatened breach of this Agreement, without the necessity of proving actual damages, as well as the right to pursue any and all other rights and remedies available at law, in equity or otherwise for such a breach or threatened breach.

11.  **Miscellaneous.** This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflict of law provisions thereof. This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. If any term of this Agreement is found by any court to be void or otherwise unenforceable, the remainder of this Agreement shall remain valid and enforceable as though such term were absent on the date of this Agreement. This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed original, and both together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

CROWN PARTNERS, LLC

By: _____

Print Name: Richard Blum

Print Title: Managing Partner

THE GEORGE WASHINGTON UNIVERSITY

By: _____

Print Name: ROMRO C. BLANC

Print Title: INTERIM CIO

2

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

CONFIDENTIAL    GW004103

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al., | ) ) ) ) | Civil Action No. 07-0841 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| George Washington University, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF RONALD BONIG

Ronald Bonig deposes and states, pursuant to 28 U.S.C. § 1746:

1.     I am employed by The George Washington University ("GW") as its Interim Vice President ("VP") and Chief Information Officer ("CIO"). I make this declaration based on personal knowledge of the facts set forth herein.

2.     In my capacity as VP and CIO, I have been, and continue to be, directly involved in GW's efforts to enhance the University's computerized document management systems.

3.     I exercise executive oversight for the GW project in connection with which GW contracted with Richmar & Associates ("Richmar").

4.     GW has no current or future plans to engage in marketing of the DCMS or DCMS Scan computer programs, either in their original or altered form. GW also has no current or future plans to market the DCMS or DCMS Scan computer programs, either in their original or altered form, jointly with any third parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Washington, D.C.

_____
Ronald Bonig

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CUS4, INC. d/b/a RICHMAR & ASSOCIATES et al., | ) ) ) |
|  | ) Civil Action |
| Plaintiffs, | ) No. 07-0841 (JR) |
|  | ) |
| v. | ) ) |
| George Washington University, | ) ) |
| Defendant. | ) ) |

## DECLARATION OF VIJAY PADMANABHAN

Vijay Padmanabhan deposes and states, pursuant to 28 U.S.C. § 1746:

1.     I am employed by The George Washington University ("GW") as a Senior Database Applications Developer in the Information Systems and Services department.  I make this declaration based on personal knowledge of the facts set forth herein.

2.     In my capacity as a Senior Database Applications Developer, I have been, and continue to be, directly involved in GW's efforts to enhance the University's computerized record management systems.

3.     I served as a web developer for the GW project to enhance the University's Human Resources Personnel department's record management in connection with which GW contracted with Richmar & Associates ("Richmar").

4.     The Document & Case Management System was to be a usable front-end wrapper that interfaced with two software products:  Documentum and Banner. Documentum is a document storage, retrieval, viewing, and sharing system, while Banner uses an Oracle database and maintains student information, faculty, and personnel

information.  Banner has security which restricts users to only view

employee/student/faculty records he or she has access to.  Richmar was responsible for

creating the interface with Documentum, and GW was responsible for creating the

interface with Banner.

     5.      Richmar built the code using struts architecture, which is an open source,

java-based architecture, as opposed to the web development kit ("WDK") issued by

Documentum, which would have increased efficiency and ease of access to

Documentum's features.

     6.      The struts architecture can be downloaded for free from the Apache website

at www.struts.apache.org.

     7.      Logging events in DCMS were also based on open source software available

from the Apache website, commons-logging and Log4j.

     8.      Architecture for a code is the blueprint for the code; a pre-defined system

that dictates where code should be placed.  The application code should adhere to the

struts architecture definition.  For example, struts defines how to create the views or

screens a user will see when accessing DCMS.

     9.      The internal coding logic, or the business logic, was defined by GW.  Impact

Innovations Systems, Inc. ("Impact"), Richmar's subcontractor, had to translate GW's

business logic into code.  Business logic defines exactly what the code needs to

accomplish.

     10.     Approximately ten to fifteen of the code files provided by Richmar to GW

are files that Impact did not create, such as configuration and definition files which are

provided by struts. Without these files, the code written by Impact could not have functioned.

11.    Richmar was also responsible for customizing eInput, a program that allows users to scan hard copy documents into Documentum to suit GW's business needs. As customized, eInput was known as DCMS Scan.

12.    During my involvement with the project, I worked with the following people from Richmar and its subcontractor Impact: Jim Gearing, the project manager; Jae Lim, who I considered the technical product manager; Wei Lam, a developer for DCMS Scan and DCMS web services code; and Drew Hammond, a developer for the DCMS code.

13.    Mr. Hammond and Mr. Lam came to GW's Ashburn offices for deployment of the code, to go through coding issues, and to discuss changes with my colleague Jennifer Bond, who shared an office with me.

14.    Throughout the process, GW tested the code, identified errors, and suggested corrections.

15.    Although most development happened at Richmar's offices, from time to time Richmar and/or its subcontractor would also come to GW's Virginia campus for deployment of various versions of the DCMS software. There were multiple deployments, or releases, starting with Release 1.1 and ending with Release 1.5 in December 2006.

16.    After Richmar delivered the code in December, but before the final release went live, I worked with Mr. Lim to fix the code concerning permission for file folders-- "session.java."

17.     In order to make updates or modifications to DCMS and DCMS Scan, GW needed a copy of the "source code," which is the version of the program as written by programmers. This is distinct from "executable code," which is needed only to install and implement software.

18.     A few days before Release 1.5 went into general use on December 18, 2006, Richmar delivered the source code to GW. CVS is a code storage system which enables multiple users to manipulate the code and keep track of the changes.

19.     Source code is made up not of one file, but often hundreds of files, as is the case here. When the code goes live, these files collectively become a new release of DCMS, despite the fact that individual files comprise the release.

20.     Although I was generally aware that the document only search capability was not functioning from September 2006, it was not until after Release 1.5 delivered from Richmar went live on December 18, 2006 that I became actively involved in correcting that problem.

21.     I was responsible for correcting the document only search function so that DCMS could function in a manner that would meet GW's business needs. I was able to correct the problem, and a functional search capability is included in Release 2, which went live in early April. The majority of the code for the document only feature of DCMS Release 2 was written by GW.

22.     Additional problems and inefficiencies with DCMS and DCMS Scan became apparent once the DCMS program went into use in December 2006. I corrected several of these problems, including inaccurate error messages and an inoperable text search function.

23.     In order to assist in our modifications to the source code, GW hired Crown Partners to evaluate the code against best practices.  I am aware that on February 9, 2007, personnel from Crown Partners were given access to the machine containing the DCMS code, which they viewed at GW's offices in Ashburn, Virginia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of June, 2007 in Ashburn, Virginia

_____
Vijay Padmanabhan

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 8



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

ADMINISTRATIVE APPLICATIONS

INFORMATION SYSTEMS AND SERVICES

January 6, 2006

Mr. Richard Gordon
RICHMAR & Associates
220 F Street, NW
Washington, DC  20002

Re:  Contract

Richard,

Attached you will find an original executed contract as we discussed today.  I faxed this to you this morning.

Please contact me with any questions.

Sincerely,

Peggy Steadman
Executive Associate
The George Washington University



**PPI260**

# CONTRACTUAL AGREEMENT

This contractual agreement is entered into on December 22, 2005 between The George Washington University, hereafter referred to as GWU, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, and RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

WHEREAS, GWU desires to employ the services of Contractor to perform certain tasks; and

WHEREAS, Contractor desires to perform certain tasks for GWU,

NOW, THEREFORE, GWU and Contractor agree as follows:

## 1. DESCRIPTION OF SERVICES

Contractor will perform certain services such as helping to design a computer system architecture for GWU, installing and configuring the Documentum package for use by the Human Resources and Contract Management departments, and other tasks that may be specified by GWU.

GWU shall issue task orders against this contract for specific projects. Task orders shall be added to this contract as appendices.

Services Ordered (BASE) - The statement of work identifies the work to be accomplished. (See Appendix A) The cost includes estimated labor hours (by labor mix) at a fixed rate per hour for the applicable labor category. The minimum order shall be 80 hours.

## 2. PERIOD OF SERVICES

GWU retains Contractor to provide services and support for a period beginning January 9, 2006 and terminating January 8, 2007. This agreement may be renewed for additional one year periods upon the mutual agreement of the parties.

## 3. TERMINATION

This agreement shall end upon the termination date; or upon 30 day written notice from one party to the other; or upon the breach of any of the requirements contained herein. In the event of such termination, GWU's obligations shall be limited to payment for services performed prior to such termination and reimbursement of expenses incurred.

## 4. CONTRACTOR PERSONNEL

Contractor shall provide personnel to provide services to GWU, after approval of proposed personnel by GWU.

## 5. REPORTS

When requested, Contractor agrees to furnish written letter reports covering the results of its services, including services on tasks not completed due to termination of this agreement, and recommendations based thereon. Such reports shall be written and prepared in such fashion as to give GWU full and free use thereof, without limitation of any sort.

PPI261

## 6. PROFESSIONAL CAPACITY OF CONTRACTOR

It is understood that the services Contractor will perform hereunder will be in its professional capacity as a Contractor and as an independent contractor; and that at no time shall any employee or subcontractor of Contractor be deemed to be an employee or agent of GWU, nor shall any employee or subcontractor of Contractor have authority to obligate GWU in any manner.

## 7. INVOICING

Payments for services shall be made upon receipt of invoices from Contractor on which Contractor will certify that services were rendered. Contractor shall render invoices on a monthly basis following the month in which services were rendered.

Any expenses to be incurred by Contractor shall be approved in advance in conformance with the usual and customary expense guidelines of GWU. Expense reimbursements will be submitted with itemized expenses and receipts for airline tickets, hotel expenses, and other expenses which GWU may reasonably require.

All invoices shall be submitted to: GWU, Attention: Accounts Payable. Contractor shall maintain appropriate time and expense records pertaining to the services performed under this agreement. Said records shall be subject to examination and audit by GWU.

## 8. ASSIGNMENT

No rights under this agreement may be assigned, and no obligations hereunder may be assumed by any person, agent, or company other than Contractor without the prior written approval of GWU. Contractor agrees to provide Jim Gearing as its representative.

## 9. INSURANCE

Contractor shall carry business liability insurance in the face amount of $4 million. Contractor shall also provide worker's compensation insurance and unemployment insurance for its employees.

## 10. CONFIDENTIAL INFORMATION

In the course of this agreement, Contractor may become familiar with confidential and sensitive information about the operation of GWU, GWU's employees, or GWU's students. Contractors recognizes the sensitivity and confidentiality of this information and agrees that its employees and subcontractors shall not at any time, during or after the term of this agreement, disclose to any person, firm, or other agent any confidential information, except under court order.

## 11. FULL FORCE

Contractor declares that there is no agreement between it and any other person, firm, or corporation which could cause this agreement not to have full force and effect.

## 12. GOVERNING LAW

This agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

PPI262

## 13. ENTIRE AGREEMENT

The parties of this agreement mutually agree that this agreement contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.

## 14. WRITTEN AGREEMENT

This agreement shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

**The George Washington University**

By: _____
Louis H. Katz

Title:   Executive Vice President and Treasurer

Date: _____1/4/06_____


**RICHMAR and Associates**

By: _____
Richard Gordon, Jr.

Title: President/CEO

Date: __12/22/05__


**PPI263**

**APPENDICES**

APPENDIX A

**Statement of Work (SOW) for Record Management System, Upgrades and Enhancements**

**1.0    Introduction**
This effort requires the Contractor to provide technical and management support to The George Washington University for the System Architecture and Documentum package system upgrades and enhancements.

The George Washington University needs the ability to readily account for critical Human Resource Management documents and records that may be maintained across the enterprise, and to establish better accountability for the costs and support of corporate goals and objectives for Contracts reaching the funding stage.    A workgroup with members from the enterprise applications group are tasked with enhancing the University's records management system with additional functions, storage/retrieval capabilities and multiple search/report functions.    The workgroup has identified enhancements and upgrades to be made to the University's computer system architecture and Documentum package.

**2.0    Scope**

The contractor shall provide quality technical, engineering, analytical, planning, and administrative support to GWU's enterprise application workgroup's Record Management systems.  The contractor shall furnish and make available all personnel, supplies, equipment, materials, data, facilities, and services necessary to assist the GWU Workgroup in accomplishing its mission. As directed by GWU, the contractor may also be required to interface with system integration contractors, equipment manufacturers, University personnel, and various GWU organizations.

**3.0    Requirements**

The contractor shall provide all of the necessary technical engineering, operations research, business, and administrative support such as: planning, organizing, managing, coordinating, and tracking (e.g., report management, cost/schedule/performance measurement, risk management, component procurement management, system engineering management, resource management, data management) required to perform all of the activities successfully as required in accordance with this SOW.

**3.1    Technical Support Tasks**

A.  The Contractor shall set up the System Architecture and Documentum application workspace, users and permissions. This shall include the development of impact statements relating to technical feasibility, cost and schedule considerations, along with supporting documentation associated with those functions.

B.  The Contractor shall set up organizational and document attributes for the database structure.

**PPI264**

C. The Contractor shall design data entry workflow and entry forms that represent the user interface.

## 3.2    Managerial Support Tasks

A. The Contractor shall attend weekly progress meetings with the GWU Workgroup.

B. The Contractor may be required to attend an initial "kick-off" meeting prior to regular weekly progress meetings to where the GWU Project Manager (PM) will provide necessary technical direction within the scope of the statement of work. If any questions arise as to whether any prescribed direction is not within the SOW, the Contractor must contact the GWU PM immediately prior to expending any effort, which is believed to be outside the scope of the SOW.

## 3.3    Administrative Support

A. The Contractor shall develop and prepare briefing packages, brochures, handouts and other information materials in various media. The Contractor shall plan and schedule conferences and meetings including the administration of background and support material.

B. The Contractor shall organize, prepare and execute GWU Workgroup displays and exhibits for technical conferences and shall make project briefings as required. The Contractor shall provide and/or conduct briefings or briefing material on any project information. The Contractor shall take minutes of all project meetings attended. The contractor shall include in the minutes the names of attendees/positions, organizations, phone numbers, and addresses of all persons attending meetings. All minutes of meetings shall be reviewed and approved by the GWU. The contractor shall incorporate all GWU comments into minutes and forward the minutes to the GWU for distribution. The contractor shall not distribute meeting minutes unless directed in writing by the GWU. The contractor's attendance on all meetings shall first be approved by the GWU prior to attendance.

C. The contractor shall perform the GWU Workgroup routine office administration as directed.

D. The Contractor shall arrange and facilitate meetings as directed by the GWU.

## 3.4    Program Management

The contractor shall efficiently and effectively manage the performance under this contract to ensure all the necessary technical, business, and administrative planning; organizing; managing; coordinating; and tracking (e.g., cost, schedule, deliverables), performance management, risk management, component procurement management, system engineering management, resource management, data management, and subcontract management required to perform all the activities successfully as required in the SOW. The Contractor representative is the primary point of contact for work to be performed under the resultant contract. The Contactor shall keep

the GWU Workgroup informed of any potential problems and make recommendations for solutions.

The Contractor shall ensure that assignments are completed in a thorough and timely manner and prepare written documentation of accomplishments. The GWU requirements in performing this contract demand that the Contractor's engineering, technical, analytical, and administrative support and the level of expertise, experience, and demonstrated performance of contractor personnel providing the services must be at the highest level of providing quality support.

The Contractor shall provide sufficient personnel, both in number and qualification to perform work described herein.

The Contractor shall provide sufficient oversight and supervision of the contract in order to ensure all employees are functioning within their designated labor categories and at acceptable levels of performance, and are performing their designated assignments in a timely manner and that all reporting requirements are honored. The Contractor shall provide a quality assurance system to ensure the University receives quality services as specified in the SOW.

## 3.5    Documentation

### 3.5.1    General Requirements

The Contractor shall coordinate with the GWU Workgroup on all reports, letters, memoranda, project documentation, minutes of meetings, steering committee reports, weekly reports, telephone conversation reports, trip reports and other written material. All documents shall be coordinated through the PM or designee prior to distribution. Further, all documents that will be distributed outside the GWU shall be reviewed for sensitive and/or classified information prior to any distribution of draft or final versions of those documents.

### 3.5.2    Document Review

The Contractor shall provide support to the GWU in the writing and/or reviewing of GWU program documentation. All documents prepared by the contractor shall be on the behalf of the GWU and the contractor may not independently publish or distribute any document without prior written permission from the GWU. The contractor shall review and provide written comments on the technical accuracy and completeness of each document. No documents, reports, information, etc., may be released to the public or provided to any party other than the GWU and it's contractors without review and written approval of the GWU.

### 3.6    Reporting Requirements

The Contractor shall provide a monthly steering report to the PM in letter format. The report shall describe the work accomplished during the reporting period, discuss problems encountered and corrective action taken, pending issues and work planned for the next period. In particular, the report shall address the extent to which any problems or circumstances will cause conflicts with the GWU project schedule.

**PPI266**

The Contractor shall provide a monthly detailed breakdown of funds expended during the reporting period, including a breakdown of labor hours utilized by the contractor and any subcontractor, associated labor costs, material costs and other direct costs incurred.

The Contractor shall deliver each steering report no later than the fifth working day of the month following the reporting period.

The Contractor shall provide a weekly briefing to the PM, which will be followed by a written narrative/summary of any agreements/resolutions. The briefing may include alternatives, findings and recommendations concerning problems encountered and corrective action taken, pending issues and work planned for the next week. In particular, the briefing shall address the extent to which any problems or circumstances may cause conflicts with the GWU project schedule.

## 3.7    Deliverables

| Deliverable | Delivery Date |
| --- | --- |
| System Requirements and Design | March 06, 2006 |
| Upgrade Documentum to version 5.3 | March 20, 2006 |
| Develop General Use Documentum module | April 03, 2006 |
| Develop Human Resources Documentum module | April 24, 2006 |
| Load Human Resources Documents and Records | May 08, 2006 |
| Develop Contract Administration Documentum module | May 29, 2006 |
| Load Contract Administration Documents and Records | June 12, 2006 |
| Develop enhanced system user interface | TBD |
| Develop enhanced reporting capabilities | TBD |
| Modify database tables and attribute structures | TBD |
| Develop archival database subsystem | TBD |
| Develop and deliver long term system support plan | TBD |
| Develop Training Package for Administrators/Webmasters | TBD |
| Deliver Training to Administrators/Webmasters | TBD |

## A. PERSONNEL

| Labor Category | Rates | Hours | Cost |
|---|---|---|---|
| Executive Management Consultant | $ 150.00 | | |
| Senior Engineer | $ 144.00 | | |
| Senior Management Consultant | $ 125.00 | | |
| Systems Analyst | $ 98.00 | | |
| Quality Analyst | $ 85.05 | | |
| Help Desk Specialist | $ 45.00 | | |
| Administrative Assistant | $ 33.67 | | |
| **Total** | | | |

## B. TASK ORDERS

PPI268

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 9



# GW Document and Case Management System (DCMS)

## Recommendation

29 March 2006
Richard Gordon, Jr.
President/CEO



1

PPI207

# User Interface

- Design and implementing **custom wrapper** around Documentum WebTop

  - Simple and easy to use user interface

  - Hides unwanted details

  - Automated jobs perform repetitive tasks

2

PPI208

# Content creation

 **THE GEORGE WASHINGTON UNIVERSITY**

**Document Management & Content Management System**

| Create | Import | Submit for Approval |

---

**Create Document**

| | | | |
|---|---|---|---|
| **Document Name** | | **Effective Date** | |
| **Dcoument Type** | Press Release ▼ | **Expiration Date** | |
| **Title** | | | |
| **Keywords** | | | |

3

PPI209

# Editing the Content

**Subheadline**
Enter a subheadline for the news item

Soaring controller pay looms large in discussions on ATC

**❋ Date**
Use MM/DD/YYYY

nulldate

**❋ Full Story**
Enter content for the news item

| Arial | ▼ | ▼ | **B** | *I* | ≣ ≣ ≣ | ⋮≣ ⋮≣ 钜 钜 |

As the US Congress, the Bush Administration, airlines and other interested parties discuss how to fund the daily operation of the US air traffic control system while also maintaining investment in technology to meet forecast growth in operations (*ATWOnline*, May 5), FAA confronts a major challenge whose outcome is central to the debate yet which until recently has received relatively little attention.

Design / Code

4

**PPI210**



# GW Document and Case Management System (DCMS)

## Recommendation

29 March 2006
Richard Gordon, Jr.
President/CEO



1

PPI207

# User Interface

- Design and implementing **custom wrapper** around Documentum WebTop

  - Simple and easy to use user interface

  - Hides unwanted details

  - Automated jobs perform repetitive tasks

2

PPI208

# Content creation



**Document Management & Content Management System**

| Create | Import | Submit for Approval |
|---|---|---|

| Create Document | | |
|---|---|---|

| **Document Name** | | **Effective Date** |
| **Dcoument Type** | Press Release ⌄ | **Expiration Date** |
| **Title** | | |
| **Keywords** | | |

3

PPI209

# Editing the Content

**Subheadline**

Enter a subheadline for the news item

Soaring controller pay looms large in discussions on ATC

**✳ Date**

Use MM/DD/YYYY

nulldate

**✳ Full Story**

Enter content for the news item

| Arial | ▼ | ▼ | **B** | *I* | | | | | | | |

As the US Congress, the Bush Administration, airlines and other interested parties discuss how to fund the daily operation of the US air traffic control system while also maintaining investment in technology to meet forecast growth in operations (*ATWOnline*, May 5), FAA confronts a major challenge whose outcome is central to the debate yet which until recently has received relatively little attention.

Design · Code

4

PPI210

# Review & Approval



**Document Management & Content Management System**

| Approval | Pending | Published |

| Pending Documents | | | | | |
|---|---|---|---|---|---|
| **Document Name** | **Author** | **Status** | **Publication Date** | **Approve** | **Inactive** |
| HRNews | John Doe | Pending | 05/05/2005 | ⊙ | N/A |
| | | Pending | | ○ | |
| BenefitesII | Michael Douglas | Pending | 04/05/2005 | ○ | N/a |

Approve || DisApprove

5

PPI211

# Review & Approval

 **THE GEORGE WASHINGTON UNIVERSITY** WASHINGTON DC

**Document Management & Content Management System**

| Approval | Pending | Published |

| Pending Documents | | | | | |
|---|---|---|---|---|---|
| **Document Name** | **Author** | **Status** | **Publication Date** | **Approve** | **Inactive** |
| HRNews | John Doe | Pending | 05/05/2005 | ⊙ | N/A |
| | | Pending | | ○ | |
| BenefitesII | Michael Douglas | Pending | 04/05/2005 | ○ | N/a |

| Approve |  || | DisApprove |

5

PPI211

# Archiving

 THE GEORGE WASHINGTON UNIVERSITY WASHINGTON DC

**Document Management & Content Management System**

**Audit Trial**   **Archiving**   **Records Management**

| | Category | Type | Expiration Date | Archive Status |
|---|---|---|---|---|
| ⊙ | <u>Compensation</u> | News | 05/05/2005 | Archived on 05/10/2005 |
| ○ | | | | |
| ○ | <u>Training</u> | General | 04/05/2005 | Not Archived |
| ○ | | | | |

**Archiving Documents**

Unarchive

6

PPI212

# Audit Trail



**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON DC

**Document Management & Content Management System**

| Audit Trail | Archiving | Records Management |
|---|---|---|

## Audit Trail

| Document Name | Author | Reviewer | Approver | Status | No. of Versions |
|---|---|---|---|---|---|
| NewsDetail 3.xml | John Doe | John Greedy | James | Active | 10 |
|  |  |  |  |  |  |
| PressRelease6.xml | Thomas Mayne | Richard Gere | N/A | Inactive | 5 |
|  |  |  |  |  |  |

7

PPI213



**Custom Wrapper for Documentum - Cost Estimate**

| Labor Categories | | Labor Rate | Labor Hours | | Current Amount |
|---|---|---|---|---|---|
| Executive Management Consultant | $ | 150.00 | 160.00 | $ | 24,000.00 |
| Senior Engineer | $ | 144.00 | 0.00 | $ | - |
| Senior Management Consultant | $ | 125.00 | 1040.00 | $ | 130,000.00 |
| Systems Analyst | $ | 98.00 | 0.00 | $ | - |
| Quality Analyst | $ | 85.05 | 0.00 | $ | - |
| Help Desk Specialist | $ | 45.00 | 0.00 | $ | - |
| Administrative Assistant | $ | 33.67 | 0.00 | $ | - |
| | **Totals Hours** | | 1200.00 | | |
| | | **Total Direct Labor** | | $ | 154,000.00 |
| | | **Other Direct Costs** | | $ | - |
| | | **Total Costs** | | $ | 154,000.00 |

**PPI214**

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 10

| Document Management System (DMS) Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** | **Date:**<br><br>April 5, 2006 |
| **Short Title:**<br><br>Documentum, Service Oriented Architecture and Open Source Solution | **Affects Oracle Workflow/Banner/portal (if applicable)?**<br><br>Does not affect Oracle Workflow/Banner/portal |
| **Requested by:**<br><br>Jim Gearing<br>Executive Management Consultant<br>RICHMAR & Associates<br>220 F Street NE<br>Washington, DC 20002<br>Office (202) 544-2015<br>Fax    (202) 544-2016<br>jgearing@richmar.info | **Supporting Materials Attached (yes/no)**<br><br>See Appendix A; cost Estimate for change by labor category. |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** A, D

RICHMAR Recommendation for Implementing a Custom Wrapper replacing Documentum WebTop user interface.

**Description of Change Request:**

Replace Documentum's WebTop user interface with a customized wrapper for the user interface by implementing web services to access Documentum functionality. A custom presentation layer will simplify the user interface significantly, making it easy for GW personnel to use Documentum and reduce training costs. Our approach will use the Documentum Webtop Application Program Interfaces (APIs), so that all native Documentum functionality will be retained for use by the presentation, business and data layers. By implementing a custom interface, GW gains flexibility in how the DMS functionality is presented.

By going to a web services approach, GW will leverage its ability to connect to Documentum from ERP systems such as Banner and EAS, without implementing one or more third party solutions  A consistent interface to the enterprise systems will make it easy for GW personnel to use DMS from any of the connected enterprise systems. SOA also makes it much simpler to add additional organizations to the GW DMS, requiring little or no additional development.

RICHMAR will use Documentum, a Service Oriented Architecture (SOA) and Open Source



PPI133

Solutions (OSS) for the Document Management System (DMS). Thus, all DMS functions will flow from the main menu of buttons that appears on every page in the system. This will facilitate the addition of a configurable solution to retrieving documents from any form in Banner or EAS without requiring modification to those ERP systems

The main functional areas of DMS are:

- **Add/Create** – This area is used to add or create a new document by entering all the relevant information about the document into a form (employee, subject, vendor, dates and times, etc.)

- **Review** – This area presents a table of checked out documents or documents pending approval. Clicking on any document in the table will present the complete data record. DMS will present appropriate tools to edit existing data or to add information regarding actions taken on the document (approvals, versions, etc.).

- **Resources** – This area provides access to a number of system information functions not directly related to specific documents, including functions to change your preferences and access to other systems.

- **Search & Retrieval** – This area allows you to search for documents by specifying criteria such as date range or type of document. The results of any document search are displayed in a table very similar to that in the "Review" area.

- **Form Retrieval** – Allows functionality similar to Search & Retrieval except search criteria is provided by ERP system Form content and retrieval is automatic.

GW is moving towards a Service Oriented Architecture (SOA). This approach enables increased application integration, reduced time to implement and lower development costs. Given that SOA is still emerging, there is no dominant commercial vendor. Our recommendation is to utilize OSS. There are compelling reasons for using OSS:
- OSS eliminates licensing fees as an impediment to leverage SOA
- OSS inherently avoids vendor lock-in and is typically vendor neutral
- OSS excels at standards-based solutions
- OSS are proven within the infrastructure layer

OSS also has the advantage that if a given commercial vendor does not have a feature that is required by GW it can be integrated and potentially offered back to the OSS community at no additional costs, so others may benefit.

**Impact on Schedule:**

No impact. RICHMAR proposes to add additional resources to work on the additional tasks that come from this change request.

| Evaluation Section | |
|---|---|
| Change in Scope | |

PPI134

| Identify requirements, & products/deliverables changes: | Estimate of effort (hrs) : |
|---|---|
| • Documentum, Service Oriented Architecture (SOA) and Open Source Solution (OSS) Requirements<br><br>• Documentum, Service Oriented Architecture (SOA) and Open Source Solution (OSS) Design<br><br>• Custom DMS User Interface<br><br>• Custom ERP system interface for Banner and EAS<br><br><br>RICHMAR believes it can shift funding within the project so that additional funding will not be required for this change request. | 1200 hours |
| **Identify plan changes:**<br><br>No plan changes | **Total Hours:** |
| **Description of risks:**<br><br>No additional risks | |

**Recommendation:**

Design and implement a **custom wrapper** around Documentum WebTop
- Simple and easy to use user interface
- Hides unwanted details
- Automated jobs perform repetitive tasks

Develop requirements definition for Documentum, Service Oriented Architecture (SOA) and Open Source Solution (OSS). SOA and OSS should be J2EE compliant.

| **Evaluated by:** | **Date:** |
|---|---|
| | |

| DECISION APPROVAL SECTION | | |
|---|---|---|
| Cancel __ | Postpone __<br>Reconsider on: | Integrate into Project __ |
| **Decision Approval Signatures:** | *[signature]* 04/07/06 | |
| **Change Advisory Board:** | | |

*[signatures]* 1/19/06

PPI135

**Appendix A – Cost Estimate For This Change By Labor Category**

| Labor Categories | Labor Rate | Labor Hours | Current Amount |
|---|---|---|---|
| Executive Management Consultant | $    150.00 | 180 | $    27,000.00 |
| Senior Management Consultant | $    125.00 | 1020 | $    127,500.00 |
| Total Hours | | 1200 | |
| Total Direct Labor | | | $    154,500.00 |
| Other Direct Costs | | | $            0 |
| Total Costs | | | $    154,500.00 |

Note:  Funding will be redirected from back scanning to absorb the cost of this scope change.

PPI136

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 11

1           IN THE UNITED STATES DISTRICT COURT FOR

                 THE DISTRICT OF COLUMBIA

2                     CIVIL DIVISION

3       - - - - - - - - - - - - - - - - - - - - - - - - -

4    CUS4, INC., d/b/a

     RICHMAR & ASSOCIATES, et al.,

5

                    Plaintiffs,

6

        v.                                Case No:

7                                  1:CV-07-0841 (JR)

     GEORGE WASHINGTON UNIVERSITY,

8

                    Defendant.

9

     - - - - - - - - - - - - - - - - - - - - - - - - -

10

                          Wednesday, May 23, 2007

11                        Washington, D.C.

12   Deposition of:

13                     TANYA K. BELL

14   called for examination by counsel for the

15   Plaintiffs, pursuant to Notice, taken at

16   the Law Offices of Geoffrey P. Gitner, Watergate,

17   Eleventh Floor, 600 New Hampshire Avenue, N.W.,

18   Washington, D.C. 20037, beginning at 9:30 a.m.,

19   before Lu Anne Dawson, Notary Public in and for

20   the District of Columbia, when were present on

21   behalf of the respective parties:

22

Page 14

1    system?
2         MR. THOMAS:  Objection to form.
3         BY MR. GITNER:
4    Q.    I am talking about you personally.
5    A.    The initial implementation was in
6    December of 2006.
7    Q.    Do you continue to use it today?
8    A.    My staff use it on a regular basis.
9    I use it occasionally.
10   Q.    So your staff has used it continuously
11   from December until today; is that a fair
12   statement?
13        MR. THOMAS:  Objection. Objection to
14   form.  That is sort of vague as to it exactly.
15        MR. GITNER:  I'll fix it up.
16        MR. THOMAS:  You haven't laid a
17   foundation as to what the DCMS is or as to what's
18   being used.
19        MR. GITNER:  No talking objections
20   here.  You can say objection to form and I will
21   either re-ask the question or I will fix it up.
22        BY MR. GITNER:

Page 15

1    Q.    Has your staff continually used the
2    DCMS system since December through today?
3    A.    I guess the question would be, what
4    does continually mean?
5    Q.    Well, have they used it or did they
6    start using it in December?
7    A.    Yes.
8    Q.    Are they using it today?
9    A.    Yes.
10   Q.    Did they use it in January?
11   A.    Yes.
12   Q.    Did they use it in February?
13   A.    Yes.
14   Q.    Did they use it in March and April?
15   A.    They did.
16   Q.    When you say your staff used it, you
17   are talking about the seven people on your staff?
18   A.    No.  I'm talking about pretty much
19   exclusively, I've got two positions that are
20   Document Imaging Specialists whose job primary
21   responsibility is to scan and image documents and
22   index documents.

Page 16

1    Q.    Have the other stakeholders used or
2    been using the DCMS since December?
3    A.    No.
4    Q.    Have they used it at all?
5    A.    Yes.
6    Q.    When did they start?  When did Faculty
7    Personnel begin to use it?
8    A.    I believe that it was during the month
9    of January 2007.
10   Q.    What about Medical Faculty Affairs?
11   A.    I believe that they also began to use
12   the system in January 2007.
13   Q.    And what about Research Services
14   Office?
15   A.    I don't recall the exact date of
16   Research nor Student Employment, but certainly
17   it was after the initial implementation in
18   December.  But they are able to use the system
19   currently.
20   Q.    Were they able to use it in January?
21   A.    I don't recall the exact date.
22   Q.    Or February?

Page 17

1    A.    I don't recall the exact day.
2    Q.    Do you know if it was in March?
3    A.    I don't recall the exact day.
4    Q.    What about student affairs office?
5    A.    Student Employment.
6    Q.    Student Employment?
7    A.    Again, I don't recall the exact
8    date.  I do know that they are able to use it
9    currently.
10   Q.    What about EEO?
11   A.    EEO has been able to access the system
12   since the initial implementation.
13   Q.    And are they still using it?
14   A.    They have access to use it.
15   Q.    What use have you and your staff made
16   of the DCMS since December?
17   A.    We have been imaging documents that
18   have come in since we have been able to, imaging
19   and indexing documents for retrieval.  We've been
20   retrieving documents that were put into the system
21   as a part of the initial implementation.
22        The staff have been able to research

Page 34

1    The mechanics of it?
2    Q.   Were you looking for any open
3  enrollment document?
4    A.   During, you have the ability to put in
5  there range of time, create date and the name of
6  the document.  If you don't recall, you recall
7  that documents went in but you don't recall the
8  name of the individual, that's when you would be
9  looking for, that's when you would use a Document
10  Only Search.
11    Q.   You say your staff uses this.  You
12  don't use it that much, but your staff uses it?
13    A.   I use it occasionally when asked for
14  something specifically or to access information
15  that they can't access.
16    Q.   How often does your staff utilize the
17  system, on a daily basis?
18    A.   Daily.
19    Q.   So it has been daily since December
20  18th?
21    A.   Unless there was a scheduled outage or
22  something.

Page 35

1    Q.   So they have been able to use it
2  despite the fact that it doesn't have the Document
3  Only Search function?
4    MR. THOMAS:  Objection to form.
5    BY MR. GITNER:
6    Q.   Correct?
7    A.   Yes.
8    Q.   So the Document Only Search function
9  has not been an essential need for them to operate
10  the DCMS as it exists now, correct?
11    MR. THOMAS:  Objection to form.
12    THE WITNESS:  It was a requirement
13  within the project definition.
14    BY MR. GITNER:
15    Q.   I'm not asking that.  I'm asking you,
16  they are able to operate this without the DOS
17  operating, correct?
18    A.   Yes.
19    Q.   So the system as it is, as it
20  operates, as it is able to index, retrieve and
21  research information, it is not essential that the
22  Document Only Search function works, correct?

Page 36

1    MR. THOMAS:  Objection to form.
2    BY MR. GITNER:
3    Q.   It's not indispensable?
4    MR. THOMAS:  Objection to form.
5    THE WITNESS:  In order for the system
6  to operate in an optimal way, it should have the
7  things that are required.
8    It is not essential for your car to
9  have air conditioning, however --
10    BY MR. GITNER:
11    Q.   It still runs?
12    A.   Correct.
13    Q.   Okay.
14    A.   However, this weekend when it's 90
15  degrees --
16    Q.   So what you're telling me is it would
17  be more convenient if it had the Document Only
18  Search?
19    A.   I'm a user, so my goal is to make it
20  as user friendly and as useful for the user as
21  possible.
22    Q.   Would you say that you're --

Page 37

1    MR. THOMAS:  Geoff --
2    MR. GITNER:  I'm sorry.
3    MR. THOMAS:  This is the third time
4  you have done that.
5    MR. GITNER:  You're right.
6    BY MR. GITNER:
7    Q.   Go ahead.  I apologize.
8    A.   I'm done.
9    Q.   I'm sorry.  Go ahead.
10    A.   I'm done.
11    Q.   All right.  Would you say it is fair
12  that GW staff has used the DCMS system since
13  December 18th hundreds of times?
14    MR. THOMAS:  Objection to form.
15    BY MR. GITNER:
16    Q.   If not thousands of times?
17    MR. THOMAS:  Objection to form.  Still
18  lack of foundation as to what it is or the system
19  is.
20    But you may answer.
21    THE WITNESS:  You are referring to
22  DCMS?



Page 58

1  our I-9 records and things that we are accountable
2  for having where there is much scrutiny, it was
3  myself who instigated this.
4        The timing of it in April is purely
5  random. We just haven't had a chance to get to it
6  with all the other projects that we're engaged in.
7        The person that is working with me on
8  this is a temp who works on various projects in
9  the office. I don't have assigned staff to be
10 able to do this validation, so this person is
11 working with me to help us to do this so that we
12 can transition these documents off-site.
13       But because I'm the responsible party,
14 even though our contractor has worked with us to
15 get these in, it's still my responsibility to
16 ensure that what has been told to me is in the
17 system is in the system, so we have to do a check.
18       We've got millions of documents that
19 can't be done in short order.
20    Q.   Has she been able to find documents
21 in the DCMS to validate?
22    A.   Yes.

Page 59

1     Q.   They were back scanned?
2     A.   Yes.
3     Q.   When did you find this box was
4  missing?
5     A.   In the course of her search about a
6  month ago, we were doing reviews for I-9s.
7     Q.   Who found a box to be missing?
8     A.   The box wasn't missing. The box of
9  information had not been scanned.
10    Q.   I'm asking you who found that.
11    A.   Vicky Baker.
12    Q.   Oh, she found that out?
13    A.   Yes.
14    Q.   Once she started doing the validation
15 process?
16    A.   Yes. So a box was missed.
17    Q.   So prior to that, you hadn't had any
18 notice that any information had been missing?
19    A.   No.
20    Q.   Did you seek approval to hire Ms.
21 Baker?
22    A.   Ms. Baker was already on staff as a

Page 60

1  temporary staff. She just --
2     Q.   Is she a member of ISS?
3     A.   No, she's not.
4     Q.   What is she a member of?
5     A.   She works in Human Resource Services
6  as a temporary employee and has worked for the
7  University essentially for the past 30 years.
8     Q.   I take it, though, prior to her
9  seeking to validate the documents were there by
10 utilizing the system and others utilizing the
11 system, you were able to validate that back
12 scanned documents were on the DCMS?
13    A.   Right, for select documents of which
14 I have thousands and thousands of records.
15    Q.   And you didn't need the Document Only
16 Search function to be activated in order to do
17 that, did you?
18       MR. THOMAS: Objection to form.
19       THE WITNESS: Not for the type of
20 review that we were doing for that particular
21 exercise, no.
22       BY MR. GITNER:

Page 61

1     Q.   I was asking you, when did you or when
2  did the plan formulate to move the legacy
3  documents off-site?
4     A.   The formal, there is no formal plan.
5  There is just the knowledge that that needs to be
6  done.
7        The paper files are taking up space.
8  Space equals money, and we don't have the money to
9  keep that square footage on K Street, which is
10 expensive.
11       So the goal has always been to reduce
12 the, reduce the amount of space taken up by paper
13 files and at the same time, that's why I said a
14 while ago a goal of the project was to image the
15 records. Another goal was to reduce the amount
16 of space that we consume as a department.
17    Q.   Have any actions been taken to
18 implement that goal, including, for example,
19 locating where you're going to move the legacy
20 documents, what you're going to do with the space
21 in which the legacy documents presently exist,
22 where you're going to get the money to move the

Page 62

1 documents? Have any actions been taken to
2 implement the goal of moving the legacy documents?
3    A.   No, because again -- we have a
4 standing contract with off-site storage, so if we
5 chose to move those documents to storage, that
6 exists. So it is not a matter of creating a new
7 arrangement.
8    Q.   Is there any paper, is there any
9 documentation, electronic or hard copy, that would
10 show that there is an estimated date or a goal of
11 when to move the hard core documents, the legacy
12 documents?
13    A.   Not that I'm aware of.
14    Q.   You also testified that one of the
15 uses that you made of the DCMS was to replace the
16 paper files, do you recall that, or a use that you
17 are making?
18    A.   To replace the paper files?
19    Q.   Yes.
20    A.   A goal of the project was to provide
21 an electronic version of the files. I would deem
22 that to be a goal of the project.

Page 63

1    Q.   What other goals were there?
2    A.   Again, to reduce the amount of space
3 taken up by the paper files, to create a central
4 repository, to be able to organize the documents
5 in a coherent fashion, logical order, segregable
6 based upon business necessity, secured way.
7    Q.   Do you need a Document Only Search
8 function to carry out those goals?
9    A.   No, you do not. However, a Document
10 Only Search does facilitate the ability to
11 retrieve documents in the system in an optimum
12 way, should you have the need to retrieve
13 documents in that way.
14    Q.   Again, you have no information,
15 personal knowledge of whether or not anyone has
16 sought to modify the source code, the program
17 code, since December 18th, 2006?
18    A.   No. I have no personal knowledge of
19 anything having to do with the modification of
20 code.
21    Q.   Have you heard? Do you have any
22 hearsay information, second-hand information?

Page 64

1    MR. THOMAS:  Objection to form.
2    THE WITNESS:  Information regarding --
3    BY MR. GITNER:
4    Q.   Any modifications to the source code
5 for the DCMS since December 18th.
6    A.   The only thing that I know for certain
7 is that there was a list of known issues and that
8 known issues were to be addressed subsequent to
9 the initial implementation.
10    Q.   Do you know if there was an agreement
11 between Richmar and GW that the Document Only
12 Search function would not be included in the first
13 release?
14    A.   I don't recall specifically, no.
15    Q.   Do you recall anything generally?
16    A.   I don't recall generally, either.
17    Q.   Do you know whether or not the
18 Document Only Search function was supposed to be
19 included in the first release as of December of
20 2006?
21    A.   I know that the Document Only Search
22 was a requirement in the original requirements

Page 65

1 document. I can't recall specifically as of the
2 initial implementation.
3    Q.   Whether it was included in the
4 requirements as of that date?
5    A.   Right. Right.
6    Q.   You say you can't recall. Did you
7 know at some point?
8    A.   I can't -- presumably.
9    Q.   You mean as part of these groups, that
10 would be something you would have known --
11    A.   Right.
12    Q.   -- but maybe you forgot?
13    A.   Right.
14    MR. THOMAS:  Let him finish his
15 questions before you answer. It assists the court
16 reporter.
17    BY MR. GITNER:
18    Q.   Do you recall a problem in activating
19 -- can I call it the DOS so we know what that
20 means, the Document Only Search?
21    A.   I prefer for you to call it the whole
22 name, because DOS to me means dos.

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 12



# DCMS
## Application Walkthrough
### 11/16/2006



INFORMATION
SYSTEMS &
SERVICES

| | Agenda & Meeting Minutes | | | | | |
|---|---|---|---|---|---|---|
| X | Marcy Day | X | Andy Smith | X | Jim Gearing |
| X | Rick Gilchrist | X | Rehan Khan | X | Jae Lim |
| X | Christina Griffin | X | Tony Ford | X | Chris McDermott |
| X | Ron Bonig | X | Richard Gordon | | |
| | | | | | |
| | | | | | |

- ✓ Project Status
- ✓ Walk through of DCMS
- ✓ Next Steps and Action Items

## Project Status

- Mantis tickets, required for go-live, were reviewed
- Two tickets (318 & 336) need to be fixed
- Two tickets (282 & 316) need to be tested
- One ticket (334) is partially fixed; text search does not need to be fixed for go-live
- Code needs to be frozen; will only fix things that would prevent going into User Acceptance Testing (UAT). Any other issues found during analyst testing should be documented. There is a code fix release planned after UAT; all documented issues will be prioritized to determine what will be included in the UAT code fix release.

## Walk Through and discussion
### DCMS issues and enhancements

- Exception handling (tickets 318 & 336) will be fixed prior to code freeze
- Text search not working; not required for go-live
- Document only search not working (design error); fix planned for release 2
- Search brings back a full list of people, instead of only those meeting selection criteria; release 2 fix
- Review function working a designed; shows past 2 weeks activity. Future enhancement will be to provide user the ability to select time frame rather than being required to use the 2 week default
- If a document is added under the wrong GWID, there needs to be a process to move the document to the correct GWID; this will be a future enhancement. There is a work around that will be provided during training
- Documents are marked for deletion; users cannot delete. An SLA needs to be put in place to allow authorized users to request the DCMS Administrator to delete documents. Future enhancement will be to purchase software that deletes documents based on assigned retention.
- Need the ability to copy documents from Documentum into eRoom; this was a requirement to allow HR Personnel to give temporary document review ability to someone who does not have access to DCMS HR Personnel. GW's eRoom license does not provide the functionality to meet this requirement; however eRoom Enterprise license does provide this functionality.

### DCMS Scan issues and enhancements

- The Create drop down box should only contain 2 items; this will be fixed before code freeze
- Form group search will be added in release 2
- When reviewing a saved document, index selections are not populated; however, all saved indexes are displayed on the left side of the screen. This will need to be shown to users during training



GW000083

**Post Production Tasks**
- Back scanned documents with form group 'Unassigned' will need to be assigned a form group. There will be 'unassigned' form groups for HRS and ORS. It will be the responsibility of the stakeholders to determine which form group to assign. Most likely, there will be some form group assignments that can be done via a batch process rather than one-by-one; Tony will work with Stakeholders to setup batch programs.

**Other concerns**
- Ron raised concern regarding the new Discovery Law that will be effective 12/1/06. Documents meeting defined retention criteria must be deleted from all sources.
- Jae is needed onsite to complete the QA install (promote code to QA). GW will do the install; Jae will be used as a resource if issues are encountered. GW is particularly concerned about validating the eInput code push. It is important the QA install be successfully completed on 11/17 in order to meet the 12/18 go-live date.
- Release 2 development is on hold. GW needs to determine when they are comfortable that appropriate processes and procedures are in place to support 2 releases simultaneously (release 1 in QA and release 2 in Development).

**Next Steps**
- Jae onsite Thursday and Friday morning (11/16 and 11/17)
- Finish development and testing
- Promote code to QA
- See action items below

| | | |
|---|---|---|
| Complete Mantis tickets 318 & 336 | Richmar | 11/16 |
| Finish testing tickets 282 & 316 | Rick, Tony | 11/16 |
| Fix Create drop down box in DCMS Scan | Jae | 11/16 |
| Approve code freeze | Rick | 11/17 |
| Promote code to QA | Rehan, Tony, Jae | 11/17 |
| Prepare SLA to allow authorized users to request the DCMS Administrator to delete documents. | Rick | 12/15 |
| Investigate eRoom Enterprise licensing | Rick | TBD |
| Investigate software to allow software retention management; determine when this is needed. | Rick | TBD |
| Inform Claire of training issues | Marcy | complete |

GW000084

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 13

Current as of: 12/6/2006

## DCMS Priority List for Fixes, Modifications and Enhancements

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 2 | | | | | | | NA | |
| 3 | | | | | | | NA | |
| 4 | 3 | Users with View only can click on Modify Attributes to see the current values assigned to a selected document. The user can also change and add values but when clicking on Confirm an error message "Operation failed." is received. | The "Confirm" button and entry boxes should be disabled when a document is selected that the user has only view access to. | DCMS | L | | 353 | 2.0 |
| 5 | 4 | Users with View only can click on Add in either the Quick Search or Document Information, go through all of the motions of adding a document but at the end when clicking on "Confirm Document" will receive the error message "Could not add document due to an internal error.". | Add buttons should not be selectable for users with only view profiles. | DCMS | L | | 355 | 2.0 |
| 6 | 5 | Form Name search displays Form Groups/Names for Org Levels that are not valid for the user. This can result in the user selecting values that will cause a subsequent error when adding the document. | Values will be restricted and not viewable. | DCMS | H | 24 | 354 | 2.0 |
| 7 | 6 | Single value drop downs in DCMS should default so the user doesn't have to select. | When there is only one value set the selection to that single entry so the user can go directly to a drop down that requires a selection. | DCMS | M | | 356 | 2.0 |
| 8 | 7 | Text search within Document is not working. | Fix search capability. | DCMS | H | | 364 | 2.0 |
| 9 | 8 | Users assume that using the enter key will retrieve documents from the Quick Search, not take them to the add screen. They are also confused by this capability since it is not labeled. | Swap Add/Retrieve buttons, change default to Retrieve. Frame and label Quick-search the same as the Advanced Search. Add disclaimer stating that the Quick Search returns only Active Employees and Jobs. | DCMS | L | | 361 | 2.0 |
| 10 | 9 | When an Employee with multiple Jobs is selected the Employee Information view is stretched out between Last Name/First Name, First Name/MI, Birth Date/Age, Age/Gender and Gender/Ethnicity. | Move all of the position information to the bottom in the same list format as the Search results screen. | DCMS | L | | 359 | 2.0 |
| 11 | 10 | When multiple cabinets are available to the user a Cabinet selection list should be presented following DCMS Login. Default Cabinet to prior value. | Add a section on the login screen or another screen to list the cabinets available to the user. Change the current drop-down list to a "Select new Cabinet" button on the Navigation bar. If only one Cabinet is available to the user the screen display should be skipped and the Select Cabinet button grayed out. | DCMS | M | | 360 | 2.0 |
| 12 | 11 | Searches with Document only search criteria currently does not work. | Fix to be scheduled | DCMS | H | 10 | 364 228 | 2.0 |
| 13 | 12 | Employee Search with Document search criteria will not narrow the list of employees but will server to filter the actual documents | Fix to be scheduled | DCMS | H | 30 | 364 323 | 2.0 |
| 14 | 13 | Add Position number code at the Employee search results List and change Position Class to the Class code only (no title) | | DCMS | M | | | review by Tanya |
| 15 | 14 | On Employee Information, replace position title with long title if available in object provided by Banner Web service. | | DCMS | | Drop if not required | | |
| 16 | 15 | When the document list and review list are exported the data cannot be read until the columns are adjusted making it hard for the user to determine what information was exported. | Write the excel file for exports with the columns set to autofit so the information is readable when viewed. | DCMS | L | | 366 | 2.0 |
| 17 | 16 | Long error messages are difficult to read and scroll bar must be moved to read the whole thing. Other error messages are confusing or misleading. | Error messages should wrap in a display box. Error messages should all be review and written to accurately report the problem encountered. | DCMS Web-S | H | 4 | 367 377 378 | 2.0 |

Printed on &[DATE]

GW004051

Current as of: 12/6/2006

## DCMS Priority List for Fixes, Modifications and Enhancements

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 18 | 17 | When the presentation columns for "Employee documents" and "Review documents" are changed they should be saved for the user/workstation. | Save values in Cookie. | DCMS | H | 4 | 365 | 2.0 |
| 19 | 18 | Provide an option to set the number of days to display for Review (currently hard-coded to 14) | Add a value on the document navigation bar that displays the current value and allow it to be saved.  Save the value in the prestation format Cookie. | DCMS | M | | 365 | 2.0 |
| 20 | 19 | Add an Advanced search capability for owner NetID, Folder # | | DCMS | M | | 364 | 2.0 |
| 21 | 20 | Currently the effective date is located on the right side of the add area requiring the user to navigate to that location and often forgeting to add Effective date which is required.  Move to left side. | Move effective date in front of File Name. | DCMS | M | | 363 | 2.0 |
| 22 | 21 | Currently the search selects all active and inactive employees and jobs increasing the time required to search for employees and decreases the number of employess that can be returned. | Modify Advanced Search with check boxes for Active/Inactive Employees and Active/Inactive Jobs with the default set to Active Employees and Jobs.  Modify Quick Search to select Active Employees and Active Jobs.  Adjust the number of employees that can be returned if jobs are set to inactive. | DCMS Web-S | H | 40 | 357 358 362 | |
| 23 | 22 | Due to the type of data being scanned some text in the document have a "Deny" meaning they should not be batched related documents, Cut and paste should be available | Determine if this option is possible with a reschedulre process of files | DCMS | E | | | review by team |
| 24 | 23 | Folder number should be added as a selectable display column for Employee documents. | Add Folder number as a selectable display column for documents | DCMS | M | | 365 | 2.0 |
| 25 | 24 | Modify Navagation bar: Currently the button name disappears, add Select Cabinet button, rename review and search buttons, add NetID and name of user logged in next to Cabinet name, move sign out button | Change the color of a selected button.  Add button for "Select new Cabinet". Use "Review recent activity" and "Search" in place of "review" and "search".  Add the name of the user from dm_user table (user_os_name) next to Cabinet.  Move the "Sign out" button to the Navigation bar. | DCMS | M | 8 | 361 | 2.0 |
| 26 | 25 | Modify labels on Seach screen | Change "Employee Information" to "Employee Search Criteria" and "Document Information" to "Document Search Criteria" | | M | | 362 | 2.0 |
| 27 | 26 | Annotation cabability | Integrate Brava with DCMS | DCMS | H | | 317 | 3.0 |
| 28 | 27 | Add indexing to DCMS to allow indexing to be completed for batches by users at their workstations at their desks | | DCMS | review with Vendor | | | 3.0 |
| 29 | 28 | Add Split/Join capability | | DCMS | review with Vendor | | | 3.0 |
| 30 | 29 | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |
| 41 | | | | | | | | |
| 42 | | | | | | | | |
| 43 | | | | | | | | |

Printed on &[DATE]

Current as of: 12/6/2006      **DCMS Priority List for Fixes, Modifications and Enhancements**      Page 3 of 12

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 44 | | | | | | | | |
| 45 | | | | | | | | |
| 46 | | | | | | | | |
| 47 | | | | | | | | |
| 48 | | | | | | | | |
| 49 | | | | | | | | |
| 50 | | | | | | | | |
| 51 | | | | | | | | |
| 52 | | | | | | | | |
| 53 | | | | | | | | |
| 54 | | | | | | | | |
| 55 | | | | | | | | |
| 56 | | | | | | | | |
| 57 | | | | | | | | |
| 58 | | | | | | | | |
| 59 | | | | | | | | |
| 60 | | | | | | | | |
| 61 | | | | | | | | |
| 62 | | | | | | | | |
| 63 | | | | | | | | |
| 64 | | | | | | | | |
| 65 | | | | | | | | |
| 66 | | | | | | | | |
| 67 | | | | | | | | |
| 68 | | | | | | | | |
| 69 | | | | | | | | |
| 70 | | | | | | | | |
| 71 | | | | | | | | |
| 72 | | | | | | | | |
| 73 | | | | | | | | |
| 74 | | | | | | | | |
| 75 | | | | | | | | |
| 76 | | | | | | | | |
| 77 | | | | | | | | |
| 78 | | | | | | | | |
| 79 | | | | | | | | |
| 80 | | | | | | | | |
| 81 | | | | | | | | |
| 82 | | | | | | | | |
| 83 | | | | | | | | |
| 84 | | | | | | | | |
| 85 | | | | | | | | |
| 86 | | | | | | | | |
| 87 | | | | | | | | |
| 88 | | | | | | | | |
| 89 | | | | | | | | |
| 90 | | | | | | | | |
| 91 | | | | | | | | |
| 92 | | | | | | | | |

Printed on &[DATE]

CONFIDENTIAL

## DCMS Scan Priority List for Fixes, Modifications and Enhancements

| | A | B |
|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes |
| 2 | 1 | The name of the batch should be more represetative of GW; the current name is hard to use |
| 3 | 2 | Change DCMS Scan to have primarily optional values except for Orgs |
| 4 | 3 | Single value drop downs in DCMS Scan should default so the user doesn't have to select. |
| 5 | 4 | When multiple cabinets are available to the user a Cabinet selection list should be presented following DCMS Scan Login |
| 6 | 5 | When entering search criteria for DCMS Scan the following are not searched and are for display only; Suffix, Gender, Benefit Category, Empl Class |
| 7 | 6 | When clicking on the calendar icon an message is displayed asking "Are you sure you want ot navigate away form this Page?". Click on OK and then the calendar is displayed. |
| 8 | | |
| 9 | 8 | Can DCMS Scan batches be removed from the desktop either automatically or by a utility provided? |
| 10 | 9 | Currently in DCMS Scan GWid can be wiped out and/or changed to an invalid GWid. |
| 11 | 10 | Long error messages are difficult to read and scroll bar must be moved to read the whole thing.  Other error messages are confusing or misleading.   Modify for SCAN |
| 12 | 11 | Currently the search selects all active and inactive employees increasing the time required to search for employees and decreases the number of employees that can be returned. |
| 13 | 12 | Display the name of the user logged in at the top of the screen. |
| 14 | 13 | Minor screen changes. |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

CONFIDENTIAL

GW004054

Current as of: 12/6/2006     **DCMS Scan Priority List for Fixes, Modifications and Enhancements**     Page 5 of 12

| | C | D | E | F | G | H |
|---|---|---|---|---|---|---|
| 1 | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 2 | | SCAN | | | | |
| 3 | | SCAN | | | | |
| 4 | When there is only one value set the selection to that single entry so the user can go directly to a drop down that requires a selection. | SCAN | M | | 368 | 2.0 |
| 5 | Add a section on the login screen or another screen to list the cabinets available to the user. User will logout of current session and log back in to select a different cabinet. | SCAN | M | | 264 | 2.0 |
| 6 | Indicate what fields are not searchable and restrict from entering data. | SCAN | L | | 369 | 2.0 |
| 7 | Fix or replace with a calandar tool with a compatiable tool that won't display this message. | SCAN | | | 370 | 2.0 |
| 8 | | SCAN | | | | |
| 9 | | SCAN | | | | |
| 10 | | SCAN | | | | |
| 11 | Error messages should wrap in a display box. Error messages should all be review and written to accurately report the problem encountered. | | | | 375 376 | 2.0 |
| 12 | Modify Search with check boxes for Active/Inactive Employees with the default set to Active Employees.   Select last job only. | SCAN | | | 371 357 | 2.0 |
| 13 | | SCAN | | | 264 | 2.0 |
| 14 | Change eInput Password to SCAN Password Remove checkbox/words for passwords the same Change below to above | | | | 372 | 2.0 |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |

Printed on &[DATE]

CONFIDENTIAL

GW004055

Current as of: 12/6/2006

## DCMS Scan Priority List for Fixes, Modifications and Enhancements

Page 6 of 12

| | A | B |
|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |
| 33 | | |
| 34 | | |
| 35 | | |
| 36 | | |
| 37 | | |
| 38 | | |
| 39 | | |
| 40 | | |
| 41 | | |
| 42 | | |
| 43 | | |
| 44 | | |
| 45 | | |
| 46 | | |
| 47 | | |
| 48 | | |
| 49 | | |
| 50 | | |
| 51 | | |
| 52 | | |
| 53 | | |
| 54 | | |
| 55 | | |
| 56 | | |
| 57 | | |
| 58 | | |
| 59 | | |
| 60 | | |
| 61 | | |
| 62 | | |
| 63 | | |
| 64 | | |
| 65 | | |
| 66 | | |
| 67 | | |
| 68 | | |
| 69 | | |
| 70 | | |
| 71 | | |
| 72 | | |
| 73 | | |
| 74 | | |
| 75 | | |
| 76 | | |
| 77 | | |
| 78 | | |
| 79 | | |

Printed on &[DATE]

CONFIDENTIAL

GW004056

Current as of: 12/6/2006    DCMS Scan Priority List for Fixes, Modifications and Enhancements

| | C | D | E | F | G | H |
|---|---|---|---|---|---|---|
| 1 | Possible Fix | Module | Priority | LCE | Mantis | Build |
| 29 | | | | | | |
| 30 | | | | | | |
| 31 | | | | | | |
| 32 | | | | | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | | | | | |
| 48 | | | | | | |
| 49 | | | | | | |
| 50 | | | | | | |
| 51 | | | | | | |
| 52 | | | | | | |
| 53 | | | | | | |
| 54 | | | | | | |
| 55 | | | | | | |
| 56 | | | | | | |
| 57 | | | | | | |
| 58 | | | | | | |
| 59 | | | | | | |
| 60 | | | | | | |
| 61 | | | | | | |
| 62 | | | | | | |
| 63 | | | | | | |
| 64 | | | | | | |
| 65 | | | | | | |
| 66 | | | | | | |
| 67 | | | | | | |
| 68 | | | | | | |
| 69 | | | | | | |
| 70 | | | | | | |
| 71 | | | | | | |
| 72 | | | | | | |
| 73 | | | | | | |
| 74 | | | | | | |
| 75 | | | | | | |
| 76 | | | | | | |
| 77 | | | | | | |
| 78 | | | | | | |
| 79 | | | | | | |

Printed on &[DATE]

CONFIDENTIAL    GW004057

|  | A | B |
|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes |
| 80 | | |
| 81 | | |
| 82 | | |
| 83 | | |
| 84 | | |
| 85 | | |
| 86 | | |
| 87 | | |
| 88 | | |
| 89 | | |
| 90 | | |
| 91 | | |
| 92 | | |

Printed on &[DATE]

CONFIDENTIAL

GW004058

Current as of: 12/6/2006                DCMS Scan Priority List for Fixes, Modifications and Enhancements                    Page 9 of 12

| | C | D | E | F | G | H |
|---|---|---|---|---|---|---|
| 1 | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 80 | | | | | | |
| 81 | | | | | | |
| 82 | | | | | | |
| 83 | | | | | | |
| 84 | | | | | | |
| 85 | | | | | | |
| 86 | | | | | | |
| 87 | | | | | | |
| 88 | | | | | | |
| 89 | | | | | | |
| 90 | | | | | | |
| 91 | | | | | | |
| 92 | | | | | | |

Printed on &[DATE]

CONFIDENTIAL

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Ref # | Suggested Changes/Fixes | Possible Fix | Module | Priority | LOE | Mantis | Build |
| 2 | 1 | When users are restricted to Org Level II values, the restricted values are displayed.  If the restricted values are selected for adding a document the user can go through all of the motions of adding a document but at the end when clicking on "Confirm Document" will receive the error message "Could not add document due to an internal error.". | Values will be restricted and not viewable. | DCMS | H | | 343 | 1.5 |
| 3 | 2 | Currently on the Employee list the are Effective and Term dates are the  same. | These dates are current invalid.  The Begin and End dates should be used, see Banner form. | WebS | H | | 347 | 1.5 |
| 4 | | | | | | | | |
| 5 | | | Invalid dates allowed by DCMS Scan | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |
| 41 | | | | | | | | |

CONFIDENTIAL

|    | A | B | C | D | E | F | G | H |
|----|---|---|---|---|---|---|---|---|
| 42 |   |   |   |   |   |   |   |   |
| 43 |   |   |   |   |   |   |   |   |
| 44 |   |   |   |   |   |   |   |   |
| 45 |   |   |   |   |   |   |   |   |
| 46 |   |   |   |   |   |   |   |   |
| 47 |   |   |   |   |   |   |   |   |
| 48 |   |   |   |   |   |   |   |   |
| 49 |   |   |   |   |   |   |   |   |
| 50 |   |   |   |   |   |   |   |   |
| 51 |   |   |   |   |   |   |   |   |
| 52 |   |   |   |   |   |   |   |   |
| 53 |   |   |   |   |   |   |   |   |
| 54 |   |   |   |   |   |   |   |   |
| 55 |   |   |   |   |   |   |   |   |
| 56 |   |   |   |   |   |   |   |   |
| 57 |   |   |   |   |   |   |   |   |
| 58 |   |   |   |   |   |   |   |   |
| 59 |   |   |   |   |   |   |   |   |
| 60 |   |   |   |   |   |   |   |   |
| 61 |   |   |   |   |   |   |   |   |
| 62 |   |   |   |   |   |   |   |   |
| 63 |   |   |   |   |   |   |   |   |
| 64 |   |   |   |   |   |   |   |   |
| 65 |   |   |   |   |   |   |   |   |
| 66 |   |   |   |   |   |   |   |   |
| 67 |   |   |   |   |   |   |   |   |
| 68 |   |   |   |   |   |   |   |   |
| 69 |   |   |   |   |   |   |   |   |
| 70 |   |   |   |   |   |   |   |   |
| 71 |   |   |   |   |   |   |   |   |
| 72 |   |   |   |   |   |   |   |   |
| 73 |   |   |   |   |   |   |   |   |
| 74 |   |   |   |   |   |   |   |   |
| 75 |   |   |   |   |   |   |   |   |
| 76 |   |   |   |   |   |   |   |   |
| 77 |   |   |   |   |   |   |   |   |
| 78 |   |   |   |   |   |   |   |   |
| 79 |   |   |   |   |   |   |   |   |
| 80 |   |   |   |   |   |   |   |   |
| 81 |   |   |   |   |   |   |   |   |
| 82 |   |   |   |   |   |   |   |   |
| 83 |   |   |   |   |   |   |   |   |
| 84 |   |   |   |   |   |   |   |   |
| 85 |   |   |   |   |   |   |   |   |
| 86 |   |   |   |   |   |   |   |   |
| 87 |   |   |   |   |   |   |   |   |
| 88 |   |   |   |   |   |   |   |   |
| 89 |   |   |   |   |   |   |   |   |

CONFIDENTIAL

GW004061

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 90 | | | | | | | | |
| 91 | | | | | | | | |
| 92 | | | | | | | | |

CONFIDENTIAL

GW004062

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 14

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3   ------------------------------------------

 4   CUS4, INC. D/B/A            :

 5   RICHMAR & ASSOCIATES,       :

 6   et al.,                     :

 7              Plaintiffs:

 8   v.                          :    No.1:CV-07-0841 (JR)

 9   GEORGE WASHINGTON           :

10   UNIVERSITY,                 :

11              Defendant.   :

12   ------------------------------------------

13                   CONFIDENTIAL

14         Deposition of VIJAY PADMANABHAN, a witness

15   herein, taken by the Plaintiff, at the offices of

16   Arnold & Porter, 555 Twelfth Street, Northwest,

17   Washington, D.C., at 1:38 p.m., Thursday, May 31,

18   2007, and the proceedings being taken down by

19   Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and

20   transcribed under her direction.

21

22
```

Vijay Padmanabhan                              CONFIDENTIAL                              May 31, 2007
                                              Washington, DC

| | |
|---|---|
| **Page 34** | **Page 36** |

**Page 34**

1       MR. GITNER: I think he understands what
2   the DCMS --
3       MS. PURI: If you understand.
4       THE WITNESS: The bulk scanning indexing
5   change.
6       MS. PURI: Does DCMS include DCMS scan for
7   any of your question?
8   BY MR. GITNER:
9       Q   Go ahead and answer the question.
10      MS. PURI: But does it include DCMS scan?
11  I'm not sure the witness can answer the question if
12  he doesn't know all the --
13      MR. GITNER: If you're going to make
14  talking objections, then I think you should ask him
15  to leave the room, and you can put whatever you want
16  on the --
17      MS. PURI: We can certainly do that. I'm
18  just asking you to clarify your question.
19      MR. GITNER: And he doesn't seem to need
20  clarification. I think you're trying to interfere
21  with the deposition.
22      MS. PURI: Certainly, I'm not trying to do

**Page 35**

1   that. My objection is short, and you can answer if
2   you understand.
3       MR. GITNER: He's been answering the whole
4   afternoon so far what the DCMS is. Are you
5   suggesting that he doesn't understand?
6       MS. PURI: It appeared to me, from your
7   current line of questioning, that you were being
8   unclear about DCMS.
9       MR. GITNER: When I mention the DCMS, I
10  mean the DCMS, okay? All right. Agreed.
11  BY MR. GITNER:
12      Q   Go ahead.
13      A   To make this change happen?
14      Q   Yeah.
15      A   Yes.
16      Q   You're going to have to rewrite the code?
17      MS. PURI: Objection. Which code?
18  BY MR. GITNER:
19      Q   Is that correct?
20      A   DCMS code?
21      Q   Yes.
22      A   Yes.

**Page 36**

1       Q   You knew I wasn't talking about Netscape's
2   code or Microsoft code, right?
3       MS. PURI: Objection. There are two parts
4   to DCMS. Which part of DCMS are you referring to?
5       MR. GITNER: All right.
6   BY MR. GITNER:
7       Q   Are you familiar with Crown Partners?
8       A   Yes.
9       Q   Can you tell me whether or not Crown
10  Partners has ever received a copy of the DCMS source
11  code?
12      A   You mean hard copy?
13      Q   Any copy, electronic or hard copy.
14      A   We have viewed the code.
15      Q   Have they received a copy of the code?
16  Was a copy of the code sent to them at their offices,
17  to your knowledge?
18      A   No.
19      Q   When you said they viewed the code, where
20  did they view the code?
21      A   At GW, the campus, Ashburn campus at GW.
22      Q   And when was that?

**Page 37**

1       A   Early February.
2       Q   And what specific person from Crown
3   Partners did that?
4       A   Kevin Burns.
5       Q   Was there anybody else from Crown Partners
6   with Mr. Burns?
7       A   No.
8       Q   How long was he at the campus viewing the
9   code?
10      A   Two days.
11      Q   Are you aware of any other individuals
12  that are not George Washington employees that have
13  viewed the DCMS source code other than Mr. Burns?
14      A   No.
15      Q   Okay. Can you tell me what were the
16  circumstances surrounding Mr. Burns viewing the code?
17  Why was he viewing the code?
18      A   He was there to evaluate the code.
19      Q   And why was he there to evaluate the code?
20      A   That's out of my work.
21      Q   Were you present when he was viewing the
22  code?

                                                        10 (Pages 34 to 37)

Vijay Padmanabhan | CONFIDENTIAL<br>Washington, DC | May 31, 2007

Page 38

1    A   Yes.
2    Q   Were you with him for the total time he
3  was viewing the code?
4    A   I was at the office when he was viewing
5  the code.
6    Q   Were you present in the same room with him
7  when he was viewing it?
8    A   Yes.
9    Q   Why were you present with him?
10    A   My desk is right next to him.
11    Q   Did you discuss what he was doing
12  evaluating the code?
13    A   No.
14    Q   Do you know who approved his evaluating
15  the code?
16    A   Rick Gilchrist.
17    Q   Were you privy to any conversations, in
18  which Mr. Gilchrist was present, as to the
19  circumstances for Mr. Burns evaluating the code?
20    A   Can you restate that?
21    Q   Yeah.  Were you privy to any conversation,
22  part of any conversation, overhear any conversation,

Page 39

1  do you have any knowledge of anything that was said
2  with regard to Burns viewing the code?
3    A   I knew from Rick that Kevin will be
4  evaluating the code.
5    Q   And why was he brought in to evaluate the
6  code?
7    MS. PURI:  Objection, asked and answered,
8  lack of foundation.
9    THE WITNESS:  That's not my job role.  I
10  just do what Rick asks me to.
11  BY MR. GITNER:
12    Q   So you have no knowledge whatsoever of why
13  Mr. Burns was viewing the code?
14    A   That was part of their work order.
15    Q   Part of their --
16    A   Part of Crown Partners' work.
17    Q   But you have no knowledge whatsoever of
18  why they were there?
19    A   I knew they're there for evaluation.
20    Q   Why were they there for evaluation?
21    MS. PURI:  Asked and answered.
22  BY MR. GITNER:

Page 40

1    Q   You don't have any knowledge of why they
2  were there?
3    A   For evaluation.
4    Q   Are you aware of any criticism there was
5  to the DCMS at that time?
6    MS. PURI:  Objection.  By whom?
7    THE WITNESS:  By who?
8  BY MR. GITNER:
9    Q   That's what I'm asking you.  Are you aware
10  of any criticism?  If you're not, then no, and if you
11  know, then I'll ask you who.
12    A   No.
13    Q   Your testimony is that, as of the
14  beginning of February, the time that Crown Partners
15  came in to do an evaluation of the DCMS computer
16  code, you were unaware of any criticism whatsoever
17  with regard to the DCMS computer code, correct?
18    A   I know there are errors in the DCMS code.
19    Q   Well, was that why Crown Partners was
20  brought in?
21    A   I don't know.
22    Q   Were you aware of any criticism of the

Page 41

1  DCMS as of February 2007?
2    A   I know the errors.
3    Q   What errors?
4    A   The list I mentioned before.
5    Q   Can you tell me again what errors?
6    A   The document only search, the net ID
7  search.
8    Q   Wait a minute.  The document only search,
9  what was wrong with it?
10    A   It wasn't working.
11    Q   All right.  The net ID?
12    A   Wasn't working.
13    Q   Go ahead.
14    A   Text search, those are a few, there are
15  many more.
16    Q   There were a few, there were many more,
17  I'm not certain what you mean by that.
18    A   Many more than what I have told.
19    MR. THOMAS:  I think he said those are a
20  few, there are many more.
21  BY MR. GITNER:
22    Q   The net ID did not work at all?

11 (Pages 38 to 41)

Vijay Padmanabhan                    CONFIDENTIAL                    May 31, 2007
                                      Washington, DC

Page 122

1  specification document for release number three?
2      A  Correct.
3      Q  And have you seen this?
4      A  Yes.
5      Q  When did you receive this?
6      A  This May.
7      Q  And do you recall if there were any
8  signatures on the requirements document?
9      A  I get an electronic version of it.
10     Q  Well, there still could be electronic
11 signatures or?
12     A  It wasn't involved there.
13     Q  Is Crown Partners going to play any role
14 in release number three?
15     A  The modifications will be done by DCMS, by
16 the GW group.
17     Q  My question was --
18     A  Based on the recommendations from --
19     Q  Crown Partners?
20     A  Crown Partners.
21     Q  This is the solution design?
22     A  I don't know if it is a solution design.

Page 123

1  I have the recommendation documents.
2      Q  Do you have recommendation documents from
3  Crown Partners, correct?
4      A  Correct.
5      Q  Let me just show you this, I don't think
6  we have to have it marked, I just want to see if this
7  was the document you were referring to.  I have a
8  document from George Washington University, Crown
9  Partners DCMS application, dated March 2nd, 2007.  Is
10 this the document you're referring to, or is this
11 something else?  Those are multiple copies of the
12 same document.
13     A  Yes.
14     Q  That's the document you're referring to?
15     A  That's the evaluation document.
16     Q  Have you seen any other documents from
17 Crown Partners?
18     A  No.
19        (Whereupon, a short recess was taken.)
20        (Plaintiff's Exhibit Number 10 was marked
21 for identification.)
22 BY MR. GITNER:

Page 124

1      Q  Let me show you what's been marked as
2  Exhibit Number 10, and let me ask you, who is Mike
3  Ng, who is that?
4      A  He is another developer working on the
5  DotNet side.
6      Q  On the what side?
7      A  The DotNet technology.
8      Q  The DotNet technology?
9      A  Correct, ASP DotNet.
10     Q  And what does that have to do with DCMS?
11     A  This is DCMS scan.
12     Q  I see.  And are you envisioning any
13 support to you with regard to modifications made to
14 the DCMS code for release number three for Crown
15 Partners?
16     A  I don't understand.
17     Q  Are you expecting to get -- will you
18 need -- are you going to have any support from Crown
19 Partners for release number three?
20     A  Yes.
21     Q  And what would that be, what support are
22 you envisioning?

Page 125

1      A  I don't envision anything.  It's been
2  given to me that they will be, they will be involved
3  in keeping the recommendations, the, doing the
4  document.
5      Q  So they're going to work with you?
6      A  I'll be the DCMS contact.
7      Q  And are they actually going to do the
8  computer coding?
9      A  From DCMS changes, I will be doing it.
10 They'll not be doing it, I'll be doing it.
11     Q  What will they be doing?
12     A  They give some recommendations on how to
13 work.  Supervision is done by Rick Gilchrist.
14     Q  But they're going to give you direction in
15 what to do?
16        MS. PURI:  Objection to form.
17        THE WITNESS:  They're going to recommend
18 certain things.
19 BY MR. GITNER:
20     Q  They're going to recommend certain things.
21 What types of things?
22     A  Probably follow up with the documents you

32 (Pages 122 to 125)

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 15

*George Washington University*
*DCMS*
*(Document & Case Management System)*



**Response to the Final Report: DCMS Code Audit**

*FINAL*

*July 10, 2006*

**Welcome to**
The New Way Of Learning

*RICHMAR and Associates*

CONFIDENTIAL

*DCMS(Document and Content Management System)*                              *Response to Code Audit*

*REVISIONS INFORMATION*

| Version | Primary Author(s) | Description of Version | Date of Revision |
|---------|-------------------|------------------------|------------------|
| Draft 1.0 | Jim Gearing<br>Jae Lim<br>Wai Lam | Initial Draft | 07/08/06 |
| Final 1.1 | Jae Lim | Edited and Elaborated | 07/10/06 |
| GW Comments 1.2 | Jenn Bond | Addition of GW's Comments | 7/11/06 |

CONFIDENTIAL

*Response to the Final Report: DCMS Code Audit*
Jim Gearing, Jae Lim, Wai Lam
Richmar Associates, Inc.

The purpose of this document to formally accept, confirm and respond to the comments provided by Sun Micro System per audit performed between June 21, 2006 to June 23, 2006. The following sections describe our understanding of the comments provided from the code review and pending actions items and discussions.

### 1. Nonstandard package names

**Comments from Sun:**
Package names such as "GWU.HR.actions" and "GWU.HR.data" do not conform to the Java standard of lower case package names. It is assumed these names are temporary and will be replaced with more formal package names in the future (Page 1).

**Response from Richmar:**
These names are temporary and will be changed in the future. The code was part of the initial release and it is a Work-In-Progress (WIP).

### 2. Lack of Javadoc comment

**Comments from Sun:**
Some Javadoc documentation was delivered, however this documentation was notably absent in the Struts "action" classes. Since these classes together form the controller portion of the web framework, they are really the core of the executable portion of the web application, and should therefore be among the best documented artifacts in the whole project.

**Response from Richmar**
The areas that are lacking in documentation will be filled in as we progress. The code was part of the initial release and it is a Work-In-Progress (WIP).

### 3. "Swallowed" exceptions

**Comments from Sun:**
Occasionally an exception is caught but no action is taken. At the very least, caught exceptions should be logged. Here is an example from the file AddAction.java:

**Response from Richmar**
These are work in progress areas and will have exceptions logged appropriately in future releases. The code was part of the initial release and it is a Work-In-Progress (WIP).

### 4. Unused import statements

**Comments from Sun:**
Many of the class files contain import statements for Java classes that are then never used within the compilation unit. This is a very minor complaint to be sure, as it does not directly affect runtime execution of the code. However, a large number of missing imports will cloud the "problems" list in Eclipse and other integrated development environments, thereby obscuring warnings that may be far more important.

Also, there is the potential for problems in the ongoing evolution of the code file, for instance the introduction of a new class that happens to have the same name as a class that was previously imported but not used. Especially since it is now a trivial function in any modern IDE, it is best to simply clean up unused imports.

**Response from Richmar**
The unused import logic eventually will be cleaned up. Some of these lines of logic are residuals from testing the code.

CONFIDENTIAL

5.  **Missing brackets around IF statement**

*Comments from Sun:*
Although one line IF statements do not technically need to be surrounded by curly brackets to denote scope, it is very bad practice to omit the brackets. From the file AddConfirmAction.java:



Note that subsequent code added to this sample, if indented, will appear to be part of the IF statement, when in fact it will be executed at all times, due to the lack of brackets.

*Response from Richmar*
Whether or not it's bad practice to omit the brackets is open for discussion and is a matter of preference. Indentation of code is meant to facilitate readability and has no influence on how the code will execute, nor does it represent your lack of responsibility in understanding the scope and code. If subsequent code is added and is meant to be part of the IF statement, then we will surround it appropriately with the appropriate brackets. Upon confirmation of the coding standard of GW, Richmar will adhere to the specifications.

*Jenn Comments:* At GW we would prefer consistent use of brackets. If you want to put it all on one line, that's fine, but please use brackets.

6.  **Usage of concrete implementation vs. interfaces**

*Comments from Sun:*
In a few cases, method signatures were found that contained implementation classes when an interface would be preferable, especially when dealing with the Java Collections API. For example, from the Javadoc documentation of the class iis.doc.document.Document:



It would be far better to return a java.util.List in this case to ensure maximum flexibility.

*Response from Richmar*
Richmar will consider the use of "java.util.List" versus "ArrayList" and make the appropriate changes.

7.  Overuse of string array in service method signatures

*Comments from Sun:*
All of the service methods from the Richmar-provided Documentum Web Service use String and String array structures as return values, into which different data is filled and must be parsed out by specific index values in any client code. It would be far preferable here to have a basic object model for the types of data being returned, and to use these model objects as the return values. It is understood that using Strings and String arrays allows developers to avoid many of the serialization and deserialization issues associated with web services. However, there are many easy solutions at this point in time, such that the loss of code robustness, readability and maintainability cannot be justified anymore. The most notable of these solutions would be to simply maintain WS-I compliance, which ensures the interoperability of a compliant service among disparate platforms. See more about WS-I at: http://www.ws-i.org/

*Response from Richmar*
One of the key benefits of creating the services methods using String and String array structures is to maximize the portability of the services to multiple locations without packaging .jar files. Hence, this would eliminate the administrative overhead. However, Richmar recognizes the application will be maintained and operated by GW, and the code will be changed to meet their design wishes.

*Jenn Comments:* Over the phone, Richmar expressed their concern about a performance hit if these string arrays are converted to objects. We have agreed to have a face to face discussion about their concern. However, if it's just string data that would be placed into an object construct, I don't see why we wouldn't proceed with objects. We are not concerned with distribution of client .jar files to consume services.

CONFIDENTIAL

8.    <u>**Fallback on static values on service failure**</u>

*Comments from Sun:*
In many cases in the Struts action classes, static data would be returned in the case of a service failure.  It is unclear whether or not this code was simply present for development purposes, or whether that was actually the intent to keep the application "alive" in the case of a back-end service failure.  If the latter is the case, this code should be inspected closely – it very well may be a bad idea to continue in this manner in the case of a service failure, and it may be far preferable to report the failure to the end user immediately, rather than hiding it as this code effectively does.

*Response from Richmar*
The code was part of the initial release and it is a Work-In-Progress (WIP).

9.    <u>Overuse of servlet session</u>

*Comments from Sun:*
There are instances of using the servlet container session when not absolutely necessary, which can quickly lead to performance problems. The most notable example was using the session to pass data from a Struts action class to the associated JSP page. In this case, it would be far better to prepopulate the Struts form bean associated with that JSP page, and pass this form bean into the page context, where it will be automatically bound to the form, which would also eliminate extraneous code on the JSP page.

*Response from Richmar*
The code was part of the initial release and it is a Work-In-Progress (WIP).

CONFIDENTIAL

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 16


**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON DC

## DCMS Project
## Richmar Closeout Meeting
## 12/14/2006

### Agenda & Meeting Minutes

| | | | | | | |
|---|---|---|---|---|---|---|
| X | Marcy Day | X | Andy Smith | X | Richard Gordon |
| X | Christina Griffin | X | Francesco de Leo | X | Jim Gearing |
| X | Rick Gilchrist | X | Tom Breslin | | |

Contract closeout; Review & Update Closeout list

The contract with Richmar ends 1/8/2007. There are two statements of work associated with the contract; Development of DCMS, and back scanning of HR Personnel records.
- HRS go-live is 12/18/2006; there is no more DCMS development that will be done under this contract, as of 12/15/06.

Back scanning will be extended to 1/31/2007; same rates will remain in place. Richmar needs to take whatever action necessary to make sure all scanning, indexing and validation is completed by 1/31/2007. Jim Gearing will remain the contact for back scanning through 1/31/2007.
- The closeout list prepared by GW was reviewed. An updated list, based on discussion at meeting, is attached. RICHMAR requested that GW fomalize the closeout list in letter format.. GW will have Legal, prepare a document for signature. RICHMAR will be required to certify items on the closeout list are completed. The extension of contract will be until 2/15/07 to allow for GW to validate that all DVDs and back scanned images have been received before Richmar proceeds with deleting the files from their systems.

| | | |
|---|---|---|
| Email Richard closeout certification paperwork | Christina | 12/31/06 |
| Schedule time with developer(s) to deliver all source code, and provide a face-to-face turnover to walk through deliverables. Note: The face-to-face should be limited to a few hours. | Jim | 12/31/06 |



CONFIDENTIAL

GW001994

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 17

# FINAL REPORT

## of the National Commission on New Technological Uses of Copyrighted Works

July 31, 1978

Library of Congress / Washington   1979

# Computers and Copyright

In creating the Commission, Congress directed that two broad subjects concerning computers and copyright be addressed: the creation of new works with computer assistance and the use of copyrighted works in conjunction with computers. With respect to the second area, the Commission has considered three separate issues: the placement into computers of any copyrighted works, the use of automated data bases, and copyright protection for the intellectual property in computer programs.

Because this study was to be undertaken, Congress included a section in the new copyright law specifying that a copyright owner had the same rights with respect to computer uses of copyrighted works as were available under the copyright law before the effective date of the Act of 1976—existing state statutes, case law, and the provisions of the Copyright Act of 1909.[36] The legislative history of the 1976 Act clearly shows that Congress intended that the provision be continued, eliminated, or modified, based upon the Commission's recommendations.[37]

## Background

From the Renaissance through the Industrial Revolution to the present, technological developments have consistently extended society's power to control natural phenomena and to shape its own destiny. The rapid developments in communications and information technology of the past three decades have immeasurably expanded and extended the power of human communication.

One of the most important contributions to the communication and information revolution has been the digital computer. Animated by elements of human creative genius, these machines are opening new avenues for recording, storing, and transmitting human thought. New means of communication transcend words fixed on paper or images on film and permit authors to communicate creatively, adaptively, and dynamically with their audience.

The first commercial computers, built shortly after World War II, were based largely on vacuum tubes and were so expensive that only the government or the largest corporations could even consider owning them. To function, the typical early computer required an environment in which temperature and humidity were carefully monitored. It was controlled by programs created by its manufacturer and users exclusively for that particular computer.

Subsequent generations of computers have been characterized by dramatic reductions in the size, energy requirements, and price for a given amount of computational power. These generations are measured by the changes in the electronic circuitry of the computer. The four generations now generally acknowledged have been based upon vacuum tubes, transistors, printed circuits, and integrated circuits, respectively.

## Foundation for the Recommendations

### Computer Programs [38]

Computer programs are a form of writing virtually unknown twenty-five years ago. They consist of sets of instructions which, when

---

[36] 17 U.S.C. § 117.
[37] House Report, *supra* note 1, p. 116.

[38] Separate opinions by Commissioners Nimmer, Hersey, and Karpatkin follow in this chapter.

properly drafted, are used in an almost limitless number of ways to release human beings from such diverse mundane tasks as preparing payrolls, monitoring aircraft instruments, taking data readings, making calculations for research, setting type, operating assembly lines, and taking inventory. Computer programs are prepared by the careful fixation of words, phrases, numbers, and other symbols in various media. The instructions that make up a program may be read, understood, and followed by a human being. For both economic and humanitarian reasons, it is undesirable for people to carry out manually the process described in painstaking detail in a computer program. Machines, lacking human attributes, cannot object to carrying out repetitious, boring, and tedious tasks. Because machines can and do perform these tasks, people are free to do those other things which they alone can do or in which they find a more rewarding expenditure of their efforts.

Great changes have occurred in the construction of computers, as well as in the media in which programs are recorded. Periodic progress has seen the development, utilization, and, in some cases, passage into obsolescence of bulky plug boards, punched paper cards and tape, magnetic tapes and disks, and semiconductor chips. It should be emphasized that these developments reflect differences only in the media in which programs are stored and not in the nature of the programs themselves.

The evolution of these media is similar to that of devices for playing recorded music. Circuit boards may be compared to music boxes, and punched paper to piano rolls, while magnetic disks and tapes store music and programs in precisely the same manner. Both recorded music and computer programs are sets of information in a form which, when passed over a magnetized head, cause minute currents to flow in such a way that desired physical work is accomplished.

The need for protecting the form of expression chosen by the author of a computer program has grown proportionally with two related concurrent trends. Computers have become less cumbersome and expensive, so that individuals can and do own computers in their homes and offices with more power than the first commercial computers, while at the same time, programs have become less and less frequently

written to comply with the requirements imposed by a single-purpose machine.

Just as there was little need to protect the ridged brass wheel in a nineteenth-century music box, so too was there little reason to protect the wired circuit or plug boards of early computers. The cost of making the wheel was inseparable from the cost of producing the ridged final product. The cost of copying a reel of magnetic tape, whether it contains a Chopin étude or a computer program, is small. Thus, the following proposition seems sound: if the cost of duplicating information is small, then it is simple for a less than scrupulous person to duplicate it. This means that legal as well as physical protection for the information is a necessary incentive if such information is to be created and disseminated.

This proposition is the underlying principle of copyright, but from 1908 until early 1972 the copyright laws of the United States did not reflect its acceptance with respect to one form of expression: recorded sounds. Because the Supreme Court held in 1908 that since a piano roll was not readily perceptible to human eyes it was not a copy of the music it rendered on a player piano, there was almost "open season" —at least in terms of federal law—on the duplication of piano rolls, shellac and vinyl records, and audio tape recordings.[39] Certain states made it illegal to duplicate such works, but federal copyright remained almost powerless in this area. While this rule was often criticized, its effect was apparently not too deleterious to producers of recorded sounds, so long as the cost of disk duplication made commercial piracy an expensive undertaking. Records and piano rolls were doubtless duplicated and sold, but on a less than threatening scale. The development of inexpensive transistorized tape recording equipment and its use by organized pirates posed serious economic problems for either the 1908 rule or the recording industry. But the principle persevered and finally prevailed in the Sound Recording Act of 1971, which provided sanctions against those who engage in the unauthorized duplication of sound recordings.[40]

As the number of computers has increased

---

[39] White-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1 (1908).
[40] P.L. 92–140, 85 Stat. 391 (1971).

dramatically, so has the number of programs with which they may be used. While the first computers were designed and programmed to perform one or a few specific tasks, an ever increasing proportion of all computers are general-purpose machines which perform diverse tasks, depending in part upon the programs with which they are used. Early programs were designed by machine manufacturers to be used in conjunction with one model or even one individual computer. Today, many programs are designed to operate on any number of machines from one or more manufacturers. In addition, and perhaps even more importantly, there is a growing proportion of programs created by persons who do not make machines. These people may be users or they may be—and increasingly are—programmers or small firms who market their wares for use by individual machine owners who are not in a position to write their own programs. Just as Victrola once made most of the first record players and records, so too did early machine manufacturers write most of the first programs. Victrola's successor, RCA, still produces sound recordings (but, interestingly enough, not phonographs), but so do hundreds of other firms. If present computer industry trends continue, it is all but certain that programs written by nonmachine manufacturers will gain an increasing share of the market, not only because writing programs and building machines are two very different skills that need not necessarily occur simultaneously, but also because program writing requires little capital investment.[41]

The cost of developing computer programs is far greater than the cost of their duplication. Consequently, computer programs, as the previous discussion illustrates, are likely to be disseminated only if:

1. the creator may recover all of its costs plus a fair profit on the first sale of the work, thus leaving it unconcerned about the later publication of the work; or

2. the creator may spread its costs over multiple copies of the work with some form of protection against unauthorized duplication of the work; or

3. the creator's costs are borne by another, as, for example, when the government or a foundation offers prizes or awards; or

4. the creator is indifferent to cost and donates the work to the public.

The consequence of the first possibility would be that the price of virtually any program would be so high that there would necessarily be a drastic reduction in the number of programs marketed. In this country, possibilities three and four occur, but rarely outside of academic and government-sponsored research. Computer programs are the product of great intellectual effort and their utility is unquestionable. The Commission is, therefore, satisfied that some form of protection is necessary to encourage the creation and broad distribution of computer programs in a competitive market.

The Commission's conclusion is that the continued availability of copyright protection for computer programs is desirable.[42] This availability is in keeping with nearly two centuries' development of American copyright doctrine, during which the universe of works protectible by statutory copyright has expanded along with the imagination, communications media, and technical capabilities of society.

This conclusion is in accord with the recommendations of groups studying this issue for the United Kingdom and the World Intellectual Property Organization.[43] Both studies recommended that computer programs be afforded protection to a degree that is virtually identical to American copyright.[44] A Canadian study

---

[41] For a discussion of barriers to entry in the hardware and software markets, see this chapter under Economic Effects of Program Copyright.

[42] The Copyright Office presently accepts computer programs for registration. (See this chapter under Statutory Copyrightability of Programs and Appendix A under Eighty-eighth Congress, 1964 Revision Bill.)

[43] COPYRIGHT AND DESIGNS LAW: REPORT OF THE COMMITTEE TO CONSIDER THE LAW ON COPYRIGHT AND DESIGNS (H.M.S.O., 1976) (frequently known as the Whitford Committee Report); MODEL PROVISIONS ON THE PROTECTION OF COMPUTER SOFTWARE (1978).

[44] A recent study for the World Intellectual Property Organization (WIPO) notes that "in a number of countries it would already be possible to give such protection [to programs] on the basis of current legislation on copyright . . . and consequently special legislation would not be necessary. In various countries including the United States . . . there would seem to be no particular desire to set up special provisions to protect software" (Kolle, *Computer Software Protection—Present Situation and Future Prospects,* 1977 COPYRIGHT 72).

reached the opposite conclusion, and an Australian report considered computer issues outside its terms of reference.[45]

The Commission also believes that the effects of the recommendations pertaining to computer programs made in this report, as well as those pertaining to the other computer-related subjects within the Commission's jurisdiction, should be periodically reviewed. This could be accomplished on a smaller scale than that undertaken by the Commission but should be performed well and often enough to prevent the copyright law from becoming as anachronistic as did the 1909 Act.

The Commission is unanimous in its belief that computer programs are entitled to legal protection. But the unanimity has not extended to the precise form that protection should take.[46] The law as it exists today with respect to the protection of computer programs is not totally clear. What is clear is that today there are different and often conflicting methods used by proprietors to attempt to protect their products. These include patent and copyright—exclusively federal statutory methods; trade secret law—derived from statutory and judicial state law; and unfair competition—based on elements of common law and federal statute.[47]

To provide reasonable protection for proprietors without unduly burdening users of programs and the general public, the following statements concerning program copyright ought to be true:

1. Copyright should proscribe the unauthorized copying of these works.

2. Copyright should in no way inhibit the rightful use of these works.

3. Copyright should not block the development and dissemination of these works.

4. Copyright should not grant anyone more economic power than is necessary to achieve the incentive to create.

Relatively few changes in the Copyright Act of 1976 are required to attain these objectives, and

the promulgation of regulations by the Copyright Office will ease the burden of compliance for both copyright owners and users.

*Recommendations for Statutory Change*

To make the law clear regarding both proprietors' and users' rights, the Commission suggests that the following changes to the Copyright Act of 1976 be made:

1. That section 117 as enacted be repealed.

2. That section 101 be amended to add the following definition:

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

3. That a new section 117 be enacted as follows:

*§ 117: Limitations on exclusive rights: computer programs*
Notwithstanding the provisions of § 106, it is not an infringement for the rightful possessor of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program *provided*:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.
Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

The 1976 Act, without change, makes it clear that the placement of any copyrighted work into a computer is the preparation of a copy and, therefore, a potential infringement of copyright. Section 117, designed to subject com-

---

[45] KEYES and BRUNET, COPYRIGHT IN CANADA: PROPOSALS FOR A REVISION OF THE LAW (1977); REPORT OF THE COPYRIGHT LAW COMMITTEE ON REPROGRAPHIC REPRODUCTION (1976).

[46] See this chapter for the separate opinions of Commissioners Nimmer, Hersey, and Karpatkin.

[47] See this chapter under Copyright and Other Methods Compared.

puter uses of copyrighted works to treatment under the old law, vitiates that proscription, at least insofar as machine-readable versions are not *copies* under the 1909 Act.[48] Therefore, to prevent any question concerning the impropriety of program piracy and to assure that all works of authorship are treated comparably under the new law, section 117 should be repealed.[49]

Because the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability. Obviously, creators, lessors, licensors, and vendors of copies of programs intend that they be used by their customers, so that rightful users would but rarely need a legal shield against potential copyright problems. It is easy to imagine, however, a situation in which the copyright owner might desire, for good reason or none at all, to force a lawful owner or possessor of a copy to stop using a particular program. One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it to that extent which will permit its use by that possessor. This would include the right to load it into a computer and to prepare archival copies of it to guard against destruction or damage by mechanical or electrical failure. But this permission would not extend to other copies of the program. Thus, one could not, for example, make archival copies of a program and later sell some while retaining some for use. The sale of a copy of a program by a rightful possessor to another must be of all rights in the program, thus creating a new rightful possessor and destroying that status as regards the seller. This is in accord with the intent of that portion of the law which provides that owners of authorized copies of a copyrighted work may sell those copies without leave of the copyright proprietor.[50]

Because of a lack of complete standardization among programming languages and hardware in the computer industry, one who rightfully acquires a copy of a program frequently cannot use it without adapting it to that limited extent which will allow its use in the possessor's computer. The copyright law, which grants to copyright proprietors the exclusive right to prepare translations, transformations, and adaptations of their work, should no more prevent such use than it should prevent rightful possessors from loading programs into their computers.[51] Thus, a right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. The conversion of a program from one higher-level language to another to facilitate use would fall within this right, as would the right to add features to the program that were not present at the time of rightful acquisition. These rights would necessarily be more private in nature than the right to load a program by copying it and could only be exercised so long as they did not harm the interests of the copyright proprietor. Unlike the exact copies authorized as described above, this right of adaptation could not be conveyed to others along with the licensed or owned program without the express authorization of the owner of the copyright in the original work. Preparation of adaptations could not, of course, deprive the original proprietor of copyright in the underlying work.[52] The adaptor could not vend the adapted program, under the proposed revision of the new law,[53] nor could it be sold as the original without the author's permission.[54] Again, it is likely that many transactions involving copies of programs are entered into with full awareness that users will modify their copies to suit their own needs, and this should be reflected in the law. The comparison of this practice to extensive marginal note-taking in a book is appropriate: note-taking is arguably the creation of a derivative work, but unless the note-taker tries to copy and vend that work, the copyright owner is unlikely to be very concerned. Should proprietors feel strongly that

---

[48] If they are not, then their unauthorized duplication would not be an infringement, just as the unauthorized duplication of sound recordings was largely without the scope of copyright before February 15, 1972. (See this chapter under Computer Programs.)

[49] This appears consistent with congressional intent that section 117 should only be effective pending the Commission's report. (See House Report, *supra* note 1, p. 116.)

[50] 17 U.S.C. § 109(a).

[51] 17 U.S.C. §§ 101 and 106(2).

[52] Grove Press, Inc., v. Greenleaf Publishing Co., 247 F.Supp. 127 (E.D.N.Y. 1965).

[53] See this chapter under Recommendations for Statutory Change.

[54] 17 U.S.C. § 106(2) and Gilliam v. American Broadcasting Co., 192 U.S.P.Q. 1 (2d Cir. 1976).

13

they do not want rightful possessors of copies of their programs to prepare such adaptations, they could, of course, make such desires a contractual matter.

### Recommendation for Regulations

Regulations for notice, deposit, and registration of programs should be promulgated by the Register of Copyrights. Copyright notice in the form prescribed in the 1976 Act should be required on all formats in which a program is marketed.[55] On copies of programs in a medium capable of being read by the unaided eye, the notice should physically appear before the list of instructions that comprises the program. Those programs that may be read only with the aid of a machine or device should contain notice in the medium of fixation so that the contents of the program cannot be listed without reproducing the notice in the position just described. Further, containers in which copies of such machine-readable programs are sold, leased, or transported should bear notice as should such devices as (1) reels upon which magnetic tape is wound, or (2) semiconductor chips in which programs are stored.

Regulations relating to deposit and registration requirements should promote public access to computer programs while being flexible enough to accommodate future changes in computer technology. In any case, programs are frequently modified and updated to reflect improvements or changes. The repeated deposit of each version of a program would be burdensome to both the program proprietor and the Copyright Office. Several options appear available. A system of temporary deposit, similar to the practice followed with respect to motion pictures, might be appropriate.[56] In the alternative, permanent deposit of complete copies of original versions of programs could be required, with descriptions rather than complete copies of

amended versions being filed thereafter. In any event, such requirements can be established best by the Copyright Office.[57]

### Case for Copyright Protection for Programs

#### THE CONSTITUTION

Under the Constitution, Congress has the power to grant authors exclusive rights in their writings to promote the progress of science and the useful arts.[58] On many occasions since 1790, Congress has exercised that power: first by creating a Copyright Act, and thereafter by periodically revising it and expanding its scope. That the word *writing* in the Constitution has broad and dynamic meaning may be seen in the nature of works that have been found constitutionally copyrightable. Notwithstanding the apparent distinction between them and literal writings, photographs, commercial art, motion pictures, and sound recordings have all been found to be writings.[59]

Judge Learned Hand, in an opinion which has been characterized as the "touchstone" for interpreting the constitutional writing requirement,[60] found copyrightable a series of meaningless words coined by a copyright claimant for use as a code for sending cables.

If . . . models or paintings are "writings," I can see no reason why [the coined] words should not be such because they communicate nothing. They may have their uses for all that, aesthetic or practical, and they may be the production of high ingenuity, or even genius. . . . [O]ur Constitution [does not] embalm inflexibly the habits of 1789 . . . its grants of power to Congress comprise, not only what was then known, but what the ingenuity of men should devise thereafter.[61]

---

[55] Such notice must consist of the word *Copyright,* the abbreviation *Copr.* or the symbol ©, together with the year of first publication and the name of the copyright owner. 17 U.S.C. § 401(b).

[56] The Copyright Office has a long-established practice of returning deposit copies of motion pictures to the depositor after registration. The copies are returned subject to recall by the Library of Congress for addition to its film collection.

[57] The Copyright Office has adopted regulations which generally comport with these suggestions, the text of which is found in Appendix J for notice, 37 C.F.R. § 201, and for deposit, 37 C.F.R. § 202.

[58] U.S. Const., Art. I, § 8, cl. 8.

[59] Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53 (1884); Bleistein v. Donaldson Lithographing Co., 188 U.S. 239 (1903); Kalem Co. v. Harper Bros., 222 U.S. 55 (1911); and Goldstein v. California, 412 U.S. 546 (1973).

[60] 1 *Nimmer on Copyright* § 8.1 (1976).

[61] Reiss v. National Quotation Bureau, Inc., 276 Fed. 717, 719 (S.D.N.Y. 1921).

As previously noted, a program is created, as are most copyrighted works, by placing symbols in a medium. In this respect, it is the same as a novel, poem, play, musical score, blueprint, advertisement, or telephone directory. However, it is not the same as a phonorecord or videotape. Those works are created by shaping physical grooves or electromagnetic fields so that when they are moved past sensing devices, electric currents are created which, when amplified, perform physical work. Notwithstanding these apparent differences, all these works are writings in the constitutional sense and eligible for copyright if Congress so provides.

## CONGRESS

One of the most noticeable developments in American copyright law since 1790 has been its frequent expansion so that, after its most recent revision, it embraces "original works of authorship . . . [including] literary works, musical works, . . . dramatic works, . . . pantomimes and choreographic works, pictorial, graphic and sculptural works, motion pictures and sound recordings."[62] This is a significant change from the subject matter of the Act of 1790: "any map, chart, book or books now printed."[63] Over time, this short list has been lengthened by the following additions:

1802 Designs, engravings, and etchings [64]
1831 Musical compositions [65]
1856 Dramatic compositions [66]
1865 Photographs and negatives [67]
1870 Statuary and models [68]
1909 All the writings of an author [69]
1912 Motion pictures [70]
1972 Sound recordings [71]
1976 Original works of authorship [72]

It should be noted that neither this list nor the list in the 1976 Act is an attempt by Congress to delineate every specific work for which copy-

right is available. Rather, the 1909 and 1976 Acts were designed to reflect the breadth of copyright's scope, while the specific emendations of other years were attempts to accommodate new technologies or to rectify restrictive judicial constructions. On no occasion in American history has copyright protection been withdrawn from a class of works for which it has been available.

### STATUTORY COPYRIGHTABILITY OF PROGRAMS

This expansion of American copyright unquestionably has already encompassed computer programs. In 1964, the Register of Copyrights announced that computer programs would be accepted for registration, provided that (1) they contained sufficient original authorship, (2) they had been published, and (3) copies submitted for registration were in human-readable form.[73] The Register acknowledged that there might be two grounds for doubt about the registrability of programs: they might not be within the concept of "writings of an author" and machine-readable versions might not be "copies" of the program. Registration, therefore, was made contingent upon the presence of authorship and the deposit of human-readable copies. Because publication was a prerequisite for federal copyright under the 1909 Act and because few programs until recently have been mass-marketed, only some two thousand programs were registered under the statute.[74] The new law, under which publication, registration, and direct human readability are not prerequisites to copyright, provides that federal copyright exists in any literary work from the moment it is fixed.[75] That dramatic change in the law and the growing trend toward mass-marketed programs mean that copyright is likely to be increasingly important in protecting computer programs, particularly those of small entrepreneurs who create their works for individual consumers and who can neither afford nor properly use other forms of protection.[76]

---

[62] 17 U.S.C. § 102(a).
[63] 1 Stat. 124.
[64] 2 Stat. 171.
[65] 4 Stat. 436.
[66] 11 Stat. 139.
[67] 13 Stat. 540.
[68] 16 Stat. 212.
[69] 35 Stat. 1076.
[70] 37 Stat. 488.
[71] 85 Stat. 391.
[72] 17 U.S.C. § 102(a).

[73] Copyright Office Circular 31D (January 1965).
[74] The number of programs in which copyright was asserted was likely much larger. Inasmuch as registration neither was nor is a prerequisite to copyright, there is no way ever to know the number of copyrighted programs in existence.
[75] 17 U.S.C. § 102(a).
[76] For a discussion of these forms, see this chapter under Copyright and Other Methods Compared.

15

The Register's 1964 determination has never been challenged. Although this hardly is dispositive, it was clearly the intent of Congress to include computer programs within the scope of copyrightable subject matter in the Act of 1976. Certain proponents of program copyrights have suggested amending the law to include programs in the list of copyrightable works.[77] In discussing the expansive history of American copyright, the House and Senate, in identical language, state why that is unnecessary:

The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. *In some of these cases the new expressive forms—electronic music, filmstrips, and computer programs, for example—could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation.* In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works [emphasis added].[78]

Thus, Congress is on record regarding not merely the issue of program copyrightability but also the ease with which programs fit into copyright.

Unlike the cases of such apparent non-writings as photographs, sound recordings, and motion pictures, no changes in the law, according to Congress, were necessary to afford copyright protection to programs. As to the location of programs within the classes of copyrightable works set out in section 102(a), the House Report makes it clear that Congress perceived programs to be "literary works":

The term "literary works" does not connote any criterion of literary merit or qualitative value: it includes catalogs, directories, and similar factual, reference, or instructional works and compilations of data. *It also includes computer data bases and computer programs to the extent that they incorporate authorship in the programmer's*

*expression of original ideas, as distinguished from the ideas themselves* [emphasis added].[79]

Thus, it is clear that those who wrote the Copyright Act of 1976 and those who have administered portions of the 1909 Act concur in the position that programs are copyrightable. Action by either Congress or the courts would be necessary to change this.[80] The Commission, of course, has not felt itself bound by these prior legislative or administrative determinations of program copyrightability.

## Copyright and Other Methods Compared

The purpose of copyright is to grant authors a limited property right in the form of expression of their ideas. The other methods used to protect property interests in computer programs have different conceptual bases and, not surprisingly, work in different ways. An appreciation of those differences has contributed to the Commission's recommendation that copyright protection not be withdrawn from programs. Patents are designed to give inventors a short-term, powerful monopoly in devices, processes, compositions of matter, and designs which embody their ideas. The doctrine of trade secrecy is intended to protect proprietors who use a "formula, pattern, device or compilation of information" in their business "which gives [them] an opportunity to obtain an advantage over competitors who do not know or use it."[81] Unfair competition is a legal theory which, among other things, proscribes misrepresentation about the nature and origin of products in commerce. Each of these forms of protection may inhibit the dissemination of information and restrict competition to a greater extent than copyright.

In certain circumstances, proprietors may find patent protection more attractive than copyright,

---

[77] Transcript, CONTU Meeting No. 6, p. 13.

[78] Senate Report, *supra* note 1, pp. 50–51; House Report, *supra* note 1, p. 51.

[79] *Supra* note 1, p. 54.

[80] In deciding whether a class of works is copyrightable, courts have displayed a certain willingness to accept the practices of the Copyright Office. See Goldstein v. California, 412 U.S. 546, 568–69 (1973), in which the Supreme Court discussed the Register's position on copyright in sound recordings; and Eltra v. Ringer, 194 U.S.P.Q. 198 (E.D. Va. 1976), *aff'd* 198 U.S.P.Q. 321 (4th Cir. 1978), in which copyright for typefaces was rejected in large part due to the Copyright Office practice.

[81] Restatement, Torts, § 757, comment b (1939).

16

since it gives them the right not only to license and control the use of their patented devices or processes but also to prevent the use of such devices or processes when they are independently developed by third parties. Such rights last for seventeen years. The acquisition of a patent, however, is time consuming and expensive, primarily because a patentee's rights are great and the legal hurdles an applicant must overcome are high. A work must be useful, novel, and nonobvious to those familiar with the state of the art in which the patent is sought.[82] The applicant must prove these conditions to the satisfaction of the Patent and Trademark Office or, failing that, to the Court of Customs and Patent Appeals or the Supreme Court.

It is still unclear whether a patent may ever be obtained for a computer program. On three occasions the Supreme Court has considered cases involving program patents.[83] In each it has found the programs before it to be ineligible for such protection. However, the Court has never addressed the broader question whether programs are patentable subject matter. The holdings of these three cases, although carefully limited in scope, make it appear that it would be difficult for any applicant to secure a patent in a program, since novel and useful mathematical formulas may not be patented and since useful "post-solution applications" of them meet the same fate.[84] In most countries where the patent question has been answered, it has been held that programs are ineligible for patent protection.[86] Even if patents prove available in the United States, only the very few programs which survive the rigorous application and appeals procedure could be patented. Once such protection attached, of course, all others would be barred from using the patented process, even if independently developed.

Trade secrecy is a doctrine known in every American jurisdiction. As a creature of state statute or common law it differs somewhat from state to state.[86] The premise on which trade secrecy is based is this: if a business maintains confidentiality concerning either the way in which it does something or some information that it has, then courts should protect the business against the misappropriation of that secret. Although many proprietors feel secure when using trade secrecy, there are several problems they must face with respect to its use in protecting programs. Because secrecy is paramount, it is inappropriate for protecting works that contain the secret and are designed to be widely distributed.[87] Although this matters little in the case of unique programs prepared for large commercial customers, it substantially precludes the use of trade secrecy with respect to programs sold in multiple copies over the counter to small businesses, schools, consumers, and hobbyists. Protection is lost when the secret is disclosed, without regard to the circumstances surrounding the disclosure. The lack of uniform national law in this area may also be perceived by proprietors as reducing the utility of this method of protection.

From the user's standpoint, there are additional drawbacks. Users must cover the seller's expenses associated with maintaining a secure system through increased prices. Their freedom to do business in an unencumbered way is reduced, since they may need to enter into elaborate nondisclosure contracts with employees and third parties who have access to the secrets and to limit that access to a very small number of people. Since secrets are by definition known to only a few people, there is necessarily a reduced flow of information in the marketplace, which hinders the ability of potential buyers to make comparisons and hence leads to higher prices.[88]

Experts in the computer industry state that a further problem with respect to trade secrecy

---

[82] 35 U.S.C. §§ 101, 102, and 103.

[83] Gottschalk v. Benson, 409 U.S. 63 (1972); Dann v. Johnston, 425 U.S. 219 (1976); and Parker v. Flook, ——U.S.——, 98 S.Ct. 2522 (1978).

[84] Benson and Flook, *supra* note 83.

[85] See the decision of the Supreme Court of the Federal Republic of Germany in Siemens AG v. AEG Telefunken, June 22, 1976; the discussion in Pagenberg, *Patentability of Computer Programs on the National and International Level*, 5 INT'L. REV. OF INDUST. PROP. & COPYRIGHT LAW 1 (1974); and the new patent convention adopted by the European Economic Community which explicitly excludes computer programs from patent protection.

[86] See Bender, *Trade Secret Software Protection*, 5 COMPUTER L. SVC. § 4–4, art. 2 (1977); and NYCUM, THE CRIMINAL ASPECTS OF COMPUTER ABUSE (Stanford Research Institute, 1976).

[87] See MILGRIM, TRADE SECRETS, § 2.05[2] (1976).

[88] SAMUELSON, ECONOMICS, 10th ed. (1976) 48; BRAUNSTEIN, ET AL., ECONOMICS OF PROPERTY RIGHTS AS APPLIED TO COMPUTER SOFTWARE AND DATA BASES (1977).

is that there is much human effort wasted when people do for themselves that which others have already done but are keeping secret. This was emphasized in the reports to the Commission prepared by the Public Interest Economics Center and the New York University economists.[89]

The availability of copyright for computer programs does not, of course, affect the availability of trade secrecy protection. Under the Act of 1976 only those state rights that are equivalent to the exclusive rights granted therein (generally, common law copyright) are preempted.[90] Any decline in use of trade secrecy might be based not upon preemption but on the rapid increase in the number of widely distributed programs in which trade secret protection could not be successfully asserted.

The common law doctrine of unfair competition of the misappropriation variety is based upon the principle that one may not appropriate a competitor's skill, expenditure, and labor. It prohibits false advertising and the "passing off" of another's work as one's own. While there is a small body of federal unfair competition law,[91] it is largely a state doctrine with the same lack of national uniformity that besets trade secrecy. Although unfair competition may provide relief ancillary to copyright in certain situations, its scope is not as broad, and it seems unlikely that it alone could provide sufficient protection against the misappropriation of programs. For example, the unauthorized copying of any work for any purpose could be a copyright infringement without amounting to unfair competition.

Table 1 presents some of the considerations weighed by the Commission in reaching its conclusion. The answers to such economic questions as the effect of protection on the market and the opportunity it creates for an uncompetitive rate of return tend to show that, of the various potential modes of protection, copyright has the smallest negative impact.

### Scope of Copyright in Programs

This section of the report will explain the extent and limitations of a copyright for a computer program. The discussion of what rights copyright proprietors have and how those rights are limited does not depend upon the Commission's proposal but is based upon various currently existing copyright doctrines.

The rights of any copyright owner are set out in section 106 of the Act of 1976. Many of the other sections of Chapter 1 of that act place limitations on those rights. Cases construing previous copyright acts also serve to define the bounds of copyright under the new law, at least when the new law does not end the vitality of those cases. Before examining the specific rights found in section 106, it is necessary to determine whether a work *is* copyrighted. If it is not, then the rights of a copyright owner are of no consequence.

Section 102(a) provides the basis for determining whether a work is copyrightable.[92] The rule is simple: a copyrightable work is an original work of authorship fixed in a tangible medium of expression.[93] There is a wealth of judicial interpretation behind the word *original*. Suffice to say that a work is original if it "[o]wes its origin to the author, i.e., is independently created, and not copied from other works."[94]

A description of what may not be copyrighted—ideas, procedures, processes, systems, methods of operation, concepts, principles, or discoveries—is found in the same section of the copyright law.[95] Because the distinction between copyrightable computer programs and uncopyrightable processes or methods of operation does not always seem to "shimmer with clarity" it is important that the distinction between programs and processes be made clear.[96] There is a venerable copyright case and recent congressional language which make the distinction in the copyright sense relatively easy to articulate. In *Baker v. Selden*, the Supreme Court held that a

---

[89] See Appendix H for a description of these reports.
[90] 17 U.S.C. § 301(a).
[91] See 15 U.S.C. § 1125(a), and Allison, *Private Cause of Action for Unfair Competition under the Lanham Act*, 14 AM. BUS. L. J. 1 (1976).

[92] The term *copyrightable* is less accurate under the new law than under the old, but the concept may be useful. Since copyright now exists from the instant a work is fixed, all copyrightable works are perforce copyrighted.
[93] 17 U.S.C. § 102(a)
[94] 1 *Nimmer on Copyright*, § 10.1 (1976), *citing* Alfred Bell & Co., Ltd., v. Catalda Fine Arts, Inc., 191 F.2d 99 (2d Cir. 1951) and Wihtol v. Wells, 231 F.2d 550 (7th Cir. 1956).
[95] 17 U.S.C. § 102(b).
[96] Parker v. Flook, *supra* note 83, at 4791–92.

TABLE 1
CHARACTERISTICS OF PROTECTIVE MECHANISMS

| Considerations | Copyright | Patent | Trade Secrecy |
|---|---|---|---|
| *General* | | | |
| National uniformity | Yes | Yes | No |
| Protection effective upon | Creation of work | Successful prosecution of application | Entrance into contractual relationship |
| Cost of obtaining protection | Nil | Moderate | Moderate |
| Term of protection | Life plus 50 years or 75 years | 17 years | Possibility of both perpetual protection and termination at any time |
| Cost of maintaining protection [1] | Nil | Nil | Significant |
| Cost of enforcing rights against violators [2] | Moderate | Moderate | Higher |
| Availability of (a) statutory damages (b) attorney's fees from infringers | (a) Yes (b) Yes | (a) No (b) Yes | (a) No (b) No |
| Protection lost by | Gross neglect | Unsuccessful litigation | Disclosure |
| *Software, including effects of Commission proposals* | | | |
| Consistency with other copyright areas | Yes | No | No |
| Availability of protective mechanism for some programs [3] | Yes | Unclear | Yes |
| Universal availability of protective mechanism for all programs [4] | Yes | No | No |
| "Process" protectible | No | Yes | Yes |
| Suited to mass distribution | Yes | Yes | No |

[1] Once copyright or patent is secured, it costs little or nothing to keep it in force; on the other hand, expensive security measures must be taken to avoid losing a trade secret. At least part of the cost of this security is passed on to the user.

[2] Copyright and patent infringers in some instances may be persuaded to comply without the institution of a lawsuit. If litigation is necessary, it may be expensive, but in copyright and patent cases, attorneys' fees may be awarded to successful plaintiffs. At trial, the proprietor bears the burden of proving that the trade secret is valid; in patent cases, there is a presumption of validity; and in copyright actions, a registration certificate is prima facie evidence of the copyright's validity. The proof of the validity of a trade secret may be expensive and difficult, as it almost necessarily involves the retention of expert witnesses. Although witnesses may be needed in copyright and patent suits, in those cases there will have been at least some compliance with federal law regarding requisite public notice of claimed rights before the lawsuit is initiated. A suit to enforce a trade secret, even though successful, may destroy the secret if it is offered into evidence and becomes part of the public record of the trial.

[3] As of the present, serious doubt exists whether programs are proper subjects for patent protection. (See this chapter under Copyright and Other Methods Compared.)

[4] Even if programs are patentable, only those that are truly novel and nonobvious will be protected. Trade secrecy is, of course, unavailable when the contents of a program have been disclosed.

valid copyright in a book describing a system of accounting, based upon the now-universal T-accounts, did not bar others from using that accounting system.[97] This holding is often misconstrued as imposing a limit on the copyrightability of works which express ideas, systems, or processes. As Professor Nimmer observes, "the rationale for the doctrine of *Baker v. Selden* in no event justifies the denial of copyrightability to any work." [98] The case properly stands for the proposition that using the system does not

infringe the copyright in the description. This rule is found in section 102(b) of the new law. Both Houses of Congress agreed as to its application to computer programs:

Section 102(b) is intended, among other things, to make clear that *the expression adopted by the programmer is the copyrightable element in a computer program*, and that the actual processes or methods embodied in the program are not within the scope of the copyright law [emphasis added].[99]

[97] 101 U.S. 99 (1879).
[98] 1 *Nimmer on Copyright*, § 37.31 (1976).

[99] Senate Report, *supra* note 1, p. 54; House Report, *supra* note 1, p. 57.

19

Copyright, therefore, protects the program so long as it remains fixed in a tangible medium of expression but does not protect the electro-mechanical functioning of a machine. The way copyright affects games and game-playing is closely analogous: one may not adopt and re-publish or redistribute copyrighted game rules, but the copyright owner has no power to pre-vent others from playing the game.[100]

Thus, one is always free to make a machine perform any conceivable process (in the absence of a patent), but one is not free to take another's program. This general rule is subject to exceptions which restrict the power of copy-right owners. These exceptions might be thought of as the "insufficient intellectual labor" excep-tion and the "idea-expression identity" excep-tion. Although they lead to similar results, they are slightly different.

Apparent works of authorship may not qualify for copyright if they are not "the fruits of intellectual labor."[101] This reasoning has barred copyright for blank forms for recording data[102] and for instructions of the rankest ob-viousness and simplicity, such as "apply hook to wall."[103] This exception would mean that a "program" consisting of a very few obvious steps could not be a subject of copyright.

The "idea-expression identity" exception pro-vides that copyrighted language may be copied without infringing when there is but a limited number of ways to express a given idea. This rule is the logical extension of the fundamental principle that copyright cannot protect ideas.[104] In the computer context this means that when specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to an infringement. In discussing an insurance company's use of a lawyer's copyrighted forms, a federal court of appeals stated in *Continental Casualty Co. v. Beardsley*:

[T]he use of specific language . . . may be so essential to accomplish a desired result and so

integrated with the use of a . . . conception that the proper standard of infringement is one which will protect as far as possible the copyrighted language and yet allow the free use of the thought beneath the language. *The evidence here shows that [the company] insofar as it has used the language of [the lawyer's] forms has done so only as incidental to its use of the underlying idea. . . . In so doing it has not infringed* [em-phasis added].[105]

The emphasized language from the *Beardsley* decision indicates that copyright protection for programs does not threaten to block the use of ideas or program language previously developed by others when that use is necessary to achieve a certain result. When other language *is* available, programmers are free to read copyrighted pro-grams and use the ideas embodied in them in preparing their own works.[106] This practice, of course, is impossible under a patent system, where the process itself is protected, and diffi-cult under trade secrecy, where the text of a pro-gram is designed not to be revealed.

Programs are a relatively new type of writing, and how copyright protects them is not univer-sally understood. Because programs are used in

---

[100] 1 *Nimmer on Copyright*, § 37.83 (1976).

[101] Trade-Mark Cases, 100 U.S. 82 (1879).

[102] Brown Instrument Co. v. Warner, 161 F.2d 910 (D.C. Cir. 1947).

[103] E. H. Tate Co. v. Jiffy Enterprises, Inc., 16 F.R.D. 571 (E.D. Pa. 1954).

[104] See 2 *Nimmer on Copyright*, § 166 (1976) and 17 U.S.C. § 102(b).

[105] 253 F.2d 702, 706 (2d Cir. 1958); see also, Harcourt, Brace & World, Inc. v. Graphic Controls Corp., 329 F.Supp. 517 (S.D.N.Y. 1971).

[106] The availability of alternative noninfringing language is the rule rather than the exception. The following colloquy to that effect took place at the tenth Commission meeting (Transcript, CONTU Meeting No. 10, pp. 44–45):

Commissioner Miller: How many different ways are there to produce a program . . . ?

Dan McCracken [vice-president of the Association for Computing Machinery]: An infinite number in principle, and in practice dozens, hundreds.

Miller: So it is comparable to the theoretically infinite number of ways of writing *Hamlet?*

McCracken: I believe so. It is not really true that there is a very restrictive way to write a program [which might make it] not copyrightable. I don't believe that at all.

Miller: When you say "infinite," I assume that along that scale there are increases and decreases in the efficiency with which the machine will operate?

McCracken: Perhaps.

Miller: In all of the programs that we have been talking about this morning, with particular reference to . . . compiler programs, does it continue to be true that there are an infinite number of ways of writing particular programs to do particular jobs?

McCracken: Yes. . . . There are hundreds of [dif-ferent] compiler [programs for] going from FORTRAN to some machines. . . .

conjunction with machines, there has not been universal agreement concerning the propriety of copyright protection. Programs should no more be considered machine parts than videotapes should be considered parts of projectors or phonorecords parts of sound reproduction equipment. All three types of works are *capable* of communicating with humans to a far greater extent than the coined code words discussed by Judge Hand in *Reiss* v. *National Quotation Bureau*.[107] In all three instances, the medium in which copyrighted material is stored is moved past a sensing device at a set speed, causing electric current to flow, and ultimately resulting in the movement of machine parts to print words, display pictures, or create sounds. All of these events may occur through the use of machines without placing copyrighted works in them. A typist may create a printed document that is indistinguishable from computer output; a television system may produce pictures without the use of a fixed work; and instruments may be used to create the sounds which are found on phonorecords. All that copyright protection for programs, videotapes, and phonorecords means is that users may not take the works of others to operate their machines. In each instance, one is always free to make the machine do the same thing as it would if it had the copyrighted work placed in it, but only by one's own creative effort rather than by piracy.

It has been suggested by Vice-Chairman Nimmer in his separate opinion that programs be copyrighted only when their use leads to copyrighted output.[108] If this approach were adopted, it would make a program for text editing or the production of graphics copyrightable. It would, however, exclude a program which might be used to assist traffic flow in rush hours or to monitor the vital signs of patients under intensive care. This distinction is not consistent with the design of the Act of 1976, which was clearly to protect all works of authorship from the moment of their fixation in any tangible medium of expression. Further, it does not square with copyright practice past and present, which recognizes copyright protection for a work of authorship regardless of the uses to which it may be put. The copyright status of the

written rules for a game or a system for the operation of a machine is unaffected by the fact that those rules direct the actions of those who play the game or carry out the process. Nor has copyright been denied to works simply because of their utilitarian aspects. It follows, therefore, that there should likewise be no distinction made between programs which are used in the production of further copyrighted works and those which are not. Should such a distinction be made, the likelihood is that entrepreneurs would simply require that programs produce a written and, by that token, an unquestionably copyrightable version of their output to obtain copyright in the programs themselves. Although the distinction tries to achieve the separation of idea from form of expression, that objective is better realized through the courts exercising their judgment in particular cases.

The Commission has considered at length the various forms in which programs may be fixed. Flow charts, source codes, and object codes are works of authorship in which copyright subsists, provided they are the product of sufficient intellectual labor to surpass the "insufficient intellectual labor" hurdle, which the instructions "apply hook to wall" fail to do.[109] They may not be copied unless such copying is authorized by the proprietor of the copyright therein or by law. That protection continues as long as the program remains fixed in a tangible medium, up to the period provided in the Act of 1976.[110]

That the words of a program are used ultimately in the implementation of a process should in no way affect their copyrightability. Traditional works have led to processes both more rigid and more flexible than those to which computer programs lead. When a phonorecord or motion picture is used in conjunction with a

---

[107] *Supra* note 61.
[108] See this chapter under the Concurring Opinion of Commissioner Nimmer.

[109] A flow chart is a graphic representation for the definition, analysis, or solution of a problem in which symbols are used to represent operations, data flow, or equipment. A source code is a computer program written in any of several programming languages employed by computer programmers. An object code is the version of a program in which the source code language is converted or translated into the machine language of the computer with which it is to be used.

[110] For the works of individuals, life plus fifty years. For the works of employed, pseudonymous, or anonymous authors, seventy-five years. 17 U.S.C. § 302.

21

properly working machine, the same result will occur on the first, the second, or the thousandth running. The chorus will remain silent until the fourth movement of Beethoven's Ninth Symphony, and Bogart will stay in *Casablanca* forever. A similar rigidity is found when a copyrighted chart is used to determine the sine of a fifty-degree angle. The process is virtually immutable. That is less true when a program is used, since it contains alternative branches selected only after use has begun, meaning that the process may be different with every use.

The text of the new copyright law makes it clear that the placement of a copyrighted work into a computer—or, in the jargon of the trade, the "inputting" of it—is the preparation of a copy. This may be ascertained by reading together the definitions of *copies* and *fixed* found in section 101. In pertinent part, they read as follows:

"Copies" are material objects . . . in which a work is fixed. . . .

A work is "fixed" . . . when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

Because works in computer storage may be repeatedly reproduced, they are fixed and, therefore, are copies.[111]

It is difficult, either as a matter of legal interpretation or technological determination, to draw the line between the copyrightable element of style and expression in a computer program and the process which underlies it. Some examples how copies of programs may be made may help to explain the nature of this problem and to place it in its proper perspective.

A computer program may be misappropriated in a variety of ways. In the first and most straightforward instance, the program listing or the programmer's original coding sheets might be photocopied, which would clearly be an infringement. The unarguably copyrightable writing has been taken. But, what if the program, rather than being recorded on paper, is recorded

on magnetic tape or disk? If the tape is used without authorization to produce a printed, human-readable version of the program, again an infringement has occurred. Should the result be different if the tape is copied? That copy may still be used to prepare a printed version at will. There is a one-to-one correspondence between the printed characters on paper and the magnetized areas of the tape. The tape is simply a version of the program from which a human-readable copy may be produced with the aid of a machine or device.

When a program is copied into the memory of a computer, it still exists in a form from which a human-readable version may be produced. That is, the copy in the computer's memory may be duplicated, just as a version listed on paper or coded on magnetic tape may be. Only when the program is inserted—instruction by instruction—into the processing element of the computer and electrical impulses are sent through the circuitry of the processor to initiate work is the ability to copy lost. This is true at least under the present state of technology. If it should prove possible to tap off these impulses then, perhaps, the process would be all that was appropriated, and no infringement of the copyright would occur.

The movement of electrons through the wires and components of a computer is precisely that process over which copyright has no control. Thus, copyright leads to the result that anyone is free to make a computer carry out any unpatented process, but not to misappropriate another's writing to do so.

Drawing the line between the copyrightable form of a program and the uncopyrightable process which it implements is simple in the first instance described above. But the many ways in which programs are now used and the new applications which advancing technology will supply may make drawing the line of demarcation more and more difficult. To attempt to establish such a line in this report written in 1978 would be futile. Most infringements, at least in the immediate future, are likely to involve simply copying. In the event that future technology permits programs to be stated orally for direct input to a computer through auditory sensing devices or permits future infringers to use an author's program without copying, difficult questions will arise. Should a line need to

---

[111] Insofar as a contrary conclusion is suggested in one report accompanying the new law, this should be regarded as incorrect and should not be followed, since legislative history need not be perused in the construction of an unambiguous statute. *Cf.* House Report, *supra* note 1, p. 53, with the plain language in the statute defining *fixed*.

be drawn to exclude certain manifestations of programs from copyright, that line should be drawn on a case-by-case basis by the institution designed to make fine distinctions—the federal judiciary.

### Economic Effects of Program Copyright

That copyright gives authors exclusive rights in their writings seems to cause some to equate it with all monopolies. This has led to the fear that protection for programs may give the copyright owner the power to dominate the program market, the machine market, or both.

To begin with, it is necessary to distinguish between those lawful monopolies whose existence is permitted or even encouraged on policy grounds and unlawful monopolies which are declared to be inimical to the public good. Permitted monopolies generally are found in regulated industries, such as public utilities, in which economies of scale are so great that the existence of more than one firm makes little sense and in which regulation, when properly accomplished, prevents such abuses as monopoly pricing or refusals to deal. Such limited monopolies as patents and copyrights are encouraged while the public interest is protected in various ways. Protection of the general good is found in the limited term and stringent standards associated with patents, the proscription of the protection of ideas under copyright, and the refusal to allow the extension of patents or copyrights beyond their limited scopes. This last matter may be the heart of the concern about the economic effects of program copyright.

The utilization of lawful patents to attempt to monopolize unpatented processes has been consistently found unlawful.[112] Because copyright grants no monopoly over ideas, a parallel line of cases does not really exist, but in certain instances courts have reached similar results. In a leading copyright-antitrust case, Judge Frank outlined how competing public interests could be balanced:

We have here a conflict of policies: (a) that of preventing piracy of copyrighted matter and (b) that of enforcing the anti-trust laws. We must

balance the two, taking into account the comparative innocence or guilt of the parties, the moral character of their respective acts, the extent of the harm to the public interest, the penalty inflicted on the [copyright owner] if we deny it relief. As the defendants' piracy is unmistakably clear, while the [owners'] infraction of the anti-trust laws is doubtful and at most marginal, we think the enforcement of the first policy should outweigh the enforcement of the second.[113]

Thus, it is not the fact of a constitutional and statutory monopoly which is disfavored, but only abuses of the lawful monopoly.[114]

One of the hallmarks of a competitive industry is the ease with which entrepreneurs may enter into competition with firms already doing business. The absence of significant barriers to entering the program-writing market is striking. There are several hundred independent firms whose stock in trade is computer programs.[115] New software firms may be formed with few people and little money; entry into the market has thus far been fairly easy.[116] None of the evidence received by the Commission suggests that affording copyright to programs would in any way permit program authors to monopolize the market for their products. Nor is there any indication that any firm is even remotely close to dominating the programming industry.

The effect of program copyright on the retail prices of consumer goods and services is so small as to be undetectable. Across a wide variety of industries, packaged software amounts to between one and two percent of data processing expenses, which themselves comprise a like percentage of a firm's gross income. This has led one commentator to describe data processing costs as a whole as "a noise-level expense, probably less than the phone bill of an average company." [117] Thus, from each one hundred dollars

---

[112] Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488 (1942); Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661 (1944).

[113] Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 106 (2d Cir. 1951).

[114] For another case in which the same court refused to permit a copyright owner to use his lawful monopoly to the detriment of the public, see Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966).

[115] Harvey, *The Developing Software Industry,* INFOSYSTEMS 34 (July 1976).

[116] Computer Sciences Corporation, which has over $100 million in annual sales, is said to have been founded on a capital investment of less than $1,000.

[117] McLaughlin, *1976 DP Budgets,* DATAMATION 52 (February 1976).

23

of income, a firm is likely to spend between one and two dollars on data processing, of which from one to four cents are spent on packaged software. There is no easy way to separate out the costs of protection from that figure, but it is clear that such costs are miniscule when compared to a firm's total operating expenses.

The market for computer hardware has been characterized by severe but not insurmountable barriers to entry. Economies of scale are very great; a firm must be prepared to invest tremendous amounts of money in creating, building, and marketing machines.[118] Natural barriers to entry, such as economies of scale, should not receive the opprobrium properly reserved for anticompetitive conspiracies. Barriers erected by present members of an industry may well be—and frequently are—antitrust violations.

The inability of hardware firms to dominate the software market was recognized by the Public Interest Economics Center, when it stated:

[W]hatever their historical dominance, the hardware corporations lack the ability to control entry into the software market, and . . . their market shares are being steadily eroded by the independents. Thus, we can tentatively conclude that protection of software . . . serves to benefit consumers by enhancing competition and increasing long-run supply.[119]

In the market for computers, monopolistic practices have been attacked by the Department of Justice on numerous occasions. As the result of an early consent decree, IBM, the largest firm in the industry, has agreed to sell its equipment instead of only leasing it. In 1969, immediately after the Justice Department filed its antitrust suit, IBM stopped selling its machines and programs as a package, thus ending a tying arrangement, the legality of which had been questioned. The government is currently prosecuting that action against IBM through which it seeks the division of IBM into several firms, much as resulted in the *Standard Oil* case.[120] This relief,

as is typically the case in an antitrust action, is directed toward the sources of a firm's alleged dominance of an industry. It is interesting to note that neither the government nor any private antitrust plaintiffs has ever argued that IBM's assertion of copyright in its programs is even remotely related to its alleged anticompetitive behavior.

Successful antitrust attacks where copyright was important to the cause of action apparently have occurred only with respect to performing rights organizations. Both ASCAP and BMI operate under consent decrees which resulted from Justice Department actions directed toward the monopoly created when performance rights not only were pooled but were available exclusively from the pool. The resulting settlements permitted the pooling to continue upon the provision that customers could go to individual proprietors as well as to the defendants to obtain performance rights. Another attack on ASCAP demonstrated again that it is not the copyright monopoly which is disfavored, but rather attempts to extend that right to acquire monopoly power in the market. When a music publisher who belonged to ASCAP sought damages for infringement from film exhibitors who had without license shown films containing the plaintiff's music on the soundtrack, in denying the relief sought, the court ruled:

Refuge cannot be sought in the copyright monopoly which was not granted to enable plaintiffs to set up another monopoly, nor to enable the copyright owners to tie a lawful monopoly with an unlawful monopoly and thus reap the benefits of both.[121]

The policy implications of such cases seem clear and correct: the lawful copyright monopoly may not be used other than as intended. A copyright owner may monopolize his expression but not the market in which it is purveyed. To suggest, as does the Public Interest Economics Center (PIE-C), that no "large" hardware manufactures be permitted to assert copyright in programs they write is to propose an instrument of dubious legality and effectiveness.[122] Certainly any large firm could create a separate entity to do its program-writing to avoid any proscription of its ownership of program copy-

---

[118] Amdahl Corporation, a newcomer to the market for large computers, spent five years and $45 million before shipping its first order. *Can Amdahl Live with IBM's New Strategy?*, BUSINESS WEEK 56B (August 5, 1977).

[119] PIE-C Report, *supra* note 21, at IV-13.

[120] Standard Oil Co. v. United States, 221 U.S. 1 (1911).

[121] M. Witmark & Sons v. Jensen, 80 F.Supp. 843, 848–49 (D. Minn. 1948).

[122] PIE-C Report, *supra* note 21, at IV-13.

24

rights. The PIE-C proposal may be less than relevant to the extent that it might lull its advocates into a false sense of having dealt with the problem of industrial concentration when they have not. Being against bigness at all costs should not be a substitute for analytical action on behalf of the general public and consumers.

On the whole, the direct approach against alleged monopolists seems far superior to fighting perceived economic evils on copyright grounds. The enforcement and, where necessary, emendation of present antitrust laws is more appropriate to the problem, if any, than the invention of a class of works which are generally copyrightable but not when their authors are disfavored, for whatever well-intentioned reasons. In the patent and copyright antitrust cases, there is no language suggesting that statutory protection should be unavailable to the defendants, notwithstanding the proof that they had abused their lawful monopolies. To create such a remedy on bald suspicion would indeed be unjust.

### Cultural Effects of Program Copyright

The introduction of new means of communication with their attendant new modes of expression often raises questions regarding the intrinsic values of such works. The works of Beethoven, Chopin, Stravinsky, and Hindemith all enjoyed less than immediate success. Early works of all of these innovative composers were condemned for being outside what was then felt to be the cultural mainstream. But, as perceptions have changed, the contributions these composers made to breaking with tradition and enriching the breadth of expression in our musical heritage have overcome the barriers to new ideas which traditionalists would have imposed.

The history of copyright legislation and the interpretations courts have given to the Copyright Clause all demonstrate that there is no basis, as some would suggest, for the imposition of a standard of literary or artistic merit for determining copyrightability. The perils of such an approach have long been recognized. Mr. Justice Holmes, in upholding copyright in a chromolithographed circus poster, said:

It would be a dangerous undertaking for persons trained only in the law to constitute themselves final judges of the worth of pictorial illustrations,

outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge. Yet if they command the interest of any public, they have a commercial value—it would be bold to say that they have not an aesthetic and educational value—and the taste of any public is not to be treated with contempt.[123]

This principle has been consistently followed in cases emphasizing that "[a]ll that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own'" [footnote omitted].[124] These judicial opinions clearly illustrate that courts have assiduously avoided adopting the critic's role in evaluating the aesthetic merits of works of authorship. To attempt to deny copyrightability to a writing because it is capable of use in conjunction with a computer would contravene this sound policy. Where could a meaningful line of demarcation be drawn? Between flow chart and ~~and~~ source code? Between source code and object code? At the moment of input into a computer or microprocessor? The Commission believes that none of these is appropriate. The line which must be drawn is between the expression and the idea, between the writing and the process which is described. This proposal acknowledges the propriety of keeping cultural value judgments out of copyright. The only legitimate question regarding copyrightability is: Is the object an original work of authorship?

The Copyright Clause of the Constitution empowers Congress to establish a patent and copyright system to improve the general public welfare, by "[p]romoting . . . the progress of Science and Useful Arts." Patent protects inventions, and copyright protects the writings of

---

[123] Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251–52 (1903).

[124] Alfred Bell and Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 102–3 (2d Cir. 1951).

authors. As previously discussed, the term *writing* has been liberally construed to embrace the fruits of intellectual and aesthetic labor embodying any modicum of original effort. Copyright protects a wide range of works; some with great cultural value, such as the novels of Pulitzer Prize winners and Nobel Laureates, original paintings, award-winning movies, and masterful musical compositions. It likewise shields works of little or no aesthetic merit: advertising copy, picture postcards, videotaped wrestling matches, violent and sexually explicit films, and the most banal popular music. The contribution of these latter works to our culture is at best questionable. Neither the Supreme Court nor any governmental or private body has been able to assess the social or cultural impact of sexually explicit materials, let alone the cultural impact of the protection of such works by copyright. Their contribution to the quality of life is not quantifiable; their effect may not even be qualitatively identifiable. The kinds of qualitative impacts which computer software may have on the quality of life may, at least, be described.

Declining costs and improved performance of electronic hardware are bringing powerful miniature computer systems into small businesses and the home. These computers and the more powerful and cheaper generations of similar systems which will follow have the potential to enrich our lives and aid in communication among humans in ways as yet inconceivable. Personalized high-quality education, at present available only to the wealthy, will be within the reach of the small school system and the average consumer in the home. Health care in public clinics will be provided on a more individualized, personal basis by using computers to aid the physician in communicating with his patient through complete and accurately maintained medical records. Leisure time may be enriched by both studying and game-playing on home computer systems. The possibilities provided by the technology are virtually limitless. They are dependent only on the ingenuity employed in developing the programs that enable humans to communicate their ideas to one another through the intermediation of the machine and on the willingness of creators of such works to disseminate them at reasonable prices. In considering the quality of life in this country, failing to weigh the positive contributions of computers

and the programs with which they are used would indeed be a mistake.

At the same time, any dehumanizing effects which might be attributable to the increasing impact of computer uses upon society are utterly unrelated to the mode of protection employed to safeguard program language. It is clear that the uses to which computers are put depend entirely upon the intent of their users and not at all upon the mechanisms designed to protect programs. To say that copyright for programs somehow is responsible for social problems ostensibly caused by computer uses is akin to arguing against copyrights for the worst of television shows or against patent protection for components of gas-guzzling cars on the grounds that such works are detrimental to American culture.

## Concurring Opinion of Commissioner Nimmer

I concur in the Commission's opinion and in its recommendations regarding software. I do, however, share in a number of the doubts and concerns expressed in Commissioner Hersey's thoughtful dissenting opinion.[125] What is most troubling about the Commission's recommendation of open-ended copyright protection for all computer software is its failure to articulate any rationale which would not equally justify copyright protection for the tangible expression of any and all original ideas (whether or not computer technology, business, or otherwise). If *literary works* are to be so broadly construed, the Copyright Act becomes a general misappropriation law, applicable as well in what has traditionally been regarded as the patent arena, and, indeed, also in other areas to which neither copyright nor patent law has previously extended. This poses a serious constitutional issue in that it is arguable that such an approach stretches the meaning of *authors* and *writings* as used in the Copyright Clause of the Constitution beyond the breaking point. Apart from the constitutional issues, it raises policy questions, the full implications of which remain murky at best. Still, at this time, knowing what we now know about the nature of the computer

---

[125] See this chapter under Dissent of Commissioner Hersey.

industry, its needs, and its potential for great contributions to the public welfare, I am prepared, on balance, to support the Commission's conclusions and recommendations.

At the same time I should like to suggest a possible line of demarcation which would distinguish between protectible and nonprotectible software in a manner more consistent with limiting such protection to the conventional copyright arena. This suggestion is made not because I recommend its immediate implementation, but rather because it may prove useful in the years to come if the Commission's recommendation for protection of all software should prove unduly restrictive. In such circumstances it may prove desirable to limit copyright protection for software to those computer programs which produce works which themselves qualify for copyright protection. A program designed for use with a data base, for example, would clearly be copyrightable since the resulting selection and arrangement of items from such data base would itself be copyrightable as a compilation. Thus, a program designed for use in conjunction with a legal information retrieval system would be copyrightable, since the resulting enumeration of cases on a given topic could claim copyright. A program designed for a computer game would be copyrightable because the output would itself constitute an audiovisual work. (For this purpose the fact that such audiovisual work is not fixed in a tangible medium of expression, and for that reason is ineligible for copyright protection should not invalidate the copyright in the computer program as long as the program itself is fixed in a tangible medium of expression.) On the other hand, programs which control the heating and air-conditioning in a building, or which determine the flow of fuel in an engine, or which control traffic signals would not be eligible for copyright because their operations do not result in copyrightable works. The fact that such a program might also provide for a printout of written instructions (which would be copyrightable) would only render protectible that particular aspect of such a program.

The distinction here suggested appears to me to be consistent with the recognized copyrightability of sound recordings. It sometimes has been argued that while printed instructions tell *how* to do work, computer programs actually *do* the work. But this is also true of sound recordings, which in a sense constitute a machine (the phonorecord) communicating with another machine (the record player). A sound recording contained in a phonorecord does not tell a record player *how* to make sounds which constitute a Cole Porter melody. Rather, it activates the record player in such manner as actully to create such a melody. But Commissioner Hersey has made another and most important distinction. "The direct product of a sound recording, when it is put in a record player, is the sound of music—the writing of the author in its audible form." [120] The point is that the operation of the sound recording produces a musical work which itself is copyrightable. That is sufficient to render the sound recording itself copyrightable quite apart from the separate copyright in the musical work. This principle is directly analogical to the distinction suggested above with respect to computer programs.

### Dissent of Commissioner Hersey

This dissent from the Commission report on computer programs takes the view that copyright is an inappropriate, as well as unnecessary, way of protecting the usable forms of computer programs. Its main argument, briefly summarized, follows.

In the early stages of its development, the basic ideas and methods to be contained in a computer program are set down in written forms, and these will presumably be copyrightable with no change in the 1976 Act. But the program itself, in its mature and usable form, is a machine-control element, a mechanical device, which on constitutional grounds and for reasons of social policy ought not be copyrighted.

The view here is that the investment of creative effort in the devising of computer programs does warrant certain modes of protection for the resulting devices, but that these modes already exist or are about to be brought into being under other laws besides copyright; that the need for copyright protection of the machine phase of computer programs, quite apart from whether it is fitting, has not been demonstrated to this

---

[120] See this chapter under Issue of Communication.

Commission; and that the social and economic effects of permitting copyright to stand alongside these other forms of protection would be, on balance, negative.

The heart of the argument lies in what flows from the distinction, raised above, between the written and mechanical forms of computer programs: admitting these devices to copyright would mark the first time copyright had ever covered a means of communication, not with the human mind and senses, but with machines.

ARE MATURE PROGRAMS "WRITINGS"?

Programs are profoundly different from the various forms of "works of authorship" secured under the Constitution by copyright. Works of authorship have always been intended to be circulated to human beings and to be used by them—to be read, heard, or seen, for either pleasurable or practical ends. Computer programs, in their mature phase, are addressed to machines.

All computer programs go through various stages of development. In the stages of the planning and preparation of software, its creators set down their ideas in written forms, which quite obviously do communicate to human beings and may be protected by copyright with no change in the present law.

But the program itself, in its mature and usable form, is a machine-control element, a mechanical device, having no purpose beyond being engaged in a computer to perform mechanical work.

The stages of development of a program usually are: a definition, in eye-legible form, of the program's task or function; a description; a listing of the program's steps and/or their expression in flow charts; the translation of these steps into a "source code," often written in a high-level programming language, such as FORTRAN or COBOL; the transformation of this source code within the computer, through intervention of a so-called compiler or assembler program, into an "object code." This last is most often physically embodied, in the present state of technology, in punched cards, magnetic disks, magnetic tape, or silicon chips—its mechanical phase.

Every program comes to fruition in its mechanical phase. Every program has but one pur-

pose and use—one object: to control the electrical impulses of a computer in such a particular way as to carry out a prescribed task or operation. In its machine-control form it does not describe or give directions for mechanical work. When activated, it does the work.

An argument commonly made in support of the copyrightability of computer programs is that they are just like ordinary printed (and obviously copyrightable) lists of instructions for mechanical work. The computer report calls programs forms of writing which "consist of sets of instructions."[127] But this metaphor does not hold up beyond a certain point. Descriptions and printed instructions tell human beings how to use materials or machinery to produce desired results. In the case of computer programs, *the instructions themselves eventually become an essential part of the machinery that produces the results*. They may become (in chip or hardware form) a permanent part of the actual machinery; or they may become interchangeable parts, or tools, insertable into and removable from the machine. In whatever material form, the machine-control phase of the program, when activated, enters into the computer's mechanical process. This is a device capable of commanding a series of impulses which open and close the electronic gates of the computer in such order as to produce the desired result.

Printed instructions explain *how* to do something; programs are *able* to do it. The language used to describe and discuss computer programs commonly expresses this latter, active, functional capability, not the preparatory "writing" phases. For example, the Commission's report on new works uses the following verbs to characterize the doings of various programs in computers: *select, arrange, simulate, play, manipulate, extract, reproduce,* and so on.[128] It is not said that the programs *describe* or *give instructions for* the functions of the computer. They *control* them. This is the mechanical fact.

*Issue of Communication*

The Commission report on computer programs suggests that musical recordings also do work, analogous to what we have been describing. "Both recorded music and computer pro-

---

[127] See this chapter under Computer Programs.
[128] See this chapter under New Works.

28

grams are sets of information in a form which, when passed over a magnetized head, cause minute currents to flow in such a way that desired physical work is accomplished." [129] But these are radically different orders of work, and the difference touches on the very essence of copyright.

We take it as a basic principle that copyright should subsist in any original work of authorship that is fixed in any way (including books, records, film, piano rolls, videotapes, etc.) which communicate the work's means of expression. But a program, once it enters a computer and is activated, does not communicate information of its own, intelligible to a human being. It utters work. Work is its only utterance and its only purpose. So far as the mode of expression of the original writing is concerned, the matter ends there; it has indeed become irrelevant even before that point. The mature program is purely and simply a mechanical substitute for human labor.

The functions of computer programs are fundamentally and absolutely different in nature from those of sound recordings, motion pictures, or videotapes. Recordings, films, and videotape produce for the human ear and/or eye the sounds and images that were fed into them and so are simply media for transmitting the means of expression of the writings of their authors. The direct product of a sound recording, when it is put in a record player, is the sound of music—the writing of the author in its audible form. Of film, it is a combination of picture and sound—the writing of the author in its visible and audible forms. Of videotape, the same. But the direct product of a computer program is a series of electronic impulses which operate a computer; the "writing" of the author is spent in the labor of the machine. The first three communicate with human beings. The computer program communicates, if at all, only with a machine.

And the nature of the machine that plays the second recording is fundamentally and absolutely different from that of the machine that uses software. The record player has as its sole purpose the performance of the writing of the author in its audible form. The computer may in some instances serve as a storage and transmission medium for writings (but different writings from those of the computer programmer—i.e., data bases) in their original and entire text, in which cases these writings may be adequately secured at both ends of the transaction by the present copyright law. But in the overwhelming majority of cases its purposes are precisely to use programs to transform, to manipulate, to select, to edit, to search and find, to compile, to control and operate computers and a vast array of other machines and systems, with a result that the preparatory writings of the computer programmer are nowhere to be found in recognizable form, because the program has been fabricated as a machine control element that does these sorts of work. It is obvious that the means of expression of the preparatory writing—that which copyright is supposed to protect—is not to be found in the computer program's mechanical phase.

An appropriate analogy to computer programs, in their capacity to do work when passed over a magnetized head, would be such mechanical devices as the code-magnetized cards which open and close locks or give access to automated bank tellers. These are not copyrightable.

But a more telling analogy, since it speaks to the supposed instructional nature of programs, is afforded by that relatively primitive mechanical device, the cam. A cam, like a mature computer program, is the objectification of a series of instructions: "Up, down, up, down . . .," or "In, out, in, out. . . ." A cam may be the mechanical fixation of rather intricate and elegant instructions. A cam controlling a drill may embody such instructions as: "Advance rapidly while the hole is shallow, pause and retract for a short distance to clear chips, advance more slowly as the hole goes deeper, stop at a precise point to control the depth of the hole, retract clear of the hole, dwell without motion while the work piece is ejected and another loaded; repeat procedure." (Computer programs can and do embody precisely similar instructions.) But although such a cam was originally conceptualized, described, and written out as this series of instructions for desired work and is, in its mature form, the material embodiment of the instructions, capable of executing them one by one, no one would say (as the Commission now says of another form of "in-

---

[129] See this chapter under Computer Programs.

structions"—the mature computer program) that it is a literary work and should be copyrighted.

To support the proposition that programs are works of authorship the report says that "the instructions that make up a program may be read, understood, and followed by a human being," and that programs "are *capable* of communicating with humans. . . ." [130] Programmers may and sometimes do read each other's copyrightable *preparatory* writings, the early phases of software, but the implication of these statements is that programs in their machine form also communicate with human "readers"—an implication that is necessarily hedged by the careful choices of the verbs *could be* and *are capable of*; for if a skilled programmer can "read" a program in its mature, machine-readable form, it is only in the sense that a skilled home-appliance technician can "read" the equally mechanical printed circuits of a television receiver.

It is clear that the machine control phase of a computer program is not designed to be read by anyone; it is designed to do electronic work that substitutes for the very much greater human labor that would be required to get the desired mechanical result. In the revealing words of the report, programs "are used in an almost limitless number of ways to release human beings from . . . diverse mundane tasks. . . ." [131] The Commission report thus recommends affording copyright protection to a labor-saving mechanical device.

## Is Copyright Protection Needed?

We may agree with a memorandum of the Commission's Software Subcommittee that computer programs "are the result of intellectual endeavors involving at least as much human creativity as the preparation of telephone books or tables of compound interest"—or, we may add (thinking of the mechanical phases of programs), as the design of high-pressure valves for interplanetary rockets or of special parts for racing cars for the Indianapolis 500. The investment in these endeavors, often dazzling in their intricacy and power, does indeed warrant legal protection of the resulting devices.

But is copyright a necessary form of protection? According to the evidence placed before the Commission it is not. In all the months of its hearings and inquiries, this Commission has not been given a single explicit case of a computer "rip-off" that was not amenable to correction by laws other than copyright. Interestingly, this exactly parallels the experience of the World Intellectual Property Organization (WIPO) in its search for a model form of protection for computer programs. [132] Alistair J. Hirst, attending the WIPO discussions as representative of the International Confederation of Societies of Authors and Composers, noted in an article of June 1978:

At no stage in the meetings of the Group was any convincing case ever made out for the proposition that computer software did actually *need* any additional legal protection; the most the representatives of the computer industry could say was that they "would *like* some further form of legal protection." No documented instances of piracy were adduced; and there was no serious suggestion that technological progress in the software field had been inhibited by any shortcomings there might be in the legal protection presently available. [133]

CONTU has had precisely the same lack of evidence on this score. A book recently published, [134] describing a large number of computer crimes committed in this country, cites no single piracy or other misappropriation that would have fallen under copyright law. A study of 168 computer crimes by the Stanford Research Institute, [135] made available to the Commission, also failed to turn up any single such case.

It appears that the existing network of technological, contractual, nondisclosure, trade-secret, common-law misappropriation, and (in a few instances) patent forms of protection, possibly to be joined soon by Sen. Abraham Ribicoff's Computer System Protection Act—to

---

[130] See this chapter under Computer Programs and under Scope of Copyright in Programs.

[131] See this chapter under Computer Programs.

[132] Ibid.

[133] CISAC document no. CJL/78/45.266, p. 2.

[134] WHITESIDE, COMPUTER CAPERS: TALES OF ELECTRONIC THIEVERY, EMBEZZLEMENT AND FRAUD (1978).

[135] PARKER, COMPUTER ABUSE (Stanford Research Institute, 1973).

say nothing of laws on fraud, larceny, breaking and entering, etc.—will be wholly adequate, as they apparently have been up to now, to the needs of developers.[136]

## LEGISLATIVE INTENT AND THE CONSTITUTIONAL BARRIER

"It was clearly the intent of Congress," the report says "to include computer programs within the scope of copyrightable subject matter in the Act of 1976." [137] This intent was by no means clear. It is true that in several places in the legislative reports there are passing references to computer programs which seem to assume their copyrightability under the 1909 Act and, by extension, the 1976 Act. Before these reports, the only authority for considering them potentially copyrightable was the Register of Copyright's letter of May 19, 1964—itself hedged with doubt whether programs were within the category of "writings of an author" in the constitutional sense. And even these legislative reports contain cautionary language on computer programs, to the effect that they would be copyrightable only "to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves." [138] Section 117 of the new copyright law provided for a moratorium precisely awaiting the conclusions of this Commission, and it indicates beyond a doubt that Congress has not reached the point of clear intention at least with respect to the use of copyrighted works.

The legislative history of the new law can give little comfort to any who would suggest that a thoughtful legislative judgment had been made about the propriety of copyright protection for computer programs. Where the Commission report finds the legislative history disconcerting, it simply avers, on its own authority, that the House Report "should be regarded as incorrect and should not be followed." [139]

Even if the legislative intent were unmistakable, there would remain the distinct possibility of a constitutional barrier to the copyrighting of computer programs. It is an underlying principle of copyright law, expressed in section 102(b) of the 1976 Act, that copyright does not extend to "any idea, procedure, process, system, method of operation . . . regardless of the form in which it is described, explained . . . or embodied in such work." This section of the statute is intended to recognize the distinction between works conveying descriptions of processes and works which are themselves the embodiment of a system or process. In *Baker* v. *Selden*, the Supreme Court found that, as a matter of constitutional law, the latter are not protected by copyright.[140]

That decision has been consistently applied to deny copyright to utilitarian works—not those, like phonorecords, which contain expression made perceptible by the use of a machine, but rather those which exist solely to assist a machine to perform its mechanical function. Professor Nimmer, while criticizing some interpretations of the *Baker* v. *Selden* decision, recognized that it properly bars copyright protection for a work embodying a method of operation when duplicated of necessity in the course of its use.[141] This dissent urges the view (to which Commissioner Nimmer's concurrence, above, seems to lend further weight) that computer programs are exactly the type of work barred from copyright by these considerations.

## DISTORTION BY SHOEHORN

We now come to two technical points that arise in the Commission's position on computer programs, matters that we stress here at some length as two examples of the forcible wrenching that is involved in fitting the mature computer program into copyright law—and consequent distortions of traditional copyright usages. It is urged that such distortions, with the formidable power of the computer industry behind them, must in the long run tend to corrupt and erode the essential purposes of copyright.

---

[136] 95th Cong., 1st sess., 1977, S. 1766.
[137] See this chapter under Statutory Copyrightability of Programs.
[138] House Report, *supra* note 1, p. 54.
[139] Note 111, *supra.*

[140] 101 U.S. 99 (1879).
[141] 1 *Nimmer on Copyright*, § 37.2 (1976).

31

## "Copies"

In its attempts to justify the copyrighting of mechanical devices—the mature phases of computer programs—the Commission's Software Subcommittee was obliged, at successive stages, to resort to certain euphemisms.

The first draft of its report described the usable, mechanical phases of computer programs as *derivative works*—a term traditionally used, with respect to the printed word, for condensations, dramatizations, translations, and so on (each of which has always had to be copyrighted separately from the parental work). When the invalidity of this suggestion became evident, the second draft of the report characterized the programs in their usable machine forms, equally with their written forms, as *literary works*. When the difficulty in maintaining that the mechanical commands on punched cards, magnetic tapes, disks, and printed circuits in chips were identical with programs' preparatory writings had been considered, the third draft of the report brought yet another shift of terms. The mechanical phases of programs were now described as *copies*. On several grounds this euphemism proves as unserviceable as the previous ones. (And so, in this view, will every euphemism that attempts to justify the copyrighting of a machine control element.)

*Copies*, for the control of which the rights vested in copyright were devised, are defined in the 1976 Act as:

material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.[142]

This definition has always referred to one form or another of reproduction of an original work, for the purpose of dissemination to and perception by human beings: in plain language, books, monographs, films, prints, and other such replications we all recognize as copies in the true copyright sense. Their uses always involved perception by one human sense or another of the linguistic intentions, the images, or the sounds of the original works. A data base, when keyed or run into a computer, *is*

being copied in this sense, for the data are maintained in the copy *as* data, and they issue *as* data for human use in the end product. But a program, when keyed or run into a computer, is transformed by a compiler program into a purely machine state. The term *copy* is meaningless for the reason that in this transformation the means of expression of the original work become totally irrelevant. All that matters is the program's functional use.

Furthermore, many programs (in fact, a greater and greater proportion of commercial programs) never are "input" into computers in the conventional sense. They are distributed already transformed into their purely mechanical form as printed circuits on chips in microprocessors. They are, in all but name, hardware. They are no more copies in the copyright sense than are repeatedly stamped-out solid-state circuits of television sets. These programs in microprocessors are built into, or can be clipped into, automobiles, airplanes, telephone and television sets, microwave ovens, games, and an ever-growing number of industrial and home gadgets. How can this vast class of machine-control elements ever be considered *copies of literary works?*

We are dealing here with an entirely new technology, one with a highly intricate multiplicity of means of fixation, of transformation, of movement from one medium (of communication) to another (of mechanical function) and back again. The fact that some of these many intricate fixations and changes enable a human-readable version of a program to be stored in a computer parallel to its mechanical variant, or to be reconverted to eye-readable form from its mechanical variant, does not mend at all the basic distortion that arises from this abuse of the term *copies*.

In discussing *copies*, the Commission report admits the central difficulty to which this dissent addresses itself:

[T]he many ways in which programs are now used and the new applications which advancing technology will supply may make drawing the line of demarcation [between the copyrightable form of a program and the uncopyrightable process which it implements] more and more difficult. To attempt to establish such a line in this report written in 1978 would be futile. Most infringements, at least in the immediate future, are likely to involve simple copying. In the event that future technology permits programs to be

---

[142] 17 U.S.C. § 101.

stated orally for direct input to a computer through auditory sensing devices or permits future infringers to use an author's program without copying, difficult questions will arise.[143]

It is the thesis of this dissent that all such difficulties, present and future, disappear if the euphemism in the word *copies* is recognized for what it is, and if a clear line is drawn forthwith. The line can and should be drawn in 1978. The line should be drawn at the moment of the program's transformation, by whatever present or future technique, to a mechanical capability. This is the moment at which the program ceases to communicate with human beings and is made capable of communicating with machines.

Here is dramatized, in our view, the central flaw—and the subtle dehumanizing danger—of the Commission's position on programs. To call a machine-control element a copy of a literary work flies in the face of common sense. Ask any citizen in the street whether a printed circuit in a microprocessor in the emission control of his or her car is a copy of a literary work, and see what answer you get. But if our government *tells* the citizens in the street that this is so and makes it law, what then happens to the citizen's sense of distinction between works that speak to the minds and senses of men and women and works that run machines—or, ultimately, the citizen's sense of the saving distinction between human beings themselves and machines themselves?

*Adaptations*

A particularly serious blurring of valid traditional distinctions lies in the report's extension of copyright protection to *adaptations* of programs.[144] There is not merely a question here of unfairness to all other sorts of adaptations, which must be recopyrighted (as in the case, for example, of a telephone directory, which is annually adapted and must be recopyrighted each year). What is shocking, in its transparency, is the reason given by the report for authorizing these adaptations—"to facilitate use."[145]

The transparency lies in the fact that the means of expression of the original program—the only thing in which copyright is reposed—is here again totally irrelevant. The only test the user is required to meet is whether the machine phase of the program, having been adapted, will then *work*. And what will make it work is certainly not its means of expression but its mechanical idea, which remains constant however expressed.

In his testimony before CONTU in Cambridge, Massachusetts, on November 17, 1977, Prof. J.C.R. Licklider of the Massachusetts Institute of Technology raised, as one of his concerns about the idea of copyrighting the mechanical phases of programs, precisely this matter of adaptation.[146] He gave the example in which a protracted program may be taken from "machine language, or FORTRAN, or whatever level . . . to a higher level and back to a lower level," and stressed that all that survives from one, version to the other is "the essential underlying idea, not the mode, not the form of expression."

In the present reality of computer usage, particularly in sophisticated operations, a great deal of programming ingenuity goes precisely into various kinds of adaptation, commonly called "program maintenance": new mechanical functions may be added to an existing program; a program may be modified, possibly extensively, to make it workable in a different or more up-to-date computer; or a program may be changed to mesh with other programs in a complex multiprocessor. Under these and many other circumstances, the protection would remain in effect for an underlying idea that was itself being adapted, or perhaps even being transformed into something quite different from the original idea. The mode of expression of the original writing would be long gone. As Licklider pointed out, only the "effect of the action of the program" is of consequence in a series of such changes; programmers, he said, "don't care a thing for the particulars of the expression."[147]

The limitations on adaptions suggested in the Commission report will, in the real world

---

[143] See this chapter under Scope of Copyright in Programs.
[144] See this chapter under Recommendations for Statutory Change.
[145] Ibid.

[146] See Transcript, CONTU Meeting No. 18, pp. 130–32.
[147] Ibid., p. 131.

of program maintenance, be unthinkably difficult to police.

By the admission of the word *adaptation*, in this new sense, with no means of test except workability, the Commission has bypassed a fundamental distinction of copyright from other forms of protection and may well have opened the way for covert protection, in the name of copyright, of the underlying mechanical idea or ideas of a program, rather than of its original means of expression.

SOCIAL EFFECTS

*Access*

The Commission report has based much of its case on its conclusion that copyright would ensure greater public access to innovative programs than would continued reliance on trade-secrecy law.

The evidence the Commission has received casts considerable doubt on this argument. In the first place, the testimony CONTU has heard makes it quite clear that the industry would have no intention of giving up trade-secrecy protection in favor of copyright; to the contrary, every indication is that it would fight hard to assert its undeniable continuing right to the former. It is obvious that the industry, faced with a choice between secrecy and dissemination, as represented in the choice between trade-secrecy laws and copyright, has overwhelmingly opted for the former. From 1964, when the Register first received programs for registration, to January 1, 1977, only 1,205 programs have been registered (and two companies, IBM and Burroughs, accounted for 971 of them). According to International Computer Programs, Inc., which publishes a newsletter on the programming industry, something in the order of 1,000,000 programs are developed each year (taking into account adaptations of existing programs so radical as to make them new programs). There are roughly 300,000 programmers in the United States who spend at least part of their time developing new programs. These figures show how miniscule the industry's interest in copyright has been, and they strongly suggest that such registration as has taken place has been in the nature of bet-hedging, reflecting efforts of major hardware manufacturers to assert any possible colorable claim to protection, regardless of its real legal merits.

The Commission report recognizes that "the availability of copyright for computer programs does not, of course, affect the availability of trade secrecy protection." [148] It suggests leaving all future "difficult questions" for settlement by the courts on a case-by-case basis.[149]

The uncertainty resulting from this situation, as Robert O. Nimtz of Bell Laboratories has pointed out in a response to the Commission's draft report, "would have the unfortunate consequence of driving computer program owners into even deeper secrecy"—by encryption, physical barriers to access, contractual restraints, nondisclosure agreements, and further innovative technical tricks for locking out pirates, thieves, and competitors. "Secrecy will be seen as the only effective protection for their creations." [150] Such being the case, public access to innovative programs would likely be inhibited rather than eased by the addition of the copyright solution to those that already exist and that would continue to exist.

Indeed, it is evident that, with eased requirements for deposit and disclosure, copyright itself would be used as one more device to prevent rather than enable, access to innovative programs—one more device of industrial security. The entitlement of copyright protection to *adaptations* of programs might, under these circumstances, even further inhibit access, insofar as it provided owners with a covert means of protecting the underlying ideas of their program. And the lengthy term of seventy-five years for corporate ownership of copyright would be a negative balance, at the very least, against the presumed "thinness" of the protection.

*Economic Costs*

All of this, rather than reducing the transaction costs of using and protecting programs, as the Commission argues, would in fact raise the costs: for producers, transacting copyright

---

[148] See this chapter under Copyright and Other Methods Compared.
[149] See this chapter under Scope of Copyright in Programs.
[150] Nimtz comment, letter to CONTU, August 30, 1977, p. 9.

34

while spending more and more money looking harder than ever for new and surer forms of secrecy; for users, to whom the added costs of this search and its found devices would be passed along in higher prices; and for the tax-paying public, which would have to bear the costs of the added burdens on the Copyright Office and the courts.

A more likely prospect for the reduction of money costs would lie in the exclusion of usable computer programs from copyright. This would eliminate or diminish the uncertainty as to legal protection available for computer pro-grams. All questions of the constitutionality of such protection would become moot; some of the guesswork which would otherwise have colored all business planning for securing soft-ware would be voided.

An additional consideration would be the easing of the administrative burden on the Copyright Office. The office, already mon-strously overloaded by administration and regu-lation of the new law, is presently unsuited for making evaluations of computer programs which might be registered for copyright. Eliminating this responsibility would save a public expenditure and place the costs of com-mercial protection on those enterprises seeking its benefits.

*Concentration of Economic Power*

While it has always been the case that corporate entities could be copyright pro-prietors, the picture CONTU has been given, where rights in computer programs are con-cerned, is that the proprietor is almost invari-ably corporate. If there is an individual "author," it will be an author for hire, whose creativity is in strict harness and whose property rights are nonexistent.

The sheer bigness of the corporate enterprise in computers is staggering. According to testi-mony by Peter McCloskey, president of Com-puter and Business Equipment Manufacturers' Association (CBEMA), the combined revenues of the forty-two members of that association of manufacturers of computers and related busi-ness equipment rose in 1976 to $32.7 billion; as to software, we heard at one point an esti-mate of $17 billion of production in the next

three years.[151] The art is growing and changing with blinding speed. In his testimony, Ralph Gommery of IBM suggested, with perhaps a pinch of hyperbole, that if the automobile in-dustry had progressed on the same curve as computers in the last fifteen years, we would now have been able to buy for twenty dollars a self-steering car that would attain speeds up to four hundred miles per hour and be able to drive the length of California on one gallon of gasoline.

In a study funded by this Commission, Harbridge House concluded that the availability of copyright protection for computer software is "of monumental insignificance to the in-dustry."[152] It is important for us to bear in mind that the universe of this study consisted almost entirely of smallish, independent corpo-rate producers. The two trade associations that were most active in pressing their views on this Commission, CBEMA and the Information In-dustry Association, represent primarily major industrial corporations. The Association of Data Processing Service Organizations, which more than any other trade association represents in-depent computer program producers, was con-spicuously absent from Commission appearances and limited its participation to a written re-sponse in support of the Software Subcommit-tee's recommendations. Such perfunctory partici-pation certainly tends to support the Harbridge House view as to the interest of the independ-ents.

On this point, the WIPO experience strikingly parallels that of CONTU. Alastair J. Hirst writes that a one-sided approach in the WIPO search

was more or less inevitable, given the composition of the Group. It is important to distinguish be-tween the names shown on the list of partici-pating organizations, and the individuals who were most active in directing and moulding the discussion as it proceeded. Of the latter, the most frequent and the best informed grouping was that composed of patent agents and lawyers in the employ of the large computer companies such as ICL and IBM. Even amongst those repre-senting the computer industry, there was a singular lack of representation from the smaller independent software houses, who were intended

---

[151] Transcript, CONTU Meeting No. 6, p. 11.
[152] LEGAL PROTECTION OF COMPUTER SOFTWARE: AN INDUSTRIAL SURVEY, iii (Harbridge House, 1977).

35

to be the chief beneficiaries of the new software right: those who had the most influence on the discussions were in fact the representatives of the large companies who are in many ways the economic adversaries of these intended beneficiaries.[158]

Congress is urged to take careful note of this difference. Why do the large industrial corporations press for copyright, while it seems to be a matter of much less concern to the small independents? Is it not evident, from the testimony CONTU received, that the big companies want, by availing themselves of every possible form of protection, to lock their software into their own hardware, while the independents want to be able to sell their programs for use in all the major lines of hardware?

Thus, a warning appears to be in order that the copyrighting of the machine phases of programs would be likely to strengthen the position of the large firms, to reinforce the oligopoly of these dominant companies, and to inhibit competition from and among small independents.

The country has lately seen an alarming trend toward the concentration of economic power in all the communications industries. One company dominates telephonic communication. One company (IBM) dominates the computer hardware field, while three others (Burroughs, Honeywell, and Sperry-Univac) join with IBM to manufacture over 85 percent of large-scale computers. One company (Xerox) dominates photocopying, and, again, three other companies (IBM, Kodak, and 3M) outstrip all others. Three networks dominate television. There are now but six major film distributors. Paperback publishing has become the backbone of the book industry, and there are now but seven leading paperback lines. Industrial conglomerates are buying up these communications leaders horizontally: e.g., Gulf and Western owns both Paramount Pictures and Simon and Schuster, which in turn owns Pocket Books.

If there are social benefits to our nation, as we have always believed, in pluralism, in diversity, in lively competition in the marketplace, and in the rights of the individual to maximum freedom of choice within the limits of the social contract and, above all, to maximum freedom of speech, then this increasing concentration of corporate power in that most sensitive area in a democracy—the area of communication from one human being to another, from leaders to citizens and vice versa—should surely be a matter of greatest concern.

COMMUNICATION—HUMAN AND MECHANICAL

The aim of all writing, be it for art or use, is communication. Up to this time, as we have seen, copyright has always protected the means of expression of various forms of "writing" which were perceived, in every case, by the human sense for which they were intended: written words by the human eye, music by the ear, paintings by the eye, and so on. Here, for the first time, the protection of copyright would be offered to a "communication" with a machine.

This pollution of copyrighted "writings" with units of mechanical work would affect not only creators but also the general public. Placed beside such traditional end products as books, plays, motion pictures, television shows, dance, and music, under the aegis of copyright, what end products of computer programs would we find?

The overwhelming majority of program applications are mechanical and industrial: the monitoring of an assembly line in a factory; the microprocessors in an automobile; the aiming device of a weapons system; the coordination of approach patterns at an airport. An entire branch of the program industry is devoted to systems software—new techniques for more efficient uses of machines, for more efficient industrial processing.

Progress is progress, and we can guess that we must have all these products of human ingenuity to keep one jump ahead of entropy. It may reasonably be argued, as the Commission report does, that they reduce the load of human labor. But a definite danger to the quality of life must come with a blurring and merging of human and mechanical communication.

As one step in its education, this Commission has had the benefit of a book written by one of our witnesses, Prof. Joseph Weizenbaum of the Massachusetts Institute of Technology, entitled *Computer Power and Human Reason*—a work which is both intricately technical and profoundly humanistic. Something that Professor

---

[158] *Supra*, note 133.

36

Weizenbaum keeps emphasizing over and over again is the extent to which computer scientists, especially those who have worked on so-called artificial intelligence—"and large segments of the general public as well"—have come to accept the propositions "that men and computers are merely two different species or a more abstract genus called 'information processing systems,'" that reason is nothing more than logic, and "that life is what is computable and only that." [154]

A society that accepts in any degree such equivalences of human beings and machines must become impoverished in the long run in those aspects of the human spirit which can never be fully quantified and which machines may be able in some distant future to linguistically "understand" but will never be able to experience, never be able to bring to life, never be able therefore to communicate. Those aspects include courage, love, integrity, trust, the touch of flesh, the fire of intuition, the yearning and aspirations of what poets so vaguely but so persistently call the soul—that bundle of qualities we think of as being embraced by the word humanity. This concern is by no means irrelevant to the issue of whether computer programs should be copyrighted. It is the heart of the matter.

## RECOMMENDATION

The logical conclusion of this dissent, then, is a recommendation to Congress that:

The Act of 1976 should be amended to make it explicit that copyright protection does not extend to a computer program in the form in which it is capable of being used to control computer operations.

Congress could obtain any technical advice necessary to assist it in reaching an appropriate definition of the cutoff point, the point at which a program ceases being a copyrightable writing and becomes an uncopyrightable mechanical device.

In our discussions, several possibilities have presented themselves: (1) the moment of transformation from "source" to "object" program; (2) the moment of input into a computer or microprocessor; or (3) at the point where a

program goes from "natural language," which any expert reader may at once grasp, to higher-level, formal computer language—this last deriving from Professor Weizenbaum, who writes: "A higher-level formal language is an abstract machine." [155] With rapidly advancing technology, natural language does in some programs already reach to the very moment of entry into the computer. In every case, however, Professor Weizenbaum makes clear, a transformation to a machine state takes place, with a result that when the program is run, communication as we understand it ceases, and what he calls "behavior"—an opening and closing of electronic gates—sets in. Where his book is most eloquent, for our purposes, is in its powerful warning of our loss of humanity if we come to believe, as many already do, that anything like human communication is still taking place, or ever can take place, after this mechanical stage has set in.

Congress should weigh most carefully the heavy responsibility of breaking with tradition and enabling, by law of the land, for the first time ever, copyright protection for communication, not with our fellow human beings, but with machines—thus equating machines with human beings as the intended recipients of the distribution that copyright was designed to foster.

Surely it is especially vital, in a time of hurtling and insatiable technology, that the nation's laws reflect, whenever possible, a distinction between the realm and responsibility of human beings and the realm and responsibility attributed to machines.

## Dissent of Commissioner Karpatkin

Throughout the Commission's deliberations on computer software, Commissioner Hersey has advocated the point of view expressed in his dissent. While a majority of the Commission has not been persuaded, Commissioner Nimmer shares a number of Mr. Hersey's doubts and concerns, and the late Commissioner Dix, who passed away before the Commission's final report, indicated that he shared them as well.

---

[154] WEIZENBAUM, COMPUTER POWER AND HUMAN REASON 158, 240.

[155] Ibid., p. 103.

37

The Commission has respectfully considered and discussed Commissioner Hersey's views. In the course of the many discussions, I have been persuaded that Commissioner Hersey has raised important issues and that they merit serious consideration. Whether that consideration tilts in the direction of a dissent or concurrence is less important than the fact that the issues raised are serious.

Without agreeing with the entire text of Commissioner Hersey's dissent I share his doubts and concerns sufficiently to lead me to add my dissent to his.

## Computer Data Bases

The automated data base represents a new technological form of a type of work long recognized as eligible for copyright. Dictionaries, encyclopedias, and tables of numeric information are all forms of data bases which long antedate the computer, and for which copyright protection has been and will continue to be available under the copyright law. Under the new law, a data base is a compilation and thus a proper subject for copyright.[156] This entitlement to copyright is not diminished by the fixation of the data base in a medium requiring the intervention of a computer to communicate its information content.[157] Accordingly, a data base, whether printed in traditional hard copy or fixed in an electromagnetic medium, is protected by copyright under the terms of the new law.[158]

Computer-readable data bases do differ, of course, from their hard-copy counterparts. Some of these differences raise copyright issues and related policy considerations.[159] Copyright applied to data bases should encourage the development and dissemination of useful stores of information to make this information readily available to the public. In addition, data base proprietors should be encouraged to publish and register their copyrighted works, thereby creating a public record of the existence of the works and, in turn, make possible public awareness and utilization of their works.[160]

### Repeal of Section 117 of the Copyright Act of 1976 Recommended

The new Copyright Act, in the absence of the limited moratorium imposed by section 117, deals effectively with questions related to copyright protection for automated data bases. For example, under the provisions of section 106, the copying or input of a data base or any other work of authorship embodied in a computer-readable medium is an exclusive right of the copyright owner. Other questions as to the scope of protection to be afforded such works by copyright can and should be repealed upon completion of the Commission's work as was apparently the legislative intent.[161]

### Adoption of Appropriate Registration and Deposit Regulations Recommended

Regulations for registration and deposit of data bases and other works first fixed in computer-readable media should permit and encourage registration and periodic updating of identifying material rather than actual data bases.

---

[156] 17 U.S.C. § 101 defines *compilation* as: "[a] work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works."

[157] 17 U.S.C. § 102(a) provides that: "Copyright protection subsists, in accordance with this title, in original works of authorship *fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device*" (emphasis added).

[158] The following language makes clear the congressional intent to include computer-readable data bases within copyright by explaining that: "The term 'literary works' does not connote any criterion of literary merit or qualitative value: it includes catalogs, directories, and similar factual references, or instruc-

tional works and compilations of data. It also includes computer data bases . . ." (House Report, *supra* note 1, p. 54).

[159] Maximization of public access to information contained in automated data bases is cited as a significant goal of a national information policy in the REPORT TO THE PRESIDENT OF THE UNITED STATES ON NATIONAL INFORMATION POLICY 70 (1976), prepared by the Domestic Council Committee on the Right of Privacy, under the chairmanship of then Vice-President Nelson Rockefeller.

[160] Registration and deposit regulations have been adopted by the Copyright Office. See 37 C.F.R. § 202 in Appendix J.

[161] House Report, *supra* note 1, p. 116.

There appears no reason to tailor any notice requirements specifically to computer-readable works; general principles contained in the new law seem adequate without being particularly burdensome. Notice appearing on the initial display of any extract or extracts obtained from the data base pursuant to a search should comply with the intent of the statutory notice requirement. A copyright notice may easily be included on the initial display extracted from a data base, and a human-readable notice may also appear on the packaging.

### Case for Copyright Protection for Data Bases

The following discussion explains the Commission's agreement with the legislative intent of the new copyright law to grant copyright protection to computer data bases equivalent to the protection accorded compilations in traditional hard-copy format. The problem areas identified and discussed are: (1) What copyright consequences attach to the "input" into a computer of a copyrighted work (perhaps better described as the fixation of a work in a medium capable of use within a computer system)? (2) What rights does the proprietor of copyright in a data base have with regard to the use of extracts provided in response to authorized searches or inquiries made of the data base? and (3) What constitutes publication of a data base, and what legal consequences attach to publication? [162]

### THE INPUT ISSUE

The issue whether copyright liability should attach at the input or output stage of use in conjunction with a computer—i.e., at the time a work is placed in machine-readable form in a computer memory unit or when access is sought to the work existing in computer memory—has been the primary source of disagreement regarding copyright protection for works in computer-readable form. This issue provided the major impetus for the introduction of section 117 into

the copyright revision bill.[163] It appears, nevertheless, that the provisions of the new copyright law offer appropriate and sufficient guidance to determine what acts create copyright liability in this area. The protection afforded by section 106 of the new law seemingly would prohibit the unauthorized storage of a work within a computer memory, which would be merely one form of reproduction, one of the exclusive rights granted by copyright.[164]

Considering the act of storing a computerized data base in the memory of a computer as an exclusive right of the copyright proprietor appears consistent both with accepted copyright principles and with considerations of fair treatment for potentially affected parties. Making a copy of an entire work would normally, subject to some possible exception for fair use, be considered exclusively within the domain of the copyright proprietor. One would have to assume, however, that fair use would apply rarely to the reproduction in their entirety of such compendious works as data bases.[165] If a copy of the work is to be stored in a computer and sub-

---

[162] It should be clear that the same principles which apply to data bases apply also to any copyrightable works embodied in a format for reproduction and use within a computer. See this chapter under Publication.

---

[163] 17 U.S.C. § 117 provides as follows: "Notwithstanding the provisions of sections 106 through 116 and 118, this title does not afford to the owner of copyright in a work any greater or lesser rights with respect to the use of the work in conjunction with automatic systems capable of storing, processing, retrieving, or transferring information, or in conjunction with any similar device, machine, or process, than those afforded to works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title."

This section was first introduced in the copyright revision bill in 1969 (see 91st Cong., 1st sess., December 10, 1969, S. 543 [Committee Print]), at which time the impact of the computer, and particularly the "input-output" question, was causing great concern on the part of copyright proprietors. Section 117 was agreed upon by interested parties as a means of permitting passage of the revision bill without committing Congress to a position on the computer-related issue until more study could be undertaken.

[164] It may be that the use of the term *input* to describe the act to which copyright liability attaches has been misleading. A more accurate description of the process by which a work may be stored in a computer memory would indicate that a reproduction is created within the computer memory to make the work accessible by means of the computer.

[165] See 17 U.S.C. § 107 for statutory criteria governing fair use.

39

sequently made accessible to others, its creation would have to be properly authorized by the copyright proprietor. That only one copy is being made, or even that the owner of the computer system intends to exact no fee for providing access to the work, would no more insulate the copies from liability for copyright infringement than would similar circumstances insulate a public library which made unauthorized duplications of entire copyrighted works for its basic lending functions.[166]

Under normal circumstances, the transfer by sale or lease of a copyrighted work in computer-readable form, such as a data base, would be a meaningless transaction unless implicit in the transfer was the authorization to place or reproduce a copy in the memory unit of the transferee's computer. Any limitations on the use to be made of the copy would be a matter to be negotiated between private parties, guided by applicable public policy considerations.[167] The proprietor of a work in computer-readable form would, under any foreseeable circumstances, be able to control by contract the future disposition of machine-readable copies of his proprietary work. The proprietor of copyright in such a work would always have a valid cause of action, arising either under copyright or contract, if a reproduction of the work were entered into a computer without the proprietor's authorization, or if a transferee authorized a third party to enter a copy into the memory unit of a computer in violation of the terms of a valid agreement with the proprietor. That copyright would not provide the sole right and remedy for unauthorized use of a protected work neither is unique to the protection of proprietary interests in computer-readable works nor is it a situation to be considered undesirable.[168]

Accordingly, the Commission believes that the application of principles already embodied in the language of the new copyright law achieves the desired substantive legal protection for copyrighted works which exist in machine-readable form. The introduction of a work into a computer memory would, consistent with the new law, be a reproduction of the work, one of the exclusive rights of the copyright proprietor. The unauthorized transfer of an existing machine-readable embodiment of a work could subject the violators to remedies for breach of contract. Principles of fair use would be applicable in limited instances to excuse an unauthorized input of a work into computer memory. Exemplifying such fair uses could be the creation of a copy in a computer memory to prepare a concordance of a work or to perform a syntactical analysis of a work, which but for the use of a computer would require a prohibitive amount of human time and effort. To satisfy the criteria of fair use, any copies created for such research purposes should be destroyed upon completion of the research project for which they were created. Should the individual or institution carrying on this research desire to retain the copy for archival purposes or future use, it should be required to obtain permission to do so from the copyright proprietor.

---

[166] The example of a copyrighted work placed in a computer memory solely to facilitate an individual's scholarly research has been cited as a possible fair use. The Commission agrees that such a use, restricted to individual research, should be considered fair. To prevent abuse of fair use principles, any copy created in a machine memory should be erased after completion of the particular research project for which it was made.

[167] Outright sale by a copyright proprietor of a copy of a protected work, rather than a lease under which the proprietor retains ownership of a copy which the lessee may use in accord with negotiated terms and conditions, normally results in a complete loss of control over the copy which has been sold. This reflects the unwillingness of courts to enforce restrictions on the alienation of property once a complete transfer of ownership interest in any item of property has been accomplished.

[168] Remedies for breach of contract, if the right being protected is not equivalent to copyright, would not be preempted under the provisions of section 301 of the new law, and would accordingly be available to one who, on the strength of a copyright interest, granted permission to another to make certain uses of the copyrighted work only to have the terms of the authorization violated. There continues to be some scope for state enforcement of proprietary rights in intellectual property under the new copyright law. See House Report, *supra* note 1, pp. 130–33. That state law rather than federal would be involved presents few real problems. The existence of parallel but not equal rights under state and federal law reflects advantages as well as disadvantages inherent in a federal polity, and generally both claims could be joined in the same federal cause of action under principles of pendent jurisdiction.

40

## SCOPE OF COPYRIGHT IN A DATA BASE

A computer-readable data base derives its value in large part from the ease with which a user may retrieve from it data conforming to certain specifications. That ease is the product of several factors: the organization of the data, the sophistication of the program which assists in the searching and retrieving, and the skill of the searcher in articulating the search criteria. The difference between a data base in hard copy and one in computer-readable form is that the use of the former is passive and the latter may be used interactively, in the language of the industry.[169] Thus, a student who searches the *Reader's Guide to Periodical Literature* (a copyrighted data base) must not only know what is sought but also painstakingly read much unsought material in numerous volumes and updates to obtain the desired information. If, however, an interactive bibliographic data base is used, only the topic(s) of interest need be expressed to receive citations to apparently pertinent literature and, frequently, abstracts of that literature to allow further evaluation of its utility. One important question for the Commission's purposes concerns what rights the proprietor of a computer-readable data base has in the information obtained pursuant to a user's request to or search of such a data base.

There is little doubt that one who obtained access to a copyrighted data base by normal commercial methods—paying the proprietor or the proprietor's authorized agent for the right to search the data base and retrieve from it information or data responsive to the search request—would infringe an existing copyright by retrieving the entire data base and marketing an exact duplicate in competition with the copyright proprietor. Such activity beyond question would be unauthorized copying in violation of a valid copyright. Purchasing access to information contained in a data base no more entitles one to make and employ copies for commercial purposes than would purchasing a copy of a copyrighted directory entitle one to produce and disseminate copies of the directory.

Two complications arise in attempting to define the scope of protection in a computerized data base. First, such works are not static; rather, they are constantly being updated by the addition of current data and the deletion of data determined obsolete. Second, the question as to what rights a copyright proprietor has in extracts of information retrieved pursuant to an authorized search of the data base must be addressed. Provisions applicable to both issues are found in the text and legislative reports of the new law.

The dynamic process by which a data base changes need not affect the entitlement of the data base to copyright protection. This process raises two concerns: (1) that deposit of a new embodiment of the data base to reflect every modification of the data contained in it would be both extremely expensive for the proprietor and cumbersome for the Library of Congress; and (2) that a proprietor, by virtue of the constant updating of the data base, could claim copyright in the work in perpetuity, in disregard of the "limited times" provision of the Constitution and the statutory term of seventy-five years applicable to data bases under the new statute. Neither of these concerns need cause serious problems.

The deposit requirement should prove no bar to providing effective copyright protection for dynamic data bases. Deposit is not a precondition to copyright under the new law. Sections 407(c) and 408(c) of the new copyright law authorize the Register of Copyrights to exempt categories of material from the deposit requirements by regulation or to require alternative forms of deposit. Computer data bases seem well suited for this exemption, for the deposit of an identifying form would achieve the statutory purpose of "providing a satisfactory archival record of a work without imposing practical or financial hardships on the depositor. . . ."[170] Nor would a dynamic data base necessarily obtain protection for a longer period than constitutionally or legislatively authorized, any more than would a telephone directory be given perpetual protection by virtue of its being updated annually. The proprietor of a data base would have to register for copyright each update of the work, just as the proprietor of a telephone di-

---

[169] An interactive data base is one with which a user, aided by a computer, can converse, i.e., the user frames questions to which the data base, controlled by a computer, provides responses.

[170] 17 U.S.C. § 407(c).

41

rectory obtains copyright in new editions of a work.

Similar also to a telephone directory, copyright in a dynamic data base protects no individual datum, but only the systematized form in which the data are presented. The use of one item retrieved from such a work—be it an address, a chemical formula, or a citation to an article—would not under reasonable circumstances merit the attention of the copyright proprietor. Nor would it conceivably constitute infringement of copyright. The retrieval and reduplication of any substantial portion of a data base, whether or not the individual data are in the public domain, would likely constitute a duplication of the copyrighted element of a data base and would be an infringement. In any event, the issue of how much is enough to constitute a copyright violation would likely entail analysis on a case-by-case basis with considerations of fair use bearing on whether the unauthorized copying of a limited portion of a data base would be held noninfringing. Fair use should have very limited force when an unauthorized copy of a data base is made for primarily commercial use. Only if information of a substantial amount were extracted and duplicated for redistribution would serious problems exist, raising concerns about the enforcement of proprietary rights.

It appears that adequate legal protection for proprietary rights in extracts from data bases exists under traditional copyright principles as expressed in the new law, supplemented by still-available relief under common-law principles of unfair competition. The unauthorized taking of substantial segments of a copyrighted data base should be considered infringing, consistent with the case law developed from infringement of copyright in various forms of directories.[171] In addition, common-law principles of misappropriation which, according to the legislative reports accompanying the new law, are not preempted with regard to computer data bases are available to enforce proprietary rights in these works.[172]

## PUBLICATION

In section 101 of the new law, publication is defined as:

the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

According to sections 401 and 407 of the new law, after publication the copyright owner is required to place copyright notice upon all publicly distributed copies of a work and to deposit two copies of the work for the Library of Congress. If a proprietor wishes also to register the work in accordance with section 408, the deposit required by section 407 must be accompanied by the prescribed registration application and fee. Although the failure to deposit copies will not result in forfeiture of copyright, the failure to place notice on published copies may.[173] Accordingly, it is of considerable importance to know what acts constitute publication of any copyrighted work. Computerized data bases are no exception.

The definition cited above, and further discussed in the legislative reports accompanying

---

[171] See Leon v. Pacific Tel. & Tel. Co., 91 F.2d 484 (9th Cir. 1937); Jeweler's Circular Pub. Co. v. Keystone Pub. Co., 281 F. 83 (2d Cir. 1922), cert. denied, 2.? U.S. 581 (1922), aff'g 274 F. 932 (S.D.N.Y. 1921); New York Times Co. v. Roxbury Data Interface, Inc., 434 F.Supp. 217, 194 U.S.P.Q. 371 (D.N.J. 1977).

[172] House Report, supra note 1, p. 132, discussing the preemption provisions of section 301.

[173] Under the new law, the most significant effect of the act of publication is the requirement that copyright notice be affixed to all copies of the work distributed thereafter. Omission of notice may result, in accord with the provisions contained in section 405, in the forfeiture of copyright. Section 405 of the Act of 1976 provides that omission of notice will not invalidate copyright if notice is omitted from a relatively small number of publicly distributed copies, if the work is registered within five years of publication and reasonable efforts are made to add notice to publicly distributed copies, or if omission of notice violates terms set by the proprietor for authorizing public distribution of copies of the work. Section 406 deals with errors in contents of the notice with like flexibility. The failure to include notice may, at least temporarily, deny the proprietor his full rights in a copyrighted work, i.e., to prevent and collect damages for unauthorized copying.

the new law, provides a reasonably clear bench mark for determining when a data base used in conjunction with an automated storage and retrieval system—a computer—is published for the purposes of the copyright law. The House Committee report thoroughly discusses the concept of publication in the context of considering the duration of copyright under the new law:

Under the definition in section 101, a work is "published" if one or more copies or phonorecords embodying it are distributed to the public—that is, generally to persons under no explicit or implicit restrictions with respect to disclosure of its contents—without regard to the manner in which the copies or phonorecords changed hands. The definition . . . makes plain that any form of dissemination in which a material object does not change hands—performance or displays on television, for example—is not a publication no matter how many people are exposed to the work. On the other hand, the definition also makes clear that, when copies or phonorecords are offered to a group of wholesalers, broadcasters, motion picture theaters, etc., publication takes place if the purpose is "further distribution, public performance, or public display." [174]

Accordingly, a data base proprietor, by display alone, could make the data base available to users, without having published the data base. The same would be true where the proprietor leased a tape containing the data base directly to a user and placed that user under explicit restrictions prohibiting disclosure or transfer. Under these circumstances, the failure to place copyright notice on the data base or to register with the Copyright Office would jeopardize no rights the proprietor might have. If, however, the proprietor authorized transferees to distribute copies or make available displays of the data base, publication would be accomplished and the notice and registration requirements of the law would take effect. Many data bases are marketed in exactly this way, with the proprietor authorizing the broker to distribute or display extracts from the data base.

Certain consequences flow from the publication of any work. Publication of a work activates the requirement of deposit under section 407, and a proprietor might choose not to publish

and, thereby, avoid the need to affix notice to all copies and deposit two copies for the Library of Congress. The doctrine of fair use may be applied more narrowly to unpublished than to published works. The Senate report accompanying the new law indicates that "[t]he applicability of the fair use doctrine to unpublished works is narrowly limited since, although the work is unavailable, this is the result of a deliberate choice on the part of the copyright owner." [175] Accordingly, the proprietor of a work may have somewhat greater rights in unpublished as opposed to published works.

Certain remedies for infringements may be made available to one who publishes and registers a work which would be denied to the proprietor of an unpublished, unregistered work under the provisions of section 412 of the Act of 1976. One who successfully prosecutes a copyright infringement action may be entitled, under section 504 of the new law, to an award of statutory damages in spite of an inability to prove actual damages. The proprietor may also be entitled to an award of attorney's fees under the provisions of section 505. Section 412 provides that the proprietor of copyright in a work neither published nor registered at the time of the infringement is not entitled to these remedies; the proprietor of a published work, however, may register the work within three months after publication without forfeiting these remedies for infringing acts occurring after publication. While the key factor in determining the availability of these remedies is registration, there exists the three-month grace period after publication for registering copyright, during which period the lack of registration will not preclude availability of statutory damages and attorney's fees for infringements then occurring. No such grace period exists for registering works which are unpublished. Consistent with this thrust of the new law, proprietors of data bases are encouraged to publish and register their works and create a public record of the information available through their proprietary works.

## New Works

The Commission was specifically assigned the

---

[174] House Report, *supra* note 1, p. 138; Senate Report, *supra* note 1, p. 121.

[175] Senate Report, *supra* note 1, p. 64.

43

responsibility to study and compile data on the creation of new works by the application or intervention of computers, to recommend any changes in copyright law or procedure necessary to preserve public access to such works, and to recognize the rights of copyright owners.[176] This matter appears to have been included within the Commission's mandate because of questions raised in the mid-sixties during early debates and hearings leading to the new law. For instance, in the 1965 report of the Register of Copyrights it was stated:

The crucial question appears to be whether the "work" is basically one of human authorship, with the computer merely being an assisting instrument, or whether the traditional element of authorship in the work (literary, artistic or musical expression or elements of selection, arrangements, etc.) were actually conceived and executed not by man but by a machine.[177]

This discussion may have been included within a concern that computers either had or were likely to soon achieve powers that would enable them independently to create works that, although similar to other copyrightable works, would not or should not be copyrightable because they had no human author. The development of this capacity for "artificial intelligence" has not yet come to pass, and, indeed, it has been suggested to this Commission that such a development is too speculative to consider at this time.[178] On the basis of its investigations and society's experience with the computer, the Commission believes that there is no reasonable basis for considering that a computer in any way contributes authorship to a work produced through its use. The computer, like a camera or a typewriter, is an inert instrument, capable of functioning only when activated either directly or indirectly by a human. When so activated it is capable of doing only what it is directed to do in the way it is directed to perform.

Computers may be employed in a variety of ways in creating works that may be protected by copyright. Works of graphic art may consist of designs, lines, intensities of color, and the like selected and organized with the assistance of a computer.[179] A computer may be used to assist an artist in filling in numerous frames in an animation sequence, thus reducing the amount of time and effort otherwise needed to prepare an animated work.[180]

In the case of computer music, a program may be designed to select a series of notes and arrange them into a musical composition, employing various tonal qualities and rhythmic patterns. The computer may also be used to simulate musical instruments and perform the music so composed.[181]

In other instances, a computer may be used to manipulate statistical information to produce an analysis of that information. The resulting work may bear little similarity to the original form or arrangement of the work being analyzed, as in the case of an economic forecast produced by the manipulation of raw economic data. A computer may, on the other hand, be employed to extract and reproduce portions of a work.[182] In every case, the work produced will result from the contents of the data base, the instructions indirectly provided in the program, and the direct discretionary intervention of a human involved in the process.

To be entitled to copyright, a work must be an original work of authorship. It must be a writing within the meaning of that term as used

---

[176] P.L. 93–573 (1974).

[177] COPYRIGHT OFFICE, SIXTY-EIGHTH ANNUAL REPORT OF THE REGISTER OF COPYRIGHTS 5 (1965).

[178] Letter to the Commission, February 1978, from John McCarthy, director of Stanford University Artificial Intelligence Laboratory.

[179] Computer graphics and other pictorial art forms have also drawn much attention. See FRANKE, COMPUTER GRAPHICS—COMPUTER ART (1971); Davis, The Artist and the Computer, 78 NEWSWEEK (September 13, 1971). Recently appearing in the New York Times was an article describing the possible future impact of computer and related technology on the creation and dissemination of works, such as musical compositions, dance, and the dramatic arts, that are potentially protectible by copyright. Greene, The Coming Impact of Technology on the Arts—Computer Violins and the Electronic Palette, NEW YORK TIMES (February 26, 1978).

[180] For examples of such applications, see Transcript, CONTU Meeting No. 18, pp. 2-10.

[181] See the following works on computer music: HOWE, ELECTRONIC MUSIC SYNTHESIS (1975); MATHEWS, THE TECHNOLOGY OF COMPUTER MUSIC (1969); HILLER and ISAACSON, EXPERIMENTAL MUSIC (1959). See also Keziah, Copyright Registration for Aleatory and Indeterminate Musical Compositions, 17 BULL. COP. SOC. 311 (1970).

[182] For a discussion of the copyright status of directories produced by computer use, see Oberman, Copyright Protection for Computer Produced Directories, 22 ASCAP COPYRIGHT L. SYMP. 1 (1977).

44

in the Copyright Clause of the Constitution.[183] The Supreme Court has interpreted this requirement to include "any physical rendering of the fruits of creative intellectual or aesthetic labor."[184] The history of the development of the concept of originality shows that only a modicum of effort is required. In *Alfred Bell & Co. Ltd.* v. *Catalda Fine Arts, Inc.,* a federal court of appeals, speaking through Judge Frank, observed:

All that is needed to satisfy both the Constitution and the statute is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own." . . . No matter how poor artistically the "author's" addition, it is enough if it be his own.[185]

Thus, it may be seen that although the quantum of originality needed to support a claim of authorship in a work is small, it must nevertheless be present.[186] If a work created through application of computer technology meets this minimal test of originality, it is copyrightable. The eligibility of any work for protection by copyright depends not upon the device or devices used in its creation, but rather upon the presence of at least minimal human creative effort at the time the work is produced.

Computers are enormously complex and powerful instruments which vastly extend human powers to calculate, select, rearrange, display, design, and do other things involved in the creation of works. However, *it is a human power they extend.* The computer may be analogized to or equated with, for example, a camera, and the computer affects the copyright status of a resultant work no more than the employment of a still or motion-picture camera, a tape recorder, or a typewriter. Hence, it seems clear that the copyright problems with respect to the authorship of new works produced with the assistance of a computer are not unlike those posed by the creation of more traditional works.

Needless to say, computers, like typewriters and other instruments, may be used to produce writings that lack the degree of originality held necessary to copyright. The statement "2 + 2 = 4" is, of course, not copyrightable, whether generated by a computer or written with a pencil. But the criteria that determine if a work is sufficiently original to qualify for copyright are already well established, and the intervention of the computer should not affect them.

Finally, we confront the question of who is the author of a work produced through the use of a computer. The obvious answer is that the author is one who employs the computer. The simplicity of this response may obscure some problems, though essentially they are the same sort of problems encountered in connection with works produced in other ways.

One such problem is that often a number of persons have a hand in the use of a computer to prepare, for example, a complex statistical table. They may have varying degrees and kinds of responsibility for the creation of the work. However, they are typically employees of a common employer, engaged in creating a work-for-hire, and the employer is the author. When the authors work together as a voluntary team and not as employees of a common employer, the copyright law with respect to works of joint authorship is as applicable here as to works created in more conventional ways, and the team itself may define by agreement the relative rights of the individuals involved.

To be used in the creation of a work, a computer must be controlled by a program and must ordinarily utilize data input from other sources. Both the program and the data may be copyrighted works or parts of copyrighted works. The question has been raised whether authorship or proprietorship of the program or data base establishes or may establish a claim of authorship of the final work. It appears to the Commission that authorship of the program or of the input data is entirely separate from authorship of the final work, just as authorship of a translation of a book is distinct from authorship of the original work. It is, of course, incumbent on the creator of the final work to obtain appropriate permission from any other person who is the proprietor of a program or data base used in the creation of the ultimate

---

[183] U.S. Const., Article I, § 8, cl. 8.

[184] Goldstein v. California, 412 U.S. 546, 561 (1973).

[185] 191 F.2d 99, 102–3 (2d Cir. 1951); but *cf.* Batlin v. Snyder, 536 F.2d 486 (2d Cir. 1976).

[186] For example, arranging the layout of an answer sheet within the rigid confines imposed by its use in an optical reading device for computer input has been held to constitute sufficient originality. Harcourt Brace & World, Inc. v. Graphic Controls Corp., 329 F.Supp. 517 (S.D.N.Y. 1971).

45

work. The unlawful use of a program or data base might limit or negate the author's claim of copyright in the ultimate work, just as the failure of a translator to obtain a license from the proprietor of the translated work might prevent securing copyright in and making use of the translation.[187] But this is not a question of authorship itself, and the author of the original work does not become the author of a translation merely because it is made from the original book without permission. Here, too, the situation with respect to works produced by the use of a computer does not appear to differ from that with respect to works otherwise created.

This approach is followed by the Copyright Office today in conducting examinations for determining registrability for copyright of works created with the assistance of computers.[188] It comports with the rather summary conclusions reached by the Whitford Committee's investigation of copyright problems in the United Kingdom.[189] It is supported by the comment of experts in the fields of computer art and music and computer science with whom the Commission has consulted.[190]

However, the Commission recognizes that the dynamics of computer science promise changes in the creation and use of authors' writings that cannot be predicted with any certainty. The effects of these changes should have the attention of Congress and its appropriate agencies to ensure that those who are the responsible policy makers maintain an awareness of the changing impact of computer technology on both the needs of authors and the role of authors in the information age. To that end, the Commission recommends that Congress, through the appropriate committees, and the Copyright Office, in the course of its administration of copyright registrations and other activities, continuously monitor the impact of computer applications on the creation of works of authorship. The subject should be considered by Congress as part of any hearings held on the general topic of the role of the computer in society. And the Copyright Office, in the course of its regular activities, should report to Congress if the impact of computers is found to raise questions of copyright law or policy requiring legislative attention.

The Commission, therefore, concludes that no special problem exists with respect to the "creation of new works by the application or intervention of such automatic systems or machine reproduction"; that existing statute and case law adequately cover any questions involved; and that no action by Congress is necessary at this time.

---

[187] See 17 U.S.C. § 103(b).

[188] The Performing Arts Section of the Examining Division, for example, requests specific information about the authorship of a musical composition submitted for registration when the composition has been created with a computer. The work will be registered only when it is shown that the applicant exercised sufficient control over the production of the work to be considered its author.

[189] COPYRIGHT AND DESIGNS LAW: REPORT OF THE COMMITTEE TO CONSIDER THE LAW ON COPYRIGHT AND DESIGNS 132-33 (1977).

[190] These include Milton Babbitt, professor of music at Princeton University; Kenneth Knowlton, a

---

computer scientist and computer artist at Bell Laboratories; Joseph Weizenbaum, professor of computer science at Massachusetts Institute of Technology; and John McCarthy, professor of computer science at the Artificial Intelligence Laboratory at Stanford University.

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 18

# Release 2 DCMS Issue detail as of 1-12-07

| ID:<br>357 | Category:<br>[DCMS] Banner<br>WebServices | Severity:<br>minor | Reproducibility:<br>always | Date Submitted:<br>01-04-07 10:25 | Last Update:<br>01-12-07 13:35 |
|---|---|---|---|---|---|

**Summary:** Modify search to accept selection of Active/Inactive Employees and Jobs (ref 358)

**Description:** Currently the search selects all active and inactive employees and jobs increasing the time required to search for employees and decreases the number of employess that can be returned.

Modify Advanced Search with check boxes for Active/Inactive Employees and Active/Inactive Jobs with the default set to Active Employees and Jobs.

Modify Quick Search to select the Employee and all Jobs.

Adjust the number of employees that can be returned if jobs are set to inactive.

| ID:<br>378 | Category:<br>[DCMS] Banner<br>WebServices | Severity:<br>major | Reproducibility:<br>always | Date Submitted:<br>01-09-07 16:22 | Last Update:<br>01-09-07 16:22 |
|---|---|---|---|---|---|

**Summary:** Error messages should all be review and written to accurately report the problem encountered.

**Description:** Many messages are misleading or missing. We should review all messages across DCMS, SCAN and WebServices.

| ID:<br>362 | Category:<br>[DCMS] DCMS<br>Front-End<br>Wrapper | Severity:<br>minor | Reproducibility:<br>always | Date Submitted:<br>01-04-07 16:23 | Last Update:<br>01-12-07 13:39 |
|---|---|---|---|---|---|

**Summary:** Make changes to the Search screen for increased functionality

**Description:** Several changes to the search screen to improve functionality
1. Change label "Employee Information" to "Employee Search Criteria"
2. Change label "Document Information" to "Document Search Criteria"
3. Change label "Search" to "Advance Search"
4. Add a button next to "Advance Search" for "Reset all Search Criteria".
5. Change current "Reset' button to read "Reset Document Search" and it should only reset "Document Search Criteria".
6. Add a 2nd set of "Search" and "Reset" buttons at the end of "Employee Search Criteria". The search should perform the same as the current "Search" button and the new "Reset Employee Search" button should only reset "Employee Search Criteria".
7. Age search needs to be expanded to handle 3 characters, currently 2.
8. Add check boxes for Active/Inactive Employees and Jobs. Active should be the default on both.
9. Rearrange or fix the Document Search Criteria so that they are not space between Org Level I and II (see Rick).

| ID:<br>363 | Category:<br>[DCMS] DCMS<br>Front-End<br>Wrapper | Severity:<br>minor | Reproducibility:<br>always | Date Submitted:<br>01-05-07 14:22 | Last Update:<br>01-12-07 13:37 |
|---|---|---|---|---|---|

CONFIDENTIAL

**Summary:** Make changes to the Add screen for increased functionality

**Description:** Make the following changes to increase the functionality and ease of use:
1. Employee information should be the same format as described in ticket 359
2. Change label "Document Information" to "Document Indexing"
3. Move Effective Date in front of File Name (for ease of use)
4. Move Current/All radio buttons for the form lookup icon to
   the right of the icon (this is also the same in Advance Search)
5. Change the Keywords selection to eliminate the spaces between Form Group
   and Form Name [must keep the capability of selecting multiple keywords]
   (or Org Level II and Form Group once Effective Date is moved in item 3)
6. Increase size of File Name box so whole path
   and file name is visable after browsing.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|-----|-----------|-----------|------------------|-----------------|--------------|
| 377 | [DCMS] DCMS Front-End Wrapper | major | always | 01-09-07 16:21 | 01-10-07 09:08 |

**Summary:** Error messages should all be review and written to accurately report the problem encountered.

**Description:** Many messages are misleading or missing. We should review all messages across DCMS, SCAN and WebServices.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|-----|-----------|-----------|------------------|-----------------|--------------|
| 364 | [DCMS] DCMS Front-End Wrapper | major | always | 01-05-07 15:00 | 01-09-07 14:08 |

**Summary:** Fix Document search for both Document only and for Employee + Document search

**Description:** The are two primary issues with the Advanced search capability,
a 3rd to be aware of, 4th, there are some invalid and missing data
searches and 5th, add the export function to the employee list:

1. When only Document search criteria is entered the search 1st tries to
   retrieve all employee records and always runs out of memory and fails.
   This will require that the repository database be searched first
   generating a list of distinct PIDMs which would then be filtered to
   include only those employees that the user has access to. The employee
   list would then be displayed and the documents would be listed when an
   employee was selected for viewing. Since the number of employees may well
   exceed the 800 count for a list there needs to be the additional
   capability of displaying the returned employees by pages (the user should
   be able to select the number of employees per page displayed).

2. When Document search criteria is entered in addition to employee
   information the search returns all employees that match the employee
   search criteria and then if you click on an employee that does have
   matching documents the selection is correct in most cases. It should
   limit the employees displayed to only those employees that match the
   document search criteria.

3. When only employee search criteria are entered the current information
   being returned is correct. It returns all employees matching the employee
   search criteria regardless if they have documents or not.
   When an employee is selected the documents displayed are limited to
   "Active" documents only. This is correct for employee search only and
   should not be modified.

4. Currently the Text search does not work, Folder number search does not
   work and NetID search is missing.

5. The user would like to have the increased functionality of exporting the

CONFIDENTIAL                                                                  GW004064

list of employees returned by the advanced search (including PIDM). In the case of item 1 with multiple pages all employees should be exported not just the current page displayed.

**Additional Information:** Reference tickets 228 for item 1 and 323 for item 2.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 367 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-09-07 09:29 | 01-09-07 09:29 |

**Summary:** The display of error messages should be changed to wrap within a display box.

**Description:** Current some messages are to long to be displayed without have to scroll to read the whole message. The user may not realize or take the time to scroll and read the whole message and not understand the error correctly.

Change so that there is a display box that can be viewed without scrolling by wrapping error message to fit within the box.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 366 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-09-07 09:26 | 01-09-07 09:26 |

**Summary:** Write the excel file for exports with the colums set to autofit so the information is readable when viewed.

**Description:** When the document list and review list are exported the data cannot be read until the columns are adjusted making it hard for the user to determine what information was exported.

Set the spreadsheet to default to autofit the columns.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 365 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-05-07 16:48 | 01-05-07 16:48 |

**Summary:** Modify "Change Presentation" to save user settings and add additional attributes

**Description:**
1. Currently the document lists for Review and Document Information under Search Results allow the user to use "Change Presentation" to change the attributes by adding & taking away attributes and reordering the sequence. This is a nice feature that the user would like to have saved from session to session so they don't have to reset each time they come in. The user is OK with this being managed by a Cookie realizing that if they delete Cookies for whatever reason they will revert back to the defaults and have to reset their preferred parameters.
2. Currently the Review List contains all documents which were added or changed in the last 14 days. The user would like to have the number of days be selectable and saved from session to session as in item 1 for presentation format. Add a value on the document navigation bar that displays the current value and allow it to be changed and saved.
3. The Review List current does not allow for the selection of name and the user feels that this information would be beneficial for verifying the changes made to documents or to check to assure that all Documents were added. We need to add name in the format of (last, first) as a selectable value for the list but not a default. The addition of this will require an additional query against Banner to retrieve the Last and First names.
4. Folder number needs to be added to the list of selectable attributes for Document Information under Search Results.

GW004065

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 361 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-04-07 15:13 | 01-04-07 15:40 |

**Summary:** Modify current Navigation bar for ease of use

**Description:** Several changes to the navigation bar to make it more functional and easier to use.

1. Add the NetID and user name for the individual logged in (user_os_name from dm_user table).
2. Make the buttons more visible, possibly as TABs, currently they blend into the color scream and disappear when selected.
3. Use "Review recent activity" and "Search" in place of "review" and "search".
4. Remove current Cabinet drop-down and replace with a "Select New Cabinet" button to launce a pop-up window with a list of Cabinets the user has access to (see ticket 360). Place next to current Cabinet name display.
5. A 4th button will be required for "Index" to meet the new indexing requirement.
6. Move the sign-out button to the navigation bar and more visible on the right side of bar.
7. Quick search which is visible above each screen and just below the Navigation bar needs to be highlighted and labeled "Quick Search"
8. Should say "Enter GWid or SSN"
9. Swap the "Add" and "Retrieve" buttons, making the "Retrieve" button the default when an entry is made in the GWid or SSN box.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 360 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-04-07 14:32 | 01-04-07 14:32 |

**Summary:** Modify Cabinet selection to use a "Select new Cabinet" button

**Description:** Change the current drop-down list to a "Select new Cabinet" button on the Navigation bar (see ticket 361). If only one Cabinet is available to the user the Select Cabinet button should be grayed out.

When the "Select new Cabinet" button is clicked present a pop-up listing the Cabinets available to the individual (See Tony for help on determining this)

Save the last Cabinet accessed to be used as the initial Cabinet to be displayed (1st time in for a new user with multiple Cabinets use the 1st Cabinet in the list as the initial Cabinet).

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 359 | [DCMS] DCMS Front-End Wrapper | minor | always | 01-04-07 11:56 | 01-04-07 11:56 |

**Summary:** Move all position information to the bottom in a table format and balance the remaining data

**Description:** When an Employee with multiple Jobs is selected the Employee Information view is stretched out between Last Name/First Name, First Name/MI, Birth Date/Age, Age/Gender and Gender/Ethnicity.

See attach for alignment of data (subject to approval by Tanya)

**Attached Files:** DCMS multiple jobs v4.doc (81 KB) *01-04-07 11:56*

| There are no notes attached to this issue. |
|---|

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 358 | [DCMS] DCMS | minor | always | 01-04-07 11:27 | 01-04-07 11:29 |

GW004066

Front-End
Wrapper

| | |
|---|---|
| **Summary:** | Modify advanced search to allow selection of Active/Inactive Employees and Jobs (ref 357) |
| **Description:** | Modify Advanced Search window with check boxes for Active/Inactive Employees and Active/Inactive Jobs with the default set to Active Employees and Jobs. Adjust the number of employees that can be returned if jobs are set to inactive. |
| | Modify Quick Search to select the employee specified and all jobs. |

| ID: 356 | Category: [DCMS] DCMS Front-End Wrapper | Severity: minor | Reproducibility: always | Date Submitted: 01-04-07 10:10 | Last Update: 01-04-07 10:10 |
|---|---|---|---|---|---|

| | |
|---|---|
| **Summary:** | When Add is selected, single values for Org level I & II should be populated |
| **Description:** | When there is only one value set the Org level selection to that single entry so the user can go directly to a drop down that requires a selection. |

| ID: 355 | Category: [DCMS] DCMS Front-End Wrapper | Severity: minor | Reproducibility: always | Date Submitted: 01-04-07 10:04 | Last Update: 01-04-07 10:04 |
|---|---|---|---|---|---|

| | |
|---|---|
| **Summary:** | Add buttons should not be selectable for users with only view profiles. |
| **Description:** | To avoid confusion the two add buttons, one in Quick Search and one in Search Results, should be made inaccessible by removing or graying out. |
| | Users with View only can click on Add in either the Quick Search or Document Information, go through all of the motions of adding a document but at the end when clicking on "Confirm Document" will receive the error message "Could not add document due to an internal error." |

| ID: 354 | Category: [DCMS] DCMS Front-End Wrapper | Severity: minor | Reproducibility: always | Date Submitted: 01-04-07 09:42 | Last Update: 01-04-07 09:42 |
|---|---|---|---|---|---|

| | |
|---|---|
| **Summary:** | Form names should not be presented in the list box if the user doesn't not have access to the corresponding ORGs |
| **Description:** | Form Name search displays Form Groups/Names for Org Levels that are not valid for the user. This can result in the user selecting values that will cause a subsequent error when adding the document. |
| | This results in the user selecting a form that can not be inserted due to ORGs that are not valid for the individual and making the list longer than necessary. |
| | Values need to be restricted and not viewable. |

| ID: 353 | Category: [DCMS] DCMS Front-End Wrapper | Severity: minor | Reproducibility: always | Date Submitted: 01-04-07 09:32 | Last Update: 01-04-07 09:32 |
|---|---|---|---|---|---|

GW004067

**Summary:** Users with View only access to a Document should be able to view attributes but not modify them

**Description:** Users with View only can click on Modify Attributes to see the current values assigned to a selected document. The user can also change and add values but when clicking on Confirm an error message "Operation failed." is received.

The "Confirm" button and entry boxes should be disabled when a document is selected that the user has only access to view.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|-----|-----------|-----------|------------------|-----------------|--------------|
| 239 | [DCMS] DCMS Front-End Wrapper | minor | always | 08-16-06 17:11 | 01-03-07 15:26 |

**Summary:** 2.0 When viewing documents a small screen that is resizable is displayed, to be made larger

**Description:** The window is only 3-4inches by 5 inches and can be resized. See 8/31 note

**Additional Information:** Fixed - The window has been changed so that you can resize it 9/01/06.

**Attached Files:**

### Notes

| | |
|---|---|
| (0000566)<br>rickg<br>08-30-06 14:55 | Window still opens in a small frame that can be resized. Can the be fixed so that the window is bigger when opened without having to change each time? |
| (0000588)<br>jxfeng<br>08-31-06 11:10 | Per 8/31/06 Group Meeting, the pop-up doc view window will needs to be enlarged and moved the X and Y axis down. |
| (0000770)<br>rickg<br>01-03-07 15:26 | This issue needs further evaluation to determine the extent of the problem. So far this has only been an issue from Rick's workstation. |

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|-----|-----------|-----------|------------------|-----------------|--------------|
| 250 | [DCMS] DCMS Front-End Wrapper | minor | always | 08-21-06 16:10 | 01-03-07 15:24 |

**Summary:** Can't print Documents for other than PDF and Word

**Description:** Only PDF documents can be printed others such as tiff, jpeg, etc do not have an option to print...

**Attached Files:**

### Notes

| | |
|---|---|
| (0000589)<br>jxfeng<br>08-31-06 11:48 | Per 8/31/06 Group Meeting -- When documents are launched in separate browsers, some do not offer the print option. Will need to conduct more analysis from both GW and Richmar. |

## Viewing Issue Advanced Details

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|-----|-----------|-----------|------------------|-----------------|--------------|

GW004068

| 352 | [DCMS] DCMS Front-End Wrapper | minor | always | 12-19-06 15:40 | 01-03-07 12:45 |

**Summary:** 2.0 Org_name is being populated with "HR Personnel" by DCMS Scan but not DCMS

**Description:** When documents are being imported by DCMS and added to Documentum the field named "org_name" in "gw_hr_personnel_doc" is not be populated with "HR Personnel" while it is when a document is addded in the DCMS Scan process.

---

## Viewing Issue Advanced Details

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
| --- | --- | --- | --- | --- | --- |
| 265 | [DCMS] Documentum Configuration/Admin | minor | always | 09-01-06 13:02 | 01-03-07 15:20 |

**Summary:** 2.0 PIDM change process to use Documentum Database table

**Description:** This process will be implemented in steps (see attached for details on tables and process).

step 1. PIDM changes being made will be manually added to a "DCMS_PIDM_GWID_CHANGE_LOG" table; the DCMS PIDM change process will select new entries make the PIDM/GWID changes and update the table.

step 2. Once the Banner PIDM change process has been implemented the DCMS PIDM change process can be modified to pull new entries from the Banner "DCMS_MULTI_PIDM_CHANGE_LIST" and insert them into the "DCMS_PIDM_GWID_CHANGE_LOG". GWID changes can be extracted from Banner by executing a Query against the SPRIDEN table and updating the "DCMS_PIDM_GWID_CHANGE_LOG".

**Attached Files:** Specification_on_Handling_Dup_PIDMs_in_DCMS3.doc (777 KB) *09-01-06 13:02*

| There are no notes attached to this issue. |

---

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
| --- | --- | --- | --- | --- | --- |
| 380 | [DCMS] eInput Front-End | minor | always | 01-12-07 13:46 | 01-12-07 13:47 |

**Summary:** Change the pop-up display for selecting employees

**Description:** Currently this screen comes up with colors that make it difficult to read the data and the selection is not clear when selecting an employee.

Change to make it easier to read and see the current selection.

---

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
| --- | --- | --- | --- | --- | --- |
| 369 | [DCMS] eInput Front-End | minor | always | 01-09-07 10:03 | 01-12-07 13:41 |

**Summary:** Indicate what fields are not searchable and restrict from entering data.

**Description:** When entering search criteria for DCMS Scan the following are not searched and are for display only; Suffix, Gender, Benefit Category and Empl Class.

These should be noted as such and have the entry of data restriced.

**Attached Files:**

| Notes |
| --- |
| (0000775) |

GW004069

| rickg<br>01-12-07 13:41 | per Andy, it would be prefered to have one screen with only the search criteria and a 2nd display screen with the results from the selected employee. |
| --- | --- |

| ID:<br>376 | Category:<br>[DCMS] eInput<br>Front-End | Severity:<br>major | Reproducibility:<br>always | Date Submitted:<br>01-09-07 16:19 | Last Update:<br>01-09-07 16:19 |
| --- | --- | --- | --- | --- | --- |

| Summary: | Error messages should all be review and written to accurately report the problem encountered. |
| --- | --- |
| Description: | Many messages are misleading or missing. We should review all messages across DCMS, SCAN and WebServices. |

| ID:<br>375 | Category:<br>[DCMS] eInput<br>Front-End | Severity:<br>minor | Reproducibility:<br>always | Date Submitted:<br>01-09-07 16:03 | Last Update:<br>01-09-07 16:03 |
| --- | --- | --- | --- | --- | --- |

| Summary: | The display of error messages should be changed to wrap within a display box. |
| --- | --- |
| Description: | Currently some messages are to long to be displayed without have to scroll to read the whole message. The user may not realize or take the time to scroll and read the whole message and not understand the error correctly.<br><br>Change so that there is a display box that can be viewed without scrolling by wrapping error message to fit within the box. |

| ID:<br>166 | Category:<br>[DCMS] eInput<br>Front-End | Severity:<br>minor | Reproducibility:<br>always | Date Submitted:<br>07-25-06 15:49 | Last Update:<br>01-09-07 15:58 |
| --- | --- | --- | --- | --- | --- |

| Summary: | Form name lookup icon and search popup window are not found for eInput |
| --- | --- |
| Description: | The form lookup icon (next to the Form Group combo box) and its functionality are not available. |
| Steps To Reproduce: | |
| Additional Information: | Analysis from RICHMAR: This feature is not included in today's code release, and should be made available in the next (final) code release on 8/7/06. Jae wants to discuss further with Jim on this request.<br><br>8-21-06 This feature is included in latest codes release |
| Attached Files: | |

| Notes | |
| --- | --- |
| (0000584)<br>jxfeng<br>08-31-06 10:51 | 08/31/2006 -- Per group meeting, this feature will be available in the final release. |
| (0000665)<br>rickg<br>10-30-06 11:57 | Modified for eInput only.<br><br>DCMS moved to Release 1; see ticket numbers 305 & 306 |
| (0000773)<br>rickg | Not delivered for eInput as noted above by RICHMAR |

CONFIDENTIAL

01-09-07 15:58

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 372 | [DCMS] eInput Front-End | minor | always | 01-09-07 10:23 | 01-09-07 10:23 |

**Summary:** Minor screen changes

**Description:** Make the following screen changes:
1. Change "eInput Password" to SCAN Password"
2. Remove the check box and "Net ID Password and eInput Password are the same." and remove logic using the check box.
3. Change "...information below" to "information above"

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 371 | [DCMS] eInput Front-End | minor | always | 01-09-07 10:13 | 01-09-07 10:13 |

**Summary:** Modify Employee Search with check boxes for Active/Inactive Employees

**Description:** Modify Employee Search with check boxes for Active/Inactive Employees with the default set to Active Employees and last active or inactive job.

See ticket 358 for DCMS version of this request and 357 for the Banner WebService change.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 264 | [DCMS] eInput Front-End | minor | always | 08-31-06 17:06 | 01-09-07 09:59 |

**Summary:** The Cabinet should be selectable by user when there is more than one available

**Description:** Add a selection following the login which will display a list of cabinets that the user has access to. If there is only one cabinet available to the user it should automatically be selected and bypass the selection.

We will need to modify eInput to only display the IA processes that are linked to the selected cabinet.

The cabinet selected should be displayed along with the user's NetID and name.

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 368 | [DCMS] eInput Front-End | minor | always | 01-09-07 09:52 | 01-09-07 09:52 |

**Summary:** Single values for Org level I & II should be populated

**Description:** When there is only one value set the Org level selection to that single entry so the user can go directly to a drop down that requires a selection.

CONFIDENTIAL

GW004071

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 19

| **From:** | Tanya Bell <tkbell@gwu.edu> |
|---|---|
| **Sent:** | Friday, December 15, 2006 5:53 PM |
| **To:** | 'Marcy Day' <mkremer@gwu.edu> |
| **Cc:** | 'Christina L. Griffin' <cgriffin@gwu.edu> |
| **Subject:** | RE: DCMS HR Personnel User Acceptance |

---

Please proceed.

---

**From:** Marcy Day [mailto:mkremer@gwu.edu]
**Sent:** Friday, December 15, 2006 8:51 AM
**To:** 'Tanya Bell'
**Cc:** 'Christina L. Griffin'
**Subject:** DCMS HR Personnel User Acceptance

Tanya,
Two additional updates/fixes were added to the go-live release on or after 12/12. It is my understanding you have tested and verbally approved these updates for go-live. **Please send me an email notification of User Acceptance for go-live on 12/18/06.** You acceptance of these last two tickets along with your email from 12/12, noting your acceptance with the 'understanding that we will not be fully operational for some tbd period of time' will be maintained on file.

- Mantis Ticket 343; DCMS presents Org Levels that the user doesn't have write access to, allowing user to go through the search and add process and then be notified at the very end of the process they do not have sufficient access to complete the transaction.
- Mantis Ticket 347; Job begin and end dates populating incorrectly.

---

**From:** Tanya Bell [mailto:tkbell@gwu.edu]
**Sent:** Tuesday, December 12, 2006 12:14 PM
**To:** 'Marcy Day'
**Cc:** 'Christina L. Griffin'; 'Ron Bonig'; 'Rick Gilchrist'
**Subject:** RE: DCMS HR Personnel UAT Retest

All,

Current access and privileges assigned to me do not allow me to validate any of the items you have outlined below. Rick indicates that he has worked with Data Admin to build cubes which will use the data provided through the extract, but to my knowledge I have not been provided with similar access nor data that would allow me to validate the success of the extract independently. I would very much appreciate being given the additional access or provided with the data.

Based upon our discussion yesterday and your note below, it does not appear that any of the known/reported issues have been fixed since initial testing. Since many of the bugs and fixes have been moved to a subsequent release, a target date for the second release would also be appreciated. In their current iteration DCMS and DCMS Scan will allow us to begin imaging and retrieving incoming documents. This will provide some relief for the mounting number of documents in "pending" status. However, without the implementation of full functionality including the load of a significant percentage of back-scanned documents (last estimate for the load of back-scanned documents had decreased from 66% to 10%.) we will continue to be reliant on the current manual/paper process which was cited as deficient. **I am prepared okay the initial implementation, but with the understanding that we will not be fully operational for some tbd period of time.**

On a higher note, Rick and I also discussed a potential solution to the volume scanning issue. His proposal sounds very promising and I look forward to additional information in this regard.

If anyone has questions for me , please let me know. Thanks!

PS. As I write this note, Rick has informed me of a critical fix to dates in DCMS. I will test and report back results shortly.

CONFIDENTIAL                                                   GW000513

**From:** Marcy Day [mailto:mkremer@gwu.edu]
**Sent:** Tuesday, December 12, 2006 8:09 AM
**To:** Tanya K. Bell
**Cc:** 'Christina L. Griffin'
**Subject:** DCMS HR Personnel UAT Retest

The retest is scheduled for today; 12/12.

Per the discussion yesterday, you will be doing some random testing today to validate the new build. There are three changes that have been applied since the 3 days of UAT testing on 11/29-12/1.

1. The Extract; DCMS updates the Activity Table. The table will be used by Data Warehouse to produce Activity Reports; this is almost ready for your review.
2. Advance Search was changed to retrieve by PIDM; this is behind the scenes and you should see no change in retrieval results.
3. PIDM change program; this is a utility outside of DCMS.

Today is the last day scheduled for UAT testing, prior to 12/18 HRS go-live. I will be sending you a signoff for go-live later today.

Additional bug fixes and enhancements identified during UAT will be put into an enhancement release; the contents and planned release date are still being evaluated and will be reviewed with you in the near term.

CONFIDENTIAL

GW000514

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 20



Richard Gordon, Jr.
President/CEO
220 F Street. NE
Washington, DC 20002
Cell 202-669-6122
Phone 202-544-2015
Fax 202-544-2016
richard@richmar.info
www.richmar.info

**Computer System Architecture and Installation
and Configuration of Documentum Package for
Records Management System, Version 2**



Prepared for
The George Washington University (GWU)

**RICHMAR**
Price Proposal
December 19, 2005



Rev. 12/29/2005

CONFIDENTIAL

GW004072

# Table of Contents

Part 1 – Project Plan.................................................................................. 1
Part 2 - Technical Approach .................................................................... 6
Part 3 - Cost Pricing Schedule ................................................................ 8
Part 4 - Schedule of Major Activities and Deliverables ...................... 9

Rev. 12/29/2005

CONFIDENTIAL

GW004073

# Part 1 – Project Plan

### A.     Goals and Objective:

The goals of the George Washington University represent a continued progression to a more managerially-oriented record management program.   The purpose of this project is to provide a simple method for sharing and tracking records at all levels of the enterprise and the associated status.  In an effort to improve GWU knowledge management capabilities, this project will provide the following:

- centralized and secure storage of records and associated documents
- an enterprise-level solution
- ability to locate useful information quickly
- a comprehensive solution for electronic file storage
- accessibility via the internet
- ability to capture versions of documents
- security at multiple levels
- ability to handle security at the department level versus admin level

The primary objective is to implement a Documentum General Use Module (DGUM) and Documentum Human Resources Module (DHRM) for various divisions, organizations and departments to use.

### B.     Tasks:

1.     Set up workspace, users and permissions
2.     Set up record attributes for the database structure
3.     Design record data entry workflow and entry form
4.     Prepare reports
5.     Training
6.     Progress Meetings

Note: For description of tasks, see appendix A (Statement of Work).

### C.     GWU responsibilities:

1.     The GWU workgroup will be available for two two-hour meetings per week during the entire contract.

2.     The workgroup and RICHMAR will agree on the list of organizational and fact attributes for records and the pre-determined values for the attributes.  GWU will need to provide the values for record attributes to be stored in the DGUM and DHRM.

3.     The workgroup shall provide formats for up to 15 standard reports required.  This project does not provide a GWU ad hoc reporting capability.

System Architecture and Document Package                                Page 1
RICHMAR & Associates                                                            12/29/2005

**CONFIDENTIAL**

**GW004074**

4.    GWU will provide data to build the organizational section of the DGUM. This requires data from every organization referred to by records that GWU wants to store in the repository. The organization attributes are necessary to attach the record to the appropriate part of the appropriate office

5.    After the system is in production, GWU will scan completed records, assign attributes to them, and enter them in the system.

6.    GWU will host and own the system.

7.    The schedule requires that GWU review and provide comments on all deliverables and working documents within three (3) business days of receiving them.

8.    GWU and RICHMAR will agree on a numbering convention for records.

**D.    System Administration Requirements**

There will be an ongoing requirement for GWU maintenance of the records, users, permissions, etc. RICHMAR will provide a set of features and screens to handle the maintenance of these attributes.

**E.    Training Requirements**

RICHMAR will create a User Guide to be accessible from the DGUM and DHRM home page that provides instruction on system use. Additionally, 24 hours of classroom training will be delivered to up to 30 students for each module.

**F.    Deliverables;**

1.    Project Plan
2.    Data Entry Workflow
3.    Data Entry Form
4.    Completed DGUM Structure
5.    DGUM System Administration Subsystem
6.    DHRM Structure
7.    Completed Training Package
8.    Initial "kick-off" meeting
9.    Progress Meetings
10.   Detail Work Plan

**G.    System Acceptance Criteria:**

System acceptance criteria consist of the completion of the deliverables in the section above. Acceptance criteria for the DGUM and subsequent modules will be specified in the Systems Design and Integration Requirements Document and Detail Work Plans.

CONFIDENTIAL

GW004075

H.    **Schedule and Milestones:**

DGUM and DHRM timeline, starting from the signing date of the contract:

- **Phase 1 (Total time 8 weeks) – Requirements and Design – Completed 8 weeks after contract award (ACA)**

    Requirements analysis, system analysis, database design, interface design and creation of the deliverables Project Plan, "System Design and Integration Requirements Document" and "Design Document".

    | Labor Category | Labor Hours |
    |---|---|
    | Executive Management Consultant | 192 |
    | Senior Management Consultant | 128 |
    | System Analyst | 192 |
    | Administrative Assistant | 32 |
    | Total Estimated Labor Hours | 544 |

- **Phase 2 (Total time 6 weeks) – Upgrade Documentum to Version 2.3 – Completed 10 weeks ACA**

    GWU reviews documents delivered in Phase 1 and Detail Work Plan, which specifies entry and exit criteria for this phase. Changes are incorporated into the documents, which are then signed off by GWU. System Architecture for DGUM and DHRM is delivered. This will include all object definitions. Objects that support attribute assignment for records will be populated.

    System scope is frozen upon signoff.

    | Labor Category | Labor Hours |
    |---|---|
    | Executive Management Consultant | 48 |
    | Senior Management Consultant | 24 |
    | System Analyst | 240 |
    | Quality Analyst | 40 |
    | Administrative Assistant | 24 |
    | Total Estimated Labor Hours | 376 |

**CONFIDENTIAL**                                           GW004076

- **Phase 3 (Total time 4 weeks) - Construct DGUM and System Administration Function - Completed 12 weeks ACA**

  Based on the design from Phase 1 and Detail Work Plan, which specifies entry and exit criteria for this phase, the DGUM web application and System Administration Function is constructed, tested, and presented to GWU for acceptance. The training requirements are also presented to GWU for acceptance.

  | Labor Category | Labor Hours |
  |---|---|
  | Executive Management Consultant | 96 |
  | Senior Engineer | 24 |
  | Senior Management Consultant | 140 |
  | System Analyst | 160 |
  | Quality Analyst | 24 |
  | Administrative Assistant | 24 |
  | Total Estimated Labor Hours | 468 |

- **Phase 4 (Total time 8 weeks) - Construct Documentum Human Resource Module (DHRM) - Completed 15 weeks ACA**

  Based on the design from Phase 1 and Detail Work Plan, which specifies entry and exit criteria for this phase, the DGUM web application and System Administration Function is extended to Human Resources, tested, and presented to GWU for acceptance. The training requirements are also presented to GWU for acceptance.

  | Labor Category | Labor Hours |
  |---|---|
  | Executive Management Consultant | 192 |
  | Senior Engineer | 64 |
  | Senior Management Consultant | 288 |
  | System Analyst | 320 |
  | Quality Analyst | 64 |
  | Administrative Assistant | 80 |
  | Total Estimated Labor Hours | 1008 |

**User Training** – To occur after all system acceptance criteria have been met. The workgroup will review and approve training plan and materials. The training plan will include the appropriations necessary to complete delivery of training.

Phases will overlap. The elapsed time from contract signing to system acceptance will be 15 weeks.

CONFIDENTIAL                                          GW004077

**I.    GWU Resources Required:**

1.    For the duration of the computer system architecture and Documentum records management project, GWU will need to assign a Project Manager to devote 25% of her/his time to the project.

2.    GWU will need to supply computer operations staffing on a part time basis for Production, Database Administration and Web Support for transition to production and continued operation.

3.    GWU will need to provide three (3) computer environments for the records database system: system test, user training and production.  GWU will handle migration to production.  RICHMAR will provide support for this effort.

**CONFIDENTIAL**

**GW004078**

# Part 2 - Technical Approach

RICHMAR will conduct the project in accordance with current "best practice" in the software industry. Highlights of RICHMAR's approach include the following:

## Phase 1 - Requirements and Design

Requirements analysis, system analysis, database design, interface design and creation of the deliverables "System Design and Integration Requirements Document" and "Project Plan Document".

### A.    Project Kick-Off Meeting

The first element of RICHMAR's approach is the execution of a project Kick-Off meeting. The purpose of this meeting is to introduce project members and review project materials:

- Project team members
- Team member responsibilities
- Project objectives
- Project tasks
- Historical records and associated data
- Schedule requirements

This meeting provides the foundation for a common understanding of project objectives and assists in the communication process between GWU and RICHMAR. RICHMAR recommends that the Kick-Off meeting occur within one (1) week of contract signing. To assist in the execution of the overall task, RICHMAR asks that the following be provided to RICHMAR at or prior to the Kick-Off meeting:

- System technical documentation
- GWU team roster and responsibilities
- Project physical data (to include physical locations, hardware locations, user locations, operating systems, etc)
- Legacy data for Human Resources and Contract Administration
- Project contact list to include name, phone number, location and email address

Provision of these materials at or prior to the Kick-Off will allow the immediate initiation of project activities.

### B.    Documentation Review

Using the documentation provided, RICHMAR will analyze the GWU requirements to establish an initial System Architecture and Documentum Records Management System Conceptual View. The review may be used to identify system enhancements.

System Architecture and Document Package
RICHMAR & Associates

Page 6
12/29/2005

**CONFIDENTIAL**

GW004079

C.    **Data Architecture**

Based on the initial information developed in this phase, RICHMAR will design the System Architecture and associated assessments. This architecture will document:

- data types and usage
- data structures
- data management
- sharing/transfer of data from or to other operational systems

D.    **Legacy Data Conversion**

The process for populating the DHRM with existing data and information has yet to be completely defined and is not included in the scope of this effort. RICHMAR will provide support for this effort, including the indexing of approximately 2.5 million copies of legacy data and information.

**Phase 2 – Upgrade Documentum to Version 2.3**

GWU reviews documents delivered in Phase 1. Changes are incorporated into the documents, which are then signed off by GWU. Project Plan and System Architecture for DGUM and DHRM is delivered. This will include all object definitions. Objects that support attribute assignment for records will be populated.

System scope is frozen upon signoff.

**Phase 3 - Construct DGUM and System Administration Function**

Based on the design from Phase 1 and Detail Work Plan, which specifies entry and exit criteria for this phase, the DGUM web application and System Administration Function is constructed, tested, and presented to GWU for acceptance. The Training Requirements are also presented to GWU for acceptance.

**Phase 4 - Construct Documentum Human Resource Module (DHRM) and Training Package**

Based on the design from Phase 1 and Detail Work Plan, which specifies entry and exit criteria for this phase, the DGUM web application and System Administration Function is extended to Human Resources, tested, and presented to GWU for acceptance. The Training Requirements are also presented to GWU for acceptance.

**Training Plan** – To occur after all system acceptance criteria have been met. The workgroup will review and approve training plan and materials.

**Management Plan** – To occur after all system acceptance criteria have been met. The workgroup will review and approve management plan and materials.

CONFIDENTIAL                                                    GW004080

# Part 3 –Cost Estimate Pricing Schedule

System Architecture and Documentum Records Management/Web System *Rough Order of Magnitude (ROM)* pricing is as follows:

| CLIN | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 0001 | System Requirements and Design | $ | 67,125.44 |
| 0002 | Upgrade Documentum to version 5.3 | $ | 37,930.08 |
| 0003 | Develop General Use Documentum module | $ | 53,885.28 |
| 0004 | Develop Human Resources Documentum module | $ | 113,512.80 |
| **Total** | | **$** | **272,453.60** |

Note – GWU requested travel and incidentals will be billed as actual costs

System Architecture and Document Package
RICHMAR & Associates

Page 8
12/29/2005

CONFIDENTIAL

GW004081

# Part 4 – Estimated Schedule of Major Activities and Deliverables

| Deliverable | Delivery Date |
|---|---|
| System Requirements and Design | March 06, 2006 |
| Upgrade Documentum to version 5.3 | March 20, 2006 |
| Develop General Use Documentum module | April 03, 2006 |
| Develop Human Resources Documentum module | April 24, 2006 |
| Develop enhanced system user interface | TBD |
| Develop enhanced reporting capabilities | TBD |
| Modify database tables and attribute structures | TBD |
| Develop archival database subsystem | TBD |
| Develop and deliver long term system support plan | TBD |
| Develop Training Package for Administrators/Webmasters | TBD |
| Deliver Training to Administrators/Webmasters | TBD |



CONFIDENTIAL

GW004082

**APPENDICES**

## APPENDIX A

**Statement of Work (SOW) for Record Management System, Upgrades and Enhancements**

### 1.0    Introduction

This effort requires the Contractor to provide technical and management support to The George Washington University for the System Architecture and Documentum package system upgrades and enhancements.

The George Washington University needs the ability to readily account for critical Human Resource Management documents and records that may be maintained across the enterprise, and to establish better accountability for the costs and support of corporate goals and objectives for Contracts reaching the funding stage. A workgroup with members from the enterprise applications group are tasked with enhancing the University's records management system with additional functions, storage/retrieval capabilities and multiple search/report functions. The workgroup has identified enhancements and upgrades to be made to the University's computer system architecture and Documentum package.

### 2.0    Scope

The contractor shall provide quality technical, engineering, analytical, planning, and administrative support to GWU's enterprise application workgroup's Record Management systems. The contractor shall furnish and make available all personnel, supplies, equipment, materials, data, facilities, and services necessary to assist the GWU Workgroup in accomplishing its mission. As directed by GWU, the contractor may also be required to interface with system integration contractors, equipment manufacturers, University personnel, and various GWU organizations.

### 3.0    Requirements

The contractor shall provide all of the necessary technical engineering, operations research, business, and administrative support such as: planning, organizing, managing, coordinating, and tracking (e.g., report management, cost/schedule/performance measurement, risk management, component procurement management, system engineering management, resource management, data management) required to perform all of the activities successfully as required in accordance with this SOW.

### 3.1    Technical Support Tasks

A. The Contractor shall set up the System Architecture and Documentum application workspace, users and permissions. This shall include the development of impact statements relating to technical feasibility, cost and schedule considerations, along with supporting documentation associated with those functions.

B. The Contractor shall set up organizational and document attributes for the database structure.

**CONFIDENTIAL**

C. The Contractor shall design data entry workflow and entry forms that represent the user interface.

## 3.2    Managerial Support Tasks

A. The Contractor shall attend weekly progress meetings with the GWU Workgroup.

B. The Contractor may be required to attend an initial "kick-off" meeting prior to regular weekly progress meetings to where the GWU Project Manager (PM) will provide necessary technical direction within the scope of the statement of work. If any questions arise as to whether any prescribed direction is not within the SOW, the Contractor must contact the GWU PM immediately prior to expending any effort, which is believed to be outside the scope of the SOW.

## 3.3    Administrative Support

A. The Contractor shall develop and prepare briefing packages, brochures, handouts and other information materials in various media. The Contractor shall plan and schedule conferences and meetings including the administration of background and support material.

B. The Contractor shall organize, prepare and execute GWU Workgroup displays and exhibits for technical conferences and shall make project briefings as required. The Contractor shall provide and/or conduct briefings or briefing material on any project information. The Contractor shall take minutes of all project meetings attended. The contractor shall include in the minutes the names of attendees/positions, organizations, phone numbers, and addresses of all persons attending meetings. All minutes of meetings shall be reviewed and approved by the GWU. The contractor shall incorporate all GWU comments into minutes and forward the minutes to the GWU for distribution. The contractor shall not distribute meeting minutes unless directed in writing by the GWU. The contractor's attendance on all meetings shall first be approved by the GWU prior to attendance.

C. The contractor shall perform the GWU Workgroup routine office administration as directed.

D. The Contractor shall arrange and facilitate meetings as directed by the GWU.

## 3.4    Program Management

The contractor shall efficiently and effectively manage the performance under this contract to ensure all the necessary technical, business, and administrative planning; organizing; managing; coordinating; and tracking (e.g., cost, schedule, deliverables), performance management, risk management, component procurement management, system engineering management, resource management, data management, and subcontract management required to perform all the activities successfully as required in the SOW. The Contractor representative is the primary point of contact for work to be performed under the resultant contract. The Contactor shall keep

GW004084

the GWU Workgroup informed of any potential problems and make recommendations for solutions.

The Contractor shall ensure that assignments are completed in a thorough and timely manner and prepare written documentation of accomplishments. The GWU requirements in performing this contract demand that the Contractor's engineering, technical, analytical, and administrative support and the level of expertise, experience, and demonstrated performance of contractor personnel providing the services must be at the highest level of providing quality support.

The Contractor shall provide sufficient personnel, both in number and qualification to perform work described herein.

The Contractor shall provide sufficient oversight and supervision of the contract in order to ensure all employees are functioning within their designated labor categories and at acceptable levels of performance, and are performing their designated assignments in a timely manner and that all reporting requirements are honored. The Contractor shall provide a quality assurance system to ensure the University receives quality services as specified in the SOW.

## 3.5    Documentation

### 3.5.1    General Requirements

The Contractor shall coordinate with the GWU Workgroup on all reports, letters, memoranda, project documentation, minutes of meetings, steering committee reports, weekly reports, telephone conversation reports, trip reports and other written material. All documents shall be coordinated through the PM or designee prior to distribution. Further, all documents that will be distributed outside the GWU shall be reviewed for sensitive and/or classified information prior to any distribution of draft or final versions of those documents.

### 3.5.2    Document Review

The Contractor shall provide support to the GWU in the writing and/or reviewing of GWU program documentation. All documents prepared by the contractor shall be on the behalf of the GWU and the contractor may not independently publish or distribute any document without prior written permission from the GWU. The contractor shall review and provide written comments on the technical accuracy and completeness of each document. No documents, reports, information, etc., may be released to the public or provided to any party other than the GWU and it's contractors without review and written approval of the GWU.

## 3.6    Reporting Requirements

The Contractor shall provide a monthly steering report to the PM in letter format. The report shall describe the work accomplished during the reporting period, discuss problems encountered and corrective action taken, pending issues and work planned for the next period. In particular, the report shall address the extent to which any problems or circumstances will cause conflicts with the GWU project schedule.

CONFIDENTIAL

The Contractor shall provide a monthly detailed breakdown of funds expended during the reporting period, including a breakdown of labor hours utilized by the contractor and any subcontractor, associated labor costs, material costs and other direct costs incurred.

The Contractor shall deliver each steering report no later than the fifth working day of the month following the reporting period.

The Contractor shall provide a weekly briefing to the PM, which will be followed by a written narrative/summary of any agreements/resolutions. The briefing may include alternatives, findings and recommendations concerning problems encountered and corrective action taken, pending issues and work planned for the next week. In particular, the briefing shall address the extent to which any problems or circumstances may cause conflicts with the GWU project schedule.

## 3.7   Deliverables

| Deliverable | Delivery Date |
|---|---|
| System Requirements and Design | March 06, 2006 |
| Upgrade Documentum to version 5.3 | March 20, 2006 |
| Develop General Use Documentum module | April 03, 2006 |
| Develop Human Resources Documentum module | April 24, 2006 |
| Develop enhanced system user interface | TBD |
| Develop enhanced reporting capabilities | TBD |
| Modify database tables and attribute structures | TBD |
| Develop archival database subsystem | TBD |
| Develop and deliver long term system support plan | TBD |
| Develop Training Package for Administrators/Webmasters | TBD |
| Deliver Training to Administrators/Webmasters | TBD |

CONFIDENTIAL

## A. PERSONNEL

| Labor Category | Rates | Hours | Cost |
|---|---|---|---|
| Executive Management Consultant | $ 150.00 | | |
| Senior Engineer | $ 144.00 | | |
| Senior Management Consultant | $ 125.00 | | |
| Systems Analyst | $ 98.00 | | |
| Quality Analyst | $ 85.05 | | |
| Help Desk Specialist | $ 45.00 | | |
| Administrative Assistant | $ 33.67 | | |
| **Total** | | | |

## B. TASK ORDERS

CONFIDENTIAL

GW004087

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 21

# *George Washington University*
# *DMS*
# *(Document & Content Management System)*



## System Design Document

*Version 3.0*

*May 14, 2006*

**Welcome to**
The New Way Of Learning

*RICHMAR and Associates*

## REVISIONS INFORMATION

| Version | Primary Author(s) | Description of Version | Date of Revision |
|---------|-------------------|----------------------|------------------|
| Draft 1.0 | Jae Lim<br>Mon Lee<br>Won H. Jung<br>Wai C. Lam<br>John Schleifer | Initial Draft | 04/03/06 |
| Version 1.1 | Jae Lim<br>Mon Lee<br>Won H. Jung | Added Documentum and InputAccel Design Specification | 04/10/06 |
| Version 1.2 | John Schleifer<br>Won H. Jung | Added Document Lifecycle | 04/12/06 |
| Version 1.3 | Jae Lim<br>Won H. Jung<br>Mon Lee | Modified Documentum and InputAccel Design Specification | 04/14/06 |
| Version 2.0 | Jae Lim<br>Won H. Jung<br>Wai Lam | Modified Web Service Components Definitions | 04/19/06 |
| Version 2.1 | Jae Lim | Edited and Re-organized the Contents | 04/21/06 |
| Version 2.2 | Jae Lim | Added the General Use Definitions | 04/22/06 |
| Version 2.3 | Jae Lim<br>John Schleifer | Changed the object model for both HR and General Use module | 4/31/06 |
| Version 3.0 | Jae Lim | Major changes made to the general use framework DOM and taxonomy. | 5/14/06 |

CONFIDENTIAL

GW003314

*GW DMS (Document & Content Management System)*    *System Design Document*

## TABLE OF CONTENTS

*1.  Introduction* ............................................................................................6
    *1.1 Overview* ...........................................................................................6
    *1.2 Solution Overview* ............................................................................7
    *1.3 Architecture* ......................................................................................8
    *1.4 Implementation Overview* ...............................................................9
    *1.5 Software Development Lifecycle Overview* ...................................13
*2.  DOCUMENTUM SYSTEM COMPONENTS* ..........................................14
*3.  DOCUMENTUM DESIGN SPECIFICATION* ........................................16
    *3.1 Docbase Configuration Parameters* ...............................................16
        *3.1.1 Server Configuration* ..............................................................16
        *3.1.2 Development/Test Environment* .............................................16
        *3.1.3 Production and QA/DR Environment* .....................................17
        *3.1.4 Docbase Configuration* ...........................................................18
        *3.1.5 Proposed Solution* ..................................................................19
    *3.2 Object Definition* .............................................................................19
        *3.2.1 Documentum Object Model (DOM) Overview* .......................19
        *3.2.2 Document Taxonomy* ..............................................................20
        *3.2.3 System Document Type – Attributes of dm_document* ...........21
        *3.2.4 GW Document* .......................................................................22
        *3.2.5 Custom Document Type – HR PERSONNEL* .........................23
        *3.2.6 HR Personnel Document* .........................................................24
        *3.2.7 HR Personnel Subtype Documents* ........................................25
    *3.3 Repository Structure* ........................................................................26
        *3.3.1 Cabinet Structure* ...................................................................26
        *3.3.2 Human Resources (HR) Folder Structure* .............................27
    *3.4 General Use Documentum Object Model (DOM) and Taxonomy* .....28
        *3.4.1 General Use DOM Overview* ...............................................28
        *3.4.2 Custom Document Type – GENERAL FRAMEWORK* ...........29
        *3.4.3 General Use Documents* .........................................................30
        *3.4.4 Correspondence Documents* ...................................................31
        *3.4.5 Contract Documents* ..............................................................32
        *3.4.6 Financial Documents* ..............................................................33
        *3.4.7 General Documents* ................................................................34
        *3.4.8 Report Documents* ..................................................................35
        *3.4.9 Policy Documents* ...................................................................36
        *3.4.10 Project Documents* ................................................................37
        *3.4.11 Publication Documents* ..........................................................38
        *3.4.12 Custom Cabinet Type – GENERAL FRAMEWORK* ............39
        *3.4.13 GW General Cabinet Type* ...................................................40
    *3.5 Enterprise Documentum Object Model (DOM) and Taxonomy* ......41
    *3.6 Documentum Object Model (DOM) Continuity* ............................42
    *3.7 Security, User and Group* ...............................................................43
        *3.7.1 Basic Permission* ...................................................................43
        *3.7.2 Extended Permission* ..............................................................43

CONFIDENTIAL

GW003315

3.8 Users and Groups ........................................................................................... 44
    3.8.1 Users and Groups .................................................................................. 44
    3.8.2 Access Control List (ACL) ................................................................... 46
4.    INPUTACCEL DESIGN SPECIFICATION ............................................. 50
    4.1 InputAccel Components ............................................................................ 50
        4.1.1 IA Server (IAS) .................................................................................. 50
        4.1.2 eInput ................................................................................................ 51
        4.1.3 Scan ................................................................................................... 52
        4.1.4 Image Enhancement ........................................................................... 52
        4.1.5 eStatus Monitor ................................................................................. 53
        4.1.6 ODBC Export ..................................................................................... 53
        4.1.7 Prime OCR ........................................................................................ 53
        4.1.8 Index .................................................................................................. 53
        4.1.9 DCTM Export .................................................................................... 53
        4.1.10 Multi ................................................................................................ 54
    4.2 InputAccel Architecture ........................................................................... 55
    4.3 InputAccel Process Flow .......................................................................... 56
    4.4 Custom Parameterizations – eInput (eScan) Interface Design ................ 56
5.    WEB SERVICES DESIGN SPECIFICATION ......................................... 57
    5.1 GW Web Services Overview ...................................................................... 57
    5.2 GW Web Services Components .................................................................. 59
    5.3 GW Web Services Interface Definition ..................................................... 60
    5.4 WS Document Definition – User Authentication ...................................... 61
        5.4.1 User Authentication – Overview ........................................................ 61
        5.4.2 User Authentication – SOAP/XML Definition ................................... 61
        5.4.3 User Authentication – Main Flow (Algorithm) ................................. 61
        5.4.4 User Authentication – Methods Called .............................................. 62
    5.5 WS Document Definition – Document Import .......................................... 63
        5.5.1 Document Import - Overview ............................................................. 63
        5.5.2 Document Import – SOAP/XML Definition ....................................... 63
        5.5.3 Document Import – Main Flow (Algorithm) ...................................... 63
        5.5.4 Document Import – Method Calls ...................................................... 64
    5.6 WS Document Definition – Search ........................................................... 65
        5.6.1 Document Import - Overview ............................................................. 65
        5.6.2 BANNER Search – SOAP/XML Definition ........................................ 65
        5.6.3 DOCUMENT Search – SOAP/XML Definition .................................. 66
        5.6.4 Search – Main Flow (Algorithm) ...................................................... 66
        5.6.5 Search – BANNER Search Method Calls .......................................... 67
        5.6.6 Search – DOCUMENT Search Method Calls .................................... 68
    5.7 WS Document Definition – Update Properties ........................................ 69
        5.7.1 Document Properties - Overview ....................................................... 69
        5.7.2 Document Properties – SOAP/XML Definition ................................. 69
        5.7.3 Search – Main Flow (Algorithm) ...................................................... 70
        5.7.4 Search – Method Calls ...................................................................... 70
    5.8 WS Document Definition – Review Documents ....................................... 71
        5.8.1 Review Documents - Overview .......................................................... 71

CONFIDENTIAL

*5.8.2 Review Documents – SOAP/XML Definition* ........................................... 71
*5.8.3 Review – Main Flow (Algorithm)* ........................................................... 71
*5.8.4 Review – Method Calls... MORE>>>>>>>* .......................................... 71
*5.9 Services provided by Documentum suites* ................................................. 72
*5.9.1 Document View – Supported by WDK Client* ....................................... 72
*Need to fill this out and require testing of the WDK drl webcomponet~* .......... 72
*TBD* .................................................................................................................. 72
*TBD* .................................................................................................................. 72
*TBDAdd-on WS Implementation (1b, 1c, etc.....)* .......................................... 72
*Add-on WS Implementation (1b, 1c, etc.....)* ................................................. 73
*5.9.2 Document Versions* ................................................................................. 73
*5.9.3 Check-In/Check-Out – Supported by WEBTOP* .................................. 73
*5.9.4 Document Export* ................................................................................... 74
*5.9.5 Document Lifecycle* ............................................................................... 74
*5.9.6 Manage Users - Implemented as WDK/DA Application* ...................... 74
*5.10 Web Services Implementation* ................................................................. 76
6.  *USER INTERFACES* .................................................................................. 77
*6.1 Struts Overview* ........................................................................................ 77
*6.2 Struts Framework Configuration* ............................................................. 77
*6.3 Struts Configuration Declaration* ............................................................ 79
*Note: STILL CHANGING???? Need to update the screens* .......................... 80
*6.4 Login Page* ............................................................................................... 80
*6.5 Add/Create Page* ...................................................................................... 81
*6.6 Add Confirmation Page* ........................................................................... 82
*6.7 Add Result Page* ....................................................................................... 83
*6.8 Add/Create using GWID* .......................................................................... 84
*6.9 Review Page* ............................................................................................. 85
*6.10 Search Page* ........................................................................................... 86
*6.11 Search Result* ......................................................................................... 87
*6.12 Retrieve (using GWID)* ........................................................................... 88
*6.13 Document View* ....................................................................................... 89
7.  *REFERENCES* ............................................................................................. 90
8.  *Approval and Signoff* .................................................................................. 91

CONFIDENTIAL

GW003317

## 1.4 Implementation Overview

The overall tactical mission of the project is to provide GW with one centralized place to create, search, track and maintain all GW HR documents (both scanned and native electronic formats) from the many existing distributed repositories, such network SAN devices and others. Furthermore, GW desires to create a centralized content repository of all divisions of the university.

Based on our experience in project implementation, the complexity of GW business processes, and the number of Divisions of GW, the project team recommends the implementation of Documentum in a "phased iterative" approach. During the "Stage 1a – HR and General Use Implementation" phase of the project, the system will be implemented with focused groups/organizations of GW. The system will reflect all the GW's HR business requirements. Also, the Doucmentum ECM platform built for HR will be used as the baseline for the general use and future phases of the implementation. Upon successful implementation of the initial phase, the system will be further enhanced to include a comprehensive set of GW business and system requirements.

The table below describes a plan for implementing Documentum at GW in phases. The initial stage will take place as part of the HR and general use implementation. As it is depicted below, the stage 1 is broken down into three phases. The other stages should be addressed as part of subsequent implementation tasks.

**Exhibit 1.    Content Management Staged Implementation, Stage 1a**

| Stages | Major Tasks and Milestones | Major Functionalities | Documentum Products |
|---|---|---|---|
| Stage 1a HR Module | • Install and configure Documentum ECM, eRoom, and Captiva baseline products at GW.<br>• Configure and parameterize Documentum and Captiva per GW HR business requirements.<br>• Configure and parameterize eInput module per GW HR business requirements.<br>• Develop an intuitive client user front-end that is scalable.<br>• Develop the SOAP based Web Services framework that is scalable for the future use.<br>• Synchronize the user accounts with LDAP.<br>• Develop screens and backend services layers for the first seven (7) document types for General Use Framework. | ***Documentum Based (HR)***<br>• Import documents<br>• Search and retrieve information from BANNER into Documentum.<br>• Search and retrieve documents based on the person's information.<br>• View documents.<br>• Index imported documents.<br>• Update properties information of the documents.<br><br>***Documentum Based (General Use)***<br>• Implement the seven (7) general use document types.<br>• Support the system functions as mentioned in the HR modue.<br><br>***InputAccel Based (HR)***<br>• Search and retrieve information from BANNER into Documentum.<br>• Index scanned documents.<br>• Export scanned images into Documentum directly. | • eContent Server<br>• Web Services<br>• WDK Clients – Webtop, Documentum Administrator (DA)<br>• Content Transformation Services (CTS)<br>• Application Builder<br>• Workflow Manager<br>• Captiva InputAccel<br>• Captiva eInput<br>• eRoom |

CONFIDENTIAL                                                                    GW003321

As it was mentioned in the previous section, the main focus of the initial phase (Stage 1a) is on building the content management framework by which the HR personnel can create, track and maintain GW personnel records efficiently.  Furthermore, the baseline framework built for HR will be extended for general use for other divisions of GW.

During this phase 1b, the engagement will further enhance the baseline features and functionalities

**Exhibit 2.   Content Management Staged Implementation, Stage 1b**

| Stages | Major Tasks and Milestones | Major Features | Documentum Products |
|--------|----------------------------|----------------|---------------------|
| **Stage 1b HR & General Use Module** | • Configure and parameterize Documentum per GW General Use requirements | ***Documentum Based (GENERAL USE)***<br>• Edit Documents<br>• Version Control<br>• Check-in and Check-out<br>• Annotate documents.<br>• Show properties information of the general documents.<br>• Customize search results of the general documents.<br>• Make documents available to eRoom by users.<br>• Alerts<br>• Customize search results.<br><br>***InputAccel Based (GENERAL USE)***<br>• Search and retrieve documents into Documentum.<br>• Export scanned images into Documentum. | • eContent Server<br>• Web Services<br>• WDK Clients -- Webtop, Documentum Administrator (DA)<br>• Content Transformation Services (CTS)<br>• Application Builder<br>• Workflow Manager<br>• Captiva InputAccel<br>• Captiva eInput<br>• eRoom |

CONFIDENTIAL

GW003322

**Exhibit 3.  Content Management Staged Implementation, Stage 1c**

| Stage | Major Tasks and Milestones | Functionality | Documentum Product(s) |
|---|---|---|---|
| Stage 1c HR & General Use Module | • Build upon the system with features by which each organization can perform a limited set of administration of the system. | ***Documentum Based*** <br> • Organizational Administrator will be able to associate new users. <br> • Organizational Administrator will be able to maintain dropdown values of key indexes. <br> • Custom Audit Trails | • eContent Server <br> • Web Services <br> • WDK Clients – Webtop, Documentum Administrator (DA) <br> • Content Transformation Services (CTS) <br> • Application Builder <br> • Workflow Manager <br> • Captiva InputAccel <br> • Captiva eInput <br> • eRoom |

It is critical to note the following points regarding this staged implementation:

- The functionality in the initial stage will focus on the GW HR division.
- The functionality in the initial stage will include the implementation of the general use modules for potentially all divisions within GW.
- The general use module of the system will be implemented without gathering any business and/or systems requirements.  Hence, the initial baseline configuration of the general user module requires enhancements in the subsequent stages of the project.
- Efficient use of time on the Pilot necessitates that GW make available hardware, software, network information, and other similar items as they are needed.

CONFIDENTIAL

GW003323

**Exhibit 4.   Phased Iterative Implementation**



| Stage 1 | Stage 1b | Stage 1c | Stage 2,3,4.. |
|---|---|---|---|
| HR & General | Add-on Features | Org Admin & Other | More Divisions |

**Stage 1a – HR & General Use**

The tactical mission of this initial stage is to build the HR specific content management system and establish the Enterprise Content Management (ECM) framework by which the GW can build upon.  Furthermore, eInput scanning solution for the general use module will be developed during this phase.

**Key Features**
- Import documents
- Search and retrieve information from BANNER into Documentum.
- Search and retrieve documents based on the person's information.
- View documents.
- Index imported documents.
- Update properties information of the documents.
- Make documents available to eRoom by users.

**Project Scope Summary**
- Human Resources
- General Use Module
- Financial and Insurance Debt

**Documentum Components**
- Documentum ECM Components
- Captiva InputAccel/eInput
- Documentum eRoom

**Stage 1b – Add-on Features & General Use**

During this phase, the current existing framework will be further enhanced with additional features and functionalities as shown below.

**Add-on Features**
- Edit Documents
- Version Control
- Check-in and Check-out
- Annotate documents.
- Show properties information of the general documents.
- Customize search results of the general documents.
- Alerts
- Customize search results.
- Capture system matrics

**Project Scope Summary**
- Add-on Feature on Documentum WS

**Documentum Products**
- Documentum ECM Components
- Captiva InputAccel/eInput
- Documentum eRoom

**Stage 1c – Org Admin & General Use Module**

The tactical mission of this stage is to derive the overall implementation approach and scale the solutions to more divisions.

**Add-on Features**
- Add/Remove users
- Modify document attributes
- Delete documents
- Assign/remove users to/from groups
- Search transaction history
- Create eRoom accounts
- Copy documents to eRoom
- Banner number batch update

**Project Scope Summary**
- Organization Administrator
- Dynamic configuration of general use module values

**Documentum Products**
- Documentum ECM Components
- Captiva InputAccel/eInput
- WebXtender Migraion (TBD)

CONFIDENTIAL

GW003324

*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 22

## Issue Tracking System (ITS)
### ISS's Problem reporting system for GWU Development Projects

Logged in as: *vijayp* (Vijay Padmanabhan - developer)          *05-21-2007 15:10 EDT*          Project: [All Projects]  [Switch]

| Main | My View | View Issues | Report Issue | Change Log | Docs | My Account | Logout |          [      ]  [Jump]

---

## Viewing Issue Advanced Details [ Jump to Notes ]

[ View Simple ]  [ Issue History ]
[ Print ]

| ID | Category | Severity | Reproducibility | Date Submitted | Last Update |
|---|---|---|---|---|---|
| 0000228 | [DCMS] DCMS Front-End Wrapper | major | always | 07-28-06 19:01 | 01-05-07 15:20 |

| | | | | | |
|---|---|---|---|---|---|
| Reporter | rickg | View Status | public | | |
| Assigned To | vijayp | | | | |
| Priority | high | Resolution | suspended | Platform | |
| Status | closed | | | OS | |
| Projection | none | | | OS Version | |
| ETA | none | | | Product Build | 2.0 |

| Summary | 0000228: Moved to 364: Document ONLY search does not work (no documents are retrived though there are) |
|---|---|
| Description | 07/28/2006 3rd Release: Step 1 – Added a document for J.Feng under HRS (Org Lvl 1) and ER (Org Lvl 2). Was able to "Retrieve" that doc when retrieving by J.Feng's specific GWid. This approved that there's a doc under HRS, ER. Step 2 - Clicked on Search to bring up the Search screen. On the Search Screen, left the "Employee Information" section empty, and just supplied two document search criteria: HRS (Org Lvl 1) and ER (Org Lvl 2). Then clicked on the Search button. Result Page -- Nothing came back. |
| Steps To Reproduce | |
| Additional Information | RETURNS ALL INFORMATION, TOO MANY RECORDS TO DISPLAY  8/21/06: Your search criteria must be narrowed down to return less than 200 records from banner in order to get proper results. Only searching on document attributes will return search results greater than 200 records. |
| Attached Files | Document_Only_Search_Criteria.png [^] (86,190 bytes) 07-28-06 19:01 Document_Only_Search_Returned_Nothing.png [^] (64,193 bytes) 07-28-06 19:01 |

| Change Status To... | | Monitor Issue | Reopen Issue | Delete Issue |
|---|---|---|---|---|
| new | | | | |

## ⊟ Relationships

| There are no users monitoring this issue. |
|---|

## ⊟ Notes

| (0000537)<br>rickg<br>08-20-06 14:20 | I'm concerned that we may be approaching the search for documents without employee search criteria. Will we be able to search for any doucments by document criteria only. Maybe we need to search documents first then present a list of PIDMs to a Web Service that returns from that list the PIDMs this person can see and then display list. Let's discuss... RPG |
|---|---|
| (0000552)<br>user55<br>08-28-06 12:09 | This is probably the only non-trivial issue on the list. Fundamental problem is that Banner security needs to be applied before documents are displayed, in order to assure that the person looking for documents has authority.<br><br>Current code in both DCMS and Banner Web Services (BWS) cannot simply be tweaked to make this work.<br><br>Something like the following would work: DCMS searches for qualifying documents and assembles a list of PIDM values. Some of or all of that list is passed to BWS for validation. BWS passes another list back of qualified PIDMs. DCMS then displays a document list for those documents, without employee information. This would be a change in both DCMS and BWS. |
| (0000597)<br>rickg<br>09-01-06 14:39<br>edited on: 09-11-06 11:33 | There is a web service available which will accept PIDM and return employee data for a valid PIDM. This can be used to validate a document and to select any additional employee information for display.<br><br>We are asking Tanya to determine how the documents will be displayed.<br>option 1: Display valid employee list for the documents found matching the search criteria and then as each employee is selected display the list of reports found for the search criteria.<br>option 2. Display all the documents found that match the search criteria and are allowed for the user to view.<br><br>Tanya wants option 1. See next note. |

0000228: Moved to 364: Document ONLY search does not work (no documents are retrived though there are) - Mantis

| (0000505) rickg 09-11-06 11:35 | In a review session Tanya indicated the following requirements for Document only search: a)Should not have any limit, number displayed in list at one time should be configurable. b)When exporting, the whole selection must be exported not just the current list (for example: if 100 employees are displayed and 500 were selected then an export would contain all 500 not 100). c)The list must include Last and First name. |
| (0000771) rickg 01-05-07 15:20 | Use for reference only. Refer to 364 for new detail and to update notes. |

## ⊟ Issue History

| Date Modified | Username | Field | Change |
|---|---|---|---|
| 07-28-06 19:01 | jxfeng | New Issue | |
| 07-28-06 19:01 | jxfeng | Status | new => assigned |
| 07-28-06 19:01 | jxfeng | Assigned To | => jlim |
| 07-28-06 19:01 | jxfeng | File Added: Document_Only_Search_Criteria.png | |
| 07-28-06 19:01 | jxfeng | File Added: Document_Only_Search_Returned_Nothing.png | |
| 08-19-06 17:37 | jlim | Status | assigned => resolved |
| 08-19-06 17:37 | jlim | Resolution | open => fixed |
| 08-19-06 17:37 | jlim | Additional Information Updated | |
| 08-20-06 14:20 | rickg | Note Added: 0000537 | |
| 08-20-06 14:20 | rickg | Status | resolved => feedback |
| 08-20-06 14:20 | rickg | Resolution | fixed => reopened |
| 08-21-06 22:23 | jlim | Additional Information Updated | |
| 08-28-06 12:09 | user58 | Note Added: 0000552 | |
| 09-01-06 14:39 | rickg | Note Added: 0000597 | |
| 09-01-06 14:40 | rickg | Summary | BUG - Document ONLY search does not work (no documents are retrived though there are) => Document ONLY search does not work (no documents are retrived though there are) |
| 09-05-06 17:10 | rickg | Priority | normal => urgent |
| 09-11-06 11:33 | rickg | Note Edited: 0000597 | |
| 09-11-06 11:35 | rickg | Note Added: 0000605 | |
| 09-18-06 11:12 | rickg | Priority | urgent => high |
| 09-20-06 14:07 | rickg | build | => 1 |
| 09-20-06 14:15 | rickg | build | 1 => UAT |
| 09-21-06 10:53 | rickg | Assigned To | jlim => |
| 09-21-06 10:53 | rickg | build | UAT => POST |
| 09-22-06 12:27 | rickg | Status | feedback => assigned |
| 09-22-06 12:27 | rickg | Assigned To | => jimgearing |
| 01-03-07 15:27 | rickg | Reporter | jxfeng => rickg |
| 01-03-07 15:27 | rickg | Assigned To | jimgearing => vijayp |

| 01-03-07 15:27 | rickg | build | POST => 2.0 Document ONLY search does not work (no documents are retrived though there are) => 2.0 |
| 01-03-07 15:27 | rickg | Summary | Document ONLY search does not work (no documents are retrived though there are) |
| 01-05-07 15:20 | rickg | Note Added: 0000771 | |
| 01-05-07 15:20 | rickg | Status | assigned => closed |
| 01-05-07 15:20 | rickg | Resolution | reopened => suspended |
| 01-05-07 15:20 | rickg | Summary | 2.0 Document ONLY search does not work (no documents are retrived though there are) => Moved to 364: Document ONLY search does not work (no documents though there are) |

mantis@gwu.edu
53 total queries executed.
35 unique queries executed.



*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 23

MessageResources.properties - WordPad

File  Edit  View  Insert  Format  Help

```
error.searchParameter.required= At least one search parameter is required.
error.searchParameter.tooMany = Enter just one search parameter.
error.searchParameter.invalidSSN = SSN must be a 9 digits long.
error.searchParameter.invalidSSNFormat = SSN can not contain alpha or special characters.
error.searchParameter.invalidDate = Invalid date format. Please use MM/DD/YYYY or DD-Mon-YYYY.
error.searchParameter.invalidGwid = GWID/SSN does not exist.


# Index Page
index.title=Struts Validator
index.power=Powered by Struts

# HR Main Form
hr.mainForm.title=GW DCMS Prototype
hr.mainForm.tabmenu.review=review
hr.mainForm.tabmenu.search=search
hr.mainForm.logout=Logout
hr.mainForm.help=help

hr.mainForm.selMenuDropDown.1=HR Personnel
hr.mainForm.selMenuDropDown.2=Framework

hr.mainForm.gwid.enter=Enter GWid/SSN
hr.mainForm.gwid.add=add
hr.mainForm.gwid.retrieve=retrieve
hr.mainForm.externalApp.title=External Applications
hr.mainForm.externalApp.email=e-mail
hr.mainForm.externalApp.eroom=eRoom
hr.mainForm.externalApp.einput=eInput
hr.mainForm.externalApp.banner=Banner
hr.mainForm.externalApp.eas=EAS
hr.mainForm.signatureInfo=© 2006 Developed by RICHMAR &amp; Associates for George Washington University

# Index Form
hr.indexForm.search.title=Search
hr.indexForm.search.lastName=Last Name:
hr.indexForm.search.gwId=GWid:
hr.indexForm.search.firstName=First Name:
hr.indexForm.search.ssn=SSN:
hr.indexForm.search.mi=MI:
hr.indexForm.search.age=Age:
hr.indexForm.search.suffix=Suffix:
```

**DCMS Copyright message**

For Help, press F1



*CUS4, Inc., d/b/a Richmar & Associates, et al. v. George Washington University*
1:CV-07-0841 (JR)

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| **CUS4, INC. D/B/A**<br>**RICHMAR & ASSOCIATES et al.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GEORGE WASHINGTON UNIVERSITY,**<br><br>**Defendant** | Case No. 1: CV-07-0841 (JR) |

### PLAINTIFF RICHMAR'S ANSWERS TO
### DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, CUS4, Inc. d/b/a Richmar & Associates submits the following responses to

Defendant's First Set of Interrogatories. Plaintiff reserves the right to revise, correct,

supplement, or clarify its answers to these interrogatories, when other and further

discovery, already scheduled, has been completed. Plaintiff answers those interrogatories

agreed between counsel for the parties, subject to the following General Objections.

#### General Objections and Conditions

Richmar incorporates paragraphs 1 through 7 of the following General Objections

and Conditions into the specific answers to each interrogatory.

1.    In searching for responsive information, Richmar will conduct a

reasonable search for information, consistent with these General Objections and

Conditions from records and persons most likely to contain or know of information

responsive to defendant's discovery. To the extent that defendant purports to require



more, plaintiff objects that the interrogatories are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

2.    Richmar objects to defendant's First Set of Interrogatories, including but not limited to the extent they seek information protected from discovery by the attorney-client privilege, work product doctrine or other legally applicable privilege against disclosure. Subject to its General and Specific Objections, Richmar will answer the interrogatories based on non-privileged information.

3.    Richmar objects to defendant's First Set of Interrogatories to the extent it purports to require Richmar to disclose confidential or competitively sensitive information the disclosure of which could harm Richmar, its affiliates or third parties, or which may otherwise be subject to confidentiality agreements between Richmar and third parties limiting its disclosure. If Richmar withholds information on this basis, it will timely notify defendant and will work with defendant to prepare a protective order or confidentiality agreement that would allow the disclosure of the competitively sensitive or confidential information, while protecting Richmar and/or third parties from harm.

4.    Richmar objects to defendant's First Set of Interrogatories to the extent they purport to seek information in the possession of third parties, or otherwise not in Richmar's possession, custody or control. Richmar will answer the interrogatories based on information within its possession, custody or control.

5.    Richmar's objections to the specific interrogatories are not to be deemed a waiver of the right to make additional objections to defendant's First Set of Interrogatories, including but not limited to, objections on the basis of burden or expense.

2

6.    Richmar reserves its right to revise, correct, supplement, or clarify its objections to defendant's First Set of Interrogatories.

7.    Richmar's general and specific objections shall not be construed as a waiver of any objection as to the discoverability or admissibility of any information provided by Richmar.

<u>**Specific Objections**</u>

<u>**INTERROGATORY NO. 2.**</u>

State whether Richmar has a standard license agreement for the DCMS computer program and, if such license agreement exists, identify (a) the date such standard license agreement was created; (b) the terms of such standard license agreement; (c) all documents that identify the terms of such standard license agreement; and (d) all communications with GW concerning such standard license agreement.

<u>**ANSWER:**</u>

RICHMAR does not have a standard license agreement for DCMS.

<u>**INTERROGATORY NO. 3.**</u>

Identify all communications between Richmar and GW concerning ownership concerning ownership of or license rights to computer programs or copies thereof created pursuant to the Contractual Agreement between the parties dated December 22, 2005, any modification thereof, or any other agreement between the parties. For each such communication identify: (1) the date of the communication; (2) the substance of the communication; and (3) the persons with whom Richmar communicated.

<u>**ANSWER:**</u>

The only communication between GW and RICHMAR concerning ownership of or license rights to DCMS or copies first took place during discussions of the DCMS close out list, Thursday, December 14, 2006. This was an Executive Steering Committee Meeting, in which Ron Bonig was absent. It was contemplated that RICHMAR would provide multiple years of management consulting and software development support for GW; thus, any discussion of licensing would evolve over time or take place at the conclusion of our services. The meeting was led by Christina Griffin. The substance of the communication is contained in the correspondence between the parties concerning extending the contract. These discussions were with held Christina Griffin and Marcy Day in person and Christina Griffin and Ron Bonig via email, all GW employees. There was a series of emails from January 4, 2007 through January 10, 2007 designed to facilitate completion of the scanning work. In an email to Christina Griffin, January 10, 2007, RICHMAR provided GW with several options to expedite the resolution of outstanding issues. These included: GW agree to the Richmar proposed Closeout List; GW agree to the proposed language above; and GW agree to bifurcate negotiations concerning the DCMS close out activities and extension of HR back scanning and indexing. GW chose to agree to the Richmar proposed Closeout List.

**<u>INTERROGATORY NO. 4</u>**

Describe all efforts that Richmar has made to market theDCMS computer program, including but not limited to (a) the identity of each potential customer with which Richmar communicated to attempt to sell or license DCMS; (b) the name and contact information for each person at such potential customer(s) with which Richmar

had communications; (c) the date of any such communications; and (d) the price at which license or ownership of the product was offered.

**ANSWER:**

RICHMAR's DCMS marketing efforts occurred extended from September or October, 2006 through March, 2007 and included meetings with American University, University of Mary Washington, Howard University, Clemson University, University of Georgia, University of Alabama, Georgia State University, Morehouse College, University of Maryland and others. The initial contact for American University was made through DeEtta Jones, independent consultant, and University of Mary Washington was though Mehdi Aminrazavi, Professor of Philosophy and Religion, University of Mary Washington, Fredericksburg, Virginia. Contact at Howard University was Terrence Jackson, an independent consultant. Contacts at the other universities were through Michael Simpson, independent consultant. Price would be dependent upon what functions would be required. Richmar believes that such systems would range from $250,000 to over $3.0 million.

**INTERROGATORY NO. 6**

Identify all modifications to DCMS made by Richmar subsequent to December 18, 2006, including (a) the date of the modification; (b) the purpose of the modification; and (c) the person that made the modification.

**ANSWER:**

No modifications were made to DCMS by RICHMAR after December 18, 2006.

DATED: May 22, 2007

Respectfully submitted,

Geoffrey P. Gitner (D.C. Bar No. 176479)
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
(202) 772-5926

6

## **VERIFICATION**

I, Richard Gordon, declare that I am the President of CUS4, Inc., d/b/a Richmar & Associates, and verify the foregoing Plaintiff's Answers to Defendant's First Set of Interrogatories, that I am duly authorized to do so; that some or all of the facts and matters set forth therein are not within my personal knowledge; that the facts and matters set forth therein have been assembled by authorized counsel for the Plaintiff; and that I am informed that the facts and matters set forth therein are true and correct to the best of my knowledge and belief.

DATED: May 22, 2007

Richard Gordon

5

## CERTIFICATE OF SERVICE

I certify that on May 22, 2007 a copy of the foregoing Plaintiff CUS4, Inc.' Answers to

Defendant's First Set of Interrogatories was sent in the following manner to:

*By hand delivery:*

James Thomas, Esq.
Arnold & Porter, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Counsel for Defendant

*By first class mail:*

Leslie J. Polt, Esq.
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202-1612
Counsel for Federal National

Geoffrey P. Gitner