## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **CUS4, INC. D/B/A**<br>**RICHMAR & ASSOCIATES et al.**<br><br><br>**Plaintiff,**<br><br>**v.**<br><br>**GEORGE WASHINGTON UNIVERSITY,**<br><br>**Defendant** | Case No. 1: CV-07-0841 (JR) |

### RICHMAR'S REPLY TO GW'S OPPOSITION TO RICHMAR'S MOTION FOR PRELIMINARY INJUNCTION AND RICHMAR'S MOTION THAT HEARING BE CONTINUED UNTIL SUCH TIME AS RICHMAR CAN MARSHAL AND EXAMINE THE EVIDENCE LATELY PRODUCED BY GW

## I.    Introduction and Overview

After two Court telephone discovery conferences, GW finally produced the documents

and code that will prove its guilt of massively infringing, exploiting and destroying Richmar's

copyrighted rights in the DCMS.[1]  Richmar was able to review hard copy records for the first

---

[1] After a telephone discovery conference with the Court on Thursday, May 31, 2007, GW agreed to produce the documents requested during the call without restriction and imminently.  These documents were: 1) DCMS code as revised by GW; 2) System Design for Releases 2.0 and 3.0 and 3) documents reflecting the scope of work of Crown Partners, LLC. Despite repeated calls from Richmar, and promises for production by GW, these materials were not provided to Richmar until noon on Tuesday, June 5, during the deposition of Ronald Bonig. GW produced certain documents (including the Design Solutions and contracts between GW and Crown) under an alleged "Lawyers' Eyes Only" restriction that would not permit Richmar's president Richard Gordon to examine the documents during the remainder of Bonig's deposition. Despite its earlier promise, GW did not produce a CD copy of the GW revised computer code. After Bonigs deposition, at approximately 2:30 p.m. the matter was brought before the Court in a second discovery conference.  The Court granted relief from the Lawyer's Eyes Only Restriction and ordered that the GW revised DCMS code be produced imminently.  The Code was not produced to Richmar until Wednesday.  The Code was delivered to Impact Solutions, Richmar's computer

time on Wednesday, June 6. These documents show that prior to the expiration of Richmar's

contract on January 8, 2007, GW recognized it had placed itself in a quandary because it had

failed to protect (or address) its rights in the original time and materials contract it entered with

Richmar on January 6, 2006. (P.Ex.2).[2]  Under that contract GW failed to retain any ownership

rights in the intellectual property that was to be developed under the agreement. Neither did the

agreement address whether GW would have a license to modify the system once developed to

make anything from minor bug fixes to derivative works.

As shown below, GW solved its problem, by secretly presenting a "business opportunity"

to a Richmar competitor on December 2, 2006, before Richmar's go-live production of Release

No. 1 on December 18, 2007, and before Richmar completed the back scanning of GW's legacy

documents on February 21, 2007. (P.Ex. 4).

On January 2, 2007, unbeknownst to Richmar, as well as being intentionally concealed,

GW entered into a "Master Services Work Agreement" with Crown Partners, LLC, a program

developer and programmer with expertise similar to Richmar---design and production of large

scale customized Documentum based record repository systems. (P.Ex. 5). Under this contract,

GW sought not to make the same mistakes it had made with Richmar's original contract. The

Crown contract provides, *inter alia*:

    (1)    That GW will own the copyright and other intellectual property of the system
           developed and built by Crown;

    (2)    Crown will be permitted to take the developed product and system and sell it in
           the open market;[3]

---

programmers, who are presently making an electronic comparison of the code. This analysis will
not be completed until Monday or Tuesday of next week.

[2]  P.Ex. 1 is Richmar's certificate of Copyright for the DCMS.

[3]  Ex. 5, MSA, at 3:

(3)    GW will receive a free license from Crown to further modify or add-on to the DCMS as revised by Crown.[4]

Just three days later on January 5, 2007, Bonig wrote to Richmar agreeing that Richmar was with in its rights to refuse to deliver their copies of the DCMS code and design system to GW because that would require that "Richmar erase its own intellectual property---which legally we would have no right to do anyway." (P.Ex. 18).  Together with the protection of its intellectual property rights contained in the January 2, 2007 MSA for additional DCMS development, Bonig's statement shows GW was well aware that Richmar had creative author intellectual property rights to the DCMS. Yet, the actions taken by GW since that time evidences its total refusal to abide by those rights and in effect evinces through its subsequnet bullying actions an intent to destroy those rights.

The work being done by Crown is summarized in two documents ordered produced by Court and released from the onerous restriction of a "Lawyer's Eyes Only" designation.  These documents are: Crown's "*Master Statement of Work, DCMS Framework,*" dated April 25, 2007

---

Customer [GW] agrees that to the extent that Work Product [all intellectual property] developed pursuant to this Agreement is of such a nature that it would be subject to reuse, with or without modification, on Consultant's subsequent projects ("Generic Inventions") such Generic Inventions shall be the property of Consultant, and Consultant shall grant Customer a nonexclusive, perpetual, non-transferable, royalty free license to use the Generic Inventions for Customer's internal business purposes. ***Consultant shall have the right to develop, use, market, and license any software or data processing material that is similar or related to Generic Inventions developed by Consultant for Customer.***

(Emphasis added)

[4] Though finding a need to have this protection in the Crown contract of January 2, 2007, GW argues it did not need similar protection in Richmar's agreement. The Crown agreement constitutes an admission in fact that such language was need in the Richmar contract to support the position now being taken by GW, and should be considered a concession that they are aware that they do not have any copyright ownership or license rights to the DCMS code and GW

("MSW") (P.Ex. 6), and GW's "*DCMS HR Personnel; Release 3 Project Charter,*" dated April 17, 2007 ("Release 3 Charter"). (Ex.7).

The MSW shows that GW has turned over to Crown the DCMS in its entirety and that Crown will take the DCMS program and add a "Framework with a flexible front-end." (MSW, at 2). During Richmar's development of the DCMS, this same flexible framework was envisioned to be added after Richmar's Release No. 1. (Ex. 8, Declaration of James Gearing at ¶ 13; Ex. 9, Declaration of Richard Gordon at ¶ 7).

The Project Description in the Release 3 Charter describes the other programming work Crown will execute, for GW and itself:

> DCMS HR Personnel has been in production since December 2006. It was clear to all that much time had been spent on the DCMS application; however the DCMS Scan application did not meet all requirements. Some improvements were made to DCMS Scan in Release 2 to improve reliability but productivity enhancements are needed to meet the high volume of paper received daily by HR personnel offices and for all other GW departments that will use DCMS in the future. DCMS HR Personnel Release 3 will focus on three major deliverables; allow indexing to be done at the user workstation rather than the scan station, provide bulk scanning capability (the ability to scan more documents in a batch) and allow documents to be re-indexed.
>
> *       *       *       *       *
>
> All work on this project will be completed by GW except for SBO development (SBO)- Service Business Objects *are written* to leverage Documentum WepTop and Documentum Foundation Class code) that *will be completed by Crown Partners*.
>
> *       *       *       *       *
>
> *Docmentum and its components are tools for which GW resources have limited experience*. There could be delays as a result of our inexperience however whe have mitigated this substantially by engaging with *Crown Partners to provide design advice and to write the critical SBO modules to leverage Documentum standards*.

(P.Ex. 7) (Emphasis added).

---

cannot do, as testified to by Ronald Bonig, its Interim Chief Intelligence Officer, that "they can do *whatever* they want because they paid for it." (Bonig Dep. at 27, 34, 57, Ex. 12).

These revisions, to be made to the DCMS program and source code, have several implications. First, they constitutes derivative works of Richmar's copyright. They are not "bug fixes" or "adaptations" of the type permitted under any of the cases interpreting 17 U.S.C. § 117. (Gearing Decl. ¶ 3; Gordon Decl. ¶ 7. ) Rather they constitute an intentional and whole scale confiscation of Richmar's system infrastructure under the cover of GW's bulldozing tactic of trumped-up claims that the only modifications GW is making to the code is to fix Richmar built defects. (GW Opposition Mem. at 8 to 10).

On May 7, 2007, Crown received a task order from GW to begin these revisions. They are on-going and appear to be being made, at least in part, out of Crown's offices in Dayton Ohio. (P.Ex. 11). Once complete, it will constitute the very design envisioned by Richmar. (Gearing Decl. ¶ 5; Gordon Decl. ¶ 9. ) Neither Crown nor GW has received permission from Richmar to create these derivative works.

Second, once the flexible framework is added to the DCMS Code, Crown will have a product that will put Richmar's DCMS Code out of the market. (Gearing Decl. ¶ 5; Gordon Decl. ¶ 9 ) Richmar will not be able to compete against Crown as Crown will in effect be able to shrink wrap the final product, put it in a box, and sell it to Universities and Colleges. The "flexible framework," originally envisioned by Richmar, and originally within the scope of its deliverables to GW, will permit the expansion of use of the DCMS to all departments of a University without having to make further revisions to the back-end DCMS Source Code. *Id.* This will result in the DCMS becoming an "off the shelf" program like Windows or Quicken, but for Universities and Colleges. (Ex. 8, Gearing Declaration at ¶ 5; Ex. 9, Gordon Declaration 3). This end-product was the reason that Richmar was willing to invest in the GW contract with

below market rates, transfer without cost one of its Documentum employees (now on staff at GW as their Documentum expert) and give up weeks of its time without compensation. (Ex. 9, Gordon Declaration ¶ 6).

Third, GW is either directly or indirectly commercially exploiting Richmar's code. The MSA makes clear that Crown intends to commercially market the DCMS. (P.Ex. __ at 3, first full paragraph). Ronald Bonig, GW's interim Chief Information Officer testified that his division, ISS operates as a separate profit center, in effect selling its services and DCMS to other divisions of the University. (Ex. 12, Bonig dep. at 61). And, here, GW was also able to exploit its infringement of the DCMS Code by entering into a "sweet heart" deal with Crown, thereby resolving the problems with which Bonig was faced under the Richmar contract and gaining a commercial benefit.

In his deposition, Bonig, despite his professed 35 years of experience in the IP administration field took the position that "he [GW] could do whatever it wanted to do with Richmar's work product because GW had paid for it." (Ex.12, Bonig dep. at 57). Bonig's position is that he may ignore the limitations of GW's contract with Richmar as well as the law.

His testimony that he was unaware that under the Richmar contract that GW had certain limitations on further development of the DCMS is not credible. Should Bonig desire to have Richmar continue to develop the project he could pay them, but they would still own the creative rights; he could enter into a license agreement that would allow GW to finish the development and make other modifications; or he could start over with a new developer. These were his legal options. (Ex. __, Gordon Decl. at __).

Instead Bonig chose to ignore Richmar's ownership in the code and the limitations of GW's agreement with Richmar. Bonig recognized the problems with the Richmar contract. In

negotiations with Richmar in December to extend the contract and conclude the back scanning work, Bonig told Richmar's Gordon he could not extend the contract because it had "problems." (Ex. 9, Gordon Decl. at 10).

Unbeknownst to Richmar, at the very same time, Bonig began to discuss a "business opportunity" with Crown on December 2, 2006, as shown by a Non-Disclosure Agreement, another of GW's belated and recently produced documents. (P.Ex. 4). In late December, 2006, Bonig began to pressure Richmar to turn over to GW the DCMS source codes and development papers. (Ex. 9, Gordon Decl. at 14; P.Ex. 15). Richmar contends that Bonig's attempt to take sole possession of the code was intended to resolve his quandary of not owning the copy right. During his deposition Bonig admitted as much, testifying that the reason he wanted the code was because he did not want Richmar to have it. (Ex. 12, Bonig Dep. at 49-50).

After failing this gambit, Bonig employed another. Though he promised he would pay all invoices in order to have Richmar complete the back scanning of over 1,000,000 pages,[5] after completion of the work, he refused to pay, for the first time in the year old project claiming incompetency in the DCMS development. In his letter to Richmar on March 23, 2007 he wrote he was withholding payment because "Richmar had failed miserably" in developing the DCMS. (P.Ex. 20) Yet at his deposition, Bonig's position waivered as to whether his complaints regarded the scanning project or the DCMS. (Bonig dep. at 149, Ex. 12). Regarding what Richmar failures under the DCMS, Bonig was unable to recall any specifics.

Knowing Richmar is a small 8(a) company, not a national concern with large resources, GW has sought to bully over Richmar's rights and has engaged in a pattern of hiding the ball during expedited discovery.

---

[5] P.Ex. 15.

7

For example, On June 10, 2007, with its Rule 26(a) disclosure statement, GW produced over 4000 pages of documents. The subject matters addressed in these documents are the same as those in the withheld documents, except the withheld documents are far more damaging to GW showing the extent and circumstances of the massive revisions to the DCMS code. The Court should draw an adverse inference against GW's credibility that it sought to conceal these records and otherwise impair Richmar's use of this information. Richmar has deposed three GW employees. Based on the records produced, these depositions were spent quibbling about whether a "fix" was a "modification" or "enhancement" under Release No. 2. (See, e.g. Ex. 14, Dep. of Vijay Padmanabhan, at 27, 28, 43, 62, 63) It was only through the second of the GW witnesses that Richmar discovered that there were documents that described the modifications now occurring under Crown's direction. Yet, GW chose not to produce these obviously relevant and damaging documents with its original production.

### A.    GW continues to hide the Best Evidence and Request that "Developed Code" Be Produced

On Wednesday, June 6, Richmar had its first opportunity to examine the Release 2.0 and 3.0 solution documents referenced above. Those documents show that once again, Richmar has been misled as to the existence of critical evidence. From these documents it is clear that Crown and GW have engaged in the preparation of a "Developed Revised Version" of the DCMS. That is, the CD revised code delivered and produced on Thursday still does not show all of the changes that have been made to the DCMS Code. Rather, what was delivered is what is being presently used by GW for its current document needs. The DCMS code on the developers' machines will show the changes to the DCMS code *after* the GW's production fixes to Richmar's delivered code. These changes may be made at either or both Crown's offices in Ohio and at GW.

The changes to the "developed code," at least as it appears in the Crown Design Solution and Release 3 specifications, will likely be of far greater depth than what GW delivered Wednesday. Accordingly, GW has yet to produce the best evidence of the modifications made to date to the DCMS code. Richmar requests that the Court order its production forthwith.

**B.    Richmar has been unable to make an analysis of the GW revised code**

Because it was not produced until Wednesday, Richmar's subcontractor and computer programmer, Impact Innovations, has not had time to analyze the revised code. This is due to prior commitments, and physically transmitting a copy to their offices in Manassas. Impact believes it can complete an analysis in a days time, and can be done by Monday or Tuesday of next week. (See Ex. 10, Declaration of Jae Lim).

**C.    Richmar should be given a continuance to receive and analyze the "Developed" and "GW Revised Code" and to Marshal the Evidence Lately Produced by GW**

Richmar has had at best a day to analyze and review the lately produced document. Despite its best efforts it has been denied the "developed code version" and has been unable to make anything other than a cursory review of the "GW revised code." Fairness dictates that Richmar not be penalized by GW's delaying tactics. Richmar requests that the Court allow Richmar a short continuance to get the "developed code," complete its analysis and be afforded a reasonable period to marshal and present this information to the Court.

## II.    FACTUAL STATEMENT

The following statement is based on the information gathered to date:

1.    Richmar was hired by the GW for its expertise in developing large scale electronic enterprise document management systems. Richmar was hired to develop a document management system for the University with the initial group in GW to use the system being the

Human Resources Personnel Department ("HR"). The engagement also required Richmar and to scan and index over 1,000,000 pages of HR's "legacy documents" into the system developed by Richmar.[6] Each organization new to DCMS would have to go through a requirements analysis similar to that for HR. (P. Ex. 6 – Requirements Definition).

2.    GW lacked any expertise in building a document management system. In previous years GW had worked with other program developers, but those projects had been unsuccessful. (P. Exs. 7 and 8).

3.    Richmar agreed to provide its development expertise and designed and build a document and case management and back scanning system for GW's HR division as Phase I.

4.    Richmar prepared the first draft of the development time and materials contract. Richmar used as a form an older contract under which intellectual property rights created by the engagement It intentionally deleted from the agreement that GW would own the rights to any developed works. (P.Ex. 3). In exchange Richmar offered GW reduced pricing, invested its own time and offered GW other concessions in order that Richmar would have the right to copyright the computer system and codes and exploit them commercially. (Ex. 9, Gordon Decl. ¶ 3). Though they negotiated other contractual provisions, they did not object to Richmar owning the creative rights. (Ex. 9, Gordon Decl. ¶ 3). The contract was entered on January 6, 2006. The contract ran through January 7, 2007, during which time either party could terminate the contract on thirty days written notice. (P.Ex. 2).

5.    Richmar and GW contemplated a long term relationship, with HR being the prototype for a roll out of a modified DCMS system to the remainder of the University's divisions, modified for the particular needs of each of those divisions. Both parties understood,

---

[6] The legacy documents comprised GW's hard copy documents. These records went back over

10

however, that continuation of a roll out would be dependent on University financial and budgetary constraints. (Ex. 9, Gordon Decl. ¶ 7).

      6.      GW's ability to develop and roll out a system was dependent on funds the ISS division acquired from other divisions to develop the features of the system. (Ex. 9, Gordon Decl. ¶ 19).

      7.      The DCMS HR Personnel system was paid for with funds from HR's budget that was provided to ISS. ISS supervised the DCMS project as GW's representative. ISS was to develop requirement specifications for the system to be developed.

      8.      In October, 2006 Richmar and GW orally agreed to the system specifications for Release 1.0 and a go-live release and a go-live date of December 18, 2006 was projected. (Ex. 9, Gordon Decl. ¶ 7; Ex. 8, Gearing Decl. ¶ 12).

      9.      Release 1.0 included HR. A later release included the other HR Stakeholder and Release 1.0 bug fixes.

      10.     Richmar delivered the Document Only Search (DOS) subsystem in Release No. 1 according to GW approved specifications. At this point, however, GW requested additional DOS features.[7] This would require additional requirements definition and design sessions to both scope out and develop the new features. The decision was made by ISS because of financial restraints and a desire not to delay Release 1.0 until such time as DOS would be completed. (Ex. 8, Gearing Decl. at ¶ 8; Gordon Decl. at ¶ 7).

---

40 years and numbered in excess of 1,000,000 pages.

[7] There is a workable DOS subsystem included in Release 1.0. When frozen by ISS, the DOS system could retrieve document only searches, but those searches had to be limited to 2000 returned results. Because of timing (and possibly lack of money) ISS chose to defer enhancements to the DOS until Phase 2.

11.     During development GW refused to sign off on Requirement Specifications prepared by Richmar.  Instead, ISS interim Chief Information Officer, Ronald Bonig told Richmar "let's just see what works." (Ex. 9, Gordon Decl. ¶ 9).  ISS' refusal to agree on the system specifications was contrary to Richmar's prior work experience and appeared contrary to GW policy as customers typically agreed to the specifications they wanted to see in their developed systems.  (Ex. 8, Gearing Decl. at ¶ 9).

12.     GW specified that it wanted Richmar to develop a "flexible framework" which would allow ISS to extend the DCMS University-wide. See Task Order 2A. (Ex. 17).  This would not require access to the code, and therefore no additional licensing fees.

13.     Richmar understood it would make further enhancements and modifications to the system delivered in Phase 1 during Phase 2.  Phase 2 was to include *inter alia*:

(a)     Advanced search features (e.g., additional development of the DOS)

(b)     Development of a bulk scanning system, i.e. a scanning system that could scan and index multiple separate documents;[8]

(c)     development of the DCMS so it could be rolled out to other University departments, such Financial Aid, Financial Services.

14.     Richmar did not write any code for these features and all constitute derivative works. GW wanted Richmar to build a system configured by administrators rather then having to be programmed by developers and therefore rolled out to the other departments without further modifications to the Code. (Ex. 9, Gordon Decl. ¶ 5; Ex. 8, Gearing Decl. ¶ 28).

15.     Richmar and members of ISS had discussed building the DCMS on a flexible framework so that DCMS could be modified to meet the needs eventually of all GW departments

---

[8] No code had been written for this function and none was included in the DCMS.

and would become a University-wide system. These were contemplated to be done in future releases, and little DCMS code was written for these future projects. .  (Ex. 9, Gordon Decl. ¶ 7).

16.    Under the January 6, 2006 Contract, the contract would expire, unless extended, on January 8, 2007.  (P.Ex. 2).  On or about December 15, 2007, Richmar and GW failed to reach an agreement on a contract extension.  ISS' Bonig informed Richmar's Gordon that "there were problems with the contract," and that it could not be extended.  ISS' Bonig further informed Richmar that ISS did not have adequate funds to continue to pay Richmar for continued development of the DCMS Release 2.0. .  (Ex. 9, Gordon Decl. ¶ 10).

17.    Shortly after the DCMS "went live" on December 18, 2006, ISS sent Richmar a contract extension for continued back scanning and a proposed "close out check list."  ISS informed Richmar that if they could agree on the checklist, Richmar would be paid for all outstanding invoices on the DCMS development, and that Richmar could finish the back scanning and indexing of the legacy documents.  ((Ex. 9, Gordon Decl. ¶ 11); P.Ex. 15).

18.    Prior to going live on December 18, 2006, GW and Richmar spent three weeks of User Acceptance Training for Release 1.0.  The UAT was successful.[9]

19.    On December 20, 2006, all problems related to Release 1.0 had been fixed.[10] Thus, extending the sytem to include other stakeholder offices in HR should have been relatively simple.

---

[9] UAT is in essence beta-testing.  A test run before the system goes live by non-technical people who will be using the system to identify system problems so they can be fixed before general release of the product.

[10] As shown in Mr. Gearing's testimony, in developing computer systems there are always bug fixes that must be made after a system is put in use and used by multiple users.  The identification and fix of bug problems is part of the development process.

20.    During a Steering Comittee meeting GW requested that Richmar comply with a
close out checklist.  Richmar objected to items in the checklist that would require Richmar to
turn over all of its copies of the DCMS Code and all of its development papers to GW. Richmar
informed ISS that if GW insisted on this as a term of payment, Richmar would not extend the
back scanning task order and consider the entire contract closed on January 8, 2007.

21.    On January 5, 2007, ISS' Bonig retracted the ISS request that Richmar relinquish
the DCMS computer code, as Bonig "recognized Richmar's legal ownership rights in the code."
(See letter Bonig to Gordon, January 5, 2007.  Based on this retraction and Bonig's agreement to
pay all outstanding invoices on the DCMS development and for completion of back scanning and
indexing the legacy documents, Richmar agreed to complete the scanning project.

22.    Release 1.0 went live on December 18, 2006.  It has been in used by Human
Resource Personnel since that time.  It is used as the primary document management, retrieval
and scanning system for the Personnel division.  During January, 2007, the DCMS was rolled out
to the other four other HR divisions.

23.    The head of Human Resources Personnel has reported satisfaction with the
system and it has been used on a daily basis since going live.  The DCMS is used by five
departments, and delivers there document management requirements.  In the DCMS Steering
Committee notes of December 20, 2006, the Committee reported the system was working find,
and that a few minor bug fixes had been performed.[11]

23.    In  January, 2007, two GW computer programmers attended five days of on-line
training in Documentum, the database program used as the repository for GW's documents in

_____

[11] As stated in Mr. Gehring's testimony, in developing computer systems there are always bug
fixes that must be made after a system in put in use and used by multiple users.  The
identification and fix of bug problems is part of the development process.

DCMS. Between January and April, 2007 the two programmers made numerous changes to the DCMS computer code. These changes resulted in the need to make "bug fixes" to the DCMS that were not contemplated. The "bug fixes" resulted from the addition of "new features and functions." These "new features and functions." These were included in Release No. 2 which went live on April 2, 2007.

24.     On December 2, 2006, GW began to explore a "business opportunity" with Crown Partners.

25.     Not having the expertise to develop a flexible framework or Bulk Scanning function for the DCMS on January 2, 2007, GW hired Crown to determine how it could build these functions

26.     On April 25, 2007 Crown provided a solution design for the flexible framework.

27.     It appears that on April 19, 2007 Crown provided a solution design for bulk scanning and other scanning features to be added to the DCMS.

28.     On May 7, 2007 Crown Partners began to develop the Flexible Framework. (P.Ex. 11).

29.     Under the MSA, Crown will be able to develop and market a shrink wrapable DCMS system for sale to colleges and universities. This will destroy the value of Richmar's copyright and its right to exploit its commercial advantage in owning the DCMS copyright.

## ARGUMENT

A.     **GW Revisions to the DCMS Constitute a Derivative Work Which Infringes Richmar's Code**

A derivative work is "a work based upon one or more preexisting works, such as a translation . . . or any other form in which a work may be recast, transformed or adapted." 17 U.S.C.A. § 101. Consequently, the unauthorized preparation of a derivative work constitutes an

infringement. *See, e.g., CMAX/Cleveland Inc. v. UCR, Inc.*, 804 F.Supp. 337 (M.D.Ga. 1992) (a firm that uses a code generator to create software that duplicated the function of a program leased by the firm violated the lessor's copyright in the program); *In re Indepndent Services Organizations Antitrust Litigation,* 964 F. Supp. 1469 (D.Kan. 1997) (copyright owner's registration of derivative diagnostic software and service manuals was sufficient to permit owner to sue for infringement of those derivative works, even though owner had not registered preexisting works from which registered upgrades were derived).

Section 106(2) grants the holder of the copyright the exclusive right to prepare a derivative work.  To constitute a violation of this section, the infringing work must incorporate in some form a portion of the copyrighted work. The infringing work must be substantially similar to the original work. *Vault Corp. v. Quaid Software, Ltd.*, 655 F.Supp. 750 (E.D. La. 1987), aff'd, 847 F.2d 255 (5th cir. 1988) (need for substantial similarity).

Here, as shown in the documents produced by GW, as well as the declarations of Messrs. Gordon and Gearing, there can be no doubt that the modifications to the Richmar DCMS have been massive and planned to be massive. The infringing code incorporates as its infrastructure the Richmar code, and will never be able to operate without the core DCMS code. Rather, GW, through Crown, is simply incorporating additional functions to add to the functionality and value of the DCMS, and to permit it to be used by a wide class of user.

The courts have uniformly followed the rule that a work can be copyrighted as a derivative work only if the new work was produced with the permission of the owner of the copyright on the previous work or its duly authorized licensee. *See, e.g., Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988) (using copyrighted art works without the consent of the copyright

owner constituted the preparation of derivative works that infringed upon the underlying copyright). *See generally* 149 ALR Fed 527, § 5.

Once obtained, registration constitutes prima facie evidence of the validity of the copyright claim, and places the burden of rebuttal on the defendant. *SAS Institute Inc. v. S&H Computer Systems, Inc.*, 605 F.Supp. 816 (M.D. Tenn. 1985)

**B.    GW's Revisions Are Not Permitted under 17 U.S.C. § 117**

In its Opposition Brief GW argues that the modifications it discusses in its brief are permitted to GW, as an owner of the DCMS code, as essential fixes and adaptations to allow it to fully utilize the DCMS. GW, in its brief, however, does not address the massive modifications now being deployed in conjunction with Crown Partners. Rather, it appears GW was prepared to present to the Court a picture that omitted its revisions to the system planned over the next seven months. This omission, and attempted concealment, should be taken as proof that GW has knowingly infringed Richmar's DCMS.

GW's revisions, as now discovered, go far beyond what is permitted by the statutory language, CONTU history or case precedent. 17 USC § 117 provides it is not copyright infringement for the owner of a copy of a computer program "provided that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner . . ." The case law interpreting this provision span a spectrum from permitting only those changes *essential* to operate the program on a new computer (*Apple Computer Inc. v. Formula Computer Inc.*, 594 F.Supp. 617, 622 (C.D. Cal. 1984), to adaptations adding new functions to update or get more use out of the delivered system. *Aymes v. Bonelli*, 47 F.3d 23, 26 (2d Cir. 1995).

Here it should not be persuasively argued that the past and future revisions to the DCMS are simply an "essential step in the utilization of the that program on a computer." § 117.

Defendant bears the burden of establishing that the exception of §s. 117 applies. *Allen-Myland v. International Business Machines, Corp.*, 746 F.Supp. 520, 536 (E.D. Pa. 1990); *Atari, Inc. v. JS &A Group, Inc.*, 597 F.Supp. 5, 10 (N.D.Ill. 1983).

None of the cases addressing section 117, however, would permit as "an essential step" the revisions to the DCMS. For example in *SAS Institute v. S&H Computer Systems, Inc.*, 605 F.Supp. 816 (M.D. Tenn. 1985) a group of professors obtained a license to use a certain statistical analysis program. The program could only run on IBM or IBM compatible systems. The professors only had access to the VAX capable program. The court found that because the VAX-capable program ran on source code contained in the IBM-capable program, with certain changes to suit the VAX system, the VAX program was clearly a derivative work. Because the derivative work was created without the consent of the copyright owner of the pre-existing work, the derivative work infringed upon that copyright.

In *Micro-Sparc, Inc. v. Amtype Corp.*, 592 F. Supp. 33, 223 U.S.P.Q. (BNA) 1210 (D. Mass. 1984), the court held that typing computer programs from directions in a magazine and subsequently selling the programs to third parties was not authorized conduct under § 117 of the Copyright Act, which is applicable only to internal use of a program for utilization purposes. The Court emphasized the language from the CONTU report that "One who rightfully possesses a copy of a program . . . should be provided with a legal right to copy it *to the extent which will permit it use* by the possessor . . . .The permission to copy stated in subsection (1) is strictly limited to inputting programs. That is the import of the phrase 'essential step in the utilization of the computer program" that appears in the statute and the phrase "to the extent which it will permit its use' that appears in the CONTU report." *Id.* at 35.

In *Eastern Business Systems, Inc. v. Original Incentives, Inc.*, 1987 WL 17545 (D. Mass. 1987), the court held that a user's inputting of software into its computer or that of its client for whom the software was designed, pursuant to contract with the software's designer and copyright owner, does not violate § 117, but that if it copied portions of the software on behalf of the client who was not in possession of such copy, this would be in violation of that subsection. The defendant contracted with the plaintiff for a special computer program for management of its client's Frequent Travel program information, and the court held that its use of the software for this purpose was quite within the boundaries of the statute's permission. But copying for a broader use would go beyond the privilege created by § 117. There was a genuine dispute as to whether the defendant had in fact made a copy of the program for its client, which question needed to be resolved. If it had done so, both the defendant and its client would have infringed on the program's copyright.

The basis of the court's decision was it finding that CONTU was unambiguous in its recommendation that person in rightful possession of a copy of a copyrighted program be provided with a legal right to copy it (use it) but only "to the extent which will permit its use by the possessor." *Id.* at 2. Here, the court held that possession by anyone other than the owner would have been an infringement in finding that the defendant had copied the software on someone else's behalf and at their direction is "broader than the privilege created by" §. 117. *Id.* These cases infer that use by a third party, such as Crown, even if just at GW's direction-- would likewise be an infringement, as the use is going beyond the essential use of the program delivered by Richmar.

*See also Equinox Software Systems, Inc. v. Airgas, Inc.,* 1997 WL 12133 (E.D. Pa. 1997), (licensee of software may not copy it to other computers for the purpose of advancing its own

business operations.  The defendant argued that an "enhancement" to the copyrighted program,

would permit the program to operate on more efficient computers, increasing the efficiency of

the program, and therefore "would have no other purpose than the support and operations" of the

original program.  Applying § 117, the court held this argument disingenuous); *Expediters*

*Intern. of Washington, Inc. v. Direct Line Cargo Management Services, Inc.*, 955 F. Supp. 468

(D.N.J. 1998) (owner of a copy of a computer program designed to consolidate ocean freight

shipments could not use it after expiration of a license agreement to generate manifests for

billing customers.  The court analyzed § 117 of the Copyright Act and concluded that it allowed

only the preparation of a copy by the program's placement into a computer for purposes of its use

in that computer; in this case, the defendant's use went far beyond what would constitute internal

use); *Hubco Data Products Corp. v. Management Assistance Inc.*, 219 U.S.P.Q. (BNA) 450,

1983 WL 1130 (D. Idaho 1983) )§ 117 did not permit the copying of a computer manufacturer's

operating system programs for use in an upgrading procedure to enhance the capacity of those

programs in less expensive models of the manufacturer's computers.  The defendant had learned

how to locate and remove the "governors" in the plaintiff's code, which restricted the memory

and peripheral capacity of different operating systems, and to thereby enhance the capacity of the

plaintiff's less expensive computers.  Whether it did this manually or via a computer program,

the court held, it involved the unauthorized copying of an therefore the violation of the copyright

in the plaintiff's operating system program.  The court therefore ordered a preliminary injunction

forbidding the defendant's use of the plaintiff's copyrighted object code in the upgrading of the

plaintiff's operating system programs); *Apple Computer, Inc. v. Formula Intern., Inc.*, 594 F.

Supp. 617, 224 U.S.P.Q. (BNA) 560 (C.D. Cal. 1984) (purchaser of authorized copies of a

computer program who then copied them further in permanent form onto silicon chips for sale

purposes had not acted within the limited exception available under § 117; its conduct could not be construed as the "internal use" contemplated by the statutory exception, and it had not confined its use of the unauthorized copies to its own use.

As stated in *Apple Computer* any broader construction of § 117 would "effectively emasculate the protections for computer programs contained in other sections of the Copyright Act." Here, GW says there are no boundaries on adaptations that it can make under § 117. To GW the scope of 117 is limitless.

### C.    GW has no implied license to make the modifications

A number of implied license cases involve transactions in which one party is commissioned to create a work for a client, but the terms of the agreement fail to provide the client with ownership of the work or an express license to use it. An implied nonexclusive license can be given either orally or implied from conduct. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Such an implied license does not transfer the ownership of a copyright; rather "it simply permits the use of a copyrighted work in a particular manner." *Id.*

These cases involve an inquiry as to whether the conduct involved and the language used sufficiently demonstrates that the licensor expected that the licensee was to make use of work involved, and, if so, what uses are reasonably within that implication. As stated in Nimmer, *Law of Computer Technology*, §. 7:56, "Implied licenses---Implied license and estoppel (2007 Supp.) the most important factor to be decided are

(1)    the intent of the putative licensor, as indicated by his actions. Did the licensor's behavior manifest an intent to confer a privilege to use the copyrighted information in the manner used by the putative licensee and;

(2)    whether the entirety of the facts indicate an agreement that the client would have a right to use the commissioned work in the manner that it sought to use the work, including whether the parties agreed that the work could be used without any involvement by the person who created it.

21

An example of a case in which the implied license argument failed is *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998).  There the Sixth Circuit held that an architect did not grant an implied license to the client to use his plans for remodeling a house.  The architect twice sent the owner standard form contracts that reserved ownership in any completed plans and forbade use of the plans unless the architect consent and was compensated. Though the contracts were never signed the owner encouraged the architect to move forward.  After the architect completed the plans and marked them as copyrighted, the owner's-lawyer presented a counter contracts either transferring the copyright to the owner, or permitting the owner to use the plans as "she desired." After the parties failed to agree on a contract, the owner hired a new architect who used the plans. The Circuit rejected the implied license defense, stating;

> almost every objective fact in the present case points away from the existence of an implied license.  Johnson [the first architect] submitted two AIA contracts, both of which contained express provisions that he would retain ownership of his drawings, and that those drawings would not be used for completion of the Jones [the owner] hose by others except, by written agreement with appropriate compensation.  These contractual provisions, although never signed by Jones speak to Johnson's intent; they demonstrate that Johnson created with drawings with the understanding that he would be the architect in charge of the project. They further demonstrate that Johnson would not have allowed [the new architect] to finish the project using his drawings without a written agreement, and additional compensation. [12]

This case differs from those cases in which an implied license was found as in those cases "the copyright owner intended that the copyright works be used in the manner in which that are eventually used." *See, e.g., I.A.E. v. Shaver*, 74 F.3d 768 (7th Cir. 1996).  Here, no such intent should be found.  Richmar was careful to protect it ownership of the copy right to the DCMS. This was reflected in its drafting of the contract. GW was aware that Richmar believed it had been engaged to complete the project through the flexible framework and completion of the

scanning programs. Indeed, Richmar refused to turn over its copies of the source code and design documents because it wanted to protect its intellectual property rights, a right recognized by Bonig himself in his January 5 letter.

In the event an implied license is found, then its scope must be determined. The scope of an implied license takes its form from the circumstances and conduct that created them. According to *Nimmer on Modern Licensing Law*, § 10:17 "the core focus lies in determining what scope of use of the parties' conduct reasonably suggests as the range of permitted use of the licensed rights. That determination inevitably reflects both an analysis of the particular circumstances (what reasonably can be construed as the nature of the 'agreement') and the limitation of the applicable defense."

Here, Richmar permitted GW to retain a copy of the source code, as is trade practice with a customized development of software programs. The GW copy would be necessary for bug fixes to a newly developed system, proposed product improvements (specific revisions planned by Richmar to the system) and maintenance. There was never license given to permit GW to hire consultants to destroy Richmar's investment in the DCMS. To the contrary, Richmar had agreed to provide below market rates, give GW an employee proficient in Documentum and invested substantial free hours in order that Richmar would have something valuable to market. The record is absolutely devoid of any evidence that Richmar agreed to give a license that would include GW's infringing the code to add the flexible framework and scanning functions.

A case presenting similar facts is *McLean Associates v. Wm.M. Mercer-Meidinger-Hanser*, 952 F.2d 769, 778-779 (3rd Cir. 1991), the Third Circuit found that a consultant who delivered a program to its client for which he consulted on a specific project for the New York

---

[12] 149 F.3d at 500.

Stock Exchange, only granted an implied license for use of the program on that specific project, as to which the consultant had been hired.  There the Circuit found that both consultant and client understood that the program was being development only for the NYSE and that there was never any agreement or license contemplated beyond that specific project, nor an implied license that would permit the client to compete commercially against the consultant.

Here, there should be no dispute that the DCMS was only for the GWU's HR Personnel group.  Modification and expansion of the DCMS to divisions other than HR would be beyond the scope of any implied license. As GW operates its ISS as a free-standing profit center within the University, with other divisions having to pay for and buy ISS services if they desire to use a modified DCMS in their organization, GWU's ISS department is placed in competition with Richmar for expansion of the system. Far worse is Crown's marketing to other colleges and universities.  A result of GW's infringement that has tremendous commercial implications to Richmar.

### D.    Richmar will suffer Irreparable Injury

In copyright infringement case, "[a] copyright holder may be presumed to suffer irreparable harm as a matter of law when his right to the exclusive use of copyrighted material is invaded, and such a holder is entitled to a preliminary injunction without a detailed showing of harm." *Health Ass'n of America v. Novelli,* 211 F.Supp.2d 23, 28 (D.D.C. 2002) (Walton, J.), citing *Hart v. Sampley,* 1992 WL 100135, at *3 (D.D.C. Feb. 4, 1992).  Similarly, "[t]rademark infringement by its very nature causes irreparable injury." *Id., quoting, Appleseed Foundation Inc. v. Appleseed Inst., Inc.,* 981 F.Supp. 672m 677 (D.D.C. 1997) (citations omitted).  Thus, if the Court finds that plaintiff has demonstrated a substantial likelihood of success on the merits of

either its copyright infringement claim, it is not necessary for plaintiff to provide overwhelming evidence in support of its showing of irreparable injury.

But here, Richmar can show overwhelming irreparable injury. Each day that passes brings Crown closer to having a product that will beat Richmar in the marketplace. In fact Richmar will hardly be able to compete if Crown and GW are permitted to complete the DCMS development. Here, Richmar has invested large sums of lost opportunity costs, giving GW bargain pricing, as well a valuable employee. This investment is in danger of complete loss should an injunction not issue.

Nor should GW be able to complain of the impact an injunction would have on its development. Infringers of software are in a poor position to complain about the scope of relief. First, it is using the DCMS for its document repository and according to the head of HR Personnel, the staff is happy with its use. Second, GW has intentionally infringed. It seeks to bull doze over Richmar with its greater resources, obstinate attitude and gamesmanship to date in discovery. Even when a preliminary injunction threatens severely to damage the defendant's business (which would not happen here), courts hold that a knowing infringer has no basis to complain about the consequences of equitable relief granted to the plaintiff. See, e.g. *Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3d Cir. 1983), *cert. dism.*, 464 U.S. 1033 (1984); *Atari Inc v. North American Phillips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982), cert den, 459 US 880 (1982).

## IV.    Conclusion

Should the Court not yet be satisfied that Richmar has carried its burden in showing that a preliminary injunction should issue, the Court should permit Richmar to fully develop the record before further considering the preliminary injunction.

DATED:  June 7, 2007                                Respectfully submitted,


Geoffrey P. Gitner (D.C. Bar No. 176479)
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 772-5926

## CERTIFICATE OF SERVICE

I certify that on June 7, 2007 a copy of the foregoing Plaintiff Richmar's Reply to GW's

Opposition to Richmar's Motion for Preliminary Injunctiojn and Richmar's Motion that Hearing

be Continued Until Such Time as Richmar Can Marshal and Examine the Evidence Lately

Produced by GW was sent in by electronic and first class mail, postage prepaid to:

James Thomas, Esq.
Arnold & Porter, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Counsel for Defendant

Leslie J. Polt, Esq.
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202-1612
Counsel for Federal National

Geoffrey P. Gither