# Exhibit 9

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**CUS4, INC. D/B/A**
**RICHMAR & ASSOCIATES et al.**


**Plaintiff,**


**v.**                                          Case No. 1: CV-07-0841 (JR)


**GEORGE WASHINGTON UNIVERSITY,**


**Defendant**

## DECLARATION OF RICHARD GORDON

I, Richard Gordon, Jr. depose and say as follows:

1.        I am the President/CEO of CUS4, Inc. d/b/a RICHMAR and Associates.  I

founded RICHMAR in 1995 and eventually obtained the first contract in April of 1997.

Since 1997, RICHMAR has been providing management consulting and other business

and computer services to both commercial and Government clients.  I have over thirty

years of continuing functional experience that includes lessons learned from an array of

commercial and Government programs, including the design and development of new

technology to support more effective business processes.  In 1977, I began my career as a

labor negotiator with the Bakery, Confectionary and Tobacco Workers International

Union, Local 362-T while working for the Brown and Williamson Tobacco Company in

Macon, Georgia.  I came to Washington, DC at the request of Congressman J. Roy

Rowland and worked five (5) years as his Administrative Aide and Legislative Assistant.

We served on the House Committee for Public Works and Transportation and Veterans

Affairs. After leaving the Hill, I served nine (9) years as the Director of Labor Relations for the National Air Traffic Controllers Association (NATCA) before beginning work full time at Richmar in 1997. During this period, much of my attention was focused on the deployment of Air Traffic Control technology, large, complex systems costing billions of dollars. Thus, my background and experiences enables me to provide a unique perspective and insight into many commercial and government programs.

2.     In late November and early December of 1995, I began holding discussions with Anne-Marie Taylor and Drew Sanzenbacher of The George Washington University (GW) concerning the development of a system for managing GW contracts. Jim Gearing and I provided demonstrations of the Grievance Electronic Tracking System and Memorandum of Agreement System Richmar developed for the Federal Aviation Administration (FAA), which could be adapted for GW's Contract Management process.

3.     As a result of these meetings, RICHMAR was hired by GW for its proven expertise in developing large scale electronic enterprise document management systems. However, I was surprised when GW asked me to write the contract. Particularly, after GW's Office of General Counsel was advised that we would be pleased to consider their proposals. Unlike Federal contracting where the procurement rules for the ownership of intellectual property are dictated by Statute, this commercial contract offered me an opportunity of a lifetime; the possibility of developing a product that could be packaged and marketed as "Commercial Off-The-Shelf- Software in an environment where nothing like it existed. From my prior contract and negotiation experience and training I knew that if the GW contract did not contain a work for hire provision, Richmar would be entitled to own the intellectual property rights. Owning those rights was my underlying

2

reason for entering into the agreement. Therefore, we removed the paragraph regarding work for hire from a form contract we had previously used. It was my intention, as expressed in the agreement that this would accomplish several things; 1) ensure that RICHMAR retained the rights to any products created; 2) allow us to invest heavily in the resulting product; and 3) protect ourselves against a much larger organization, often known to treat its vendors unfairly. In the case of any unfairness, GW would be required to negotiate with RICHMAR over any expansion of DCMS or start from over. On January 6, 2006, the contract was signed between RICHMAR and GW for RICHMAR to develop a Contract Management System and a document management system for GW.

4.     Discussions with Rick Gilchrist and Marcy Day concerning the Human Resources Personnel Department (HR) project focused on developing a general document management system framework for the University to use with the initial group in GW to 'go live' being HR.[1] RICHMAR agreed to provide its development expertise to initially design and build a document and case management and scanning system for GW's HR division. The engagement also required RICHMAR to scan and index over 1,000,000 of HR's "legacy documents" into the system developed by RICHMAR.[2] Each organization new to DCMS will have to go through a requirements analysis similar to that for HR.[3]

---

[1] GW Project Definition (Gordon Ex. 1, attached to this declaration. Hereafter exhibits attached to this declaration shall be referred to as "Gordon Ex. __"). This document is unsigned, was developed by GW and was first given to me as a part of the discovery process.

[2] The legacy documents comprised GW's hard copy documents. These records went back over 40 years and numbered in excess of 1,000,000 pages. (Task Order, Gordon Ex. 2.)

[3] Requirements Specifications Document for HR Personnel Extension of Business Continuity Framework DCMS, Version 6.0, dated May 4, 2006. (Gordon Ex. 3).

3

5.    RICHMAR and GW contemplated a long term relationship, with HR being the prototype for a roll out of Business Continuity Framework that could be extended to the remainder of the University's divisions, derivative computer applications designed for the particular needs of each of those divisions.[4] Both parties understood, however, that continuation of a roll out would be dependent on University financial and budgetary constraints.[5] However, I was confident that GW would continue with a multiple year contract because GW lacked any expertise in building a document management system in general and in Documentum specifically.[6] It was primarily because of this lack of expertise that GW wanted a system that could be rolled out to other departments without further modifications.   Vijay Padmanabhan, who was hired by GW in June, 2006, did not join the DCMS project until the fall of 2006 and was not scheduled to receive training from RICHMAR on DCMS until the knowledge transfer at the end of the development for Phase 1.  (Vijay Deposition at 6, 14, Ex. 14 to Opposition).[7] Knowledge transfer included documenting certain information about the code and explaining how the documentation related to the code.  A review of the code and associated documentation was agreed to by RICHMAR and conducted by Sun Microsystems, author of the JAVA language.  This would help ensure that GW would be able to maintain the code that was

---

Richmar produced separate requirements specifications for the Business Continuity Framework.

[4] List of GW Offices and Departments (Gordon Ex. 4)

[5] GW Change Control #021, Description of Risks (Gordon Ex. 5)

[6]  GW Change Control #004 and 006, Description of Risks and 011 Reason for Change (Gordon Ex. 6)

[7] GW Change Control #004 Description of Risks (Gordon Ex. 6)

4

being developed.[8]   At no time did RICHMAR contemplate or believe that GW would make anything other than <u>minor</u> changes to the code.

     6.    RICHMAR invested its own time and money into developing DCMS.  In addition to time spent before the Contract was signed, we conducted a preliminary review and developed a prototype system to derive a system for Student Financial Aid.   The request was made by Christina Griffin after GW was unsuccessful at obtaining funds to cover the cost of this work.[9]  Additionally, RICHMAR invested over 60 days of development time for DCMS HR Personnel, 26 of which were used to address out of scope activities and to cover the cost of GW employing Tony Ford.  GW was unable to efficiently process Tony Ford's paper work as a GW employee so he remained on the RICHMAR payroll.  Further, because GW had no Documentum expertise, RICHMAR allowed GW to hire Tony Ford without requiring its customary fee of 20 percent of salary.

     7.    RICHMAR and members of ISS had discussed building the DCMS on a flexible framework so that DCMS could be modified to meet the needs eventually of all GW departments and would become a University-wide system. These were contemplated to be done in future releases, and little or no DCMS code was written for these future projects.

In July 2006 RICHMAR and GW agreed that the Business Continuity framework development  began with DCMS HR Personnel release 1a and 1b development of web

---

[8] GW Change Control #017 Reason for Change (Gordon Ex. 7)

[9] GW Change Control #016 Description of Change Request (Gordon Ex. 8)

serves and the wrapper... *would* be an ongoing process as more modules are added to

DCMS." The parties further agreed that "a General Use module for Business Continuity

will not be completed as planned. Instead, Release 2 (a and b) will build a Self Service

Module." Rick Gilchrist stated the reason for change: "a self service module provides

greater flexibility for the University."[10] As a result of this agreement, RICHMAR

developed a Task Order, for Release 2a and 2b, which contained the Flexible Framework

and Planned Product Improvements (PPI), those items in Release 1.0 that had been

deferred due to lack of money.[11] These included:

     (a)     Document search (Page 2 of 3 or number 17a)

     (b)     Development of a bulk scanning system, i.e. a scanning system that could scan in and index multiple separate documents.

     (c)     System Administration subsystem

     8.     At some point GW stated that the information it had provided to

RICHMAR during the requirements gathering process was not sufficient and raised

concerns about how the Document Only search worked; however, the feature worked as

planned and did not affect HR organizational or system performance. (Bell Transcript

Page 24, Line 10 – Page 28, Line 5, Page 35, Line 1 – Page 38, Line 4, Page 56, Line 9 –

Page 60, Line 21). While we were certainly willing to talk about the changes GW wanted

they were out of scope and not included in Release 1. However, they were planned for

Release 2 as a Planned Product Improvement. Thus, on August 31, 2006, GW was finally

advised that any such changes were out of scope and had to be documented in a Change

---

[10] GW Change Control #021 Description of Risks (Gordon Ex. 5)

[11] Task Order (Gordon Ex. 9) No code had been written for this function and none was included in the DCMS.

request Form.[12] RICHMAR delivered the Document Only Search (DOS) in Release No. 1.0 according agreed-upon requirements specifications. The advanced search feature wanted by GW requires additional specifications and design sessions to both scope out and develop the new features. (Bell Transcript Page 28, Line 13 – Page 31, Line 21)

9.    During development GW refused to sign off on Requirement Specifications prepared by RICHMAR. Instead, ISS interim Chief Information Officer, Ronald Bonig told RICHMAR "let's just see what works." ISS refusal to agree on the system specifications was contrary to RICHMAR's prior work experience. In retrospect, it seems clear that Bonig was positioning himself to make false claims concerning RICHMAR's work product. Bonig stated during his deposition we were over budget, behind schedule and a host of other problems yet refused to acknowledge any responsibility for these problems. Yet, the estimated cost for Crown Partners Consulting to finish our work will cost GW at least $200,000.00 more than what we proposed. As a result, we lose the revenue, the code and the marketing advantage we held for developing the DCMS Flexible Framework for other GW organizations and other Universities and Colleges.

10.    Under the January 6, 2006 Contract, the contract would expire, unless extended, on January 8, 2007. However, on or about December 15, 2006, RICHMAR and GW failed to reach an agreement on a contract extension for DCMS. ISS' Bonig informed me that "there were problems with the contract," and that it could not be extended. ISS' Bonig further informed me that ISS did not have adequate funds to continue to pay RICHMAR for continued development of the DCMS past Release 2.0.

7

11.    RICHMAR had completed development on Release 1.0 and shortly after the DCMS "went live" on December 18, 2006 ISS sent RICHMAR a contract extension for continued back scanning and a proposed "close out check list." ISS informed RICHMAR that if they could agree on the checklist, RICHMAR would be paid for all outstanding invoices on the DCMS development, and that RICHMAR could finish the back scanning and indexing of the legacy documents.

12.    Prior to going live on December 18, 2006, GW and RICHMAR spent three weeks of User Acceptance Training for Release 1.0. The UAT was successful.

13.    On December 20, 2006, all problems with Release 1.0 had been fixed.[13] Thus, extending the system to include other stakeholder offices in HR did not require any DCMS code changes.

14.    During a Steering Committee meeting GW requested that RICHMAR comply with a close out checklist. (P.Ex. 15).  RICHMAR objected to items in the checklist that would require RICHMAR to turn over all of its copies of the DCMS Code and all of its development papers to GW. RICHMAR informed ISS that if GW insisted on this as a term of payment. RICHMAR would not extend the back scanning task order and consider the entire contract closed on January 8, 2007. (P.Ex. 16). On January 5, 2007 RICHMAR provided GW with it' best and final offer (BAFO). *Id.*

15.    On January 5, 2007, ISS' Bonig agreed to the RICHMAR's BAFO, dropping its request that RICHMAR relinquish the DCMS computer code, as Bonig "recognized RICHMAR's legal ownership rights in the code." (P.Ex. 17).  Based on this

---

[12] Mantis Trouble Ticket Discussion 8/31/06, meeting notes (Gordon Ex. 10).
[13] Ex. 20 to Opposition, Minutes of Training and Help Desk Meeting, GW 000105

8

agreement, retraction and Bonig's agreement to pay all outstanding invoices on the DCMS

development and for completion of back scanning and indexing the legacy documents,

RICHMAR agreed to complete the scanning project.

16.    Release 1.0 went live on December 18, 2006. It has been in use by Human

Resource Personnel since that time. It is used as the primary document management,

retrieval and scanning system for the Personnel division. During January, 2007, DCMS

was rolled out to the other HR divisions----Student Faculty, Faculty Affairs, EEO and

Research Services.

17.    The head of Human Resources Personnel has reported satisfaction with the

system and it has been used on a daily basis since going live. (Bell Transcript Page 67,

Line 1 – Page 69, Line 16) The DCMS is used by five departments, and satisfies their

document management requirements. In the DCMS Steering Committee notes of

December 20, 2006, the Committee reported the system was working fine, and that a few

minor bug fixes had been performed. (Ex. 20 to Opposition, Minutes of Training and

Help Desk Meeting, GW 000105).

18.    In January, 2007, two GW computer programmers attended five days of

on-line training in Documentum, the database program used as the repository for GW's

documents in DCMS. Between January and April, 2007 the two programmers made

numerous changes to the DCMS computer code. These changes resulted in the need to

make "bug fixes" to the DCMS that were not contemplated. (Gordon Ex. 5 and 9). The

"bug fixes" resulted from the addition of new features and functions. These new features

and functions were included in a GW revised Release which went live on April 2, 2007.

(Gordon Ex. 11).

17.     Not having the expertise to develop the Bulk Scanning function or advance search functions (Document Only Search) which was planned for *Phase 2* of the project, on or about January 2, 2007, ISS hired a competitive computer programming consultant. A Release 3.0 is planned by GW. This release will require additional modifications to the DCMS source code. Additional releases are planned, including migrating the ORS/GCAS system developed by SC Foster to DCMS and expanding the DCMS to other University departments and divisions.

19.     GW plans to further modify the DCMS in order to expand its use to the remainder of the University. In order to expand these divisions will pay ISS for the transfer and the system design, development, scanning and computer programming to add them to the DCMS.

The foregoing is true and accurate to the best of my knowledge and belief.

DATED: June 7, 2007

Richard Gordon

10

# GORDON
# EXHIBIT 1

**Project Definition**

 

# The George Washington University
# *Business Continuity Framework*
# *HR Personnel*

**Project Manager:** Marcy Day
**Project Sponsor:** Susan kaplan

Project Name                                                    Page 3 of 16

CONFIDENTIAL

GW003445

Table of Contents

1. Introduction
    1.1.   Mission
    1.2.   Objectives
    1.3.   Benefits
    1.4.   Related Documents
2. Project Scope
    2.1.   Requirements to be Implemented
    2.2.   Planned Process Improvements
    2.3.   Exclusions
3. Project Milestones
4. Assumptions/Dependencies
    4.1.   Assumptions
    4.2.   Dependencies
5. Risks
6. Project Organization
    6.1.   Project Team
    6.2.   Participating Departments/Third Parties
    6.3.   Change Control Board(s)
7. Project Approach
    7.1.   Define
    7.2.   Plan
    7.3.   Implement
    7.4.   Close-out
    7.5.   Change Management
    7.6.   Communication
    7.7.   Issue Management
    7.8.   Risk Management
    7.9.   Testing
    7.10.  Training
    7.11.  Process Improvement
    7.12.  Analysis of Custom Forms and Modifications to Baseline
8. System Requirements
    8.1.   Database Server Requirements
    8.2.   PC Client Requirements
    8.3.   SCT and 3rd Party Product Requirements
    8.4.   Software Compatibility
9. Project Deliverables
10. Project Success Criteria
11. Approval to Proceed
12. Document History
13. Acronyms
14. Definitions

CONFIDENTIAL           GW003446

## Executive Summary

HR personnel records are managed by Human Resource Services, Medical Center Faculty Affairs, Faculty Personnel, Office of Research Services, and Student Employment. These records are in manual file cabinets in each of the 5 offices.

The University was recently audited by Price Waterhouse Coopers and Beers and Cutler. The Audit identified the need for an online document storage and retrieval system for HR personnel records. The audit found that personnel records have been lost, cannot be easily found, and are not readily accessible.

To address some of the audit issues, Documentum will be used to provide an online document and retrieval application for HR personnel records. The system will be developed using the business continuity framework; that is currently under development. The two projects will be developed in simultaneously; the HR Personnel project will be the first application using the business continuity framework and will serve as the pilot for the Business Continuity Framework project.

CONFIDENTIAL                                                              GW003447

## Introduction

### 1.1  Mission

HR personnel records are managed by HRS and its stakeholder offices; Medical Center Faculty Affairs, Faculty Personnel, and Student Employment.   The "paper-and-file cabinet" approach to storing and utilizing critical data and information has resulted in difficulty finding needed documents, redundant effort, and inconsistent and costly decision-making.

The intent of this project is to provide an online tool for storage and retrieval of HR personnel records.

### 1.2  Objectives

The objective of the project to provide online storage and retrieval of HR personnel records, for HRS and its stakeholder offices.  The system will be developed using the University business continuity framework.

All active personnel records, for the past five years, will be back scanned.  One exception is student temporary workers; back scanning will be limited to I9s.

### 1.3  Benefits

Benefits for HRS and its stakeholder offices include the following.

- Centralized storage of HR personnel documents regardless of point of origin
- Simplified and expedited retrieval of HR personnel documents
- Robust document search functionality
- Secure documents; only authorized personnel have access
- Compliance of regulatory issues for HR
- There are backup copies of HR documents
- Reduced risks for decision-making through more complete and higher quality data

### 1.4  Project Documents

All project documentation will maintained in the GW eRoom; Documentum Phase II.  Eroom is a Documentum product that can be used for collaboration and storage.  The following table lists the project documentation that will be maintained.  It should be noted that the Business Continuity Framework Project and HR Personnel Project are being developed simultaneously; as a result, some of the documentation will be managed as a single project.

| Document Name | Description/Location |
|---|---|
| Project Definition | Documentum Phase II eRoom |
| Project Plan | Documentum Phase II eRoom |
| Change Management Plan | Documentum Phase II eRoom |
| Communication Plan | Documentum Phase II eRoom |
| Risk Assessment and Mitigation | Documentum Phase II eRoom |
| Issues log | Documentum Phase II eRoom |
| Test Plans | Documentum Phase II eRoom |
| Training Plan | Documentum Phase II eRoom |

CONFIDENTIAL                                                                              GW003448

## 2  Project Scope

### 2.1  Requirements to be Implemented

The HR Personnel Project will be developed using the University business continuity framework; see the Business Continuity Framework Project PDD for requirements/functionality that will be inherited by the HR Personnel Project.

### 2.2  Exclusions

Workflow/routing will not be included; this will need to be addressed in a later phase of the project.

Access to documents from EAS or from Banner.

Access to personnel records is limited to HRS and its stakeholder offices; however the ability to make documents available to others, on an as needed basis, can be achieved using eRoom as a temporary storage area for document review.

### 2.3  Planned Process Improvements

Policies and processes will be documented and communicated
Centralized storage of all HR personnel documents
Easy access and retrieval of documents for authorized personnel

## 3  Project Milestones

| Milestone | Date |
| --- | --- |
| Project Start. | 2-09-2006 |
| Richmar development environment complete | 3-06-2006 |
| Project Proposal (s) approved | 4-04-2006 |
| Project Definition Approved | 4-04-2006 |
| Project Plan prepared | 3-24-2006 |
| Requirements Document Approved | 4-15-2006 |
| Begin back scanning | 4-17-2006 |
| GW Hardware Installation complete | 4-30-2006 |
| GW Enterprise software installed | 4-30-2006 |
| HR Personnel development completed | 5-26-2006 |
| User Training begins | 6-02-2006 |
| User Acceptance | 6-30-2006 |
| Move to production environment. | 6-30-2006 |
| Identify and resolve project issues from move to production. | 8-04-2006 |
| Conduct post implementation review. | 8-04-2006 |
| Complete back scanning | 10-20-2006 |
| Project End | 10-20-2006 |

CONFIDENTIAL                                                                 GW003449

## 4   Assumptions/Dependencies

### 4.1 Assumptions

It is assumed that hardware and software purchases, setup and installation will be given highest priority, and will be completed in a timely manner.

It is assumed that all project approvals will be expedited and completed in a timely manner.

It is assumed there will be no issues with moving code developed at Richmar to the GW environment.

It is assumed that Richmar will be fully responsible for gathering requirements, development and testing.

It is assumed the Richmar will be responsible for project management of their tasks.

It is assumed Richmar will have adequate resources to support the project and meet project timelines.

It is assumed Administrative Applications, Human Resource Services and stakeholder resources will be available, as needed, to meet project timelines.

Back scanning of personnel records will begin in April 2006, and can be completed in 6 months.

### 4.2   Dependencies

Business continuity framework tasks are completed in required timeframe.

Funding will be available in and FY07 to support backfill of 2 HRS FTEs.

Funding will be available in FY06 and FY07 to support filling 2 FTE positions, to support stakeholder offices during back scanning and transition to using the HR Personnel application. It is assumed that ½ FTE will be needed for each stakeholder office.

Funding is available in FY06 for scanners and PC upgrades needed to begin using the HR Personnel application.

Desktop Support has resources available to support rollout of HR Personnel.

Training has resources available to support rollout of HR Personnel.

## 5   Risks

The risks below are initial risks identified at the beginning of the project. The table below will not be maintained. The risk log will be managed and stored in a central location; see section 1.4.

CONFIDENTIAL                                           GW003450

| Risk | Probability | Impact | Value (P*I) | Action |
|---|---|---|---|---|
| HR resources not available to support project | 3 | 3 | 5 | • Hire backfill positions<br>• Provide temporary and/permanent positions for HR stakeholder offices |
| ISS support constraints due to conflicting priorities impact HR implementation | 3 | 3 | 5 | • Hire analyst that can be dedicated to the project. Hire an application administrator to support an enterprise quality solution |
| Imaging processors not robust enough to support HR requirements | 3 | 3 | 5 | • Purchase additional Captiva products |
| Infrastructure updates (hardware and software) cannot be implemented fast enough to meet project timeline | 3 | 3 | 5 | • Ensure management commitment to support funding.<br>• Keep TechOps and vendors informed of pending need so delivery and installation can meet project timeline<br>• Richmar will prepare a development environment to jump start development |
| Back scanning of active HR documents not completed by October 2006 | 3 | 2 | 4 | • Employ additional consultants needed to complete back scan prep. |
| Joint ownership not recognized by 4 stakeholder offices | 2 | 2 | 3 | • Joint ownership mandated by VPs |
| Delays in project approvals, initiation or future phases will postpone completion of the back scanning requirement | 3 | 3 | 5 | • Ensure resource commitment and executive sponsorship of project priorities |
| New HR documents do not get scanned while back scanning is in progress | 2 | 2 | 3 | • Setup go-forward processing to be done in conjunction with back scan processing |
| Documentum V5.3 upgrade issues impact HR schedule | 1 | 2 | 2 | • Setup dedicated HR environment |
| Availability of physical space for on-site scanning | 1 | 2 | 2 | • Identify how space can be made available; re-arrange layout, identify what can be moved to another location |

| Probability guidelines: | | | Impact guidelines | | |
|---|---|---|---|---|---|
| • Very Likely | 70-100% | A=3 | • Catastrophic | B=3 |
| • Probable | 40-70% | A=2 | • Critical | B=2 |
| • Unlikely | 0-40% | A=1 | • Marginal | B=1 |

## 6   Project Organization

### 6.1   Project Team

CONFIDENTIAL                                                              GW003451

**Project Definition**

Throughout this document there is reference made to the core project team and the extended project team. The core project team is highlighted in the table below; this team is responsible for requirements, application development, testing and rollout. All others on the team are considered part of the extended project team.

| Resource | Role | Responsibility |
|---|---|---|
| Susan Kaplan | Project Sponsor | Decision support |
| Ron Bonig | Resource Sponsor | Resource commitment and support. |
| Anne_Marie Taylor | Resource Sponsor | Resource commitment and support |
| **Rick Gilchrist** | **GW Architect** | **Hardware and enterprise software** |
| **Marcy Kremer** | **Project Manager** | **Project reports, project plan management, meetings, and communication.** |
| **Liz Cobb** | **Lead Analyst** | **Technical solution analysis** |
| Jeff Baxter | Resource Manager | Responsible for hardware set-up |
| Ken Fischer | Resource Manager | Responsible for networking |
| Dinesh Nangia | Resource Manager | Subject matter expert for database administration |
| Asif Hafiz | Resource Manager | Contact for Banner & EAS Integration |
| Francesco de Leo | Resource Manager | Subject matter expert for web content |
| Bob Leidich | GW Resource Manager | Responsible for eRoom setup and configuration |
| Joe Brewer | Resource Manager | Training |
| Claire Mooney | Trainer | Training |
| Krisi Trisani | Security | Subject matter expert |
| Rehan Khan | Documentum System Administrator, and GW DBA | Install, configure, manage Documentum and Captiva software |
| Andrew Sherrod | Web Server Management | Install web servers, and install Documentum and Captiva software on web servers |
| Chris Peacor | Resource | Desktop Support |
| Carolyn Chase | Resource Manager | Help Desk |
| Andy Navarrete | Windows Sys Admin | Setup servers and provide sys admin support |
| Chris King | Unix Sys Admin | Setup servers and provide sys admin support |
| Tanya Bell | Resource Manager | HR Requirements, testing and approval |
| Anne Scammon | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Monica Partsch | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Barbara Marshall | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Harold Gallos | Stakeholder Resource Manager | HR Requirements, testing and approval |

CONFIDENTIAL                                                      GW003452

| Resource | Role | Consultants |
|---|---|---|
| **Richmar Consulting** | **Project Management** | **Richard Gordon Jr.** |
| | **Documentum** | **Jim Gearing** |
| | **Installation Support** | **Tony Ford** |
| | **Hardware sizing** | **Jae Lim** |
| | **Hardware configuration support** | **Mon Lee** |
| | **Requirements Gathering** | |
| | **Documentum Development** | |
| | **Documentation** | |
| | **Training** | |

## 6.2  Participating Departments/Third Parties

| Department/Third Party Name | Responsibility | Resource(s) |
|---|---|---|
| ECG | Review | Susan Kaplan |
| | | Nina Mikhalevsky |
| | | Mary Bayliss |
| | | Anne-Marie Taylor |
| Beers & Cutler | Review | Monica Modi |

## 6.3  Change Control Board

Changes occur in all projects. It is important that all changes are effectively and professionally managed. Requested changes are described in writing using the Project Change Request form. The impact of the change to both project cost and schedule is assessed and included in the documentation.

Changes are subject to a management-review process, in which estimated effort, costs, and impact on project schedules are examined, and decisions are made to approve or not approve the requested changes. The project manager will assess the impact of each proposed change on both project cost and schedule, and the relevant information presented to the project Change Control Board who reviews all change requests for acceptance. The project schedule and cost estimates are revised to accommodate approved changes.

The purpose of a change request is to provide a formal written communication vehicle between the project team, the project sponsor and the Change Control Board concerning changes. The formality of a notification in writing is critical to communicate that there is a need for discussion, agreement, and planning for handling changes that will affect a project deliverable.

The project manager, (who will be responsible for estimating scope, schedule and cost impacts), forwards all change requests to the Change Control Board; the sponsor is one member of the board. Approved changes are immediately included in the project plan. All change requests are logged, tracked and reported on in status reports and status meetings.

Formal change acceptance is required before working on any changes outside of the scope of the project. Change acceptance is given when the project Change Control Board formally approves the change by duly executing the request form.

The Change Control Board for the HR Personnel will be made up of the participants as indicated in the table below.

CONFIDENTIAL

**Project Definition**

| | |
|---|---|
| Anne-Marie Taylor | GW Management approval |
| | ISS, Administrative Applications |
| Rick Gilchrist | GW Architect |
| | ISS, Administrative Applications |
| Susan Kaplan | Project Sponsor |
| | Human Resource Services |
| Tanya Bell | Primary Stakeholder |
| | Human Resource Services |
| Marcy Day | GW Project Manager |
| | ISS, Administrative Applications |
| Richard Gordon Jr | Richmar. Management approval |
| Jim Gearing | Richmar, Architect |

## 7   Project Approach

### 7.1   Plan and Implementation

Detailed project plans will be completed and maintained by the project manager. All phases of the methodology will be followed

HR Personnel will be the first group to use the business continuity framework. The HR Personnel Project is being developed in conjunction with the Business Continuity Framework Project; the projects will be managed as one project.

Due to the large volume of HR personnel records being back scanned, Documentum V5.3 is required. A V5.3 environment will be setup for the HR Personnel rollout; production applications currently using V5.2.5 will be converted at a later date.

Richmar has been contracted to serve as the implementer for this project. They will be responsible for requirements gathering, solution design, and development.

The project will be managed through a collaborative effort between GW and Richmar. The GW eRoom will provide a common repository for project documentation and a forum for online discussions and consensus building. All project participants will have access to the eRoom.

### 7.2   Close-Out

The close-out of the project will begin after HR Personnel has been implemented. A Lessons Learned meeting to gather information on what worked and didn't work will be held with all parties involved with the project.

### 7.3   Change Management

When changes to project requirements, scope, deliverables or related plans are requested by end-users (customers) or other project participants the following process should be followed:

Change Procedure:

- Fill out the Project Change Request Form.
- This form can be filled out by the project manager, team member or customer.

CONFIDENTIAL                                                    GW003454

**Project Definition**

- Project manager receives form and updates the change log.
- Project manager assesses scope/budget, resources and change request.
- Project manager reviews change request with project sponsor.
- If change is accepted the project manager updates the project plan, budget and deliverables as required.
  - Implement change within project and update change log.
- If change is not accepted update change log and project status and begin issue management process.

The project will follow the Change Management Process defined by the PMO office; see Change Management Plan. The Change Control Board has been defined in this document; see Section 6.3 Change Control Board.

### 7.4   Communication

The communication matrix for the project is below; the matrix was developed at the time of this writing. The matrix will be maintained in a central location; see section 1.4.

The communication objectives of the project follow.
- To keep the directors, project staff, and the business constantly up-to-date on project goals, plans, issues, and status.
- To communicate project information through email and/or meetings as often as possible.
- To keep all communications simple, no matter who is the sender or the receiver.
- To clearly communicate and closely manage expectations.

### Communication Matrix

| # | Communication Product (What) | Sender/From (Whom/Responsibility) | Receiver (Who) | Objective (Why) | Schedule (When) | Format (How) |
|---|---|---|---|---|---|---|
| 1 | Detailed project status | Core Project Team | Marcy Day | To provide a review of day-to-day activities | Weekly | Meeting |
| 2 | Project status | Marcy Day, Rick Gilchrist | Extended Project Team | Discuss status, gather advice and guidance, and ensure that the project is being managed to the expectations of the manager | 2x per month | Meeting |
| | | Core Project Team | Anne_Marie Taylor | | 2x per month | Meeting |
| | | Anne_Marie Taylor, Marcy Day | ECG | | As Requested | Meeting |
| | | Marcy Day | Christina Griffin | | Weekly | Meeting, Report |
| 3 | Project Listing Status | Marcy Day | Adriana Christopher, Christina Griffin | Keep management up to date with the status of the project. | Weekly | Project Listing Document |

CONFIDENTIAL                                                                 GW003455

## Project Definition

| # | Communication Product (What) | Sender/From (Whom/Responsibility) | Receiver (Who) | Objective (Why) | Schedule (When) | Format (How) |
|---|---|---|---|---|---|---|
| 4 | Project Definition Document | Marcy Day | Anne-Marie Taylor<br>Rick Gilchrist<br>Ron Bonig | To obtain signature approval of the project charter | One-time | Document |
| 5 | Project Schedule | Core Project Team | Marcy Day | To review status of milestone dates | Weekly | Meeting, Document |
| 6 | Project Issue Log | Core Project Team | Marcy Day | To review status of outstanding issues and identify new issues | Weekly | |
| 7 | Project Risk Update | Core Project Team<br><br>Marcy Day | Marcy Day<br><br>Anne-Marie Taylor | To review and discuss current and new project risks<br><br>To review and discuss current and new project risks | Weekly<br><br>Monthly | Document and meeting<br><br>Document and meeting |
| 8 | Local Awareness Building Sessions | Core Project Team | Stakeholders, Participating Departments, Extended Project Team, and 3rd parties | Inform people of the project and the deliverables that will impact them | As needed | Stand-up presentations |
| 9 | Training | Richmar<br>GW Trainers | GW Trainers<br>End users | Provide train-the trainer<br>Provide user training | Before user acceptance testing | Presentation |
| 10 | Testing | Liz Cobb, analyst<br><br>Liz Cobb | Rick Gilchrist, QA oversight<br>End users, Stakeholders | Ensure application testing is thorough | One-time | Test Scripts, meeting |
| 11 | Lessons Learned | Extended Project Team | Marcy Day | To provide a review of the project management efforts that were well managed and those that could have been handled for effectively and efficiently | After implementation | Document, meeting |
| 12 | Close out report | Core Project Team<br><br>Marcy Day | Stakeholders<br><br>Storage medium | To provide an overall review of the project.<br><br>Ensure storage all project documentation on a medium accessible to all parties with need for access and review. | When project completes<br><br>When project completes | Document<br><br>Document |

CONFIDENTIAL

GW003456

### 7.5    Issue Management

The objectives of issue management are the quick and effective resolution of issues affecting scope, schedule or cost of the project.

Issues are to be attempted to be resolved immediately at the time of discovery. If resolution is not possible they are to be recorded in an issue log by the project manager, who is to attempt resolution and if necessary solicit assistance from their director. The issue log will track the status of each issue until its closure including the closure date and resolution.

If an issue cannot be resolved by the combined efforts of the project manager and his/her director then it is to be escalated to the executive director.

An issue log will be maintained by the GW PM, and is on file in the project documentation. The issue log will be reviewed at project meetings, as appropriate.

### 7.6    Risk Management

As the project progresses through its life cycle and phases, more will be known about the project and the associated issues.

The ability to understand and identify risk items will increase. Experience with the project will allow for the development of more realistic contingency plans, including specific action plans. The project manager will track these action plans. It may be necessary to modify the actual worksheet to show who has the assigned risk.

The analysis of project risks is a continual process throughout the project because of the need to eliminate or mitigate a particular risk, should it occur. This process is iterative. Because the results could affect the project plan, monitoring the status of risks is important and one of the key processes in risk management.

A risk log will be maintained by the GW PM, and is on file with the project documentation. The risk log will be reviewed at project meetings, as appropriate.

### 7.7    Testing

The GW analyst is responsible for developing test plans. These plans will be reviewed and approved by the GW architect responsible for QA. The analyst will be responsible for preliminary acceptance testing. HRS and its stakeholders will be responsible for user acceptance testing.

### 7.8    Training

Richmar will be responsible for providing training documentation and training to GW trainers during the initial rollout of the project   GW trainers will provide training on a go-forward basis.

### 7.9    Process Improvements

Business process improvement is principally the responsibility of the customer areas. The project will provide a tool to facilitate the reengineering of business processes, but it is outside the scope of the project to reengineer the customer areas' business processes. It is up to the customer areas to determine how best to leverage the capabilities of the tools provided by the project.

CONFIDENTIAL                                                                GW003457

- Centralized storage of documents regardless of point of origin.
- Easy access and retrieval of documents for authorized personnel.
- Web accessible system for storing and managing documents:
- Ability to capture and track versions of documents without saving each version with different names.
- Secure documents; only authorized personnel have access.
- Robust searches without knowledge of document name or content.
- Similar look and feel, and navigation, regardless of which University organization is using the product.

## 8   Project Deliverables

The purpose of this project is to provide a tool to HRS and its stakeholders to share HR personnel records.

## 9   Project Success Criteria

The success of the project can be measured by the cumulative success of HRS and its stakeholders.

CONFIDENTIAL                                                        GW003458

**Approval to Proceed**

Name:  Anne-Marie Taylor
Title:   Executive Director, Administrative
         Applications
Date

Name:  Ron Bonig
Title:   Deputy Chief Information Officer
         ISS Technology Operations
Date

Name:  Tanya Bell
Title:   Director, Records and Data Management
         Human Resource Services
Date

Name:  Susan Kaplan
Title:   Asc VP Human Resources
         Human Resource Services
Date

CONFIDENTIAL                                    GW003459

## 10 Document History

This section identifies who updated this document and when.  It is an audit trail for future references.

*Revision Record*

| Number | Revision Section | Author | Notes |
|--------|-----------|-----------|-------|
| 0.01 | 03/14/2006 | Marcy Day | First Draft |
| 1.0 | 4/15/2006 | Marcy Day | Final |
| 1.01 | 5/10/2006 | Marcy Day | Exec Summary changed to say University audited rather than HRS was audited. |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## 11 Acronyms

| Acronym | Definition |
|---------|------------|
|  |  |

## 12 Definitions

| Term | Definition |
|------|------------|
|  |  |

CONFIDENTIAL                                                    GW003460

# GORDON
# EXHIBIT 2

# TASK ORDER

This task order is issued on March 29, 2006 by the George Washington University, hereafter referred to as GW, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, to RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

Special provisions attached to and hereby made part of thereof, the contract dated December 22, 2005 to design the computer system architecture for GW, installing and configuring the Documentum package for use by the Human Resources.

WHEREAS, GW desires to employ the services of Contractor to perform certain additional tasks; and

WHEREAS, Contractor desires to perform certain additional tasks for GW,

NOW, THEREFORE, GW and Contractor agree as follows:

## *DESCRIPTION OF SERVICES*
Contractor will perform additional services such as helping to convert paper document to digital images and loading these images with predefined document attributes into the GW Documentum package for use by the Human Resources.

## *WRITTEN AGREEMENT*
The parties of this agreement mutually agree that this task order contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.
This task order shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

George Washington University

By: _____
*(name)*

Title: *DEO. CFO*

Date: *3/29/06*

RICHMAR and Associates

By: _____
Richard Gordon, Jr.

Title: *President/CEO*

Date: *3/30/06*

PPI355

Rev. 3/30/2006

220 F Street N.E.
Washington DC 20002
202-544-2015-OFFICE
202-544-2016-FAX
www.richmar.info

**RICHMAR &
Associates**

**Welcome to
The New Way Of
Learning**

# Fax

**To:** PEGGY STEADMAN    **From:** RICHMAR (JIDE DADA)

**Fax:** 703 726 1922    **Pages:** 2

**Phone:** 703 726 1998    **Date:** 3/31/06.

**Re:** TASK ORDER    **cc:**

☐ Urgent ☒ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

● **Comments:**

As per your Facsimile on Task Order.

**Facsimile**

Date: March 30, 2006
Cover + 1

To: Jide Dada
Fax #: 202 544 2016

**From:**
Peggy Steadman
The George Washington University
703 726 1998 (tel)
703 726 1922 (fax)

NOTES:
Jide - The attached is for Richard's
signature as soon as possible.
After he signs, please fax to
me at the number above.
Thanks, Peggy

PPI357

# GORDON
# EXHIBIT 3

**Requirements Specification Document for**

**HR Personnel Extension of**

**Business Continuity Framework**

**Document and Case Management System**

**Version 6.0**

**Version Date: May 4, 2006**

The material contained in this Requirements Specification Document represents proprietary and confidential information pertaining to RICHMAR products and methods.

Project ID: GW-06-C-001-DCMS
Date Created: March 24, 2006

| Name | Email | Signature | Date |
|------|-------|-----------|------|
| Tanya Bell | | | |
| Liz Cobb | | | |
| Marcy Day | | | |
| Tony Ford | | | |
| Jim Gearing | | | |
| Rick Gilchrist | | | |
| Jae Lim | | | |
| Anne-Marie Taylor | | | |

**DOCUMENT CONTROL**

| Version | Date | Added/ Deleted/ Modified (A/D/M) | Section | Brief Description of Change/Change Request document number |
|---|---|---|---|---|
| 1 | 3/6/06 | Initial Release | n/a | Separated Business Continuity requirements from HR requirements. First release to customer |
| 2 | 3/15/06 | M | 2 | Minor modifications to the data model |
| 3 | 4/2/06 | D | 3 | Removed design sections to a separate document |
| 3 | 4/2/06 | M | 1, 2 | Reformatted to conform with Business Continuity Requirements document; various minor edits |
| 4 | 5/2/06 | M | 2 | Various edits to bring this document into conformance with the Business Continuity Requirements version 5 document |
| 4 | 5/2/06 | A | 3 | Added section on Logical Data Model |
| 5 | 5/4/06 | M | All | Typos and minor grammar |
| 5 | 5/4/06 | M | 2.11.2 | Fleshed out HR Personnel implementation step |
| 6 | 5/4/06 | M | All | Added language from all matching sections of Business Continuity Framework Requirements document version 5. |

# Table of Contents

1.0    INTRODUCTION ..................................................................................................5
   1.1    Purpose of this Version of this Document ................................ 5
   1.2    Purpose of this Document ......................................................... 5
   1.3    Scope of the HR Personnel Extension ..................................... 5
   1.4    Project Approach ...................................................................... 5
   1.5    Current Document Processing and Storage .............................. 5
   1.6    Assumptions .............................................................................. 6
   1.7    Exclusions ................................................................................. 6
2.0    FUNCTIONAL REQUIREMENTS ....................................................................8
   2.1    Security Requirements ............................................................. 8
      2.1.1    Authentication (LDAP) ................................................ 8
      2.1.2    Groups and Privileges ................................................ 8
      2.1.3    Login/Authentication ................................................. 10
      2.1.4    Administration ........................................................... 11
      2.1.5    Security and Encryption ........................................... 11
      2.1.6    Making Copies of Folders or Forms Available for Examination ...................... 11
      2.1.7    Department Permissions ........................................... 12
      2.1.8    Litigation and Folder Security ................................... 13
   2.2    Input and Output Requirements .............................................. 13
      2.2.1    Adding Documents ................................................... 13
      2.2.2    Deleting or Replacing a Document ........................... 13
      2.2.3    Creating Versions of a Document ............................. 13
      2.2.4    Links to Documents .................................................. 14
      2.2.5    Paper Document Capture .......................................... 14
      2.2.6    Electronic Document Capture ................................... 16
      2.2.7    Dynamic Attribute Values ......................................... 16
      2.2.8    User Workflow ........................................................... 16
         i.     Add Screen ....................................................... 17
         ii.    Confirmation Screen ......................................... 17
         iii.   Review Screen ................................................... 18
         iv.    Modify Screen ................................................... 18
         v.     Search Screen ................................................... 18
         vi.    Manage Users Screen ...................................... 18
      2.2.9    Associating Sets of Documents ............................... 18
      2.2.10   Converting the Formats of Documents ..................... 18
      2.2.11   Transaction History ................................................... 19
   2.3    Processing requirements ......................................................... 19
      2.3.1    Document Annotation ................................................ 19
      2.3.2    Document Workflow ................................................... 19
      2.3.3    Document Collaboration ............................................ 20
      2.3.4    Notifications .............................................................. 20
      2.3.5    Additional Functions Required by HR Personnel ...... 20
   2.4    Search Requirements .............................................................. 20
   2.5    Reporting Requirements .......................................................... 21

| | 2.6 | Legacy File Conversion Requirements | 22 |
|---|---|---|---|
| | 2.7 | Systems Integration | 22 |
| | | 2.7.1   DCMS to Banner Interface | 22 |
| | 2.8 | Performance Requirements | 22 |
| | 2.9 | System Monitoring Requirements | 22 |
| | 2.10 | Storage Requirements | 23 |
| | 2.11 | Training and Implementation Requirements | 23 |
| | | 2.11.1  Training | 23 |
| | | 2.11.2  Implementation | 23 |
| **3.0** | | **LOGICAL DATA MODEL** | **25** |
| | 3.1 | COMMON ATTRIBUTES | 25 |
| | 3.2 | DOCUMENT TYPES AND THEIR ATTRIBUTES | 25 |
| **APPENDIX A – HRS DOCUMENT FLOW** | | | **27** |
| **APPENDIX B – HR PERSONNEL SCREEN NOTES** | | | **29** |

# 1.0  INTRODUCTION

## 1.1  Purpose of this Version of this Document

Version 6 of this document has been created without references to the Business Continuity Frameworks Requirements document. This has the benefit of making this document comprehensive, without having to refer to another document. The disadvantage is that the incorporated sections of the Framework requirements document are from version 5 of that document. As the Framework document continues to evolve, the changes won't be updated in this document.

## 1.2  Purpose of this Document

The purpose of this document is to define HR Personnel requirements that are extensions to what is defined in the Requirements Specification Document Business Continuity Framework. This document will be presented to the GW DCMS Workgroup for evaluation, approval and sign off.

## 1.3  Scope of the HR Personnel Extension

The purpose of HR Personnel DCMS is to provide a relatively simple method for electronically storing, tracking, and sharing HR forms and HR documents. Documents will be available for viewing by users based on their organizational permissions.

Human Resources (HR) Personnel is a functional area in which five GW organizations will use a common area of Documentum to store forms and documents. The six areas are HRS, EEO, Faculty Personnel, Medical Faculty Personnel, Research, and Student Records. These five groups, using the HR Personnel cabinet, will be the initial GW users of Documentum within the GW business continuity framework.

## 1.4  Project Approach

RICHMAR will use the installation of Documentum version 5.3 that will be implemented for the Business Continuity Framework  Extensions particular to HR Personnel will be made to that system.

## 1.5  Current Document Processing and Storage

HR Personnel offices currently have between 1 million and 2.5 million pages of paper forms and documents representing HR actions and transactions for HRS and the other stakeholder offices. This set of documents covers up to 40 years of personnel activity. The documents are currently stored in GW facilities in downtown Washington, D.C. They are only accessible physically, and in those locations. There is no backup of the data. There are occasionally problems in finding particular forms or documents.

## 1.6   Assumptions

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

- For the duration of the DCMS project, GW will assign a Project Manager to devote 25% of her/his time to the project.

- GW will supply computer operations staffing for Production, Database Administration and Web Support for transition to production and continued operation.

- GW will provide two (2) computer environments for the DCMS System: Development-Test-Training, and Production. RICHMAR will coordinate migration to production and provide support for the above effort. After the system is turned on in production, RICHMAR will provide support at contracted rates, if GW desires.

- GW will use the numerous existing file formats supported by Documentum to store digital files.

- Workflow(s) and additional document types can be created; however, requirements sessions must take place to make sure all attributes and workflows are reliably captured and specifics about those attributes and workflows are understood.

**NOTE:** There are no purely electronic forms used for HRS Personnel. This is to say that any HR Personnel forms that are presented online are not processed online. The form may be filled out online, but it must be printed in order to be processed. That printed form will be submitted for the appropriate processing and approval. After approval, the form will be scanned and stored in DCMS. At the point at which purely electronic forms are considered by GW, a wholly different approach will be required to make electronic forms part of the permanent record.

## 1.7   Exclusions

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

- Route work in an organized fashion; in Documentum this is accomplished by the creation and use of workflows and life cycles.

- The business continuity framework module will have a limited number of attributes. Additional attributes will be able to be added for individual organizations. Note that adding attributes will require additional configuration of Documentum.

- Encryption will not be used to secure documents at the raw file level. When using Documentum, the only realistic encryption method is to use Documentum's Trusted Content Services. This product handles end-to-end encryption and decryption, but it significantly increases processing time, it requires an additional licensing, and it requires a significant level of enterprise policy and training.

- Direct access to Documentum from Banner is out of scope for the first phase. Documentum's WebExtender is a possible solution if this feature is added to the list of EMC supported products.

- Direct access to Documentum from EAS is out of scope for the first phase. Documentum's WebExtender is a possible solution if this feature is added to the list of EMC supported products. Additional customization will be explored in Phase 2.

- Multifunction scanning/copying/fax machines may seem like candidates to use for scanning documents. If the machine has an IP address, and is not behind the firewall, and is not physically secured, it is a security risk and should not be used for scanning documents to put into DCMS.

- In certain cases, it may be permissible for a user to view a document, but not to save it or print it. For instance, a manager can request viewing a person's file, or a person may request seeing his/her own file. In these cases and similar cases, the following requirements may apply:

- Turning off the save capability of the browser
- Turning off the save capability in Acrobat
- Turning off PC screen capture
- Turning off PC print screen capability

It must be noted that the actions listed above are not part of the Documentum package. If these requirements must be implemented, custom code will be necessary. There is no estimation at this time of what that would require in terms of time and resources.

## 2.0  FUNCTIONAL REQUIREMENTS

## 2.1    Security Requirements

### 2.1.1    Authentication (LDAP)

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

User access in the existing Documentum environment is based on LDAP, and will continue to be for DCMS. The LDAP directory server will be used for user authentication as well as user and group management. Users will have accounts in Documentum, but passwords will be validated through the LDAP directory server.

A DCMS user will have to have an entry in the LDAP system. In addition, the user will also have to have an account set up in Documentum. When the user is entered in the Documentum system, he/she will also be assigned one or more groups. These groups will be defined in Documentum, based on the organizational structure of GW. The groups will have permissions associated with them, so that permissions will not be assigned to individuals. Individuals will be assigned to groups, and thereby assume the permissions of the group.

### 2.1.2    Groups and Privileges

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Based on the fact that Documentum will initially be used primarily as a digital filing cabinet, a certain number of Documentum features will neither be needed nor appropriate for the first phase. The group definitions below reflect that.

The user access and privilege levels define what administrative operations a user can perform in the repository. The list below starts with the most powerful privileges and declines with each step down the list

| Groups | Privileges |
|---|---|
| System Administrator | There should be a limited number of system administrators per GW organization. Can alter baseline configuration parameters and perform all activities related to maintenance of the Documentum system. |
| Organization Administrator | There should be a limited number of Organization Administrators per GW department. Can add users to groups and remove users from groups for all levels below department administrator; cannot create cabinets; Can read, add, update, delete, and annotate any document in his/her organization. Can also modify attributes for any document in his/her organization. |

| | |
|---|---|
| **Department Viewer** | There will be multiple viewers per department. Can only read documents in his/her department. Read ability may be further constrained depending on folder and document security. |
| **Department Filer** | There will be multiple filers per department. Can add documents to one or more folders in his/her department. Can delete documents while they are in the pending state of the lifecycle. A filer <u>cannot</u> annotate documents. A filer cannot create folders. |
| **Department Annotater** | There can be multiple annotaters per department. Can annotate documents in his/her department. Cannot otherwise update, add, change, or delete documents or folders. |
| **Organization Auditor** | This is a group with read-only permission, but across all documents in <u>one organization</u>. Intended for auditors and legal staff. Cannot change anything, but can see everything in one organization. |

The groups of Organization Administrator, Department Administrator, Department Viewer, and Department Filer will have similar privileges in each organization and department, within their scope of authority.

Below is a sample list to illustrate the proposed groups, using HR as an example organization. In this example, HRS, SE, FP, MF, and RES represent groups of groups that will have the ability to insert, replace, and view HR forms in the HR cabinet in Documentum:

**Group**
superuser
sys_admin

hr_org_auditor

hr_org_admin

hrs_filer
hrs_annotater
hrs_viewer

se_filer
se_annotater
se_viewer

and so on…

The contractor and/or the System Administrator will set up the workspace, users and permissions for the Organization Administrators. The Organization Administrators will set up additional users.

- Employee Relations Filer access (er_filer group), which would include viewing, filing, and replacing ER documents

- Benefits View access (ben_viewer group), which would allow viewing, but not changing or deleting, Benefits documents

### 2.1.3  Login/Authentication

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The login function will require users to enter their login information to access DCMS. Once logged in, users will have access to DCMS features and functions based on his/her login credentials and assigned groups.

### 2.1.4   Administration

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

System Administrators will be able to: create user-defined Documentum object types; create, modify and remove cabinets; and create, modify and remove groups; create, modify, and remove users.

Organization Administrators and Department Administrators will be able to create, modify, and remove groups; create, modify and remove users; will not be able to create, modify, and remove cabinets.

Organization Administrators will assign users to groups with access privileges defined for the group. Organization Administrators will set DCMS to default to a group based on user authentication. System Administrators and Organization Administrators will be able to deactivate users. Deleting users is not recommended, since user names may be attached to documents in the repository. Once a user is deactivated (rather than deleted), that user can no longer get into DCMS, but the documents will remain in the repository.

The filer group will allow the user to delete the documents when they are in the "Pending" state. Once the documents are "Approved", "Disapproved" or "Filed", then the filer group will not allow the user to delete the documents. Furthermore, a system or organization administrator can delete a document in any state of the lifecycle. A transaction history of the activities will be recorded.

When adding, a user will begin by selecting the record or location attributes (e.g.. GWid, Name, Vendor Number, Department, Organization, etc.). The System will populate the data in the organizational fields according to the user privileges set by the Administrator. These are described in the previous section.

Given the sensitivity of many of the documents that will be stored in DCMS, security must be tight. This has two aspects. One is security within the application and the other is security against unauthorized browsing of the data at the raw file (disk) level.

Application security will be enforced through LDAP and Documentum. LDAP will control who can log into DCMS. Security features of Documentum will allow further restriction on what registered users can do and see. This will be done through assigning users to groups. The groups will have privileges associated with them. It will be up to the System Administrator, and any other administrator who has the ability to associate users with groups, to assign users only to groups that are appropriate.

### 2.1.5   Security and Encryption

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

### 2.1.6   Making Copies of Folders or Forms Available for Examination

There are cases, such as an employee wanting to see his/her own file, where a full set of HR Personnel forms and documents must be available for viewing by a particular person for a limited

time. This function will be fulfilled by the use of EMC's eRoom product. An organization administrator will be able to copy a set of forms and documents to eRoom, create a temporary account for the person who needs to view the forms and documents, and create an end date for the forms and documents to be no longer available.

### 2.1.7    Department Permissions

The groups in HR Personnel will be able to see the forms and documents they have put in Documentum. In some cases they will be able to see documents other groups have put in. Listed below are the four HR Personnel stakeholder offices, the four divisions of HRS, and which other groups' documents each group can view:

| *Group* | *Access* |
|---|---|
| **Student Employment** | Can only see documents filed by the Student Employment |
| **Medical Faculty Personnel** | Can only see documents filed by Medical Faculty Personnel |
| **Faculty Personnel** | Can see documents filed by Faculty Personnel and documents filed by Medical Faculty Personnel |
| **Research Services** | Can only see documents filed by the Research Services |
| **HRS Benefits** | Can see HRS Benefits documents and all stakeholder office documents above |
| **HRS Employee Relations (ER)** | Can see <u>all</u> HRS documents and all stakeholder office documents above |
| **HRS Records and Data Administration (RADM)** | Can see only HRS RADM documents and all stakeholder office documents above |
| **HRS Staffing, Compensation, and Salary (SCS)** | Can see only HRS SCS documents and all stakeholder office documents above |

The contractor and/or the System Administrator will set up the workspace, users and permissions for the Organization Administrators and Department Administrators. The Department Administrators will set up additional users.

### 2.1.8   Litigation and Folder Security

In the current paper environment, when an employee becomes involed in litigation with the University, that employee's folder is physically removed from the main file room and stored in a more secure location. This requirement must continue to be met in DCMS.

## 2.2     Input and Output Requirements

### 2.2.1   Adding Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Adding documents is one of the fundamental tasks in a document management system. DCMS will provide screens to users in filer groups with screens to add documents to DCMS.

Screens will be tailored to the document types being added. A user will make one or more selections identifying the type of document to be added. In response to these choices, a screen will appear that requests appropriate attribute values. By tailoring the add screens, users will be presented with only the attributes that are necessary for that type of document.

The Add screen will not be available to the Department Viewer. However, an Administrator may change user privileges for a Department Viewer by reassigning him/her to a different or additional group.

### 2.2.2   Deleting or Replacing a Document

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Provided the user is the owner, he/she may replace the document while it is in the "Pending" state of lifecycle. The person who owns the document will be able to modify the document; provided it has not been promoted to the "Approved", "Disapproved" or "Filed" state. Once it is in the "Approved", "Disapproved" or "Filed" state of lifecycle, an Administrator is the only user who can replace or delete the document.

### 2.2.3   Creating Versions of a Document

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Documentum allows multiple versions of a document as a core feature. Versioning is not coupled with Documentum workflow, so it will be available in the initial release of DCMS. DCMS users will be able to create versions of documents if they belong to a group that has Version permission.

#### 2.2.4   Links to Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Documentum allows copies of documents to be stored in the repository and it allows links to documents to be stored. Having multiple copies of a document in the repository invites trouble when versions are possible. If there are multiple copies and people begin working on different copies at the same time, the integrity of the data will be lost.

Copies of documents will not be allowed, but links (subscriptions) to documents will be. In a nutshell, these links are shortcuts to the frequently reference documents. That means that the document is placed in the repository once. Links or pointers to the document can be placed in other folders or cabinets, but there will only be one copy of the document. If some one checks out the document to create a new version of it, no one else can alter the document until it is checked in. Documentum maintains an audit trail of all changes to documents, so it will be possible to review the change history of a document.

#### 2.2.5   Paper Document Capture

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Initially, DCMS will be used mostly to scan forms and documents and then store the digitized images in Documentum. Scanning stations will typically be for multiple employee use, and thus will not be desktop scanners.

Captiva will be used to insert documents into Documentum. Captiva will be configured to name the documents base on a schema. Users will not name documents going into DCMS.

Decisions will also have to be made for each organization as to whether optical character recognition (OCR) will be useful for that organization's scanned documents. If documents are scanned and then processed through OCR, the contents will be able to be searched in Documentum. However, several questions have to be considered:

- What is the rate of correct conversion to readable characters?

  A high rate of conversion is necessary in order to be able to conduct meaningful searches of scanned documents. The higher the rate of correct conversion, the more accurate search results will be.

- Do the forms or documents have hand written information on them?

  In the case of the HR Personnel forms that will be scanned and saved in DCMS, most of the unique information on the forms is handwritten. Hand writing will not be converted by OCR. If we were to apply OCR to the HR forms, what we would get would be the forms themselves, rather than the contents of the forms. The useful information would not be captured.

  The strategy in HR Personnel will be to index the forms with a handful of data attributes when they are scanned. These attributes will allow searching for the forms by PIDM, name, GWid, and a few other attributes. Searching by these attributes should return the desired forms.

- Are the paper forms or documents related to another system that can be searched for data?

Again, using HR Personnel as an example, these forms back up actions that have been entered in the Banner system. Searches can be done against Banner data. The resulting lists of people will then be able to be used to search for relevant forms and documents in DCMS. DCMS will be configured, by organization, to conduct relevant searches in Banner.

- Will the pre-printed words on the form help locate a form or document?

    While the contents of most forms will be handwritten, the words on the form itself may help locate particular forms. This may be a reason to put the forms through OCR, even if the content of the form does not get converted.

EMC's eInput product will be used for front end conversion of documents to formats compatible with Documentum. eInput must be configured to dynamically code or index documents to the greatest practical extent. All scan users are going to use the eInput web scanning front-end for digitizing paper documents.

This could include fetching or validating the PIDM by typing a name in. This method has the potential to make document coding cleaner and faster than using bar codes.

### HR Personnel specific requirements:

Although GW does possess multi-function copier/scanner machines, these will not be used for scanning documents into Documentum due to security concerns.

HR Personnel DCMS will primarily deal with scanning HR Personnel forms and documents and storing the digitized images in Documentum. Scanning stations can be set up for departmental use or for individuals. People doing scanning will login either as the "workstation user" or as an individual staff member.

Optical character recognition (OCR) will **not** be used for HRS legacy forms and documents.

Other stakeholder offices' HR Personnel forms will not go through OCR. However, other documents that have significant text in them may go through OCR. This will be determined for each stakeholder office.

EMC's eInput will be used to dynamically code or index documents being inserted into the Repository. This will include fetching or validating the PIDM (Banner primary key), for instance. This method has the potential to make document coding cleaner and faster than using bar codes.

Scanning equipment needed by office:

### HRS/EEO Scanning Equipment

2 high volume/capacity scanning workstations

1 scanning station - EEO

1 scanning station - Academic Center

1 scanning station - Virginia Campus worksite

1 scanning station - Employee Training Development

**Faculty Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Medical Faculty Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Research Services Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Student Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**NOTE:** There is a section in the Business Continuity Requirements document that contains specifications for a variety of models of scanners.

### 2.2.6   Electronic Document Capture

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Inserting electronic documents in DCMS/Documentum will be much simpler than generating and storing electronic images. Users can select and attach documents by navigating a hard-drive.

### 2.2.7   Dynamic Attribute Values

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Certain attributes will require the user to select an entry from a pull-down list, also known as a list of values (LOV). All such lists will originate in database tables inside DCMS. These lists will be managed by organization administrators or by the Documentum Administrator. No lists will be coded inside programs.

### 2.2.8   User Workflow

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The current document and records management process is manual and provides no nationally integrated workflow or historical reference capabilities. Automated notification of review/approval dates to the approval authority and automated feedback of approvals/rejections to document originators may be required in the future to improve the overall document management process.

### i.  Add Screen

Users are able to add documents. The "Add Screen" will not be available to the Viewer User. However, an Administrator may assign additional user privileges to a Viewer User by assigning him/her additional permissions. The User will begin by selecting the document attributes (i.e. Organization, Type, Date, etc.). The System may be set to default to the user profile (e.g. Human Resources/Employee Relations, etc.).

A menu will be provided for the following attributes:

Organization Level
Type of Document
Status
Approval Review


An active calendar icon will be provided for all dates.

Date Signed
Effective Date
Date Expires

A text box will be provided for the Approval Clearance, Key Words, Title. Upon completion of the attributes, the User is presented with a "Confirmation Screen."


### ii.      Confirmation Screen

The User is able to attach the document or cancel attaching. Users must enter all required attributes in order to save a document. If all required attributes are not entered, the document will not be saved.

The Confirmation Screen will display the following attributes:

Record Number
Status
Organizational Level
Date Signed
Effective Date
Date Expires
Effective Date
Type of Document
Subject
Title
Key Word

Clearances

### iii.  Review Screen

If the User is unable to attach a document, he/she may save the "Confirmation Screen" and return later to complete the transaction.  The User may access his/her unfinished document transactions using the "Review Screen."

### iv.  Modify Screen

Users are able to modify document records and the associated attributes if the lifecycle state is 'Pending".  He/she will open the document record to complete the transaction.  Upon modification of the attributes, the User is presented with a "Confirmation Screen."  The User is then able to "Modify" the Record data, attach a different version of the document or attach an additional document.  Once the document file(s) is attached, it does not replace the existing file and does not modify the record number.

### v.  Search Screen

All users can locate documents using the Search screen.  The Search Results screen will return up to 100 records or documents per screen.  The user may sort the records or documents by any of the column headers on the screen.  The user can use the "next" and "previous" buttons to review additional records.  Clicking on the document title will open the document.  Document attributes will show for each document type.

The user can open a PDF image or document.  The image or document will open in a new browser window.  Multiple PDF images or documents may be opened at once.

### vi.  Manage Users Screen

Administrators are able to add users within their organizations.  The Administrator will enter the user name and assign the user to a group.  The new user access level is based on the Administrator's access level (e.g. Human Resources-wide, Academic Affairs-wide, Information System Services-wide, etc.).

## 2.2.9  Associating Sets of Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

## 2.2.10  Converting the Formats of Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

### 2.2.11  Transaction History

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

## 2.3     Processing requirements

### 2.3.1   Document Annotation

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

It is required to have the ability to annotate documents during the review process. Annotations will become a separate layer of the document and will not make permanent marks on the original document (in essence, adding a virtual post-it note). Authorized users will be able to create and view annotated comments and redlines made to a document. The Brava Enterprise tool will be used for annotation of documents. A separate permission group will be created for annotation. That group will only have annotation permission. Users may be assigned to the annotation group in addition to other group(s).

### 2.3.2   Document Workflow

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Core DCMS functionality will be provided to all registered users. All system users will be able to search, retrieve, report, display and print content related to defined attribute values. DCMS will require privileges for adding, modifying and/or deleting documents and objects. DCMS will allow the Systems Administrator, Organization Administrator and Department Filer to store, catalog and index content related to predefined attribute values. Security for adding or modifying documents and attributes will be set by user group and access privileges.

Users will be able to import both scanned and digital files through the Add function.

### HR Personnel specific requirements:

DCMS will be initially used as a digital imaging system and will not include the use of Documentum workflow for this phase. Appendix A has a diagram that shows how DCMS will be used within HRS business process.

### 2.3.3   Document Collaboration

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS will use EMC's eRoom product for this view function. Only an administrator will be able to make documents available. GW already has enterprise licensing for eRoom.

### 2.3.4   Notifications

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Notifications are a handy, if not essential, tool in document management. Notifications are a core feature of Documentum, but they are defined in the realm of workflow, which is not being implemented in the initial release of DCMS.

As an interim measure, DCMS will implement a simple notification feature prior to exposing Document workflow in DCMS. This will allow a user who is adding a document to specify a notification date. A DCMS notification will be produced by a TBD method. How far do we need to go with this now? Is anyone still awake?

### 2.3.5   Additional Functions Required by HR Personnel

The following additional functions will need to be created to support HR DCMS:

- Change PIDM (and by extension GWid) attribute value for one or more documents
- New PIDM must be a valid entry in Banner
- Change other document attribute values, but not content
- Add/Modify/Hide HR Personnel Document Types
- Add/Modify/Hide HR Personnel Document Names

There is a process in Banner that changes PIDM values to resolve cases where one person has data under two PIDM values. There will need to be a linked process in HR DCMS that picks up the list of PIDM merge values and executes the same function in Documentum.

## 2.4   Search Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS will provide an integrated search function that will allow users to search Banner and/or DCMS. Part of the Search screen will have text boxes and pull-down lists for attributes that are available in Banner. Users may use this part of the Search screen to put in criteria to find a person in order to look at his/her documents. There will be nothing on the screen that says "Banner".

If a user fills in one of the Banner search fields, DCMS will search Banner and bring back one or more people who meet the criteria entered. If only DCMS fields are filled in, DCMS will only search Documentum and bring back all documents.

If a user fills in Banner search criteria and DCMS search criteria, the results dictate which screen the user will see after clicking the Search button. If more than one person qualifies in the Banner search, a list of people will appear. If only one person qualifies in Banner, that person's document list will appear.

Full text searching is supported by Documentum out of the box. What documents a user can search depends on his/her permissions. Note that in the first phase of DCMS, there will be little or no OCR and text conversion. However, the DCMS search function will support document text searching.

DCMS searching must support several options for the DCMS "Status" document attribute, which is an attribute with one of several possible values. Searches must be able to select for any or all of its values, which must be displayed as a pull-down menu.

When documents are added to the repository, no documents can be physically deleted, except by an administrator. When users change Status to Deleted, Duplicate, or Inactive, the document is then screened out from basic searching by the users.

The user who changed Status to Deleted can change it back to Active in order to make the documents available. Only an Administrator can physically delete documents with a Status of Deleted.

The Banner search screen supplied for DCMS must be easily reconfigured to support additional GW organizations Banner search requirements. This means being able to easily add and/or remove elements from the search screen in order to show what is necessary for a given organization's search.

If a user conducts a search against documents or people without much limitation on criteria, only, it is possible to match hundreds or thousands of employees or documents.

It is a requirement that a warning message be issued to the user when the number of people from Banner exceed a threshold, to be determined

It is a requirement that a warning message be issued to the user when the number of documents from DCMS exceed a threshold, to be determined.

In either case, a popup window is required that tells the user the number of employees or documents that have matched the search criteria. This window must also ask, "Do you want to continue?". It must have a button to continue and another button to cancel.

## 2.5    Reporting Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

A transaction history is required that will be searchable by user, date, record type, etc. A transaction history is required to determine who modified the document and when. It is also required to determine who viewed a document.

Documentum provides audit trail and transaction history capabilities. DCMS will use those capabilities to provide a transaction history of updates to document attributes as well as views of a document. A screen for searching the transaction history will be provided.

For attribute changes or document deletion or replacement, DCMS will capture user id, date, and the value of the attribute prior to the last change.

For a record of viewing documents, DCMS will capture user id, date, and data to identify the document that was viewed.

## 2.6    Legacy File Conversion Requirements

There is a separate requirements document for legacy file conversion.

## 2.7    Systems Integration

### 2.7.1   DCMS to Banner Interface

The interface to Banner is covered in the Search Requirements section above.

## 2.8    Performance Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

TBD.

## 2.9    System Monitoring Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The Captiva Input Management Console will be installed and configured to monitor and control document input by scanning. It will also be used to monitor DCMS throughput and activity.

System metrics must also be captured. The statistics must be saved in a database for month-to-month and year-to-year comparisons. The following list is a minimum requirement for performance statistics:

- Documents imported by organization
- Documents scanned per day
- Number of pages per day
- Number of pages/documents imported per day through Captiva
- Number of pages/documents imported per day through direct input

## 2.10    Storage Requirements

Based on the HRS Forms Inventory spreadsheet, we expect approximately 64 gigabytes a year of disk storage for HR Personnel documents.  This number is expected to be sufficient for the next two years.

Key assumptions are:

| | | |
|---|---:|---|
| Pages of HR documents per year | 643,000 | pages |
| Storage size per page | 100,000 | bytes |
| Calculated storage size | 643,000,000,000 | bytes (64 gigabytes) |

Storage requirements for the relational database that holds attributes, indexes, and audit trails have not been estimated.  It is assumed that the storage required for these items will be less than that for the documents themselves.

## 2.11    Training and Implementation Requirements

### 2.11.1  Training

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS training requirements analysis will be conducted separately and apart from the DCMS requirements analysis.  The training needs to focus on clearly explaining what to enter in the subject, document description, comments/remarks and other attributes.  There may be several components for training:

- Train the Trainer
- User Guide
- Context-sensitive help
- Training Guide

Training analysis should begin as DCMS moves closer to production.

### 2.11.2  Implementation

HR Personnel will have two tracks of implementation.  One will be addition of the back scanned documents to the production system and the other will be adding new documents to the system.

Back scanned documents will be added to the DCMS system by a different method from new documents. They will be loaded by a batch process, using DVDs of scanned and indexed documents as input.  They will not use any screens.

Loading back scanned documents is completely independent of adding new documents. Back scanned documents can be loaded as soon as the production environment is certified. Loading back scanned documents will begin before users begin adding new documents.

New documents cannot be loaded until the DCMS front end is turned on in production. HRS staffers will be the initial users for several weeks. After HRS is satisfied with the functioning of the system, other stakeholder offices will be added.

## 3.0 LOGICAL DATA MODEL

This section covers the definition of DCMS document types and document attributes for the general framework.

## 3.1 COMMON ATTRIBUTES

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

There are two kinds of common attributes: those that are automatically provided by Documentum and those which are defined within DCMS for all document types stored in DCMS.

Documentum provides over 60 data attributes for every document type that is defined in a Documentum system. DCMS will expose the following four:

| Document Name | Text | Definition here |
|---|---|---|
| Created Date | Date | Definition here |
| Modified Date | Date | Definition here |
| Title | Text | Definition here |

Below are additional document attributes that will be available for every document type defined for DCMS:

| Alert Date | Date | Definition here |
|---|---|---|
| Document Date | Date | Definition here |
| Expiration Date | Date | Definition here |
| Keywords | Text | Definition here |
| Organization Level 1 | Text | Definition here |
| Organization Level 2 | Text | Definition here |
| Organization Level 3 | Text | Definition here |
| Organization Level 4 | Text | Definition here |
| Status | Character | Definition here |
| Text (of the document) | Text | Definition here |

## 3.2 DOCUMENT TYPES AND THEIR ATTRIBUTES

It appears that HR Personnel can be run using a single document type, HR Personnel. It may be that during the design process this single document type is split into several document types, to make document security easier to provide.

### HR Personnel

This document type is the one under which HR Personnel forms and documents are filed in DCMS. It will have the specific attributes below, as well as the DCMS common attributes and the Documentum common data attributes. See the framework requirements document for those attributes.

Attributes for HR Personnel:
- PIDM (link to Banner)
- GWid
- Form Name
- Form Group
- Folder Number (from back scanning)

**APPENDIX A – HRS DOCUMENT FLOW**

The following diagram shows how and when DCMS will be used within HR business process management.  The items in gray in the picture below indicate where DCMS will be integrated with HR business processes.

The diagram of the document flows are shown on the next page.



**BENEFITS**

Receive all employee applications (medical, dental, etc.)

FMLA document received?

Yes → File by employee last name and share document with ER

No → File by employee last name

**A**

KEY:

Areas that DMS will control once it is implemented

Processes Outside the scope of DCMS

These processes will be no longer needed once DCMS is implemented

**EMPLOYEE RELATIONS (ER)**

Create Document (grievances, unions, disciplinary, etc.)

Does action require file in employee file?

No → File information by Department

Yes → File information by Department and in Employee File

**A**

**STAFFING & COMPENSATION**

Receive information (recruitment, classification actions, etc.)

Recruitment or Classification action documents?

Recruitment → File by requisition number → Organization Documents: Move documents off-site after 2 years

Employee Documents

Classification → File by department, then fiscal year and file docs alphabetically

**A**

**RECORDS AND DATA MANAGEMENT**

**A** → Receive employee documents from other HR areas → File Documents in employee file by Last Name → Keep records indefinitely but for at least 7 years

## APPENDIX B – HR PERSONNEL SCREEN NOTES

HR Personnel
    Org Level 1 contains
        1. Faculty Personnel
        2. Medical Faculty Personnel
        3. Research Services
        4. Student Employment
        5. HRS

    Org Level 2 contains:
        1. Benefits
        2. Employee Relations (ER) / EEO
        3. Staffing, Compensation, and Salary (SCS)
        4. Records and Data Management (RADM)

    Org Level 2 values ER, SCS, and RADM appear under all Level 1 organizations.  Benefits appear only under the Level 1 HRS entry

Users will be able to choose one or more keywords from a dropdown list, maintained by the Documentum Administrator.

Users will be able to choose a form **name** form a dropdown list, maintained by the Documentum Administrator.

Users will be able to choose a form **group** form a dropdown list, maintained by the Documentum Administrator.

Form group will be automatically derived if form name is chosen first.

If form group is chosen first, then a tailored list of form names will be available for selection by a pulldown menu.  Only one form name can be chosen.

# GORDON
# EXHIBIT 4

| | C | D | E | F | G |
|---|---|---|---|---|---|
| 2 | | | **LIST OF GW OFFICES AND DEPARTAMENTS** | | |
| 3 | | | | | |
| 4-5 | **Appendix** | **Tab** | **Office/Department/ School** | **EMA POC** | **Alternate EMA** |
| 7 | Appendix No. 1: Office the President and Board of Trustees | | | 3 | 8 |
| 9 | Appendix No. 2: Office of the Provost and VP for Health Affairs | | | 3 | 9 |
| 10 | A  VP for Communications | | | 3 | 9 |
| 11 | | | MPA Building | 3 | 8 |
| 12 | | | Lisner Auditorium | 3 | 8 |
| 13 | B VP for Govt., International and Corporate Affairs | | | 3 | 9 |
| 14 | C School of Medicine & Health Sciences | | | 3 | 9 |
| 15 | | | Anatomy and Cell Biology | 3 | 9 |
| 16 | | | Anesthesiology | 3 | 9 |
| 17 | | | Biochemistry & Molecular Biology | 3 | 9 |
| 18 | | | Dermatology | 3 | 9 |
| 19 | | | Emergency Medicine | 3 | 9 |
| 20 | | | Health Care Sciences | 3 | 9 |
| 21 | | | Immunology | 3 | 9 |
| 22 | | | Medicine | 3 | 9 |
| 23 | | | Microbiology and Tropical Medicine | 3 | 9 |
| 24 | | | Neurological Surgery | 3 | 9 |
| 25 | | | Neurology | 3 | 9 |
| 26 | | | OBGYN | 3 | 9 |
| 27 | | | Ophthalmology | 3 | 9 |
| 28 | | | Orthopaedic Surgery | 3 | 9 |
| 29 | | | Pathology | 3 | 9 |
| 30 | | | Pediatrics | 3 | 9 |
| 31 | | | Pharmacology | 3 | 9 |
| 32 | | | Physiology and Experimental Medicine | 3 | 9 |
| 33 | | | Psychiatry and Behavioral Sciences | 3 | 9 |
| 34 | | | Radiology | 3 | 9 |
| 35 | | | Surgery | 3 | 9 |
| 36 | | | Urology | 3 | 9 |
| 37 | D  School of Public Health and Health Services | | | 3 | 9 |
| 38 | | | Environmental and Occupational Health | 3 | 9 |
| 39 | | | Epidemiology and Biostatistics | 3 | 9 |
| 40 | | | Exercise Science | 3 | 9 |
| 41 | | | Health Policy | 3 | 9 |
| 42 | | | Health Serv. Mgt. and Leadership | 3 | 9 |
| 43 | | | Global Health | 3 | 9 |
| 44 | | | Prevention and Community Health | 3 | 9 |
| 45 | E  Response to Emergencies and Disasters Institute (READI) | | | 7 | 8 |
| 46 | F  Medical Center Research | | | 8 | 9 |
| 48 | Appendix No. 3: Office of the EVP & Treasurer | | | 8 | 3 |
| 49 | A  Compliance and Privacy Office | | | 6 | 7 |
| 50 | B  Information Systems and Services | | | 7 | 8 |
| 51 | C  Chief Investment Officer | | | 6 | 7 |
| 52 | D Univ. Budget Office | | | 6 | 7 |
| 53 | | | Supply Chain | 6 | 7 |
| 54 | E Univ. Business and Operations Office | | | 8 | 9 |
| 55 | | | Auxiliaries | 8 | 9 |
| 56 | | | Facilities | 8 | 9 |
| 57 | | | Gworld | 7 | 3 |
| 58 | | | Institutional Real Estate | 8 | 9 |
| 59 | | | Investment Real Estate | 8 | 9 |
| 60 | | | Residential Property Management | 8 | 9 |

| | C | D | E | F | G |
|---|---|---|---|---|---|
| 61 | **F Univ. Finance Office** | | | 6 | 3 |
| 62 | | Cashier's Office | | 6 | 3 |
| 63 | | Comptroller's Office | | 6 | 3 |
| 64 | | | Payroll Services | 6 | 3 |
| 65 | | | Student Account Services | 6 | 3 |
| 66 | | | Tax Department | 6 | 3 |
| 67 | | Financial Emergency/Emergent Issues Team (FEET) | | 6 | 3 |
| 68 | | Risk Management | | 6 | 3 |
| 69 | | Treasury Management | | 6 | 3 |
| 70 | **G Planning and Analysis** | | | 9 | 3 |
| 71 | **H Office of Public Safety and Emergency Management (EMAs Office)** | | | 7 | 6 |
| 72 | | 2100 M Street Office | | 7 | 6 |
| 73 | | Command Center Complex | | 8 | 7 |
| 75 | **Appendix No. 4: Office of the EVP for Academic Affairs** | | | 8 | 7 |
| 76 | **A Columbian College** | | | 3 | 7 |
| 77 | | GSPM | | 3 | 7 |
| 78 | | SMPA | | 6 | 9 |
| 79 | | SPPPA | | 3 | 9 |
| 80 | | Africana Studies | | 8 | 3 |
| 81 | | American Studies | | 3 | 6 |
| 82 | | Anthropology | | 8 | 7 |
| 83 | | Art | | 7 | 8 |
| 84 | | Art Therapy | | 3 | 7 |
| 85 | | Biochemistry and Molecular Biology | | 9 | 7 |
| 86 | | Bioinformatics | | 9 | 7 |
| 87 | | Biological Sciences | | 7 | 9 |
| 88 | | Biomedical Sciences | | 7 | 9 |
| 89 | | Biostatistics and Epidemiology | | 9 | 8 |
| 90 | | Chemistry | | 3 | 7 |
| 91 | | Classical and Semitic Languages | | 3 | 7 |
| 92 | | Communication | | 3 | 6 |
| 93 | | Counseling | | 7 | 3 |
| 94 | | Criminal Justice | | 8 | 3 |
| 95 | | Dramatic Literature | | 6 | 3 |
| 96 | | Early Modern European Studies | | 9 | 8 |
| 97 | | Earth and Envirom. Studies | | 8 | 3 |
| 98 | | East Asian Languages and Literature | | 9 | 6 |
| 99 | | Economics | | 3 | 7 |
| 100 | | Electronic Media | | 9 | 3 |
| 101 | | English | | 8 | 9 |
| 102 | | EFL | | 7 | 8 |
| 103 | | Envi. and Resource Policy | | 6 | 7 |
| 104 | | Epidemiology | | 3 | 6 |
| 105 | | Film Studies | | 9 | 3 |
| 106 | | Forensic Sciences | | 8 | 9 |
| 107 | | Genetics | | 7 | 8 |
| 108 | | Geography | | 3 | 7 |
| 109 | | German and Slavic Langauges and Literature | | 6 | 7 |
| 110 | | Historic Preservation | | 3 | 6 |
| 111 | | History | | 3 | 7 |
| 112 | | Hominid Paleobiology | | 6 | 8 |
| 113 | | Human Sciences | | 8 | 6 |
| 114 | | Human Services | | 9 | 3 |
| 115 | | Humanities | | 3 | 6 |
| 116 | | Journalism | | 6 | 7 |
| 117 | | Judaic Studies | | 7 | 8 |
| 118 | | Linguistics | | 8 | 9 |
| 119 | | Math | | 9 | 8 |
| 120 | | Microbiology and Tropical Medicine | | 8 | 7 |
| 121 | | Molecular and Cellular Oncology | | 7 | 6 |
| 122 | | Museum Studies | | 6 | 3 |
| 123 | | Music | | 3 | 8 |
| 124 | | Neuroscience | | 9 | 8 |
| 125 | | Organizational Sciences | | 3 | 6 |

| # | | Item | | | F | G |
|---|---|---|---|---|---|---|
| 127 | | | Pharmacology | | 7 | 9 |
| 128 | | | Philosophy | | 3 | 6 |
| 129 | | | Physics | | 9 | 8 |
| 130 | | | Political Science | | 3 | 9 |
| 131 | | | Professional Psychology | | 8 | 9 |
| 132 | | | Psychology | | 3 | 9 |
| 133 | | | Religion | | 3 | 9 |
| 134 | | | Romance Languages and Literature | | 6 | 3 |
| 135 | | | Sociology | | 3 | 6 |
| 136 | | | Speech and Hearing | | 3 | 6 |
| 137 | | | Statistics | | 8 | 9 |
| 138 | | | Telecommunication | | 3 | 6 |
| 139 | | | Theater and Dance | | 7 | 3 |
| 140 | | | University Writing | | 9 | 8 |
| 141 | | | Women and Leadership | | 8 | 9 |
| 142 | | | Women's Studies | | 3 | 7 |
| 143 | | B Elliott School of International Affairs | | | 7 | 6 |
| 144 | | C Graduate School of Education & Human Development | | | 7 | 8 |
| 145 | | D Law School | | | 3 | 6 |
| 146 | | E School of Business & Public Management | | | 6 | 3 |
| 147 | | | Accountancy | | 6 | 3 |
| 148 | | | Finance | | 6 | 3 |
| 149 | | | International Business | | 3 | 6 |
| 150 | | | Management Science | | 6 | 3 |
| 151 | | | Marketing | | 6 | 3 |
| 152 | | | Public Administration | | 6 | 3 |
| 153 | | | Strategic Mgt. and Public Policy | | 6 | 3 |
| 154 | | | Tourism and Hospitality Mgt. | | 3 | 6 |
| 155 | | F School of Engineering and Applied Sciences | | | 3 | 6 |
| 156 | | G Gelman Library | | | 8 | 9 |
| 157 | | H College of Professional Studies | | | 3 | 6 |
| 158 | | I Mount Vernon Campus | | | 7 | 8 |
| 159 | | J Virginia Campus | | | 3 | 8 |
| 160 | | K Alexandria Graduate Education Center (AGEC) | | | 3 | 8 |
| 161 | | L Biostatics Center | | | 9 | 8 |
| 162 | | M Academic Planning and Development | | | 7 | 9 |
| 163 | | N Associate VP for Research and Grad. Studies | | | 3 | 6 |
| 164 | | O Graduate Student Enrollment Management (GSEM) | | | 3 | 8 |
| 165 | | | Graduate Data Entry Center | | 3 | 8 |
| 166 | | P Graduate Studies and Academic Affairs | | | 8 | 3 |
| 167 | | Q Office of the Registrar | | | 7 | 8 |
| 169 | Appendix No.5: Office of the Sr. VP for SASS | | | | 8 | 9 |
| 170 | | A Assoc. Vice President and Dean of Students | | | 8 | 9 |
| 171 | | | CLLC | | 7 | 8 |
| 172 | | | Student Health Srvices | | | |
| 173 | | | University Counseling Center | | 7 | 8 |
| 174 | | B Office of the Associate VP and Dean of Freshman | | | | |
| 175 | | | Mount Vernon | | 8 | 8 |
| 176 | | | International Services Office (ISO) | | 7 | 6 |
| 177 | | | Parent Services | | 3 | 6 |
| 178 | | C Associate VP for Student and Academic Support Services | | | 3 | 8 |
| 179 | | | Marvin Center | | 8 | 6 |
| 180 | | | Multicultural Student Services Center | | 6 | 9 |
| 181 | | | Student Activities Center | | 8 | 7 |
| 182 | | D Athletics and Recreation | | | 8 | 7 |
| 183 | | E Communications and Technology | | | 3 | 9 |

| | C | D | E | F | G |
|---|---|---|---|---|---|
| 185 | G  Undergraduate Admissions | | | 8 | 3 |
| 186 | H  Parent  Services | | | 3 | 9 |
| 187 | I  University Police Department | | | 3 | 8 |
| 188 | J Budget , Personnel & Finance | | | 6 | 9 |
| 190 | **Appendix No. 6: Office of the General Counsel** | | | 3 | 8 |
| 191 | A  Associate Vice President for Human Resources | | | 3 | 7 |
| 192 | | HR Services | | 3 | 7 |
| 193 | | HR Benefits | | 3 | 7 |
| 195 | **Appendix No. 7: Office of the VP for Advancement** | | | 3 | 9 |
| 196 | A  Office of Alumni Programs | | | 3 | 9 |
| 197 | B  Advancement Services | | | 3 | 9 |

# GORDON
# EXHIBIT 5





| *DCMS HR Personnel* |
| --- |
| **Change Request Form** |

| **CHANGE IDENTIFICATION SECTION** | |
| --- | --- |
| **Change Control # : 021** | **Date: 7/10/2006** |
| **Short Title: Change Business Continuity Framework scope** | **Affects Oracle Workflow/Banner/portal? n/a** |
| **Requested by: Rick Gilchrist** | **Supporting Materials Attached (yes/no)  yes** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:**   Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2.   All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:**    After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| **EVALUATION SECTION** | | |
| --- | --- | --- |
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours: N/A** |
| **Description of risks** No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum. | | |
| **Recommendation:** Approve Request. | | |
| **Evaluated by: Marcy Day** | | **Date: 6/26/06** |

| **DECISION APPROVAL SECTION** | | |
| --- | --- | --- |
| **Cancel __** | **Postpone __ Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042





| DCMS HR Personnel<br>Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| **EVALUATION SECTION** | |
|---|---|
| Identify requirements, & products/deliverables changes: See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| **Evaluated by:** Marcy Day | **Date: 6/26/06** |
|---|---|

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| Cancel __ | Postpone __<br>Reconsider on: | Integrate into Project __ |
| **Decision Approval Signatures:** | | |

1

CONFIDENTIAL

GW000042

 

| DCMS HR Personnel<br>Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |
| **Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule | |
| **Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.<br><br>Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM. | |
| **Reason for Change:**   After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.<br>. | |

| **EVALUATION SECTION** | |
|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |
| **Description of risks**<br>No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum. | |
| **Recommendation:** Approve Request. | |
| **Evaluated by:** Marcy Day | **Date: 6/26/06** |

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042





## DCMS HR Personnel
## Change Request Form

**CHANGE IDENTIFICATION SECTION**

| | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P**=Plan/Sched Chg, **A**=Architecture Chg, **D**=Design Chg, **T**=Tech Chg:   Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:**    After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

**EVALUATION SECTION**

| | |
|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| | |
|---|---|
| **Evaluated by:** Marcy Day | **Date: 6/26/06** |

**DECISION APPROVAL SECTION**

| | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042





## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours:** N/A |
| **Description of risks** No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays In delivery of a module that can be used, by the University department to expedite use of Documentum. | | |
| **Recommendation:** Approve Request. | | |
| **Evaluated by:** Marcy Day | | **Date: 6/26/06** |

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** Reconsider on: | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042





## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| **Evaluated by:** Marcy Day | **Date: 6/26/06** |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** <br> **Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1





## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | Date: 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:**    After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours: N/A** |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| **Evaluated by:** Marcy Day | **Date: 6/26/06** |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| Cancel __ | Postpone __<br>Reconsider on: | Integrate into Project __ |
| **Decision Approval Signatures:** | | |

1

GW000042

# GORDON
# EXHIBIT 6



**THE GEORGE WASHINGTON UNIVERSITY**
WASHINGTON DC



## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| DCMS HR PERSONNEL | |
| **Change Control # : 004** | Date: 05/25/06 |
| **Short Title: Release 1A schedule and cost change** | **Affects Oracle Workflow/Banner/portal (if applicable)? N/A** |
| **Requested by: Jim Gearing** | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:**
Development of HR Personnel and Business Continuity Framework was scheduled for implementation in July, 2006. In order to provide a timely delivery, the product needs to be delivered in three releases. Release 1A will be delivered July 27th and will provide basic functionality required to go-live with HR Personnel and Business Continuity. An additional $514K will be needed to complete this release. See attached 'Freeze Memo' for list of functions to be provided in each of three releases.

**Reason for Change:**
Extended development time is necessary to complete delivery of release 1A. The LOE to use web services (CR002) was underestimated. Team members were also diverted to look at SFA, Debt & Ins., Web Extender, etc.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See Attached 'Requirement Freeze' letter | | **Estimate of effort (hrs) :** Not available |
| **Identify plan changes:** Delivery dates | | **Total Hours:** |

**Description of risks:**
In order approve this CR additional funding sources must be found; seeCR008 – CR010. After re-allocating funding to pay for this CR, there is still a very high risk that funding to provide a smooth turnover from RICHMAR to GW will not be adequate. There is no funding available for maintenance support from RICHMAR. There is no funding available to support RICHMAR mentoring of GW developers; RICHMAR has said that mentoring is not possible until after delivery of release 1A and 1B. GW does not have Java and Documentum expertise to replace RICHMAR.
**Recommendation:** Release 1A must be completed in order for HRS to resolve audit compliance issues; therefore the CR must be approved with clear understanding of the documented risks. See attached, Budget Review meeting notes.

| **Evaluated by:** Budget review team; Anne-Marie Taylor, Christina Griffin, Marcy Day, Richard Gordon, and Jim Gearing. | **Date: 5/25/06** |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** Reconsider on: | **Integrate Into Project __** |

2

 THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

 ISS
Information Systems & Services

| *DCMS HR Personnel*<br>**Change Request Form** | |
|---|---|
| **CHANGE IDENTIFICATION SECTION**<br>DCMS HR PERSONNEL | |
| **Change Control #** : 006 | **Date:**<br>05/25/06 |
| **Short Title:** Release 1C schedule and cost change | **Affects Oracle Workflow/Banner/portal (if applicable)?** N/A |
| **Requested by:** Jim Gearing | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:**
Release 1C needs to be added to the project plan to complete delivery of HR Personnel and Business Continuity requirements. Release 1C is planned to be completed Sept 27th An additional $220K will be needed to complete this release.

**Reason for Change:**
Extended development time and cost are necessary to complete delivery of the Admin Module that was identified in requirements for Business Continuity and HR Personnel

| **EVALUATION SECTION** | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:**<br>See Attached 'Requirement Freeze' letter | | **Estimate of effort (hrs) :**<br>Not available |
| **Identify plan changes:**<br>Delivery dates | | **Total Hours:** |

**Description of risks:**
Funding is not available. The risks associated with not implementing release 1C are as follows:
- Admin Apps resources are not available to complete release 1C in a timely manner.
- Admin Apps resources do not have adequate knowledge of Documentum and Java to complete development of release 1C
- There is no funding available to support RICHMAR mentoring of GW developers.

**Recommendation:** Delivery of release 1C must be put on hold until GW resources are available to complete the development. See attached, Budget Review meeting notes

| **Evaluated by:** Budget review team; Anne-Marie Taylor, Christina Griffin, Marcy Day, Richard Gordon, Jim Gearing. | **Date: 5/25/06** |
|---|---|

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |
| **Change Advisory Board:** | | |

1

THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC



| DCMS HR Personnel Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** DCMS HR PERSONNEL | |
| **Change Control # :** 011 | **Date:** 05/25/06 |
| **Short Title:** Divert $23K, from other funding sources, into project budget | **Affects Oracle Workflow/Banner/portal (if applicable)?** N/A |
| **Requested by:** Marcy Day | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Budget

**Description of Change Request:**
Obtain funding to support an SOW to have EMC configure the Centera with Documentum; $23k is needed for the SOW.

**Reason for Change:** ISS does not have the knowledge to configure the Centera with Documentum; the Centera storage is cheaper than using Clarion and provides WORM technology.

| EVALUATION SECTION | |
|---|---|
| **Identify requirements, & products/deliverables changes:** None | **Estimate of effort (hrs) :** N/A |
| **Identify plan changes:** None | **Total Hours:** |

**Description of risks:** Risk to divert $23K is minimal; should not impact any other efforts.

**Recommendation:**
Approve funding for SOW to have EMC configure the Centera with Documentum.

| **Evaluated by:** Budget Review Team; Anne-Marie Taylor, Marcy Day, Christina Griffin, Richard Gordon, Jim Gearing | **Date:** 5/25/06 |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** Reconsider on: | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |
| **Change Advisory Board:** | | |

1

CONFIDENTIAL

GW000031

# GORDON
# EXHIBIT 7





## DCMS HR Personnel
## Change Request Form

**CHANGE IDENTIFICATION SECTION**

| | |
|---|---|
| **Change Control # :** 017 | **Date:** 6/01/2006 |
| **Short Title:** Budget allocation for code review. | **Affects Oracle Workflow/Banner/portal (if applicable)?** |
| **Requested by:** Marcy Day | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Budget, $9,200

**Description of Change Request:** Anne-Marie as asked SUN to do a code review. The cost is $9200. Cost center 615001 will be used to pay for the review.

**Reason for Change:** GW will be responsible for maintaining the code once the project is finished. GW would like an independent review of the code that will be received from RICHMAR, to ensure maintainability.

**EVALUATION SECTION**

| | |
|---|---|
| **Identify requirements, & products/deliverables changes:** None | **Estimate of effort (hrs) :** N/A |
| **Identify plan changes:** None | **Total Hours:** N/A |

**Description of risks**
No risk. If the CR is not approved GW increases the risk of receiving code that may not be maintainable.

**Recommendation:** Approve CR

| | |
|---|---|
| **Evaluated by:** Marcy Day, Christina Griffin | **Date:** 6/01/06 |

**DECISION APPROVAL SECTION**

| Cancel __ | Postpone __ Reconsider on: | Integrate into Project __ |
|---|---|---|
| Decision Approval Signatures: | | |

1

GW000018

# GORDON

# EXHIBIT 8





| DCMS HR Personnel<br>Change Request Form | | |
|---|---|---|
| **CHANGE IDENTIFICATION SECTION** | | |
| **Change Control # :** 016 | **Date:** 6/01/2006 | |
| **Short Title:** Budget allocation for SFA review. | **Affects Oracle Workflow/Banner/portal (if applicable)?** | |
| **Requested by:** Marcy Day | **Supporting Materials Attached (yes/no)** | |
| **Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg: Budget, $9,000 | | |
| **Description of Change Request:**<br>The purpose of this CR is to allocate $9,000 from the project budget for the SFA review. RICHMAR has been asked to provide a preliminary estimate of cost to develop an application for SFA using DCMS, Business Continuity Framework. The review has required several meetings, as well as time to mock up a prototype of what could be developed for SFA using DCMS. | | |
| **Reason for Change:** RICHMAR has been asked to show SFA what could be developed for them using DCMS. The time being spent on SFA, by RICHMAR, is being charged to the DCMS budget. SFA is out of scope for the current DCMS effort, therefore the money spent for SFA needs to be documented.<br>. | | |

| **EVALUATION SECTION** | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** None | **Estimate of effort (hrs) :** N/A | |
| **Identify plan changes:** None | **Total Hours:** N/A | |
| **Description of risks**<br> It is important to provide a review to SFA that would encourage them to use DCMS. If another application is used, it detracts from the plan to use DCMS to house all documents for business continuity.<br>The $9,000 to be spent on SFA creates/add to the existing DCMS budget deficit. | | |
| **Recommendation:** Allocate $9,000 from the DCMS project budget to be spent on preliminary research, screen mockups, and a cost estimate for SFA. Monitor DCMS budget closely. | | |
| **Evaluated by:** Marcy Day, Christina Griffin | **Date:** 6/01/06 | |

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

2

CONFIDENTIAL

GW000037

# GORDON
# EXHIBIT 9

## TASK ORDER

This task order is issued on July 6, 2006 by the George Washington University, hereafter referred to as GW, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, to RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

Special provisions attached to and hereby made part of thereof, the contract dated December 22, 2005 to design the computer system architecture for GW, installing and configuring the Documentum package for use by the Human Resources.

WHEREAS, GW desires to employ the services of Contractor to perform certain additional tasks; and

WHEREAS, Contractor desires to perform certain additional tasks for GW,

NOW, THEREFORE, GW and Contractor agree as follows:

### DESCRIPTION OF SERVICES
Contractor will perform additional services such as reworking the DCMS framework so that new document types/folders can be added to DCMS by configuration, rather than by system development.  A detailed feature list is attached.

### WRITTEN AGREEMENT
The parties of this agreement mutually agree that this task order contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained. This task order shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.


**George Washington University**            **RICHMAR and Associates**


By:_____            By:_____
(name)                                   Richard Gordon, Jr.

Title:                                   Title: President/CEO

Date: _____                   Date: _____

CONFIDENTIAL                                              GW001820

# DCMS Feature List for Releases 2A and 2B

## General Description

The feature lists below reflect requirements for reworking the DCMS framework so that new document types/folders can be added to DCMS by configuration, rather than by system development. It also includes the features of Release 1C, which had previously been deferred due to lack of money.

The new framework is designed so that DCMS cabinet administrators can perform the following functions:
- Design their own document types/folders
- Choose from a fixed number (say, 30) index fields that they can name
- Choose data types for the index fields from text, date, and number
- Choose the sequence of these fields on the target screen for the new document type/folder
- Create lists of values (LOVs) for text and numeric fields that will make those fields require a choice from a pull-down menu, rather than entry by typing
- After performing above functions, generate a target screen that will be available to the organization's users to use to save documents and their attributes.

Below is a more detailed feature list that will be the basis of a change order to implement this new framework. Features not in the list will not be implemented, unless another change order is submitted.

## DCMS Feature List for Release 2A

1. System will allow dynamic configuration of organization document types/folders (target screen)
2. System will allow dynamic configuration of attributes for document types/folders above (target screen)
3. System will allow dynamic arrangement of order of attributes for target screen from above
4. Attribute data types supported will be text, date, and number. Ten of each type field will be available
5. DCMS will only reveal defined attributes on target screen. If 30 are available, but the cabinet administrator only defines 12, only 12 will be shown.
6. Cabinet Administrator function will be created to create lists of values (LOVs) for attributes defined above
7. Folders will inherit attributes of folders above them. If folder level 1 has two attributes and folder level 2 has its own three attributes, documents that are inserted at folder level 2 will have five attributes available. DCMS will not enforce database-type relational integrity checks on document attribute values in parent-child relationships. Documents will inherit the attributes of the folder they are in and inherit the attributes of the folders above them.

CONFIDENTIAL                                                                 GW001821

8. Validation of attribute values will either be via lists of values (LOVs) or by reference to an external ERP system. Integration to ERP systems such as EAS is not part of release 2.
9. A non-dynamic screen for Banner searching, similar to that for HR Personnel, will be implemented to support the Workers Compensation function. In Release 2A, it will only support the Workers Compensation function.
10. Access Control Lists (ACLs) will be defined by ISS. There will be one for each cabinet and one for the first level folder in each cabinet. Folders at lower levels will inherit the ACL from the folder(s) above.
11. If an organization needs more restricted access for a folder it creates, ISS will design and implement the ACL for that folder. Users will not create ACLs. Upon creation of a cabinet, DCMS will create a Documentum document type for that cabinet.
12. ISS will create cabinets through the Documentum Administrator interface.
13. Cabinet administrators will create folders for their organizations.
14. Cabinet administrators will be able to create new document types/folders for their cabinet, but only in the ISS test/development environment. ISS will migrate new document types/folders to QA for testing, then migrate the new document types/folders to production.
15. Cabinet administrators will have a limited ability to make changes to production, primarily adding or hiding elements of LOVs.
16. A maximum of five levels of folders below the cabinet will be allowed.
17. Support features of DCMS Releases 1A and 1B, including, but not limited to:
    a. Document search
    b. eInput capture and indexing of paper documents allowing indexing with items driven from the user definitions in Set-up tool
    c. Adding and indexing electronic documents. Screens will be displayed dynamically with items driven from the user definitions in Set-up tool
    d. Create versions of documents
    e. Annotate documents
    f. Create links to documents
    g. Rendering documents into different formats
    h. Alerts
    i. Searching electronic documents. Search selection screens will be displayed dynamically with items driven from the user definitions in Set-up tool

DCMS Feature List for Release 2B

1. Cabinet administrator will be able to add users to groups or remove users from groups (1C req. #8). Only ISS will create groups.
2. Allow a cabinet administrator to create masks and range checks for numeric fields
3. Allow a cabinet administrator to create maximum lengths for text fields
4. Allow a cabinet administrator to mark fields as required
5. Capture system metrics and provide reporting on them (1C req. #52)
6. Create screen for searching transaction history (1C req. #45)
7. Was duplicate of 11 below.

CONFIDENTIAL                                                                    GW001822

8. For the eRoom function, create the ability for a cabinet administrator to conduct a single search across multiple folders (as is now possible in DCMS), and put links to the retrieved documents into an eRoom (1C req. #56)
9. Cabinet administrator will be able to change the labels of attributes
10. Cabinet administrator will be able to change the labels for the organization levels.
11. Create a screen for cabinet administrator of HR Personnel to maintain LOVs for the HR Personnel extension (1C req. # 24). This may be taken care of by the new framework LOV function, but it may not fit into the new framework LOV function. If it does not fit in the new framework LOV function, it must be provided separately.
12. Cabinet administrator will be able to indicate that OCR is required for a new document type/folder. This will cause eInput to put the document through OCR processing. The search screen will always show a text box for searching, because a given cabinet could have documents anywhere in it that have been through OCR.

Features that will not be in DCMS Releases 2A and 2B
1. Workflow
2. Easily reconfigurable Banner search screen (1C requirement #41)

## Cost Estimate

**Phase 2a**

| Name | Hours | Cost |
|------|-------|------|
| Executive Management Consultant | 480 | $ 72,000.00 |
| Sr. Management Consultant | 1848 | $ 231,000.00 |
| Systems Analyst | 176 | $ 17,248.00 |
| Total Phase 2a | | $ 320,248.00 |

**Phase 2b**

| Name | Hours | Cost |
|------|-------|------|
| Executive Management Consultant | 480 | $ 72,000.00 |
| Sr. Management Consultant | 1144 | $ 143,000.00 |
| Systems Analyst | 176 | $ 17,248.00 |
| Total Phase 2b | | $ 232,248.00 |

**TOTAL Phase 2a & 2b**                    $ 552,496.00

RICHMAR & Associates

Richard Gordon, Jr.
President/CEO

{ FILENAME }                    4 of 4                    July 6, 2006

CONFIDENTIAL                    GW001823

# GORDON
# EXHIBIT 10

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

Attending:

| | | |
|---|---|---|
| Marcy Day | Jenn Bond | Andy Smith |
| Rick Gilchrist | Jingxiao Feng | Richard Gordon |
| Jim Gearing | Jae Lim | Tony Ford |
| Rehan | | |

**Objective of this meeting** – To go through all outstanding issues and understand what the issues are; to make a determination whether each will affect UAT or not; to talk about which version of Banner is being used for testing.

Also, to understand what will be available for the production release, and what level of effort is required for getting that accomplished.

Overall assessment from RICHMAR (Jae Lim)
eInput – is about 90% complete. Rick Gilchrist tested the code this morning and will give results of his test.

Testing and Port issues
- Port concern – 8080, 8180 are now open. 8080 is for all ongoing development, 8180 will be used for deployment (code drop).
- RICHMAR will still need to coordinate w/ WebServices each time they deploy -- this situation is dynamically changing
- Document Search – discussion on how are we going to do this, what is the user expecting –
    - Tanya wants to search against Documentum only; when retrieved, they have to be validated against Banner security.
    - Request for person's name in Change Presentation Layout screen
    - When searching by document only, will want to do second search by other attributes (create date, etc).

    RICHMAR requested this be documented in a change request, since search currently formerly understood requirement

- Banner Webservices -- GW is working on the security. RICHMAR needs to implement the WebServices so that they can test. *This is a show stopper.* RICHMAR will incorporate this into the system for UAT. RICHAMAR received LDAP just last week with the Java docs; RICHMAR must now has to change the logic in DCMS. Can currently test system incorporating the PIDM.

- GW will populate the PIDMs in so Jingxiao can test the security piece.

CONFIDENTIAL                                                                    GW002430

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

- Rick will let Jenn know which PIDMs and scenarios she will be testing (she has already done this).


GW internal design requirement – There is a conflict about what the user should see if the search fails – Tanya doesn't want the user to know details, Jenn does.....

Rick will talk to Tanya about what she wants the users to see.

Review
166 – Needs additional repair
183 – Will be resolved w/ new WebServices; with LDAP added
190 – Will be removed.
193 – CLOSED
221 – CLOSED
228 – Requires more testing--
238 – CLOSED
239 – Jae will adjust to make sure it is cascading (full screen, but move x/y down), and you can see that you are still in Documentum
245 – Need to mitigate duplicate name results. RICHMAR will address.
246 – CLOSED
250 – Seems to be closed; needs some more testing – seems to depend on separate browser.
252 – Requirement that none of the HRS groups can see into the stakeholders groups – HR Directors group overrides this.
253 – RICHMAR will address
255 – Needs additional testing – is currently using hard-coded IP addresses. RICHMAR will  to change to Alias.  Empty field Org-Name.  Use lowest level for search. Additional details in Mantis report.  Richmar will delete Object Type.
257 –

**Additional Discussion**
1. Flip eInput Password and net ID Password on eInput screen.
2. Change GWU_HR_Personnel to HR_Personnel
3. Missing Gender, attributes (ref discussion w/ Richard/Rick last week)

**New** – Keyword should not be a mandatory index field in eInput

Have second button in Document Added screen to "Retrieve Documents" (for same individual) screen. **Request needs to be made in writing.**

Remove HR folder from HR group.

Individual tied to RADM (only) – Internal error, or could not add document ....

CONFIDENTIAL

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

If in Webtop, documents are there. – Possibly an ACL issue?

<u>Reports</u>  Info is stored in a table – it then is a simple query to run against the data. Can be done in SQL.  Mike Wolfe will be able to connect to the same table in Documentum and make the info available in reports, then the information in the reports will be available for Tanya to do trending and analysis

**Issue – not capturing "employee name" in Documentum**, may need Banner Webservices to create a capture.  Currently retrieving document with PIDM.

<u>1B</u>

Annotation and OCR features.  Timeframe – will be released with 1A.

<u>Next meeting</u>

To discuss other issues –

9/6  2:30pm; Marcy, Jim, Rick, Richard Chris.  Location TBD

4.

# GORDON EXHIBIT 11

&[DATE]

## DCMS Release 2 Mantis Ticket Ranking

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Rank | id | Category | Summary | Priority | | | |
| 2 | 1 | 352 | DCMS | 2.0 Org_name is being populated with "HR Personnel" by DCMS Scan but not DCMS | high | | | |
| 3 | 1 | 364 | DCMS | Fix Document search for both Document only and for Employee + Document search | high | | | |
| 4 | 1 | 367 | DCMS | The display of error messages should be changed to wrap within a display box. | high | | | |
| 5 | 1 | 357 | Web-S | Modify search to accept selection of Active/Inactive Employees and Jobs (ref 358) | high | | | |
| 6 | 2 | 353 | DCMS | Users with View only access to a Document should be able to view attributes but not modify them | low | | | |
| 7 | 2 | 354 | DCMS | Form names should not be presented in the list box if the user doesn't not have access to the corresponding ORGs | high | | | |
| 8 | 2 | 358 | DCMS | Modify advanced search to allow selection of Active/Inactive Employees and Jobs (ref 357) | high | | | |
| 9 | 2 | 361 | DCMS | Modify current Navigation bar for ease of use | normal | | | |
| 10 | 2 | 362 | DCMS | Make changes to the Search screen for increased functionality | normal | | | |
| 11 | 2 | 363 | DCMS | Make changes to the Add screen for increased functionality | normal | | | |
| 12 | 2 | 365 | DCMS | Modify "Change Presentation" to save user settings and add additional attributes | normal | | | |
| 13 | 2 | 377 | DCMS | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 14 | 2 | 166 | eInput | Form name lookup icon and search popup window are not found for eInput | high | | | |
| 15 | 2 | 264 | eInput | The Cabinet should be selectable by user when there is more than one Cabinet. | high | | | |
| 16 | 2 | 296 | eInput | BL - 9/2006    Einput Documentation – add another process | normal | | | |
| 17 | 2 | 368 | eInput | Single values for Org level I & II should be populated | normal | | | |
| 18 | 2 | 370 | eInput | Fix or replace the calendar tool with a compatiable tool that won't clicking to bypass message each time. | normal | | | |
| 19 | 2 | 371 | eInput | Modify Employee Search with check boxes for Active/Inactive Employees | normal | | | |
| 20 | 2 | 375 | eInput | The display of error messages should be changed to wrap within a display box. | normal | | | |
| 21 | 2 | 376 | eInput | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 22 | 2 | 378 | Web-S | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 23 | 3 | 239 | DCMS | 2.0 When viewing documents a small screen that is resizeable is displayed, to be made larger | high | | | |
| 24 | 3 | 250 | DCMS | Can't print Documents for other than PDF and Word | high | | | |

CONFIDENTIAL

&[DATE]

Page 2 of 2

## DCMS Release 2 Mantis Ticket Ranking

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Rank | Id | Category | Summary | Priority | | | |
| 25 | 3 | 356 | DCMS | When Add is selected, single values for Org level I & II should be populated | low | | | |
| 26 | 3 | 360 | DCMS | Modify Cabinet selection to use a "Select new Cabinet" button | normal | | | |
| 27 | 3 | 369 | eInput | Indicate what fields are not searchable and restrict from entering data. | low | | | |
| 28 | 3 | 372 | eInput | Minor screen changes | normal | | | |
| 29 | 4 | 265 | Banner | 2.0 PIDM change process to use Documentum Database table | high | | | |
| 30 | 4 | 317 | DCMS | Integrate Brava for Annotation profile | high | | | |
| 31 | 4 | 359 | DCMS | Move all position information to the bottom in a table format and balance the remaining data | low | | | |
| 32 | 5 | 355 | DCMS | Add buttons should not be selectable for users with only view profiles. | low | | | |
| 33 | 5 | 366 | DCMS | Write the excel file for exports with the columns set to autofit so the information is readable when viewed. | low | | | |

GW000176

CONFIDENTIAL

**CERTIFICATE OF SERVICE**

I certify that on June 7, 2007 a copy of the foregoing Plaintiff Richmar's Reply to GW's

Opposition to Richmar's Motion for Preliminary Injunctiojn and Richmar's Motion that Hearing

be Continued Until Such Time as Richmar Can Marshal and Examine the Evidence Lately

Produced by GW was sent in by electronic and first class mail, postage prepaid to:

James Thomas, Esq.
Arnold & Porter, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Counsel for Defendant

Leslie J. Polt, Esq.
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202-1612
Counsel for Federal National

Geoffrey P. Gither

# Table of Contents

**Exhibits for Richmar's Reply to GW's Opposition to
Richmar's Motion for Preliminary Injunction
and
Richmar's Motion that Hearing be Continued Until Such Time as
Richmar can Marshal and Examine the Evidence Lately Produced by GW**

| Exhibit # | Description |
|-----------|-------------|
| 1 | Certificate of Registration |
| 2 | Contractual Agreement |
| 3 | Consultant Agreement |
| 4 | Mutual Nondisclosure Agreement |
| 5 | Master Services Agreement |
| 6 | Master Statement of Work - DCMS Framework dated April 25, 2007 |
| 7 | DCMS HR Personnel;  Release 3 Project Charter |
| 8 | Philip Gearing Declaration |
| 9 | Richard Gordon Declaration |
| 10 | Jae Lim Declaration |
| 11 | SOW - DCMS Framework - Task Order 1 - Solution Design |
| 12 | Ronald G. Bonig Deposition |
| 13 | Tonya K. Bell Deposition |
| 14 | Vijay Padmanabhan Deposition |
| 15 | Letter from Ronald Bonig to Richard Gordon dated 4 January 2007 |
| 16 | Letter from Richard Gordon to Ronald Bonig dated January 5, 2007 attaching DCMS Closeout List PPI360-362 |
| 17 | Letter from Ronald Bonig to Richard Gordon dated January 5, 2007 PPI363 |
| 18 | Letter from Linda Schutjer to Richard Gordon dated March 16, 2007 PPI398-399 |
| 19 | Letter from Ronald Bonig to Richard Gordon dated March 23, 2007 PPI400 |
| 20 | GW HR DCMS Meeting Minutes |

# Exhibit 1

# Certificate of Registration



**FORM TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**TX 6-537-700**

EFFECTIVE DATE OF REGISTRATION

4   16   07
Month   Day   Year

SEPARATE CONTINUATION SHEET.

**1**
**TITLE OF THIS WORK ▼**
Document and Case Management System

**PREVIOUS OR ALTERNATIVE TITLES ▼**
DCMS

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.     **Title of Collective Work ▼**

If published in a periodical or serial give: Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

**2**
**a**
**NAME OF AUTHOR ▼**
Impact Innovations Systems, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
{ Domiciled in ▶ United States

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Computer program

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**
**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
{ Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**
**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ _____
{ Domiciled in ▶ _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**
**a**
**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2006 ◀ Year

**b**
**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ December   Day ▶ 18   Year ▶ 2006
United States ◀ Nation

**4**
**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Richmar & Associates
1513 Vermont Ave., N.W., Washington, D.C. 20005

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
Assignment

APPLICATION RECEIVED
APR 16 2007
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

See instructions before completing this space.

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.     • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

PPI364

FORM TX

CHECKED BY _____

☐ CORRESPONDENCE
   Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5** **PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▶                **Year of Registration** ▶

**6** **DERIVATIVE WORK OR COMPILATION**
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

a    Certain code from pre-existing computer programs "Grievance Electronic Trading
     System" and "Memorandum of Agreement System" are incorporated — no claim of
     copyright is asserted therein

See instructions before completing this space.

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b    Compilation and additional new computer code

**7** **DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
a   **Name** ▼                                                    **Account Number** ▼

b   **CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/Zip ▼
    Susan B. Flohr
    Blank Rome LLP
    600 New Hampshire Avenue, N.W., Washington, D.C. 20037

    Area code and daytime telephone number ▶ 202-772-5800                    Fax number ▶ 202-772-5858
    Email ▶ flohr@blankrome.com

**8** **CERTIFICATION*** I, the undersigned, hereby certify that I am the
                                            ☐ author
              Check only one ▶             ☐ other copyright claimant
                                            ☐ owner of exclusive right(s)
                                            ☒ authorized agent of  Richmar & Associates
                                               Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Susan B. Flohr                                                    Date ▶ 4-16-07

Handwritten signature ▼
                    Susan B Flohr

**9** Certificate will be mailed in window envelope to this address:

Name ▼
Susan B. Flohr c/o Blank Rome LLP                    ( 811255. 0010)
Number/Street/Apt ▼
600 New Hampshire Avenue, N.W.
City/State/Zip ▼
Washington, D.C. 20037

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form TX – Full  Rev. 11/2006  Print 11/2006 — 60,000  Printed on recycled paper.                    U.S. Government Printing Office: 2006-xx-xxx/60,xxx

PPI365

# Exhibit 2

Case 1:07-cv-00841-JR    Document 13-3    Filed 06/07/2007    Page 6 of 57
p.7
202 544-2016
Richard Gordon, Jr.
21 06 01:36p

Page 1 of 3

# CONTRACTUAL AGREEMENT

This contractual agreement is entered into on December 22, 2005 between The George Washington University, hereafter referred to as GWU, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, and RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

WHEREAS, GWU desires to employ the services of Contractor to perform certain tasks; and

WHEREAS, Contractor desires to perform certain tasks for GWU,

NOW, THEREFORE, GWU and Contractor agree as follows:

## 1. DESCRIPTION OF SERVICES
Contractor will perform certain services such as helping to design a computer system architecture for GWU, installing and configuring the Documentum package for use by the Human Resources and Contract Management departments, and other tasks that may be specified by GWU.

GWU shall issue task orders against this contract for specific projects. Task orders shall be added to this contract as appendices.

Services Ordered (BASE) - The statement of work identifies the work to be accomplished. (See Appendix A)  The cost includes estimated labor hours (by labor mix) at a fixed rate per hour for the applicable labor category.  The minimum order shall be 80 hours.

## 2. PERIOD OF SERVICES
GWU retains Contractor to provide services and support for a period beginning January 9, 2006 and terminating January 8, 2007. This agreement may be renewed for additional one year periods upon the mutual agreement of the parties.

## 3. TERMINATION
This agreement shall end upon the termination date; or upon 30 day written notice from one party to the other; or upon the breach of any of the requirements contained herein. In the event of such termination, GWU's obligations shall be limited to payment for services performed prior to such termination and reimbursement of expenses incurred.

## 4. CONTRACTOR PERSONNEL
Contractor shall provide personnel to provide services to GWU, after approval of proposed personnel by GWU.

## 5. REPORTS
When requested, Contractor agrees to furnish written letter reports covering the results of its services, including services on tasks not completed due to termination of this agreement, and recommendations based thereon. Such reports shall be written and prepared in such fashion as to give GWU full and free use thereof, without limitation of any sort.

PPI347

o 21 06 01:36p    Richard Gordon, Jr.                           202 544-2016                p.8

Page 2 of 3

## 6. PROFESSIONAL CAPACITY OF CONTRACTOR

It is understood that the services Contractor will perform hereunder will be in its professional capacity as a Contractor and as an independent contractor; and that at no time shall any employee or subcontractor of Contractor be deemed to be an employee or agent of GWU, nor shall any employee or subcontractor of Contractor have authority to obligate GWU in any manner.

## 7. INVOICING

Payments for services shall be made upon receipt of invoices from Contractor on which Contractor will certify that services were rendered. Contractor shall render invoices on a monthly basis following the month in which services were rendered.

Any expenses to be incurred by Contractor shall be approved in advance in conformance with the usual and customary expense guidelines of GWU. Expense reimbursements will be submitted with itemized expenses and receipts for airline tickets, hotel expenses, and other expenses which GWU may reasonably require.

All invoices shall be submitted to: GWU, Attention: Accounts Payable. Contractor shall maintain appropriate time and expense records pertaining to the services performed under this agreement. Said records shall be subject to examination and audit by GWU.

## 8. ASSIGNMENT

No rights under this agreement may be assigned, and no obligations hereunder may be assumed by any person, agent, or company other than Contractor without the prior written approval of GWU. Contractor agrees to provide Jim Gearing as its representative.

## 9. INSURANCE

Contractor shall carry business liability insurance in the face amount of $4 million. Contractor shall also provide worker's compensation insurance and unemployment insurance for its employees.

## 10. CONFIDENTIAL INFORMATION

In the course of this agreement, Contractor may become familiar with confidential and sensitive information about the operation of GWU, GWU's employees, or GWU's students. Contractors recognizes the sensitivity and confidentiality of this information and agrees that its employees and subcontractors shall not at any time, during or after the term of this agreement, disclose to any person, firm, or other agent any confidential information, except under court order.

## 11. FULL FORCE

Contractor declares that there is no agreement between it and any other person, firm, or corporation which could cause this agreement not to have full force and effect.

## 12. GOVERNING LAW

This agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

## 13. ENTIRE AGREEMENT

The parties of this agreement mutually agree that this agreement contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.

## 14. WRITTEN AGREEMENT

This agreement shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

**The George Washington University**

By: _____
Louis H. Katz

Title: Executive Vice President and Treasurer

Date: 1/4/06

**RICHMAR and Associates**

By: _____
Richard Gordon, Jr.

Title: President/CEO

Date: 12/22/05

**APPENDICES**

**APPENDIX A**

**Statement of Work (SOW) for Record Management System, Upgrades and Enhancements**

**1.0    Introduction**
This effort requires the Contractor to provide technical and management support to The George Washington University for the System Architecture and Documentum package system upgrades and enhancements.

The George Washington University needs the ability to readily account for critical Human Resource Management documents and records that may be maintained across the enterprise, and to establish better accountability for the costs and support of corporate goals and objectives for Contracts reaching the funding stage.    A workgroup with members from the enterprise applications group are tasked with enhancing the University's records management system with additional functions, storage/retrieval capabilities and multiple search/report functions.    The workgroup has identified enhancements and upgrades to be made to the University's computer system architecture and Documentum package.

**2.0    Scope**

The contractor shall provide quality technical, engineering, analytical, planning, and administrative support to GWU's enterprise application workgroup's Record Management systems.    The contractor shall furnish and make available all personnel, supplies, equipment, materials, data, facilities, and services necessary to assist the GWU Workgroup in accomplishing its mission.    As directed by GWU, the contractor may also be required to interface with system integration contractors, equipment manufacturers, University personnel, and various GWU organizations.

**3.0    Requirements**

The contractor shall provide all of the necessary technical engineering, operations research, business, and administrative support such as: planning, organizing, managing, coordinating, and tracking (e.g., report management, cost/schedule/performance measurement, risk management, component procurement management, system engineering management, resource management, data management) required to perform all of the activities successfully as required in accordance with this SOW.

**3.1    Technical Support Tasks**

A. The Contractor shall set up the System Architecture and Documentum application workspace, users and permissions. This shall include the development of impact statements relating to technical feasibility, cost and schedule considerations, along with supporting documentation associated with those functions.

B. The Contractor shall set up organizational and document attributes for the database structure.

C. The Contractor shall design data entry workflow and entry forms that represent the user interface.

## 3.2     Managerial Support Tasks

A. The Contractor shall attend weekly progress meetings with the GWU Workgroup.

B. The Contractor may be required to attend an initial "kick-off" meeting prior to regular weekly progress meetings to where the GWU Project Manager (PM) will provide necessary technical direction within the scope of the statement of work. If any questions arise as to whether any prescribed direction is not within the SOW, the Contractor must contact the GWU PM immediately prior to expending any effort, which is believed to be outside the scope of the SOW.

## 3.3     Administrative Support

A. The Contractor shall develop and prepare briefing packages, brochures, handouts and other information materials in various media. The Contractor shall plan and schedule conferences and meetings including the administration of background and support material.

B. The Contractor shall organize, prepare and execute GWU Workgroup displays and exhibits for technical conferences and shall make project briefings as required. The Contractor shall provide and/or conduct briefings or briefing material on any project information. The Contractor shall take minutes of all project meetings attended. The contractor shall include in the minutes the names of attendees/positions, organizations, phone numbers, and addresses of all persons attending meetings. All minutes of meetings shall be reviewed and approved by the GWU. The contractor shall incorporate all GWU comments into minutes and forward the minutes to the GWU for distribution. The contractor shall not distribute meeting minutes unless directed in writing by the GWU. The contractor's attendance on all meetings shall first be approved by the GWU prior to attendance.

C. The contractor shall perform the GWU Workgroup routine office administration as directed.

D. The Contractor shall arrange and facilitate meetings as directed by the GWU.

## 3.4     Program Management

The contractor shall efficiently and effectively manage the performance under this contract to ensure all the necessary technical, business, and administrative planning; organizing; managing; coordinating; and tracking (e.g., cost, schedule, deliverables), performance management, risk management, component procurement management, system engineering management, resource management, data management, and subcontract management required to perform all the activities successfully as required in the SOW. The Contractor representative is the primary point of contact for work to be performed under the resultant contract. The Contactor shall keep

**PPI351**

Page A3 of 4

the GWU Workgroup informed of any potential problems and make recommendations for solutions.

The Contractor shall ensure that assignments are completed in a thorough and timely manner and prepare written documentation of accomplishments. The GWU requirements in performing this contract demand that the Contractor's engineering, technical, analytical, and administrative support and the level of expertise, experience, and demonstrated performance of contractor personnel providing the services must be at the highest level of providing quality support.

The Contractor shall provide sufficient personnel, both in number and qualification to perform work described herein.

The Contractor shall provide sufficient oversight and supervision of the contract in order to ensure all employees are functioning within their designated labor categories and at acceptable levels of performance, and are performing their designated assignments in a timely manner and that all reporting requirements are honored. The Contractor shall provide a quality assurance system to ensure the University receives quality services as specified in the SOW.

**3.5    Documentation**

**3.5.1    General Requirements**

The Contractor shall coordinate with the GWU Workgroup on all reports, letters, memoranda, project documentation, minutes of meetings, steering committee reports, weekly reports, telephone conversation reports, trip reports and other written material. All documents shall be coordinated through the PM or designee prior to distribution. Further, all documents that will be distributed outside the GWU shall be reviewed for sensitive and/or classified information prior to any distribution of draft or final versions of those documents.

**3.5.2    Document Review**

The Contractor shall provide support to the GWU in the writing and/or reviewing of GWU program documentation. All documents prepared by the contractor shall be on the behalf of the GWU and the contractor may not independently publish or distribute any document without prior written permission from the GWU. The contractor shall review and provide written comments on the technical accuracy and completeness of each document. No documents, reports, information, etc., may be released to the public or provided to any party other than the GWU and it's contractors without review and written approval of the GWU.

**3.6    Reporting Requirements**

The Contractor shall provide a monthly steering report to the PM in letter format. The report shall describe the work accomplished during the reporting period, discuss problems encountered and corrective action taken, pending issues and work planned for the next period. In particular, the report shall address the extent to which any problems or circumstances will cause conflicts with the GWU project schedule.

The Contractor shall provide a monthly detailed breakdown of funds expended during the reporting period, including a breakdown of labor hours utilized by the contractor and any subcontractor, associated labor costs, material costs and other direct costs incurred.

The Contractor shall deliver each steering report no later than the fifth working day of the month following the reporting period.

The Contractor shall provide a weekly briefing to the PM, which will be followed by a written narrative/summary of any agreements/resolutions. The briefing may include alternatives, findings and recommendations concerning problems encountered and corrective action taken, pending issues and work planned for the next week. In particular, the briefing shall address the extent to which any problems or circumstances may cause conflicts with the GWU project schedule.

## 3.7    Deliverables

| Deliverable | Delivery Date |
|---|---|
| System Requirements and Design | March 06, 2006 |
| Upgrade Documentum to version 5.3 | March 20, 2006 |
| Develop General Use Documentum module | April 03, 2006 |
| Develop Human Resources Documentum module | April 24, 2006 |
| Load Human Resources Documents and Records | May 08, 2006 |
| Develop Contract Administration Documentum module | May 29, 2006 |
| Load Contract Administration Documents and Records | June 12, 2006 |
| Develop enhanced system user interface | TBD |
| Develop enhanced reporting capabilities | TBD |
| Modify database tables and attribute structures | TBD |
| Develop archival database subsystem | TBD |
| Develop and deliver long term system support plan | TBD |
| Develop Training Package for Administrators/Webmasters | TBD |
| Deliver Training to Administrators/Webmasters | TBD |

**PPI353**

Page A5 of 4

## A. PERSONNEL

| Labor Category | Rates | Hours | Cost |
|---|---|---|---|
| Executive Management Consultant | $ 150.00 | | |
| Senior Engineer | $ 144.00 | | |
| Senior Management Consultant | $ 125.00 | | |
| Systems Analyst | $ 98.00 | | |
| Quality Analyst | $ 85.05 | | |
| Help Desk Specialist | $ 45.00 | | |
| Administrative Assistant | $ 33.67 | | |
| **Total** | | | |

## B. TASK ORDERS

PPI354

# Exhibit 3

CONSULTANT AGREEMENT

This Consultant Agreement entered into this **3RD** day of **February**, 1986, between COMSAT Technology Products, a corporation duly incorporated, with offices at 22300 Comsat Drive, Clarksburg, Maryland 20871; and Database System Designs, hereinafter referred to as the "Consultant" with offices at 1422 Euclid Street, N.W., Washington, D.C.

WHEREAS, COMSAT Technology Products desires to employ the services of the Consultant to perform certain tasks as set forth herein; and

WHEREAS, Consultant desires to perform certain tasks for COMSAT Technology Products,

NOW, THEREFORE, COMSAT Technology Products and Consultant hereby agree as follows:

1. DEFINITION

COMSAT Technology Products, referred to hereinafter as "CTP", is both the group known as COMSAT Technology Products and any or all of its subsidiaries.

2. DESCRIPTION OF SERVICES

The following tasks shall be accomplished by the Consultant:

The Consultant shall perform mutually agreed upon services relating to the low cost data terminal business, as authorized and directed by CTP.

**PPI401**

The Consultant's point of contact with respect to the specific nature and scope of services to be provided hereunder, and the days the Consultant is to engage in work hereunder, will be directed by <u>Barrick H. Miller, Manager, Computer Engineering, or Robert Meeker, Director of Design Engineering</u>.

3.    <u>PERIOD OF SERVICES</u>

CTP hereby retains the Consultant to render advisory services on an exclusive basis for a period not less than <u>six (6) months</u> during the term commencing <u>January 1, 1986</u> and ending <u>June 30, 1986</u>. This Agreement may be renewed for <u>two (2)</u> periods of <u>three (3) months</u> each upon the mutual agreement of both parties.

4.    <u>REPORTS</u>

When requested, Consultant agrees to furnish written letter reports covering the results of his services, including services on tasks not completed due to termination of this Agreement, and recommendations based thereon. Such reports shall be written and prepared in such fashion as to give CTP full and free use thereof, without limitation of any sort.

5.    <u>INFORMATION</u>

Consultant agrees that the reports furnished hereunder and other information and materials generated directly from performance of services under this Agreement shall be the exclusive property of CTP. Consultant agrees to hold all information related to performance of services acquired by Consultant during performance of such services, in trust and confidence, and to disclose and utilize same only in connection with the performance of services hereunder.

PP1402

6.    PROFESSIONAL CAPACITY OF CONSULTANT

It is understood that the services the Consultant will perform here-
under will be in his professional capacity as a Consultant and as an independ-
ent contractor; and that at no time shall he be deemed to be an employee or
agent of CTP, nor shall he have authority to obligate CTP in any manner.


7.    PAYMENT

CTP, as a retainer, agrees to pay Consultant $ -0- U.S. dollars per
month. Subject to the provisions of Paragraph 3, hereof, the days when the
Consultant is to engage in work hereunder will be designated by CTP and, where
practicable, selected on the basis of mutual convenience of the parties. For
the services hereunder, CTP will pay Consultant a fee of $60.00 per hour for
each day he is engaged wholly in work for CTP excluding expenses. Consultant
will be reimbursed for reasonable actual expenses. A consulting work day
shall consist of eight (8) hours work in a day, but such payment shall be
reduced by   -0-  of $ -0-  for each hour less than   -0-  not worked
during that day. In no event shall Consultant receive more than $ N/A  for
services performed in any one calendar day hereunder, and the total fee paid
under this Agreement shall not exceed $75,000.00, exclusive of travel
expenses. Consultant's work will be performed at   Clarksburg, Maryland
or at other locations as necessary and as authorized by Barrick Miller or
Robert Meeker. CTP will reimburse Consultant for his reasonable and necessary
travel expenses to such places with CTP's prior approval. Travel and transit
time will be considered working time for the purposes of this Agreement.

In the event that CTP does not utilize the full   twenty (20)  days per
month for which Consultant is being paid per above, Consultant agrees to
credit the unused time toward the next month, provided the Contract is not
terminated. This arrangement shall apply to unused time accrued at the end of
the Contract term, provided the Contract is renewed.

-3-

PPI403

8.    <u>BILLINGS</u>

  Payments for services shall be made upon receipt of invoices from
Consultant on which the Consultant will certify that services were rendered.
Consultant shall render invoices on a  <u>monthly</u>  basis following the  <u>month</u>
services were rendered.  Any expense for which reimbursement is claimed shall
be itemized and supported by receipts for airline tickets and hotel accom-
modations, and other such documents as CTP may reasonably require.  All
invoices shall be submitted to: CTP, Attention:  Accounts Payable.  Consultant
shall maintain appropriate time and expense records pertaining to the services
performed under this Agreement.  Said records shall be subject to examination
and audit by CTP.


9.    <u>TERMINATION</u>

  This Agreement shall terminate upon Consultant's death or disability
which prevents him from efficiently performing the services; upon a thirty
(30) day prior written notice from one party to the other; or upon the breach
of any of the requirements contained herein.  In the event of such termina-
tion, CTP's obligations shall be limited to payment for services performed
prior to such termination and reimbursement of expenses incurred.


10.    <u>ADVERTISING</u>

  It is understood and agreed that Consultant will not use the name of
CTP for advertising or promotional purposes without CTP's prior written
permission.

PPI404

11.    <u>ASSIGNMENT</u>

No rights under this Agreement may be assigned, and no obligations hereunder may be assumed by any person other than the Consultant without the prior written approval of CTP. The Consultant Company agrees to provide James Gearing as their representative exclusively.

12.    <u>SUBSEQUENT WORK</u>

Consultant understands and agrees that the execution of this Agreement does not constitute any commitment on the part of CTP, express or implied, that the Consultant will be awarded any subsequent work for CTP.

13.    <u>RIGHTS IN INVENTIONS</u>

The Consultant agrees that any and all ideas, improvements and inventions conceived of, developed, or first reduced to practice in the performance of work hereunder for CTP shall become the exclusive property of CTP; and that any ideas, information and data received by CTP hereunder and ideas and developments accruing therefrom shall be fully disclosed to CTP and shall be the exclusive property of CTP, and may be dealt with by CTP as such without payment of further consideration that is hereinabove specified. Consultant further agrees to execute all papers and documents necessary to vest title to such ideas, developments, information, data, improvements and inventions in CTP and to enable CTP to apply for and obtain letters patent(s) in any and all countries and to assign to CTP the entire right, title and interest thereto.

14.    The Consultant covenants that there is no agreement between him and any other person, firm or corporation which could cause this Agreement not to have full force and effect.

PPI405

15.    This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia.

16.    The parties to this Agreement mutually agree that this Agreement contains the final and entire Agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties, or representations, oral or written, not herein contained.

17.    This Agreement shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date executed by both parties hereto.


COMSAT Technology Products, Inc.

Consultant:
 Database System Designs


By: _Charles A. Zito_              By: _Philip James Gearing, Jr._
     Charles A. Zito                    Philip James Gearing, Jr.

Title: _Vice President &_          Title:  _President/Consultant_
        _General Manager_

Date: _2/14/86_                    Date: _2/3/86_

PPI406

# Exhibit 4

From: 9372997831        Page: 1/2        Date: 12/22/2006 11:18:16 AM

DEC. 22. 2006  9:45AM    BANNER-APPLICATIONS                    NO. 6652  P. 2

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is executed as of December 5, 2006, by and between Crown Partners, LLC, a Delaware limited liability company with a principal place of business at 7750 Paragon Road, Dayton, Ohio 45459, and The George Washington University, a CONGRESSIONALLY CHARTED NON-PROFIT CORPORATION with a principal place of business at 2121 I STREET, N.W. SUITE 601 WASHINGTON DC 20052. As used this Agreement, the party disclosing Confidential Information is referred to as the "Disclosing Party" and the party receiving the Confidential Information is referred to as the "Receiving Party."

**1. Purpose.** The parties wish to explore a business opportunity of mutual interest (the "Opportunity"). In connection with exploring the Opportunity, each party may provide to the other confidential and proprietary information which the Disclosing Party desires the Receiving Party hold in confidence and not to disclose or use except as expressly permitted by this Agreement.

**2. Confidential Information.** "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects, that the Disclosing Party identifies as confidential at the time of disclosure or that a reasonable person would understand to be of a confidential nature. Confidential Information shall not include any information that (a) is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, generally known or available to the public domain, (b) the Receiving Party can demonstrate was rightfully in its possession prior to its disclosure to the Receiving Party by the Disclosing Party, (c) is obtained by the Receiving Party from a third party without a breach of any obligation to the Disclosing Party or (d) is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Confidential Information.

**3. Obligations.** The Receiving Party agrees (a) to hold the Disclosing Party's Confidential Information in strict confidence, (b) not to disclose the Disclosing Party's Confidential Information to any third party; provided, however, the Receiving Party may disclose the Disclosing Party's Confidential Information to its employees, agents and affiliates who have a bona fide need to know such Confidential Information, but only for the purpose of evaluating the Opportunity and only if such employee, agents and affiliates are advised of the confidential nature of such Confidential Information and the terms of this Agreement and are bound by a written agreement to protect the confidentiality of such Confidential Information, and (c) not to use the Disclosing Party's Confidential Information for any purpose other than to evaluate the Opportunity. The Receiving Party agrees to be responsible for any breach of this Agreement by any of its employees, agents and affiliates to whom the Receiving Party discloses the Disclosing Party's Confidential Information.

**4. Maintenance of Confidentiality.** The Receiving Party agrees to exercise the same degree of care in protecting the Disclosing Party's Confidential Information that the Receiving Party uses in protecting its own Confidential Information, but in no event less than a reasonable degree of care. The Receiving Party shall promptly notify the Disclosing Party in the event of any unauthorized use or disclosure of the Disclosing Party's Confidential Information.

**5. Required Disclosure.** The Receiving Party may disclose the Disclosing Party's Confidential Information if and only to the extent that such disclosure is required by any request or order of any governmental authority or by applicable law; provided, however, that the Receiving Party shall notify the Disclosing Party in writing of such required disclosure prior to disclosing the Confidential Information and provide the Disclosing Party a reasonable opportunity to (a) review the disclosure and to interpose its own objection to the disclosure or (b) seek a protective order or other appropriate relief.

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only.
—Page 1

p.2            1-202-994-1553                    Susie O'quinn        Dec 20 08 02:07p

CONFIDENTIAL                                    GW004102

DEC. 22. 2006  9:45AM     BANNER-APPLICATIONS                    NO. 6652    P. 3

**6. Return of Confidential Information.** Upon the Disclosing Party's request, the Receiving Party will (a) promptly return to the Disclosing Party all copies of the Disclosing Party's Confidential Information, (b) destroy all notes, abstracts and other documents containing the Disclosing Party's Confidential Information and (c) provide to the Disclosing Party a written certification of an officer of the Receiving Party that it has done so.

**7. No License.** Nothing in this Agreement is intended to grant any rights to the Receiving Party in or to (a) any of the Disclosing Party's Confidential Information except as expressly set forth in this Agreement or (b) any patent, copyright, trade secret or other intellectual property right of the Disclosing Party.

**8. No Obligations.** Nothing in this Agreement shall obligate either party to proceed with any contemplated transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity.

**9. Term.** The term of this Agreement shall end on the three-year anniversary of the date first set forth above. This Agreement shall only apply to information disclosed during the term. The confidentiality obligations set forth in this Agreement shall expire five years after the end of the term of this Agreement.

**10. Injunctive Relief.** The Receiving Party acknowledges that the unauthorized use or disclosure of the Disclosing Party's Confidential Information would cause irreparable harm to the Disclosing Party and that monetary damages would be inadequate to compensate the Disclosing Party for any such unauthorized use or disclosure. Accordingly, the Receiving Party agrees that the Disclosing Party will have the right to obtain immediate injunctive relief against any breach or threatened breach of this Agreement, without the necessity of proving actual damages, as well as the right to pursue any and all other rights and remedies available at law, in equity or otherwise for such a breach or threatened breach.

**11. Miscellaneous.** This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflict of law provisions thereof. This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. If any term of this Agreement is found by any court to be void or otherwise unenforceable, the remainder of this Agreement shall remain valid and enforceable as though such term were absent on the date of this Agreement. This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed original, and both together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

CROWN PARTNERS, LLC                    THE GEORGE WASHINGTON
                                       UNIVERSITY

By:                                    By:

Print Name: Richard Ware              Print Name: ROMAO C. BEGUE

Print Title: Managing Partner          Print Title: INTERIM CIO

2

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

CONFIDENTIAL                                                    GW004103

# Exhibit 5

# MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement") is entered into as of this 2nd day of January 2007 (the "Effective Date") by and between Crown Partners, LLC, a Delaware limited liability company with a principal place of business at 7750 Paragon Road, Dayton, Ohio 45459 ("Consultant"), and The George Washington University, a Congressionally Chartered not for profit corporation having a notice address of 2121 I Street, N.W., Suite 701, Washington, DC 20052 ("Customer").

Whereas, Consultant and Customer desire to set forth the terms on which Consultant will provide services to Customer from time to time,

Now, Therefore, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Master Agreement.** This Agreement sets forth the terms upon which Consultant will provide to Customer the materials and services set forth in one or more Statements of Work signed by Consultant and Customer during the term of this Agreement. This Agreement also sets forth the terms upon which Consultant will provide to Customer materials and services without the execution of a Statement of Work during the term of this Agreement. In the event of any conflict between the terms of this Agreement and any particular Statement of Work, the terms of the Statement of Work shall govern the project to which the Statement of Work relates. Materials and services provided by Consultant to Customer pursuant to this Agreement or any Statement of Work are referred to herein as "Services."

2. **Payment for Services.** Customer agrees to pay Consultant in the amounts, at the rates, and on the terms set forth in each Statement of Work. If no payment terms are set forth in a Statement of Work, then the following terms shall apply. Consultant will invoice Customer on a time and materials basis at Consultant's then applicable standard rates. Customer will reimburse Consultant for Consultant's reasonable out of pocket expenses incurred in providing Services under this Agreement. Once each month, Consultant shall invoice Customer for the Services and expenses incurred during the prior one month period. Invoices shall be payable within 30 days after receipt.

3. **Consultant Personnel.** Consultant shall be solely responsible for the compensation of its personnel, including the payment of salary, benefits and employment-related taxes and withholding. If Customer is dissatisfied with the performance of any of Consultant's personnel assigned by Consultant to provide Services to Customer, Customer shall notify Consultant of the details of the unsatisfactory performance. At the request of Customer, Consultant will immediately remove from a project any individual who is unsatisfactory to Customer and replace the unsatisfactory individual within a reasonable period of time. Consultant shall be permitted to use subcontractors to provide Services under this Agreement, provided that Consultant shall be responsible for the performance of its subcontractors.

**CONFIDENTIAL**        **ATTORNEYS' EYES ONLY**        **GW004123**

**4. Confidentiality.** In the course of performing or receiving Services in connection with this Agreement, Consultant or Customer (each, when receiving information, the "Receiving Party") may be given or have access to, confidential and proprietary information of the other party (the "Disclosing Party") and the Disclosing Party's affiliates, subsidiaries, business partners, and licensors, including, but not limited to, pricing information, marketing strategies and tactics, research and development information, operation of its computer systems and/or data relating to the approval, administration, use or experience relating to any or all of the Disclosing Party's products (whether marketed or in development), business proposals, manufacturing and distribution processes, customer lists, computer software and related documentation, financial information, and employee data, whether tangible or intangible, and including all copies, analyses and derivatives thereof), that is marked or otherwise identified as proprietary or confidential at the time of disclosure, or which by its nature would be understood by a reasonable person to be sensitive, proprietary or confidential (collectively, "Confidential Information"). The Receiving Party shall not, without the Disclosing Party's prior written consent, disclose to any third party, any Confidential Information. The Receiving Party shall employ the same standard of care in protecting the Confidential Information as it would employ to protect its own confidential information, but shall in no event use less than reasonable care. The Receiving Party shall disseminate Confidential Information to its employees, agents and independent contractors only on a "need-to-know" basis. The Receiving Party shall cause each of its employees, agents and independent contractors who has access to Confidential Information to comply with the terms of this Section in the same manner as it is bound by this Section, with the Receiving Party remaining responsible for the actions and disclosures of any such employees, agents or independent contractors

For purposes hereof, "Confidential Information" does not include information that (i) was rightfully in the Receiving Party's possession without restriction before disclosure hereunder, (ii) was or became public knowledge through no fault of the Receiving Party, (iii) was rightfully disclosed to the Receiving Party without restriction by a third party not bound by a confidentiality restriction, or (iv) was independently developed by the Receiving Party or its employees or agents without reliance on such information. The restrictions in this Section shall not prevent disclosures required by law, court order or other governmental order or demand; provided that the Receiving Party has provides prompt written notice and assistance to Disclosing Party prior to such disclosure, so that the Disclosing Party may seek a protective order or other appropriate remedy to protect against or limit such disclosure.

**5. Intellectual Property Rights.** Information, data, software code, scripts, tools, utilities, materials, works of authorship, documents, abstracts and summaries thereof, concepts, reports, discoveries, processes, systems, methods, inventions, innovations or other intellectual property or know-how, whether or not patentable, copyrightable, or subject to other legal protection that is conceived, discovered, reduced to practice, made or developed by Consultant in the course of performing services for Customer is referred to in this Agreement as "Work Product." Subject to the contrary terms of this Agreement or any Statement of Work, Customer shall own all right, title and interest (including patent rights, copyright rights, trade secret rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all Work Product. All Work Product shall be work made for hire to the extent allowed by law and, in addition, Consultant hereby makes and agrees to make all

2

assignments necessary to accomplish the foregoing ownership. Consultant shall assist Customer, at Customer's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights assigned.

Customer acknowledges that Consultant may undertake projects for clients other than Customer, and in doing so, Consultant personnel may use general knowledge and experience developed in the course of providing services under this Agreement without reference to any of Customer's Confidential Information. Notwithstanding any other provision of this Agreement or any other agreement contemplated hereby, Customer agrees that to the extent that Work Product developed pursuant to this Agreement is of such a nature that it would be subject to reuse, with or without modification, on Consultant's subsequent projects ("Generic Inventions"), such Generic Inventions shall be the property of Consultant, and Consultant shall grant Customer a nonexclusive, perpetual, non-transferable, royalty free license to use the Generic Inventions for Customer's internal business purposes. Consultant shall have the right to develop, use, market, and license any software or data processing material that is similar or related to Generic Inventions developed by Consultant for Customer.

Customer acknowledges that any tangible or intangible deliverable developed by Consultant prior to this Agreement or for another party independent of Consultant's work under this Agreement remains the exclusive property of Consultant ("Existing Consultant Property"). If any Existing Consultant Property is incorporated in any of the deliverables provided to Customer pursuant to this Agreement, Consultant shall grant to Customer a nonexclusive, perpetual, non-transferable, royalty free license to use the Existing Consultant Property for Customer's internal business purposes. In the event that pursuant to any Statement or Work, Customer licenses from Consultant one or more of Consultant's software products ("Consultant Software Products"), such Consultant Software Products shall be licensed to Customer under the terms of a separate software license agreement to be negotiated by Consultant and Customer, and the license granted under this Agreement shall not apply to such Consultant Software Products.

6. **Limited Warranty and Liability.** Consultant warrants that the Services provided hereunder will be of a professional quality conforming to generally accepted industry standards. In addition, Consultant represents and warrants that (a) none of the Services or any part of this Agreement is or will be inconsistent with any obligation Consultant may have to others; (b) the Services or Work Products as they are delivered to Customer will not infringe, misappropriate or violate any intellectual property or other right of any person or entity; (c) Consultant has the full right to provide Company with the assignments and rights provided for herein (including without limitation, through execution of appropriate written agreements with its employees, agents and contractors).

THE FOREGOING WARRANTY IS PROVIDED IN LIEU OF ALL OTHER WARRANTEES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WHICH ARE SPECIFICALLY DISCLAIMED.

EXCEPT IN THE CASE OF BREACH OF CONFIDENTIALITY OR INFRINGEMENT, IN NO EVENT SHALL CONSULTANT OR CUSTOMER OR THEIR

3

CONFIDENTIAL

**ATTORNEYS' EYES ONLY**

GW004135

RESPECTIVE EMPLOYEES, AGENTS, OWNERS OR OFFICERS BE LIABLE TO THE OTHER PARTY FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT AMOUNTS PAYABLE BY CUSTOMER TO CONSULTANT FOR SERVICES OR REIMBURSEMENT OF EXPENSES, AND EXCEPT IN THE CASE OF BREACH OF CONFIDENTIALITY OR INFRINGEMENT, THE LIABILITY OF CONSULTANT AND CUSTOMER AND THEIR RESPECTIVE EMPLOYEES, AGENTS, OWNERS AND OFFICERS SHALL BE LIMITED TO THE AMOUNT RECEIVED BY CONSULTANT FROM CUSTOMER UNDER THIS AGREEMENT DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM. No action, regardless of form, shall be brought against either party or its employees, agents, owners or officers more than one year after the occurrence of the circumstances giving rise to the cause of action became known to such party. The passage of thirty days from the delivery of Services or deliverables to Customer without written notice of non-acceptance from Customer or Customers' use of the Services or deliverables shall constitute final acceptance of the Services or deliverables.

7. **Term and Termination.** This Agreement shall commence on the Effective Date and will continue in full force and effect until terminated as provided herein. This Agreement may be terminated, in whole or in respect of any particular Statement of Work, by either party upon ten days prior written notice to the other party. Notwithstanding the foregoing, in the event that Customer does not pay any invoice within ten days of the date payment was due, Consultant shall have the right to immediately terminate this Agreement or any related Statement of Work by notice to Customer, or leave the Agreement in place and cease all work under any active Statements of Work.

If this Agreement is terminated in accordance with the terms hereof, Consultant shall stop work and act diligently to minimize further costs. In the event of any early termination of this Agreement, Customer shall pay Consultant for the Services delivered through the date of termination and the reasonable non-cancelable costs and expenses incurred by Consultant up to the effective date of termination (but in no event more than the total amount payable for the applicable phase). The provisions of Sections 4-19 shall survive any termination or expiration of this Agreement.

8. **Non-Solicitation.** During the time Consultant is providing Services under this Agreement and for a period of one year thereafter, Customer shall not intentionally or knowingly directly or indirectly Hire (as defined below), or solicit for Hire, Employees (as defined below) of Consultant who performed any Services under this Agreement or any related Statement of Work. For purposes of this Agreement, the term "Hire" shall mean hiring a person as an employee or directly or indirectly receiving services from such person as a consultant, agent or in any other capacity. For purposes of this Agreement, the term "Employee" shall mean any current employee, agent or contractor of Consultant and any person who has been an employee, agent or contractor of Consultant during the prior one year period.

4

**9. Governing Law.** All questions concerning the validity, operation, interpretation, and construction of this Agreement will be governed by and determined in accordance with the substantive laws of the State of Delaware and the Federal laws of the United States, without giving effect to the conflicts of law provisions thereof.

**10. Waiver of Compliance.** Neither party shall by mere lapse of time, without giving notice or taking other action hereunder, be deemed to have waived any breach by the other party of any of the provisions of this Agreement. Further, the waiver by either party of a particular breach of this Agreement by the other shall not be construed as or constitute a continuing waiver of such breach or of other breaches of the same or other provisions of this Agreement.

**11. Force Majeure.** If the performance of any obligation under this Agreement by either party (other than the obligation to pay amounts due hereunder) is prevented, restricted, or interfered with by reason of war, revolution, civil commotion, acts of public enemies, blockade, embargo, strikes, any law, order, proclamation, regulation, ordinance, demand, or requirement having a legal effect of any government or any judicial authority or representative of any such government, which is beyond the reasonable control of the party affected, then the party so affected shall, upon giving prior written notice to the other party, be excused from such performance to the extent of such prevention, restriction, or interference, provided that the party so affected shall use reasonable commercial efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder with reasonable dispatch whenever such causes are removed. Neither party shall be in default if any delay or failure to perform any obligation hereunder (other than the obligation to pay amounts due hereunder) that is caused by events beyond such party's control.

**12. Partial Illegality.** It is intended that this Agreement shall not violate any applicable law and the unenforceability or invalidity of any provision (other than the provisions obligating Customer to make payments to Consultant) shall not effect the force and validity of any other provision and such invalid provisions shall be deemed severed from this Agreement, and, if permissible, be replaced with terms which as closely as possible approximate the intent of such invalid provisions.

**13. Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

**14. Headings.** The headings contained in this Agreement are for convenience of reference only and do not qualify or affect in any way the meaning or interpretation of this Agreement.

**15. Entire Agreement.** The parties hereto acknowledge that this Agreement, together with any Statements of Work attached hereto or executed after the date hereof, is the complete and exclusive statement of agreement respecting the subject matter hereof and supersedes and renders null and void any and all agreements and proposals (oral or written), understandings, representations, conditions, and other communications between the parties relating hereto and shall constitute the only valid binding and enforceable agreement between them. This Agreement

5

CONFIDENTIAL

ATTORNEYS' EYES
ONLY

GW004127

may be amended only by a subsequent writing that specifically refers to this Agreement. In no event will the terms of any purchase order or other document be of any legal effect if such purchase order or other document is not signed by both of the parties hereto, regardless of any terms set forth in any such purchase order or document stating that commencement of work under or payment of amounts due under any such purchase order or other document constitutes approval.

16.  **Construction of Agreement.** Each party represents that it has carefully read and fully understands the scope and effect of all the provisions of this Agreement, and that it was offered such period as it deemed necessary to consider it. Consequently, any language deemed to be ambiguous contained herein shall not be construed in favor of one party over the other.

17.  **Relationship.** Notwithstanding any provision hereof, for all purposes of this Agreement each party shall be and act as an independent contractor and not as partner, joint venturer, employer, employee or agent of the other and shall not bind nor attempt to bind the other to any contract. Consultant is an independent contractor and is solely responsible for all taxes, withholdings, and other statutory or contractual obligations of any sort, including, but not limited to, Workers' Compensation Insurance.

18.  **Remedies.** Each party acknowledges and agrees that in the event of any breach or threatened breach of Section 4 or 5, the other party will suffer irreparable damage for which it will have no adequate remedy at law. Accordingly, each party shall be entitled to injunctive and other equitable remedies to prevent or restrain, temporarily or permanently, such breach or threatened breach, without the necessity of posting any bond or surety, in addition to any other remedy that such party may have at law or in equity.

In Witness Whereof, the parties have executed this Agreement as of the Effective Date.

The George Washington University            Crown Partners, LLC

By: _____            By: _____
            Louis H Katz
Name: Executive Vice President & Treasurer   Name:  RICHARD S. HEARN

Title: _____          Title:  MANAGING DIRECTOR

6

CONFIDENTIAL                    ATTORNEYS' EYES
                                     ONLY                            GW004128



## Services SOW

Crown Partners, LLC ("Crown Partners" or Subcontractor") agrees to provide products and services to The George Washington University ("GWU" or "Company") under the following terms and conditions. Crown Partners' and GWU's signature of this Services SOW is an acknowledgment of this SOW. Crown Partners's signature of this Services SOW is acknowledgement of this SOW and the GWU Master Services Agreement (MSA) dated *1-2-2007,*

This SOW is intended to set forth the services to be provided for relationship between the Company and Subcontractor  The Company enters into this SOW at it requires additional services in skill areas possessed by the Subcontractor.

This SOW is hereby executed on behalf of the parties on the date last below written

By: _____          By: _____

Printed: Louis H. Katz                Printed: *RICHARD S HEARN*

Title: Executive Vice President and Treasurer   Title: *MANAGING DIRECTOR*

Date: *2-6-2007*                      Date: *2-6-2007*

For and on behalf of                  For and on behalf of Crown Partners, LLC
The George Washington University

Accordingly The George Washington University and Crown Partners, LLC jointly agree to the following SOW conditions:

### 1. Standard Charges and Payment Terms.

GWU will be charged for the actual hours provided by Crown Partners in performing services described in Section A, at the following hourly rates:

Hourly Rate for resource(s):
- Technical Lead (100%) – Sr. Consultant: $176.00 / Hour/resource (plus actual expenses incurred).
- Project Administration (20%) – Consultant: $155 00 / Hour/resource (plus actual expenses incurred).

Crown Partners will prepare a monthly invoice based on the hourly-billing rate. In addition, GWU will reimburse Crown Partners for approved travel and living expenses incurred in providing these services. Payment will be made as outlined in the MSA.

### 2. Acceptance.

Signature constitutes acceptance of this Statement of Work in accordance with the terms and conditions of the GWU MSA.

### 3. Services Description.

This Statement of Work represents an agreement between GWU and Crown Partners

GWU would like Crown Partners to provide support for a current DCMS (Documentum/Captiva) deployment for HR Personnel, conversion advice for our ORS/GCAS Desktop customization on 5 2 to WebTop 5.3 and advice on design of the Flexible Framework for DCMS.

The services to be provided are detailed below.

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client Internal use of only.
Page 1 of 5

CONFIDENTIAL          ATTORNEYS' EYES
ONLY

GW004129



## Services SOW

**a. Services to be delivered.**

Activities to be performed under this statement of work include:

5 weeks of support on the current implementation and DCMS design to include:

1. 5 days to review the DCMS source code and provide an evaluation of adherence to best practice for WDK/WebTop API development

2. 5 days to provide support for issues relating to the current code and modifications to provide additional functionality to HR Personnel including Brava integration

3. 5 days to provide design advice to implement an indexing and split/join functions in DCMS to complete the indexing of batches scanned by eInput, partially indexed, processed by IA, separated into PDF documents, exported to DCMS, listed as a batch for selection and then presented 1-by1 for viewing and indexing.

4. 3 days to provide advice on steps to move the ORG/GCAS Cabinet in the 5.2 environment to the new 5.3 environment including the documents with full text indexing. The current 5.2 customized desktop code should continue to work until converted to DCMS.

5. 7 Days to provide design advice on implementing a flexible framework to allow the rapid deployment of DCMS Cabinets across the University giving offices the flexibility of assigning their own attribute labels and values.

The timeframes listed above are best estimates by GW and will be confirmed, and modified if appropriate, both after the initial meeting with the GW project team has taken place and during the engagement.

**b. Delivery Schedule.**
This Statement of Work is effective February 5th 2007 through April 27th 2007 or three months from actual start date. GWU may extend the resource(s) upon written request no less than two (2) weeks prior to completion of effective period. GW will engage the resources for contiguous periods of time up to 5 days and a minimum of 2 days.

**c. Primary Contact for contract**

The George Washington University, Christina Griffin, Asst. Director, Project Management Office. cgriffin@gwu.edu , 703-726-1911

Crown Partners Project Administrator: Andrea Kozak; andrea.kozak@crownpartners.com , 830-991-7878.

The assigned resources will be consultants with experience utilizing Java wrappers for Documentum/Captiva and Brava. Crown Partners reserves the right to substitute resources but intends to utilize the resources named above

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use only.
Page 2 of 5

CONFIDENTIAL        ATTORNEYS' EYES
ONLY        GW004130



## Services SOW

### d. Estimated Hours and Cost

| Total Estimated Hours | 240 | Crown Partners | | |
|---|---|---|---|---|
| Role | Hours | Price | Cost | |
| Technical Lead | 200 | $  175.00 | $  35,000 | |
| Project Administrator | 40 | $  155.00 | $  6,200 | |
| Sub Total | | | $  41,200 | |
| Estimated Expenses | | | $  6,160 | |
| Total Estimated Cost | | | $  47,360 | |

### e. Anticipated Start Date.

February 5th, 2007

### f. Assumptions

1. Crown assumes that any requested scope modifications will require a Project Change Order Effort on the project shall be billed monthly on a time and materials basis. Payment will be made as outlined in the MSA.

2. Mutually agreed upon changes to the scope of this engagement will be achieved through the Change Control Process and may affect the overall cost and timeline. (Attachment 1)

3. Client will reimburse Crown Partners for approved travel and living expenses incurred in providing these services. Travel time to and from the customer site will be accomplished between Monday and Thursday and will not be billable time.

4. Client will provide the necessary resources to assist Crown Partners providing services defined in this agreement. Crown assumes that GWU will provide access to key information technology professionals supporting computing hardware infrastructure, system software, and development standards.

5. Schedule will not be contiguous from start date, but will fall within the start and end dates. Delays in the delivery due to unavailability of client resources will be a cause for a project change order

6. Crown will make every effort to identify problems, and define and implement corrective actions as discussed in the activities in Section 3 above, however, Crown can not guarantee resolution of problems in the timeframes set above. In situations where resolution can not be made in the defined timeframe, Crown will provide and estimated time and cost for resolution.

7. Crown assumes that this engagement is complete and accepted upon submission and review of the deliverables defined in Section 4.

8. Crown assumes that GWU will provide Internet Access from within GWU facilities.

9. Crown assumes that GWU will provide a development, test, and production environment to support any required software promotion lifecycle.

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client Internal use of only.
Page 3 of 5

CONFIDENTIAL                    ATTORNEYS' EYES                    GW004131
                                     ONLY



## Services SOW

10. Crown assumes that GWU will provide workspace for Crown Partners personnel including desk, chair, telephone, system access, security clearance, etc.

11. Crown assumes that business reorganizations will not occur during the delivery of this solution and that key personnel on the project team will not be reassigned during the duration of this Statement of Work.

12 Crown assumes that customer personnel will be available to review and will approve all major Project Milestones upon successful completion

### 4. Deliverables

Crown Partners will provide George Washington University with the following deliverables:

1. A detailed Microsoft Word document summarizing the systems adherence to best practice for WDK/WebTop API development and recommendations for any changes to improve best practices.

2. Support to GWU in diagnosing and making existing systems enhancements with a detailed Word document identifying key enhancements and estimates of costs and timeframes to implement them

3. A recommendation outlining steps to migrate the ORG/GCAS Cabinet to the 5.3 environment

4. A Indexing Design Document in a PPT format

5 A Flexible Framework Design Document in PPT format

Entire contents © 2006 Crown Partners, LLC
CONFIDENTIAL: For Client internal use of only.
Page 4 of 5

CONFIDENTIAL                    ATTORNEYS' EYES
                                    ONLY                            GW004132



## Services SOW

### Attachment 1
### CHANGE REQUEST
### EVALUATION RESPONSE FORM

**Insert Project Name**
Change Request No.:
Requestor Name:
Review Date:

**Request No._____ has been:**
- ☐ Accepted without changes
- ☐ Accepted with modifications (see below)
- ☐ Redirected for further study (schedule and cost to be mutually agreed)
- ☐ Rejected

**Modifications to Change Request:**
(Insert any changes that are made to the original Change Request. Identify, in detail, the changes to the scope of work, schedule and costs.)

**Background:**
(Insert the justification for the proposed change and how it impacts the overall scope and any issues it presents.)

**Schedule Revision:**
(Insert new dates [or attach revised Project plan/schedule] which show the impact of the Change Request, if any.)

**Cost Revision:**
Additional Cost: $
Party Responsible for Cost:
Payment Due Date:
Acceptance Criteria/Deliverables:

**Agreed and Signed:**

Client Name, Inc.:                         Crown Partners, LLC:

By: _____               By: _____

Name:  Louis H. Katz                     Name: _____
Title:  Executive Vice President and Treasurer   Title: _____
        The George Washington University
Date: _____, 2006                Date: _____, 2006

CONFIDENTIAL                    ATTORNEYS' EYES
ONLY

# Exhibit 6

A Master SOW for
# George Washington University

THE GEORGE WASHINGTON UNIVERSITY

**Master Statement of Work**

**DCMS Framework**

**April 25, 2007**

CONFIDENTIAL
ATTORNEYS' EYES
ONLY
GW004151



**Master Statement of Work for DCMS Framework**

## 1.0   Table of Contents

1.0    Table of Contents ............................................................................................ 1

2.0    Our Understanding of Your Needs.......................................................... 2

3.0    Project Objectives ........................................................................................ 3

4.0    Solution Description .................................................................................... 4

5.0    Implementation Methodology:  Task Orders.................................... 6

6.0    Project Scope ................................................................................................ 7

7.0    Project Resource Plan ............................................................................... 8

8.0    Project Schedule ........................................................................................ 10

9.0    Customer Responsibilities ...................................................................... 11

10.0   Assumptions................................................................................................ 12

11.0   Project Budget............................................................................................. 13

12.0   Knowledge Transfer ................................................................................. 14

13.0   Project Authorization .............................................................................. 15

Appendix 1: Change Control Template ......................................................... 16

Appendix 2: Project Management Status Report Template.................... 17

Appendix 3: Sample Task Order ....................................................................... 19

CONFIDENTIAL                         ATTORNEYS' EYES
                                         ONLY                              GW004152

 **PARTNERS**                     **Master Statement of Work for DCMS Framework**

# 2.0   Our Understanding of Your Needs

The George Washington University (GW) has invested in EMC's Documentum software to support the University's business continuity objectives. Meeting GW's continuity objectives will involve implementing the Documentum platform in a manner that meets the diverse and sometimes conflicting needs of departmental line-of-business users, the Information Systems & Services (ISS) group and the GW executive management. To provide an amenable solution to all constituents, the Information Systems & Services has established the vision of a "Framework with a flexible front-end" for the Document and Content Management System (DCMS). The DCMS Framework will:

- *Provide scan / upload / retrieval functionality* to line-of-business users in an easy-to-use, intuitive manner that provides a custom experience for each department, but is consistent in presentation and functionality across the enterprise. This includes migrating the existing functionality of the DCMS HR Personnel application.
- *Is supportable, scalable and extensible* to meet the administration and support needs of the ISS Administrative Application department. The DCMS Framework will be implemented using only Documentum-recommended Web Development Kit components to ensure compliance with the Documentum upgrade path. The DCMS Framework will be implemented in a manner that can scale to meet the image and document management needs of GW's diverse departments and 2000-plus employees. The DCMS Framework will establish a foundation for basic scan / upload / retrieval functionality in the short-term while enabling more advanced functionality such as workflow, electronic forms, annotation and retention policy in the future.
- *Enable Rapid Deployment* of the line-of-business departments consuming the DCMS scan / upload / retrieval functionality. Rapidly deploying the DCMS functionality is a strategic imperative to achieving GW's business continuity objectives.

In addition to the DCMS Framework development and DCMS application migration to a WDK based solution; GW requires additional Documentum implementation support to migrate the ORS/GCAS application to the DCMS Framework and to consolidate the Content Server environments, likely requiring data and content migration or transformation.

Successfully accomplishing GW's stated needs will result in the following business benefits:
- Achieve business continuity objectives
- Reduce impact of event risk
- Ensure protection & redundancy of critical documents & records
- Easily share, find and access Information in a secure manner
- Reduce operating expenses associated with finding information
- Improve decision making through access to better information
- Improved compliance & audit trail
- Scale infrastructure to meet expanding needs without incremental cost growth
- Enable university knowledge worker productivity

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL: For Client Internal use of only

CONFIDENTIAL                     **ATTORNEYS' EYES ONLY**                     GW004153

 **Master Statement of Work for DCMS Framework**

## 3.0   Project Objectives

Project Objectives describe the measurable goals that should be obtained as a result of the DCMS Flexible Framework project. Crown Partners' approach to implementing the DCMS Framework application is based on the following objectives:

1) Establish a roadmap that clearly articulates how the DCMS Framework will enable increasingly sophisticated content management functionality to the GW user community.
2) Provide a front-end wizard driven DCMS Framework application that can enable a business analyst to provide a GW department with scan / upload / retrieval functionality based on department-specific requirements in approximately two weeks.
3) Establish the application infrastructure for providing additional content services in the future in a manner consistent with EMC Documentum's best practices for Web Development Kit (WDK) implementation.
4) Provide a migration path for both ORS-GCAS and HR Personnel from the existing Documentum implementations to the DCMS Framework.

The section, "Solution Description," explains how these objectives will be realized.

CONFIDENTIAL                    **ATTORNEYS' EYES ONLY**                    GW004154



**Master Statement of Work for DCMS Framework**

## 4.0   Solution Description

### The DCMS Flexible Framework solution will include:

1. Configuration Wizard
    a. *Administrative* functionality to deploy department-specific extensions of the core GW cabinet
    b. *WDK Component Generator* (configuration) to customize the presentation of the DCMS upload / scan / retrieval interface in a department-specific manner for both manually identified document types *and* for those documents whose attributes are dynamically generated from pointers to Systems of Record (Banner, EAS, etc.) without involving custom WDK development. Only document types and corresponding attributes that are specific to the security profile of the user will be presented. (SOR integration is included in the analysis and design, but implementation is currently outside the scope of this Master SOW.)
    c. *Captiva eInput* Customizing the presentation and configuration of the Captiva eInput application. This involves eInput consuming the index configuration file (XML) from the Configuration Wizard & dynamically assembling the department-specific index page. Note: modifications to the InputAccel process (IPP) are outside the scope of this Master SOW.
2. WDK Application with existing DCMS functionality:
    a. Migrate the base struts-based DCMS functionality to a WDK application.
    b. Pilot the DCMS Framework by configuring the new base WDK application to emulate the HR Personnel implementation look and feel.
3. Foundation WDK Application to expose additional content management functionality over time. This Foundation WDK Application will be the Crown Partners DigiFirst™ application or equivalent. Functionality might include workflow, electronic forms, split/join, annotations, records and retention policy, lifecycles and business activity monitoring.

### Vision

The vision use-case for the DCMS Framework Flexible Front-end application initiates with the Documentum Analyst or System Administrator completing document audits with representatives from a department. The document audits identify the document types, search criteria, document volumes, categorize user security, establish archive or retention requirements and identify system of record linking requirements. The Documentum Administrator then uses these document specifications as inputs for the DCMS Framework Flexible Front-end Configuration Wizard.

Launching the Wizard guides the Administrator through the logical process of deploying the department-specific cabinet(s) and establishing the relationships between cabinets, attributes and document types. The Administrator would incorporate security and add users using the Documentum Administrator client. Next, the Wizard guides the Administrator through the

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL:  For Client internal use of only

CONFIDENTIAL

ATTORNEYS' EYES
ONLY

GW004155



**Master Statement of Work for DCMS Framework**

WDK presentation configuration of the scan and upload, search and search results pages. Dynamically generated search pages from systems of record would be simulated and final presentation tweaked during this step of the process. With the Wizard process now complete, the System Administrator executes the automated build episode and the WDK component generator produces the deployment packages for the Documentum and Captiva eInput applications for the Test environment. Department users then execute acceptance test scripts based on the original document audit specifications against the newly configured application. Upon successful completion, the System Administrator migrates the WDK application and eInput application to the production environment and schedules the document audits with the next department.

CONFIDENTIAL                    ATTORNEYS' EYES
                                    ONLY                        GW004156

 **Master Statement of Work for DCMS Framework**

# 5.0   Implementation Methodology:  Task Orders

The purpose of this Master Statement of Work is to provide guidance to the project team by communicating the currently understood project scope, expected external (Crown) resources and resulting budget, anticipated implementation timeline and approach – via Task Orders.  No work items, deliverables, resources or obligations will be established by this Statement of Work.  Specific work items will be contracted individually using Task Orders that relate to the Master Statement of Work.  A Task Order will represent a contractual obligation and will be grouped into one of three categories:  Design, Development and Implementation.  Task orders will range in duration from four to six weeks and will establish scope, budget, schedule, deliverables and resources.  Change control will normally occur for Task Orders, not for this Master Statement of Work.

Please see Appendix 1 for the Change Control template.

Please see Appendix 3 for a sample Task Order.

CONFIDENTIAL                      **ATTORNEYS' EYES
ONLY**                      GW004157

 **PARTNERS**    **Master Statement of Work for DCMS Framework**

## 6.0   Project Scope

### *Included In Scope*

The scope for the DCMS Framework project includes Documentum implementation services in the following areas:

1.  DCMS HR Personnel application functional analysis and solution design for migration to a WDK architecture.
2.  Flexible Front-end Wizard requirements analysis, solution design, development, testing and deployment for manually created department cabinets, folders, document types and related attributes.
3.  Flexible Front-end Wizard requirements analysis and solution design only for dynamically generated index, upload, search and search results from systems of record (Banner and EAS) integration.
4.  Analysis and Design to establish the Roadmap for extending additional content management functionality through the Foundation WDK Application.  This application is the Crown Partners DigiFirst or equivalent application.
5.  Implementation or Development, Testing and Deployment of the Foundation WDK Application, Crown Partners DigiFirst or functional replacement.
6.  Analysis, design, development, testing and deployment for distributed administration enabling cabinet owners to attach users, set profiles and manage list-of-values (LOV) for attributes.
7.  Performing a DCMS Framework Pilot to validate and test the implementation process and application functionality.
8.  Analysis-only for architectural accommodation in the Framework for integration with GW Systems-of-Record (Banner, EAS) with implementation if time and budget permits.
9.  Migration of ORS/GCAS and HR Personnel applications including Captiva eInput application to DCMS Framework, time and budget permitting.

### *Out of Scope*

The following items are out of scope for the DCMS Framework project:

1.  Development, testing or deployment services surrounding Framework Front-end wizard-generated index pages for the Captiva eInput application other than knowledge support.
2.  Extending content management functionality beyond scan, index, upload, search and retrieval capability other than building in future use of DigiFirst functionality.
3.  Modifications to the InputAccel process(es), IPP files other than knowledge support.

CONFIDENTIAL                        ATTORNEYS' EYES
                                   ONLY                              GW004158

 **Master Statement of Work for DCMS Framework**

## 7.0   Project Resource Plan

This project will be delivered using a blended team of resources from GW's Information Systems & Services department and Crown Partners. A core team of resources are expected to participate continuously on the project with specialized resources added as required and defined by individual Task Orders.

These activities account for the time required to complete project activities including (but not limited to) the following:

### *George Washington Resources:*

**Project Manager:** Responsible for the management of Scope, Schedule, and Budget, Status Reporting, Time/Expenses validation, issue management & escalation, perform cross-project and cross-team coordination, orchestrate meetings, manage and document change order process.

**WDK Developer:** Responsible for development/configuration of WDK tasks as assigned by Technical Lead in accordance with requirements and design documentation, execution of unit testing against code and configuration items.

**Captiva eInput Developer:** Responsible for Captiva eInput and InputAccel application development and IPP file creation. This includes the activities pertaining to requirements gathering, input capture system design, application development and integration, testing, deployment, documentation and user and administrator training.

**Documentum & Captiva System Administrator:** Responsible for all system administration activities for the Documentum and Captiva infrastructure and client applications. For specific administration requirements, refer to the respective Documentum and Captiva Administrator Guides.

**DCMS Subject Matter Expert:** Responsible for providing knowledge of the existing DCMS system as well as it's uses within the user community and the business processes affected by it's modification/enhancement.

**Framework and front-end wizard Visionary:** Responsible for communicating the DCMS framework, front-end wizard and business/functional requirements. These requirements will serve as direct input during the Requirements Analysis and Solution Design activities.

### *Crown Resources*

**WDK Technical Lead:** Responsible for ensuring and helping the client understand how the solution makes its way into production, translates functional requirements into design specifications, manages the technical implementation of the project, ensures compliance to technology standards, technical best practices, and correct implementation of functional

CONFIDENTIAL

ATTORNEYS' EYES ONLY

GW004159

 **Master Statement of Work for DCMS Framework**

requirements, perform knowledge transfer, performs code reviews/integration testing, perform technical issue management, define solution architecture and technical/development tasks, resources and dependencies to the PM, review all technical deliverables

**WDK Developer(s):** Responsible for development/configuration of WDK tasks as assigned by Technical Lead in accordance with requirements and design documentation, execution of unit testing against code and configuration items.

**Documentum Architect:** Responsible for defining and implementing the EMC| Documentum architecture per best practices and GW infrastructure requirements.

**Captiva eInput Developer:** Responsible for development/configuration of Captiva tasks as assigned by Technical Lead in accordance with requirements and design documentation, execution of unit testing against code and configuration items.

**Project Administrator:** Responsible for Crown resource and deliverable management; including time & expenses, invoicing and status reporting. The Project Administrator will also work with the GW Project Manager to process change orders and to reconcile Crown time and expenses and task order budgets.

CONFIDENTIAL                    **ATTORNEYS' EYES ONLY**                    GW004160



## 8.0   Project Schedule

Crown estimates that the effort described in this Master Statement of Work can be completed in approximately five to seven months and consuming twelve to sixteen FTE-months of Crown development support spread across two to four engineers. George Washington University ISS will contribute equal development resources and maintain project management responsibility.

Crown anticipates a May 7, 2007 project start date. Crown may require up to three weeks from the execution of the Master Statement of Work to fully staff and begin the project.

CONFIDENTIAL                              ATTORNEYS' EYES
ONLY                              GW004161



## 9.0   Customer Responsibilities

George Washington University's knowledge of its processes and requirements are a fundamental part of delivering a successful project. The following responsibilities will be assumed by George Washington University:

- Overall management responsibility for the project including managing the budget, the focus and prioritization of project scope items, the project schedule and timeline.
- Captiva eInput and InputAccel application development.
- Provide a dedicated GW project manager who will work with Crown and the George Washington University's Director of Enterprise Document Management as a primary point of contact to optimize the best use of time and resources
- Ownership of the overall solution delivery including all requirements, configurations, source code, test protocols and deployment specifications.
- Subject Matter experts and Business Users will participate in the refinement of Application Requirements
- Resources from the Information Systems and Services group will be available to address any infrastructure issues
- ISS Documentum Support Staff will be available throughout the project.

CONFIDENTIAL                          ATTORNEYS' EYES
ONLY                          GW004162



## 10.0 Assumptions

The following are assumed:

1.  GW will manage this project via an incremental delivery approach with each delivery episode defined by an individual Task Order.
2.  The GW Project Manager will be able to sequence the Task Orders without downtime where it is desirable for Crown resources to participate contiguously on sequential Task Order efforts.
3.  GW will provide all development infrastructures for Crown resources except for laptops.
4.  The GW ISS project team will be able to clarify questions surrounding functionality of the DCMS for HR Personnel and the Flexible Front-end for the DCMS.
5.  Effort estimates assume leveraging DigiFirst for the WDK Foundational application to quickly expose tabbed browsing, SOR integration, image split-join manipulation, virtual folders, workflow, electronic forms and annotations.
6.  Crown will invoice George Washington University for reimbursement, at cost, of all pre-approved, reasonable travel and out-of-pocket living expenses incurred by the Crown team.
7.  Mutually agreed upon changes to the scope of this engagement will be achieved through the Change Control Processes and may affect the overall cost and timeline.
8.  George Washington University will provide co-development Subject Matter Experts to work in conjunction with Crown throughout the project.
9.  GW resources will perform all InputAccel eInput customizations. Crown will support GW's effort with expertise, when requested.
10. Crown and GW assume that key personnel on the project team from both Crown and GW will not be reassigned during the duration of this Master Statement of Work unless agreed to by both parties and that any George Washington University business reorganizations will not affect the delivery of this solution.
11. George Washington University will be available to review and will approve all major Project Deliverables upon successful completion, as per approved functional requirements.
12. Unless otherwise agreed upon, George Washington University is responsible for any and all subsequent training activities outside the scope of this Master Statement of Work.
13. Crown assumes that knowledge transfer will occur throughout the project.
14. In the case that Knowledge Transfer must occur at the end of the project, Crown anticipates that it will take two weeks to perform Knowledge Transfer assuming that George Washington University provides a technically proficient Documentum WDK developer resource.
15. GW will provide all hardware and software associated with this development project with the exception of Crown resource requirements for PCs and associated products.
16. Most work will be performed on-site at GW and some at Crown Partners facilities at the discretion of the GW Project Manager.
17. GW will provide workspace for Crown personnel including desk, chair, system access, security clearance, etc. when work is performed on-site at GW.



# 11.0 Project Budget

Crown's budgetary estimate this project is $755,000.

## Budget Detail:

| | | |
|---|---|---|
| – | Crown DigiFirst: | $ 50k + Maintenance  (Discounted to GSA pricing) |
| – | Crown Technical Staff: | $300k (12 person mo over 4-6 mo duration) |
| – | Crown Technical Staff Contingency: | $150k (6 person mo over 2-3 mo duration) |
| – | Crown Project Administration | $ 40k (Overall Project Management to be done by GW) |
| – | Estimated Travel/Living expense: | $ 80k |
| – | ORS/GCAS V5.3 upgrade | $ 50k |
| – | ORS/GCAS data migration | $ 25k |
| – | Migrate to Framework | $ 60K (Budget permitting; ORS/GCAS, HR Personnel) |

### Assumptions:

1. Crown will invoice George Washington University monthly on a time and expense basis for the roles and rates established in individual Task Orders. Invoices will detail costs for each Task Order by individual/role.
2. Crown will invoice George Washington University for reimbursement, at cost, of all pre-approved, reasonable travel and out-of-pocket living expenses incurred by the Crown team on a monthly basis.
3. Mutually agreed upon changes to the scope of specific Task Orders will be achieved through the Change Control Processes and may affect the overall cost and timeline.
4. The project will not exceed the stated Time & Materials Estimate without written authorization from George Washington University. All project changes will be handled via the Change Control process.
5. Crown estimates T&E to be approximately 15% of the overall project total for all projects (as a general rule). This number, of course, can be controlled by limiting travel to and from the client site. In many of our projects, we work with our customers to control T&E by developing a project plan that stipulates off-site development where it makes sense. Crown will work with George Washington University to this end where feasible.

### SOW Validity Period:

This SOW is valid for 30 days from the date on this proposal.

CONFIDENTIAL                         ATTORNEYS' EYES
                                                    ONLY                                    GW004164



## 12.0 Knowledge Transfer

Project and Application Knowledge is most effectively transferred to active project participants throughout the course of the project. In the case that Knowledge Transfer must occur at the end of the project, Crown anticipates that it will take two weeks to perform Knowledge Transfer assuming that George Washington University provides a technically proficient WDK and Captiva eInput Development resources Crown assumes that George Washington University will not provide an unskilled resource for knowledge transfer. If George Washington University provides an unskilled resource, Knowledge Transfer could take as long as two months, which would constitute a change in scope and would be handled via, change control.

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only                                    Page 14 of 21

CONFIDENTIAL                      **ATTORNEYS' EYES
ONLY**                      GW004165



## 13.0 Project Authorization

SUBMITTED ON BEHALF OF CROWN PARTNERS, INC.

_____     N/A (RSH)          _____
Mark Kennedy                                        Richard Hearn
Account Manager                                     Managing Director
Crown Partners                                      Crown Partners
April 25, 2007                                      April 25, 2007

George Washington University accepts the proposal and agrees to the terms set forth herein.

AGREED TO ON BEHALF OF GEORGE WASHINGTON UNIVERSITY

_____                         _____
Signature                                           Date  5/7/07

_____                         _____
Louis H. Katz, Executive Vice President & Treasurer     Purchase Order # (if required)

**Billing Address (please mark corrections):**          **Any questions regarding this proposal should be**
George Washington University                            **addressed to:**
Street Address   2121 Eye Street, NW                    Mark Kennedy
Mail Stop        Rice Hall 701                          Crown Partners
City, State, Zip  Washington, DC 20052                  7750 Paragon Rd
                                                        Dayton, OH 45459
                                                        Phone: 937.723.2316
                                                        Fax: 937.439.7949
                                                        E-mail: mkennedy@crownpartners.com

                        RSH
                        7750
This Statement of Work is entered into Crown Partners, LLC, an Ohio limited liability company with a
principal place of business at 7725 Paragon Road, Suite A, Dayton, Ohio 45459 ("Consultant" or "Crown
Partners"), and George Washington University, ("Customer" or "George Washington University") pursuant to
that certain Master Services Agreement between the parties, dated as of Juary 2, 2007 (the *Agreement*).

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL:  For Client Internal use of only

CONFIDENTIAL                    ATTORNEYS' EYES                    GW004166
                                     ONLY



# Appendix 1: Change Control Template

The following change control process will be initiated as required:

<div align="center">

**CHANGE REQUEST
EVALUATION RESPONSE FORM**

**SOW – DCMS Framework – Task Order # - description**

</div>

**Change Request No.:**
**Requestor Name:**
**Review Date:**

**Request No._____has been:**
- ❑  Accepted without changes
- ❑  Accepted with modifications (see below)
- ❑  Redirected for further study (schedule and cost to be mutually agreed)
- ❑  Rejected

**Modifications to Change Request:**
(Insert any changes that are made to the original Change Request. identify, in detail, the changes to the scope of work, schedule and costs.)

**Schedule Revision:**
(Insert new dates [or attach revised Project plan/schedule] which show the impact of the Change Request, if any.)

**Background:**
(Insert the justification for the proposed change and how it impacts the overall scope and any issues it presents.)

**Cost Revision:**
**Additional Cost: $**
**Party Responsible for Cost:**
**Payment Due Date:**
**Acceptance Criteria/Deliverables:**

**Agreed and Signed:**

**George Washington University**              **Crown Partners, LLC**

**By: _____**              **By: _____**

**Name:_____**              **Name:_____**

**Title:_____**              **Title:_____**

**Date:_____**              **Date:_____**

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only

CONFIDENTIAL         **ATTORNEYS' EYES ONLY**         GW004167



## Appendix 2: Project Management Status Report Template

| Status Report — mm/dd/yyyy |
| :---: |
| **GW — DCMS Framework** |

**Hours Tracking**

|  | PTD | This Week | Next Week |
| --- | --- | --- | --- |
| Phase 1 |  |  |  |
| Documentum Architect |  |  |  |
| Documentum SME |  |  |  |
| Documentum Developer |  |  |  |
| Total |  |  |  |
|  |  |  |  |
| Milestone 2.1 |  |  |  |
| Documentum Architect |  |  |  |
| Documentum SME |  |  |  |
| Documentum Developer |  |  |  |
| Total |  |  |  |

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only

CONFIDENTIAL

ATTORNEYS' EYES ONLY

GW004168

**Expense Summary**

| Resources | Destination | Days | Purpose | Cost ($) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

**Issues & Risks**

| Issue Number | Status: Received, Open, Closed | Responsible | Description |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**Schedule**

### Last Week's Activities

| Activity | Status: Received, Open, Closed | Resource | Description |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

### This Week's Activities

| Activity | Status: Received, Open, Closed | Resource | Description |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

### Next Week's Activities

| Activity | Status: Received, Open, Closed | Resource | Description |
|---|---|---|---|
|  |  |  |  |

**Discussion Topics:**

CONFIDENTIAL                    ATTORNEYS' EYES ONLY                    GW004169



## Appendix 3: Sample Task Order

### SOW - DCMS Framework - Task Order 1 - Solution Design

**Crown Partners, LLC ("Crown Partners")** agrees to provide products and services to **George Washington University ("GW" or "Client")** under the following terms and conditions. Crown Partners' and George Washington University's signatures on this Task Order are acknowledgement of this **Task Order**, the **Master Statement of Work** dated ▓▓▓▓▓▓ and titled DCMS Framework and the **George Washington University Master Services Agreement (MSA)** dated January 2, 2007.

This Task Order under the Master SOW is intended to set forth the services to be provided for relationship between the Client and Subcontractor. The Company enters into this TASK ORDER as it requires additional services in skill areas possessed by the Subcontractor.

This TASK ORDER is hereby executed on behalf of the parties on the date last below written

| | |
|---|---|
| By: _____ | By: _____ |
| Printed: _Ronald C. Bonig_____ | Printed: _Richard Hearn_____ |
| Title: Vice President and CIO____ | Title: Managing Director_____ |
| Date: _____ | Date: _____ |
| For and on behalf of The George Washington University | For and on behalf of Crown Partners, LLC |

Accordingly **George Washington University** and **Crown Partners, LLC** jointly agree to the following TASK ORDER conditions:

### 1. Standard Charges and Payment Terms.
**GW** will be charged for the actual hours provided by Crown Partners in performing services described in Section 3, at the following hourly rates:

> **Hourly Rate** for resources:
> Sr. Consultant:   $XXX.00 / Hour / resource (plus actual expenses incurred).
> Consultant:     $XXX.00 / Hour / resource (plus actual expenses incurred).

Crown Partners will prepare a monthly invoice based on the hourly-billing rate. In addition, **GW** will reimburse Crown Partners for approved travel and living expenses incurred in providing these services. Payment will be made as outlined in the **MSA.**

### 2. Acceptance.
Signature constitutes acceptance of this Task Order in accordance with the terms and conditions of the MSA and the **Master SOW.**

### 3. Services Description.

---

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL:  For Client internal use of only

CONFIDENTIAL           **ATTORNEYS' EYES
ONLY**                          GW004170



This Task Order represents an agreement between GW and Crown Partners. The services to be provided are detailed below.

**a. Services to be delivered.**

   **Activities to be performed under this Task Order include:**

**b. Delivery Schedule.**
This Task Order is effective _____, 2007 through_____, 2007. GW may extend the resources upon written request no less than two (2) weeks prior to completion of effective period.

**c. Primary Contact for contract.**
   - GW Project Manager:  Marcy Day; E-mail: mkremer@gwu.edu, (703) 726-1973
   - GW Functional Manager:  Rick Gilchrist; E-mail: rickg@gwu.edu, (703) 726-1966
   - Crown Partners: Andrea Kozak, Director, Crown Project Office, akozak@crownpartners.com
     , 630-991-7878

**d. Name of Resource Providing Service.**
   Technical Lead – TBD
   Documentum Architect - TBD
   Project Administrator – TBD

The assigned resources will be consultants with experience utilizing the Crown Partners DigiFirst application. Crown Partners, LLC. reserves the right to substitute resources but intends to utilize the resources named above.

**e. Estimated Hours and Cost**

| Role | Hours | CP Rate | Fee |
|------|-------|---------|-----|
|      |       |         |     |
| Sub-Total |  |  |  |
| Estimated Expenses |  |  |  |
| Total Estimated Cost |  |  |  |

**f. Anticipated Start Date.**
   _____, 2007

**g. Assumptions**

   1. Crown assumes that work will be performed at Crown Partners facilities and at GW facilities as agreed to by the GW Project Manager.

   2. This agreement refers to the activities mentioned herein and does not include out of scope actions such as development, testing, deployment, etc.

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL:  For Client internal use only

CONFIDENTIAL

ATTORNEYS' EYES ONLY

GW004171

# Exhibit 7





# The George Washington University

## *DCMS HR Personnel; Release 3 Project Charter*

| | |
|---|---|
| **Prepared By:** | Marcy Day |
| **Create Date:** | April 17, 2007 |
| **Project Manager:** | Marcy Day |
| **Project Sponsor:** | Val Berry |

CONFIDENTIAL

ATTORNEYS' EYES
ONLY

GW004116

# Project Charter for DCMS HRS Personnel; Release 3

## Project Description

DCMS HR Personnel has been in production since December 2006. It was clear to all that much time had been spent on the DCMS application; however the DCMS Scan application did not meet all requirements. Some improvements were made to DCMS Scan in Release 2 to improve reliability but productivity enhancements are needed to meet the high volume of paper received daily by HR Personnel offices and for all other GW departments that will use DCMS in the future. DCMS HR Personnel Release 3 will focus on three major deliverables; allow indexing to be done at the user workstation rather than the scan station, provide bulk scanning capability (the ability to scan more than one document in a batch), and allow documents to be re-indexed.

## Statement of Business Need/Business Benefit/Business Objectives

DCMS Release 3 is intended to provide productivity enhancements for HRS and the four Stakeholder offices (Faculty Personnel, Medical Faculty Affairs, Student Employment and OCRO) using the current DCMS HR Personnel system. The following describes the three major components of the release and the business need being satisfied. The Indexing solution is being designed to meet the immediate need of HR Personnel as well as future enterprise scanning requirements for all GW offices; and will be incorporated into the DCMS Framework release.

### Move indexing from scan station to desktop

**Issues:** Today all indexing must be done at the scan station document by document which severely slows down production. Most of the scan stations are in open areas within the HR offices; this does not provide the security needed when working on sensitive documents. The scan station is shared; which results in users waiting while others complete their scanning and indexing.

**Solution:** Release 3 will allow the majority of indexing to be completed at the user desktop; the only indexing that must be completed at the scan station are indexes required for DCMS and Banner validation. This will minimize user time at the scan station; allowing HR staff to spend most of their time at their desk. This will also provide the privacy needed when working on sensitive documents.

### Bulk scanning

**Issues:** HRS and the Stakeholder offices receive huge amounts of paper; most of their work is paper based rather than electronic. As a result, a large amount of time is spent scanning paper documents. Today, those documents must be scanned and indexed one at a time; this has proven to be a very time intensive task.

**Solution:** Bulk scanning will allow documents to be batched together. Each batch will consist of multiple documents which will be separated by a standard separator patch sheet placed between each document to indicate the end of a document and the beginning of the next document. Required at scan time will be Cabinet and the Org Level indexes; all other indexes will be optional until the batch is imported into DCMS where indexing will be done at the user desktop. The user should enter indexes that are common to the batch since these will be added automatically to each document in the batch.

CONFIDENTIAL       ATTORNEYS' EYES
ONLY       GW004117

Re-indexing

**Issues:** The Org Level indexes and employee indexes cannot, currently, be changed by the user in the DCMS application. If scanned documents are indexed to the wrong employee or assigned the incorrect Org level, you will not be able to find the document. Today, when these errors are found, documents must be deleted; then rescanned and indexed correctly. In some cases the documents along with the correct indexing information can be given to the Documentum Administrator for manual correction. Both of the solutions are a productivity concern for HR Personnel.

**Solution:** Release 3 will provide users, with appropriate level of access, the ability to re-index documents; assign to the correct Org Level and/or to the correct employee.

## Assumptions

All work on this project will be completed by GW except for SBO development (SBO - Service Business Objects are written to leverage Documentum WepTop and Documentum Foundation Class code) that will be completed by Crown Partners.

It is assumed ISS, Human Resource Services and stakeholder resources will be available, as needed, to meet project timelines.

## Constraints

June will be a critical time for the project; and resources from ISS, HRS and Stakeholder offices will need to be available. GW resource availability is a concern, especially in June when all leave must be used.

GW resources are responsible for development on this project. Documentum and its components are tools for which GW resources have limited experience. There could be delays as a result of our inexperience however we have mitigated this substantially by engaging with Crown Partners to provide design advice and to write the critical SBO modules to leverage Documentum standards.

The deliverables in Release 3 are new and will significantly change already prepared training materials. Training will be required to spend significant time to update training materials; this could delay the project as the documentation updates cannot begin until after analyst testing is complete.

If significant issues are found during user acceptance testing the time required completing development, additional testing, and update documentation could impact the project schedule.

## High Level Project Timeline

The following are estimated dates and will be revised during project plan preparation. It is highly desirable we meet a July 30th go-live date, for which estimated dates are based; however these high level estimates cannot be confirmed at this time.

| | |
|---|---|
| Project Kick-off | 4/30/07 |

---

CONFIDENTIAL
ATTORNEYS' EYES
ONLY
GW004118

| Project Charter Approved | 4/27/07 |
|---|---|
| Project Plan Approved | 5/4/07 |
| Overall Requirements Approved | 5/11/07 |
| Overall Design Approved | 5/11/07 |
| Development Completed | 6/01/07 |
| Analyst Testing Completed | 6/15/07 |
| User Acceptance Testing completed | 6/25/07 |
| Training Start | 7/16/07 |
| Go-live | 7/30/07 |

**Roles and Responsibilities**

| | | |
|---|---|---|
| Val Berry | Project Sponsor | Decision Support |
| Marcy Day | Project Manager | Project reporting, plan management, meetings, and communication. |
| Rick Gilchrist | Resource Manager | GW enterprise system requirements and solution design. |
| Tony Ford | Analyst | Technical Solution Analysis, Documentum administration, testing, and end-user support. |
| Claire Mooney | Trainer | Prepare training materials and provide end-user training |
| Andy Smith | Resource Manager | |
| Michael Ng | Developer | EInput development |
| Vijay Padmanabhan | Developer | DCMS development |
| Tanya Bell | HRS Resource Manager | Requirements, user acceptance |
| Monica Partsch | MC Faculty Resource Manager | User acceptance |
| Barbara Marshall | Faculty Personnel Resource Manager | User acceptance |

CONFIDENTIAL

ATTORNEYS' EYES ONLY

GW004119

| | | |
|---|---|---|
| Sarah Fayle | Student Employment Resource Manager | User acceptance |
| Kris Moen | OCRO Resource Manager | User acceptance |
| Kevin Burns | Crown Oversight and development | SBO development, development advice |

CONFIDENTIAL

ATTORNEYS' EYES
ONLY

GW004120

## Approval to Proceed

| Name: | Val Berry | Name: | Ron Bonig |
|---|---|---|---|
| Title: | Chief Human Resources Officer | Title: | Interim Vice President and Deputy Chief Information Officer |
| Date | | Date | |

| Name: | Tanya Bell | Name: | Tom Breslin |
|---|---|---|---|
| Title: | Director Records & Data Mgmt Dept Human Resource Srvcs | Title: | Managing Director ERP Systems |
| Date | | Date | |

| Name: | | Name: | Rick Gilchrist |
|---|---|---|---|
| Title: | | Title: | Director, Enterprise Document Management |
| Date | | Date | |

ATTORNEYS' EYES ONLY

GW004121

## DCMS Specification outline for Release 3    Updated: 5/17/07

## I: Documentum setup

1. Cabinet registered table; named "cabinet"
   A) Name of Cabinet as setup in Documentum
   B) CidP - Unique 2-8 character Cabinet identification Prefix; named "CidP"
   C) Cabinet description; named "description"
   D) Input Accel process selection option; named "IAoption"
      1: DCMS (basic IA process for generic Cabinets, DCMS_IAP)
      2: CidP (specific for a Cabinet, uses CidP_IAP, i.e. HRP_DCMS_IAP)
      3: BASE (non-DCMS Scan usage, CidP_IAP, i.e. ORS-GCAS_BASE_IAP; dummy cabinets added for security and SCAN profile
      4: Future BASE: WebX(AX), LIB(Library), BB(BlackBoard)

2. Batch registered tables (see Crown document)
   A) Batch header
      1: Table name: dm_dbo.dcms_batch
         (a) batch_id:
         (b) ei_data_id
         (c) dcms_cabinet
         (d) ia_batch_name
         (e) ei_sent_dt
         (f) ia_start_dt
         (g) ia_export_dt
         (h) index_start_dt
         (i) index_finish_dt
         (j) ei_scan_user
         (k) priviledge_role
         (l) batch_owner
         (m) user_batch_name
         (n) ei_page_count
         (o) ia_doc_count
   B) Batch common indexes
      1: Table name: dm_dbo.dcms_batch_index
         (a) batch_id
         (b) index_sequence
         (c) index_name
         (d) index_value
   C) Batch documents
      1: Table name: dm_dbo.dcms_batch_doc
         (a) batch_id
         (b) doc_number
         (c) doc_type
         (d) page_count
         (e) index_user
         (f) index_start_dt
         (g) index_finish_dt

CONFIDENTIAL    ATTORNEYS' EYES ONLY    GW004106

## DCMS Specification outline for Release 3          Updated: 5/17/07

        (h) doc_r_object_id
- D) Batch documents, assigned indexes
  - 1: Table name: dm_dbo.dcms_batch_doc_index
    - (a) batch_id
    - (b) doc_number
    - (c) index_sequence
    - (d) index_name
    - (e) index_value

- 3. Cabinet
  - A) Always setup a Cabinet;
    - 1: For DCMS and for a DCMS Scan process that is for another application such as v5.2.5 Documentum or WebXtender.
    - 2: CidP_Scan profile for DCMS Scan user
    - 3: CidP_Scan_Admin profile for DCMS Scan Administrator access
    - 4: Allows DCMS Scan to use same method for validating users against SCAN profiles and the LDAP/Documentum security
    - 5: For all DCMS cabinets with stored documents establish an Index_staging folder with ACL for System Administrators and DCMS internal access.

## II:  Web Services

- 1. Method to return list of Cabinets that the user has access to for:
  - A) DCMS all profiles except CidP_Scan and CidP_Scan_Admin
  - B) DCMS Scan , CidP_Scan or CidP_Scan_Admin profiles only

## III:  SBOs for WDK interface

- 1. Service based Objects (SBO) have been created which will implement the following functionalities
  - a. Retrieve all the batches the logged in user has been assigned and has access to (Administrators has access to all the batches)
  - b. Retrieve batch information for a specific batch (need to provide the batch id)
  - c. Retrieve index information for a specific document within the batch based on the object id.
  - d. Update batch information when an user locks and starts indexing a batch
  - e. Update batch information when an user completed indexing a batch
  - f. Update the owner of the batch (Administrators can assign/Reassign batch to users)
  - g. Unlock batches (Administrators can unlock batches which has been locked by some user for indexing)
  - h. Update the index and move the document from staging folder to appropriate folder in documentum. During re-indexing, documents will be

ATTORNEYS' EYES
ONLY
CONFIDENTIAL                                                            GW004107

## DCMS Specification outline for Release 3          Updated: 5/17/07

> moved from an existing folder (not a staging folder) to a new location
> based on the index changes.

2. Add SBOs
   a. Add an SBO to move from staging (or current) folder to indexed (or re-indexed) folder
   b. Add an SBO for inserting into Batch tables (if required for DCMS Scan)

3. These SBOs will need to be included in a web-service to expose them to the current struts implementation.

4. Additional SBOs may need to be written to insert into the four tables from eInput and InputAccel.

## IV:  DCMS

1. Create web-services to expose the SBOs written by Crown.

2. Create new "TAB" for "Index Batch"
   A) When clicked should bring up the Batch list window

3. Batch list window
   A) List only batches which are open for the current Cabinet
      1: and available for the current user
      2: Allow user to select and index batch
         (a) Lock batch to the user NetID
         (b) Bring up the Index window positioned at the first document to be indexed
   B) Columns to be include are:
      1: Batch ID (batch_id)
      2: Batch description (user_batch_name)
      3: Scanner (ei_scan_user)
      4: Scanned date/time (ei_sent_dt)
      5: Received date/time (ia_export_dt)
      6: Locked by (batch_owner or open)
      7: Doc total (ia_doc_count)
      8: Doc remaining (count docs in staging folder)
      9: Detail button or hyperlink
         (a) display pop-up page
            (i) All Batch values including Batch Index value pairs
         (b) Document button (future)
            (i) List documents
               1. Doc number
               2. Page count
               3. Indexer
               4. Start date/time
               5. End date/time

CONFIDENTIAL          **ATTORNEYS' EYES ONLY**          GW004108

# DCMS Specification outline for Release 3    Updated: 5/17/07

      6. Object ID

      (ii) Future will have List indexes button to display Index value pairs

  C) Scan Administrators (CidP_Scan_Admin)

    1: see all open batches for the current Cabinet

    2: can unlock batches for assignment to other users

    3: can assign to a specific user

    4: Checkbox exposed to allow a review of closed batches

4. Index window

  A) Top Left frame contains title Batch information

  B) Lower Left frame contains

    1: "Apply Indexes" button, active when all required Indexes are filled in

    2: "Batch details" (display as title)

      (a) Batch ID

      (b) Batch description

      (c) Total Docs

      (d) Remaining Docs

      (e) Batch description; user description of the batch

      (f) OCR (yes or no); XML config values = Always, Never, YorN

      (g) Separators (yes or no); a batch with all single page documents; XML
config values = Never, YorN

    3: "Required Indexes" (display as title)

      (a) Retrieve from XML config file

      (b) Common batch indexes loaded in index/value pairs

      (c) for HR Personnel; Org level one, Org level two (if HRS), Form Group,
Form Name, Status, Effective date, PIDM/GWid (link to ERP linkage;
search results)

    4: "Optional Indexes" (display as title)

      (a) Retrieve from XML config file

      (b) Common batch indexes loaded in index/value pairs

      (c) for HR Personnel; Key words

    5: Search criteria for ERP system linkage

      (a) Retrieve from XML config file

      (b) Banner for HR Personnel, display as "Banner Search criteria"

      (c) First; display Boxes with labels for search criteria

      (d) Second; display data retrieved with labels

  C) Right frame contains the application controls, image controls and the page

    1: Application controls

      (a) Display document number

      (b) First|Prev|Next|Last (controls pertains to remaining documents in
staging folder)

5. Re-Index

  A) Receives a Document to be re-indexed

    1: Check a box in the document list and click on the re-index button.

ATTORNEYS' EYES
ONLY

CONFIDENTIAL    GW004100

## DCMS Specification outline for Release 3    Updated: 5/17/07

  2: Change attribute button could be used and replace current functionality with re-index screen or keep change attribute and add new button

  3: In framework we will be able to check multiple boxes and have the re-index function bring up the next checked document (this will be facilitated by the DigiFirst clipboard).

# V: DCMS Scan

1. Login/Cabinet/Security
   - A) NetID and Password
     - 1: Authenticate against LDAP, retrieve PIDM from Banner
     - 2: Authenticate against Documentum
     - 3: Select list of Cabinets for which the user has a SCAN profile
     - 4: Authorize the user by determining that there is at least 1 SCAN profile by retrieving (CidP_Scan or CidP_Scan_Admin)

2. Primary screen
   - A) Same information and navigation bars as used by DCMS
   - B) Cabinets selected and displayed
     - 1: Initially display last cabinet used. Use DCMS User Preference table (dm_dbo.gw_user_preference) with a gwfunction value of scan_cabinet
     - 2: First time for a user, treat the first cabinet as selected
     - 3: Retrieve XML configuration file for cabinet selected (CidP_config.xml)
     - 4: "Cabinet" button when pressed presents user with list of available cabinets
   - C) Determine InputAccel process used to process Cabinet documents
     - 1: Use Cabinet registered table
     - 2: DCMS (basic IA process for generic Cabinets, DCMS_IAP)
     - 3: CidP (specific for a Cabinet, uses CidP_IAP, i.e. HRP_DCMS_IAP)
     - 4: BASE (non-DCMS Scan usage, CidP_IAP, i.e. ORS-GCAS_BASE_IAP; dummy cabinets added for security and SCAN profile
     - 5: Future BASE cabinets: WebX(AX), LIB(Library), BB(BlackBoard)
   - D) "SCAN Batch" button to bring up screen used to create a new batch
   - E) List of all open batches for the scan user (batches will be available for display until indexing is complete in DCMS)

3. "SCAN Batch" screen
   - A) Displays current Cabinet selected, user NetID and name (Same as DCMS)
   - B) Top bar contains all Buttons and eInput options
     - 1: Buttons: "SCAN", "SEND", "Return" (warn that batch will be deleted)
     - 2: Options: "Action", "Scanner", "Image size' (now called Options), "Batch Parms" (now called Document Fields)
   - C) Left frame contains:
     - 1: "Batch Parameters" (display as title)
       - (a) Indexer; group, myself, drop-down list of valid indexers
       - (b) Batch description; user description of the batch
       - (c) OCR (yes or no); XML config values = Always, Never, YorN

CONFIDENTIAL  **ATTORNEYS' EYES ONLY**  GW004110

## DCMS Specification outline for Release 3          Updated: 5/17/07

     (d) Separators (yes or no); a batch with all single page documents; XML
       config values = Never, YorN
   2: "Required Indexes" (display as title)
    (a) Retrieve from XML config file
    (b) for HR Personnel; Org level one, Org level two (if HRS)
   3: "Optional Indexes" (display as title)
    (a) Retrieve from XML config file
    (b) for HR Personnel; Form Group, Form Name, Status, Effective date,
     Key words, PIDM/GWid (link to ERP linkage; search results)
   4: Search criteria for ERP system linkage
    (a) Retrieve from XML config file
    (b) Banner for HR Personnel, display as "Banner Search criteria"
    (c) EAS for ORS-GCAS, display as "EAS Search criteria"
    (d) First; display Boxes with labels for search criteria
    (e) Second; display data retrieved with labels
  D) Right frame contains:
   1:  Top line contains image controls provided by eInput
   2:  Image pane

## VI: <u>Input Accel</u>

  1. eInput batch level parameters passed to IA
  A)  Cabinet
  B)  IA process
  C)  Batch number
  D)  OCR YorN
  E)  Separator YorN
  F)  NetID of Scan operator

CONFIDENTIAL      **ATTORNEYS' EYES**      GW004111

# DCMS Specification outline for Release 3    Updated: 5/17/07

## Appendix: Notes/Ideas

## Left frame in DCMS Scan

███████████

**Indexer:** ● group  o myself  o [＿＿＿] ▼
**Batch description:** [＿＿＿＿＿＿＿＿＿＿＿]
**OCR:**        ● Yes  o No
**Separators:** ● Yes  o No (single sheets only)

████████████

Org Level 1:
Org Level 2:

███████████

Form Group:
Form Name:
Doc Status:
Effective date:
Keywords:

████████████████

GWid:
PIDM:

███████████  ██████  █████

GWid:
SSN:
Last name:
First name:
MI:
Birth date:
Adjusted Srvc:
Position #:      (display only)
Title:           (display only)
Home Org code: (display only)
Home Org Desc: (display only)

CONFIDENTIAL                    ATTORNEYS' EYES
                                      ONLY                        GW004112

# DCMS Specification outline for Release 3

Updated: 5/17/07

## Left frame in DCMS indexing

▮▮▮▮▮▮▮▮▮▮▮▮        "Add detail button"
Batch ID:              10123
Batch Description:     My special batch
Total Docs:            50
Remaining Docs:        35

▮▮▮▮▮▮▮▮▮▮▮▮▮
Org Level 1:
Org Level 2:
Form Group:
Form Name:
Doc Status:
Effective date:

▮▮▮▮▮▮▮▮▮▮
Keywords:

▮▮▮▮▮▮▮▮▮
GWid:
PIDM:

▮▮▮▮▮▮▮▮  ▮▮▮  ▮▮▮
GWid:
SSN:
Last name:
First name:
MI:
Birth date:
Adjusted Srvc:
Position #:      (display only)
Title:           (display only)
Home Org code: (display only)
Home Org Desc: (display only)

CONFIDENTIAL                      ATTORNEYS' EYES                    GW004113

# DCMS Specification outline for Release 3

Updated: 5/17/07

## Pop-up for Batch detail

| | |
|---|---|
| eInput/IA: | rickg_10123_My-special-batch-name_2007-05-10_13-45-59 |
| Batch ID: | 10123 |
| Description: | My special batch name |
| Scan User: | rickg |
| Scan Sent: | 2007-05-10 13-45-59 |
| IA Start: | 2007-05-10_13-55-18 |
| IA Export: | 2007-05-10_14-01-20 |
| Orig. pages: | 150 |
| Doc count: | 50 |
| Batch Owner: | tonyford |
| Index Start: | 2007-05-11_09-15-05 |
| Index Finish: | 2007-05-11_09-35-25 |
| Docs remain: | 25 |

Batch Indexes

| | |
|---|---|
| 1/index_name: | index_value |
| 2/index_name: | index_value |
| n/index_name: | index_value |

## Pop-up for Document List

| nbr | Pages | Indexer | Index Date | Start | Finish | Object ID |
|---|---|---|---|---|---|---|
| 1 | 3 | rickg | 2007-05-11 | 09-15-05 | 09-16-15 | A123e234x9y9z |
| 2 | 5 | rickg | 2007-05-11 | 09-15-15 | 09-17-25 | E456f678z8x8y |
| n | | | | | | |

CONFIDENTIAL          ATTORNEYS' EYES ONLY          GW004114

## DCMS Specification outline for Release 3    Updated: 5/17/07

Validation to be done against 1. LDAP  2. Documentum users 3. List of Cabinets for user

Note: dummy cabinets will be added for BASE usage (i.e. ORS-GCAS/WebXtender)

Select Cabinet on login page.  Cabinet used to substantiate cabinet xml file which specifies the IA process

OCR options in XML for a given Cabinet:  Always, Never, YorN

Separator options in XML for a given Cabinet: Never, YorN

**Indexer:** ● group  o myself  o [        ] ▼
**Batch description:** [                          ]
**OCR:**        ● Yes  o No
**Separators:** ● Yes  o No (single sheets only)

**CONFIDENTIAL**                    **ATTORNEYS' EYES ONLY**

GW004115

# Exhibit 8

# GEARING DECLARATION

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| CUS4, INC. D/B/A<br>RICHMAR & ASSOCIATES et al.<br><br>**Plaintiff,**<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY,<br><br>**Defendant** | Case No. 1: CV-07-0841 (JR) |

## DECLARATION OF PHILIP J. GEARING, JR.

I, Philip J. Gearing Jr., depose and say as follows:

1.      I was the Richmar's project manager and lead analyst for the DCMS installation. I have over 35 years of experience in developing, designing and building large scale enterprise document management systems, including a background in Documentum and Web Services Applications. I have previously analyzed, designed, and programmed software systems for government agencies, private companies, and nonprofit organizations, including universities. I ~~have~~ developed systems that are large and have complex business rules, systems that have large volumes of data, and systems that have high-availability requirements. Based on my experience, the GWU DCMS system fell into the category of a medium sized, medium difficulty system.

2.      I have examined GW documents including Master Services Agreement (between Crown Partners and GW) and the GW DCMS HR Personnel Release 3 Project Charter in order to assess planned changes to the DCMS that was designed and written by Richmar.

3.      The changes described in the documents are a major revision to the DCMS, as it was delivered. There are major new features being planned for incorporation in DCMS, many of

which Richmar had originally planned to incorporate. These features include, but are not limited to: a flexible framework (see paragraph 28 below), a refined Document Only Search (DOS), saving search criteria, saving search results layouts, and bulk scanning. These features will be created by altering, including adding to, the code Richmar designed and wrote. The sum of these changes will in effect constitute a derivative work. It will be a derivative work because the changes being installed and contemplated could not exist without the base of the DCMS code that Richmar designed and wrote.

4.      We have received documents from the GW CVS source code repository. These documents show some changes to the DCMS, but we believe that they do not show the full extent of changes currently being developed by GW. In order to assess the full extent of changes to the DCMS, we need copies of development code, which may appear on multiple employees computer workstations. It is the nature of the software development process that code is not checked in to the source code repository until it is almost ready for production.

5.      According to the Master Services Agreement between Crown Partners and GW, dated January 2, 2007, there is a strong implication that Crown Partners will be able to transform DCMS into a "shrink wrapped" product that it can sell to colleges and universities across the country (paragraph 5 – Intellectual Property). Once this work is finished, it will constitute a configurable university document management system that Richmar had envisioned being able to sell. Once Crown has created this product on top of Richmar's work, Crown will have a significant competitive advantage over Richmar in the document management market.

6.      GW awarding to Crown Partners the ability to commercialize a derivative product based on DCMS destroys Richmar's ability to compete, due to Crown being a larger company that already has a national practice. For Crown Partners to create such a product without

2

deriving it from DCMS would require Crown to develop such a system "from scratch", without basing it on DCMS.

7.    GW is incorrect in its assertion that Richmar delivered a defective product when DCMS went into production in December 2006. It is almost inevitably the case that any custom software system will go into production with some minor known errors and without some features that had been planned. This is due to the nature of the software requirements, design, and development process, which is not a mature process compared, say, to bridge engineering. In the software development process, there is no widely recognized step that freezes system requirements. The lack of such a step generally means that the client and the developer continue to discuss adding features until late in the project. This often means that certain features have to be held back, in order to deliver a working system within a reasonable time frame.

8.    It is also inevitable that certain minor errors will be present in any custom software system when it is first deployed in production. This is due to the complexity of thousands of interdependent computer instructions, deadline pressures, inadequate testing, and simple mistakes. It is very common for a new computer system to go into production accompanied by a list of "known problems". By definition, these problems are relatively minor, or the system would not be put into production.

9.    No system is complete in its first release, due to the reasons cited above. As a commercial example, one need only remember that Microsoft Windows was not considered reasonably stable and working well until its third release. That did not stop Microsoft from selling millions of copies of the first two releases and it did not stop its customers from using them. It just did not always work perfectly.

3

10.    GW has trumped up claims of defects that misconstrue the software development process in general and the development of DCMS in particular. The deferral of the Document Only Search (DOS) was due to a discovery late in the system development process by Jingxiao Feng, a GW employee, that the DOS would have to check the DCMS user's security in a manner that was different from what was done for the employee search. At that time, Richmar had already implemented a working DOS, based on the requirements it had received from GW.

11.    It took several months for GWU and Richmar to agree on a design for making the DOS conform to the new requirements. By the time the parties agreed on the design, it was too late to include the DOS in the first production release. GWU and Richmar agreed that the first production release would not be held up for the DOS. This is a normal outcome in the system development process.

12.    DCMS Release 1 was planned to be an initial production release, with enough features so that the DCMS users could use the system effectively. It would accomplish the basic functions necessary to scan documents into DCMS and search for employees and find those employees' electronic documents. In October of 2006, Richmar and GWU agreed on the feature list for Release 1 and agreed on a target deployment date for production of mid-December 2006. Richmar finished working on the code for Release 1 in late November or early December 2006.

13.    Release 2, alternately known as 1B and 1C, was planned by Richmar and GWU to introduce new features, revised features, and fixes for some known problems. It was to include document annotation, a revised DOS, a notification feature, document check-in/check-out feature, and other such features such as the flexible framework (paragraph 28 below). Richmar had planned to incorporate these features as of June 2006, but GWU declined to renew the contract in January of 2007.

4

14.     Allegations by GWU of defects in DCMS are trumped up. DCMS was put in production on or about December 18, 2006. It was not and has not been removed from production. DCMS users have successfully used the system since it went into production (Tanya Bell deposition). Tanya Bell, Director of GWU Human Resource Services, said in a phone conversation with me in mid-January 2007, "My people love the system." This is not a typical comment made about a new computer system the first month after it goes into production.

15.     Problems in DCMS all fell into the category of "normal production problems". This phrase means that the system works, but there are minor problems, as there always are in a new software system.

16.     The assertion by GWU that Richmar's inappropriate use of the Struts framework is particularly wrong, if not duplicitous. There was a design meeting April or May at the GWU facility in Ashburn Virginia to discuss the methods Richmar was going to use to implement DCMS. Jennifer Bond of GWU declared that Richmar must use the Struts methodology, because that was the GWU standard. Richmar then discussed this topic in the meeting, suggesting that Struts was not the most desirable methodology to use. GWU declined to entertain any alternatives and told Richmar to use Struts.

17.     The result of this discussion was captured in the DCMS Design Document in versions 4.0, 5.0, and 6.0 (check versions). (See Version 5, attached hereto as Gearing Ex. 1). In all three versions of that document, there are references on pages 77 and 79 (check page numbers) that contain language that shows that GWU agreed to the use of the Struts methodology.

18.     GWU has asserted that DCMS and DCMS Scan are separate systems. This is not true. Neither one alone can accomplish the tasks that GWU wanted DCMS to perform. DCMS

5

has two definitions in the Richar/GWU dispute. One is as the overall title of the system that

Richmar designed, wrote, and installed at GWU to manage documents and perform employee

searches. Up to this paragraph, that has been the definition of DCMS. Within the DCMS

system, there are several subsystems. One is called "DCMS Scan", which handles the scanning

of paper documents. "DCMS web services" handle communication behind the screens.

"DCMS", in this paragraph, refers to the user interface code and the code which calls other

subsystems. The fact that the DCMS system is packaged as several subsystems is completely

normal for computer software systems.

      19.    GWU asserts that intellectual property rights are not addressed in the contract

between Richmar and GWU. I wrote the initial draft of that contract. I used as a basis an old

contract I had with Comsat Technology Products. When I was preparing the draft, I read

paragraph 5 (check #), titled "RIGHTS IN INVENTIONS". I recognized that Richmar intended

to hold all applicable intellectual property rights from developing software for GWU. I therefore

did not include this paragraph in the draft contract. The omission of such a paragraph does not

constitute a forfeiture of intellectual property rights by the contractor. To the contrary, such

omission then puts the contract under the interpretation of the federal Copyright Act of 1996,

which states that absent a claim of ownership by the client, and if the contractor is a true arms-

length contractor and not an employee, the contractor retains the rights to the software.

Richmar's counsel can explain this further.

GWU's claim of co-authorship of DCMS is without merit. GWU instructed Richmar that it

would write a particular set of methods called Banner Web Services (BWS). These methods, or

programs, were called by Richmar's code as part of the user interface. Richmar handed BWS the

DCMS user's ID and some search criteria. BWS, in turned, called the Banner system, GWU's

6

administrative and human resources system.  Banner returned user validation (or not) and search results to BWS.  BWS, in turn, handed over the user validation and search result to DCMS.

20.    Richmar was willing, ready and able to write the Banner Web Services portion of DCMS, but GWU said it would do it.  BWS is a subsidiary part of DCMS.  It is a separate set of code from DCMS.  Richmar does not assert copyright over BWS.  The fact that there is some code in the DCMS that Richar did not write, does not mean that Richmar cannot copyright what it did write.  In addition, Richmar wrote all the major documents in the requirements and design phases of DCMS, including Business Continuity Requirements, HR Requirements, the Requirements Traceability Matrix, the DCMS Solution Design Document, the Test Script document, and the Test Cases document.  Most of these documents had more than four versions, all of which were written by Richmar personnel.

21.    GWU was essentially a passive consumer of Richmar's effort.

22.    GWU asserts that "customers do not generally receive source code."  This statement is disingenuous at best.  Customers of so-called "shrink wrapped" software do not receive source code.  An example of this is Microsoft's programs.  Customers of custom enterprise software systems almost always receive the source code.  What they can do with it depends on what the intellectual property rights are between the parties.

23.    In the case of DCMS, Richmar intended and intends to maintain its intellectual and copyright rights in the code.  Delivering source code does not abrogate these rights.  When dealing with copyrighted software, minor adaptations to get the system to run in a particular environment are allowed under the law.  So are minor error fixes.  New feature development is not allowed.

7

24.     GW appears to make a claim that Richmar's consent to place the DCMS source code in CVS, a source code management system, constitutes an implied license for GWU to change the code. This is not true. When delivering source code, it is necessary to copy the code into some directory structure on some computer. It did not matter to Richmar whether the code was being placed in a directory structure under CVS, or in any other directory structure. The code must be installed somewhere in order for it to be built on the local system. The fact that CVS could track changes made to the DCMS source does not constitute a license to change it.

25.     GW also appears to assert that the fact that Richmar turned over the code implied a license to change it. Again, in order to adapt the DCMS to a particular computer system, some small modifications may have to be made. This is permissible under the Copyright Act of 1996, as are minor changes to fix minor problems.

26.     It was Richmar's expectation that Richmar would continue to develop DCMS with planned product improvements that had been noted in many documents over the course of 2006. There was no intent by Richmar to give up its rights and allow GW to make additions, changes, or create new features without Richmar's involvement.

27.     GW also argues that it was a co-author of the DCMS and is entitled to co-authorship. GW did not write a single line of Code for the DCMS. That was written by Richmar's subcontractor, Impact Innovations, Inc. GW did prepare code for the Banner system component, but this is not part of the DCMS copyright.

28.     The DCMS Flexible Framework feature, which Richmar had planned and expected to develop for DCMS, was designed to make DCMS be able to be extended to other parts of the university by having features in DCMS that would allow an administrator to define electronic cabinets, document types, input screens and search screens without having to write

8

new computer code. This is a key feature that would have completed Richmar's vision of a university document management software package, that it could sell as a "shrink wrapped" work. It is also a key feature in Richmar's business plan to market the DCMS to colleges and universities across the country.

9

The foregoing is accurate to the best of my knowledge and belief.

DATED: June 7, 2007

Philip J. Gearing, Jr.

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION

CUS4, INC. D/B/A
RICHMAR & ASSOCIATES et al.

Plaintiff,

v.

GEORGE WASHINGTON UNIVERSITY,

Defendant

Case No. 1: CV-07-0841 (JR)

## DECLARATION OF RICHARD GORDON

I, Richard Gordon, Jr. depose and say as follows:

1.        I am the President/CEO of CUS4, Inc. d/b/a RICHMAR and Associates.  I founded RICHMAR in 1995 and eventually obtained the first contract in April of 1997. Since 1997, RICHMAR has been providing management consulting and other business and computer services to both commercial and Government clients.  I have over thirty years of continuing functional experience that includes lessons learned from an array of commercial and Government programs, including the design and development of new technology to support more effective business processes.  In 1977, I began my career as a labor negotiator with the Bakery, Confectionary and Tobacco Workers International Union, Local 362-T while working for the Brown and Williamson Tobacco Company in Macon, Georgia.  I came to Washington, DC at the request of Congressman J. Roy Rowland and worked five (5) years as his Administrative Aide and Legislative Assistant. We served on the House Committee for Public Works and Transportation and Veterans

Affairs. After leaving the Hill, I served nine (9) years as the Director of Labor Relations for the National Air Traffic Controllers Association (NATCA) before beginning work full time at Richmar in 1997. During this period, much of my attention was focused on the deployment of Air Traffic Control technology, large, complex systems costing billions of dollars. Thus, my background and experiences enables me to provide a unique perspective and insight into many commercial and government programs.

2.    In late November and early December of 1995, I began holding discussions with Anne-Marie Taylor and Drew Sanzenbacher of The George Washington University (GW) concerning the development of a system for managing GW contracts. Jim Gearing and I provided demonstrations of the Grievance Electronic Tracking System and Memorandum of Agreement System Richmar developed for the Federal Aviation Administration (FAA), which could be adapted for GW's Contract Management process.

3.    As a result of these meetings, RICHMAR was hired by GW for its proven expertise in developing large scale electronic enterprise document management systems. However, I was surprised when GW asked me to write the contract. Particularly, after GW's Office of General Counsel was advised that we would be pleased to consider their proposals. Unlike Federal contracting where the procurement rules for the ownership of intellectual property are dictated by Statute, this commercial contract offered me an opportunity of a lifetime; the possibility of developing a product that could be packaged and marketed as "Commercial Off-The-Shelf- Software in an environment where nothing like it existed. From my prior contract and negotiation experience and training I knew that if the GW contract did not contain a work for hire provision, Richmar would be entitled to own the intellectual property rights. Owning those rights was my underlying

2

reason for entering into the agreement. Therefore, we removed the paragraph regarding work for hire from a form contract we had previously used. It was my intention, as expressed in the agreement that this would accomplish several things; 1) ensure that RICHMAR retained the rights to any products created; 2) allow us to invest heavily in the resulting product; and 3) protect ourselves against a much larger organization, often known to treat its vendors unfairly. In the case of any unfairness, GW would be required to negotiate with RICHMAR over any expansion of DCMS or start from over. On January 6, 2006, the contract was signed between RICHMAR and GW for RICHMAR to develop a Contract Management System and a document management system for GW.

      4.     Discussions with Rick Gilchrist and Marcy Day concerning the Human Resources Personnel Department (HR) project focused on developing a general document management system framework for the University to use with the initial group in GW to 'go live' being HR.[1] RICHMAR agreed to provide its development expertise to initially design and build a document and case management and scanning system for GW's HR division. The engagement also required RICHMAR to scan and index over 1,000,000 of HR's "legacy documents" into the system developed by RICHMAR.[2] Each organization new to DCMS will have to go through a requirements analysis similar to that for HR.[3]

---

[1] GW Project Definition (Gordon Ex. 1, attached to this declaration. Hereafter exhibits attached to this declaration shall be referred to as "Gordon Ex. __"). This document is unsigned, was developed by GW and was first given to me as a part of the discovery process.

[2] The legacy documents comprised GW's hard copy documents. These records went back over 40 years and numbered in excess of 1,000,000 pages. (Task Order, Gordon Ex. 2.)

[3] Requirements Specifications Document for HR Personnel Extension of Business Continuity Framework DCMS, Version 6.0, dated May 4, 2006. (Gordon Ex. 3).

5.    RICHMAR and GW contemplated a long term relationship, with HR being the prototype for a roll out of Business Continuity Framework that could be extended to the remainder of the University's divisions, derivative computer applications designed for the particular needs of each of those divisions.[4]  Both parties understood, however, that continuation of a roll out would be dependent on University financial and budgetary constraints.[5]  However, I was confident that GW would continue with a multiple year contract because GW lacked any expertise in building a document management system in general and in Documentum specifically.[6]  It was primarily because of this lack of expertise that GW wanted a system that could be rolled out to other departments without further modifications.   Vijay Padmanabhan, who was hired by GW in June, 2006, did not join the DCMS project until the fall of 2006 and was not scheduled to receive training from RICHMAR on DCMS until the knowledge transfer at the end of the development for Phase 1.  (Vijay Deposition at 6, 14, Ex. 14 to Opposition).[7]  Knowledge transfer included documenting certain information about the code and explaining how the documentation related to the code.  A review of the code and associated documentation was agreed to by RICHMAR and conducted by Sun Microsystems, author of the JAVA language.  This would help ensure that GW would be able to maintain the code that was

---

Richmar produced separate requirements specifications for the Business Continuity Framework.

[4] List of GW Offices and Departments (Gordon Ex. 4)

[5] GW Change Control #021, Description of Risks (Gordon Ex. 5)

[6]  GW Change Control #004 and 006, Description of Risks and 011 Reason for Change (Gordon Ex. 6)

[7] GW Change Control #004 Description of Risks (Gordon Ex. 6)

being developed.[8]   At no time did RICHMAR contemplate or believe that GW would make anything other than <u>minor</u> changes to the code.

6.     RICHMAR invested its own time and money into developing DCMS.  In addition to time spent before the Contract was signed, we conducted a preliminary review and developed a prototype system to derive a system for Student Financial Aid.   The request was made by Christina Griffin after GW was unsuccessful at obtaining funds to cover the cost of this work.[9]  Additionally, RICHMAR invested over 60 days of development time for DCMS HR Personnel, 26 of which were used to address out of scope activities and to cover the cost of GW employing Tony Ford.  GW was unable to efficiently process Tony Ford's paper work as a GW employee so he remained on the RICHMAR payroll.  Further, because GW had no Documentum expertise, RICHMAR allowed GW to hire Tony Ford without requiring its customary fee of 20 percent of salary.

7.     RICHMAR and members of ISS had discussed building the DCMS on a flexible framework so that DCMS could be modified to meet the needs eventually of all GW departments and would become a University-wide system. These were contemplated to be done in future releases, and little or no DCMS code was written for these future projects.

In July 2006 RICHMAR and GW agreed that the Business Continuity framework development  began with DCMS HR Personnel release 1a and 1b development of web

---

[8] GW Change Control #017 Reason for Change (Gordon Ex. 7)

[9] GW Change Control #016 Description of Change Request (Gordon Ex. 8)

serves and the wrapper... *would* be an ongoing process as more modules are added to

DCMS." The parties further agreed that "a General Use module for Business Continuity

will not be completed as planned. Instead, Release 2 (a and b) will build a Self Service

Module." Rick Gilchrist stated the reason for change: "a self service module provides

greater flexibility for the University."[10] As a result of this agreement, RICHMAR

developed a Task Order, for Release 2a and 2b, which contained the Flexible Framework

and Planned Product Improvements (PPI), those items in Release 1.0 that had been

deferred due to lack of money.[11] These included:

(a)    Document search (Page 2 of 3 or number 17a)

(b)    Development of a bulk scanning system, i.e. a scanning system that could scan in and index multiple separate documents.

(c)    System Administration subsystem

8.     At some point GW stated that the information it had provided to

RICHMAR during the requirements gathering process was not sufficient and raised

concerns about how the Document Only search worked; however, the feature worked as

planned and did not affect HR organizational or system performance. (Bell Transcript

Page 24, Line 10 – Page 28, Line  5, Page 35, Line 1 – Page 38, Line 4, Page 56, Line 9 –

Page 60, Line 21). While we were certainly willing to talk about the changes GW wanted

they were out of scope and not included in Release 1. However, they were planned for

Release 2 as a Planned Product Improvement. Thus, on August 31, 2006, GW was finally

advised that any such changes were out of scope and had to be documented in a Change

---

[10] GW Change Control #021 Description of Risks (Gordon Ex. 5)

[11] Task Order (Gordon Ex. 9) No code had been written for this function and none was included in the DCMS.

request Form.[12] RICHMAR delivered the Document Only Search (DOS) in Release No. 1.0 according agreed-upon requirements specifications. The advanced search feature wanted by GW requires additional specifications and design sessions to both scope out and develop the new features. (Bell Transcript Page 28, Line 13 – Page 31, Line 21)

9.    During development GW refused to sign off on Requirement Specifications prepared by RICHMAR. Instead, ISS interim Chief Information Officer, Ronald Bonig told RICHMAR "let's just see what works." ISS refusal to agree on the system specifications was contrary to RICHMAR's prior work experience. In retrospect, it seems clear that Bonig was positioning himself to make false claims concerning RICHMAR's work product. Bonig stated during his deposition we were over budget, behind schedule and a host of other problems yet refused to acknowledge any responsibility for these problems. Yet, the estimated cost for Crown Partners Consulting to finish our work will cost GW at least $200,000.00 more than what we proposed. As a result, we lose the revenue, the code and the marketing advantage we held for developing the DCMS Flexible Framework for other GW organizations and other Universities and Colleges.

10.    Under the January 6, 2006 Contract, the contract would expire, unless extended, on January 8, 2007. However, on or about December 15, 2006, RICHMAR and GW failed to reach an agreement on a contract extension for DCMS. ISS' Bonig informed me that "there were problems with the contract," and that it could not be extended. ISS' Bonig further informed me that ISS did not have adequate funds to continue to pay RICHMAR for continued development of the DCMS past Release 2.0.

7

11.     RICHMAR had completed development on Release 1.0 and shortly after the DCMS "went live" on December 18, 2006 ISS sent RICHMAR a contract extension for continued back scanning and a proposed "close out check list." ISS informed RICHMAR that if they could agree on the checklist, RICHMAR would be paid for all outstanding invoices on the DCMS development, and that RICHMAR could finish the back scanning and indexing of the legacy documents.

12.     Prior to going live on December 18, 2006, GW and RICHMAR spent three weeks of User Acceptance Training for Release 1.0. The UAT was successful.

13.     On December 20, 2006, all problems with Release 1.0 had been fixed.[13] Thus, extending the system to include other stakeholder offices in HR did not require any DCMS code changes.

14.     During a Steering Committee meeting GW requested that RICHMAR comply with a close out checklist. (P.Ex. 15). RICHMAR objected to items in the checklist that would require RICHMAR to turn over all of its copies of the DCMS Code and all of its development papers to GW. RICHMAR informed ISS that if GW insisted on this as a term of payment. RICHMAR would not extend the back scanning task order and consider the entire contract closed on January 8, 2007. (P.Ex. 16). On January 5, 2007 RICHMAR provided GW with it' best and final offer (BAFO). *Id.*

15.     On January 5, 2007, ISS' Bonig agreed to the RICHMAR's BAFO, dropping its request that RICHMAR relinquish the DCMS computer code, as Bonig "recognized RICHMAR's legal ownership rights in the code." (P.Ex. 17). Based on this

---

[12] Mantis Trouble Ticket Discussion 8/31/06, meeting notes (Gordon Ex. 10).

[13] Ex. 20 to Opposition, Minutes of Training and Help Desk Meeting, GW 000105

8

agreement, retraction and Bonig's agreement to pay all outstanding invoices on the DCMS

development and for completion of back scanning and indexing the legacy documents,

RICHMAR agreed to complete the scanning project.

16.    Release 1.0 went live on December 18, 2006.  It has been in use by Human

Resource Personnel since that time.  It is used as the primary document management,

retrieval and scanning system for the Personnel division.  During January, 2007, DCMS

was rolled out to the other HR divisions----Student Faculty, Faculty Affairs, EEO and

Research Services.

17.    The head of Human Resources Personnel has reported satisfaction with the

system and it has been used on a daily basis since going live. (Bell Transcript Page 67,

Line 1 – Page 69, Line 16)  The DCMS is used by five departments, and satisfies their

document management requirements.  In the DCMS Steering Committee notes of

December 20, 2006, the Committee reported the system was working fine, and that a few

minor bug fixes had been performed.  (Ex. 20 to Opposition, Minutes of Training and

Help Desk Meeting, GW 000105).

18.    In January, 2007, two GW computer programmers attended five days of

on-line training in Documentum, the database program used as the repository for GW's

documents in DCMS.  Between January and April, 2007 the two programmers made

numerous changes to the DCMS computer code.  These changes resulted in the need to

make "bug fixes" to the DCMS that were not contemplated.  (Gordon Ex. 5 and 9).  The

"bug fixes" resulted from the addition of new features and functions.  These new features

and functions were included in a GW revised Release which went live on April 2, 2007.

(Gordon Ex. 11).

17.    Not having the expertise to develop the Bulk Scanning function or advance search functions (Document Only Search) which was planned for *Phase 2* of the project, on or about January 2, 2007, ISS hired a competitive computer programming consultant. A Release 3.0 is planned by GW. This release will require additional modifications to the DCMS source code. Additional releases are planned, including migrating the ORS/GCAS system developed by SC Foster to DCMS and expanding the DCMS to other University departments and divisions.

19.    GW plans to further modify the DCMS in order to expand its use to the remainder of the University. In order to expand these divisions will pay ISS for the transfer and the system design, development, scanning and computer programming to add them to the DCMS.

The foregoing is true and accurate to the best of my knowledge and belief.

DATED: June 7, 2007

Richard Gordon

# GORDON
# EXHIBIT 1

Project Definition




# The George Washington University
# *Business Continuity Framework*
# *HR Personnel*

**Project Manager:** Marcy Day
**Project Sponsor:** Susan kaplan

Project Name

CONFIDENTIAL

GW003445

Table of Contents

1.  Introduction
    1.1.    Mission
    1.2.    Objectives
    1.3.    Benefits
    1.4.    Related Documents
2.  Project Scope
    2.1.    Requirements to be Implemented
    2.2.    Planned Process Improvements
    2.3.    Exclusions
3.  Project Milestones
4.  Assumptions/Dependencies
    4.1.    Assumptions
    4.2.    Dependencies
5.  Risks
6.  Project Organization
    6.1.    Project Team
    6.2.    Participating Departments/Third Parties
    6.3.    Change Control Board(s)
7.  Project Approach
    7.1.    Define
    7.2.    Plan
    7.3.    Implement
    7.4.    Close-out
    7.5.    Change Management
    7.6.    Communication
    7.7.    Issue Management
    7.8.    Risk Management
    7.9.    Testing
    7.10.   Training
    7.11.   Process Improvement
    7.12.   Analysis of Custom Forms and Modifications to Baseline
8.  System Requirements
    8.1.    Database Server Requirements
    8.2.    PC Client Requirements
    8.3.    SCT and 3rd Party Product Requirements
    8.4.    Software Compatibility
9.  Project Deliverables
10. Project Success Criteria
11. Approval to Proceed
12. Document History
13. Acronyms
14. Definitions

CONFIDENTIAL                                             GW003446

## Executive Summary

HR personnel records are managed by Human Resource Services, Medical Center Faculty Affairs, Faculty Personnel, Office of Research Services, and Student Employment. These records are in manual file cabinets in each of the 5 offices.

The University was recently audited by Price Waterhouse Coopers and Beers and Cutler. The Audit identified the need for an online document storage and retrieval system for HR personnel records. The audit found that personnel records have been lost, cannot be easily found, and are not readily accessible.

To address some of the audit issues, Documentum will be used to provide an online document and retrieval application for HR personnel records. The system will be developed using the business continuity framework; that is currently under development. The two projects will be developed in simultaneously; the HR Personnel project will be the first application using the business continuity framework and will serve as the pilot for the Business Continuity Framework project.

CONFIDENTIAL                                                                              GW003447

## Introduction

### 1.1 Mission

HR personnel records are managed by HRS and its stakeholder offices; Medical Center Faculty Affairs, Faculty Personnel, and Student Employment. The "paper-and-file cabinet" approach to storing and utilizing critical data and information has resulted in difficulty finding needed documents, redundant effort, and inconsistent and costly decision-making.

The intent of this project is to provide an online tool for storage and retrieval of HR personnel records.

### 1.2 Objectives

The objective of the project to provide online storage and retrieval of HR personnel records, for HRS and its stakeholder offices. The system will be developed using the University business continuity framework.

All active personnel records, for the past five years, will be back scanned. One exception is student temporary workers; back scanning will be limited to I9s.

### 1.3 Benefits

Benefits for HRS and its stakeholder offices include the following.

- Centralized storage of HR personnel documents regardless of point of origin
- Simplified and expedited retrieval of HR personnel documents
- Robust document search functionality
- Secure documents; only authorized personnel have access
- Compliance of regulatory issues for HR
- There are backup copies of HR documents
- Reduced risks for decision-making through more complete and higher quality data

### 1.4 Project Documents

All project documentation will maintained in the GW eRoom; Documentum Phase II. Eroom is a Documentum product that can be used for collaboration and storage. The following table lists the project documentation that will be maintained. It should be noted that the Business Continuity Framework Project and HR Personnel Project are being developed simultaneously; as a result, some of the documentation will be managed as a single project.

| Document Name | Description/Location |
|---|---|
| Project Definition | Documentum Phase II eRoom |
| Project Plan | Documentum Phase II eRoom |
| Change Management Plan | Documentum Phase II eRoom |
| Communication Plan | Documentum Phase II eRoom |
| Risk Assessment and Mitigation | Documentum Phase II eRoom |
| Issues log | Documentum Phase II eRoom |
| Test Plans | Documentum Phase II eRoom |
| Training Plan | Documentum Phase II eRoom |

CONFIDENTIAL                                                                    GW003448

## 2   Project Scope

### 2.1   *Requirements to be Implemented*

The HR Personnel Project will be developed using the University business continuity framework; see the Business Continuity Framework Project PDD for requirements/functionality that will be inherited by the HR Personnel Project.

### 2.2   *Exclusions*

Workflow/routing will not be included; this will need to be addressed in a later phase of the project.

Access to documents from EAS or from Banner.

Access to personnel records is limited to HRS and its stakeholder offices; however the ability to make documents available to others, on an as needed basis, can be achieved using eRoom as a temporary storage area for document review.

### 2.3   *Planned Process Improvements*

Policies and processes will be documented and communicated
Centralized storage of all HR personnel documents
Easy access and retrieval of documents for authorized personnel

## 3   Project Milestones

| Milestone | Date |
|---|---|
| Project Start. | 2-09-2006 |
| Richmar development environment complete | 3-06-2006 |
| Project Proposal (s) approved | 4-04-2006 |
| Project Definition Approved | 4-04-2006 |
| Project Plan prepared | 3-24-2006 |
| Requirements Document Approved | 4-15-2006 |
| Begin back scanning | 4-17-2006 |
| GW Hardware Installation complete | 4-30-2006 |
| GW Enterprise software installed | 4-30-2006 |
| HR Personnel development completed | 5-26-2006 |
| User Training begins | 6-02-2006 |
| User Acceptance | 6-30-2006 |
| Move to production environment. | 6-30-2006 |
| Identify and resolve project issues from move to production. | 8-04-2006 |
| Conduct post implementation review. | 8-04-2006 |
| Complete back scanning | 10-20-2006 |
| Project End | 10-20-2006 |

CONFIDENTIAL                                                                 GW003449

## 4  Assumptions/Dependencies

### 4.1 Assumptions

It is assumed that hardware and software purchases, setup and installation will be given highest priority, and will be completed in a timely manner.

It is assumed that all project approvals will be expedited and completed in a timely manner.

It is assumed there will be no issues with moving code developed at Richmar to the GW environment.

It is assumed that Richmar will be fully responsible for gathering requirements, development and testing.

It is assumed the Richmar will be responsible for project management of their tasks.

It is assumed Richmar will have adequate resources to support the project and meet project timelines.

It is assumed Administrative Applications, Human Resource Services and stakeholder resources will be available, as needed, to meet project timelines.

Back scanning of personnel records will begin in April 2006, and can be completed in 6 months.

### 4.2  Dependencies

Business continuity framework tasks are completed in required timeframe.

Funding will be available in and FY07 to support backfill of 2 HRS FTEs.

Funding will be available in FY06 and FY07 to support filling 2 FTE positions, to support stakeholder offices during back scanning and transition to using the HR Personnel application. It is assumed that ½ FTE will be needed for each stakeholder office.

Funding is available in FY06 for scanners and PC upgrades needed to begin using the HR Personnel application.

Desktop Support has resources available to support rollout of HR Personnel.

Training has resources available to support rollout of HR Personnel.

## 5  Risks

The risks below are initial risks identified at the beginning of the project.  The table below will not be maintained.  The risk log will be managed and stored in a central location; see section 1.4.

CONFIDENTIAL                                                    GW003450

| | Probability | Impact | Severity | Mitigation |
|---|---|---|---|---|
| HR resources not available to support project | 3 | 3 | 5 | ▪ Hire backfill positions<br>▪ Provide temporary and/permanent positions for HR stakeholder offices |
| ISS support constraints due to conflicting priorities impact HR implementation | 3 | 3 | 5 | ▪ Hire analyst that can be dedicated to the project. Hire an application administrator to support an enterprise quality solution |
| Imaging processors not robust enough to support HR requirements | 3 | 3 | 5 | ▪ Purchase additional Captiva products |
| Infrastructure updates (hardware and software) cannot be implemented fast enough to meet project timeline | 3 | 3 | 5 | ▪ Ensure management commitment to support funding.<br>▪ Keep TechOps and vendors informed of pending need so delivery and installation can meet project timeline<br>▪ Richmar will prepare a development environment to jump start development |
| Back scanning of active HR documents not completed by October 2006 | 3 | 2 | 4 | ▪ Employ additional consultants needed to complete back scan prep. |
| Joint ownership not recognized by 4 stakeholder offices | 2 | 2 | 3 | ▪ Joint ownership mandated by VPs |
| Delays in project approvals, initiation or future phases will postpone completion of the back scanning requirement | 3 | 3 | 5 | ▪ Ensure resource commitment and executive sponsorship of project priorities |
| New HR documents do not get scanned while back scanning is in progress | 2 | 2 | 3 | ▪ Setup go-forward processing to be done in conjunction with back scan processing |
| Documentum V5.3 upgrade issues impact HR schedule | 1 | 2 | 2 | ▪ Setup dedicated HR environment |
| Availability of physical space for on-site scanning | 1 | 2 | 2 | ▪ Identify how space can be made available; re-arrange layout, identify what can be moved to another location |

| Probability guidelines: | | | Impact guidelines | | |
|---|---|---|---|---|---|
| ▪ Very Likely | 70-100% | A=3 | ▪ Catastrophic | B=3 |
| ▪ Probable | 40-70% | A=2 | ▪ Critical | B=2 |
| ▪ Unlikely | 0-40% | A=1 | ▪ Marginal | B=1 |

## 6   Project Organization

### *6.1   Project Team*

CONFIDENTIAL                                                                              GW003451

Throughout this document there is reference made to the core project team and the extended project team. The core project team is highlighted in the table below; this team is responsible for requirements, application development, testing and rollout. All others on the team are considered part of the extended project team.

| Resource | Role | Responsibility |
|---|---|---|
| Susan Kaplan | Project Sponsor | Decision support |
| Ron Bonig | Resource Sponsor | Resource commitment and support. |
| Anne_Marie Taylor | Resource Sponsor | Resource commitment and support |
| **Rick Gilchrist** | **GW Architect** | **Hardware and enterprise software** |
| **Marcy Kremer** | **Project Manager** | **Project reports, project plan management, meetings, and communication.** |
| **Liz Cobb** | **Lead Analyst** | **Technical solution analysis** |
| Jeff Baxter | Resource Manager | Responsible for hardware set-up |
| Ken Fischer | Resource Manager | Responsible for networking |
| Dinesh Nangia | Resource Manager | Subject matter expert for database administration |
| Asif Hafiz | Resource Manager | Contact for Banner & EAS Integration |
| Francesco de Leo | Resource Manager | Subject matter expert for web content |
| Bob Leidich | GW Resource Manager | Responsible for eRoom setup and configuration |
| Joe Brewer | Resource Manager | Training |
| Claire Mooney | Trainer | Training |
| Krisi Trisani | Security | Subject matter expert |
| Rehan Khan | Documentum System Administrator, and GW DBA | Install, configure, manage Documentum and Captiva software |
| Andrew Sherrod | Web Server Management | Install web servers, and install Documentum and Captiva software on web servers |
| Chris Peacor | Resource | Desktop Support |
| Carolyn Chase | Resource Manager | Help Desk |
| Andy Navarrete | Windows Sys Admin | Setup servers and provide sys admin support |
| Chris King | Unix Sys Admin | Setup servers and provide sys admin support |
| Tanya Bell | Resource Manager | HR Requirements, testing and approval |
| Anne Scammon | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Monica Partsch | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Barbara Marshall | Stakeholder Resource Manager | HR Requirements, testing and approval |
| Harold Gallos | Stakeholder Resource Manager | HR Requirements, testing and approval |

CONFIDENTIAL                                                            GW003452

**Project Definition**

| Vendor | Role | Resource(s) |
|---|---|---|
| **Richmar Consulting** | **Project Management** | **Richard Gordon Jr.** |
| | **Documentum** | **Jim Gearing** |
| | **Installation Support** | **Tony Ford** |
| | **Hardware sizing** | **Jae Lim** |
| | **Hardware configuration support** | **Mon Lee** |
| | **Requirements Gathering** | |
| | **Documentum Development** | |
| | **Documentation** | |
| | **Training** | |

### 6.2 Participating Departments/Third Parties

| Department/Third Party Name | Responsibility | Resource(s) |
|---|---|---|
| ECG | Review | Susan Kaplan |
| | | Nina Mikhalevsky |
| | | Mary Bayliss |
| | | Anne-Marie Taylor |
| Beers & Cutler | Review | Monica Modi |

### 6.3 Change Control Board

Changes occur in all projects. It is important that all changes are effectively and professionally managed. Requested changes are described in writing using the Project Change Request form. The impact of the change to both project cost and schedule is assessed and included in the documentation.

Changes are subject to a management-review process, in which estimated effort, costs, and impact on project schedules are examined, and decisions are made to approve or not approve the requested changes. The project manager will assess the impact of each proposed change on both project cost and schedule, and the relevant information presented to the project Change Control Board who reviews all change requests for acceptance. The project schedule and cost estimates are revised to accommodate approved changes.

The purpose of a change request is to provide a formal written communication vehicle between the project team, the project sponsor and the Change Control Board concerning changes. The formality of a notification in writing is critical to communicate that there is a need for discussion, agreement, and planning for handling changes that will affect a project deliverable.

The project manager, (who will be responsible for estimating scope, schedule and cost impacts), forwards all change requests to the Change Control Board; the sponsor is one member of the board. Approved changes are immediately included in the project plan. All change requests are logged, tracked and reported on in status reports and status meetings.

Formal change acceptance is required before working on any changes outside of the scope of the project. Change acceptance is given when the project Change Control Board formally approves the change by duly executing the request form.

The Change Control Board for the HR Personnel will be made up of the participants as indicated in the table below.

CONFIDENTIAL

| | |
|---|---|
| Anne-Marie Taylor | GW Management approval |
| | ISS, Administrative Applications |
| Rick Gilchrist | GW Architect |
| | ISS, Administrative Applications |
| Susan Kaplan | Project Sponsor |
| | Human Resource Services |
| Tanya Bell | Primary Stakeholder |
| | Human Resource Services |
| Marcy Day | GW Project Manager |
| | ISS, Administrative Applications |
| Richard Gordon Jr | Richmar. Management approval |
| Jim Gearing | Richmar, Architect |

## 7  Project Approach

### 7.1  Plan and Implementation

Detailed project plans will be completed and maintained by the project manager.  All phases of the methodology will be followed

HR Personnel will be the first group to use the business continuity framework.  The HR Personnel Project is being developed in conjunction with the Business Continuity Framework Project; the projects will be managed as one project.

Due to the large volume of HR personnel records being back scanned, Documentum V5.3 is required.  A V5.3 environment will be setup for the HR Personnel rollout; production applications currently using V5.2.5 will be converted at a later date.

Richmar has been contracted to serve as the implementer for this project.  They will be responsible for requirements gathering, solution design, and development.

The project will be managed through a collaborative effort between GW and Richmar.  The GW eRoom will provide a common repository for project documentation and a forum for online discussions and consensus building.  All project participants will have access to the eRoom.

### 7.2  Close-Out

The close-out of the project will begin after HR Personnel has been implemented.  A Lessons Learned meeting to gather information on what worked and didn't work will be held with all parties involved with the project.

### 7.3  Change Management

When changes to project requirements, scope, deliverables or related plans are requested by end-users (customers) or other project participants the following process should be followed:

Change Procedure:

- Fill out the Project Change Request Form.
- This form can be filled out by the project manager, team member or customer.

CONFIDENTIAL

- Project manager receives form and updates the change log.
- Project manager assesses scope/budget, resources and change request.
- Project manager reviews change request with project sponsor.
- If change is accepted the project manager updates the project plan, budget and deliverables as required.
  - o  Implement change within project and update change log.
- If change is not accepted update change log and project status and begin issue management process.

The project will follow the Change Management Process defined by the PMO office; see Change Management Plan.  The Change Control Board has been defined in this document; see Section 6.3 Change Control Board.

### 7.4   *Communication*

The communication matrix for the project is below; the matrix was developed at the time of this writing.  The matrix will be maintained in a central location; see section 1.4.

The communication objectives of the project follow.
- To keep the directors, project staff, and the business constantly up-to-date on project goals, plans, issues, and status.
- To communicate project information through email and/or meetings as often as possible.
- To keep all communications simple, no matter who is the sender or the receiver.
- To clearly communicate and closely manage expectations.

### Communication Matrix

| # | Communication Product (What) | Sender/From (Whom/Responsibility) | Receiver (Who) | Objective (Why) | Schedule (When) | Format (How) |
|---|---|---|---|---|---|---|
| 1 | Detailed project status | Core Project Team | Marcy Day | To provide a review of day-to-day activities | Weekly | Meeting |
| 2 | Project status | Marcy Day, Rick Gilchrist | Extended Project Team | Discuss status, gather advice and guidance, and ensure that the project is being managed to the expectations of the manager | 2x per month | Meeting |
|   |   | Core Project Team | Anne_Marie Taylor |   | 2x per month | Meeting |
|   |   | Anne_Marie Taylor, Marcy Day | ECG |   | As Requested | Meeting |
|   |   | Marcy Day | Christina Griffin |   | Weekly | Meeting, Report |
| 3 | Project Listing Status | Marcy Day | Adriana Christopher, Christina Griffin | Keep management up to date with the status of the project. | Weekly | Project Listing Document |

CONFIDENTIAL                                                              GW003455

**Project Definition**

| # | Communication Product (What) | Sender/From (Whom/Responsibility) | Receiver (Who) | Objective (Why) | Schedule (When) | Format (How) |
|---|---|---|---|---|---|---|
| 4 | Project Definition Document | Marcy Day | Anne-Marie Taylor<br>Rick Gilchrist<br>Ron Bonig | To obtain signature approval of the project charter | One-time | Document |
| 5 | Project Schedule | Core Project Team | Marcy Day | To review status of milestone dates | Weekly | Meeting, Document |
| 6 | Project Issue Log | Core Project Team | Marcy Day | To review status of outstanding issues and identify new issues | Weekly | |
| 7 | Project Risk Update | Core Project Team<br><br>Marcy Day | Marcy Day<br><br>Anne-Marie Taylor | To review and discuss current and new project risks<br><br>To review and discuss current and new project risks | Weekly<br><br>Monthly | Document and meeting<br><br>Document and meeting |
| 8 | Local Awareness Building Sessions | Core Project Team | Stakeholders, Participating Departments, Extended Project Team, and 3rd parties | Inform people of the project and the deliverables that will impact them | As needed | Stand-up presentations |
| 9 | Training | Richmar<br>GW Trainers | GW Trainers<br>End users | Provide train-the trainer<br>Provide user training | Before user acceptance testing | Presentation |
| 10 | Testing | Liz Cobb, analyst<br><br>Liz Cobb | Rick Gilchrist, QA oversight<br>End users, Stakeholders | Ensure application testing is thorough | One-time | Test Scripts, meeting |
| 11 | Lessons Learned | Extended Project Team | Marcy Day | To provide a review of the project management efforts that were well managed and those that could have been handled for effectively and efficiently | After implementation | Document, meeting |
| 12 | Close out report | Core Project Team<br><br>Marcy Day | Stakeholders<br><br>Storage medium | To provide an overall review of the project.<br><br>Ensure storage all project documentation on a medium accessible to all parties with need for access and review. | When project completes<br><br>When project completes | Document<br><br>Document |

CONFIDENTIAL                                                                    GW003456

### 7.5   Issue Management

The objectives of issue management are the quick and effective resolution of issues affecting scope, schedule or cost of the project.

Issues are to be attempted to be resolved immediately at the time of discovery. If resolution is not possible they are to be recorded in an issue log by the project manager, who is to attempt resolution and if necessary solicit assistance from their director. The issue log will track the status of each issue until its closure including the closure date and resolution.

If an issue cannot be resolved by the combined efforts of the project manager and his/her director then it is to be escalated to the executive director.

An issue log will be maintained by the GW PM, and is on file in the project documentation. The issue log will be reviewed at project meetings, as appropriate.

### 7.6   Risk Management

As the project progresses through its life cycle and phases, more will be known about the project and the associated issues.

The ability to understand and identify risk items will increase. Experience with the project will allow for the development of more realistic contingency plans, including specific action plans. The project manager will track these action plans. It may be necessary to modify the actual worksheet to show who has the assigned risk.

The analysis of project risks is a continual process throughout the project because of the need to eliminate or mitigate a particular risk, should it occur. This process is iterative. Because the results could affect the project plan, monitoring the status of risks is important and one of the key processes in risk management.

A risk log will be maintained by the GW PM, and is on file with the project documentation. The risk log will be reviewed at project meetings, as appropriate.

### 7.7   Testing

The GW analyst is responsible for developing test plans. These plans will be reviewed and approved by the GW architect responsible for QA. The analyst will be responsible for preliminary acceptance testing. HRS and its stakeholders will be responsible for user acceptance testing.

### 7.8   Training

Richmar will be responsible for providing training documentation and training to GW trainers during the initial rollout of the project  GW trainers will provide training on a go-forward basis.

### 7.9   Process Improvements

Business process improvement is principally the responsibility of the customer areas. The project will provide a tool to facilitate the reengineering of business processes, but it is outside the scope of the project to reengineer the customer areas' business processes. It is up to the customer areas to determine how best to leverage the capabilities of the tools provided by the project.

CONFIDENTIAL                                                   GW003457

- Centralized storage of documents regardless of point of origin.
- Easy access and retrieval of documents for authorized personnel.
- Web accessible system for storing and managing documents:
- Ability to capture and track versions of documents without saving each version with different names.
- Secure documents; only authorized personnel have access.
- Robust searches without knowledge of document name or content.
- Similar look and feel, and navigation, regardless of which University organization is using the product.

## 8   Project Deliverables

The purpose of this project is to provide a tool to HRS and its stakeholders to share HR personnel records.

## 9   Project Success Criteria
The success of the project can be measured by the cumulative success of HRS and its stakeholders.

CONFIDENTIAL                                           GW003458

**Approval to Proceed**

Name:   Anne-Marie Taylor
Title:   Executive Director, Administrative
        Applications
Date

Name:   Ron Bonig
Title:   Deputy Chief Information Officer
        ISS Technology Operations
Date

Name:   Tanya Bell
Title:   Director, Records and Data Management
        Human Resource Services
Date

Name:   Susan Kaplan
Title:   Asc VP Human Resources
        Human Resource Services
Date

CONFIDENTIAL                                          GW003459

## 10 Document History

This section identifies who updated this document and when.  It is an audit trail for future references.

*Revision Record*

| Number | Revision Section | Author | Notes |
|--------|-----------------|--------|-------|
| 0.01 | 03/14/2006 | Marcy Day | First Draft |
| 1.0 | 4/15/2006 | Marcy Day | Final |
| 1.01 | 5/10/2006 | Marcy Day | Exec Summary changed to say University audited rather than HRS was audited. |
| | | | |
| | | | |
| | | | |

## 11 Acronyms

| Acronym | Definition |
|---------|-----------|
| | |

## 12 Definitions

| Term | Definition |
|------|-----------|
| | |

CONFIDENTIAL                                    GW003460

# GORDON
# EXHIBIT 2

# TASK ORDER

This task order is issued on March 29, 2006 by the George Washington University, hereafter referred to as GW, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, to RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

Special provisions attached to and hereby made part of thereof, the contract dated December 22, 2005 to design the computer system architecture for GW, installing and configuring the Documentum package for use by the Human Resources.

WHEREAS, GW desires to employ the services of Contractor to perform certain additional tasks; and

WHEREAS, Contractor desires to perform certain additional tasks for GW,

NOW, THEREFORE, GW and Contractor agree as follows:

## *DESCRIPTION OF SERVICES*
Contractor will perform additional services such as helping to convert paper document to digital images and loading these images with predefined document attributes into the GW Documentum package for use by the Human Resources.

## *WRITTEN AGREEMENT*
The parties of this agreement mutually agree that this task order contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.
This task order shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

George Washington University

By: _____
*(name)*

Title: *DEO. (FO*

Date: *3/29/06*

RICHMAR and Associates

By: _____
    *Richard Gordon, Jr.*

Title: *President/CEO*

Date: *3/30/06*

**PPI355**

Rev. 3/30/2006

220 F Street N.E.
Washington DC 20002
202-544-2018-OFFICE
202-544-2018-FAX
www.richmar.info

**RICHMAR &
Associates**

**Welcome to
The New Way Of
Learning**

# Fax

To: PEGGY STEADMAN   From: RICHMAR (JIDE DADA)

Fax: 703 726 1922   Pages: 2

Phone: 703 726 1998   Date: 3/31/06.

Re: TASK ORDER   cc:

☐ Urgent  ☒ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

● Comments:

As per your Facsimile on Task Order.

**Facsimile**

Date: March 30, 2006
Cover + _1_

To: Jide Dada

Fax #: 202 544 2016

**From:**
Peggy Steadman
The George Washington University
703 726 1998 (tel)
703 726 1922 (fax)

NOTES:

Jide - The attached is for Richard's
signature as soon as possible.
After he signs, please fax to
me at the number above.
Thanks, Peggy

**PPI357**

# GORDON
# EXHIBIT 3

**Requirements Specification Document for**

**HR Personnel Extension of**

**Business Continuity Framework**

**Document and Case Management System**

**Version 6.0**

**Version Date: May 4, 2006**

The material contained in this Requirements Specification Document represents proprietary and confidential information pertaining to RICHMAR products and methods.

Project ID: GW-06-C-001-DCMS
Date Created: March 24, 2006

| Name | Email | Signature | Date |
|------|-------|-----------|------|
| Tanya Bell | | | |
| Liz Cobb | | | |
| Marcy Day | | | |
| Tony Ford | | | |
| Jim Gearing | | | |
| Rick Gilchrist | | | |
| Jae Lim | | | |
| Anne-Marie Taylor | | | |

## DOCUMENT CONTROL

| Version | Date | Added/ Deleted/ Modified (A/D/M) | Section | Brief Description of Change/Change Request document number |
|---------|------|----------|---------|-----------------------------------------------------------|
| 1 | 3/6/06 | Initial Release | n/a | Separated Business Continuity requirements from HR requirements. First release to customer |
| 2 | 3/15/06 | M | 2 | Minor modifications to the data model |
| 3 | 4/2/06 | D | 3 | Removed design sections to a separate document |
| 3 | 4/2/06 | M | 1, 2 | Reformatted to conform with Business Continuity Requirements document; various minor edits |
| 4 | 5/2/06 | M | 2 | Various edits to bring this document into conformance with the Business Continuity Requirements version 5 document |
| 4 | 5/2/06 | A | 3 | Added section on Logical Data Model |
| 5 | 5/4/06 | M | All | Typos and minor grammar |
| 5 | 5/4/06 | M | 2.11.2 | Fleshed out HR Personnel implementation step |
| 6 | 5/4/06 | M | All | Added language from all matching sections of Business Continuity Framework Requirements document version 5. |

# Table of Contents

1.0    **INTRODUCTION** ........................................................................................................ **5**

    1.1    Purpose of this Version of this Document ......................................... 5
    1.2    Purpose of this Document .................................................................. 5
    1.3    Scope of the HR Personnel Extension ............................................... 5
    1.4    Project Approach ............................................................................... 5
    1.5    Current Document Processing and Storage ....................................... 5
    1.6    Assumptions ...................................................................................... 6
    1.7    Exclusions ......................................................................................... 6

2.0    **FUNCTIONAL REQUIREMENTS** ............................................................................... **8**

    2.1    Security Requirements ....................................................................... 8
        2.1.1    Authentication (LDAP) ....................................................... 8
        2.1.2    Groups and Privileges ....................................................... 8
        2.1.3    Login/Authentication ........................................................ 10
        2.1.4    Administration .................................................................. 11
        2.1.5    Security and Encryption ................................................... 11
        2.1.6    Making Copies of Folders or Forms Available for Examination ...................... 11
        2.1.7    Department Permissions .................................................. 12
        2.1.8    Litigation and Folder Security .......................................... 13
    2.2    Input and Output Requirements ........................................................ 13
        2.2.1    Adding Documents ........................................................... 13
        2.2.2    Deleting or Replacing a Document .................................... 13
        2.2.3    Creating Versions of a Document ..................................... 13
        2.2.4    Links to Documents .......................................................... 14
        2.2.5    Paper Document Capture ................................................. 14
        2.2.6    Electronic Document Capture ........................................... 16
        2.2.7    Dynamic Attribute Values ................................................. 16
        2.2.8    User Workflow .................................................................. 16
            i.        Add Screen ........................................................ 17
            ii.       Confirmation Screen .......................................... 17
            iii.      Review Screen ................................................... 18
            iv.      Modify Screen .................................................... 18
            v.        Search Screen ................................................... 18
            vi.      Manage Users Screen ....................................... 18
        2.2.9    Associating Sets of Documents ........................................ 18
        2.2.10 Converting the Formats of Documents .............................. 18
        2.2.11 Transaction History ......................................................... 19
    2.3    Processing requirements .................................................................. 19
        2.3.1    Document Annotation ....................................................... 19
        2.3.2    Document Workflow .......................................................... 19
        2.3.3    Document Collaboration ................................................... 20
        2.3.4    Notifications ...................................................................... 20
        2.3.5    Additional Functions Required by HR Personnel ............... 20
    2.4    Search Requirements ....................................................................... 20
    2.5    Reporting Requirements ................................................................... 21

2.6   Legacy File Conversion Requirements ........................................................................ 22
2.7   Systems Integration ................................................................................................... 22
        2.7.1   DCMS to Banner Interface ............................................................................ 22
2.8   Performance Requirements ....................................................................................... 22
2.9   System Monitoring Requirements .............................................................................. 22
2.10  Storage Requirements .............................................................................................. 23
2.11  Training and Implementation Requirements .............................................................. 23
        2.11.1  Training ........................................................................................................ 23
        2.11.2  Implementation ............................................................................................ 23
3.0    LOGICAL DATA MODEL ..................................................................................................... 25
3.1   COMMON ATTRIBUTES ........................................................................................... 25
3.2   DOCUMENT TYPES AND THEIR ATTRIBUTES ...................................................... 25
APPENDIX A – HRS DOCUMENT FLOW ............................................................................................ 27
APPENDIX B – HR PERSONNEL SCREEN NOTES .......................................................................... 29

# 1.0  INTRODUCTION

## 1.1  Purpose of this Version of this Document

Version 6 of this document has been created without references to the Business Continuity Frameworks Requirements document. This has the benefit of making this document comprehensive, without having to refer to another document. The disadvantage is that the incorporated sections of the Framework requirements document are from version 5 of that document. As the Framework document continues to evolve, the changes won't be updated in this document.

## 1.2  Purpose of this Document

The purpose of this document is to define HR Personnel requirements that are extensions to what is defined in the Requirements Specification Document Business Continuity Framework. This document will be presented to the GW DCMS Workgroup for evaluation, approval and sign off.

## 1.3  Scope of the HR Personnel Extension

The purpose of HR Personnel DCMS is to provide a relatively simple method for electronically storing, tracking, and sharing HR forms and HR documents. Documents will be available for viewing by users based on their organizational permissions.

Human Resources (HR) Personnel is a functional area in which five GW organizations will use a common area of Documentum to store forms and documents. The six areas are HRS, EEO, Faculty Personnel, Medical Faculty Personnel, Research, and Student Records. These five groups, using the HR Personnel cabinet, will be the initial GW users of Documentum within the GW business continuity framework.

## 1.4  Project Approach

RICHMAR will use the installation of Documentum version 5.3 that will be implemented for the Business Continuity Framework  Extensions particular to HR Personnel will be made to that system.

## 1.5  Current Document Processing and Storage

HR Personnel offices currently have between 1 million and 2.5 million pages of paper forms and documents representing HR actions and transactions for HRS and the other stakeholder offices. This set of documents covers up to 40 years of personnel activity. The documents are currently stored in GW facilities in downtown Washington, D.C. They are only accessible physically, and in those locations. There is no backup of the data. There are occasionally problems in finding particular forms or documents.

## 1.6    Assumptions

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

- For the duration of the DCMS project, GW will assign a Project Manager to devote 25% of her/his time to the project.

- GW will supply computer operations staffing for Production, Database Administration and Web Support for transition to production and continued operation.

- GW will provide two (2) computer environments for the DCMS System: Development-Test-Training, and Production.  RICHMAR will coordinate migration to production and provide support for the above effort.  After the system is turned on in production, RICHMAR will provide support at contracted rates, if GW desires.

- GW will use the numerous existing file formats supported by Documentum to store digital files.

- Workflow(s) and additional document types can be created; however, requirements sessions must take place to make sure all attributes and workflows are reliably captured and specifics about those attributes and workflows are understood.

**NOTE:** There are no purely electronic forms used for HRS Personnel.  This is to say that any HR Personnel forms that are presented online are not processed online.  The form may be filled out online, but it must be printed in order to be processed.  That printed form will be submitted for the appropriate processing and approval.  After approval, the form will be scanned and stored in DCMS.  At the point at which purely electronic forms are considered by GW, a wholly different approach will be required to make electronic forms part of the permanent record.

## 1.7    Exclusions

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

- Route work in an organized fashion; in Documentum this is accomplished by the creation and use of workflows and life cycles.

- The business continuity framework module will have a limited number of attributes. Additional attributes will be able to be added for individual organizations.  Note that adding attributes will require additional configuration of Documentum.

- Encryption will not be used to secure documents at the raw file level. When using Documentum, the only realistic encryption method is to use Documentum's Trusted Content Services. This product handles end-to-end encryption and decryption, but it significantly increases processing time, it requires an additional licensing, and it requires a significant level of enterprise policy and training.

- Direct access to Documentum from Banner is out of scope for the first phase. Documentum's WebExtender is a possible solution if this feature is added to the list of EMC supported products.

- Direct access to Documentum from EAS is out of scope for the first phase. Documentum's WebExtender is a possible solution if this feature is added to the list of EMC supported products. Additional customization will be explored in Phase 2.

- Multifunction scanning/copying/fax machines may seem like candidates to use for scanning documents. If the machine has an IP address, and is not behind the firewall, and is not physically secured, it is a security risk and should not be used for scanning documents to put into DCMS.

- In certain cases, it may be permissible for a user to view a document, but not to save it or print it. For instance, a manager can request viewing a person's file, or a person may request seeing his/her own file. In these cases and similar cases, the following requirements may apply:

- Turning off the save capability of the browser
- Turning off the save capability in Acrobat
- Turning off PC screen capture
- Turning off PC print screen capability

It must be noted that the actions listed above are not part of the Documentum package. If these requirements must be implemented, custom code will be necessary. There is no estimation at this time of what that would require in terms of time and resources.

## 2.0  FUNCTIONAL REQUIREMENTS

### 2.1    Security Requirements

#### 2.1.1    Authentication (LDAP)

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

User access in the existing Documentum environment is based on LDAP, and will continue to be for DCMS. The LDAP directory server will be used for user authentication as well as user and group management. Users will have accounts in Documentum, but passwords will be validated through the LDAP directory server.

A DCMS user will have to have an entry in the LDAP system. In addition, the user will also have to have an account set up in Documentum. When the user is entered in the Documentum system, he/she will also be assigned one or more groups. These groups will be defined in Documentum, based on the organizational structure of GW. The groups will have permissions associated with them, so that permissions will not be assigned to individuals. Individuals will be assigned to groups, and thereby assume the permissions of the group.

#### 2.1.2    Groups and Privileges

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Based on the fact that Documentum will initially be used primarily as a digital filing cabinet, a certain number of Documentum features will neither be needed nor appropriate for the first phase. The group definitions below reflect that.

The user access and privilege levels define what administrative operations a user can perform in the repository. The list below starts with the most powerful privileges and declines with each step down the list

| Groups | Privileges |
| --- | --- |
| System Administrator | There should be a limited number of system administrators per GW organization. Can alter baseline configuration parameters and perform all activities related to maintenance of the Documentum system. |
| Organization Administrator | There should be a limited number of Organization Administrators per GW department. Can add users to groups and remove users from groups for all levels below department administrator; cannot create cabinets; Can read, add, update, delete, and annotate any document in his/her organization. Can also modify attributes for any document in his/her organization. |

**Department Viewer**

There will be multiple viewers per department.  Can only read documents in his/her department.  Read ability may be further constrained depending on folder and document security.

**Department Filer**

There will be multiple filers per department.  Can add documents to one or more folders in his/her department.  Can delete documents while they are in the pending state of the lifecycle.  A filer <u>cannot</u> annotate documents.  A filer cannot create folders.

**Department Annotater**

There can be multiple annotaters per department.  Can annotate documents in his/her department.  Cannot otherwise update, add, change, or delete documents or folders.

**Organization Auditor**

This is a group with read-only permission, but across all documents in <u>one organization</u>.  Intended for auditors and legal staff.  Cannot change anything, but can see everything in one organization.

The groups of Organization Administrator, Department Administrator, Department Viewer, and Department Filer will have similar privileges in each organization and department, within their scope of authority.

Below is a sample list to illustrate the proposed groups, using HR as an example organization. In this example, HRS, SE, FP, MF, and RES represent groups of groups that will have the ability to insert, replace, and view HR forms in the HR cabinet in Documentum:

**Group**
superuser
sys_admin

hr_org_auditor

hr_org_admin

hrs_filer
hrs_annotater
hrs_viewer

se_filer
se_annotater
se_viewer

and so on…

The contractor and/or the System Administrator will set up the workspace, users and permissions for the Organization Administrators. The Organization Administrators will set up additional users.

- Employee Relations Filer access (er_filer group), which would include viewing, filing, and replacing ER documents

- Benefits View access (ben_viewer group), which would allow viewing, but not changing or deleting, Benefits documents

### 2.1.3   Login/Authentication

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The login function will require users to enter their login information to access DCMS. Once logged in, users will have access to DCMS features and functions based on his/her login credentials and assigned groups.

### 2.1.4   Administration

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

System Administrators will be able to: create user-defined Documentum object types; create, modify and remove cabinets; and create, modify and remove groups; create, modify, and remove users.

Organization Administrators and Department Administrators will be able to create, modify, and remove groups; create, modify and remove users; will not be able to create, modify, and remove cabinets.

Organization Administrators will assign users to groups with access privileges defined for the group. Organization Administrators will set DCMS to default to a group based on user authentication. System Administrators and Organization Administrators will be able to deactivate users. Deleting users is not recommended, since user names may be attached to documents in the repository. Once a user is deactivated (rather than deleted), that user can no longer get into DCMS, but the documents will remain in the repository.

The filer group will allow the user to delete the documents when they are in the "Pending" state. Once the documents are "Approved", "Disapproved" or "Filed", then the filer group will not allow the user to delete the documents. Furthermore, a system or organization administrator can delete a document in any state of the lifecycle. A transaction history of the activities will be recorded.

When adding, a user will begin by selecting the record or location attributes (e.g.. GWid, Name, Vendor Number, Department, Organization, etc.). The System will populate the data in the organizational fields according to the user privileges set by the Administrator. These are described in the previous section.

Given the sensitivity of many of the documents that will be stored in DCMS, security must be tight. This has two aspects. One is security within the application and the other is security against unauthorized browsing of the data at the raw file (disk) level.

Application security will be enforced through LDAP and Documentum. LDAP will control who can log into DCMS. Security features of Documentum will allow further restriction on what registered users can do and see. This will be done through assigning users to groups. The groups will have privileges associated with them. It will be up to the System Administrator, and any other administrator who has the ability to associate users with groups, to assign users only to groups that are appropriate.

### 2.1.5   Security and Encryption

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

### 2.1.6   Making Copies of Folders or Forms Available for Examination

There are cases, such as an employee wanting to see his/her own file, where a full set of HR Personnel forms and documents must be available for viewing by a particular person for a limited

time. This function will be fulfilled by the use of EMC's eRoom product. An organization administrator will be able to copy a set of forms and documents to eRoom, create a temporary account for the person who needs to view the forms and documents, and create an end date for the forms and documents to be no longer available.

### 2.1.7   Department Permissions

The groups in HR Personnel will be able to see the forms and documents they have put in Documentum. In some cases they will be able to see documents other groups have put in. Listed below are the four HR Personnel stakeholder offices, the four divisions of HRS, and which other groups' documents each group can view:

| Group | Access |
|---|---|
| **Student Employment** | Can only see documents filed by the Student Employment |
| **Medical Faculty Personnel** | Can only see documents filed by Medical Faculty Personnel |
| **Faculty Personnel** | Can see documents filed by Faculty Personnel and documents filed by Medical Faculty Personnel |
| **Research Services** | Can only see documents filed by the Research Services |
| **HRS Benefits** | Can see HRS Benefits documents and all stakeholder office documents above |
| **HRS Employee Relations (ER)** | |
| | Can see all HRS documents and all stakeholder office documents above |
| **HRS Records and Data Administration (RADM)** | |
| | Can see only HRS RADM documents and all stakeholder office documents above |
| **HRS Staffing, Compensation, and Salary (SCS)** | |
| | Can see only HRS SCS documents and all stakeholder office documents above |

The contractor and/or the System Administrator will set up the workspace, users and permissions for the Organization Administrators and Department Administrators. The Department Administrators will set up additional users.

### 2.1.8  Litigation and Folder Security

In the current paper environment, when an employee becomes involed in litigation with the University, that employee's folder is physically removed from the main file room and stored in a more secure location. This requirement must continue to be met in DCMS.

## 2.2     Input and Output Requirements

### 2.2.1  Adding Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Adding documents is one of the fundamental tasks in a document management system. DCMS will provide screens to users in filer groups with screens to add documents to DCMS.

Screens will be tailored to the document types being added. A user will make one or more selections identifying the type of document to be added. In response to these choices, a screen will appear that requests appropriate attribute values. By tailoring the add screens, users will be presented with only the attributes that are necessary for that type of document.

The Add screen will not be available to the Department Viewer. However, an Administrator may change user privileges for a Department Viewer by reassigning him/her to a different or additional group.

### 2.2.2  Deleting or Replacing a Document

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Provided the user is the owner, he/she may replace the document while it is in the "Pending" state of lifecycle. The person who owns the document will be able to modify the document; provided it has not been promoted to the "Approved", "Disapproved" or "Filed" state. Once it is in the "Approved", "Disapproved" or "Filed" state of lifecycle, an Administrator is the only user who can replace or delete the document.

### 2.2.3  Creating Versions of a Document

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Documentum allows multiple versions of a document as a core feature. Versioning is not coupled with Documentum workflow, so it will be available in the initial release of DCMS. DCMS users will be able to create versions of documents if they belong to a group that has Version permission.

### 2.2.4   Links to Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Documentum allows copies of documents to be stored in the repository and it allows links to documents to be stored. Having multiple copies of a document in the repository invites trouble when versions are possible. If there are multiple copies and people begin working on different copies at the same time, the integrity of the data will be lost.

Copies of documents will not be allowed, but links (subscriptions) to documents will be. In a nutshell, these links are shortcuts to the frequently reference documents. That means that the document is placed in the repository once. Links or pointers to the document can be placed in other folders or cabinets, but there will only be one copy of the document. If some one checks out the document to create a new version of it, no one else can alter the document until it is checked in. Documentum maintains an audit trail of all changes to documents, so it will be possible to review the change history of a document.

### 2.2.5   Paper Document Capture

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Initially, DCMS will be used mostly to scan forms and documents and then store the digitized images in Documentum. Scanning stations will typically be for multiple employee use, and thus will not be desktop scanners.

Captiva will be used to insert documents into Documentum. Captiva will be configured to name the documents base on a schema. Users will not name documents going into DCMS.

Decisions will also have to be made for each organization as to whether optical character recognition (OCR) will be useful for that organization's scanned documents. If documents are scanned and then processed through OCR, the contents will be able to be searched in Documentum. However, several questions have to be considered:

- What is the rate of correct conversion to readable characters?

   A high rate of conversion is necessary in order to be able to conduct meaningful searches of scanned documents. The higher the rate of correct conversion, the more accurate search results will be.

- Do the forms or documents have hand written information on them?

   In the case of the HR Personnel forms that will be scanned and saved in DCMS, most of the unique information on the forms is handwritten. Hand writing will not be converted by OCR. If we were to apply OCR to the HR forms, what we would get would be the forms themselves, rather than the contents of the forms. The useful information would not be captured.

   The strategy in HR Personnel will be to index the forms with a handful of data attributes when they are scanned. These attributes will allow searching for the forms by PIDM, name, GWid, and a few other attributes. Searching by these attributes should return the desired forms.

- Are the paper forms or documents related to another system that can be searched for data?

Again, using HR Personnel as an example, these forms back up actions that have been entered in the Banner system. Searches can be done against Banner data. The resulting lists of people will then be able to be used to search for relevant forms and documents in DCMS. DCMS will be configured, by organization, to conduct relevant searches in Banner.

- Will the pre-printed words on the form help locate a form or document?

  While the contents of most forms will be handwritten, the words on the form itself may help locate particular forms. This may be a reason to put the forms through OCR, even if the content of the form does not get converted.

EMC's eInput product will be used for front end conversion of documents to formats compatible with Documentum. eInput must be configured to dynamically code or index documents to the greatest practical extent. All scan users are going to use the eInput web scanning front-end for digitizing paper documents.

This could include fetching or validating the PIDM by typing a name in. This method has the potential to make document coding cleaner and faster than using bar codes.

### HR Personnel specific requirements:

Although GW does possess multi-function copier/scanner machines, these will not be used for scanning documents into Documentum due to security concerns.

HR Personnel DCMS will primarily deal with scanning HR Personnel forms and documents and storing the digitized images in Documentum. Scanning stations can be set up for departmental use or for individuals. People doing scanning will login either as the "workstation user" or as an individual staff member.

Optical character recognition (OCR) will **not** be used for HRS legacy forms and documents.

Other stakeholder offices' HR Personnel forms will not go through OCR. However, other documents that have significant text in them may go through OCR. This will be determined for each stakeholder office.

EMC's eInput will be used to dynamically code or index documents being inserted into the Repository. This will include fetching or validating the PIDM (Banner primary key), for instance. This method has the potential to make document coding cleaner and faster than using bar codes.

Scanning equipment needed by office:

### HRS/EEO Scanning Equipment

2 high volume/capacity scanning workstations

1 scanning station - EEO

1 scanning station - Academic Center

1 scanning station - Virginia Campus worksite

1 scanning station - Employee Training Development

**Faculty Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Medical Faculty Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Research Services Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**Student Employment Scanning Equipment**

One high volume/capacity scanning workstation will be needed.

**NOTE:** There is a section in the Business Continuity Requirements document that contains specifications for a variety of models of scanners.

### 2.2.6   Electronic Document Capture

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Inserting electronic documents in DCMS/Documentum will be much simpler than generating and storing electronic images.  Users can select and attach documents by navigating a hard-drive.

### 2.2.7   Dynamic Attribute Values

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Certain attributes will require the user to select an entry from a pull-down list, also known as a list of values (LOV).  All such lists will originate in database tables inside DCMS.  These lists will be managed by organization administrators or by the Documentum Administrator.  No lists will be coded inside programs.

### 2.2.8   User Workflow

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The current document and records management process is manual and provides no nationally integrated workflow or historical reference capabilities. Automated notification of review/approval dates to the approval authority and automated feedback of approvals/rejections to document originators may be required in the future to improve the overall document management process.

### i.   Add Screen

Users are able to add documents. The "Add Screen" will not be available to the Viewer User. However, an Administrator may assign additional user privileges to a Viewer User by assigning him/her additional permissions. The User will begin by selecting the document attributes (i.e. Organization, Type, Date, etc.). The System may be set to default to the user profile (e.g. Human Resources/Employee Relations, etc.).

A menu will be provided for the following attributes:

Organization Level
Type of Document
Status
Approval Review


An active calendar icon will be provided for all dates.

Date Signed
Effective Date
Date Expires

A text box will be provided for the Approval Clearance, Key Words, Title. Upon completion of the attributes, the User is presented with a "Confirmation Screen."


### ii.       Confirmation Screen


The User is able to attach the document or cancel attaching. Users must enter all required attributes in order to save a document. If all required attributes are not entered, the document will not be saved.

The Confirmation Screen will display the following attributes:

Record Number
Status
Organizational Level
Date Signed
Effective Date
Date Expires
Effective Date
Type of Document
Subject
Title
Key Word

Clearances

### iii.  Review Screen

If the User is unable to attach a document, he/she may save the "Confirmation Screen" and return later to complete the transaction.  The User may access his/her unfinished document transactions using the "Review Screen."

### iv.  Modify Screen

Users are able to modify document records and the associated attributes if the lifecycle state is 'Pending".  He/she will open the document record to complete the transaction.  Upon modification of the attributes, the User is presented with a "Confirmation Screen."  The User is then able to "Modify" the Record data, attach a different version of the document or attach an additional document.  Once the document file(s) is attached, it does not replace the existing file and does not modify the record number.

### v.  Search Screen

All users can locate documents using the Search screen.  The Search Results screen will return up to 100 records or documents per screen.  The user may sort the records or documents by any of the column headers on the screen.  The user can use the "next" and "previous" buttons to review additional records.  Clicking on the document title will open the document.  Document attributes will show for each document type.

The user can open a PDF image or document.  The image or document will open in a new browser window.  Multiple PDF images or documents may be opened at once.

### vi.  Manage Users Screen

Administrators are able to add users within their organizations.  The Administrator will enter the user name and assign the user to a group.  The new user access level is based on the Administrator's access level (e.g. Human Resources-wide, Academic Affairs-wide, Information System Services-wide, etc.).

## 2.2.9   Associating Sets of Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

## 2.2.10  Converting the Formats of Documents

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

### 2.2.11 Transaction History

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

## 2.3    Processing requirements

### 2.3.1    Document Annotation

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

It is required to have the ability to annotate documents during the review process. Annotations will become a separate layer of the document and will not make permanent marks on the original document (in essence, adding a virtual post-it note). Authorized users will be able to create and view annotated comments and redlines made to a document. The Brava Enterprise tool will be used for annotation of documents. A separate permission group will be created for annotation. That group will only have annotation permission. Users may be assigned to the annotation group in addition to other group(s).

### 2.3.2    Document Workflow

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Core DCMS functionality will be provided to all registered users. All system users will be able to search, retrieve, report, display and print content related to defined attribute values. DCMS will require privileges for adding, modifying and/or deleting documents and objects. DCMS will allow the Systems Administrator, Organization Administrator and Department Filer to store, catalog and index content related to predefined attribute values. Security for adding or modifying documents and attributes will be set by user group and access privileges.

Users will be able to import both scanned and digital files through the Add function.

### HR Personnel specific requirements:

DCMS will be initially used as a digital imaging system and will not include the use of Documentum workflow for this phase. Appendix A has a diagram that shows how DCMS will be used within HRS business process.

### 2.3.3  Document Collaboration

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS will use EMC's eRoom product for this view function.  Only an administrator will be able to make documents available. GW already has enterprise licensing for eRoom.

### 2.3.4  Notifications

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

Notifications are a handy, if not essential, tool in document management.  Notifications are a core feature of Documentum, but they are defined in the realm of workflow, which is not being implemented in the initial release of DCMS.

As an interim measure, DCMS will implement a simple notification feature prior to exposing Document workflow in DCMS.  This will allow a user who is adding a document to specify a notification date.  A DCMS notification will be produced by a TBD method.  How far do we need to go with this now?  Is anyone still awake?

### 2.3.5  Additional Functions Required by HR Personnel

The following additional functions will need to be created to support HR DCMS:

- Change PIDM (and by extension GWid) attribute value for one or more documents
- New PIDM must be a valid entry in Banner
- Change other document attribute values, but not content
- Add/Modify/Hide HR Personnel Document Types
- Add/Modify/Hide HR Personnel Document Names

There is a process in Banner that changes PIDM values to resolve cases where one person has data under two PIDM values.  There will need to be a linked process in HR DCMS that picks up the list of PIDM merge values and executes the same function in Documentum.

## 2.4  Search Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS will provide an integrated search function that will allow users to search Banner and/or DCMS. Part of the Search screen will have text boxes and pull-down lists for attributes that are available in Banner. Users may use this part of the Search screen to put in criteria to find a person in order to look at his/her documents.  There will be nothing on the screen that says "Banner".

If a user fills in one of the Banner search fields, DCMS will search Banner and bring back one or more people who meet the criteria entered. If only DCMS fields are filled in, DCMS will only search Documentum and bring back all documents.

If a user fills in Banner search criteria and DCMS search criteria, the results dictate which screen the user will see after clicking the Search button. If more than one person qualifies in the Banner search, a list of people will appear. If only one person qualifies in Banner, that person's document list will appear.

Full text searching is supported by Documentum out of the box. What documents a user can search depends on his/her permissions. Note that in the first phase of DCMS, there will be little or no OCR and text conversion. However, the DCMS search function will support document text searching.

DCMS searching must support several options for the DCMS "Status" document attribute, which is an attribute with one of several possible values. Searches must be able to select for any or all of its values, which must be displayed as a pull-down menu.

When documents are added to the repository, no documents can be physically deleted, except by an administrator. When users change Status to Deleted, Duplicate, or Inactive, the document is then screened out from basic searching by the users.

The user who changed Status to Deleted can change it back to Active in order to make the documents available. Only an Administrator can physically delete documents with a Status of Deleted.

The Banner search screen supplied for DCMS must be easily reconfigured to support additional GW organizations Banner search requirements. This means being able to easily add and/or remove elements from the search screen in order to show what is necessary for a given organization's search.

If a user conducts a search against documents or people without much limitation on criteria, only, it is possible to match hundreds or thousands of employees or documents.

It is a requirement that a warning message be issued to the user when the number of people from Banner exceed a threshold, to be determined

It is a requirement that a warning message be issued to the user when the number of documents from DCMS exceed a threshold, to be determined.

In either case, a popup window is required that tells the user the number of employees or documents that have matched the search criteria. This window must also ask, "Do you want to continue?". It must have a button to continue and another button to cancel.

## 2.5    Reporting Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

A transaction history is required that will be searchable by user, date, record type, etc. A transaction history is required to determine who modified the document and when. It is also required to determine who viewed a document.

Documentum provides audit trail and transaction history capabilities. DCMS will use those capabilities to provide a transaction history of updates to document attributes as well as views of a document. A screen for searching the transaction history will be provided.

For attribute changes or document deletion or replacement, DCMS will capture user id, date, and the value of the attribute prior to the last change.

For a record of viewing documents, DCMS will capture user id, date, and data to identify the document that was viewed.

## 2.6    Legacy File Conversion Requirements

There is a separate requirements document for legacy file conversion.

## 2.7    Systems Integration

### 2.7.1   DCMS to Banner Interface

The interface to Banner is covered in the Search Requirements section above.

## 2.8    Performance Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

TBD.

## 2.9    System Monitoring Requirements

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

The Captiva Input Management Console will be installed and configured to monitor and control document input by scanning. It will also be used to monitor DCMS throughput and activity.

System metrics must also be captured. The statistics must be saved in a database for month-to-month and year-to-year comparisons. The following list is a minimum requirement for performance statistics:

- Documents imported by organization
- Documents scanned per day
- Number of pages per day
- Number of pages/documents imported per day through Captiva
- Number of pages/documents imported per day through direct input

## 2.10    Storage Requirements

Based on the HRS Forms Inventory spreadsheet, we expect approximately 64 gigabytes a year of disk storage for HR Personnel documents.  This number is expected to be sufficient for the next two years.

Key assumptions are:

| | | |
|---|---|---|
| Pages of HR documents per year | 643,000 | pages |
| Storage size per page | 100,000 | bytes |
| Calculated storage size | 643,000,000,000 | bytes (64 gigabytes) |

Storage requirements for the relational database that holds attributes, indexes, and audit trails have not been estimated.  It is assumed that the storage required for these items will be less than that for the documents themselves.

## 2.11    Training and Implementation Requirements

### 2.11.1  Training

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

DCMS training requirements analysis will be conducted separately and apart from the DCMS requirements analysis.  The training needs to focus on clearly explaining what to enter in the subject, document description, comments/remarks and other attributes.  There may be several components for training:

- Train the Trainer
- User Guide
- Context-sensitive help
- Training Guide

Training analysis should begin as DCMS moves closer to production.

### 2.11.2  Implementation

HR Personnel will have two tracks of implementation.  One will be addition of the back scanned documents to the production system and the other will be adding new documents to the system.

Back scanned documents will be added to the DCMS system by a different method from new documents.  They will be loaded by a batch process, using DVDs of scanned and indexed documents as input.  They will not use any screens.

Loading back scanned documents is completely independent of adding new documents. Back scanned documents can be loaded as soon as the production environment is certified. Loading back scanned documents will begin before users begin adding new documents.

New documents cannot be loaded until the DCMS front end is turned on in production. HRS staffers will be the initial users for several weeks. After HRS is satisfied with the functioning of the system, other stakeholder offices will be added.

## 3.0  LOGICAL DATA MODEL

This section covers the definition of DCMS document types and document attributes for the general framework.


### 3.1    COMMON ATTRIBUTES

Text of this section comes from Business Continuity Framework Requirements Document, version 5.

There are two kinds of common attributes: those that are automatically provided by Documentum and those which are defined within DCMS for all document types stored in DCMS.

Documentum provides over 60 data attributes for every document type that is defined in a Documentum system. DCMS will expose the following four:

| Document Name | Text | Definition here |
|---|---|---|
| Created Date | Date | Definition here |
| Modified Date | Date | Definition here |
| Title | Text | Definition here |

Below are additional document attributes that will be available for every document type defined for DCMS:

| Alert Date | Date | Definition here |
|---|---|---|
| Document Date | Date | Definition here |
| Expiration Date | Date | Definition here |
| Keywords | Text | Definition here |
| Organization Level 1 | Text | Definition here |
| Organization Level 2 | Text | Definition here |
| Organization Level 3 | Text | Definition here |
| Organization Level 4 | Text | Definition here |
| Status | Character | Definition here |
| Text (of the document) | Text | Definition here |


### 3.2    DOCUMENT TYPES AND THEIR ATTRIBUTES

It appears that HR Personnel can be run using a single document type, HR Personnel. It may be that during the design process this single document type is split into several document types, to make document security easier to provide.

### HR Personnel

This document type is the one under which HR Personnel forms and documents are filed in DCMS. It will have the specific attributes below, as well as the DCMS common attributes and the Documentum common data attributes. See the framework requirements document for those attributes.

Attributes for HR Personnel:
- PIDM (link to Banner)
- GWid
- Form Name
- Form Group
- Folder Number (from back scanning)

**APPENDIX A – HRS DOCUMENT FLOW**

The following diagram shows how and when DCMS will be used within HR business process management.  The items in gray in the picture below indicate where DCMS will be integrated with HR business processes.

The diagram of the document flows are shown on the next page.



## APPENDIX B – HR PERSONNEL SCREEN NOTES

HR Personnel

Org Level 1 contains
1. Faculty Personnel
2. Medical Faculty Personnel
3. Research Services
4. Student Employment
5. HRS

Org Level 2 contains:
1. Benefits
2. Employee Relations (ER) / EEO
3. Staffing, Compensation, and Salary (SCS)
4. Records and Data Management (RADM)

Org Level 2 values ER, SCS, and RADM appear under all Level 1 organizations. Benefits appear only under the Level 1 HRS entry

Users will be able to choose one or more keywords from a dropdown list, maintained by the Documentum Administrator.

Users will be able to choose a form **name** form a dropdown list, maintained by the Documentum Administrator.

Users will be able to choose a form **group** form a dropdown list, maintained by the Documentum Administrator.

Form group will be automatically derived if form name is chosen first.

If form group is chosen first, then a tailored list of form names will be available for selection by a pulldown menu. Only one form name can be chosen.

# GORDON
# EXHIBIT 4

| | C | D | E | F | G |
|---|---|---|---|---|---|
| 2 | \multicolumn{5}{c}{**LIST OF GW OFFICES AND DEPARTAMENTS**} | | | | |
| 3 | | | | | |
| 4 | **Appendix** | **Tab** | **Office/Department/ School** | **EMA POC** | **Alternate EMA** |
| 5 | | | | | |
| 7 | **Appendix No. 1: Office the President and Board of Trustees** | | | 3 | 8 |
| 9 | **Appendix No. 2: Office of the Provost and VP for Health Affairs** | | | 3 | 9 |
| 10 | A  VP for Communications | | | 3 | 9 |
| 11 | | | MPA Building | 3 | 8 |
| 12 | | | Lisner Auditorium | 3 | 8 |
| 13 | B VP for Govt., International and Corporate Affairs | | | 3 | 9 |
| 14 | C School of Medicine & Health Sciences | | | 3 | 9 |
| 15 | | | Anatomy and Cell Biology | 3 | 9 |
| 16 | | | Anesthesiology | 3 | 9 |
| 17 | | | Biochemistry & Molecular Biology | 3 | 9 |
| 18 | | | Dermatology | 3 | 9 |
| 19 | | | Emergency Medicine | 3 | 9 |
| 20 | | | Health Care Sciences | 3 | 9 |
| 21 | | | Immunology | 3 | 9 |
| 22 | | | Medicine | 3 | 9 |
| 23 | | | Microbiology and Tropical Medicine | 3 | 9 |
| 24 | | | Neurological Surgery | 3 | 9 |
| 25 | | | Neurology | 3 | 9 |
| 26 | | | OBGYN | 3 | 9 |
| 27 | | | Ophthalmology | 3 | 9 |
| 28 | | | Orthopaedic Surgery | 3 | 9 |
| 29 | | | Pathology | 3 | 9 |
| 30 | | | Pediatrics | 3 | 9 |
| 31 | | | Pharmacology | 3 | 9 |
| 32 | | | Physiology and Experimental Medicine | 3 | 9 |
| 33 | | | Psychiatry and Behavioral Sciences | 3 | 9 |
| 34 | | | Radiology | 3 | 9 |
| 35 | | | Surgery | 3 | 9 |
| 36 | | | Urology | 3 | 9 |
| 37 | D  School of Public Health and Health Services | | | 3 | 9 |
| 38 | | | Environmental and Occupational Health | 3 | 9 |
| 39 | | | Epidemiology and Biostatistics | 3 | 9 |
| 40 | | | Exercise Science | 3 | 9 |
| 41 | | | Health Policy | 3 | 9 |
| 42 | | | Health Serv. Mgt. and Leadership | 3 | 9 |
| 43 | | | Global Health | 3 | 9 |
| 44 | | | Prevention and Community Health | 3 | 9 |
| 45 | E  Response to Emergencies and Disasters Institute (READI) | | | 7 | 8 |
| 46 | F  Medical Center Research | | | 8 | 9 |
| 48 | **Appendix No. 3: Office of the EVP & Treasurer** | | | 8 | 3 |
| 49 | A  Compliance and Privacy Office | | | 6 | 7 |
| 50 | B  Information Systems and Services | | | 7 | 8 |
| 51 | C  Chief Investment Officer | | | 6 | 7 |
| 52 | D  Univ. Budget Office | | | 6 | 7 |
| 53 | | | Supply Chain | 6 | 7 |
| 54 | E  Univ. Business and Operations Office | | | 8 | 9 |
| 55 | | | Auxiliaries | 8 | 9 |
| 56 | | | Facilities | 8 | 9 |
| 57 | | | Gworld | 7 | 3 |
| 58 | | | Institutional Real Estate | 8 | 9 |
| 59 | | | Investment Real Estate | 8 | 9 |
| 60 | | | Residential Property Management | 8 | 9 |

| #   | C | D | E | F | G |
|-----|---|---|---|---|---|
| 61  | | | F Univ. Finance Office | 3 | 6 |
| 62  | | | Cashier's Office | 3 | 6 |
| 63  | | | Comptroller's Office | 3 | 6 |
| 64  | | | Payroll Services | 3 | 6 |
| 65  | | | Student Account Services | 3 | 6 |
| 66  | | | Tax Department | 3 | 6 |
| 67  | | | Financial Emergency/Emergent Issues Team (FEET) | 3 | 6 |
| 68  | | | Risk Management | 3 | 6 |
| 69  | | | Treasury Management | 3 | 6 |
| 70  | | | G Planning and Analysis | 3 | 9 |
| 71  | | | H Office of Public Safety and Emergency Management (EMAs Office) | 6 | 7 |
| 72  | | | 2100 M Street Office | 6 | 7 |
| 73  | | | Command Center Complex | 8 | 7 |
| 76  | | | **Appendix No. 4: Office of the EVP for Academic Affairs** | 8 | 7 |
| 76  | | | A Columbian College | 3 | 7 |
| 77  | | | GSPM | 3 | 7 |
| 78  | | | SMPA | 6 | 9 |
| 79  | | | SPPPA | 3 | 9 |
| 80  | | | Africana Studies | 8 | 3 |
| 81  | | | American Studies | 3 | 9 |
| 82  | | | Anthropology | 8 | 7 |
| 83  | | | Art | 7 | 8 |
| 84  | | | Art Therapy | 3 | 7 |
| 85  | | | Biochemistry and Molecular Biology | 9 | 7 |
| 86  | | | Bioinformatics | 9 | 7 |
| 87  | | | Biological Sciences | 7 | 9 |
| 88  | | | Biomedical Sciences | 7 | 9 |
| 89  | | | Biostatistics and Epidemiology | 9 | 8 |
| 90  | | | Chemistry | 3 | 7 |
| 91  | | | Classical and Semitic Languages | 3 | 7 |
| 92  | | | Communication | 3 | 9 |
| 93  | | | Counseling | 7 | 3 |
| 94  | | | Criminal Justice | 8 | 3 |
| 95  | | | Dramatic Literature | 9 | 3 |
| 96  | | | Early Modern European Studies | 9 | 8 |
| 97  | | | Earth and Environ. Studies | 8 | 3 |
| 98  | | | East Asian Languages and Literature | 9 | 9 |
| 99  | | | Economics | 3 | 7 |
| 100 | | | Electronic Media | 9 | 3 |
| 101 | | | English | 8 | 9 |
| 102 | | | EFL | 7 | 8 |
| 103 | | | Envt. and Resource Policy | 9 | 7 |
| 104 | | | Epidemiology | 3 | 9 |
| 105 | | | Film Studies | 9 | 3 |
| 106 | | | Forensic Sciences | 8 | 9 |
| 107 | | | Genetics | 7 | 8 |
| 108 | | | Geography | 3 | 7 |
| 109 | | | German and Slavic Languages and Literature | 9 | 7 |
| 110 | | | Historic Preservation | 3 | 9 |
| 111 | | | History | 3 | 7 |
| 112 | | | Hominid Paleobiology | 6 | 8 |
| 113 | | | Human Sciences | 8 | 9 |
| 114 | | | Human Services | 9 | 3 |
| 115 | | | Humanities | 3 | 9 |
| 116 | | | Journalism | 6 | 7 |
| 117 | | | Judaic Studies | 7 | 8 |
| 118 | | | Linguistics | 8 | 9 |
| 119 | | | Math | 9 | 8 |
| 120 | | | Microbiology and Tropical Medicine | 8 | 7 |
| 121 | | | Molecular and Cellular Oncology | 7 | 9 |
| 122 | | | Museum Studies | 9 | 3 |
| 123 | | | Music | 3 | 8 |
| 124 | | | Neuroscience | 9 | 8 |
| 126 | | | Organizational Sciences | 3 | 9 |

| # | | | Name | F | G |
|---|---|---|---|---|---|
| 127 | | | Pharmacology | 7 | 9 |
| 128 | | | Philosophy | 3 | 6 |
| 129 | | | Physics | 9 | 8 |
| 130 | | | Political Science | 3 | 9 |
| 131 | | | Professional Psychology | 8 | 9 |
| 132 | | | Psychology | 3 | 9 |
| 133 | | | Religion | 3 | 9 |
| 134 | | | Romance Languages and Literature | 6 | 3 |
| 135 | | | Sociology | 3 | 6 |
| 136 | | | Speech and Hearing | 3 | 6 |
| 137 | | | Statistics | 8 | 9 |
| 138 | | | Telecommunication | 3 | 6 |
| 139 | | | Theater and Dance | 7 | 3 |
| 140 | | | University Writing | 9 | 8 |
| 141 | | | Women and Leadership | 8 | 9 |
| 142 | | | Women's Studies | 3 | 7 |
| 143 | | B  Elliott School of International Affairs | | 7 | 6 |
| 144 | | C  Graduate School of Education & Human Development | | 7 | 8 |
| 145 | | D  Law School | | 3 | 6 |
| 146 | | E  School of Business & Public Management | | 6 | 3 |
| 147 | | | Accountancy | 6 | 3 |
| 148 | | | Finance | 6 | 3 |
| 149 | | | International Business | 3 | 6 |
| 150 | | | Management Science | 6 | 3 |
| 151 | | | Marketing | 6 | 3 |
| 152 | | | Public Administration | 6 | 3 |
| 153 | | | Strategic Mgt. and Public Policy | 6 | 3 |
| 154 | | | Tourism and Hospitality Mgt. | 3 | 6 |
| 155 | | F  School of Engineering and Applied Sciences | | 3 | 6 |
| 156 | | G  Gelman Library | | 8 | 9 |
| 157 | | H  College of Professional Studies | | 3 | 6 |
| 158 | | I  Mount Vernon Campus | | 7 | 8 |
| 159 | | J  Virginia Campus | | 3 | 8 |
| 160 | | K  Alexandria Graduate Education Center (AGEC) | | 3 | 8 |
| 161 | | L  Biostatics Center | | 9 | 8 |
| 162 | | M  Academic Planning and Development | | 7 | 9 |
| 163 | | N  Associate VP for Research and Grad. Studies | | 3 | 6 |
| 164 | | O  Graduate Student Enrollment Management (GSEM) | | 3 | 8 |
| 165 | | | Graduate Data Entry Center | 3 | 8 |
| 166 | | P  Graduate Studies and Academic Affairs | | 8 | 3 |
| 167 | | Q  Office of the Registrar | | 7 | 8 |
| 169 | Appendix No.5: Office of the Sr. VP for SASS | | | 8 | 9 |
| 170 | | A  Assoc. Vice President and Dean of Students | | 8 | 9 |
| 171 | | | CLLC | 7 | 8 |
| 172 | | | Student Health Srvices | | |
| 173 | | | University Counseling Center | 7 | 8 |
| 174 | | B  Office of the Associate VP and Dean of Freshman | | | |
| 175 | | | Mount Vernon | 8 | 8 |
| 176 | | | International Services Office (ISO) | 7 | 6 |
| 177 | | | Parent Services | 3 | 6 |
| 178 | | C  Associate VP for Student and Academic Support Services | | 3 | 8 |
| 179 | | | Marvin Center | 8 | 6 |
| 180 | | | Multicultural Student Services Center | 6 | 9 |
| 181 | | | Student Activities Center | 8 | 7 |
| 182 | | D  Athletics and Recreation | | 8 | 7 |
| 183 | | E  Communications and Technology | | 3 | 9 |

| | C | D | E | F | G |
|---|---|---|---|---|---|
| 185 | G Undergraduate Admissions | | | 8 | 3 |
| 186 | H Parent Services | | | 3 | 9 |
| 187 | I University Police Department | | | 3 | 8 |
| 188 | J Budget , Personnel & Finance | | | 6 | 9 |
| 190 | **Appendix No. 6: Office of the General Counsel** | | | 3 | 8 |
| 191 | A Associate Vice President for Human Resources | | | 3 | 7 |
| 192 | | HR Services | | 3 | 7 |
| 193 | | HR Benefits | | 3 | 7 |
| 195 | **Appendix No. 7: Office of the VP for Advancement** | | | 3 | 9 |
| 196 | A Office of Alumni Programs | | | 3 | 9 |
| 197 | B Advancement Services | | | 3 | 9 |

# GORDON
# EXHIBIT 5





## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

| |
|---|
| **Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule |
| **Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.<br><br>Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2.   All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM. |
| **Reason for Change:**    After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University.  The change in approach has been approved by Lou Katz. |

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours:** N/A |

| |
|---|
| **Description of risks**<br>No risk to HR Personnel.  There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum. |
| **Recommendation:** Approve Request. |

| |
|---|
| **Evaluated by:** Marcy Day | **Date: 6/26/06** |

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042

 

| | DCMS HR Personnel<br>Change Request Form | |
|---|---|---|
| **CHANGE IDENTIFICATION SECTION** | | |
| **Change Control # :** 021 | **Date:** 7/10/2006 | |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a | |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes | |

**Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:   Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:**   After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| **EVALUATION SECTION** | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** | |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A | |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:**  Approve Request.

| **Evaluated by:** Marcy Day | **Date: 6/26/06** |
|---|---|

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

GW000042

 

| DCMS HR Personnel<br>Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |
| **Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:   Schedule | |
| **Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.<br><br>Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM. | |
| **Reason for Change:**   After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz. | |

| **EVALUATION SECTION** | |
|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |
| **Description of risks**<br>No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum. | |
| **Recommendation:**  Approve Request. | |
| **Evaluated by:** Marcy Day | **Date: 6/26/06** |

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

CONFIDENTIAL

GW000042





## DCMS HR Personnel
## Change Request Form

**CHANGE IDENTIFICATION SECTION**

| | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

---

**EVALUATION SECTION**

| | |
|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| | |
|---|---|
| **Evaluated by:** Marcy Day | **Date: 6/26/06** |

---

**DECISION APPROVAL SECTION**

| | | |
|---|---|---|
| Cancel __ | Postpone __ Reconsider on: | Integrate into Project __ |
| **Decision Approval Signatures:** | | |

1

GW000042

 

| DCMS HR Personnel<br>Change Request Form | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| **EVALUATION SECTION** | |
|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| **Evaluated by:** Marcy Day | **Date: 6/26/06** |
|---|---|

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __**<br>**Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

CONFIDENTIAL

GW000042





## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:** After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:** Approve Request.

| **Evaluated by:** Marcy Day | | **Date: 6/26/06** |
|---|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** <br> **Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

CONFIDENTIAL

GW000042


**THE GEORGE**
**WASHINGTON**
**UNIVERSITY**
WASHINGTON DC


**ISS**
Information Systems & Services

| | |
|---|---|
| **_DCMS HR Personnel_** **Change Request Form** | |

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| **Change Control # :** 021 | **Date:** 7/10/2006 |
| **Short Title:** Change Business Continuity Framework scope | **Affects Oracle Workflow/Banner/portal?** n/a |
| **Requested by:** Rick Gilchrist | **Supporting Materials Attached (yes/no)** yes |

**Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg: Schedule

**Description of Change Request:** The Business Continuity framework development began with DCMS HR Personnel release 1A and 1B development of web services and the wrapper. Framework development will be an ongoing process as more modules are added to DCMS. The intent to provide a 'General Use' module for Business Continuity will not be completed as planned. Instead, release 2 (a and b) will build a 'Self Service Module'.

Please see the attached Requirements Traceability Matrix (RTM) to see what parts of the framework development remains in release 1 and which will be moved to release 2. All framework requirements in release 1C will be moved to release 2, all other framework requirements remain in release 1A and 1B as indicated in the RTM.

**Reason for Change:**  After reviewing plans for the General Use Module with Ceil Hamilton, the Team was asked to change the approach; a self service module provides greater flexibility for the University. The change in approach has been approved by Lou Katz.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See RTM | | **Estimate of effort (hrs) :** |
| **Identify plan changes:** Does not change HR Personnel project plan | | **Total Hours:** N/A |

**Description of risks**
No risk to HR Personnel. There is a risk to business continuity if release 2 does not get funded; then there will be delays in delivery of a module that can be used, by the University department to expedite use of Documentum.

**Recommendation:**  Approve Request.

| **Evaluated by:** Marcy Day | | **Date: 6/26/06** |
|---|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** **Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |

1

CONFIDENTIAL                                                                                 GW000042

# GORDON
# EXHIBIT 6


**THE GEORGE
WASHINGTON
UNIVERSITY**
WASHINGTON DC


**ISS**
Information Systems & Services

## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| DCMS HR PERSONNEL | |
| **Change Control # : 004** | **Date:** 05/25/06 |
| **Short Title:** Release 1A schedule and cost change | **Affects Oracle Workflow/Banner/portal (if applicable)?** N/A |
| **Requested by:** Jim Gearing | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:**
Development of HR Personnel and Business Continuity Framework was scheduled for implementation in July, 2006. In order to provide a timely delivery, the product needs to be delivered in three releases. Release 1A will be delivered July 27th and will provide basic functionality required to go-live with HR Personnel and Business Continuity. An additional $514K will be needed to complete this release. See attached 'Freeze Memo' for list of functions to be provided in each of three releases.

**Reason for Change:**
Extended development time is necessary to complete delivery of release 1A. The LOE to use web services (CR002) was underestimated. Team members were also diverted to look at SFA, Debt & Ins., Web Extender, etc.

| EVALUATION SECTION | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See Attached 'Requirement Freeze' letter | | **Estimate of effort (hrs) :** Not available |
| **Identify plan changes:** Delivery dates | | **Total Hours:** |

**Description of risks:**
In order approve this CR additional funding sources must be found; seeCR008 – CR010. After re-allocating funding to pay for this CR, there is still a very high risk that funding to provide a smooth turnover from RICHMAR to GW will not be adequate. There is no funding available for maintenance support from RICHMAR. There is no funding available to support RICHMAR mentoring of GW developers; RICHMAR has said that mentoring is not possible until after delivery of release 1A and 1B. GW does not have Java and Documentum expertise to replace RICHMAR.
**Recommendation:** Release 1A must be completed in order for HRS to resolve audit compliance issues; therefore the CR must be approved with clear understanding of the documented risks. See attached, Budget Review meeting notes.

| **Evaluated by:** Budget review team; Anne-Marie Taylor, Christina Griffin, Marcy Day, Richard Gordon, and Jim Gearing. | **Date: 5/25/06** |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** Reconsider on: | **Integrate into Project __** |

2

CONFIDENTIAL                                                                 GW000021


THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC


ISS
Information Systems & Services

| *DCMS HR Personnel* **Change Request Form** | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** DCMS HR PERSONNEL | |
| **Change Control # :** 006 | **Date:** 05/25/06 |
| **Short Title:** Release 1C schedule and cost change | **Affects Oracle Workflow/Banner/portal (if applicable)?** N/A |
| **Requested by:** Jim Gearing | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Schedule

**Description of Change Request:**
Release 1C needs to be added to the project plan to complete delivery of HR Personnel and Business Continuity requirements. Release 1C is planned to be completed Sept 27th    An additional $220K will be needed to complete this release.

**Reason for Change:**
Extended development time and cost are necessary to complete delivery of the Admin Module that was identified in requirements for Business Continuity and HR Personnel

| **EVALUATION SECTION** | | |
|---|---|---|
| **Identify requirements, & products/deliverables changes:** See Attached 'Requirement Freeze' letter | | **Estimate of effort (hrs) :** Not available |
| **Identify plan changes:** Delivery dates | | **Total Hours:** |

**Description of risks:**
Funding is not available.  The risks associated with not implementing release 1C are as follows:
- Admin Apps resources are not available to complete release 1C in a timely manner.
- Admin Apps resources do not have adequate knowledge of Documentum and Java to complete development of release 1C
- There is no funding available to support RICHMAR mentoring of GW developers.

**Recommendation:** Delivery of release 1C must be put on hold until GW resources are available to complete the development. See attached, Budget Review meeting notes

| **Evaluated by:** Budget review team; Anne-Marie Taylor, Christina Griffin, Marcy Day, Richard Gordon, Jim Gearing. | **Date: 5/25/06** |
|---|---|

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel __** | **Postpone __** **Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |
| **Change Advisory Board:** | | |

1

 

## DCMS HR Personnel
## Change Request Form

| CHANGE IDENTIFICATION SECTION DCMS HR PERSONNEL | |
|---|---|
| **Change Control # :** 011 | **Date:** 05/25/06 |
| **Short Title:** Divert $23K, from other funding sources, into project budget | **Affects Oracle Workflow/Banner/portal (if applicable)?** N/A |
| **Requested by:** Marcy Day | **Supporting Materials Attached (yes/no)** |

**Type of request (P, A, D, T): P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg:** Budget

**Description of Change Request:**
Obtain funding to support an SOW to have EMC configure the Centera with Documentum; $23k is needed for the SOW.

**Reason for Change:** ISS does not have the knowledge to configure the Centera with Documentum; the Centera storage is cheaper than using Clarion and provides WORM technology.

| EVALUATION SECTION | |
|---|---|
| **Identify requirements, & products/deliverables changes:** None | **Estimate of effort (hrs) :** N/A |
| **Identify plan changes:** None | **Total Hours:** |

**Description of risks:** Risk to divert $23K is minimal; should not impact any other efforts.

**Recommendation:**
Approve funding for SOW to have EMC configure the Centera with Documentum.

| **Evaluated by:** Budget Review Team; Anne-Marie Taylor, Marcy Day, Christina Griffin, Richard Gordon, Jim Gearing | **Date: 5/25/06** |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| **Cancel __** | **Postpone __** **Reconsider on:** | **Integrate into Project __** |
| **Decision Approval Signatures:** | | |
| **Change Advisory Board:** | | |

1

CONFIDENTIAL

GW000031

# GORDON
# EXHIBIT 7





**DCMS HR Personnel**
**Change Request Form**

| CHANGE IDENTIFICATION SECTION | |
|---|---|
| Change Control #: 017 | Date: 6/01/2006 |
| Short Title: Budget allocation for code review. | Affects Oracle Workflow/Banner/portal (if applicable)? |
| Requested by: Marcy Day | Supporting Materials Attached (yes/no) |

**Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg: Budget, $9,200

**Description of Change Request:** Anne-Marie as asked SUN to do a code review. The cost is $9200. Cost center 615001 will be used to pay for the review.

**Reason for Change:** GW will be responsible for maintaining the code once the project is finished. GW would like an independent review of the code that will be received from RICHMAR, to ensure maintainability.

| EVALUATION SECTION | |
|---|---|
| Identify requirements, & products/deliverables changes: None | Estimate of effort (hrs) : N/A |
| Identify plan changes: None | Total Hours: N/A |

**Description of risks**
No risk. If the CR is not approved GW increases the risk of receiving code that may not be maintainable.

**Recommendation:** Approve CR

| Evaluated by: Marcy Day, Christina Griffin | Date: 6/01/06 |
|---|---|

| DECISION APPROVAL SECTION | | |
|---|---|---|
| Cancel __ | Postpone __ Reconsider on: | Integrate into Project __ |
| Decision Approval Signatures: | | |

1

GW000018

# GORDON

# EXHIBIT 8





| **DCMS HR Personnel** **Change Request Form** | |
|---|---|
| **CHANGE IDENTIFICATION SECTION** | |
| **Change Control # :** 016 | **Date:** 6/01/2006 |
| **Short Title:** Budget allocation for SFA review. | **Affects Oracle Workflow/Banner/portal (if applicable)?** |
| **Requested by:** Marcy Day | **Supporting Materials Attached (yes/no)** |
| **Type of request (P, A, D, T):** P=Plan/Sched Chg, A=Architecture Chg, D=Design Chg, T=Tech Chg: Budget, $9,000 | |
| **Description of Change Request:** The purpose of this CR is to allocate $9,000 from the project budget for the SFA review. RICHMAR has been asked to provide a preliminary estimate of cost to develop an application for SFA using DCMS, Business Continuity Framework. The review has required several meetings, as well as time to mock up a prototype of what could be developed for SFA using DCMS. | |
| **Reason for Change:** RICHMAR has been asked to show SFA what could be developed for them using DCMS. The time being spent on SFA, by RICHMAR, is being charged to the DCMS budget. SFA is out of scope for the current DCMS effort, therefore the money spent for SFA needs to documented. | |

| **EVALUATION SECTION** | |
|---|---|
| **Identify requirements, & products/deliverables changes:** None | **Estimate of effort (hrs) :** N/A |
| **Identify plan changes:** None | **Total Hours:** N/A |
| **Description of risks** It is important to provide a review to SFA that would encourage them to use DCMS. If another application is used, it detracts from the plan to use DCMS to house all documents for business continuity. The $9,000 to be spent on SFA creates/add to the existing DCMS budget deficit. | |
| **Recommendation:** Allocate $9,000 from the DCMS project budget to be spent on preliminary research, screen mockups, and a cost estimate for SFA. Monitor DCMS budget closely. | |
| **Evaluated by:** Marcy Day, Christina Griffin | **Date:** 6/01/06 |

| **DECISION APPROVAL SECTION** | | |
|---|---|---|
| **Cancel** __ | **Postpone** __ **Reconsider on:** | **Integrate into Project** __ |
| **Decision Approval Signatures:** | | |

2

GW000037

# GORDON
# EXHIBIT 9

## TASK ORDER

This task order is issued on July 6, 2006 by the George Washington University, hereafter referred to as GW, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, to RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

Special provisions attached to and hereby made part of thereof, the contract dated December 22, 2005 to design the computer system architecture for GW, installing and configuring the Documentum package for use by the Human Resources.

WHEREAS, GW desires to employ the services of Contractor to perform certain additional tasks; and

WHEREAS, Contractor desires to perform certain additional tasks for GW,

NOW, THEREFORE, GW and Contractor agree as follows:

### DESCRIPTION OF SERVICES
Contractor will perform additional services such as reworking the DCMS framework so that new document types/folders can be added to DCMS by configuration, rather than by system development. A detailed feature list is attached.

### WRITTEN AGREEMENT
The parties of this agreement mutually agree that this task order contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained. This task order shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

**George Washington University**                    **RICHMAR and Associates**

By:_____                     By:_____
(name)                                          Richard Gordon, Jr.

Title:                                          Title: President/CEO

Date: _____                          Date: _____

CONFIDENTIAL                                                 GW001820

# DCMS Feature List for Releases 2A and 2B

## General Description

The feature lists below reflect requirements for reworking the DCMS framework so that new document types/folders can be added to DCMS by configuration, rather than by system development. It also includes the features of Release 1C, which had previously been deferred due to lack of money.

The new framework is designed so that DCMS cabinet administrators can perform the following functions:

- Design their own document types/folders
- Choose from a fixed number (say, 30) index fields that they can name
- Choose data types for the index fields from text, date, and number
- Choose the sequence of these fields on the target screen for the new document type/folder
- Create lists of values (LOVs) for text and numeric fields that will make those fields require a choice from a pull-down menu, rather than entry by typing
- After performing above functions, generate a target screen that will be available to the organization's users to use to save documents and their attributes.

Below is a more detailed feature list that will be the basis of a change order to implement this new framework. Features not in the list will not be implemented, unless another change order is submitted.

## DCMS Feature List for Release 2A

1. System will allow dynamic configuration of organization document types/folders (target screen)
2. System will allow dynamic configuration of attributes for document types/folders above (target screen)
3. System will allow dynamic arrangement of order of attributes for target screen from above
4. Attribute data types supported will be text, date, and number. Ten of each type field will be available
5. DCMS will only reveal defined attributes on target screen. If 30 are available, but the cabinet administrator only defines 12, only 12 will be shown.
6. Cabinet Administrator function will be created to create lists of values (LOVs) for attributes defined above
7. Folders will inherit attributes of folders above them. If folder level 1 has two attributes and folder level 2 has its own three attributes, documents that are inserted at folder level 2 will have five attributes available. DCMS will not enforce database-type relational integrity checks on document attribute values in parent-child relationships. Documents will inherit the attributes of the folder they are in and inherit the attributes of the folders above them.

CONFIDENTIAL                                                                        GW001821

8. Validation of attribute values will either be via lists of values (LOVs) or by reference to an external ERP system. Integration to ERP systems such as EAS is not part of release 2.

9. A non-dynamic screen for Banner searching, similar to that for HR Personnel, will be implemented to support the Workers Compensation function. In Release 2A, it will only support the Workers Compensation function.

10. Access Control Lists (ACLs) will be defined by ISS. There will be one for each cabinet and one for the first level folder in each cabinet. Folders at lower levels will inherit the ACL from the folder(s) above.

11. If an organization needs more restricted access for a folder it creates, ISS will design and implement the ACL for that folder. Users will not create ACLs. Upon creation of a cabinet, DCMS will create a Documentum document type for that cabinet.

12. ISS will create cabinets through the Documentum Administrator interface.

13. Cabinet administrators will create folders for their organizations.

14. Cabinet administrators will be able to create new document types/folders for their cabinet, but only in the ISS test/development environment. ISS will migrate new document types/folders to QA for testing, then migrate the new document types/folders to production.

15. Cabinet administrators will have a limited ability to make changes to production, primarily adding or hiding elements of LOVs.

16. A maximum of five levels of folders below the cabinet will be allowed.

17. Support features of DCMS Releases 1A and 1B, including, but not limited to:
    a. Document search
    b. eInput capture and indexing of paper documents allowing indexing with items driven from the user definitions in Set-up tool
    c. Adding and indexing electronic documents. Screens will be displayed dynamically with items driven from the user definitions in Set-up tool
    d. Create versions of documents
    e. Annotate documents
    f. Create links to documents
    g. Rendering documents into different formats
    h. Alerts
    i. Searching electronic documents. Search selection screens will be displayed dynamically with items driven from the user definitions in Set-up tool

DCMS Feature List for Release 2B

1. Cabinet administrator will be able to add users to groups or remove users from groups (1C req. #8). Only ISS will create groups.

2. Allow a cabinet administrator to create masks and range checks for numeric fields

3. Allow a cabinet administrator to create maximum lengths for text fields

4. Allow a cabinet administrator to mark fields as required

5. Capture system metrics and provide reporting on them (1C req. #52)

6. Create screen for searching transaction history (1C req. #45)

7. Was duplicate of 11 below.

CONFIDENTIAL                                                      GW001822

8. For the eRoom function, create the ability for a cabinet administrator to conduct a single search across multiple folders (as is now possible in DCMS), and put links to the retrieved documents into an eRoom (1C req. #56)
9. Cabinet administrator will be able to change the labels of attributes
10. Cabinet administrator will be able to change the labels for the organization levels.
11. Create a screen for cabinet administrator of HR Personnel to maintain LOVs for the HR Personnel extension (1C req. # 24). This may be taken care of by the new framework LOV function, but it may not fit into the new framework LOV function. If it does not fit in the new framework LOV function, it must be provided separately.
12. Cabinet administrator will be able to indicate that OCR is required for a new document type/folder. This will cause eInput to put the document through OCR processing. The search screen will always show a text box for searching, because a given cabinet could have documents anywhere in it that have been through OCR.

Features that will not be in DCMS Releases 2A and 2B

1. Workflow
2. Easily reconfigurable Banner search screen (1C requirement #41)

**Cost Estimate**

**Phase 2a**

| Name | Hours | Cost |
|---|---|---|
| Executive Management Consultant | 480 | $ 72,000.00 |
| Sr. Management Consultant | 1848 | $ 231,000.00 |
| Systems Analyst | 176 | $ 17,248.00 |
| Total Phase 2a | | $ 320,248.00 |

**Phase 2b**

| Name | Hours | Cost |
|---|---|---|
| Executive Management Consultant | 480 | $ 72,000.00 |
| Sr. Management Consultant | 1144 | $ 143,000.00 |
| Systems Analyst | 176 | $ 17,248.00 |
| Total Phase 2b | | $ 232,248.00 |

**TOTAL Phase 2a & 2b** $ 552,496.00

RICHMAR & Associates

Richard Gordon, Jr.
President/CEO

# GORDON
# EXHIBIT 10

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

Attending:

| | | |
|---|---|---|
| Marcy Day | Jenn Bond | Andy Smith |
| Rick Gilchrist | Jingxiao Feng | Richard Gordon |
| Jim Gearing | Jae Lim | Tony Ford |
| Rehan | | |

**Objective of this meeting** – To go through all outstanding issues and understand what the issues are; to make a determination whether each will affect UAT or not; to talk about which version of Banner is being used for testing.

Also, to understand what will be available for the production release, and what level of effort is required for getting that accomplished.

Overall assessment from RICHMAR (Jae Lim)
eInput – is about 90% complete. Rick Gilchrist tested the code this morning and will give results of his test.

Testing and Port issues
- Port concern – 8080, 8180 are now open. 8080 is for all ongoing development, 8180 will be used for deployment (code drop).
- RICHMAR will still need to coordinate w/ WebServices each time they deploy -- this situation is dynamically changing
- Document Search – discussion on how are we going to do this, what is the user expecting –
  - Tanya wants to search against Documentum only; when retrieved, they have to be validated against Banner security.
  - Request for person's name in Change Presentation Layout screen
  - When searching by document only, will want to do second search by other attributes (create date, etc).

  RICHMAR requested this be documented in a change request, since search currently formerly understood requirement

- Banner Webservices -- GW is working on the security. RICHMAR needs to implement the WebServices so that they can test. *This is a show stopper.* RICHMAR will incorporate this into the system for UAT. RICHAMAR received LDAP just last week with the Java docs; RICHMAR must now has to change the logic in DCMS. Can currently test system incorporating the PIDM.

- GW will populate the PIDMs in so Jingxiao can test the security piece.

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

- Rick will let Jenn know which PIDMs and scenarios she will be testing (she has already done this).

GW internal design requirement – There is a conflict about what the user should see if the search fails – Tanya doesn't want the user to know details, Jenn does.....

Rick will talk to Tanya about what she wants the users to see.

Review
166 – Needs additional repair
183 – Will be resolved w/ new WebServices; with LDAP added
190 – Will be removed.
193 – CLOSED
221 – CLOSED
228 – Requires more testing--
238 – CLOSED
239 – Jae will adjust to make sure it is cascading (full screen, but move x/y down), and you can see that you are still in Documentum
245 – Need to mitigate duplicate name results. RICHMAR will address.
246 – CLOSED
250 – Seems to be closed; needs some more testing – seems to depend on separate browser.
252 – Requirement that none of the HRS groups can see into the stakeholders groups – HR Directors group overrides this.
253 – RICHMAR will address
255 – Needs additional testing – is currently using hard-coded IP addresses. RICHMAR will  to change to Alias.  Empty field Org-Name.  Use lowest level for search.  Additional details in Mantis report.  Richmar will delete Object Type.
257 –

**Additional Discussion**
1. Flip eInput Password and net ID Password on eInput screen.
2. Change GWU_HR_Personnel to HR_Personnel
3. Missing Gender, attributes (ref discussion w/ Richard/Rick last week)

**New** – Keyword should not be a mandatory index field in eInput

Have second button in Document Added screen to "Retrieve Documents" (for same individual) screen. **Request needs to be made in writing.**

Remove HR folder from HR group.

Individual tied to RADM (only) – Internal error, or could not add document ....

CONFIDENTIAL

GW002431

Mantis Trouble Ticket Discussion
8/31/06
Meeting Notes

If in Webtop, documents are there. – Possibly an ACL issue?

<u>Reports</u> Info is stored in a table – it then is a simple query to run against the data. Can be done in SQL. Mike Wolfe will be able to connect to the same table in Documentum and make the info available in reports, then the information in the reports will be available for Tanya to do trending and analysis

**Issue – not capturing "employee name" in Documentum,** may need Banner Webservices to create a capture. Currently retrieving document with PIDM.

<u>1B</u>

Annotation and OCR features.  Timeframe – will be released with 1A.

<u>Next meeting</u>

To discuss other issues –

9/6  2:30pm; Marcy, Jim, Rick, Richard Chris.  Location TBD

4.

# GORDON EXHIBIT 11

&[DATE]

GW000175

# DCMS Release 2 Mantis Ticket Ranking

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Rank | Id | Category | Summary | Priority | | | |
| 1 | 352 | DCMS | 2.0 Org_name is being populated with "HR Personnel" by DCMS Scan but not DCMS | high | | | |
| 1 | 364 | DCMS | Fix Document search for both Document only and for Employee + Document search | high | | | |
| 1 | 367 | DCMS | The display of error messages should be changed to wrap within a display box. | high | | | |
| 1 | 357 | Web-S | Modify search to accept selection of Active/Inactive Employees and Jobs (ref 358) | high | | | |
| 2 | 353 | DCMS | Users with View only access to a Document should be able to view attributes but not modify them | low | | | |
| 2 | 354 | DCMS | Form names should not be presented in the list box if the user doesn't not have access to the corresponding ORGs | high | | | |
| 2 | 358 | DCMS | Modify advanced search to allow selection of Active/Inactive Employees and Jobs (ref 357) | high | | | |
| 2 | 361 | DCMS | Modify current Navigation bar for ease of use | normal | | | |
| 2 | 362 | DCMS | Make changes to the Search screen for increased functionality | normal | | | |
| 2 | 363 | DCMS | Make changes to the Add screen for increased functionality | normal | | | |
| 2 | 365 | DCMS | Modify "Change Presentation" to save user settings and add additional attributes | normal | | | |
| 2 | 377 | DCMS | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 2 | 166 | eInput | Form name lookup icon and search popup window are not found for eInput | high | | | |
| 2 | 264 | eInput | The Cabinet should be selectable by user when there is more than one Cabinet | high | | | |
| 2 | 266 | eInput | BL - 9/2006   EInput Documentation – add another process | normal | | | |
| 2 | 368 | eInput | Single values for Org level I & II should be populated | normal | | | |
| 2 | 370 | eInput | Fix or replace the calendar tool with a compatible tool that won't clicking to bypass message each time. | normal | | | |
| 2 | 371 | eInput | Modify Employee Search with check boxes for Active/Inactive Employees | normal | | | |
| 2 | 375 | eInput | The display of error messages should be changed to wrap within a display box. | normal | | | |
| 2 | 376 | eInput | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 2 | 378 | Web-S | Error messages should all be review and written to accurately report the problem encountered. | normal | | | |
| 3 | 239 | DCMS | 2.0 When viewing documents a small screen that is resizeable is displayed, to be made larger | high | | | |
| 3 | 250 | DCMS | Can't print Documents for other than PDF and Word | high | | | |

CONFIDENTIAL

&[DATE]

Page 2 of 2

## DCMS Release 2 Mantis Ticket Ranking

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Rank | Id | Category | Summary | Priority | | | |
| 25 | 3 | 356 | DCMS | When Add is selected, single values for Org level I & II should be populated | low | | | |
| 26 | 3 | 360 | DCMS | Modify Cabinet selection to use a "Select new Cabinet" button | normal | | | |
| 27 | 3 | 369 | elnput | Indicate what fields are not searchable and restrict from entering data. | low | | | |
| 28 | 3 | 372 | elnput | Minor screen changes | normal | | | |
| 29 | 4 | 265 | Banner | 2.0 PIDM change process to use Documentum Database table | high | | | |
| 30 | 4 | 317 | DCMS | Integrate Brava for Annotation profile | high | | | |
| 31 | 4 | 359 | DCMS | Move all position information to the bottom in a table format and balance the remaining data | low | | | |
| 32 | 5 | 355 | DCMS | Add buttons should not be selectable for users with only view profiles. | low | | | |
| 33 | 5 | 366 | DCMS | Write the excel file for exports with the columns set to autofit so the information is readable when viewed. | low | | | |

CONFIDENTIAL

GW000176

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| CUS4, INC. D/B/A RICHMAR & ASSOCIATES et al.<br><br>Plaintiff,<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY,<br><br>Defendant | Case No. 1: CV-07-0841 (JR) |

## DECLARATION OF JAE LIM

Jae Lim, being sworn deposes and says as follows:

1.    I am the Solutions Principal of Impact Innovations Systems, Inc. I am a Documentum program specialist.  I have over 12 years of programming and integrating Documentum large scale document repository system.

2.    Impact Innovations was the subcontractor and programmer to Richmar on the DCMS project.  We are intimately familiar with the DCMS computer code and wrote 100 per cent of that program.

3.    Last week, on Friday, June 1, I was alerted by Richmar that they would be receiving a copy of a revised DCMS code.  Richmar asked if we could compare the revised code to the version we had created.  I agreed to do this.

4.    I did not receive a copy of the code until the evening of June 6.  Because of other pending engagements and the complications such as my offices being Manassas, Virginia I was not immediately able to run an electronic comparison program on the code and determine what changes had been made.

5.    I will be able to perform and complete a reasonable analysis over the next several days and consult with Richmar.

DATED:  June 7, 2007

_____/s/_____
Jae Lim

# Exhibit 11



## SOW - DCMS Framework - Task Order 1 - Solution Design

**Crown Partners, LLC ("Crown Partners")** agrees to provide products and services to **George Washington University ("GW" or "Client")** under the following terms and conditions. Crown Partners' and George Washington University's signatures on this Task Order are acknowledgement of this **Task Order**, the **Master Statement of Work** dated 04/25/2007 and titled DCMS Framework and the **George Washington University Master Services Agreement (MSA)** dated January 2, 2007.

This Task Order under the Master SOW is intended to set forth the services to be provided for relationship between the Client and Subcontractor. The Company enters into this TASK ORDER at it requires additional services in skill areas possessed by the Subcontractor.

This TASK ORDER is hereby executed on behalf of the parties on the date last below written

| | |
|---|---|
| By: _____ | By: _____ |
| Printed: Ronald C. Bonig | Printed: Richard Hearn |
| Title: Interim Vice President & CIO | Title: Managing Director |
| Date: 5/7/07 | Date: 5-10-2007 |
| For and on behalf of The George Washington University | For and on behalf of Crown Partners, LLC |

Reviewed by: _____

Approved by: _____

Accordingly **George Washington University** and **Crown Partners, LLC** jointly agree to the following TASK ORDER conditions:

### 1. Standard Charges and Payment Terms.
**GW** will be charged for the actual hours provided by Crown Partners in performing services described in Section 3, at the following hourly rates:

**Hourly Rate** for resources:
- **Sr. Consultant:** $175.00 / Hour / resource (plus actual expenses incurred).
- **Consultant:** $155.00 / Hour / resource (plus actual expenses incurred).

Crown Partners will prepare a monthly invoice based on the hourly-billing rate. In addition, **GW** will reimburse Crown Partners for approved travel and living expenses incurred in providing these services. Payment will be made as outlined in the **MSA**.

### 2. Acceptance.
Signature constitutes acceptance of this Task Order in accordance with the terms and conditions of the **MSA** and the **Master SOW**.



### 3. Services Description.

This Task Order represents an agreement between GW and Crown Partners. The services to be provided are detailed below.

#### a. Services to be delivered.

**Activities to be performed under this Task Order include:**

1. <u>DCMS Framework Design</u> – gather, analyze and document requirements by meeting with the GW DCMS project team, incorporate functionality in the existing DCMS application into a more flexible framework and by working with the Crown DigiFirst Product Team. The analysis and design must also incorporate consideration for system of record integration (Banner, EAS).

   **Deliverables:**     Functional Requirements Document (FRD)
                         System Design Specification (SDS)

2. <u>DCMS Framework Roadmap</u> – Using as input the Functional Requirements Document, System Design Specification and future direction, author a document defining how GW can extend the DCMS Framework from the initial scan / upload / retrieval functionality to incorporate more advanced content management services such as workflow, electronic forms, annotations and retention policy.

   **Deliverable:**      DCMS Architecture and Roadmap

3. <u>Plan for first development iteration</u> – Plan for the first development iteration for the DCMS Flexible Framework.

   **Deliverable:**      Task Order 2 – Development Iteration #1

#### b. Delivery Schedule.

This Task Order is effective <u>May 14, 2007 through June 22, 2007</u>. GW may extend the resources upon written request no less than two (2) weeks prior to completion of effective period.

#### c. Primary Contact for contract.

- GW Project Manager: Marcy Day; E-mail: mkremer@gwu.edu, (703) 726-1973
- GW Functional Manager: Rick Gilchrist; E-mail: rickg@gwu.edu, (703) 726-1966
- Crown Partners: Andrea Kozak, Director, Crown Project Office, akozak@crownpartners.com , 630-991-7878

#### d. Name of Resource Providing Service.

Technical Lead – Kevin Burns and Rick Macartney
Documentum Architect - TBD
Project Administrator – TBD

The assigned resources will be consultants with experience utilizing the Crown Partners DigiFirst application. Crown Partners, LLC. reserves the right to substitute resources but intends to utilize the resources named above.

Entire contents © 2006 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only.

CONFIDENTIAL          **ATTORNEYS' EYES ONLY**          GW004174



**e. Estimated Hours and Cost**

| Role | Hours | CP Rate | Fee |
|---|---|---|---|
| Technical Lead | 160 | $ 175.00 | $ 28,000 |
| DCTM Architect | 160 | $ 175.00 | $ 28,000 |
| Project Administration | 8 | $ 155.00 | $ 1,240 |
| Sub-Total | 328 | | $ 57,240 |
| Estimated Expenses | | | $ 9,000 |
| Total Estimated Cost | | | $ 66,240 |

**f. Anticipated Start Date.**

May 14, 2007

**g. Assumptions**

1. The detailed requirements for the Wizard-driven Flexible Framework are contained in the existing DCMS system and / or from the GW Project Management and Information Technology Office DCMS project team. Crown assumes no end-user requirements gathering sessions in the effort estimate.

2. Crown assumes that work will be performed at Crown Partners facilities and at GW facilities as agreed to by the GW Project Manager.

3. This agreement refers to the activities mentioned herein and does not include out of scope actions such as development, testing, deployment, etc.

4. GW will provide the necessary resources to assist Crown Partners providing services defined in this agreement.

5. This agreement is governed by the processes defined in the Master SOW dated 4/25/2007.

CONFIDENTIAL

ATTORNEYS' EYES
ONLY

GW004175



3. GW will provide the necessary resources to assist Crown Partners providing services defined in this agreement.

4. This agreement is governed by the processes defined in the Master SOW dated mm/dd/yy.

Entire contents © 2007 Crown Partners, LLC.
CONFIDENTIAL: For Client internal use of only

CONFIDENTIAL                        ATTORNEYS' EYES
                                          ONLY                        GW004172

# Exhibit 12

# In The Matter Of:

*CUS4, Inc. d/b/a Richmar & Associates, et al. v. George Washington University*

---

*Ronald G. Bonig*
*June 5, 2007*

---

*Gagliardi Reporting Company*
*P.O. Box 7306*
*Arlington, VA 22207*
*(703) 243-4333*

Original File 0605BONI.V1, 172 Pages
Min-U-Script® File ID: 3667576289

# Word Index included with this Min-U-Script®

**Page 1**

[1]     IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF COLUMBIA

[2]             CIVIL DIVISION

[3]

[4]

[5] CUS4, INC., d/b/a

    RICHMAR & ASSOCIATES, et al.,

[6]

            Plaintiffs,

[7]

    v.              Case No:

[8]             1:CV-07-0841 (JR)

    GEORGE WASHINGTON UNIVERSITY,

[9]

            Defendant.

[10]

[11]

                Tuesday, June 5, 2007

[12]            Washington, D.C.

[13] Deposition of:

[14]        RONALD G. BONIG

[15] called for examination by counsel for the

[16] Plaintiffs, pursuant to Notice, taken at the

[17] Law Offices of Geoffrey P. Gitner, Watergate,

[18] Eleventh Floor, 600 New Hampshire Avenue, N.W.,

[19] Washington, D.C. 20037, beginning at 10:08 a.m.,

[20] before Lu Anne Dawson, Notary Public in and for

[21] the District of Columbia, when were present on

[22] behalf of the respective parties:

**Page 2**

[1] APPEARANCES:

[2]

[3] FOR THE PLAINTIFFS:

[4] GEOFFREY P. GITNER, ESQ.

[5] The Law Offices of Geoffrey P. Gitner

[6] Watergate, Eleventh Floor

[7] 600 New Hampshire Avenue, N.W.

[8] Washington, D.C. 20037

[9] (202) 295-6035

[10]

[11] FOR THE DEFENDANT:

[12] JAMES W. THOMAS, JR., ESQ.

[13] Arnold & Porter

[14] 555 Twelfth Street, N.W.

[15] Washington, D.C. 20004-1206

[16] (202) 942-6421

[17] Fax (202) 942=5999

[18] James_Thomas@aporter.com

[19]

[20]

[21]

[22]

**Page 3**

[1] ALSO PRESENT:

[2]        RICHARD GORDON, JR.

[3]        LINDA J. SCHUTJER, ESQ.

[4]        Associate General Counsel

[5]        George Washington University

[6]

[7]

[8]

[9]

[10]        CONTENTS

[11]

[12] Witness:              Page:

[13] RONALD G. BONIG

[14]    Examination by Mr. Gitner       5

[15]    Examination by Mr. Thomas      —

[16]

[17]

[18]

[19]

[20]

[21]

[22]

**Page 4**

[1]        EXHIBITS

[2]

[3] Marked for identification:      Page:

[4] BONIG DEPOSITION EXHIBIT NOS.

| | No. | Page |
|---|---|---|
| [5] | No. 1 | 25 |
| [6] | No. 2 | 42 |
| [7] | No. 3 | 48 |
| [8] | No. 4 | 67 |
| [9] | No. 5 | 72 |
| [10] | No. 6 | 77 |
| [11] | No. 7 | 83 |
| [12] | No. 8 | 105 |
| [13] | No. 9 | 113 |
| [14] | No. 10 | 120 |
| [15] | No. 11 | 139 |
| [16] | No. 12 | 163 |

[17]

[18]

[19]

[20]        (Exhibits attached to original.)

[21]

[22]

Page 5

[1]                    PROCEEDINGS

[2]

[3]

[4]     Thereupon,

[5] RONALD G. BONIG

[6] was called for examination by counsel for the

[7] Plaintiffs and, after being sworn by the Notary,

[8] was examined and testified as follows:

[9]                    EXAMINATION

[10]               BY MR. GITNER:

[11]    **Q:** Would you please state your name,

[12] sir?

[13]    **A:** Ronald Charles Bonig, B-o-n-i-g.

[14]    **Q:** Mr. Bonig, where do you reside?

[15]    **A:** Ellicott City, Maryland.

[16]    **Q:** What is your address?

[17]    **A:** 2904 Concord Court, Ellicott City.

[18]    **Q:** Do you reside there with anybody?

[19]    **A:** Yes. My wife and daughter.

[20]    **Q:** What is your wife's name?

[21]    **A:** None of your business.

[22]    **Q:** That's her name, none of your

Page 6

[1] business?

[2]    **A:** No, but my wife is not involved in

[3] this.

[4]    **Q:** Well, that is for us to decide. Could

[5] you please give me her name?

[6]    **A:** No.

[7]    **MR. GITNER:** Mr. Thomas, do you

[8] want to instruct your witness to provide that

[9] information in the event that we have to serve a

[10] subpoena on this witness and identify the people

[11] that are living in that house?

[12]    **MR. THOMAS:** I can't imagine under

[13] what circumstances you would need to serve a

[14] subpoena on Mr. Bonig's wife.

[15]      But I think under the circumstances,

[16] you can tell him your wife's name.

[17]    **THE WITNESS:** My wife's name is

[18] Judith.

[19]               BY MR. GITNER:

[20]    **Q:** How old is your daughter, sir?

[21]    **A:** Just about 20.

[22]    **Q:** What is her name?

Page 7

[1]    **A:** Susanna.

[2]    **Q:** Sir, how long have you worked at GW?

[3]    **A:** Oh, about six and a half years.

[4]    **Q:** What is your current position?

[5]    **A:** Interim Vice President and Chief

[6] Information Officer.

[7]    **Q:** What was your position when you

[8] started there?

[9]    **A:** When I started there? Executive

[10] Director for Technology Operations.

[11]    **Q:** Were you always in the ISS Division?

[12]    **A:** Yes.

[13]    **Q:** What does ISS stand for?

[14]    **A:** Information Systems and Services.

[15]    **Q:** When were you placed in your present

[16] position?

[17]    **A:** When? January 1st.

[18]    **Q:** Did you have any interim positions?

[19]    **A:** Yes. I was a deputy prior to that,

[20] Deputy CIO.

[21]    **Q:** In your positions as Deputy CIO and

[22] Interim Chief CIO, what are your responsibilities?

Page 8

[1]    **A:** The vast majority of IT operations and

[2] all the infrastructure in the university, about

[3] 260 people, all the networks, computer centers,

[4] except for the research that the professors do,

[5] all the phone systems, Internet access, storage,

[6] desktop support, et cetera.

[7]    **Q:** So ISS is in charge of developing

[8] those systems for the University?

[9]    **A:** Developing or purchasing, modifying,

[10] installing, everything from the main —

[11]    **Q:** Maintaining?

[12]    **A:** — big systems to the network

[13] switches.

[14]    **Q:** Can you give me a, starting with high

[15] school, what has been your education, formal

[16] education?

[17]    **A:** A degree from Frostburg State College,

[18] Master's degree in Systems from George Washington

[19] University in the early seventies, a year of

[20] post-graduate work at the University of Washington

[21] in the mid-seventies.

[22]    **Q:** In what field?

CYS4, Inc. d/b/a Richmar & Associates, et al.   v.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 9

[1]   A: Public affairs/finance, in effect.

[2]   Q: Can you tell me what your experience

[3] has been, your employment experience has been?

[4]   A: I worked for the Federal Government,

[5] municipal government, private industry and now the

[6] University.

[7]   Q: In what capacities did you work for

[8] each one of those?

[9]   A: IT, Information Technology, under

[10] its various names of it, from data control or

[11] systems development, et cetera. For the Federal

[12] Government, my last Federal Government position

[13] was as —

[14]   Q: Maybe we should start at the beginning

[15] and work forward, if you could. What positions

[16] have you held, what companies have you worked for,

[17] government agencies have you worked for and what

[18] was your position with each one of them?

[19]   A: I can't even remember the details

[20] of some of that stuff 35 years ago. I worked

[21] in various positions in systems in the General

[22] Services Administration, worked for a while at

Page 10

[1] the Executive Office of the President, worked

[2] the longest and most recent — and I left there

[3] in 1995 — was as the National Director of

[4] Administrative Systems for the Social Security

[5] Administration.

[6]   Q: Have you had any private —

[7]   A: Yes. I worked for Systems and

[8] Computer Technology Corporation as a consultant,

[9] as Assistant Director of the site in Indianapolis

[10] and as the Director of the outsourcing arrangement

[11] with the George Washington University.

[12]   Q: What was your position with Systems

[13] and Computer Technology?

[14]   A: Principal consultant in one spot,

[15] Assistant Director at Indianapolis and Executive

[16] Director/Account Director or Account Manager at

[17] George Washington University.

[18]   Q: How long were you there?

[19]   A: With SCT? About six years.

[20]   Q: Is it SCT?

[21]   A: Yes.

[22]   Q: Did they develop computer systems for

Page 11

[1] clients?

[2]   A: Yes. Yes, they did. The contract we

[3] had was an outsourcing contract. We ran the

[4] computer center for them. But they used, GW used

[5] SCT called Banner.

[6]   Q: Do you have any prior experience in

[7] negotiating computer system development contracts?

[8]   A: Yes.

[9]   Q: How extensive is your experience?

[10]   A: A number of different companies,

[11] Lockheed Martin, et cetera.

[12]   Q: In your past experience, have you been

[13] involved in negotiating licensing fees for

[14] computer systems?

[15]   A: Yes.

[16]   Q: How extensive?

[17]   A: Off the shelf. Not too extensive.

[18] Off the shelf licensing fees, operating system

[19] software, et cetera.

[20]   Q: In your position with GW, I take it

[21] that ultimately you are in charge of the contracts

[22] that are let between the University and outside

Page 12

[1] vendors?

[2]   A: Now I am, yes.

[3]   Q: Within the ambit of those

[4] responsibilities, have you advised yourself

[5] what the creative rights are between the

[6] University and its vendors?

[7]   MR. THOMAS: Object to form.

[8]   THE WITNESS: Pardon?

[9]   MR. THOMAS: Objection to form.

[10] You can answer.

[11]   THE WITNESS: Okay. I have a general

[12] understanding and rely on my legal counsel.

[13]           BY MR. GITNER:

[14]   Q: Do you have practical experience

[15] yourself?

[16]   A: Practical experience, yes.

[17]   Q: How many contracts have you been

[18] involved with that have addressed the rights to

[19] creative works, copyright works? Hundreds, tens?

[20]   A: No. In the tens. Probably in the

[21] tens.

[22]   Q: And you have been in the computer

Page 13

[1] development field for 35 years?

[2]   A: Operations and development.

[3]   Q: Operations and development.

[4] Approximately how many contracts have you been

[5] involved with that have involved licensing fees?

[6]   A: Well, every time we buy a piece of

[7] off-the-shelf software, there's a licensing fee.

[8]   Q: Have you been involved in the

[9] negotiation of those licensing fees?

[10]   A: To some degree.

[11]   Q: Have you been involved in negotiating

[12] licensing fees for George Washington University?

[13]   A: Yes.

[14]   Q: Are you familiar with the company SC

[15] Foster?

[16]   A: SC Foster? I believe they work in the

[17] Documentum area. I'm not that familiar with them

[18] directly.

[19]   Q: Are you familiar with the fact that

[20] they installed a computer Documentum system for

[21] GW University?

[22]   A: I believe they did, yes.

Page 14

[1]   Q: Were you involved in supervising that

[2] particular project?

[3]   A: Only in the hardware side at that

[4] point. That was prior to me becoming Deputy and

[5] prior to being in my current position, so I was

[6] Executive Director for Operations at that point.

[7]     The only contact that I would have

[8] had directly or my folks would have had directly

[9] with them was the physical installation of the

[10] hardware.

[11]   Q: Their hardware is still being or their

[12] system is still being used at the University, is

[13] it not?

[14]   A: As far as I know.

[15]   Q: What does ORS stand for?

[16]   A: Office of Research Services, I think.

[17]   Q: And GCAS?

[18]   A: Grants and Contract Accounting.

[19]   Q: Is there a license agreement between

[20] SC Foster and GW University?

[21]   A: Don't know. I would assume so, but

[22] I don't know.

Page 15

[1]   Q: Why would you assume so?

[2]   A: Well, because if we're buying

[3] software, off-the-shelf software, there would be

[4] a licensing agreement as opposed to paying an

[5] hourly group to do work for us.

[6]   Q: Do you know if there was a written

[7] contract with SC Foster?

[8]   A: At GW we won't do business without a

[9] written contract.

[10]   Q: Do you know whether or not in the

[11] contract between GW and SC Foster whether or not

[12] SC Foster or who retained the rights, creative

[13] rights?

[14]   A: I do not know.

[15]   Q: You just testified that when I guess

[16] a customer pays for a custom designed computer

[17] system, that there is no need for licensing fees?

[18]   A: I don't believe I said that.

[19]   MR. THOMAS: Objection to form.

[20]         BY MR. GITNER:

[21]   Q: Is that your belief?

[22]   A: If I'm buying ours from someone, we're

Page 16

[1] specifying what needs to be done and a programmer

[2] is programming something for the University, they

[3] are acting as if they were our staff. They're

[4] being paid for their hours.

[5]     There's two ways to pay for something,

[6] pay for a physical piece of equipment or a

[7] physical piece of software off the shelf or pay

[8] hours for someone to do some work.

[9]     If we're paying hours for someone,

[10] it's just like a staff augmentation, as if I was

[11] contracting with a third party body shop.

[12]   Q: And if you pay hours to an independent

[13] contractor, is that your belief, that you as the

[14] University would own the creative rights that are

[15] created by the independent consultant?

[16]   A: We would certainly own or have the

[17] rights to use what the consultant developed for us

[18] since we paid for that development.

[19]   Q: I'm asking you, though, who would own

[20] the copyright? Who would own the right to get the

[21] copyrights?

[22]   MR. THOMAS: Objection to form. That

CUS4, Inc. d/b/a Richmar & Associates, et al.    v.
George Washington University

Ronald G. Bonig
June 5, 2007

---

Page 17

[1] is asking him a legal question.

[2] **BY MR. GITNER:**

[3] **Q:** What is your understanding?

[4] **A:** Generally, GW doesn't copyright

[5] software that they develop, whether it's by our

[6] own staff or by our own folks or whether it's

[7] by a staff augmentation.

[8] **Q:** Do you understand that under an

[9] independent consultant agreement for the

[10] implementation and design of a custom designed

[11] computer system that it would be the independent

[12] consultant who would have the right to the

[13] copyright?

[14] **MR. THOMAS:** Objection to form of

[15] the legal question.

[16] **BY MR. GITNER:**

[17] **Q:** Is that your understanding?

[18] **A:** My understanding is if we're paying

[19] for the hours, we have the right to use it.

[20] **Q:** I'm not asking you if you have the

[21] right to use it. I'm asking you, would not the

[22] creator, the independent consultant as the

---

Page 18

[1] creator, have the right to own the copyright —

[2] **MR. THOMAS:** Objection.

[3] **BY MR. GITNER:**

[4] **Q:** — to the system?

[5] **MR. THOMAS:** Objection. Asked and

[6] answered. Calls for a legal conclusion.

[7] **THE WITNESS:** I don't know.

[8] **BY MR. GITNER:**

[9] **Q:** You don't know? Have you ever sought

[10] that advice? Let me ask you, have you sought

[11] advice from anyone in this case as to whether or

[12] not GW or Richmar is entitled to own the copyright

[13] to the DCMS?

[14] **A:** I have not asked that question.

[15] **Q:** You haven't asked it of a single soul?

[16] **A:** I don't remember. I don't think so.

[17] **Q:** You haven't asked that of any of your

[18] staff?

[19] **A:** I don't remember it. I have 260

[20] people. This is one of two dozen projects all

[21] going at the same time.

[22] **Q:** So you haven't had this discussion

---

Page 19

[1] with Ms. Day, Ms. Griffin?

[2] **A:** I may have. I don't remember.

[3] **Q:** Or Rick Gilchrist?

[4] **A:** What I said stands. I may have. I do

[5] not remember specifically asking that, no.

[6] **Q:** Have you ever sought legal advice?

[7] Have you ever sought legal advice?

[8] **A:** On what?

[9] **MR. THOMAS:** You can answer that —

[10] **MR. GITNER:** I'm just asking if he

[11] ever sought it. I'm not asking what it is.

[12] **MR. THOMAS:** Wait. You can answer

[13] that question yes or no.

[14] **THE WITNESS:** Have I sought legal

[15] advice? Yes.

[16] **BY MR. GITNER:**

[17] **Q:** Can you tell me when you sought legal

[18] advice?

[19] **A:** I do it all the time.

[20] **Q:** Well, we are talking about legal

[21] advice with regard to who owns the copyright for

[22] the DCMS. When did you seek legal advice for

---

Page 20

[1] that?

[2] **A:** I'm not sure I have ever asked that

[3] question.

[4] **Q:** Well, you just answered yes to the

[5] question, did you seek legal advice with regard to

[6] the copyright ownership?

[7] **A:** No. I answered the question, have I

[8] sought legal advice. I said yes.

[9] **Q:** All right. Have you ever sought legal

[10] advice?

[11] **A:** Yes.

[12] **Q:** Let me ask you, have you ever sought

[13] legal advice with regard to ownership of the

[14] copyright to the DCMS?

[15] **MR. THOMAS:** Again, you can answer

[16] that question yes or no, if you have a

[17] recollection beyond, of course, retention of

[18] counsel to defend this lawsuit.

[19] **THE WITNESS:** Let me talk to you for

[20] a minute.

[21] **MR. THOMAS:** Let's go off the record.

[22] (Brief recess.)

---

Page 21

[1] **THE WITNESS:** Back on the record.

[2] **BY MR. GITNER:**

[3] **Q:** Okay?

[4] **A:** Yes. I have not, I have not discussed

[5] those issues with counsel except in light of this

[6] dispute.

[7] **Q:** Prior to December 18th, 2006, is it

[8] your testimony that you sought no legal guidance

[9] with regard to what rights GW had retained to the

[10] copyright for the DCMS system?

[11] **A:** I do not remember seeking counsel or

[12] advice on that specific question, no. I speak

[13] with the lawyers all the time.

[14] **Q:** Prior to December 18th, 2006, what was

[15] your understanding of whether or not Richmar was

[16] entitled to own the copyright to the DCMS?

[17] **A:** I'm not sure I had any belief other

[18] than a firm belief that if we pay for it, we can

[19] use it and modify it as necessary.

[20] **Q:** And what is the basis or what is the

[21] background of your knowledge for your statement

[22] that you would have the right, you being GW, to

Page 22

[1] modify the system?

[2] **A:** We didn't buy a license. We bought

[3] hours.

[4] **Q:** I understand what you're saying. I'm

[5] asking you, what is the basis?

[6] **A:** The basis is we bought hours. They

[7] would not have done the work had they not done it

[8] for us and being paid by us for those hours.

[9] **Q:** Your testimony is that for that

[10] opinion, you did not seek any legal advice to

[11] back it up; is that correct?

[12] **A:** No. That's a general — in the

[13] business, you're buying somebody's hours. You

[14] rent a programmer, you get to use whatever they

[15] did.

[16] **Q:** Are you familiar with the Work for

[17] Hire Doctrine?

[18] **A:** Not as stated.

[19] **Q:** Have you ever reviewed the copyright

[20] statute, Section 106, to see what rights a

[21] copyright owner has?

[22] **A:** No.

Page 23

[1] **Q:** So your opinion that GW had the right

[2] to modify the system was based upon your prior

[3] experience and knowledge, not anything specific?

[4] **A:** Correct.

[5] **Q:** It wasn't based upon book learning

[6] that you had done, correct?

[7] **A:** Correct.

[8] **Q:** It wasn't based upon any legal advice

[9] that you had sought?

[10] **A:** Past practice.

[11] **Q:** Past practice, okay.

[12] **A:** Any time I've hired programmers, we

[13] used their work product as we saw fit.

[14] **Q:** You are aware that Richmar has

[15] obtained a certificate of copyright to the DCMS,

[16] correct?

[17] **A:** No.

[18] **Q:** You are not aware of that?

[19] **A:** No.

[20] **Q:** No one has ever told you that?

[21] **A:** No.

[22] **Q:** You have never looked at the pleadings

Page 24

[1] in this case?

[2] **A:** No. I don't have time.

[3] **Q:** How many projects do you supervise?

[4] **A:** Dozens at any one time and not just

[5] projects. All the day-to-day operations. I've

[6] got several levels of management below me.

[7] **Q:** Did you have a Project Manager for the

[8] DCMS system?

[9] **A:** Yes.

[10] **Q:** Who was that?

[11] **A:** I believe Marcy Day was the Project

[12] Manager for the majority of the time that I was

[13] involved with it.

[14] **Q:** What kind of decisions would you need

[15] to or when would she have to come to you for your

[16] input as to the decisions and the development of

[17] DCMS?

[18] **A:** Change of schedules, change of overall

[19] scope. However, those would get to my level. I

[20] was not involved at this level for the entire

[21] duration of the project.

[22] **Q:** When were you involved at that level

Page 25

[1] with the DCMS project?

[2] **A:** Somewhere around —

[3] **Q:** When did you start?

[4] **A:** — mid-October of 2006. Prior to

[5] that, it was under the control of Admin Apps,

[6] reporting to the CIO.

[7] **Q:** Have you ever seen a Certificate of

[8] Registration of Copyright?

[9] **A:** Probably not on this system.

[10] **MR. GITNER:** Let's make that Exhibit

[11] Number 1.

[12] (Thereupon, Bonig Deposition Exhibit

[13] Number 1 was marked for identification.)

[14] **BY MR. GITNER:**

[15] **Q:** Mr. Bonig, let me show you what has

[16] been marked as Exhibit Number 1. I know you are

[17] not familiar with this document. This is a

[18] Certificate of Registration filed with the

[19] Department of Patents and Trademarks —

[20] **MR. THOMAS:** No.

[21] **BY MR. GITNER:**

[22] **Q:** The Registrar of Copyrights — I'm

Page 26

[1] sorry — for the DCMS system. What is your

[2] understanding, sir, of what modifications GW is

[3] permitted to make to the DCMS system if, in fact,

[4] it has been copyrighted by Richmar?

[5] **MR. THOMAS:** Objection to form.

[6] **THE WITNESS:** I didn't hear that,

[7] James. Sorry.

[8] **MR. THOMAS:** Objection to form.

[9] **THE WITNESS:** To form. That means I

[10] can answer the question?

[11] **MR. THOMAS:** You can answer the

[12] question.

[13] **THE WITNESS:** Well, to get it to work,

[14] number one. Otherwise we paid $1 million for

[15] nothing.

[16] **BY MR. GITNER:**

[17] **Q:** To get it to work?

[18] **A:** Yeah, because the system didn't work

[19] as delivered. Not a single release or a single

[20] delivery operated when it first arrived.

[21] **Q:** Once it works, is GW entitled to make

[22] any additional modifications?

Page 27

[1] **A:** Sure.

[2] **Q:** Can you tell me what the scope is

[3] of your belief as to what modifications GW is

[4] permitted to make to the DCMS system if, in fact,

[5] it's copyrighted?

[6] **MR. THOMAS:** Objection to form.

[7] Relevance. Legal question.

[8] You can answer.

[9] **THE WITNESS:** That's a legal question

[10] so —

[11] **MR. THOMAS:** You can answer it if you

[12] have an understanding.

[13] **THE WITNESS:** My understanding is if

[14] we paid for work product, we can do what we need

[15] to do to get it working and enhance around it to

[16] enlarge it for our use.

[17] **BY MR. GITNER:**

[18] **Q:** When you —

[19] **A:** This was not an off-the-shelf piece of

[20] software. If I'm buying a license from Sun, for

[21] example, for an operating system, it's a different

[22] issue.

Page 28

[1] **Q:** Richmar completed its work on the

[2] Release Number 1 of the DCMS on December 18th,

[3] correct, approximate date?

[4] **A:** That's a date I've heard as a, you

[5] know, stake in the sand type date.

[6] **Q:** And there was what GW calls a Release

[7] Number 2 in April, correct?

[8] **A:** Yes.

[9] **Q:** Release Number 2, what was included in

[10] Release Number 2 that went live in April?

[11] **A:** I don't know exactly. I believe there

[12] were some screen changes, a few things making it

[13] more efficient.

[14] **Q:** Were those changes necessary to make

[15] the system operate as of December 18th?

[16] **MR. THOMAS:** Objection to form.

[17] **THE WITNESS:** The system as delivered

[18] on December 18th barely worked. It did not solve

[19] the problems we were attempting to solve with the

[20] whole system.

[21] My staff made some modifications to

[22] try to get it to do the things that we needed

Page 29

[1] to do and we'll continue to make changes as we
[2] develop the system.
[3]                    BY MR. GITNER:
[4]    **Q:** From December 18th until April 2nd,
[5] Release Number 1 was operating at GW University,
[6] correct?
[7]    **MR. THOMAS:** Objection to form.
[8] Foundation.
[9]    **THE WITNESS:** Minimally.
[10]                    BY MR. GITNER:
[11]    **Q:** It was being used by the HR Personnel
[12] Division, correct?
[13]    **A:** Minimally.
[14]    **Q:** Correct?
[15]    **A:** Minimally.
[16]    **Q:** It had been rolled out in January to
[17] the Medical Faculty Division?
[18]    **A:** Yes.
[19]    **Q:** Correct?
[20]    **A:** Yes.
[21]    **Q:** It had been rolled out to EEO,
[22] correct?

Page 30

[1]    **A:** Yes.
[2]    **Q:** It had been rolled out to the Student
[3] Faculty Division, correct?
[4]    **A:** I believe so, yes.
[5]    **Q:** And I believe it was rolled out to the
[6] Faculty Personnel Research Services, correct?
[7]    **A:** I believe so.
[8]    **Q:** All of those groups were using the
[9] DCMS, correct?
[10]    **A:** To simply pull a document, yes.
[11]    **Q:** Well, they were also adding documents,
[12] weren't they?
[13]    **A:** In some places, yes.
[14]    **Q:** And they were searching for legacy
[15] documents, weren't they?
[16]    **A:** I don't have personal knowledge of
[17] that. I would assume so, but I don't have
[18] personal knowledge.
[19]    **Q:** You approved the task order to
[20] complete the inputting of all of the legacy
[21] documents or records from —
[22]    **A:** Right.

Page 31

[1]    **Q:** — these divisions, correct?
[2]    **A:** Right.
[3]    **MR. THOMAS:** Let him finish his
[4] question.
[5]                    BY MR. GITNER:
[6]    **Q:** Correct?
[7]    **THE WITNESS:** Pardon?
[8]    **MR. THOMAS:** I said let him finish his
[9] question.
[10]    **THE WITNESS:** Sorry.
[11]    **MR. THOMAS:** Then answer.
[12]                    BY MR. GITNER:
[13]    **Q:** Did you authorize the modifications to
[14] Release 1 that resulted in GW's Release Number 2?
[15]    **A:** Yes.
[16]    **Q:** And when did you do that?
[17]    **A:** I don't remember the exact date.
[18]    **Q:** You say that these were some fixes to
[19] some screen changes?
[20]    **MR. THOMAS:** Objection to form. Those
[21] are two different things, but you can answer.
[22]    **THE WITNESS:** I believe some screen

Page 32

[1] form changes were included in it, yes.
[2]                    BY MR. GITNER:
[3]    **Q:** Do you have plans, and when I say you,
[4] does ISS have plans to expand the DCMS system to
[5] other divisions and organizations within the
[6] University, such as Financial Services?
[7]    **A:** Yes.
[8]    **Q:** Will that expansion require
[9] modifications to be made to the source code for
[10] the DCMS?
[11]    **MR. THOMAS:** Objection to form.
[12]    **THE WITNESS:** I don't know. I would
[13] have to talk to one of my architectural
[14] programmers about that.
[15]                    BY MR. GITNER:
[16]    **Q:** If, indeed, it requires changes to the
[17] source code, is it your opinion that GW has the
[18] right to make those changes even if Richmar is the
[19] owner to the copyright of the DCMS?
[20]    **MR. THOMAS:** Objection. Form. Calls
[21] for a legal conclusion.
[22]    You can state your understanding.

Case 1:07-cv-00841-JR    Document 13-6    Filed 06/07/2007    Page 19 of 53
CUS4, Inc. d/b/a Richmar & Associates, et al.   v.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 33

[1]    **THE WITNESS:** A large part of the
[2] code, what makes DCMS work, was written by GW
[3] personnel, so without architectural diagrams,
[4] et cetera, I don't know what pieces have to be
[5] changed.
[6]              **BY MR. GITNER:**
[7]    **Q:** Have you authorized the expansion
[8] of the DCMS to the other new departments?
[9]    **A:** Yes.
[10]   **Q:** When did you do that?
[11]   **A:** When you say authorized, it was the
[12] plan, it's the plan to expand into the other
[13] departments. None have actually been brought on
[14] board at the moment.
[15]   **Q:** That's what I asked you. Do you have
[16] a plan? Is there a time specific that you plan on
[17] doing that?
[18]   **A:** Within this calendar year we want to
[19] start expanding into other departments, yes.
[20]   **Q:** Have any specific actions been taken
[21] to implement that plan?
[22]   **A:** Yes.

Page 34

[1]    **Q:** Can you tell me what those are?
[2]    **A:** Planning with the departments, working
[3] on requirements of the departments, modifying the
[4] scanning so that we can take mass documents at
[5] once into a scanner and then index them at an
[6] individual's desk as opposed to the way it was
[7] delivered, where someone has to sit at the
[8] scanning terminal and do every single sheet.
[9]    **Q:** Is it your position, Mr. Bonig, that
[10] GW has the right to make whatever changes it wants
[11] to the DCMS code?
[12]   **A:** Yes.
[13]   **Q:** Including changing the code to bring
[14] on new divisions; is that correct?
[15]   **A:** We paid for the development of the
[16] code.
[17]   **Q:** Is there any limitation in your mind
[18] as to what GW can do as far as modifying that
[19] code?
[20]   **MR. THOMAS:** Objection to form.
[21]   **THE WITNESS:** No.
[22]     The limitation is we can't sell it to

Page 35

[1] somebody else, sure.
[2]              **BY MR. GITNER:**
[3]    **Q:** Why do you say that?
[4]    **A:** Because it's our code or code for our
[5] purposes.
[6]    **Q:** What's the basis of your knowledge
[7] that you can't sell it?
[8]    **A:** We just don't do that. It's a matter
[9] of practice with GW.
[10]   **Q:** Is it true, sir, that between December
[11] 18th and I believe the date was April 2nd, when
[12] GW Release 2 went live, that these five personnel
[13] divisions utilized the DCMS?
[14]   **A:** Did they use it?
[15]   **Q:** Yes.
[16]   **A:** Yes.
[17]   **Q:** And that the DCMS operated without
[18] any of the fixes that were included in Release
[19] Number 2?
[20]   **MR. THOMAS:** Objection to form.
[21] You can answer.
[22]   **THE WITNESS:** It operated but not

Page 36

[1] effectively or efficiently.
[2]              **BY MR. GITNER:**
[3]    **Q:** What do you mean by not effectively or
[4] efficiently?
[5]    **A:** It was laborious to put documents in,
[6] and that was one of the things we wanted to
[7] change.
[8]    **Q:** Anything else?
[9]    **A:** There were — I was getting complaints
[10] or the team was getting complaints about different
[11] things that didn't work effectively or
[12] efficiently, and they logged those for future
[13] corrections.
[14]   **Q:** Do you remember any specifics?
[15]   **A:** Some of the screen things, the
[16] navigation in some of the screens that I mentioned
[17] in 2 or that you mentioned in 2, Release 2, the
[18] mass scanning change that we needed to make in
[19] Release 3 to make it more efficient.
[20]   **Q:** Anything else?
[21]   **A:** We're trying to improve the process
[22] across the board, not just one part of it.

Page 37

[1] **Q:** You were aware that Release 1 went
[2] through User Acceptance Training in November?

[3] **A:** Yes.

[4] **Q:** It went through UAT for three weeks?

[5] **A:** Yes. I believe it was three weeks.

[6] **Q:** And in your mind, was that UAT
[7] successful?

[8] **A:** In what was delivered, yes.

[9] **Q:** And you authorized release of Release
[10] Number 1, didn't you?

[11] **A:** Yes.

[12] **Q:** Prior to authorizing the release of
[13] Release Number 1, did you inform Richmar that you
[14] had any concerns about the efficiency of the
[15] system?

[16] **A:** I don't remember specifically.

[17] **Q:** Do you recall preparing any document
[18] and providing them with that?

[19] **A:** I don't remember, but it's not my —

[20] **Q:** Have you ever?

[21] **A:** — it's not my duty.

[22] **MR. THOMAS:** Let him finish his

Page 38

[1] answer.

[2] **BY MR. GITNER:**

[3] **Q:** Go ahead.

[4] **A:** That's not my duty.

[5] **Q:** Whose duty is it?

[6] **A:** To communicate with the contractor
[7] on something, we may choose not to.

[8] **Q:** Are you aware of whether or not
[9] anybody communicated with Richmar that there
[10] were any problems in operability prior to Release
[11] Number 1?

[12] **A:** Oh, we had meetings, yes, where we
[13] talked about things not being delivered on time
[14] or things didn't work as delivered, things were
[15] developed on a different system at Richmar than we
[16] had at GW and that's why things didn't happen when
[17] they — didn't work when they arrived the first
[18] time.

[19] Richmar staff were not on site, as we
[20] hoped, so, therefore, any coordination with the
[21] pieces that my folks had to do was not smooth.

[22] Yeah, there were a lot of problems

Page 39

[1] that were discussed, yes.

[2] **Q:** Did you ever have a document prepared
[3] subsequent to December 18th, 2006 of what you
[4] believed were the failures of Richmar in
[5] developing the system?

[6] **A:** Could have. That would be not
[7] uncommon.

[8] **Q:** Well, did you?

[9] **A:** I don't remember, but it would not be
[10] uncommon.

[11] **Q:** So as you sit here today, you can't
[12] recall having such a listing prepared; is that
[13] correct?

[14] **A:** Not specifically. We on our own
[15] systems or on contractor built systems always do
[16] during UAT and different stages what did not get
[17] done correctly that we wanted to fix later things
[18] that came up that were additions that we wanted to
[19] add later or deficiencies in what was delivered
[20] that we wanted to decide whether it was a show
[21] stopper or not or whether we could fix it later.

[22] Creating that kind of list occurs on

Page 40

[1] virtually all systems. I do not specifically
[2] remember telling the staff to do it on this one,
[3] but I would assume that it happened.

[4] **Q:** Well, you have made some allegations
[5] that Richmar has failed to properly act under the
[6] contract and I'm asking you, have you ever, you
[7] yourself, prepared or have you directed someone on
[8] your staff to prepare a description of what these
[9] failures are?

[10] **A:** Stated that way, yes. The way you
[11] stated it before is a list. I'm not sure it was
[12] in a memo, but yes.

[13] **Q:** What document did you ask to be
[14] prepared?

[15] **MR. THOMAS:** Objection.

[16] Let's go off the record.

[17] **THE WITNESS:** Do you want me to go?

[18] **MR. THOMAS:** Yes.

[19] (Brief recess.)

[20] **MR. GITNER:** Read the last question.

[21] (The record was read by the reporter
[22] as follows:

Page 41

[1] **Question:** Well, you have made
[2] some allegations that Richmar has failed
[3] to properly act under the contract and I'm
[4] asking you, have you ever, you yourself,
[5] prepared or have you directed someone on
[6] your staff to prepare a description of what
[7] these failures are?
[8] **Answer:** Stated that way, yes.
[9] The way you stated it before is a list.
[10] I'm not sure it was in a memo, but yes.
[11] **Question:** What document did you
[12] ask to be prepared?)
[13]
[14] **MR. THOMAS:** And I'm going to instruct
[15] the witness to limit your answer to any document
[16] that was prepared in the ordinary course of
[17] business rather than any document that may have
[18] been requested by counsel in anticipation of
[19] litigation.
[20]     You can answer.
[21] **THE WITNESS:** It is very common, and
[22] whether I specifically asked or not, what would be

Page 42

[1] prepared is a list of deficiencies in any system
[2] that is released or any release of a system to
[3] create a list of deficiencies that needed to be
[4] either bypassed, corrected, lived with, et cetera.
[5]     That's a common practice.
[6]                 **BY MR. GITNER:**
[7] **Q:** That's a yes or no question. Did you
[8] prepare such a list or not?
[9] **A:** Did I prepare? No. I did not prepare
[10] a list.
[11] **Q:** Did you ask that such a list be
[12] prepared?
[13] **A:** I do not remember asking. Was a list
[14] prepared? Probably. It would be standard
[15] practice to prepare a list.
[16]     (Thereupon, Bonig Deposition Exhibit
[17] Number 2 was marked for identification.)
[18] **MR. GITNER:** Sorry. I don't have an
[19] extra copy of this one.
[20]                 **BY MR. GITNER:**
[21] **Q:** Let me show you what has been marked
[22] as Exhibit Number 2. Are you familiar with this

Page 43

[1] document or this type of document?
[2] **A:** This type of document. I'm not sure
[3] I saw this specific one, but this is a Mantis
[4] ticket list, okay? This is how we document all
[5] inadequacies, changes, problems, et cetera, to a
[6] system. It happens on all systems.
[7] **Q:** My understanding from prior testimony
[8] in this case is that this is a list of what was
[9] included in GW Release Number 2. Are you familiar
[10] with that?
[11] **A:** I can't say that.
[12] **Q:** Do you know whether or not these are
[13] the modifications that were made to Release Number
[14] 1 of the DCMS as part of Release Number 2?
[15] **A:** It's too detailed for my knowledge.
[16] At my level, I would not get into this.
[17] **Q:** Do you know whether or not any of
[18] these modifications were required to make the
[19] Release Number 1 of the DCMS operate?
[20] **MR. THOMAS:** Objection to form. I
[21] assume you're not asking him to sit here and read
[22] ticket by ticket and try to guess.

Page 44

[1] **THE WITNESS:** I would not know. You
[2] need to talk to the detailed programmer staff
[3] about that.
[4]                 **BY MR. GITNER:**
[5] **Q:** Are you aware of whether any of these
[6] particular items were fixes to modifications that
[7] had been attempted by GW but had failed?
[8] **A:** I do not know.
[9] **Q:** Were you satisfied with the operation
[10] of the DCMS Release Number 1 as of December 20th,
[11] 2006?
[12] **MR. THOMAS:** Objection to form.
[13] **THE WITNESS:** I have not been
[14] satisfied with the operation to date.
[15]                 **BY MR. GITNER:**
[16] **Q:** Was your staff satisfied with its
[17] operation?
[18] **A:** No. There are many things we still
[19] want to change.
[20] **Q:** You signed off on the UAT, correct?
[21] **A:** I don't have any knowledge that I
[22] signed off directly myself on it.

Page 45

[1] **Q:** Well, GW agreed to sign off on the
[2] UAT, correct?

[3] **A:** GW agreed to implement Release 1.

[4] **Q:** And when did they do that?

[5] **A:** In December.

[6] **Q:** At that point in time had GW agreed to
[7] what would be included in Release Number 1?

[8] **A:** De facto by accepting what was there.

[9] **Q:** What do you mean de facto by accepting
[10] what was there?

[11] **A:** We accepted Release 1 as it currently
[12] existed because it was the only thing we could do
[13] if we wanted to be able to read the electronic
[14] documents, which were in 400-and-some boxes. If
[15] we had not, we'd have had 400-some-boxes of
[16] documents that were needed for day-to-day
[17] operations that there was no way to get to.

[18] So regardless of the functionality
[19] of the system, of the efficiency or effectiveness
[20] of the system, we were between a rock and a hard
[21] spot.

[22] **Q:** So you had 400 cases of documents that

Page 46

[1] you wanted to be able to retrieve electronically,
[2] right?

[3] **A:** We wanted to be able to get to them.

[4] **Q:** Release Number 1 allowed you to do
[5] that?

[6] **A:** Allowed us to get to the document,
[7] yes.

[8] **Q:** When you say it didn't have the
[9] efficiency or functionality that you envisioned,
[10] specifically what are you talking about?

[11] **A:** The smoothness between screens, the
[12] navigation of the screens I heard user complaints
[13] on.

[14] **Q:** The smoothness in navigation between
[15] screens?

[16] **A:** Navigation between screens, too
[17] difficult to use.

[18] Another one was obviously the
[19] scanning thing I mentioned earlier in that to
[20] scan a document under Release 1, you had to be
[21] at a scanner and scan the document and index it
[22] at that point, which doesn't do anything for the

Page 47

[1] process.

[2] Hundreds of documents come into HR.
[3] It's very difficult for the people in the middle
[4] of the process to leave their station, go over,
[5] scan a document, index it and then go back.

[6] It's not efficient, not effective
[7] and not achieving the results that we wanted with
[8] buying the whole document system in the first
[9] place.

[10] **Q:** Any others?

[11] **A:** Those are the two big ones that I know
[12] of. There's, by this Mantis list, I would assume
[13] there are many, many others.

[14] **Q:** The screens that were included in
[15] Release Number 1 were the screens that were part
[16] of the UAT, right?

[17] **A:** Correct.

[18] **Q:** And the screens that were part of
[19] Release Number 1 were the screens that GW de facto
[20] agreed would be part of Release Number 1?

[21] **A:** Yes.

[22] **Q:** And the scanning capability of the

Page 48

[1] DCMS and its indexing capability were part of the
[2] UAT, correct?

[3] **A:** The Release 1 were, yes.

[4] **Q:** And the scanning and indexing
[5] capability of the DCMS, that was part of the
[6] Release Number 1, correct?

[7] **A:** What went live was part of 1, yes.

[8] **Q:** When you talk about scanning and
[9] index, are you talking about the bulk scanning
[10] capability, in other words, to scan in a document
[11] or to scan in a number of documents at one time as
[12] opposed to pages of a document?

[13] **A:** You scan in a number of documents at
[14] one time and then, at the individual's work
[15] station, index them.

[16] **Q:** You knew those items would not be
[17] included in Release Number 1, correct?

[18] **A:** Correct.

[19] (Thereupon, Bonig Deposition Exhibit
[20] Number 3 was marked for identification.)

[21] **BY MR. GITNER:**

[22] **Q:** Let me show you what has been marked

Page 49

[1] as Exhibit Number 3. Do you recall in December of
[2] 2006 that GW requested that Richmar turn over all
[3] of its copies of its computer code to GW?
[4]    MR. THOMAS: Objection to form.
[5]    THE WITNESS: Yes. We made a request
[6] to turn over anything that was GW's because we did
[7] not want GW specific information, test data,
[8] documents, et cetera, on someone else's machines.
[9]              BY MR. GITNER:
[10]    Q: Well, the close-out checklist that was
[11] given to Richmar, however, requested that they
[12] turn over the computer source code, did it not?
[13]    A: I believe at that time it did.
[14]    Q: GW also requested that Richmar turn
[15] over all design and development work papers with
[16] regard to the DCMS; isn't that true?
[17]    A: Yes, because the system was
[18] inadequately documented. It's the only way we
[19] knew what the architecture of it was, was to get
[20] some of the work papers.
[21]    Q: Why did you request that Richmar
[22] provide to GW all of its copies of the source

Page 50

[1] code?
[2]    A: At the time we didn't — the thinking
[3] was to test source code, you use, in effect, live
[4] documents in many cases, and we didn't want our
[5] documents sitting on other systems.
[6]    Q: You didn't want your documents —
[7] well, there's a difference between the database,
[8] which Richmar gave back to GW, but you also asked
[9] for the computer source code and I'm asking, why
[10] did you ask for that to be returned?
[11]    MR. THOMAS: Objection. Asked and
[12] answered.
[13]              BY MR. GITNER:
[14]    Q: That wouldn't have GW material on it.
[15]    MR. THOMAS: You can answer it again.
[16]    THE WITNESS: Pardon?
[17]    MR. THOMAS: You can answer the
[18] question again.
[19]    THE WITNESS: Okay. Okay.
[20]    When brought to our attention with
[21] this memo, we corrected and said that we did not
[22] intend to have individual — have any rights to

Page 51

[1] the software that Richmar may have interfered
[2] with, so to speak. I'm trying to come up with the
[3] right word.
[4]    But that we wanted the code that we
[5] paid for for our uses.
[6]              BY MR. GITNER:
[7]    Q: And Richmar agreed to give you a copy
[8] of the code, did it not?
[9]    A: Correct.
[10]    Q: And you had discussions with Richmar
[11] that they were giving you a copy of the code so
[12] that you can maintain and fix any bugs in the
[13] system; isn't that correct?
[14]    A: Yes.
[15]    Q: Did you ever receive any permission
[16] from Richmar that you could modify the code, to
[17] make enhancements to the code?
[18]    MR. THOMAS: Objection to form.
[19]    THE WITNESS: No. Did not consider it
[20] necessary.
[21]              BY MR. GITNER:
[22]    Q: In your letter, you recognize in the

Page 52

[1] final paragraph that Richmar has certain ownership
[2] rights in the intellectual property, correct?
[3]    MR. THOMAS: Objection to form. The
[4] document speaks for itself.
[5]    THE WITNESS: It was our intention not
[6] to — it was our intention to recognize that if
[7] someone developed something, their knowledge of
[8] that, how they developed it, et cetera, we could
[9] not, in effect, erase.
[10]              BY MR. GITNER:
[11]    Q: Let me read this paragraph into the
[12] record, the last paragraph, full paragraph.
[13] Subject to the foregoing we had expected that
[14] item 8 be read as encompassing code that was
[15] provided or developed by GW and/or its employees -
[16] not code that was developed solely by Richmar. As
[17] I said above, it was not our intention to make
[18] Richmar erase its own intellectual property -
[19] which legally we have to right to do anyway.
[20]    What were you referring to as
[21] Richmar's intellectual property in this letter?
[22]    MR. THOMAS: Objection to form. Legal

Page 53

[1] conclusion.

[2] **THE WITNESS:** I'm not actually sure,

[3] because this isn't my letter, as far as I know.

[4] My name doesn't appear here anywhere.

[5] **BY MR. GITNER:**

[6] **Q:** Did you prepare this letter?

[7] **A:** I don't believe so.

[8] **Q:** Did you have it prepared?

[9] (Witness reviewed document.)

[10] **THE WITNESS:** By counsel, I think.

[11] **BY MR. GITNER:**

[12] **Q:** You had it prepared by counsel; is

[13] that correct?

[14] **A:** I believe so.

[15] **Q:** As of January 5th, I would like to

[16] ask you again, what was your understanding, if you

[17] had any, as to what ownership Richmar had of the

[18] intellectual property in the DCMS?

[19] **MR. THOMAS:** Objection to form. Asked

[20] and answered.

[21] **THE WITNESS:** I can't hear you, James.

[22] I have a hearing problem.

Page 54

[1] **MR. THOMAS:** Objection to form. Asked

[2] and answered. If you had a personal understanding

[3] of what Richmar's intellectual property was, you

[4] can answer.

[5] **THE WITNESS:** Okay. My understanding

[6] was anything they wrote for us we had rights to

[7] and could modify but we could not, obviously, take

[8] out of their minds anything that they had created

[9] or anything they learned about the system while

[10] they were doing it, and they obviously had some

[11] rights to what they created mentally and

[12] intellectually.

[13] **BY MR. GITNER:**

[14] **Q:** But you didn't write this letter,

[15] counsel wrote this letter, correct?

[16] **MR. THOMAS:** Objection to form.

[17] That's asked and answered, and I don't want to

[18] stray into privileged areas.

[19] **MR. GITNER:** That's not privileged

[20] if you write a letter that is disclosed to the

[21] public, to the world.

[22] **MR. THOMAS:** He has already asked and

Page 55

[1] answered that. I'm just warning you not to stray

[2] further into potential areas.

[3] **BY MR. GITNER:**

[4] **Q:** But you didn't write this letter, your

[5] counsel wrote this letter; is that correct?

[6] **A:** I don't believe I wrote the substance

[7] of this letter, no.

[8] **Q:** Well, again, was it counsel who wrote

[9] the letter, GW counsel?

[10] **MR. THOMAS:** Objection to form. Asked

[11] and answered.

[12] If you have a recollection.

[13] **THE WITNESS:** I don't recall writing

[14] this letter myself, no.

[15] **BY MR. GITNER:**

[16] **Q:** Who do you recall writing the letter?

[17] You just testified a little while ago it was your

[18] legal counsel.

[19] **A:** I —

[20] **MR. THOMAS:** Now you're testifying,

[21] Geoff.

[22] **THE WITNESS:** I believe it was either

Page 56

[1] written by counsel or written for me in

[2] conjunction with counsel.

[3] **BY MR. GITNER:**

[4] **Q:** This letter went out with your

[5] authorization, correct, Exhibit Number 3?

[6] **A:** Yes. I did see it in advance.

[7] **Q:** Again, I'll ask you when you wrote

[8] or when this letter went out, was it your

[9] understanding that Richmar would have the right

[10] to copyright the DCMS?

[11] **A:** No. It was not my understanding.

[12] They had some intellectual rights to some of

[13] the work product that they developed but not

[14] copyright, in effect stopping GW from doing

[15] anything with the code because we paid for the

[16] development of the code.

[17] **Q:** I'm not asking that. I'm asking you

[18] whether or not you understood as of January 5th.

[19] I'm asking you whether or not you understood as

[20] of January 5th that Richmar had the right to

[21] copyright the code?

[22] **MR. THOMAS:** Objection. Asked and

Case 1:07-cv-00841-JR    Document 13-6    Filed 06/07/2007    Page 25 of 53
CUS4, Inc. d/b/a Richmar & Associates, et al.   v.
George Washington University
Ronald G. Bonig
June 5, 2007

Page 57

[1] answered. You may not like his answer.

[2]    But you can answer the question

[3] again.

[4]              BY MR. GITNER:

[5]    Q: Well, give me a yes or a no and then

[6] you can explain it however you want.

[7]    A: No. I did not equate intellectual

[8] property with a copyright which would reduce GW's

[9] right to use the code any way they saw fit.

[10]    Q: So as of the date you wrote this

[11] letter, January 5th, it was your opinion, your

[12] understanding, that GW could make whatever changes

[13] it wanted to the DCMS code?

[14]    A: Correct, since we paid for the

[15] development of the code.

[16]    Q: And your position is that it could

[17] make whatever changes it wants. It doesn't have

[18] to be just a bug fix. It can be an alteration, a

[19] modification. It can be —

[20]    A: Or throw it out and not use it.

[21]    Q: Or expand it to other parts of the

[22] University, correct?

Page 58

[1]    A: Correct. That was my understanding.

[2]    Q: Let's go back, if we could, to GW's

[3] organization. ISS is what, a division or a

[4] department?

[5]    A: It's called a division, department,

[6] however. A large entity, a major entity within

[7] the University.

[8]    Q: And when you, for example, supervised

[9] the development of the DCMS for Personnel, where

[10] did you get the money for that? Was it out of

[11] Personnel's budget?

[12]    A: I was not deeply involved in the

[13] beginning of the process, like I said.

[14]    Q: Your —

[15]    A: I got into the process later as of my

[16] promotion, but —

[17]    Q: I don't care if —

[18]    A: — from knowing the budget, the

[19] budget, I believe, came from central funds, not

[20] from HR.

[21]    Q: From what?

[22]    A: Central funds, not HR's budget.

Page 59

[1]    Q: Central funds?

[2]    MR. THOMAS: I'm going to request,

[3] Geoff, that you give Mr. Bonig a chance to finish

[4] his answer before you follow up with the next

[5] question.

[6]              BY MR. GITNER:

[7]    Q: I'm sorry. I guess my question to you

[8] is, when a division or an organization within GW

[9] wants to develop a computer system, do you have to

[10] get that out of your budget or do they have to get

[11] that out of their budget?

[12]    A: It works both ways, depending upon

[13] size, who wants it, how it happens, et cetera.

[14]    Q: Give me some for instances.

[15]    A: Okay. Minor modifications to a system

[16] might be funded either way. Major systems are

[17] generally funded centrally. It is a general,

[18] because I've seen all different funding mechanisms

[19] occur.

[20]    Q: When you say centrally, what do you

[21] mean by that?

[22]    A: In that it may serve a department but

Page 60

[1] it's paid for out of the beginning, I mean, the

[2] central funds because the University as a whole

[3] wants to support a specific system.

[4]    In other cases, where an individual

[5] department wants to have a system, for example, if

[6] Advancement wants to have a new system to solicit

[7] funds, they may pay for a new system.

[8]    If the University as a whole wants to

[9] make a modification to or purchase a system for

[10] broad use, it's generally but not always centrally

[11] funded.

[12]    There is no written specific rule on

[13] how that occurs. It occurs based on negotiations

[14] and funding and timing and the entity that is

[15] doing it, the use of the system, et cetera.

[16]    Q: For example, with the HR project,

[17] were you given — was ISS given a budget?

[18]    A: Correct.

[19]    Q: What if it went over that budget?

[20] What would you do?

[21]    MR. THOMAS: Objection.

[22]              BY MR. GITNER:

Page 61

[1] **Q:** And you wanted to continue with the
[2] project?
[3] **MR. THOMAS:** Objection to form. Is
[4] that a hypothetical or is that a —
[5] **MR. GITNER:** It's a hypothetical.
[6] **THE WITNESS:** Generally, if we go over
[7] budget on a system, if it is because the user has
[8] driven the system larger, then the user pays, I
[9] think, most cases.
[10]     If it's because we've mis-estimated
[11] the system or underestimated the system, we have
[12] to find the money inside ISS.
[13]     That's the general rule. We eat our
[14] own mistakes, in effect.
[15] **Q:** Do each one of these divisions operate
[16] as a separate profit center?
[17] **A:** No. They're budgeted separately.
[18] **Q:** They're each budgeted separately?
[19] **A:** Yes.
[20] **Q:** So they do act as a separate profit
[21] center?
[22] **A:** Well, in a non-profit university,

Page 62

[1] profit center doesn't have the same meaning.
[2] **Q:** All right. But there are still —
[3] **A:** Your intent is the same.
[4] **Q:** — balance sheets at the end of the
[5] year, correct?
[6] **A:** Yes.
[7] **Q:** Would funds be earmarked for major
[8] development projects, for example, like the Human
[9] Resource project, in central funds?
[10] **A:** Generally, yes, but not always.
[11] Departments have leeway in their own budget to
[12] fund certain things.
[13] **Q:** These expansions in the future, for
[14] example, for financial aid, how will that be
[15] financed internally through the University?
[16] **MR. THOMAS:** Objection to form.
[17] **BY MR. GITNER:**
[18] **Q:** Will that go into Financial Aid's
[19] budget and then be shifted over to ISS?
[20] **A:** Could be.
[21] **MR. THOMAS:** Objection to form.
[22] Relevance. Since we're discussing internal

Page 63

[1] GW processes here, I want to designate for the
[2] record this transcript as confidential under
[3] the anticipated stipulated order governing
[4] confidential documents.
[5] **BY MR. GITNER:**
[6] **Q:** You said it could be. What do you
[7] mean by that?
[8] **A:** It could go either way. It could be
[9] centrally funded. It could be funded by the
[10] department. It happens multiple ways.
[11] **Q:** So it happens. And this is how these
[12] various procedures have occurred through your
[13] tenure with the ISS?
[14] **A:** Yes.
[15] **Q:** So, for example, let's just take
[16] Student Affairs. Let's take Admissions of the
[17] University, all right?
[18]     If, for example, Admissions wants to
[19] have a DCMS system installed within their group,
[20] they could seek to have part of their budget
[21] allocated to that expansion, correct?
[22] **A:** They could.

Page 64

[1] **Q:** Would that money be physically
[2] transferred from their group to ISS, or is it
[3] a bookkeeping transfer?
[4] **A:** It could be either. It's happened
[5] both ways. We draw on their funds or we have a
[6] transfer into a project fund. I don't see the
[7] relevance of any of this, but —
[8] **MR. THOMAS:** Me, either.
[9] **BY MR. GITNER:**
[10] **Q:** Where will you get the manpower, ISS,
[11] if, indeed, the plans to expand the DCMS to other
[12] divisions and organizations at GW goes forward?
[13] You will have to expand your ISS, correct?
[14] **A:** We have done both in the past. We
[15] have hired supplemental programmers or we have
[16] done it internally. We always have the option of
[17] hiring folks in a surge or we have the option of
[18] stretching things out and doing them ourselves.
[19] That's always the case.
[20] **Q:** Well, what is the plan for expanding
[21] the DCMS to the other organizations?
[22] **A:** A little of both. Some things that

Page 65

[1] specifically have to do with the portions of any
[2] expansion that are related to other areas at GW or
[3] other systems in GW would probably be mostly done
[4] by my own staff.
[5]     If there were some specific things
[6] that had to do with another department, we may
[7] outsource that to a different group.
[8]     Q: Your position that as long as GW pays
[9] for the development of a system that GW has the
[10] ability do whatever it wants with that system,
[11] is that the same for employees as well as for
[12] independent consultants?
[13]     A: Yes.
[14]     Q: And in this case, Richmar was an
[15] independent consultant, correct? He wasn't an
[16] employee?
[17]     A: Correct.
[18]     Q: Did you ever investigate whether or
[19] not GW could obtain a copyright for the DCMS
[20] system?
[21]     A: No.
[22]     Q: Did anybody on your staff ever

Page 66

[1] investigate?
[2]     A: Not to my knowledge. No intention to.
[3]     Q: Did you ever investigate whether or
[4] not you would have to enter into a license
[5] agreement with Richmar in the event that you
[6] sought to make any type of modification, be it
[7] large or small?
[8]     A: No.
[9]     THE WITNESS: I'm just going to get a
[10] drink.
[11]     MR. THOMAS: Why don't we take a
[12] break, go off the record for a couple of minutes.
[13]     MR. GITNER: Sure.
[14]     (Brief recess.)
[15]             BY MR. GITNER:
[16]     Q: Can you tell me what the training and
[17] help desk is?
[18]     A: The what?
[19]     Q: Training and help desk.
[20]     A: There's two different things. I mean,
[21] training is a group that we have that trains our
[22] users on systems, all kinds of systems, everything

Page 67

[1] from Excel to Banner to EAS, et cetera.
[2]     Help desk is a call center where
[3] someone calls and says, I've got a problem with
[4] X, Y and Z.
[5]     Q: So it's like a support organization?
[6]     A: It's a support function, yes.
[7]     Q: Let me show you what has been
[8] previously marked as Plaintiff's Exhibit 8 from
[9] Vijay's deposition.
[10]     MR. GITNER: Actually, let's have that
[11] marked.
[12]     THE WITNESS: There's two things here.
[13]     MR. GITNER: Let me have that marked,
[14] please.
[15]     (Thereupon, Bonig Deposition Exhibit
[16] Number 4 was marked for identification.)
[17]             BY MR. GITNER:
[18]     Q: Let me show you what has been marked
[19] as Exhibit Number 4, which is DCMS Project
[20] Training and Help Desk Meeting, December 20th,
[21] 2006. Marcy Day is shown as an attendee. She was
[22] the Project Manager, correct?

Page 68

[1]     A: Correct.
[2]     Q: For the DCMS?
[3]     A: Correct.
[4]     Q: Under Meeting Notes, HR Personnel
[5] Implementation Plans, the DCMS was first released
[6] with HR Personnel, correct?
[7]     A: Yes.
[8]     Q: And then it was rolled out during
[9] January to what are called stakeholders?
[10]     A: Uh-huh. Yes.
[11]     Q: Where does that term stakeholders come
[12] from?
[13]     A: It's a common term in IT. In effect,
[14] the people who have an interest in the system.
[15]     Q: The people who paid for the system?
[16]     A: No, not paid, that have an interest in
[17] it.
[18]     Q: Let me read the first bullet point, if
[19] I could. HRS go-live is going well. There have
[20] been a few minor issues, which have been resolved.
[21]     Do you have any information that you
[22] are aware of that this statement on December 20th,

Page 69

[1] 2006 was not an accurate statement?

[2] **A:** No. For what was in Release 1, no.

[3] Release 1 was substantially less than we wanted,

[4] but they were pulling documents.

[5] **Q:** Was there an agreement between GW

[6] and Richmar that was prior to the UAT that the

[7] Document Only Search function would not be

[8] required to be included in Release Number 1?

[9] **A:** I don't have direct knowledge of

[10] that, no.

[11] **Q:** Is that one of your criticisms of the

[12] work that Richmar did, that a Document Only Search

[13] feature was not included in Release Number 1?

[14] **A:** I don't remember the specific Document

[15] Only Search.

[16] **Q:** Well, I'm asking you if that is one of

[17] your criticisms?

[18] **A:** I don't — no.

[19] **Q:** The second bullet point is, Stake-

[20] holder roll-out tentatively planned for January

[21] 22; there will be no code changes.

[22] Mr. Bonig, do you agree with that,

Page 70

[1] that no code changes were necessary to roll out

[2] the DCMS to the other stakeholders by January 22?

[3] **MR. THOMAS:** Objection to form. That

[4] misstates what is in the document.

[5] **BY MR. GITNER:**

[6] **Q:** Was that your understanding?

[7] **MR. THOMAS:** If you have an

[8] understanding, you can tell him.

[9] **THE WITNESS:** That's what it says.

[10] It's common, regardless of how good, bad or

[11] indifferent the system is, it's common to freeze

[12] the code at one point because you don't want to

[13] roll out multiple different versions.

[14] So even if it's got a hole in it,

[15] if you know where the hole is, you freeze the

[16] code and fix the hole until you get to another

[17] release.

[18] **BY MR. GITNER:**

[19] **Q:** Is that what happened with the DCMS

[20] Release Number 1?

[21] **A:** I believe so, yes.

[22] **Q:** And you approved that freeze, correct?

Page 71

[1] **A:** Yes.

[2] **Q:** The third bullet reads, Release 2

[3] is being evaluated to determine what will be in

[4] the release; tentatively planning release for

[5] mid-March. The release will contain bug fixes,

[6] cosmetic changes, and some enhancements.

[7] Based upon your prior experience,

[8] isn't that typical when you're rolling out a new

[9] design and development?

[10] **A:** Yes.

[11] **Q:** The paragraph goes on to read, Should

[12] not impact Desktop Support, but there will be

[13] training requirements.

[14] I take it Desktop Support are the

[15] users?

[16] **A:** Yes. In the — how the users use the

[17] system from their workstations. Sometimes there

[18] need to be changes in a workstation for a system,

[19] an agent put on the machine, et cetera. And there

[20] shouldn't be changes to the setup to the machines

[21] to use them.

[22] **Q:** So this appears to be a training and

Page 72

[1] help desk meeting where they're talking about

[2] essentially training people to use the system and

[3] if there are going to be any problems or not,

[4] right?

[5] **A:** Yes, and they're not assessing the

[6] functionality of the system.

[7] **Q:** Right, but apparently, they were able

[8] to train people to utilize the system?

[9] **A:** Yes.

[10] (Thereupon, Bonig Deposition Exhibit

[11] Number 5 was marked for identification.)

[12] **BY MR. GITNER:**

[13] **Q:** Let me show you what has been marked

[14] as Exhibit Number 5. This is a DCMS HR Personnel

[15] January 31, 2007. Are you familiar with this type

[16] of form?

[17] **A:** Yes.

[18] **Q:** What is the purpose of this?

[19] **A:** This is just agenda meeting notes.

[20] They're used all the way down at the lower

[21] technical levels and up to senior levels.

[22] **Q:** Your name is on here although it

Page 73

[1] doesn't appear you attended.

[2] **A:** Yes, if there is no X.

[3] **Q:** Why would your name be on this list?

[4] **A:** Well, there are a lot of committees

[5] and a lot of projects I'm interested in, and they

[6] notify me electronically of the meetings of all

[7] these different things. Some are overlaid three

[8] and four deep, and if I go, then an X appears and

[9] shows that I was at the meeting.

[10] **Q:** Would you as a matter of course review

[11] these notes?

[12] **A:** No.

[13] **Q:** After they were taken?

[14] **A:** Sometimes yes, sometimes no. There

[15] are dozens of meetings a week on different

[16] projects, and I can't possibly spend the time to

[17] read them all. I rarely read them at this level.

[18] **Q:** The first bullet shows that back

[19] scanning currently 85 percent complete. Do you

[20] see that?

[21] **A:** Uh-huh. Yes. Sorry.

[22] **Q:** So you were aware that Richmar was

Page 74

[1] continuing to scan in legacy documents as of

[2] January 31, right?

[3] **A:** Yes.

[4] **Q:** And you needed those legacy documents

[5] in the system so that you could more effectively

[6] utilize the system, correct?

[7] **A:** Sure, because the system didn't have

[8] all the documents in. They were very late on the

[9] schedule.

[10] **Q:** So you wanted to make sure those

[11] documents got in there, correct?

[12] **A:** Yep. We subsequently discovered that

[13] many of them were indexed wrong and had to go

[14] back.

[15] **Q:** Can you give me a percentage on how

[16] many were indexed wrong?

[17] **A:** No, I can't.

[18] **Q:** Have you —

[19] **A:** Most of the ones for Barbara Marshall,

[20] which was Faculty HR.

[21] **Q:** Have you asked anybody to determine

[22] how many were indexed improperly?

Page 75

[1] **A:** I don't believe so. I don't remember

[2] so.

[3] **Q:** Do you know if there is a written

[4] document that shows how many of them were indexed

[5] improperly?

[6] **A:** There may be. I don't have it.

[7] **Q:** So you don't know if it was 1 percent

[8] or .1 percent or 10 percent, correct, as you sit

[9] here now?

[10] **A:** Correct.

[11] **Q:** There are over a million documents

[12] that were scanned into the system, weren't there?

[13] **A:** I do not know. I know the box count

[14] was around 450 boxes. I don't know it by

[15] documents.

[16] **Q:** Would you expect there to be absolute

[17] perfection in indexing those documents?

[18] **A:** No.

[19] **Q:** Do you have any kind of standard

[20] margin of error for a project like that —

[21] **MR. THOMAS:** Objection to form.

[22] **THE WITNESS:** No.

Page 76

[1]         **BY MR. GITNER:**

[2] **Q:** — that would be acceptable to you?

[3] **A:** Very small.

[4] **Q:** What is very small?

[5] **A:** Under a percent.

[6] **Q:** Do you know whether or not that is a

[7] best practice that is utilized by —

[8] **A:** I don't know what other people's

[9] standards are.

[10] **Q:** So that's just a subjective opinion on

[11] your part?

[12] **A:** Correct.

[13] **Q:** Have you been a project manager on a

[14] back scanning project?

[15] **A:** No.

[16] **Q:** Have you ever run a back scanning

[17] project?

[18] **A:** No.

[19] **Q:** Have you ever had a back scanning

[20] project of this magnitude operate under your

[21] supervision before?

[22] **A:** No.

CUS4, Inc. d/b/a Richmar & Associates, et al. v.
George Washington University

Ronald G. Bonig
June 5, 2007

---

Page 77

[1] **Q:** So you really don't have any
[2] experience with what the error rate would be
[3] on a back scanning project like this, do you?
[4] **A:** Microfilm a long time ago. I don't
[5] remember the error rate.
[6] **Q:** Microfilm is a little different than
[7] back scanning; would you agree with me?
[8] **A:** Yes.
[9] **Q:** So you don't have any prior
[10] experience?
[11] **A:** No.
[12]   (Thereupon, Bonig Deposition Exhibit
[13] Number 6 was marked for identification.)
[14]       **BY MR. GITNER:**
[15] **Q:** Let me show you what has been marked
[16] as Exhibit Number 6. This is another HR Personnel
[17] agenda meeting minutes, correct?
[18] **A:** Yes.
[19] **Q:** It shows that you are on the list but
[20] apparently you did not attend?
[21] **A:** True.
[22] **Q:** It shows that on the back scanning,

---

Page 78

[1] All documents should be loaded into production by
[2] the end of the week; do you see that?
[3] **A:** Yes.
[4] **Q:** Was that about when all the documents
[5] were loaded into the system?
[6] **A:** Approximately.
[7] **Q:** Middle of February?
[8] **A:** Some errors were found after that, but
[9] that was about the time when they were initially
[10] loaded.
[11] **Q:** Had any errors been found before this?
[12] **A:** Yes.
[13] **Q:** How many?
[14] **A:** Don't have a count.
[15] **Q:** Any complaints to Richmar about those
[16] errors?
[17] **A:** Yes.
[18] **Q:** Who made the complaints?
[19] **A:** I remember them at a meeting, a
[20] project meeting, probably in December. Maybe
[21] later, a little later than that.
[22] **Q:** A project meeting late in December?

---

Page 79

[1] **A:** Somewhere near the go-live date.
[2] **Q:** And what was the message that was
[3] conveyed to Richmar?
[4] **A:** I just remember that there was some —
[5] some people were complaining about the incorrect
[6] scanning and there were sheets called a PIDM
[7] sheet, which is — we were trying to get rid of
[8] SSNs, Social Security numbers, and PIDM sheets
[9] were sheets that were used instead of an SSN to
[10] identify someone and some people's documents were
[11] scanned under wrong PIDMs and things.
[12] **Q:** Did you terminate Richmar at that
[13] point?
[14] **A:** No.
[15] **Q:** From the back scanning project?
[16] **A:** No.
[17] **Q:** Did you terminate it at any point in
[18] January-February, when mistakes were found?
[19] **A:** No.
[20] **Q:** Did you warn them that if further
[21] mistakes were found, that you would have to
[22] terminate them? Did you give them any warning?

---

Page 80

[1] **A:** It was too close to the end anyway.
[2] **Q:** Did you ever give them any warnings?
[3] **A:** That what, we were going to terminate?
[4] **Q:** Yes.
[5] **A:** The clock was already running out.
[6] **Q:** I guess that's a no, you never gave
[7] them any warnings?
[8] **A:** No. I don't know why you would give a
[9] warning to someone who already knew when the clock
[10] was running out.
[11] **Q:** Do you know what percentage of
[12] documents had been loaded into the DCMS as of
[13] December 18?
[14] **A:** No. I don't recall.
[15] **Q:** Would you disagree that it was about
[16] 45 percent of the documents?
[17] **A:** Don't recall. I knew it wasn't 100
[18] percent, but I don't know how low.
[19] **Q:** Exhibit Number 6, if you have that in
[20] front of you, under Form Group/Form Names at the
[21] bottom, it says, All updates have been made.
[22]   I guess in order to add a Form Group

---

Case 1:07-cv-00841-JR    Document 13-6    Filed 06/07/2007    Page 31 of 53
CUS4, Inc. d/b/a Richman & Associates, et al. v.    Ronald G. Bonig
George Washington University    June 5, 2007

Page 81

[1] or a Form Name, you would have to change the or

[2] make a modification to the DCMS?

[3]    MR. THOMAS: Objection to form.

[4] If you know.

[5]    THE WITNESS: There are tables that

[6] list the kind of forms, whether it's a form to

[7] change your W-4 or change your withholding or

[8] whether it's a form to elect benefits, et cetera.

[9] You have to establish a form type.

[10]    BY MR. GITNER:

[11]    Q: Right.

[12]    A: This is Form 1, 2, 3, 4 or Form 5, 6,

[13] 7, 8, and it should be a table function that you

[14] just add to the code or add to the system.

[15]    Q: So the system was being modified to

[16] have additional form groups and form names added

[17] to it, correct?

[18]    A: I would assume, based on these notes,

[19] that that was correct.

[20]    Q: Was this envisioned at the time that

[21] you approved Release Number 1, that additional

[22] modifications would be made for more form groups

Page 82

[1] and form names?

[2]    A: Otherwise this is useless. Yes.

[3]    Q: So there was —

[4]    A: What's the use of a system where you

[5] can't add another form?

[6]    Q: So there was nothing wrong with the

[7] DCMS for you to want to add these additional form

[8] groups or form names. This was just part of a

[9] matter of course, correct?

[10]    A: Correct. That part was normal

[11] operations.

[12]    Q: Did you see anything in any of these

[13] prior notes as of February 7th that there was any

[14] criticism of Richmar's development of the DCMS?

[15]    A: Did I see them? No.

[16]    Q: Did you believe as of December 7th,

[17] 2007, that Richmar had performed improperly in

[18] some manner in developing the DCMS?

[19]    MR. THOMAS: Objection to form. I'm

[20] not sure what the latest 20 minutes of questions

[21] have to do with your motion for a preliminary

[22] injunction, but I've been pretty patient.

Page 83

[1]    You can answer the question.

[2]    THE WITNESS: Under function, over

[3] budget and late, and a trainer who is in this

[4] meeting or someone working a desktop in this

[5] meeting is not privy to those kinds of

[6] discussions.

[7]    BY MR. GITNER:

[8]    Q: Was that your opinion on December

[9] 18th, 2006?

[10]    A: Yes.

[11]    Q: I didn't get it. Under budget? I'm

[12] sorry. Over budget?

[13]    A: Over budget, underperforming and late.

[14] We got less than we wanted later than we wanted it

[15] and more expensive than we wanted to spend.

[16]    We had to go live because our

[17] documents were sitting in a warehouse and being

[18] scanned, so we were caught between a rock and a

[19] hard spot.

[20]    (Thereupon, Bonig Deposition Exhibit

[21] Number 7 was marked for identification.)

[22]    BY MR. GITNER:

Page 84

[1]    Q: Let me show you what has been marked

[2] as Exhibit Number 7 and ask you if that is your

[3] signature on the second page.

[4]    A: Yes.

[5]    Q: Were you the author of this letter or

[6] did somebody else write this for you?

[7]    A: I believe it was me and counsel.

[8]    Q: On January 4th, was it your opinion

[9] that Richmar had over-estimated and — what were

[10] the three things you said before?

[11]    A: I couldn't hear that. What?

[12]    MR. THOMAS: Let's let the court

[13] reporter read back.

[14]    (The record was read by the reporter

[15] as follows:

[16]    Over budget, underperforming and

[17] late.)

[18]    BY MR. GITNER:

[19]    Q: When you wrote this letter, was that

[20] your opinion, that Richmar had been over budget,

[21] underperforming and late?

[22]    A: Yes.

CUS4, Inc. d/b/a Richmar & Associates, et al.   v.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 85

[1]    **Q:** Was it your intention to withhold
[2] funds from Richmar as of January 4th, 2007?
[3]    **A:** I don't believe so at that point.
[4]    **Q:** Was it your intention on January 4th,
[5] 2007 to pay Richmar for its scanning work?
[6]    **MR. THOMAS:** Objection to form.
[7] If you know.
[8]    **THE WITNESS:** At that time, yes,
[9] before the problems were discovered.
[10]    **BY MR. GITNER:**
[11]    **Q:** And when were the problems discovered?
[12]    **A:** When the documents were completed. I
[13] believe the last document was February the 7th or
[14] so.
[15]    **Q:** The last scanned document, you mean?
[16]    **A:** The prior — wait a minute.
[17]    **MR. THOMAS:** While you are looking at
[18] that, Geoff, I would just like to ask you on the
[19] record how much longer you intend to utilize
[20] Mr. Bonig's time with respect to your contract
[21] claim as opposed to the motion for preliminary
[22] injunction and copyright claim.

Page 86

[1]    **MR. GITNER:** I have read your implied
[2] license defense this morning. I think these all
[3] go to that.
[4]    **MR. THOMAS:** Not in the least bit.
[5]    **THE WITNESS:** The notes that you
[6] showed me, Exhibit 6 note that on the 7th of
[7] February, quote, All documents should be loaded
[8] into production by the end of the week.
[9]    Also, the next one says, Kris Moen
[10] reported he was unable to see any back scanned
[11] documents, et cetera, Tanya found a few cases
[12] where multiple documents were scanned as one.
[13]    **BY MR. GITNER:**
[14]    **Q:** So until approximately February 7th,
[15] you were unaware of these problems, the over
[16] budget, the underperforming and the late; is that
[17] correct?
[18]    **A:** No. We were not unaware of those
[19] problems. We were aware of those problems.
[20]    **Q:** But even though you were aware of
[21] those problems, you had not formulated an
[22] intention to withhold any payments from Richmar,

Page 87

[1] is that correct, until February 7?
[2]    **MR. THOMAS:** Objection to form.
[3]    **THE WITNESS:** They were still
[4] invoicing us. We hadn't discovered the problems
[5] yet.
[6]    It's not uncommon for us to hold
[7] payment until the end of the contract because they
[8] work up to the end of the contract, not withhold,
[9] but the normal payment cycle, and you pay at the
[10] end of the contract the final invoices.
[11]    **BY MR. GITNER:**
[12]    **Q:** I'm asking you when you found these
[13] problems. Was it as of February 7?
[14]    **A:** The problems were, the problems were
[15] from the fall on.
[16]    **Q:** But you have said that you found some
[17] problems that caused you to determine that you
[18] were going to withhold payment on or about
[19] February 7th.
[20]    **A:** The back scanning problems, yes.
[21]    **Q:** Those were the back scanning problems?
[22]    **A:** Correct.

Page 88

[1]    **Q:** That is what caused you to formulate
[2] that intention, correct?
[3]    **MR. THOMAS:** Objection to form.
[4]    **THE WITNESS:** One of them. One of
[5] them, yes.
[6]    **BY MR. GITNER:**
[7]    **Q:** Did you make any written record of
[8] that?
[9]    **A:** I don't remember. I could have.
[10] I don't remember.
[11]    **Q:** Do you remember what triggered that,
[12] what triggered you to come to that conclusion,
[13] that you should do that?
[14]    **A:** The hours that my staff and the
[15] users had to spend dealing with and fixing
[16] problems that were occurring with the system,
[17] the fact that Barbara Marshall, for example,
[18] couldn't see anything, found that things were
[19] indexed incorrectly and a number of those problems
[20] that the technicians of the project staff have
[21] more detailed knowledge of that were causing GW
[22] to expend more and more time and money just to

Page 89

[1] get what had been delivered into production
[2] accurately.
[3]    **Q:** Do you know whether her inability to
[4] see the screen was a result of Richmar's work or
[5] GW's work to enhance the system?
[6]    **A:** Part of it was the scanning was
[7] incorrect, a major portion. I know that.
[8]    **Q:** The scanning of new documents?
[9]    **A:** Scanning of her historical, the way
[10] I understand it, the scanning of her historical
[11] faculty documents were done incorrectly and a
[12] large number were as delivered useless.
[13]    **Q:** Did you make a written memorandum
[14] of what it was that you felt were the problems
[15] that were Richmar's failures when you decided to
[16] withhold payment? Did you make any written record
[17] of that, of what those problems were?
[18]    **A:** Nothing formal.
[19]    **Q:** Have you ever made that, a written
[20] record of that?
[21]    **MR. THOMAS:** I'm going to instruct the
[22] witness to answer the question only insofar as it

Page 90

[1] was made in the ordinary course of business as
[2] opposed to in anticipation of litigation.
[3]    **MR. GITNER:** Well, I think he has
[4] answered that already.
[5]    **THE WITNESS:** Well, I don't recall
[6] specifically making a list of that, no.
[7]                **BY MR. GITNER:**
[8]    **Q:** Did you tell anybody at the time that
[9] you came to this decision on or about February 7th
[10] that you were going to withhold payments from
[11] Richmar?
[12]    **A:** Yes.
[13]    **Q:** Did you tell anybody else?
[14]    **A:** The people who would issue the
[15] payment.
[16]    **Q:** And who would that be?
[17]    **A:** Well, it would be certified by the
[18] project staff, Marcy Day, or one of her folks, and
[19] probably reviewed by Christina Griffin and then it
[20] would go to the financial staff.
[21]    **Q:** I'm asking who you told.
[22]    **A:** Christina for sure. I don't know if

Page 91

[1] the other ones were at the meeting or were told at
[2] that time. Christina would be the key, because
[3] that's where I could intervene in the payment
[4] process and stop payment prior to it being issued.
[5]    **Q:** I'm asking you if you have a specific
[6] recollection of talking to them, not an assumption
[7] based on your past business practices.
[8]       Do you have a specific recollection
[9] of telling her that you were going to withhold
[10] payment?
[11]    **A:** I said, Hold them. I know I told her,
[12] Hold them for future discussion, Christina
[13] Griffin.
[14]    **Q:** Was anybody else present?
[15]    **A:** I do not recall.
[16]    **Q:** Where were you?
[17]    **A:** I don't recall exactly where. I have
[18] multiple offices. I don't remember exactly where
[19] I was.
[20]    **Q:** Do you remember the date you told her?
[21]    **A:** No, not firmly.
[22]    **Q:** Did you tell her why you were

Page 92

[1] withholding payment?
[2]    **A:** Yes.
[3]    **Q:** What did you tell her?
[4]    **A:** Errors, and we were spending too much
[5] of our own time and money fixing induced errors.
[6]    **Q:** How much money had you spent as of
[7] February 7th —
[8]    **A:** I don't know.
[9]    **Q:** — of your own money fixing these
[10] errors?
[11]    **A:** I don't know. As of February 7, I do
[12] not know.
[13]    **Q:** Did you look to see? Did you
[14] investigate to see?
[15]    **A:** In detail? No. I asked how the staff
[16] was working, what kinds of fixes and changes they
[17] were doing.
[18]       (Witness' phone ringing.)
[19]    **THE WITNESS:** Sorry. I should have
[20] done it in advance, but if I pick it up to do it
[21] now, I'm going to answer it.
[22]                **BY MR. GITNER:**

Page 93

[1] **Q:** Did you have any idea of how much
[2] money your division had spent on these fixes, any
[3] order of magnitude?
[4] **A:** Oh, at that time I would say probably
[5] low six figures.
[6] **Q:** Well, did you investigate?
[7] **A:** In detail, no.
[8] **Q:** Did you ever ask to see the records so
[9] you can make a determination?
[10] **A:** Eventually, I did. At that time
[11] period that you're asking about, I do not know.
[12] I believe I asked for details later.
[13] **Q:** How long did this conversation with
[14] Christina last?
[15] **A:** I have no idea. Christina is a
[16] project office manager. I talk to her all the
[17] time. I couldn't go back and reconstruct out of
[18] my mind how long a specific conversation months
[19] ago happened.
[20] **Q:** You had a budget for the HR Personnel
[21] project, correct?
[22] **A:** Yes.

Page 94

[1] **Q:** Had that been exceeded as of December
[2] 20th, 2006?
[3] **A:** I believe so.
[4] **Q:** So there was no more money in that
[5] budget to make any fixes to the DCMS; is that
[6] correct?
[7] **A:** No. We were taking money out of the
[8] Admin Apps budget, the other project budget,
[9] reallocating money out of other projects.
[10] **Q:** When had you met your budget? When
[11] had you met the money that you had allocated for
[12] the HR Personnel project?
[13] **A:** In the fall sometime. Exact date, I
[14] don't know. I believe we were over budget when I
[15] came on the scene in October.
[16] **Q:** Have you caused any investigation to
[17] determine whether or not going over the budget,
[18] what responsibility GW had for that, if any?
[19] **A:** I asked some general questions. As to
[20] looking at this function versus that function, no.
[21] **Q:** There was an agreement, was there not,
[22] I believe in October, to freeze what would be

Page 95

[1] included in the release, correct?
[2] **A:** Correct.
[3] **Q:** Was there a requirement specification
[4] document that set forth what was to be included in
[5] Release Number 1?
[6] **A:** There were draft documents. I had
[7] seen memos. I believe Richmar put together a
[8] document which documented what was in Release 1.
[9] There was no formal approval of it.
[10] It was accepted as de facto because there wasn't
[11] enough time if we were going to go up and get our
[12] documents on-line in December, there wasn't enough
[13] time to do any major fixes or changes or anything
[14] at that point anyway, so we accepted what was
[15] there, knowing it wasn't what we desired or
[16] expected originally.
[17] **Q:** When you say what you expected or
[18] desired originally, part of the project for
[19] Richmar or with Richmar was to determine what
[20] could be delivered and what was capable of being
[21] delivered, correct?
[22] **A:** Correct.

Page 96

[1] **Q:** So things that you might have wanted
[2] might not have been possible to deliver within
[3] your budget; isn't that correct?
[4] **A:** Correct.
[5] **MR. THOMAS:** Objection to form.
[6] **THE WITNESS:** All of them, correct.
[7] **BY MR. GITNER:**
[8] **Q:** In other words, it's a process, it's
[9] an evolving process, correct?
[10] **A:** Yes.
[11] **Q:** Did Richmar present to GW a
[12] requirements specification document setting forth
[13] what it believed would be included in Release
[14] Number 1?
[15] **A:** I believe so, yes.
[16] **Q:** Did they ask that you sign off on that
[17] document?
[18] **A:** I believe they did.
[19] **Q:** Did you sign off on that document?
[20] **A:** No, I did not.
[21] **Q:** Why not?
[22] **A:** Because I did not want to give

Page 97

[1] credence to the fact that that was what GW —
[2] that was all the requirements that GW had.
[3] **Q:** And why did you do that?
[4] **A:** Because what was developed was
[5] developed at that point and we froze the code as
[6] it was. Signing off on the document would have no
[7] effect.
[8] **Q:** Well, did you believe or did you lead
[9] Richmar to believe that if they provided that,
[10] that would be acceptable, what was in Release
[11] Number 1?
[12] **A:** That was Release 1.
[13] **Q:** So you didn't want to sign it because
[14] you didn't want to give any credence that you
[15] really agreed to it; is that it?
[16] **MR. THOMAS:** Objection to form.
[17] **THE WITNESS:** That it was the original
[18] specifications.
[19] **BY MR. GITNER:**
[20] **Q:** You wanted to save your options for a
[21] future date; is that what you were doing?
[22] **A:** That was done from what was there.

Page 98

[1] It's documenting what had been done, not
[2] documenting what was desired. It was —
[3] **Q:** I'm asking —
[4] **A:** — post creation of the code.
[5] **Q:** By I'm asking you why you didn't sign
[6] off on it, and you said you didn't want to give it
[7] any credence.
[8] **A:** I didn't want to have anyone,
[9] including my own staff or my own managers, believe
[10] that we accepted that as it was everything that we
[11] wanted out of the system.
[12] **Q:** Was one of the reasons you didn't sign
[13] off on the document that you wanted to preserve
[14] your ability later on to seek a set-off against
[15] Richmar for the work that they had done?
[16] **A:** No, not at that time.
[17] **Q:** But you wanted to preserve a defense
[18] that what you were getting was not what you had
[19] envisioned; is that it?
[20] **A:** Yes.
[21] **MR. THOMAS:** Objection to form.
[22] **BY MR. GITNER:**

Page 99

[1] **Q:** And once you had preserved that
[2] defense, what were you intending to do with it?
[3] **A:** If my boss had said, Why did you sign
[4] off on these requirements for a system that is
[5] inadequate, okay, my answer is, These requirements
[6] are as developed, not prior to the development.
[7] They're documenting what is there, not what we
[8] desired.
[9] **Q:** Mr. Bonig, do you have Exhibit
[10] Number 7 in front of you?
[11] **A:** Yes.
[12] **Q:** Exhibit Number 7, essentially, that
[13] you were saying to Richmar if they agreed on the
[14] DCMS close-out list, then they could go ahead and
[15] complete the tasks, I take it, the back scanning
[16] at that point; is that correct?
[17] **A:** Yes.
[18] **Q:** And that that would remain in full
[19] force and effect until February 15th, 2007?
[20] That's in the second paragraph.
[21] **A:** Second paragraph, yes.
[22] **Q:** And you then wrote, Upon satisfactory

Page 100

[1] completion of the tasks, contractor may invoice
[2] GWU for these services and payment will be made by
[3] GWU in accordance with Section 7 of the contract.
[4] You wrote that, correct?
[5] **A:** Yes.
[6] **Q:** Now, at the time that you wrote that,
[7] was it your contemplation to consider whether or
[8] not at a future date you would determine whether
[9] or not Richmar's work on the DCMS had been
[10] acceptable or not and whether or not you should
[11] withhold payments from them; is that correct?
[12] **MR. THOMAS:** Objection to form.
[13] **THE WITNESS:** I believe after the fact
[14] you're putting words in my mouth.
[15] **BY MR. GITNER:**
[16] **Q:** At the time you wrote this letter in
[17] your mind did you retain this defense that Richmar
[18] had not delivered to GW everything that had been
[19] contemplated?
[20] **MR. THOMAS:** Objection to form. I
[21] don't know what you mean by defense.
[22] **THE WITNESS:** Richmar was paid for

Page 101

[1] what they did deliver. There were items that we
[2] had wanted in the system that were not delivered,
[3] and we agreed with Release 2 and 3 that those
[4] things would be added in the future.

[5]     We did not penalize, in effect,
[6] Richmar for not delivering those items that were
[7] agreed before UAT that weren't going to be in
[8] Release 1.

[9]             BY MR. GITNER:

[10]    Q: When you wrote this, were you in your
[11] mind contemplating that at some future date, you
[12] would determine whether or not to pay Richmar for
[13] all of its invoices, on all of its invoices that
[14] were presented?

[15]    MR. THOMAS: Objection to form. Asked
[16] and answered. That's the last question on the
[17] contract item I am going to allow him to answer,
[18] Geoff. It is about 45 minutes on the contract
[19] claim.

[20]    You can answer the question.

[21]    THE WITNESS: I do not know exactly
[22] when I decided that the errors and the effort that

Page 102

[1] my staff had to expend fixing and altering and
[2] modifying the work to make it for useful required
[3] GW to, in effect, recover some of its own costs
[4] because of the poor performance discovered later
[5] in some places of Richmar's product.

[6]             BY MR. GITNER:

[7]    Q: So you don't know whether or not you
[8] had that thought before or after you wrote this
[9] letter?

[10]    A: I don't remember the timing.

[11]    Q: So it could have been before?

[12]    A: Could have been before. It could have
[13] been after.

[14]    Q: I don't understand your testimony.
[15] You say that you got everything that you agreed to
[16] when the freeze was put on.

[17]    A: Delivered code.

[18]    Q: True?

[19]    A: As documented.

[20]    Q: Right.

[21]    A: When the freeze was put on.

[22]    Q: And you went through the UAT training

Page 103

[1] and it worked. You approved the UAT training?

[2]    A: Yes.

[3]    Q: Went into operation in December with
[4] Personnel?

[5]    A: Yes.

[6]    Q: Went into operation with the four
[7] other stakeholders in January?

[8]    A: With problems.

[9]    Q: Well, you say problems.

[10]    A: You say it went smoothly.

[11]    Q: Can you show me any documentation that
[12] said that there were any problems?

[13]    MR. THOMAS: Objection to form.

[14]    You can answer the question and after
[15] this question, we're going to take a lunch break
[16] and when we get back from lunch, you can decide to
[17] continue asking questions on your motion for
[18] copyright or we can discontinue, adjourn the
[19] deposition.

[20]    You can answer that question.

[21]    THE WITNESS: I do not have that
[22] documentation with me.

Page 104

[1]    MR. THOMAS: Okay. Let's take lunch
[2] unless you think you can finish before lunch, and
[3] if you think you can finish in the next little
[4] bit, we'll finish before lunch, or we can go ahead
[5] and take a lunch break.

[6]    MR. GITNER: I would like to know when
[7] we're going to get our code and all the other
[8] documents we have requested and you agreed to
[9] provide the other day.

[10]    MR. THOMAS: We can certainly discuss
[11] it off the record.

[12]    MR. GITNER: Okay. We'll go off the
[13] record for a second until we get an answer.

[14]    (Discussion held off the record.)

[15]

[16]    (Thereupon, at 12:02 p.m., a luncheon
[17] recess was taken.)

[18]

[19]

[20]

[21]

[22]

Page 105

[1]                    **AFTERNOON SESSION**

[2]    1:13 p.m.

[3]    **MR. GITNER:** Let's mark this as the

[4] next exhibit.

[5]    (Thereupon, Bonig Deposition Exhibit

[6] Number 8 was marked for identification.)

[7]    **MR. THOMAS:** Can you put the time on

[8] the record, please?

[9]    **THE REPORTER:** I did.

[10]    **MR. THOMAS:** Thanks.

[11]                    **BY MR. GITNER:**

[12]    **Q:** Let me show you what has been marked

[13] as Exhibit Number 8, Mr. Bonig. Do you recognize

[14] what that type of document is?

[15]    **A:** Code of some kind. It's copied into

[16] Wordpad. It's code copied into Wordpad, a way of

[17] presenting it instead of Word.

[18]    **Q:** On the last page there is a copyright.

[19] Do you see that? It says Copyright George

[20] Washington University 2006?

[21]    **A:** Uh-huh. Yes.

[22]    **Q:** Did you instruct anybody on your staff

Page 106

[1] to insert that copyright?

[2]    **A:** Nope.

[3]    **Q:** Do you know who inserted that?

[4]    **A:** No.

[5]    **Q:** Do you have any information about how

[6] that got on there?

[7]    **A:** No. First time I've seen it. First

[8] time I'm aware of.

[9]    **Q:** If you look on the first page of the

[10] exhibit, you see there is a copyright which says,

[11] Copyrighted by Richmar & Associates for GW

[12] University.

[13]    **MR. THOMAS:** Object to form. That's

[14] not what the document says.

[15]                    **BY MR. GITNER:**

[16]    **Q:** Could you read to me what it says

[17] since I don't have a copy in front of me?

[18]    **A:** HR.mainform.signature info.

[19]    **Q:** Let me have the document.

[20]    **MR. THOMAS:** He's reading the document

[21] correctly.

[22]                    **BY MR. GITNER:**

Page 107

[1]    **Q:** All right. Do you want to read —

[2]    **A:** I was reading that line. The next

[3] thing on the line was an at sign or a copyright

[4] sign, and then I was reading that specific line.

[5]    **Q:** Where it says, Copyright 2006,

[6] Developed by Richmar @ Associates for George

[7] Washington University, were you aware that that

[8] copyright characteristic was being added to the

[9] DCMS code?

[10]    **A:** No.

[11]    **Q:** Had you ever viewed the DCMS code?

[12]    **A:** Oh, hell, no. It's a decade since

[13] I've coded. I wouldn't know how to read the

[14] modern code.

[15]    **Q:** You testified earlier that the reason

[16] that you asked Richmar to return to you all their

[17] design documents is so that you would know what is

[18] in the design; is that correct?

[19]    **A:** Yes.

[20]    **Q:** You also asked, however, in the

[21] checklist for Richmar to destroy its copy of the

[22] design documents; is that correct?

Page 108

[1]    **A:** I believe so.

[2]    **Q:** Why would you ask them to or how would

[3] it help you know what is in the design of the DCMS

[4] to have Richmar destroy its documents?

[5]    **MR. THOMAS:** Objection to form.

[6]    **THE WITNESS:** It wouldn't — pardon?

[7] It wouldn't.

[8]                    **BY MR. GITNER:**

[9]    **Q:** Why did you ask that they destroy

[10] their copy of the document?

[11]    **A:** Finished, they were — we'd paid them

[12] and they were finished with it, as far as I

[13] understood.

[14]    **Q:** When you asked them to destroy their

[15] copy of the development documents, was that

[16] because you were aware that GW did not own the

[17] copyright?

[18]    **A:** No.

[19]    **Q:** Or that you had not entered into a

[20] license agreement with them?

[21]    **A:** No.

[22]    **Q:** Are you aware of an application known

CUS4, Inc. d/b/a Richmar & Associates, et al.  v.
George Washington University

Ronald G. Bonig
June 5, 2007

---

Page 109

[1] as Student Hire?

[2] **A:** Yes.

[3] **Q:** Can you tell me what the architecture

[4] of that system is?

[5] **A:** No.

[6] **Q:** Do you know when that program was

[7] conceived and developed?

[8] **A:** Somewhere in the last year. I don't

[9] have any tighter dates than that. It was not a

[10] major system.

[11] **Q:** Do you know whether Richmar was

[12] instructed to use struts as part of its

[13] development methodology?

[14] **A:** To use what?

[15] **Q:** Struts.

[16] **A:** Stress?

[17] **Q:** Struts.

[18] **A:** Struts?

[19] **Q:** Yes.

[20] **A:** No. No idea.

[21] **Q:** Do you recall having a meeting with

[22] Richard Gordon in the middle of December 2006?

---

Page 110

[1] **A:** We met multiple times. I don't — I

[2] assume we had one about that time.

[3] **Q:** Do you recall having a meeting with

[4] Mr. Gordon in which you discussed the extension

[5] of the contract or the lack of extension of the

[6] contract?

[7] **A:** We talked about the possibility of

[8] having a few people for a few weeks after we went

[9] live, yes.

[10] **Q:** And as part of that discussion,

[11] did you and he talk about whether or not the

[12] January 6, 2006 contract would be extended?

[13] **A:** We talked about that briefly because

[14] the scanning was also outstanding and would be

[15] historically for another five weeks or so, so we

[16] had no contract mechanism.

[17] They weren't going to complete on

[18] time regardless of what the original contract

[19] was.

[20] **Q:** Do you recall Mr. Gordon asking you

[21] if GW wanted to extend the contract, the January 6

[22] contract?

---

Page 111

[1] **A:** I believe at that time we said yes.

[2] **Q:** You recall him saying that, correct?

[3] **A:** Yes.

[4] **Q:** Do you recall telling him that you

[5] felt that you could not extend the contract?

[6] **A:** I don't believe so.

[7] **Q:** Did you tell him that you would extend

[8] the contract?

[9] **A:** I said I think we'd consider it.

[10] **Q:** Did you ever tell —

[11] **A:** Or probably. Either probably or

[12] consider it.

[13] **Q:** Did you ever tell him that you felt

[14] that there were problems with the contract?

[15] **A:** With the contract?

[16] **Q:** Yes.

[17] **A:** No, not with the document.

[18] **Q:** Do you deny that you told him that?

[19] **A:** Do I deny it?

[20] **Q:** Yes.

[21] **A:** I don't remember, so I guess I

[22] deny it.

---

Page 112

[1] **Q:** Were you aware when you had that

[2] conversation with Mr. Gordon that the contract,

[3] the January 6 contract, had failed to retain

[4] the copyright interests for George Washington

[5] University?

[6] **MR. THOMAS:** Objection to form.

[7] Could you read me that question,

[8] please?

[9] (The record was read by the reporter

[10] as follows:

[11] Were you aware when you had

[12] that conversation with Mr. Gordon that

[13] the contract, the January 6 contract,

[14] had failed to retain the copyright interests

[15] for George Washington University?)

[16]

[17] **MR. THOMAS:** Same objection.

[18] **THE WITNESS:** No.

[19] **BY MR. GITNER:**

[20] **Q:** Does George Washington University have

[21] a standard computer system development contract?

[22] **A:** No.

---

Page 113

[1]   Q: Do you know whether or not your
[2] division, ISS, and George Washington have ever
[3] entered into a contract in which they retained the
[4] copyright's interests?
[5]   A: I do not know.
[6]   Q: Do you have a written policy regarding
[7] contracting for computer program development?
[8]   A: Not for specific computer program
[9] development, no. We have procurement rules.
[10]   Q: Pardon me?
[11]   A: Normal, standard procurement rules but
[12] not for specific program development.
[13]   Q: So you have a policy manual for
[14] procurement?
[15]   A: General contracting, buying,
[16] et cetera.
[17]   Q: And in that policy, are there
[18] provisions with regard to ownership of the
[19] creative works and the intellectual property?
[20]   A: I do not know.
[21]   (Thereupon, Bonig Deposition Exhibit
[22] Number 9 was marked for identification.)

Page 114

[1]            BY MR. GITNER:
[2]   Q: Let me show you what has been marked
[3] as Exhibit Number 9.
[4]   MR. THOMAS: Do you have a copy?
[5]   MR. GITNER: I'm sorry.
[6]   BY MR. GITNER:
[7]   Q: Mr. Bonig, this is the contract with
[8] Richmar that was signed off by GW on January 6.
[9] Have you ever seen a copy of this before?
[10]   A: Yes, I have.
[11]   Q: When was the first time you saw a copy
[12] of this contract?
[13]   A: I do not know. I was not involved in
[14] it early on in the process. I don't remember
[15] exactly where down the road I saw it.
[16]   Q: Do you recall, was it in 2006?
[17]   A: Yes, in 2006.
[18]   Q: Do you recall the circumstances in
[19] which you first reviewed this document?
[20]   A: No. No, I do not.
[21]   Q: You are unaware of whether or not it
[22] was in the first half of 2006, the second half of

Page 115

[1] 2006, the fall of 2006? You couldn't be able to
[2] pinpoint it?
[3]   A: It was not early in 2006. I would say
[4] it was in the second half of 2006.
[5]   Q: And why do you say that?
[6]   A: That's my —
[7]   Q: Is that just a guess?
[8]   MR. THOMAS: Don't guess. If you
[9] don't know, you don't know.
[10]   THE WITNESS: I had virtually no
[11] involvement in it early on. I did not become
[12] involved until budgeting issues later in the year,
[13] so it had to be summer of 2006.
[14]            BY MR. GITNER:
[15]   Q: Can you tell me why you would have
[16] been looking at this contract?
[17]   A: Originally, budgetary responsibility.
[18] The contract, as we said, was running hot, meaning
[19] if you draw a straight line on a graph, at the
[20] current burn rate, we're going to run out of
[21] money.
[22]   And so I got involved on the financial

Page 116

[1] side to see what the burn rate was and a few
[2] things like that. I was not involved at that
[3] point in any substantive part of the Documentum or
[4] the DCMS system, only in the, you now, what the
[5] burn rate was, where are we going to find money to
[6] complete it, et cetera.
[7]   Q: And do you recall what the status was
[8] of the budget that had been set aside for the HR
[9] project from the first review of the contract?
[10]   A: Still had money, but running hot. If
[11] we continued at the same rate, we'd overrun the
[12] budget.
[13]   Q: Had you been appointed the interim CIO
[14] at that point?
[15]   A: No. No. That was approximately six
[16] months before then.
[17]   Q: When you became the interim CIO, had
[18] the budget been exceeded?
[19]   A: Yes.
[20]   Q: Had the budget been exceeded prior to
[21] your appointment as the interim?
[22]   A: Yes. I believe it went red somewhere

Page 117

[1] around October the 1st, approximately. But in
[2] that time, short — in that period.
[3]   Q: Do you know how it was that Richmar
[4] was selected for this contract?
[5]   A: I was not involved. I've only heard
[6] hearsay type comments.
[7]   Q: Were they selected because of their
[8] expertise in Documentum?
[9]   A: I can't say that.
[10]   Q: Do you have any information as to why
[11] they were or what capabilities they had that led
[12] to their being hired by GW?
[13]   A: No.
[14]   Q: Based upon your knowledge and custom
[15] and practice, who would have been in charge of
[16] selecting Richmar?
[17]   A: Anne Marie Taylor.
[18]   Q: And she was the Project Manager on
[19] this project?
[20]   A: She was the Executive Director for
[21] Administrative Applications. The project teams
[22] reported to her.

Page 118

[1]   Q: Do you know what the process would
[2] have been to select a vendor for this contract?
[3]   A: The process normally would be check
[4] Dun & Bradstreet, check references, get a — at
[5] least interview several companies, compare their
[6] capabilities and bids, et cetera.
[7]   There are, under GW's procurement
[8] rules, there are ways to sole source. There are
[9] ways to compete.
[10]   Q: But one qualification would have
[11] to have been Richmar's capability and expertise
[12] in this area, Documentum, and putting together
[13] large-scale document retrieval and management
[14] systems, correct?
[15]   MR. THOMAS: Objection to form. Are
[16] you asking him hypothetically, or are you asking
[17] him based on his knowledge of what happened here?
[18]   You can have him clarify the question
[19] before you answer.
[20]   THE WITNESS: Yeah. Would you clarify
[21] the question?
[22]   BY MR. GITNER:

Page 119

[1]   Q: Was Richmar hired or was one of the
[2] reasons Richmar was hired was its experience and
[3] expertise in the area of designing and developing
[4] document management systems?
[5]   A: That's what I was told by Anne Marie
[6] Taylor.
[7]   Q: Did GW have the expertise in-house to
[8] build a document management system such as DCMS,
[9] build and, I should say, design and build?
[10]   A: Probably could have. We've done many
[11] similar systems of similar size, not specific
[12] document systems. The decision is always a choice
[13] as to whether to build in-house or go outside,
[14] depending upon other priorities, staffing,
[15] in-house knowledge, training, et cetera.
[16]   MR. THOMAS: Can we go off the record?
[17]   (Discussion held off the record.)
[18]   MR. THOMAS: Can we take a break,
[19] please?
[20]   (Brief recess.)
[21]   BY MR. GITNER:
[22]   Q: Did GW have any Documentum or Captiva

Page 120

[1] expertise on staff?
[2]   A: Some.
[3]   Q: What would that have been?
[4]   A: Oh, one of our project leaders, Rick
[5] Gilchrist, had experience from a prior position.
[6]   Q: Had he ever done any programming
[7] utilizing Documentum or Captiva?
[8]   A: I don't know the details of his exact
[9] experience.
[10]   MR. GITNER: Let's have this marked as
[11] the next exhibit.
[12]   (Thereupon, Bonig Deposition Exhibit
[13] Number 10 was marked for identification.)
[14]   BY MR. GITNER:
[15]   Q: Let me show you what has been marked
[16] as Exhibit Number 10 and ask if you can identify
[17] that document.
[18]   MR. THOMAS: Just for the record, this
[19] document has been marked by GW as Attorneys' Eyes
[20] Only pursuant to the draft confidentiality order I
[21] have provided to counsel and expect to be signed
[22] forthwith.

CUS4, Inc. d/b/a Richmar & Associates, et al.  v.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 121

[1]    **MR. GITNER:** I'll tell you right now

[2] I'm not agreeing Attorneys' Eyes Only for

[3] technical documents.

[4]    **MR. THOMAS:** In that case, I'm going

[5] to ask on the record that the documents that

[6] were produced earlier in order to expedite the

[7] preliminary injunction hearing be returned to GW

[8] immediately insofar as they are marked Attorneys'

[9] Eyes only.

[10]    **MR. GITNER:** You should have brought

[11] this up before the court. We'll take it up with

[12] the court.

[13]                **BY MR. GITNER:**

[14]    **Q:** Can you identify this document?

[15]    **A:** Oh, I can read it. It says Master

[16] Services Agreement with Crown Partners and GW.

[17]    **Q:** And that was entered on January 2nd,

[18] 2007?

[19]    **A:** That's what it says.

[20]    **Q:** Can you tell me who was involved in

[21] negotiating that contract from ISS?

[22]    **A:** I can't tell you exactly who was

Page 122

[1] involved.

[2]    **Q:** Were you aware that ISS was going to

[3] enter into that contract?

[4]    **A:** I knew that they were talking to Crown

[5] Partners, yes.

[6]    **Q:** How far in advance of January 2nd were

[7] you aware that somebody was talking to Crown

[8] Partners?

[9]    **A:** Don't remember.

[10]    **Q:** When was Crown Partners first

[11] contacted?

[12]    **A:** Don't know.

[13]    **Q:** Did you approve the hiring of Crown

[14] Partners?

[15]    **A:** Ultimately, I had to.

[16]    **Q:** Whose idea was it to seek their help?

[17]    **A:** Don't know.

[18]    **Q:** Were you involved in the decision to

[19] hire Crown Partners?

[20]    **A:** Only in effect, only as much as it's

[21] in ISS and I'm involved — everything that expends

[22] money in ISS ultimately I have to approve, but

Page 123

[1] as to the details of that relationship or that

[2] contract or who talked to them first, no, I don't

[3] know.

[4]    **Q:** Where did the money come from to pay

[5] Crown Partners, what division?

[6]    **A:** Out of Application, Administrative

[7] Application funds and lapsed salary that we were

[8] allowed to reuse.

[9]    **Q:** And what were they hired to do?

[10]    **MR. THOMAS:** If you know. If you

[11] don't know, you don't —

[12]    **THE WITNESS:** Exactly, I don't know.

[13]                **BY MR. GITNER:**

[14]    **Q:** Generally, what were they hired to

[15] do? You don't know at all what they were going to

[16] do?

[17]    **A:** Work on — work with EMC's Documentum.

[18] They were an EMC partner. That, I know.

[19]    **Q:** Would you look at paragraph 5 of the

[20] exhibit?

[21]    **A:** Okay.

[22]    **Q:** Well, strike that.

Page 124

[1] So they were hired to work with

[2] Documentum; is that correct?

[3]    **A:** Yes.

[4]    **Q:** And help develop the DCMS system?

[5]    **A:** They, from what I remember, they were

[6] specifically — I can't even say that.

[7]       It was my impression from remembering

[8] certain project meetings that they were hired to

[9] help in the expansion of the Documentum product

[10] from EMC to other departments later in the year.

[11]    **Q:** Would you take a look at paragraph

[12] number 5?

[13]    **A:** Uh-huh.

[14]    **Q:** Paragraph number 5 provides, does it

[15] not, that GW will retain all rights to any

[16] intellectual property that is created under the

[17] Crown Partners contract, correct?

[18]    **A:** I'm not a lawyer, so —

[19]    **Q:** Are you aware of what the substance —

[20]    **A:** I'd have to read these four or five

[21] paragraphs. You're not allowing me time to.

[22] Would you like me to read them?

Page 125

[1]   **Q:** If you think you need to, go ahead.
[2] Are you not aware of that as you sit here right
[3] now, that under the Crown Partners contract with
[4] GW, GW retained all of the creative rights and
[5] intellectual property rights?
[6]   **A:** I was not aware that specific
[7] provision was in this contract.
[8]   **Q:** Did you review this contract before
[9] it was executed?
[10]   **A:** Probably went through it quickly, yes.
[11]   **Q:** Can you tell me —
[12]   **A:** Probably. I do not remember exactly.
[13]   **Q:** Who was in charge of this contract for
[14] ISS?
[15]   **A:** I do not know. I know the area. It
[16] would be in the Administrative Applications area.
[17]   Whether the subject matter specialist
[18] the way it's organized under the programming side
[19] would have done it versus the project side, I
[20] don't remember.
[21]   **Q:** Well, can you tell me why in this
[22] GW would have needed to have a specific clause

Page 126

[1] retaining to itself the intellectual property
[2] rights for an expansion of the DCMS when the
[3] Richmar contract did not include it?
[4]   **MR. THOMAS:** Objection to form.
[5]   **BY MR. GITNER:**
[6]   **Q:** Why was there a need now to have it?
[7]   **A:** Do not know.
[8]   **Q:** You were paying Crown Partners for its
[9] work, right?
[10]   **A:** Yes.
[11]   **Q:** Your position is if you pay for it,
[12] you own it, right?
[13]   **A:** Yes.
[14]   **Q:** Why would it be necessary to have this
[15] intellectual property provision in the contract?
[16]   **MR. THOMAS:** Objection to form.
[17] If you know. You've already
[18] testified —
[19]   **THE WITNESS:** I'm not a lawyer. I
[20] don't know.
[21]   **BY MR. GITNER:**
[22]   **Q:** Did you have any discussions with

Page 127

[1] anyone to make sure that the contract with Crown
[2] Partners retained the intellectual property rights
[3] for GW?
[4]   **A:** Do not remember any such discussions.
[5]   **Q:** Pardon me?
[6]   **A:** I do not remember any such discussion.
[7]   **Q:** You don't remember it. Do you deny
[8] that it occurred?
[9]   **A:** I don't remember it.
[10]   **Q:** Crown Partners was given access to
[11] GW's — what do you call it — CVS computer
[12] system?
[13]   **A:** Is that a statement or a question?
[14]   **Q:** That's a question.
[15]   **A:** I do not know.
[16]   **Q:** You don't know?
[17]   **A:** I would not be involved at that level.
[18]   **Q:** His declaration, Mr. Gilchrist says,
[19] In order to review the code, Kevin Burns from
[20] Crown Partners was given access to GW's Virtual
[21] Private Network.
[22]   Were you aware of that?

Page 128

[1]   **A:** No, but it would be very common for
[2] any of our contractors to be given access or they
[3] couldn't work on our network.
[4]   **Q:** Were you aware that prior to Mr. Burns
[5] being given access, that he was going to review
[6] the DCMS code?
[7]   **A:** No.
[8]   **Q:** Has GW taken any steps to prevent
[9] Crown Partners from making a copy of the DCMS
[10] code?
[11]   **A:** I do not know.
[12]   **Q:** Would you consider Crown Partners to
[13] be a competitor of Richmar in the Documentum area,
[14] development area?
[15]   **A:** Not really.
[16]   **Q:** Why not?
[17]   **A:** Because they're a much larger, more
[18] functional and certified company.
[19]   **Q:** Why didn't you hire them, then, in
[20] January of 2006?
[21]   **A:** Good question for someone else.
[22]   **Q:** Do you know why?

Page 129

[1]  **A:** No.

[2]  **Q:** Do you believe that Richmar charged

[3]  prevailing market rates for its work, or did it

[4]  give GW a discount under the contract?

[5]  **A:** I'd have to go back and look at the

[6]  rates. I don't know.

[7]  **MR. THOMAS:** And what in the world —

[8]  **BY MR. GITNER:**

[9]  **Q:** Are you aware —

[10]  **MR. THOMAS:** — does that have to

[11]  do with your copyright infringement claim, Geoff?

[12]  **BY MR. GITNER:**

[13]  **Q:** Are you aware of whether or not

[14]  Richmar made an investment in time to provide

[15]  George Washington with the DCMS, develop the DCMS?

[16]  **MR. THOMAS:** Objection to form.

[17]  **THE WITNESS:** What do you mean by

[18]  investment of time?

[19]  **BY MR. GITNER:**

[20]  **Q:** Gave their time at no cost?

[21]  **MR. THOMAS:** At no cost?

[22]  **THE WITNESS:** They got paid.

Page 130

[1]  **BY MR. GITNER:**

[2]  **Q:** They gave some of their time at no

[3]  cost, correct?

[4]  **A:** Not aware.

[5]  **Q:** Did you ever have any conversations

[6]  with Mr. Gordon in which you discussed the

[7]  investment that Richmar was making in the DCMS?

[8]  **A:** By investment, are you talking about

[9]  something free?

[10]  **Q:** No. Investment could be sweat equity,

[11]  reduced rates. An investment, do you recall

[12]  having any discussion with him in which —

[13]  **A:** No, I do not.

[14]  **Q:** — you and he discussed that Richmar

[15]  was making an investment in the DCMS?

[16]  **A:** Not in those words, no.

[17]  **Q:** Exhibit Number 9, if you could?

[18]  **A:** Uh-huh.

[19]  **Q:** Are you aware that this contract ran

[20]  or had a one-year term to it, paragraph 2?

[21]  **MR. THOMAS:** If you're not aware —

[22]  **THE WITNESS:** I wasn't aware at the

Page 131

[1]  time.

[2]  **BY MR. GITNER:**

[3]  **Q:** Did you ever become aware of it?

[4]  **A:** Yes.

[5]  **Q:** Obviously, by the time you got —

[6]  **A:** Yeah. By the time we were in December

[7]  and talking about it, whether we were going to

[8]  have the folks, some of the folks work a little

[9]  past that or not, yes, I was involved with that.

[10]  **Q:** Do you see paragraph 3?

[11]  (Witness reviewed document.)

[12]  **BY MR. GITNER:**

[13]  **Q:** Could you just look at paragraph 3?

[14]  **A:** Uh-huh.

[15]  **Q:** And that states, The agreement shall

[16]  end upon termination date or upon 30-day written

[17]  notice from one party to the other.

[18]  Do you see that?

[19]  **A:** Yes.

[20]  **Q:** Were you aware prior to December 18th,

[21]  2006 that you could terminate the contract with 30

[22]  days' written notice?

Page 132

[1]  **A:** Yes.

[2]  **Q:** When did you first become aware of

[3]  that?

[4]  **A:** Sometime in the fall when we

[5]  discussed — when I got involved in it on a more

[6]  detailed basis, when I looked at this in detail.

[7]  **Q:** Did you ever consider giving Richmar

[8]  notice in terminating them?

[9]  **A:** Absolutely.

[10]  **Q:** When did you consider that?

[11]  **A:** Almost immediately upon taking over

[12]  in October.

[13]  **Q:** Did you ever give them 30-day notice?

[14]  **A:** No, I did not.

[15]  **Q:** Why not?

[16]  **A:** Because we were so far in, we had

[17]  invested so much already, the only reasonable

[18]  approach we had was to try to finish it out and

[19]  get Release 1, whatever Release 1 could consist

[20]  of.

[21]  **Q:** And at the time that you made that

[22]  decision did you consider that once Release 1,

Page 133

[1] the work on Release 1 was finished, that you would
[2] then approach Richmar about being compensated
[3] for their inadequate work, that GW would be
[4] compensated?

[5]    A: Not at that time no.

[6]    Q: The thought never crossed your mind?

[7]    MR. THOMAS: Objection to form.

[8]           BY MR. GITNER:

[9]    Q: Is that correct?

[10]   A: Not then, no.

[11]   Q: Did you have any discussions with
[12] anybody prior to December 18th, 2006, anybody on
[13] your staff, about whether or not you should
[14] terminate Richmar?

[15]   A: Yeah. Around the October time frame,
[16] like I said.

[17]   Q: Who did you talk to?

[18]   A: My boss.

[19]   Q: Who is your boss?

[20]   A: Dave Swartz, who was the CIO at that
[21] time. I believe Christina Griffin. Maybe Marcy
[22] Day, also.

Page 134

[1]    Q: Were these people all present at the
[2] same time?

[3]    A: No.

[4]    Q: When you talked to Mr. Swartz, was it
[5] just you and he?

[6]    A: Yes.

[7]    Q: Do you recall when you spoke with him?

[8]    A: Within ten days after being appointed
[9] to take over from Anne Marie Taylor.

[10]   Q: Can you tell me the substance of your
[11] conversation with Mr. Swartz?

[12]   A: That I thought the project was in
[13] trouble and we had a couple of options. One was
[14] play it out since we'd already poured so much
[15] money down the rat hole or, you know, pay them off
[16] and try to take over ourselves. We discussed the
[17] various options.

[18]   Q: What did you decide?

[19]   A: That the only reasonable approach
[20] given how much we already had put into it was to
[21] try to finish out the base contract and get what
[22] we could.

Page 135

[1]    Q: Was there any discussion between you
[2] and Mr. Swartz at that time of withholding any
[3] payments to Richmar?

[4]    A: No.

[5]    Q: So the contemplation at that point was
[6] to pay them off for their work; is that correct?

[7]    A: And get Release 1.

[8]    Q: With Ms. Griffin, do you recall, when
[9] did you speak to her?

[10]   A: In the same time frame. I don't know
[11] the exact date.

[12]   Q: What was the substance of your
[13] conversation with her?

[14]   A: Basically the same. We were sitting
[15] around trying to figure out what the possibilities
[16] were, what the options were.

[17]   Q: And what were the options that you
[18] discussed with her?

[19]   A: Basically the same thing. Finish it
[20] as it was, terminate the contract or follow
[21] through, finish out the contract as it existed
[22] and try to get something useful out of the

Page 136

[1] project.

[2]    Q: So your testimony is you didn't find
[3] out until mid-February that there were sufficient
[4] problems that you felt it would be reasonable to
[5] withhold payment; is that your testimony?

[6]    A: No.

[7]    MR. THOMAS: Objection to form.

[8]    THE WITNESS: Problems existed then
[9] with how items were being resolved between the
[10] teams with Richmar not on-site; problems with how
[11] the code was, quote, unquote, dropped, meaning
[12] changes to the code were brought in by Richmar's
[13] employees or contractors and given to us; problems
[14] in some of the interfaces where we thought that it
[15] would be best if we had Richmar and GW staff
[16] working together to shorten the time frame and
[17] not, in effect, cost us more money as we went back
[18] and forth and back and forth.

[19]    Problems were in the process at that
[20] point, later as we got closer to testing, closer
[21] to the User Acceptance Testing, when we looked at
[22] the kind of problems we had and had to decide

CUS4, Inc. d/b/a Richmar & Associates, et al.  v.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 137

[1] whether or not we could do work-arounds, whether
[2] we could accept it as it was, whether it had
[3] enough functionality to go live; would users be
[4] upset, et cetera, and then eventually into
[5] problems with performance; the problems with the
[6] systems; the problems with the scanning, with the
[7] indexing, et cetera.
[8]                **BY MR. GITNER:**
[9]    **Q:** But other than the indexing and the
[10] scanning, the other problems you just discussed
[11] you knew about in 2006? As a matter of fact —
[12]    **A:** Some of them.
[13]    **Q:** — apparently around October of 2006.
[14]    **A:** Some of them in 2006, some of them as
[15] the system was installed, some of them as we
[16] developed, as people started, as began to use the
[17] system, other things popped up.
[18]      That's why the Mantis tickets were
[19] created for the specific things that you pointed
[20] out in your other exhibit.
[21]    **Q:** But what were the problems that popped
[22] up in February that broke the camel's back, in

Page 138

[1] other words?
[2]    **MR. THOMAS:** Objection to form.
[3]    Again, we are now an hour back into this
[4] deposition. You have done about five minutes
[5] on copyright infringement and the rest on some
[6] type of contract claim or contractual defenses.
[7]      You can answer the question, but I
[8] think we're getting close to having to cut this
[9] off, Geoff.
[10]      You can answer.
[11]    **THE WITNESS:** Can you read it back?
[12]    (The record was read by the reporter
[13] as follows:
[14]      But what were the problems that
[15] popped up in February that broke the camel's
[16] back, in other words?)
[17]
[18]    **THE WITNESS:** There were a list of
[19] problems. I don't have all of them right in front
[20] of me, so I can't give you an exact. Which one of
[21] the Mantis tickets we got this February versus we
[22] found out earlier, I don't know which is which.

Page 139

[1]                **BY MR. GITNER:**
[2]    **Q:** So up until that point, you were going
[3] to pay Richmar for all its work on the scanning,
[4] and after that you decided not to, correct?
[5]    **A:** That developed. The irritation at GW
[6] on the lack of functionality of the system and the
[7] problems we had with the scanning developed over a
[8] period of time, and the idea of re-compensating or
[9] compensating ourselves, in effect, for all the
[10] work we had to do came about.
[11]    **MR. GITNER:** Give me a few minutes, if
[12] you could, to take a break.
[13]    (Brief recess.)
[14]    (Thereupon, Bonig Deposition Exhibit
[15] Number 11 was marked for identification.)
[16]    **MR. GITNER:** All set?
[17]    **MR. THOMAS:** Geoff, I would encourage
[18] you to conclude your examination before 2:30, when
[19] we adjourn to speak to the court, so to the extent
[20] you have additional items that are relevant to the
[21] motion for preliminary injunction, I would suggest
[22] that you do that and complete those by 2:30.

Page 140

[1] Thanks.
[2]                **BY MR. GITNER:**
[3]    **Q:** Let me show you what has been marked
[4] as Exhibit Number 11, Mr. Bonig.
[5]    **A:** Yes.
[6]    **Q:** Do you recognize this letter? Can you
[7] identify this letter?
[8]    **A:** Yes.
[9]    **Q:** And what is this letter?
[10]    **A:** A letter to Richard because he had
[11] been writing to Lou Katz and calling Lou Katz's
[12] office about the fact that he hadn't gotten paid
[13] and this is basically saying our analysis showed
[14] that, You didn't perform. We're not going to pay
[15] you for some of the invoices.
[16]    **Q:** Is that your signature, sir?
[17]    **A:** Yes.
[18]    **Q:** Did you author this letter?
[19]    **A:** Yes.
[20]    **Q:** You say that over the past few weeks
[21] or the past weeks, you had asked your staff to
[22] review Richmar's performance. Can you tell me

Page 141

[1] when you asked them to first do that?

[2] **A:** Well, they review the performance of

[3] a contract all the way along the process.

[4] This was done specifically as to what

[5] we were billed for, when we were billed for it,

[6] what changes had to be made that we were re-billed

[7] for and what changes had to be made to the

[8] indexing for the scanned documents, et cetera.

[9] **Q:** But I'm asking you, it says here,

[10] Over the past weeks I have asked my staff.

[11] I'm asking you, when did you ask them

[12] to do this review?

[13] **A:** Well, in those past weeks, I assume.

[14] This is dated March 23rd.

[15] **Q:** What would you have meant by past

[16] weeks? One week? Two weeks? Three weeks?

[17] **A:** Probably end of February, beginning

[18] of March, in that time frame.

[19] **Q:** And what caused you to ask that your

[20] or what caused you to request your staff to do

[21] that?

[22] **A:** An increasing awareness of all the

Page 142

[1] problems that had been dumped on our laps, in

[2] effect, because of the Richmar code and the

[3] scanning and the inadequacy of the system.

[4] **Q:** Was it just a coincidence that your

[5] review coincided with Richmar's finishing its work

[6] on the back scanning project?

[7] **MR. THOMAS:** Objection to form.

[8] **THE WITNESS:** Don't know. Don't know

[9] what the timing was.

[10] **BY MR. GITNER:**

[11] **Q:** Did you start your review after

[12] Richmar had completed all its work on the back

[13] scanning project?

[14] **A:** Don't remember the exact timing.

[15] **Q:** Can you tell me who you asked to

[16] perform this review?

[17] **A:** The financial and the project people,

[18] who were aware of what was delivered and when it

[19] was delivered and the problems in the Mantis

[20] tickets, et cetera.

[21] **Q:** Well, did you put somebody in charge

[22] of reporting back to you what the results of the

Page 143

[1] review were?

[2] **A:** Yes. I believe that was Christina

[3] Griffin.

[4] **Q:** Did she ever give you a written

[5] report?

[6] **A:** I believe she showed me one. I don't

[7] remember if I have a copy.

[8] **Q:** When did she show you one?

[9] **A:** In this time frame. Don't know

[10] exactly when, what date.

[11] **Q:** How many pages was it, approximately?

[12] **A:** Don't remember.

[13] **Q:** What was the caption? What was the

[14] title?

[15] **A:** I don't remember.

[16] **Q:** Do you know what it contained?

[17] **MR. THOMAS:** You can answer that

[18] question yes or no. I think we're starting to

[19] stray into privileged areas in anticipation of

[20] litigation.

[21] **THE WITNESS:** I agree.

[22] **MR. THOMAS:** You can answer the

Page 144

[1] question yes or no.

[2] **THE WITNESS:** Yes, I remember some of

[3] the things.

[4] **BY MR. GITNER:**

[5] **Q:** Was this document prepared for your

[6] lawyers?

[7] **MR. THOMAS:** Let's go off the record.

[8] There's potential privilege issues.

[9] We're off.

[10] (Brief recess.)

[11] **MR. GITNER:** What is the question?

[12] (The record was read by the reporter

[13] as follows:

[14] Was this document prepared for

[15] your lawyers?)

[16]

[17] **THE WITNESS:** It was prepared for me

[18] and for counsel. For me and for counsel.

[19] **BY MR. GITNER:**

[20] **Q:** Oh, counsel. You and for counsel?

[21] **A:** Yes.

[22] **Q:** I couldn't hear what you said. Your

Page 145

[1] testimony is that until a few weeks prior to the
[2] date of this letter, March 23rd, 2007, you had
[3] never contemplated withholding money from Richmar
[4] for alleged inadequacies in its development of the
[5] system; is that correct?
[6]    **MR. THOMAS:** Objection to form. The
[7] record speaks for itself.
[8]    You can answer the question.
[9]                    **BY MR. GITNER:**
[10]   **Q:** Is that correct?
[11]   **A:** No, it's not correct.
[12]   **Q:** When did you?
[13]   **A:** I told you before I don't remember
[14] exactly when. It wasn't this late. It wasn't as
[15] early as your prior question, which was in the
[16] fall, October, November or whatever it was.
[17]   **Q:** Well, was it before you entered — I
[18] believe you testified you had not formulated that
[19] position at the time you wrote your January 5th
[20] letter, correct?
[21]   **A:** I believe that's true.
[22]   **Q:** So you formulated this position

Page 146

[1] somewhere between January 5th and March 23rd,
[2] correct, or actually, weeks before March 23rd?
[3]   **A:** I believe that's the time frame.
[4]   **Q:** So that would be somewhere between
[5] January 5th and, let's say, end of February?
[6]   **A:** I believe so.
[7]   **Q:** But you don't recall whether or not
[8] it was before or after Richmar finished working on
[9] the scanning project?
[10]   **A:** I do not remember specifically.
[11]   **Q:** Did you discuss your position with
[12] Mr. Katz before you wrote this on March 23rd?
[13]   **MR. THOMAS:** Objection to form.
[14]   **THE WITNESS:** Yes.
[15]                    **BY MR. GITNER:**
[16]   **Q:** In here you say, Their preliminary
[17] findings. Whose preliminary findings? Would that
[18] be Christina Griffin?
[19]   **A:** And her team.
[20]   **Q:** And who is her team?
[21]   **A:** It would Marcy Day, Rick Gilchrist
[22] and individual programmers that worked across

Page 147

[1] different —
[2]   **Q:** When you —
[3]   **A:** — versions.
[4]   **Q:** Sorry. When you wrote this on March
[5] 23rd, did you have a document that included their
[6] preliminary findings?
[7]   **A:** I had seen a document, yes.
[8]   **Q:** What did these preliminary findings
[9] contain?
[10]   **MR. THOMAS:** Objection to form.
[11]   Actually, I think I'm going to object
[12] to that on the basis of attorney-client privilege,
[13] because the document, he testified, had been
[14] prepared for himself and counsel.
[15]   I instruct the witness not to answer.
[16]                    **BY MR. GITNER:**
[17]   **Q:** Was this document anything other than
[18] a listing of alleged defects in the DCMS system?
[19]   **MR. THOMAS:** You can answer that
[20] question yes or no.
[21]   **THE WITNESS:** Yes.
[22]                    **BY MR. GITNER:**

Page 148

[1]   **Q:** Was there a request for advice in this
[2] document from counsel?
[3]   **A:** I'm sorry?
[4]   **Q:** Was there a request for legal advice
[5] in this list, in this document, the preliminary
[6] findings?
[7]   **MR. THOMAS:** You can answer that
[8] question yes or no.
[9]   **THE WITNESS:** I don't believe so.
[10]   **MR. GITNER:** Why is it privileged?
[11]   **MR. THOMAS:** Because he testified that
[12] the document was prepared —
[13]   **MR. GITNER:** For him.
[14]   **MR. THOMAS:** — for himself and for
[15] counsel and it is prepared for counsel in order to
[16] receive legal advice, whether or not there is a
[17] specific request for legal advice in the document
[18] itself.
[19]   It doesn't have to be a specific
[20] request for legal advice in order for the document
[21] to be privileged.
[22]                    **BY MR. GITNER:**

Page 149

[1]  **Q:** Is that the only list that you are
[2] aware of that shows or critiques the alleged
[3] malfunctions?
[4]  **MR. THOMAS:** Objection to form.
[5]                          **BY MR. GITNER:**
[6]  **Q:** Is that the only list?
[7]  **A:** No.
[8]  **Q:** What other lists are there?
[9]  **A:** Mantis tickets, programmer notes,
[10] those types of things.
[11]  **Q:** In your letter, you say that Richmar
[12] failed miserably in its attempts to perform under
[13] the contract. How did they attempt to fail
[14] miserably?
[15]  **MR. THOMAS:** How did they attempt to
[16] fail miserably? Was that the question?
[17]  **MR. GITNER:** Bad question.
[18]                          **BY MR. GITNER:**
[19]  **Q:** How did they fail miserably in its
[20] attempts — it's his letter — to perform under
[21] the contract?
[22]  **A:** Let me count the ways. Start from the

Page 150

[1] beginning in the original analysis of what was
[2] required in the HR department; how that was
[3] translated into requirements; how those were
[4] programmed; how they were interfaced with the
[5] Banner; how the scanning was established; the
[6] procedures for providing the documents back to us.
[7]     The quality control procedures that
[8] were used in the scanning area didn't even pick up
[9] the fact that there were bad scanners being used.
[10] People scanned hundreds if not thousands of
[11] documents on a scanner that you couldn't read.
[12]     The PIDM sheets weren't in the right
[13] area to identify documents by individual. The
[14] indexing was completely wrong in a major area.
[15] Those are the ones I can remember offhand.
[16]  **Q:** What evidence did you have that they
[17] had billed for work not delivered?
[18]  **A:** We had some indications or some
[19] comments from some of the subcontractors that
[20] had worked on X or Y functionality that was not
[21] delivered at the end.
[22]  **Q:** Have you ever computed or calculated

Page 151

[1] how much you contend Richmar has billed for work
[2] not delivered?
[3]  **A:** No.
[4]  **Q:** Had you made such a calculation at the
[5] time you wrote this letter on March 23rd?
[6]  **A:** I don't believe so.
[7]  **Q:** What evidence do you have of work that
[8] they did incorrectly?
[9]  **A:** Well, rework tickets through Mantis
[10] where something was delivered, didn't work, had to
[11] be sent back, it was delivered again, didn't work,
[12] had to be sent back.
[13]  **Q:** Had you reviewed those Mantis tickets
[14] as of the date you wrote this letter, March 23rd?
[15]  **A:** I had reviewed some of them, yes. Not
[16] every one.
[17]  **Q:** Which ones? How did you decide which
[18] ones to review?
[19]  **A:** Speaking with the staff said, Show me
[20] an example of where something occurred.
[21]  **Q:** So you were shown examples?
[22]  **A:** Yes.

Page 152

[1]  **Q:** Did you make a record of which Mantis
[2] tickets you reviewed?
[3]  **A:** No.
[4]  **Q:** What evidence do you have of work
[5] outside the scope of the engagement by Richmar?
[6]  **MR. THOMAS:** Objection to form.
[7] Sitting here today.
[8]  **THE WITNESS:** Pardon?
[9]  **MR. THOMAS:** If you recall sitting
[10] here today, then that's fine. Again, I struggle
[11] to understand what this has to do with the motion
[12] for preliminary injunction on copyright
[13] infringement.
[14]  **THE WITNESS:** Okay. Tasks that were
[15] in excess of the requirements that were frozen in
[16] October.
[17]                          **BY MR. GITNER:**
[18]  **Q:** Such as?
[19]  **A:** I don't remember specifically right
[20] now.
[21]  **Q:** Did you ever make a list of these?
[22]  **A:** Pardon?

Page 153

[1]  **Q:** Do you have a list of these somewhere?

[2]  **A:** No. I don't have a list.

[3]  **Q:** Did you ever calculate how much time

[4] Richmar spent on these tasks outside the scope of

[5] the engagement?

[6]  **A:** I didn't. I don't know if somebody

[7] else did.

[8]  **Q:** Have you ever seen them?

[9]  **A:** I don't remember if I've seen it in

[10] that form.

[11]  **Q:** What form have you seen it in?

[12]  **MR. THOMAS:** Objection to form. I'm

[13] going to instruct the witness not to —

[14]                 **BY MR. GITNER:**

[15]  **Q:** Would this be in the docket of

[16] so-called privileged document?

[17]  **MR. THOMAS:** You can answer the

[18] question yes or no.

[19]  **THE WITNESS:** Yes.

[20]                 **BY MR. GITNER:**

[21]  **Q:** How did Richmar deliver a seriously

[22] flawed work product? Would it be anything other

Page 154

[1] than what you testified a few seconds ago,

[2] minutes ago?

[3]  **A:** Just what I testified before, in that

[4] Release 1 was a barely functional system that

[5] allowed the simple pulling of a document when we

[6] had expected, desired and hopefully contracted for

[7] a much more functional system at that time and

[8] cost.

[9]  **Q:** But you knew all that in November and

[10] December of 2006, didn't you?

[11]  **A:** We knew what was planned at that

[12] point. It hadn't been delivered until December.

[13]  **Q:** Well, you knew it was —

[14]  **A:** It hadn't been tested and used

[15] extensively until after that.

[16]  **Q:** So you knew what the work product was

[17] in November and December of 2006?

[18]  **A:** Not all.

[19]  **Q:** Not all.

[20]  **A:** You buy a car. You find later the

[21] transmission doesn't clink right. You don't know

[22] it the day you buy it.

Page 155

[1]  **Q:** Well, when did you find out what was

[2] flawed in the work product that you didn't know

[3] about on December 18th, 2006 as of March 23rd

[4] here?

[5]  **MR. THOMAS:** Objection to form.

[6]  **THE WITNESS:** I don't remember some of

[7] the specific details.

[8]  **MR. THOMAS:** If you know the details

[9] that were determined after December 18th — is

[10] that the date in your question?

[11]  **MR. GITNER:** Yes.

[12]  **MR. THOMAS:** — of what was determined

[13] to be problems with the deliverables, then —

[14]  **THE WITNESS:** I don't have that in

[15] memory.

[16]                 **BY MR. GITNER:**

[17]  **Q:** Do you remember any of them? I mean,

[18] it is a seriously flawed work product.

[19]  **MR. THOMAS:** If you recall sitting

[20] here today. It's not a memory test.

[21]  **THE WITNESS:** I don't.

[22]                 **BY MR. GITNER:**

Page 156

[1]  **Q:** You were aware when you wrote this

[2] letter that GW owed Richmar some over $230,000,

[3] weren't you?

[4]  **A:** About that.

[5]  **Q:** And you were aware, were you not,

[6] that GW did not have a license to make any

[7] modifications to the DCMS system?

[8]  **MR. THOMAS:** Objection to form.

[9]  **THE WITNESS:** No.

[10]                 **BY MR. GITNER:**

[11]  **Q:** You weren't aware? Did you have a

[12] license?

[13]  **MR. THOMAS:** Calls for a legal

[14] conclusion.

[15]  You can answer the question if you

[16] know one way or the other.

[17]                 **BY MR. GITNER:**

[18]  **Q:** Did you have a license from Richmar

[19] in March? Did you have a written license from

[20] Richmar in March of 2007?

[21]  **A:** No.

[22]  **Q:** And you knew that you had a written

Page 157

[1] contract with Crown Partners at that same time

[2] that provided that you would retain or GW would

[3] retain all the ownership rights to any creative

[4] works or intellectual property, right?

[5]     MR. THOMAS: Objection to form. I

[6] think that misstates his testimony —

[7]                 BY MR. GITNER:

[8]     Q: Is that correct?

[9]     MR. THOMAS: — concerning that

[10] contract.

[11]     But you can answer.

[12]     THE WITNESS: You reminded me by

[13] showing me the contract.

[14]                 BY MR. GITNER:

[15]     Q: Right. You've seen it today. GW had

[16]

[17]     A: Correct.

[18]     Q: Right.

[19]     A: Today.

[20]     Q: And you knew Richmar was a small

[21] company. It's not a big company, correct?

[22]     A: Yes.

Page 158

[1]     Q: And you were aware, were you not, that

[2] by alleging that Richmar had developed a seriously

[3] flawed work product, that Richmar would have to

[4] instigate legal proceedings if it wanted to get

[5] paid, correct?

[6]     MR. THOMAS: Objection to form.

[7] If that was your understanding.

[8]     THE WITNESS: I guess I assume so.

[9]                 BY MR. GITNER:

[10]     Q: And the reason or a reason that you

[11] withheld that money was in order to exert leverage

[12] over Richmar in the event that they sought to

[13] protect their copyright interests; isn't that

[14] correct?

[15]     A: Nope.

[16]     Q: Is it your testimony it's all just a

[17] big coincidence that right after Richmar completes

[18] the back scanning contract that you withhold

[19] further payment for that work; that is just a

[20] coincidence?

[21]     MR. THOMAS: Objection to form.

[22]                 BY MR. GITNER:

Page 159

[1]     Q: Is that your testimony?

[2]     A: No.

[3]     MR. THOMAS: He answered your

[4] question.

[5]                 BY MR. GITNER:

[6]     Q: So the fact that Richmar had completed

[7] the work was a factor in your timing, was it not,

[8] of informing them that they would no longer be

[9] paid or withholding payment, correct?

[10]     A: Yes.

[11]     Q: And you knew this and you had

[12] formulated this opinion or position at the same

[13] time that Richmar was completing its work on the

[14] back scanning project; isn't that correct?

[15]     A: When they had our documents, yes.

[16]     Q: Have you had any discussions with

[17] anyone on your staff as to whether or not GW will

[18] be required to enter into a license agreement with

[19] Richmar in the event that the court finds that GW

[20] has improperly made modifications to the DCMS

[21] system?

[22]     In other words, have you considered

Page 160

[1] that if GW is found to have infringed or may

[2] infringe in the future, that you may have to enter

[3] into a license arrangement with Richmar in the

[4] event that you want to make further modifications

[5] to the system?

[6]     A: I don't recall any opportunity or time

[7] that I've discussed that with the staff.

[8]     Q: What is your understanding of what

[9] will happen if it is found that GW is not

[10] permitted to make modifications to the DCMS system

[11] in order to roll it out to other divisions of the

[12] University?

[13]     MR. THOMAS: Objection to form. That

[14] calls for a hypothetical. Who knows until we

[15] litigate this case?

[16]     If you have made contingency plans,

[17] you can testify. If not, I'm not clear how you

[18] can answer that question.

[19]     THE WITNESS: I have not made

[20] contingency plans, didn't think it likely.

[21]                 BY MR. GITNER:

[22]     Q: Are you aware of whether or not GW

Page 161

[1] ISS Division reviewed Exhibit Number 9, the
[2] contract, before it was executed? Do you know if
[3] anybody in your group reviewed it? That's the
[4] contract, the Richmar contract.
[5]    A: Yes. It would have gone through a
[6] normal review process.
[7]    Q: What would that have entailed?
[8]    A: Different people review the contract
[9] for different things. At the time that I saw
[10] the contract, if I saw it earlier, and I don't
[11] remember having seen it, but if I saw it earlier
[12] than when I got involved, I would have seen it and
[13] probably, now that I think about it, did see it
[14] for budgetary implications, not as to what — the
[15] provisions of the contract. Do we have the money?
[16]    Because at the time this contract was
[17] issued, I had no responsibility for Docmentum or
[18] DCMS. My only responsibilities were overall
[19] budget management in ISS, so any review that I
[20] did prior to October would have been, Do we have
[21] money that's been cited by the manager who is
[22] citing funds, in effect, to pay for this?

Page 162

[1]    Other people would have reviewed it
[2] for other aspects, legal review, or are the right
[3] signature places in the right boxes? That kind of
[4] thing.
[5]    Q: Was it a matter of course to have
[6] these types of contracts reviewed by legal? Did
[7] they have legal review on them?
[8]    A: Generally.
[9]    Q: Is there like a cut-off level, a
[10] certain sum?
[11]    A: There are criteria. It has to do
[12] with a number of things, the kind of thing,
[13] purchase versus contract versus agreements versus
[14] a standard, like a service level agreement, which
[15] is like a user agreement.
[16]    Q: In any case, ISS had the opportunity
[17] to have this reviewed by legal, should they want
[18] to, correct?
[19]    A: It's always an option.
[20]    Q: You have an in-house legal staff that
[21] does this sort of thing?
[22]    A: Yes.

Page 163

[1]    Q: So there weren't any prohibitions on
[2] getting legal review here?
[3]    A: No.
[4]    MR. THOMAS: It is a couple of minutes
[5] before 2:30. If you have any additional questions
[6] on your contract copyright infringement claim, you
[7] should probably wind it up.
[8]    MR. GITNER: We can adjourn here. Let
[9] me just look through my outline and see if we have
[10] any further things, but I think this would be a
[11] good spot.
[12]    I think I have actually a couple more.
[13]    MR. THOMAS: You can't review those
[14] documents. We'll read and sign.
[15]    MR. GITNER: Wait. Wait. I just said
[16] I had a couple more.
[17]    MR. THOMAS: Oh. I thought you said
[18] you didn't have any.
[19]    MR. GITNER: Let's mark this.
[20]    (Thereupon, Bonig Deposition Exhibit
[21] Number 12 was marked for identification.)
[22]                BY MR. GITNER:

Page 164

[1]    Q: Let me show you what has been marked
[2] as Exhibit Number 12 and ask if you can identify
[3] this document.
[4]    (Witness reviewed document.)
[5]    THE WITNESS: I saw something like
[6] this. I have to make an assumption it's this one.
[7]                BY MR. GITNER:
[8]    Q: Do you recall going over this document
[9] with Mr. Gordon personally, face-to-face?
[10]    A: In detail, no.
[11]    Q: Having a session with him in which
[12] this document was present?
[13]    A: A document similar to this. I don't
[14] know if this was the exact one.
[15]    Q: And that was in around October of
[16] 2006?
[17]    A: Middle of October.
[18]    Q: And that was a time when a freeze was
[19] put on further development of the Document Only
[20] Search function, correct?
[21]    A: Yes.
[22]    Q: And Mr. Gordon asked you to sign off

Page 165

[1] on this document, correct?

[2] **A:** I don't remember on this one.

[3] **Q:** You don't remember that?

[4] **A:** No.

[5] **Q:** Do you remember telling him you

[6] wouldn't sign off on the document?

[7] **A:** No.

[8] **Q:** Do you remember ever telling Mr.

[9] Gordon to the effect that the reason why you

[10] didn't want to sign off on the document is that

[11] you'll know it when you see it or, Let me know

[12] when it's soup? Are either one of those

[13] characterizations familiar to you?

[14] **A:** No.

[15] **Q:** Is that a term that you would use,

[16] that you have used in the past, Let me know when

[17] it's soup?

[18] **A:** I don't think so. I don't recall

[19] that, no.

[20] **Q:** Well, do you recall expressing to

[21] Mr. Gordon the sentiment essentially that you

[22] didn't want to sign off on this document but you

Page 166

[1] would know what it would be that you would want in

[2] Release Number 1 when you saw it?

[3] **A:** No, I don't remember that sentiment.

[4] **Q:** How is Richmar supposed to know what

[5] GW wanted in Release Number 1 unless GW signed off

[6] on a requirements specification?

[7] **A:** The reason that we froze the system at

[8] that time is because we wanted to freeze the

[9] requirements that they were working to at that

[10] time.

[11] **Q:** Well, how —

[12] **A:** So, so that the scope would not creep

[13] past the point where we had any hope of delivering

[14] a usable system in a reasonable amount of time.

[15] **Q:** Is there any written document that

[16] shows what was to be included in Release Number 1

[17] at the time it was frozen, as you just testified

[18] to?

[19] **A:** I believe there was a document that

[20] was an after fact documentation of what Release 1

[21] entailed. It's not this document.

[22] **Q:** There was an after the fact document

Page 167

[1] after Release 1?

[2] **A:** Not after it went live but after the

[3] freeze. There was documentation of what was in

[4] Release 1.

[5] **Q:** Do you know what the name of that

[6] document was?

[7] **A:** No, I don't. It's similar to this,

[8] I believe. I don't think it's this one, but I

[9] believe there is another document.

[10] **Q:** Was that prepared by Richmar?

[11] **A:** Yes.

[12] **Q:** Did GW sign off on that?

[13] **A:** No.

[14] **MR. GITNER:** I have no further

[15] questions at this time.

[16] **MR. THOMAS:** We'll read and sign.

[17]

[18] (Thereupon, at 2:28 p.m., the

[19] deposition was adjourned.)

[20]

[21] (Reading and signature not waived.)

[22]

Page 168

[1] CERTIFICATE OF NOTARY PUBLIC

[2] I, LU ANNE DAWSON, the officer before

[3] whom the foregoing deposition was taken,

[4] do hereby certify that the witness whose testimony

[5] appears in the foregoing deposition was duly sworn

[6] by me; that the testimony of said witness was

[7] taken by me in shorthand and thereafter reduced to

[8] typewriting by me; that said deposition is a true

[9] record of the testimony given by said witness;

[10] that I am neither counsel for, related to, nor

[11] employed by any of the parties to the action in

[12] which this deposition was taken; and, further,

[13] that I am not a relative or employee of any

[14] attorney or counsel employed by the parties

[15] thereto, nor financially or otherwise interested

[16] in the outcome of the action.

[17]

[18]

[19]

LU ANNE DAWSON

[20] Notary Public in and for

the District of Columbia

[21]

My Commission expires:

[22] November 30, 2009

Page 169

[1]  **READING AND SIGNING PROCEDURE**

[2]

[3]    The Deposition of RONALD G. BONIG was

[4] taken in the matter, on the date, and at the time

[5] and place set out on the title page hereof.

[6]    It was requested that the deposition

[7] be taken by the reporter and that same be reduced

[8] to typewritten form.

[9]    It was agreed by and between counsel

[10] and/or the parties and/or the Deponent that the

[11] Deponent will read and sign the transcript of said

[12] deposition.

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

Page 170

[1]    CERTIFICATE

[2]

[3] STATE OF _____ :

[4] COUNTY/CITY OF _____ :

[5]

[6]    Before me, this day, personally

[7] appeared RONALD G. BONIG, who, being duly sworn,

[8] states that the foregoing transcript of his/her

[9] Deposition, taken in the matter, on the date, and

[10] at the time and place set out on the title page

[11] hereof, constitutes a true and accurate transcript

[12] of said deposition.

[13]

[14]

[15]

[16] SUBSCRIBED and SWORN to before me this

[17] _____ day of _____,

[18] 2007, in the jurisdiction aforesaid.

[19]

[20]

[21]

[22] My Commission Expires       Notary Public

Page 171

[1]    DEPOSITION ERRATA SHEET

[2] CASE CAPTION: CUS4, Inc. d/b/a Richmar Associates

     v. George Washington University, et al.

[3]

[4] DEPONENT: RONALD G. BONIG

[5] DEPOSITION DATE: June 5, 2007

[6]    I have read the entire transcript of

[7] my Deposition taken in the captioned matter or the

[8] same has been read to me. I request that the

[9] changes noted on the following errata sheet be

[10] entered upon the record for the reasons indicated.

[11]    I have signed my name to the Errata

[12] Sheet and the appropriate Certificate and

[13] authorize you to attach both to the original

[14] transcript.

[15]

[16] PAGE/LINE    CHANGE        REASON

[17]

[18]

[19]

[20]

[21] SIGNATURE:_____DATE:_____

[22]    RONALD G. BONIG

Page 172

[1] PAGE/LINE    CHANGE        REASON

[2]

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21] SIGNATURE:_____DATE:_____

[22]    RONALD G. BONIG

# Exhibit 13

# In The Matter Of:

*CUS4, Inc. d/b/a Richmar & Associates, et al. v.*
*George Washington University*

---

*Tanya K. Bell*
*May 23, 2007*

---

*Gagliardi Reporting Company*
*P.O. Box 7306*
*Arlington, VA 22207*
*(703) 243-4333*

*Original File 0523BELL.V1, 87 Pages*
*Min-U-Script® File ID: 0816394610*

**Word Index included with this Min-U-Script®**

Page 1

[1]    IN THE UNITED STATES DISTRICT COURT FOR

        THE DISTRICT OF COLUMBIA

[2]            CIVIL DIVISION

[3]

[4] CUS4, INC., d/b/a

    RICHMAR & ASSOCIATES, et al.,

[5]

        Plaintiffs,

[6]

        v.            Case No:

[7]            1:CV-07-0841 (JR)

    GEORGE WASHINGTON UNIVERSITY,

[8]

        Defendant.

[9]

[10]

            Wednesday, May 23, 2007

[11]        Washington, D.C.

[12] Deposition of:

[13]        TANYA K. BELL

[14] called for examination by counsel for the

[15] Plaintiffs, pursuant to Notice, taken at

[16] the Law Offices of Geoffrey P. Gitner, Watergate,

[17] Eleventh Floor, 600 New Hampshire Avenue, N.W.,

[18] Washington, D.C. 20037, beginning at 9:30 a.m.,

[19] before Lu Anne Dawson, Notary Public in and for

[20] the District of Columbia, when were present on

[21] behalf of the respective parties:

[22]

Page 2

[1] APPEARANCES:

[2]

[3] FOR THE PLAINTIFFS:

[4] GEOFFREY P. GITNER, ESQ.

[5] The Law Offices of Geoffrey P. Gitner

[6] Watergate, Eleventh Floor

[7] 600 New Hampshire Avenue, N.W.

[8] Washington, D.C.  20037

[9] (202) 295-6035

[10]

[11] FOR THE DEFENDANT:

[12] JAMES W. THOMAS, JR., ESQ.

[13] Arnold & Porter

[14] 555 Twelfth Street, N.W.

[15] Washington, D.C.  20004-1206

[16] (202) 942-6421

[17] Fax (202) 942=5999

[18] James_Thomas@aporter.com

[19]

[20] ALSO PRESENT:  LINDA J. SCHUTJER, ESQ.

[21]        Associate General Counsel

[22]        George Washington University

Page 3

[1]            CONTENTS

[2]

[3] Witness:            Page:

[4] TANYA K. BELL

[5]    Examination by Mr. Gitner        4

[6]    Examination by Mr. Thomas        —

[7]

[8]

[9]

[10]

[11]        EXHIBITS

[12] Marked for identification:        Page:

[13] BELL DEPOSITION EXHIBIT NOS.

[14]    No. 1            74

[15]    No. 2            80

[16]

[17]

[18]    (Exhibits attached.)

[19]

[20]

[21]

[22]

Page 4

[1]        PROCEEDINGS

[2]

[3]

[4]    Thereupon,

[5] TANYA K. BELL

[6] was called for examination by counsel for the

[7] Plaintiffs and, after being sworn by the Notary,

[8] was examined and testified as follows:

[9]        EXAMINATION

[10]        BY MR. GITNER:

[11]    Q: Ms. Bell, would you please state your

[12] name for the record?

[13]    A: My name is Tanya K. Bell.

[14]    MR. THOMAS: Do you want to get

[15] appearances on the record?

[16]    MR. GITNER: Sure. I think we already

[17] have them.

[18]    Do we already have them?

[19]    THE REPORTER: Yes.

[20]    MR. THOMAS: Very good.

[21]        BY MR. GITNER:

[22]    Q: Ms. Bell, where are you employed?

Page 5

[1] **A:** I'm employed with the George
[2] Washington University.
[3] **Q:** In what capacity?
[4] **A:** I work as the Director of Records and
[5] Data Management for Human Resource Services.
[6] **Q:** Director of Data Management?
[7] **A:** Records and Data Management.
[8] **Q:** Records and Data Management. How long
[9] have you held that position?
[10] **A:** I've been in that capacity for the
[11] past seven years.
[12] **Q:** Is that part of a particular
[13] department or division of the GW University?
[14] **A:** It's within the Human Resources
[15] Division, yes.
[16] **Q:** Could you just describe to me just in
[17] a short manner what is comprised in the Human
[18] Resources Division? Is it a division, department?
[19] **A:** We're in transition. We have new Vice
[20] Presidents, so we're referred to now as the
[21] Division of Human Resources.
[22] The Division of Human Resources

Page 6

[1] encompasses Human Resource Services, which
[2] includes Benefits Services, Records and Data
[3] Management, Employee and Labor Relations and
[4] Staffing and Compensation Services.
[5] It also includes Equal Employment
[6] Opportunity and Employee Training and Development.
[7] **Q:** Are all those pretty much on the same
[8] level, what you just stated?
[9] **A:** Yes.
[10] **Q:** Who do you report to?
[11] **A:** Currently I report to the Chief Human
[12] Resource Officer.
[13] **Q:** And who is that?
[14] **A:** Val Berry.
[15] **Q:** He is the Chief Human Resource
[16] Officer?
[17] **A:** Yes.
[18] **Q:** Just so I can get sort of an
[19] organizational tree here, who does he report
[20] to?
[21] **A:** He reports to the President of the
[22] University.

Page 7

[1] **Q:** So he is really — is it a he or she?
[2] **A:** He.
[3] **Q:** All right. So he is really the head
[4] of Human Resources?
[5] **A:** He is the Chief Human Resources
[6] Officer.
[7] **Q:** And you are in charge of Records and
[8] Data Management?
[9] **A:** Yes.
[10] **Q:** For GW University?
[11] **A:** Yes.
[12] **Q:** How many people? Is your group called
[13] a division or a department?
[14] **A:** It's currently, again, we're in
[15] transition, so it's referred to as a division, but
[16] that may change shortly.
[17] **Q:** How many people are in your division?
[18] **A:** In my division I have seven positions.
[19] **Q:** You have seven positions?
[20] **A:** Uh-huh.
[21] **Q:** How many people work with you in
[22] obtaining records and data management?

Page 8

[1] **MR. THOMAS:** Objection to form.
[2] **BY MR. GITNER:**
[3] **Q:** Are those the only seven people
[4] that work with you as far as getting records,
[5] retrieving records, filling out records for Human
[6] Resources?
[7] **A:** No.
[8] **Q:** How many would there be?
[9] **A:** There are a number of persons who work
[10] with retrieving employee records within the
[11] University. That is not exclusive to employees
[12] that report to me.
[13] **Q:** Who would those employees be, what
[14] groups?
[15] **A:** There are other stakeholder offices.
[16] There is a Faculty Personnel Office.
[17] **Q:** Faculty Personnel?
[18] **A:** Yes.
[19] **Q:** Others?
[20] **A:** There is a Medical Center Faculty
[21] Affairs Office.
[22] **Q:** Medical Faculty Affairs Office?

**Page 9**

[1]  **A:** Right.

[2]  **Q:** Any others?

[3]  **A:** There is a Research Service Office and

[4]  there is a Student Employment Office.

[5]  **Q:** Approximately how many employees are

[6]  there in those groups?

[7]  **A:** I don't know the number, the exact

[8]  number.

[9]  **Q:** Approximately. Hundreds? Tens?

[10]  **A:** I would say in the tens, definitely

[11]  not in the hundreds.

[12]  **Q:** Prior to your position that you hold

[13]  or held for the last seven years, were you also

[14]  at GW?

[15]  **A:** Yes, I was.

[16]  **Q:** What were your prior positions?

[17]  **A:** I worked as Systems Analyst in the

[18]  IT Department and I worked previously in Human

[19]  Resources as a Compensation Analyst and in varying

[20]  capacities in Human Resources.

[21]  **Q:** When did you start at GW?

[22]  **A:** 1985.

**Page 10**

[1]  **Q:** How long were you a Systems Analyst in

[2]  the IT Department?

[3]  **A:** Two years.

[4]  **Q:** Is that what is now known as the ISS

[5]  Department?

[6]  **A:** Correct.

[7]  **Q:** What did you do while you were a

[8]  Systems Analyst? I take it that it was the IT

[9]  Department back then.

[10]  **A:** Right. I provided support to the

[11]  Human Resource and Payroll and Budgeting

[12]  Departments as related to the Banner Human

[13]  Information System.

[14]  **Q:** Banner is a University-wide system;

[15]  is that correct?

[16]  **A:** It is an enterprise system.

[17]  **Q:** Were you a member of the DCMS Steering

[18]  Committee?

[19]  **A:** There were a variety of committees

[20]  related to the DCMS implementation, so I was a

[21]  member of several groups that met on a regular

[22]  basis, the names of which I don't recall the

**Page 11**

[1]  specifics, so I was a member of several groups

[2]  that met regularly regarding DCMS.

[3]  **Q:** Can you describe the groups?

[4]  **A:** Sure. The primary group that I

[5]  participated with was the stakeholder group.

[6]  **Q:** Why don't you list them out, and then

[7]  I will go back and ask you what each one was.

[8]  **A:** The stakeholder groups are essentially

[9]  the same that I listed before as the offices,

[10]  Medical Faculty, Research, Student Employment,

[11]  Research and Human Resources and myself.

[12]  **Q:** These would be the groups that are

[13]  going to use the DCMS?

[14]  **A:** Yes.

[15]  **Q:** What other groups did you belong to?

[16]  **A:** Formal groups, initially requirements

[17]  gathering, groups within Human Resources. They're

[18]  Human Resource Directors. Those were internal

[19]  discussions.

[20]  **Q:** The requirements gathering groups, did

[21]  you say?

[22]  **A:** Yes.

**Page 12**

[1]  **Q:** What did that do?

[2]  **A:** Those were simply preliminary meetings

[3]  within Human Resource Services to identify

[4]  specific documents that needed to be stored and

[5]  retrieved within the system.

[6]  **Q:** Is it fair to say that the object of

[7]  the DCMS was to replace your paper files, put them

[8]  on electronic media?

[9]  **A:** I believe that was a goal of the

[10]  project.

[11]  **Q:** Let me ask you this. You say or

[12]  you have named certain departments here. What

[13]  departments presently use the DCMS?

[14]  **A:** The Human Resource Services

[15]  Department, the EEO Department, the Research

[16]  Services Department, Student Employment, Faculty

[17]  Affairs, Faculty Personnel.

[18]  **Q:** Those are the same ones as the

[19]  stakeholders except now you have added, I guess,

[20]  the EEO; is that it?

[21]  **A:** Right. The EEO and HR both are under

[22]  the auspices of Human Resources, so we sort of

Page 13

[1] share.

[2] **Q:** Are you over all of these different

[3] groups in some manner?

[4] **MR. THOMAS:** Objection to form.

[5]        **BY MR. GITNER:**

[6] **Q:** In other words, are you in charge

[7] of data retrieval and management for all these

[8] different groups that you just named, or do they

[9] have somebody else in charge?

[10] **A:** I am not specifically in charge of

[11] their, of the data. However, because it is — one

[12] of the goals of the project was to be a central

[13] repository in order to respond to select requests,

[14] I would be able to serve as a custodian for the

[15] center repository.

[16] **Q:** Is it fair to say you were essentially

[17] the HR lead on the DCMS project?

[18] **A:** That would be fair.

[19] **Q:** Or I think they refer to you all as

[20] end users?

[21] **A:** That would be fair, also.

[22] **Q:** How long have you used the DCMS

Page 14

[1] system?

[2] **MR. THOMAS:** Objection to form.

[3]        **BY MR. GITNER:**

[4] **Q:** I am talking about you personally.

[5] **A:** The initial implementation was in

[6] December of 2006.

[7] **Q:** Do you continue to use it today?

[8] **A:** My staff use it on a regular basis.

[9] I use it occasionally.

[10] **Q:** So your staff has used it continuously

[11] from December until today; is that a fair

[12] statement?

[13] **MR. THOMAS:** Objection. Objection to

[14] form. That is sort of vague as to it exactly.

[15] **MR. GITNER:** I'll fix it up.

[16] **MR. THOMAS:** You haven't laid a

[17] foundation as to what the DCMS is or as to what's

[18] being used.

[19] **MR. GITNER:** No talking objections

[20] here. You can say objection to form and I will

[21] either re-ask the question or I will fix it up.

[22]        **BY MR. GITNER:**

Page 15

[1] **Q:** Has your staff continually used the

[2] DCMS system since December through today?

[3] **A:** I guess the question would be, what

[4] does continually mean?

[5] **Q:** Well, have they used it or did they

[6] start using it in December?

[7] **A:** Yes.

[8] **Q:** Are they using it today?

[9] **A:** Yes.

[10] **Q:** Did they use it in January?

[11] **A:** Yes.

[12] **Q:** Did they use it in February?

[13] **A:** Yes.

[14] **Q:** Did they use it in March and April?

[15] **A:** They did.

[16] **Q:** When you say your staff used it, you

[17] are talking about the seven people on your staff?

[18] **A:** No. I'm talking about pretty much

[19] exclusively, I've got two positions that are

[20] Document Imaging Specialists whose job primary

[21] responsibility is to scan and image documents and

[22] index documents.

Page 16

[1] **Q:** Have the other stakeholders used or

[2] been using the DCMS since December?

[3] **A:** No.

[4] **Q:** Have they used it at all?

[5] **A:** Yes.

[6] **Q:** When did they start? When did Faculty

[7] Personnel begin to use it?

[8] **A:** I believe that it was during the month

[9] of January 2007.

[10] **Q:** What about Medical Faculty Affairs?

[11] **A:** I believe that they also began to use

[12] the system in January 2007.

[13] **Q:** And what about Research Services

[14] Office?

[15] **A:** I don't recall the exact date of

[16] Research nor Student Employment, but certainly

[17] it was after the initial implementation in

[18] December. But they are able to use the system

[19] currently.

[20] **Q:** Were they able to use it in January?

[21] **A:** I don't recall the exact date.

[22] **Q:** Or February?

Page 17

[1]   **A:** I don't recall the exact day.

[2]   **Q:** Do you know if it was in March?

[3]   **A:** I don't recall the exact day.

[4]   **Q:** What about student affairs office?

[5]   **A:** Student Employment.

[6]   **Q:** Student Employment?

[7]   **A:** Again, I don't recall the exact

[8]   date. I do know that they are able to use it

[9]   currently.

[10]   **Q:** What about EEO?

[11]   **A:** EEO has been able to access the system

[12]   since the initial implementation.

[13]   **Q:** And are they still using it?

[14]   **A:** They have access to use it.

[15]   **Q:** What use have you and your staff made

[16]   of the DCMS since December?

[17]   **A:** We have been imaging documents that

[18]   have come in since we have been able to, imaging

[19]   and indexing documents for retrieval. We've been

[20]   retrieving documents that were put into the system

[21]   as a part of the initial implementation.

[22]   The staff have been able to research

Page 18

[1]   various and sundry information as a part of

[2]   business necessity.

[3]   **Q:** I think you said, and I'm not sure

[4]   as to the first one, your indexing and scanning,

[5]   is that new information that comes in?

[6]   **A:** We still produce paper. Human

[7]   Resources still produces paper, so we have

[8]   documents that come into our offices on a daily

[9]   basis. That information has to be included and

[10]   attached to the employee's record, and so that's

[11]   what we have been doing.

[12]   **Q:** This would be, for example, a new

[13]   application or a new W-2 or I-9, things like that?

[14]   **A:** Potentially.

[15]   **MR. THOMAS:** I'm going to have to

[16]   object again that you are going to have to clarify

[17]   as to what the, what you're referring to —

[18]   **MR. GITNER:** I'm going to ask you to

[19]   stop, please.

[20]   **MR. THOMAS:** — when you see in

[21]   minutes —

[22]   **MR. GITNER:** If you're going to make

Page 19

[1]   an objection and you're going to talk during that

[2]   objection, I would like to excuse the witness.

[3]   **MR. THOMAS:** That's fine. Let's go

[4]   off the record.

[5]   **MR. GITNER:** No. I'm not going off

[6]   the record. I just want the witness to leave the

[7]   room so she doesn't hear what your objection is so

[8]   we don't have any coaching.

[9]   **MR. THOMAS:** That's fine.

[10]   **MR. GITNER:** So if you're planning on

[11]   making a speaking objection —

[12]   **MR. THOMAS:** Let's go off the record.

[13]   This is not an objection. This is to —

[14]   **MR. GITNER:** Well, I'm not going off

[15]   the record.

[16]   **MR. THOMAS:** — save time and

[17]   resources.

[18]   **MR. GITNER:** What would you like to

[19]   do? Would you like to lodge a speaking objection?

[20]   **MR. THOMAS:** This is not a speaking

[21]   objection. It's not an objection.

[22]   **MR. GITNER:** Well, then there is

Page 20

[1]   nothing to be done. The deposition goes on.

[2]   I don't know what you want to do now.

[3]   If you want to make a speaking objection, that's

[4]   fine. The witness will have to excuse herself

[5]   from the room so she is not privy to the speaking

[6]   objection.

[7]   **MR. THOMAS:** That's fine. If Mr.

[8]   Gitner will not go off the record, we will excuse

[9]   the witness.

[10]   **MR. GITNER:** I think that is the

[11]   procedure.

[12]   Thank you, Ms. Bell.

[13]   **THE WITNESS:** No problem.

[14]   (Witness exited deposition room.)

[15]   **MR. THOMAS:** The only point that I'm

[16]   trying to make, Geoff, is that you are referring

[17]   to the DCMS. You have not established with this

[18]   witness what the DCMS is.

[19]   There are two components, one of which

[20]   is the subject of your copyright complaint.

[21]   That's the DCMS search function.

[22]   This indexing, e-input function, is

Page 21

[1] not the subject of your client's copyright, so in
[2] order to make — if that's the case, then we have
[3] some serious issues.
[4]     MR. GITNER: Well, you will be allowed
[5] to call this witness yourself, and if you want to
[6] clarify anything, you'll have that opportunity.
[7]     This is deposition. I may get to
[8] where you're going. I may not. But you have the
[9] right to call the witness.
[10]     MR. THOMAS: What I'm saying is that
[11] you're wasting this time and you're creating an
[12] incorrect —
[13]     MR. GITNER: This is my time.
[14]     MR. THOMAS: — unfair record.
[15]     MR. GITNER: I've got 16 hours. It's
[16] my time if it's wasted.
[17]     MR. THOMAS: It's not your time. It's
[18] the witness's time that's being wasted and the
[19] court's.
[20]     MS. SCHUTJER: Do you want me to bring
[21] her back?
[22]     (Witness re-entered deposition room.)

Page 22

[1]             BY MR. GITNER:
[2]     Q: We were talking about indexing of
[3] essentially new matter that comes into the office.
[4]     A: Right.
[5]     Q: I understand that, and let me know if
[6] I am accurate here, that the name given to the old
[7] files or the old paper files was the legacy
[8] documents; is that a fair description?
[9]     A: That's one name.
[10]     Q: So what you are talking about would be
[11] documentation that has come in that would not be a
[12] part of the original legacy documents, other new
[13] information, for example, for new employees, new
[14] students; is that correct?
[15]     A: I'm talking about those documents, but
[16] I'm also talking about things that might have come
[17] in from the point at which a contractor stopped
[18] imaging, and we had — we got the capacity to
[19] image, so there is a little bit of a gap there,
[20] so those new documents as well as things that came
[21] in during that interim period.
[22]     Q: My understanding is that at the time

Page 23

[1] that the DCMS went live on December 18, that there
[2] were a certain percentage of the legacy documents
[3] that had already been scanned and indexed into the
[4] system; isn't that correct?
[5]     A: That's correct.
[6]     Q: I have heard anywhere from one-third
[7] to 50 percent; is that a fair approximation?
[8]     A: I don't recall the percentage, but it
[9] was certainly not 100 percent.
[10]     Q: Right. But it was a pretty good or a
[11] substantial amount?
[12]     MR. THOMAS: Objection to form.
[13] You may answer.
[14]     THE WITNESS: I can't recall the
[15] percentage, so I couldn't characterize it as
[16] substantial or not.
[17]             BY MR. GITNER:
[18]     Q: Scanning and indexing continued after
[19] December 18th, correct?
[20]     A: Yes.
[21]     Q: Did that come to a conclusion around
[22] the middle of February?

Page 24

[1]     MR. THOMAS: Objection to form. Lack
[2] of foundation.
[3]     THE WITNESS: I don't recall the
[4] specific date of that, but sometime at the early
[5] part of February it seems to be.
[6]             BY MR. GITNER:
[7]     Q: And was that the bulk of the legacy
[8] documents that had been scanned and indexed in?
[9]     A: Yes.
[10]     Q: Were you then able to retrieve
[11] information out of the scanned and indexed
[12] documents using the DCMS system?
[13]     MR. THOMAS: Objection to form.
[14]             BY MR. GITNER:
[15]     Q: For example, in February and March?
[16]     MR. THOMAS: Same objection.
[17]     THE WITNESS: We were able to retrieve
[18] information from DCMS.
[19]             BY MR. GITNER:
[20]     Q: And you also said that or I take it
[21] that that ability continues today?
[22]     MR. THOMAS: Objection to form.

S4, Inc. d/b/a Richmar & Associates, et al.
George Washington University

Case 1:07-cv-00841-JR   Document 13-7     Filed 06/07/2007     Page 9 of 60

Tanya K. Bell
May 23, 2007

Page 25

[1]                **BY MR. GITNER:**
[2]   **Q:** The ability to retrieve information?
[3]   **A:** We are able to retrieve information
[4] from DCMS.
[5]   **Q:** Is it fair to say, then, that for
[6] information that had been scanned and indexed in
[7] as of December — oh, I remember the question I
[8] wanted to ask. Strike that question.
[9]   **A:** Okay.
[10]   **Q:** The scanning and indexing, was that
[11] done alphabetically? In other words, did they
[12] start with the A's and work down towards the Z's?
[13]   **A:** Essentially.
[14]   **Q:** So am I —
[15]   **A:** Let me qualify that. Essentially for
[16] the Human Resource records. I can't speak to how
[17] the other stakeholder offices' records were, what
[18] the approach was for those records.
[19]   **Q:** So for HR, am I correct that as of
[20] December 18th, you had at least the A's and B's
[21] and C's in the system?
[22]   **A:** I can't say that what was available in

Page 26

[1] the system was a specific part of the alphabet.
[2]   **Q:** But you were able to retrieve
[3] information as of December 18th?
[4]   **A:** We were able to retrieve information.
[5]   **Q:** And that holds true, that you were
[6] able to retrieve information in January, February
[7] and March?
[8]   **A:** That's correct.
[9]   **Q:** You also said that there was another
[10] function that used the DCMS which was researching
[11] information?
[12]   **A:** Correct.
[13]   **Q:** Were you able to research information
[14] as of December 18?
[15]   **MR. THOMAS:** Objection to form.
[16]   **THE WITNESS:** Yes.
[17]                **BY MR. GITNER:**
[18]   **Q:** I take it you are able to research
[19] information today?
[20]   **A:** Yes.
[21]   **Q:** And you have been able to research
[22] information between December, also into January,

Page 27

[1] February, March?
[2]   **A:** Yes.
[3]   **Q:** At some point these other
[4] stakeholders, as you call them, they were able
[5] to likewise commit the same functions, i.e.,
[6] indexing, retrieving and research information?
[7]   **MR. THOMAS:** Objection to form. Lack
[8] of foundation.
[9]   **THE WITNESS:** It would be my
[10] assumption that they have. I don't know that
[11] specifically. I only need to state that on the
[12] basis of their having moved forward and not, I've
[13] not heard them object vehemently.
[14]                **BY MR. GITNER:**
[15]   **Q:** So to the best of your knowledge —
[16]   **A:** If they weren't able to access it, I
[17] would have heard that they couldn't access it, in
[18] other words.
[19]   **Q:** In other words, you know they are
[20] using it, they haven't told you that they can't
[21] use it?
[22]   **A:** They haven't said that they are unable

Page 28

[1] to access it.
[2]   **Q:** The first part of my question is, you
[3] know that they are using it?
[4]   **A:** I know that they're using it
[5] currently, yes.
[6]   **Q:** Have you utilized the Document Only
[7] Search function —
[8]   **MR. THOMAS:** Objection to form.
[9]                **BY MR. GITNER:**
[10]   **Q:** — as part of the DCMS?
[11]   **MR. THOMAS:** Objection to form. Lack
[12] of foundation.
[13]   **THE WITNESS:** I have not. I have
[14] tested the Document Only Search and found it not
[15] to work.
[16]                **BY MR. GITNER:**
[17]   **Q:** When was that?
[18]   **A:** I believe that I tested that as a part
[19] of the user acceptance testing, and I have tested
[20] it subsequent to the initial release, initial
[21] implementation.
[22]   **Q:** What were the circumstances of your

Page 29

[1] first time that you tested it; do you recall what
[2] that date was?
[3]    **A:** No, I do not.
[4]    **Q:** Was that in 2006?
[5]    **A:** It is likely that that would have been
[6] something I would have looked at in 2006.
[7]    **Q:** Can you tell me if it was in the fall
[8] or winter or summer?
[9]    **A:** If it were in 2006, it would have
[10] likely been in — I don't recall having seen
[11] anything in the system prior to November, so it
[12] would have had to have been late.
[13]    **Q:** So you have never utilized, you have
[14] never successfully utilized the Document Only
[15] Search feature of the DCMS; is that correct?
[16]    **A:** No.
[17]    **Q:** Do you know if subsequent to December
[18] 18th, 2006 anyone has sought to implement a
[19] Document Only Search feature into the DCMS?
[20]    **MR. THOMAS:** Objection to form.
[21]    **THE WITNESS:** A document — implement
[22] a Document Only?

Page 30

[1]                  BY MR. GITNER:
[2]    **Q:** Right.
[3]    **A:** I know that as a known issue, the
[4] Document Only Search was an issue to be fixed, and
[5] so it was something that, something on the plate
[6] to be addressed.
[7]    Now, again, I've not — I've not
[8] successfully used that.
[9]    **Q:** My question is, do you know whether
[10] or not anybody after December 18th has sought to
[11] implement, correct, activate, make the thing, make
[12] the Document Only Search work so you can use it?
[13]    **A:** I know that it has been, that there
[14] was consensus that all the known issues and all
[15] the requirements within our project, which
[16] Document Only Search was one, would be addressed,
[17] if not during the initial release, during
[18] subsequent releases.
[19]    So my assumption is that there are
[20] those who would be working on that, as well as any
[21] other fixes.
[22]    **Q:** Your assumption. Do you know who is

Page 31

[1] working on it?
[2]    **A:** No, I do not. I can't tell you anyone
[3] encoded anything for this particular project. I'm
[4] an end user.
[5]    **Q:** So you don't know if anybody on the
[6] staff of GW has modified or altered the DCMS code
[7] to permit the DOS, Document Only Search, function;
[8] is that correct?
[9]    **A:** No. I am on the user side of this
[10] project.
[11]    **Q:** You say you have tried to use the DOS;
[12] is that correct?
[13]    **A:** Yes.
[14]    **Q:** Have you tried to use the DOS since
[15] December 18th, 2006?
[16]    **A:** Yes, and I've not been successful in
[17] having done so.
[18]    **Q:** When was that?
[19]    **A:** I've tried to use that in the last
[20] week, because I was looking for a specific
[21] document.
[22]    **Q:** Was that the first time you tried to

Page 32

[1] use the DOS, was last week?
[2]    **A:** No. I've tried it previously.
[3]    **Q:** When have you tried it previously?
[4]    **A:** I don't recall the exact day, but
[5] certainly since the initial implementation I've
[6] tried it.
[7]    **Q:** Can you be more specific? Between
[8] December 18th and today?
[9]    **A:** No, because I don't recall the day.
[10]    **Q:** Do you recall if it was shortly after
[11] implementation?
[12]    **A:** No. I've likely tried it several
[13] times. Again, I don't use the system on a daily
[14] basis. It's just as needed.
[15]    **Q:** Well, you say you have likely tried
[16] it. Do you have a recollection that you did try
[17] it a number of times?
[18]    **MR. THOMAS:** Objection. Asked and
[19] answered.
[20]    **THE WITNESS:** It is likely, because I
[21] am, as part of my job, I look at a variety of
[22] things over time as staff bring things to me, so

**Page 33**

[1] it is likely that I've looked at that, as well as
[2] — but again, I don't document everything, didn't
[3] know we would end up here today, so I wasn't
[4] taking copious notes.
[5]                BY MR. GITNER:
[6]    **Q:** Well, that's why I am asking, because
[7] likely is not the same as specifically recalling
[8] having done it. It may be custom and practice.
[9]    **A:** I don't recall specifically whether
[10] I did or didn't.
[11]    **Q:** But you do recall last week, at least,
[12] that, you do recall?
[13]    **A:** I do recall having done that.
[14]    **Q:** What were you trying to do last week?
[15]    **A:** I was looking for an open enrollment
[16] document. We could not recall the name of the
[17] individual, so that is one of the reasons why one
[18] would need a Document Only Search.
[19]    **Q:** Can you just tell me what the search
[20] was, what the search entailed?
[21]    **A:** To look for an open enrollment
[22] document.

**Page 34**

[1]    The mechanics of it?
[2]    **Q:** Were you looking for any open
[3] enrollment document?
[4]    **A:** During, you have the ability to put in
[5] there range of time, create date and the name of
[6] the document. If you don't recall, you recall
[7] that documents went in but you don't recall the
[8] name of the individual, that's when you would be
[9] looking for, that's when you would use a Document
[10] Only Search.
[11]    **Q:** You say your staff uses this. You
[12] don't use it that much, but your staff uses it?
[13]    **A:** I use it occasionally when asked for
[14] something specifically or to access information
[15] that they can't access.
[16]    **Q:** How often does your staff utilize the
[17] system, on a daily basis?
[18]    **A:** Daily.
[19]    **Q:** So it has been daily since December
[20] 18th?
[21]    **A:** Unless there was a scheduled outage or
[22] something.

**Page 35**

[1]    **Q:** So they have been able to use it
[2] despite the fact that it doesn't have the Document
[3] Only Search function?
[4]    MR. THOMAS: Objection to form.
[5]                BY MR. GITNER:
[6]    **Q:** Correct?
[7]    **A:** Yes.
[8]    **Q:** So the Document Only Search function
[9] has not been an essential need for them to operate
[10] the DCMS as it exists now, correct?
[11]    MR. THOMAS: Objection to form.
[12]    THE WITNESS: It was a requirement
[13] within the project definition.
[14]                BY MR. GITNER:
[15]    **Q:** I'm not asking that. I'm asking you,
[16] they are able to operate this without the DOS
[17] operating, correct?
[18]    **A:** Yes.
[19]    **Q:** So the system as it is, as it
[20] operates, as it is able to index, retrieve and
[21] research information, it is not essential that the
[22] Document Only Search function works, correct?

**Page 36**

[1]    MR. THOMAS: Objection to form.
[2]                BY MR. GITNER:
[3]    **Q:** It's not indispensable?
[4]    MR. THOMAS: Objection to form.
[5]    THE WITNESS: In order for the system
[6] to operate in an optimal way, it should have the
[7] things that are required.
[8]    It is not essential for your car to
[9] have air conditioning, however —
[10]                BY MR. GITNER:
[11]    **Q:** It still runs?
[12]    **A:** Correct.
[13]    **Q:** Okay.
[14]    **A:** However, this weekend when it's 90
[15] degrees —
[16]    **Q:** So what you're telling me is it would
[17] be more convenient if it had the Document Only
[18] Search?
[19]    **A:** I'm a user, so my goal is to make it
[20] as user friendly and as useful for the user as
[21] possible.
[22]    **Q:** Would you say that you're —

Page 37

[1]    **MR. THOMAS:** Geoff —

[2]    **MR. GITNER:** I'm sorry.

[3]    **MR. THOMAS:** This is the third time

[4] you have done that.

[5]    **MR. GITNER:** You're right.

[6]                **BY MR. GITNER:**

[7]    **Q:** Go ahead. I apologize.

[8]    **A:** I'm done.

[9]    **Q:** I'm sorry. Go ahead.

[10]   **A:** I'm done.

[11]   **Q:** All right. Would you say it is fair

[12] that GW staff has used the DCMS system since

[13] December 18th hundreds of times?

[14]   **MR. THOMAS:** Objection to form.

[15]                **BY MR. GITNER:**

[16]   **Q:** If not thousands of times?

[17]   **MR. THOMAS:** Objection to form. Still

[18] lack of foundation as to what it is or the system

[19] is.

[20]    But you may answer.

[21]   **THE WITNESS:** You are referring to

[22] DCMS?

Page 38

[1]                **BY MR. GITNER:**

[2]    **Q:** Yes.

[3]    **A:** I would say that that's fair to say

[4] that it has been used in excess of that.

[5]    **Q:** Thank you. I take it you haven't run

[6] any reports with the DOS?

[7]    **A:** Was that a question?

[8]    **Q:** Yes. I'm sorry. Have you run any,

[9] since you told me that you — let me ask, have you

[10] run any reports using the Document Only Search

[11] function?

[12]   **A:** I have been provided with activity

[13] reports.

[14]   **Q:** By using the Document Only Search

[15] function?

[16]   **A:** I'm sorry. Document Only Search?

[17]   **Q:** Yes.

[18]   **A:** No. No. No. No. I'm sorry. I

[19] misunderstood the question. Could you restate the

[20] question? I'm sorry.

[21]   **Q:** Sure. Have you run any reports,

[22] printed out any reports, utilizing the Document

Page 39

[1] Only Search function?

[2]    **A:** No. No.

[3]    **Q:** Have you been able to run reports

[4] using the DCMS function, DCMS system?

[5]    **A:** I've had reports provided to me

[6] regarding DCMS activity.

[7]    **Q:** Can you just give me a sampling of

[8] what those reports are, the types of reports?

[9]    **A:** They are simply activity reports that

[10] identify usage, types of documents, who imaged,

[11] who created. Those are the types of reports,

[12] very basic reports.

[13]   **Q:** Do you have a list of users of the

[14] DCMS system, or do you know if one exists?

[15]   **A:** There is a list of users that is

[16] maintained.

[17]   **Q:** I'm sorry. I missed that.

[18]   **A:** There is a list of users.

[19]   **Q:** Who would have that? Would you have

[20] that?

[21]   **A:** No, I don't maintain that.

[22]   **Q:** Do you know who does?

Page 40

[1]    **A:** The ISS Department would maintain that

[2] list.

[3]    **Q:** Are you able to do employee and

[4] document searches on the DCMS?

[5]    **A:** I don't recall having attempted an

[6] employee and document search.

[7]    **Q:** Can you describe to me what an

[8] employee and document search is?

[9]    **A:** An employee and document search would

[10] include specific data with employee attributes, as

[11] well as document attributes.

[12]   **Q:** Can you name the people on your staff

[13] who have used the DCMS system most, who have used

[14] it the most since December 18th? In other words,

[15] can you tell me who those people are, sort of the

[16] person who has used it the most and sort of rank

[17] it that way?

[18]   **A:** Yes.

[19]   **Q:** Okay. Who would those be?

[20]   **A:** They would, on my staff specifically,

[21] it would be the Document Imaging Specialists.

[22]   **Q:** What are their names?

CU84, Inc. v. Richman & Associates, et al.
George Washington University

Case 1:07-cv-00841-JR   Document 13-7   Filed 06/07/2007   Page 13 of 60

Tanya K. Bell
May 23, 2007

Page 41

[1] **A:** Norine Ruffin and Stephanie Wingate.

[2] **Q:** Have they been there the entire time,
[3] from December through now?

[4] **A:** No.

[5] **Q:** Are both of them still at GW?

[6] **A:** Yes.

[7] **Q:** When did they come on board?

[8] **A:** One began late December, one began in
[9] February.

[10] **Q:** Did you have somebody else between
[11] December and February that is no longer there or
[12] transferred?

[13] **A:** Yes. I had one person.

[14] **Q:** And who was that?

[15] **A:** Suzanne Davis.

[16] **Q:** What happened to Suzanne?

[17] **A:** She went back to her prior employer.

[18] **Q:** Who was her prior employer; do you
[19] know?

[20] **A:** I don't recall the name right at the
[21] moment, but —

[22] **Q:** Do you know where Ms. Davis lives?

Page 42

[1] **A:** We have that information in her record
[2] as part of her application.

[3] **Q:** Just offhand, do you recall where she
[4] lives?

[5] **A:** I know she lives in Prince George's
[6] County. Beyond that, I don't know.

[7] **Q:** Is she married; do you know?
[8] About how old was she?

[9] **MR. GITNER:** I think she is saying no.

[10] **BY MR. GITNER:**

[11] **Q:** You don't know whether she is married?

[12] **A:** I don't know what her marital status
[13] is.

[14] **Q:** What about her age, approximately?

[15] **A:** I don't know what her age is, either.

[16] **Q:** Young? Old? Middle? Gray hair, like
[17] me?

[18] **A:** I don't know. I don't know.

[19] **Q:** No idea about her age?

[20] **A:** I don't recall.

[21] **Q:** The list that ISS has would show the
[22] people in the other departments that are DCMS

Page 43

[1] users?

[2] **A:** Yes.

[3] **Q:** How long a list do you think that is,
[4] 30? 50?

[5] **A:** I don't know.

[6] **Q:** Where are you physically located, your
[7] office? Are you on K Street?

[8] **A:** I am.

[9] **Q:** What is it, 21-something K Street?

[10] **A:** 2033.

[11] **Q:** 2033. Is that where all the paper
[12] personnel files, HR files, are kept?

[13] **A:** That's where all the Human Resource
[14] files are.

[15] **Q:** Is there any plan to move those paper
[16] files?

[17] **A:** Yes.

[18] **Q:** Can you tell me what that plan is?

[19] **A:** The plan is to move the files.

[20] **Q:** To Iron Mountain, Closed Storage,
[21] Wauburn?

[22] **A:** Right now we're still in the process

Page 44

[1] of validating the success of the back scan effort,
[2] the legacy documents. So until we can complete
[3] that, we have not made a final determination about
[4] that move.

[5] **Q:** Tell me what the plan is, though. Is
[6] the plan to move those legacy documents off-site?

[7] **MR. THOMAS:** I'm going to object to
[8] form on this entire line of questioning, because
[9] it has no relevance at all. You've gone about 45
[10] minutes now. You have asked about three questions
[11] that are relevant to your motion for a preliminary
[12] injunction, which is the subject of today's
[13] deposition.

[14] **MR. GITNER:** I'm going to object to
[15] any speaking objection. If you want to object to
[16] the form, you can. I think it is well known that
[17] that is all you are allowed to do. If you want to
[18] do anything more than that, I think you should ask
[19] your witness to leave.

[20] **BY MR. GITNER:**

[21] **Q:** Can you tell me what the plan is to
[22] move those legacy documents off-site?

CUSA, Inc. v. B. Richman & Associates, et al.
George Washington University

Case 1:07-cv-00841-JDB   Document 13-7   Filed 06/07/2007   Page 14 of 60

Tanya K. Bell
May 23, 2007

Page 45

[1]  **A:** Yes.
[2]  **Q:** Has there been a time or do you have
[3]  a time frame of when that's going to happen?
[4]  **A:** No. Again, right now we have to
[5]  validate the success of the back scan, the legacy
[6]  documents and having gotten into DCMS before we
[7]  can make a determination and finalize a time line
[8]  to move those records.
[9]  **Q:** Is the idea to move those records
[10] essentially to a closed status?
[11]  **A:** That is correct.
[12]  **Q:** Is there any effort ongoing to
[13] validate that the legacy documents have been
[14] duplicated electronically?
[15]  **A:** Yes.
[16]  **Q:** Can you tell me what that process
[17] is?
[18]  **A:** I have a staff member who is
[19] reviewing, doing a random sampling of paper files
[20] vis-a-vis DCMS to ensure that documents are in the
[21] system.
[22]  **Q:** What is that person's name?

Page 46

[1]  **A:** Vicky Baker.
[2]  **Q:** How long has she been doing that?
[3]  **A:** We just started this process maybe a
[4]  month ago.
[5]  **Q:** So in April?
[6]  **A:** Yes.
[7]  **Q:** Can you tell me how that came about,
[8]  who instigated that idea?
[9]  **A:** I —
[10]  **MR. THOMAS:** I'm going to object to
[11] the form. The status of the back scan project is
[12] the subject of your contract claim, which is not
[13] the subject of today's deposition.
[14]     I'm going to instruct the witness not
[15] to answer any additional questions with respect —
[16]  **MR. GITNER:** You can't instruct her
[17] not to answer. This is a deposition.
[18]  **MR. THOMAS:** I just did.
[19]  **MR. GITNER:** You did?
[20]  **MR. THOMAS:** Yes. And I'm happy to
[21] move the court for a protective order, because the
[22] subject of this deposition is limited discovery

Page 47

[1]  related to your copyright —
[2]  **MR. GITNER:** Well, then I think you
[3]  should move the court for a protective order,
[4]  because that's what you have to do. Are you
[5]  prepared to do that now?
[6]  **MR. THOMAS:** I am prepared to do that
[7]  if you continue to ask questions that are
[8]  irrelevant to your —
[9]  **MR. GITNER:** I'm going to ask my
[10] questions. Are you going to do that now?
[11]  **MR. THOMAS:** We can do that for the
[12] rest of the day.
[13]  **MR. GITNER:** You're telling me you are
[14] going to file a protective order, right? I'm not
[15] filing a motion to compel. You have to file the
[16] protective order.
[17]  **MR. THOMAS:** You can ask your
[18] questions.
[19]  **MR. GITNER:** Are you going to file a
[20] protective order or not? We'll adjourn the
[21] deposition. That's how the procedure works.
[22]  **MR. THOMAS:** If you want to adjourn

Page 48

[1]  the deposition because —
[2]  **MR. GITNER:** For you to file your
[3]  protective order. Go ahead.
[4]  **MR. THOMAS:** — because I've
[5]  instructed the witness not to answer questions
[6]  with respect to the status of the back scan
[7]  project —
[8]  **MR. GITNER:** Then go file your
[9]  protective order and we'll have her back here,
[10] either that or she answers the question. It's one
[11] or the other. You don't get to do that. Now, you
[12] tell me what you want to do. You think about it.
[13]  **MR. THOMAS:** It's your deposition. If
[14] you want to adjourn it, you can adjourn it.
[15]  **MR. GITNER:** Are you going to file for
[16] your protective order?
[17]  **MR. THOMAS:** It's your deposition. If
[18] you want to adjourn it, you can adjourn it.
[19]  **MR. GITNER:** Sir, please tell me if
[20] you're going to file for your protective order.
[21]  **MR. THOMAS:** I have told you the
[22] status of it. I don't have anything else to say,

Page 49

[1] Mr. Gitner.

[2] **MR. GITNER:** It's a yes or no

[3] question. Are you filing for a protective order

[4] or not? I'm not going to have you sit here and

[5] tell her what she can and can't answer. There is

[6] plenty of case law on that. Do I have to file for

[7] sanctions? Are you going to file your motion for

[8] a protective order? That's all I'm asking you.

[9] **MR. THOMAS:** I will file a motion for

[10] a protective order with respect to this witness

[11] answering questions concerning your copyright

[12] claim, yes. I am prepared to move the court for

[13] a protective order —

[14] **MR. GITNER:** And you're going to do

[15] that as soon as we finish this deposition?

[16] **MR. THOMAS:** I'm going to do that in

[17] due course within what the rules require.

[18] **MR. GITNER:** What rule, sir? What

[19] rules are you referring to?

[20] **MR. THOMAS:** Federal Rules of Civil

[21] Procedure.

[22] **MR. GITNER:** Are you familiar with the

Page 50

[1] Prentiss Hall case? Are you familiar with the

[2] Prentiss Hall case?

[3] **MR. THOMAS:** Geoff, if you want to

[4] talk about this, we can talk about it off the

[5] record.

[6] **MR. GITNER:** No. I'm not going to

[7] have you tell me what I can ask and can't ask.

[8] We'll go to court. File your protective order,

[9] and it better be filed by today because if it's

[10] not, I'm going for sanctions.

[11] **MS. SCHUTJER:** I think you can go off

[12] the record.

[13] (Brief recess.)

[14] **MR. GITNER:** Let me make my record.

[15] I have asked Mr. Thomas if he is

[16] prepared to move for a protective order, which is

[17] his right if he feels that this deposition is

[18] being used for some inappropriate manner.

[19] The rules are clear. My understanding

[20] of the rules is that he may not instruct the

[21] witness not to answer a question unless it is

[22] privileged or it is meant for harassment or

Page 51

[1] humiliation.

[2] Mr. Thomas has refused to commit to

[3] adjourning the deposition until he can file for a

[4] protective order. He refuses to tell me whether

[5] he will or not.

[6] I believe that this is interfering

[7] with my deposition. I also believe that this is

[8] going to set the tone for the depositions to

[9] follow, which, I might add, the Defendant has

[10] not been very cooperative in setting with me, so

[11] we still haven't had Mr. Bonig's deposition.

[12] Unless he can tell me what he is

[13] prepared to do, I guess I'm going to have to

[14] go call the court and move for sanctions for

[15] interfering in my deposition, for him determining

[16] what is relevant or not, which is improper.

[17] Do you want to take a position and

[18] tell me what you're going to do? Because if

[19] you're not going to tell me what to do, I am going

[20] to go to court.

[21] **MR. THOMAS:** The parties agreed in

[22] advance of the depositions that the depositions

Page 52

[1] would be limited to the issues raised by the

[2] Plaintiff's motion for a preliminary injunction

[3] concerning its copyright infringement claim —

[4] **MR. GITNER:** Will you please —

[5] **MR. THOMAS:** — period.

[6] **MR. GITNER:** Will you please excuse

[7] the witness while this is going on?

[8] (Witness exited deposition room.)

[9] **MR. GITNER:** Thanks.

[10] **MR. THOMAS:** The line of questions

[11] concerning the status of a back scanning project

[12] concerns the Plaintiff's contract claim and has

[13] no likelihood to move to admissible evidence or

[14] evidence concerning the copyright claim or the

[15] issues involved in the preliminary injunction.

[16] We should not take up the witness'

[17] time or counsel's time or the court's time —

[18] **MR. GITNER:** And your defense is that

[19] this is an essential, that the DOS is an essential

[20] adaptation; isn't that your defense?

[21] I believe it is relevant to show that

[22] they have already made plans to get rid of the

---

Page 53

[1] legacy documents because they don't need the DOS
[2] to operate this, and that goes directly to your
[3] defense.
[4]     Are you prepared to withdraw your
[5] instruction?
[6]     **MR. THOMAS:** I have stated my position
[7] on the record that the status of the back scanning
[8] project has no relevance whatsoever.
[9]     **MR. GITNER:** I just gave you my
[10] interpretation of relevance, that your defense
[11] is that it is an essential step under 117 to use
[12] this program, that they have to have the Document
[13] Only Search capability, and this question goes
[14] specifically to show that they don't need the
[15] Document Only Search capability.
[16]     It shows that they have already made
[17] plans to move the legacy documents off-site.
[18] Therefore, they don't need, she just said she
[19] doesn't use the Document Only Search capability,
[20] that the idea behind this whole project was to
[21] replicate the legacy documents in electronic form
[22] so they can use them.

Page 54

[1]     So if they don't need the paper on
[2] site, obviously, they don't need the Document Only
[3] Search as an essential component.
[4]     Now, I don't know how it could be more
[5] relevant to your defense. Do you want to think
[6] about it? I would rather just go on with the
[7] deposition. I don't need to file any more
[8] motions.
[9]     **MR. THOMAS:** I am happy to proceed
[10] with the deposition.
[11]     **MR. GITNER:** Are you going to withdraw
[12] your instruction? And if you're not, then file
[13] for a protective order if you feel that strongly
[14] about it. That's the procedure.
[15]     **MR. THOMAS:** We can have the question
[16] reread and I will give it one additional thought,
[17] but we're not taking discovery into the contract
[18] claim as part of the preliminary injunction.
[19]     **MR. GITNER:** Well, what you might
[20] think is part of the contract claim is not what
[21] I believe is part of the contract claim, and it
[22] is my time and I really need to know whether

Page 55

[1] or not you're going to interfere with these
[2] depositions.
[3]     Because I have the right to conduct
[4] them and not have you sit there and try to channel
[5] it down a path that you would like.
[6]     **MR. THOMAS:** I'm done stating my
[7] objections within the rules. If you want to go
[8] off the record, I will review the objection, and
[9] if not, we can adjourn the deposition.
[10]     **MR. GITNER:** I would like you to, to
[11] be honest, I would like you to read the Prentiss
[12] Hall case. I would rather not file any motions.
[13] I will get you a copy of the case, if you would
[14] like. I just want to get this thing done.
[15]     **MR. THOMAS:** Geoff, I'm happy to sit
[16] here and let you make speeches on the record as
[17] long as you want to.
[18]     **MR. GITNER:** No. These aren't
[19] speeches. I'm trying to get it so that we can
[20] proceed, that my client has a right to pursue this
[21] case and not be interfered.
[22]     You decide what you want to do. I'll

Page 56

[1] give you five minutes. Let me know. I'll step
[2] outside.
[3]     Off the record.
[4]     (Brief recess.)
[5]     (Witness re-entered deposition room.)
[6]     (The record was read by the reporter
[7] as follows:
[8]     **Question:** Is there any effort
[9] ongoing to validate that the legacy documents
[10] have been duplicated electronically?
[11]     **Answer:** Yes.
[12]     **Question:** Can you tell me what
[13] that process is?
[14]     **Answer:** I have a staff member who
[15] is reviewing, doing a random sampling of paper
[16] files vis-a-vis DCMS to ensure that documents
[17] are in the system.
[18]     **Question:** What is that person's
[19] name?
[20]     **Answer:** Vicky Baker.
[21]     **Question:** How long has she been
[22] doing that?

---

CUS4, Inc. d/b/a Richman & Associates, et al.   v.
George Washington University

Tanya K. Bell
May 23, 2007

Page 57

[1] **Answer:** We just started this process
[2] maybe a month ago.
[3] **Question:** So in April?
[4] **Answer:** Yes.
[5] **Question:** Can you tell me how
[6] that came about, who instigated that idea?)
[7]
[8]                    **BY MR. GITNER:**
[9] **Q:** Who instigated that idea?
[10] **A:** Tanya Bell.
[11] **Q:** And why did you do that?
[12] **A:** As a part of any kind of process where
[13] we're transitioning this much information, as the
[14] custodian of records, I have to ensure that what
[15] is in, what is told to me is in the system is in
[16] the system.
[17]      In the process, we have found at least
[18] one box of information that was supposed to be in
[19] the system not to be in the system, and we've had
[20] to go back.
[21]      So we found that this, because we have
[22] to ensure that we have these records, particularly

Page 58

[1] our I-9 records and things that we are accountable
[2] for having where there is much scrutiny, it was
[3] myself who instigated this.
[4]      The timing of it in April is purely
[5] random. We just haven't had a chance to get to it
[6] with all the other projects that we're engaged in.
[7]      The person that is working with me on
[8] this is a temp who works on various projects in
[9] the office. I don't have assigned staff to be
[10] able to do this validation, so this person is
[11] working with me to help us to do this so that we
[12] can transition these documents off-site.
[13]      But because I'm the responsible party,
[14] even though our contractor has worked with us to
[15] get these in, it's still my responsibility to
[16] ensure that what has been told to me is in the
[17] system is in the system, so we have to do a check.
[18]      We've got millions of documents that
[19] can't be done in short order.
[20] **Q:** Has she been able to find documents
[21] in the DCMS to validate?
[22] **A:** Yes.

Page 59

[1] **Q:** They were back scanned?
[2] **A:** Yes.
[3] **Q:** When did you find this box was
[4] missing?
[5] **A:** In the course of her search about a
[6] month ago, we were doing reviews for I-9s.
[7] **Q:** Who found a box to be missing?
[8] **A:** The box wasn't missing. The box of
[9] information had not been scanned.
[10] **Q:** I'm asking you who found that.
[11] **A:** Vicky Baker.
[12] **Q:** Oh, she found that out?
[13] **A:** Yes.
[14] **Q:** Once she started doing the validation
[15] process?
[16] **A:** Yes. So a box was missed.
[17] **Q:** So prior to that, you hadn't had any
[18] notice that any information had been missing?
[19] **A:** No.
[20] **Q:** Did you seek approval to hire Ms.
[21] Baker?
[22] **A:** Ms. Baker was already on staff as a

Page 60

[1] temporary staff. She just —
[2] **Q:** Is she a member of ISS?
[3] **A:** No, she's not.
[4] **Q:** What is she a member of?
[5] **A:** She works in Human Resource Services
[6] as a temporary employee and has worked for the
[7] University essentially for the past 30 years.
[8] **Q:** I take it, though, prior to her
[9] seeking to validate the documents were there by
[10] utilizing the system and others utilizing the
[11] system, you were able to validate that back
[12] scanned documents were on the DCMS?
[13] **A:** Right, for select documents of which
[14] I have thousands and thousands of records.
[15] **Q:** And you didn't need the Document Only
[16] Search function to be activated in order to do
[17] that, did you?
[18] **MR. THOMAS:** Objection to form.
[19] **THE WITNESS:** Not for the type of
[20] review that we were doing for that particular
[21] exercise, no.
[22]                    **BY MR. GITNER:**

CUS4, Inc. d/b/a Richmar & Associates, et al. v.
George Washington University
Case 1:07-cv-00841-JR    Document 13-7    Filed 06/07/2007    Page 18 of 60
Tanya K. Bell
May 23, 2007

Page 61

[1]    **Q:** I was asking you, when did you or when
[2] did the plan formulate to move the legacy
[3] documents off-site?
[4]    **A:** The formal, there is no formal plan.
[5] There is just the knowledge that that needs to be
[6] done.
[7]        The paper files are taking up space.
[8] Space equals money, and we don't have the money to
[9] keep that square footage on K Street, which is
[10] expensive.
[11]        So the goal has always been to reduce
[12] the, reduce the amount of space taken up by paper
[13] files and at the same time, that's why I said a
[14] while ago a goal of the project was to image the
[15] records. Another goal was to reduce the amount
[16] of space that we consume as a department.
[17]    **Q:** Have any actions been taken to
[18] implement that goal, including, for example,
[19] locating where you're going to move the legacy
[20] documents, what you're going to do with the space
[21] in which the legacy documents presently exist,
[22] where you're going to get the money to move the

Page 62

[1] documents? Have any actions been taken to
[2] implement the goal of moving the legacy documents?
[3]    **A:** No, because again — we have a
[4] standing contract with off-site storage, so if we
[5] chose to move those documents to storage, that
[6] exists. So it is not a matter of creating a new
[7] arrangement.
[8]    **Q:** Is there any paper, is there any
[9] documentation, electronic or hard copy, that would
[10] show that there is an estimated date or a goal of
[11] when to move the hard core documents, the legacy
[12] documents?
[13]    **A:** Not that I'm aware of.
[14]    **Q:** You also testified that one of the
[15] uses that you made of the DCMS was to replace the
[16] paper files, do you recall that, or a use that you
[17] are making?
[18]    **A:** To replace the paper files?
[19]    **Q:** Yes.
[20]    **A:** A goal of the project was to provide
[21] an electronic version of the files. I would deem
[22] that to be a goal of the project.

Page 63

[1]    **Q:** What other goals were there?
[2]    **A:** Again, to reduce the amount of space
[3] taken up by the paper files, to create a central
[4] repository, to be able to organize the documents
[5] in a coherent fashion, logical order, segregable
[6] based upon business necessity, secured way.
[7]    **Q:** Do you need a Document Only Search
[8] function to carry out those goals?
[9]    **A:** No, you do not. However, a Document
[10] Only Search does facilitate the ability to
[11] retrieve documents in the system in an optimum
[12] way, should you have the need to retrieve
[13] documents in that way.
[14]    **Q:** Again, you have no information,
[15] personal knowledge of whether or not anyone has
[16] sought to modify the source code, the program
[17] code, since December 18th, 2006?
[18]    **A:** No. I have no personal knowledge of
[19] anything having to do with the modification of
[20] code.
[21]    **Q:** Have you heard? Do you have any
[22] hearsay information, second-hand information?

Page 64

[1]    **MR. THOMAS:** Objection to form.
[2]    **THE WITNESS:** Information regarding —
[3]            **BY MR. GITNER:**
[4]    **Q:** Any modifications to the source code
[5] for the DCMS since December 18th.
[6]    **A:** The only thing that I know for certain
[7] is that there was a list of known issues and that
[8] known issues were to be addressed subsequent to
[9] the initial implementation.
[10]    **Q:** Do you know if there was an agreement
[11] between Richmar and GW that the Document Only
[12] Search function would not be included in the first
[13] release?
[14]    **A:** I don't recall specifically, no.
[15]    **Q:** Do you recall anything generally?
[16]    **A:** I don't recall generally, either.
[17]    **Q:** Do you know whether or not the
[18] Document Only Search function was supposed to be
[19] included in the first release as of December of
[20] 2006?
[21]    **A:** I know that the Document Only Search
[22] was a requirement in the original requirements

Page 65

[1] document. I can't recall specifically as of the
[2] initial implementation.
[3]    **Q:** Whether it was included in the
[4] requirements as of that date?
[5]    **A:** Right. Right.
[6]    **Q:** You say you can't recall. Did you
[7] know at some point?
[8]    **A:** I can't — presumably.
[9]    **Q:** You mean as part of these groups, that
[10] would be something you would have known —
[11]    **A:** Right.
[12]    **Q:** — but maybe you forgot?
[13]    **A:** Right.
[14]    **MR. THOMAS:** Let him finish his
[15] questions before you answer. It assists the court
[16] reporter.
[17]              **BY MR. GITNER:**
[18]    **Q:** Do you recall a problem in activating
[19] — can I call it the DOS so we know what that
[20] means, the Document Only Search?
[21]    **A:** I prefer for you to call it the whole
[22] name, because DOS to me means dos.

Page 66

[1]    **Q:** If you prefer, that's fine. We don't
[2] want to go back to dos, do we?
[3]    **A:** No, we don't.
[4]    **Q:** Do you recall a problem with the
[5] Document Only Search function was the security
[6] component?
[7]    **A:** I don't recall why the Document Only
[8] Search wouldn't have worked. Again, my focus,
[9] because I'm extremely busy, is on the user side
[10] and so if something isn't working, I really don't
[11] need to know the mechanics of it and why it
[12] doesn't work. I just, that's not my focus.
[13]    **Q:** Have your employees reported
[14] satisfaction with the DCMS system?
[15]    **MR. THOMAS:** Objection to form.
[16]    **THE WITNESS:** Are you speaking of the
[17] scan part of the system or the retrieval part of
[18] the system?
[19]              **BY MR. GITNER:**
[20]    **Q:** Let's try the retrieval part of the
[21] system.
[22]    **A:** Could you restate the question?

Page 67

[1]    **Q:** Have your employees expressed
[2] satisfaction with the system?
[3]    **MR. THOMAS:** Objection to form.
[4]    **THE WITNESS:** Have they expressed
[5] satisfaction with the retrieval part?
[6]              **BY MR. GITNER:**
[7]    **Q:** Correct.
[8]    **A:** Of the document system?
[9]    **Q:** Yes.
[10]    **A:** I don't know if I would characterize
[11] it as satisfaction. I think I would characterize
[12] it as adequate.
[13]    **Q:** Have they expressed any preference in
[14] using DCMS over Banner?
[15]    **MR. THOMAS:** Objection to form.
[16]    **THE WITNESS:** Again, the difference
[17] between — are you talking about the scan piece or
[18] the —
[19]              **BY MR. GITNER:**
[20]    **Q:** Retrieval piece.
[21]    **A:** — retrieval piece?
[22]        Yes. They have expressed some

Page 68

[1] preference in the layout of data.
[2]    **Q:** Easier to use?
[3]    **A:** I wouldn't say it's easier to use. I
[4] think it's the layout of the information is in one
[5] place as opposed to multiple places.
[6]    **Q:** More user friendly?
[7]    **A:** Some might say that.
[8]    **Q:** Do you recall having a meeting with
[9] Mr. Gordon, Richard Gordon, in December and
[10] January?
[11]    **MR. THOMAS:** December 2006 and January
[12] 2007?
[13]    **MR. GITNER:** Correct. Right.
[14]    **THE WITNESS:** A meeting with Mr.
[15] Gordon?
[16]              **BY MR. GITNER:**
[17]    **Q:** Yes. Just you and Mr. Gordon?
[18]    **A:** No. I might have talked to him in
[19] passing or something.
[20]    **Q:** Do you remember meeting with him in
[21] your conference room?
[22]    **A:** I might have sat down to talk with

Page 69

[1] him briefly. Oh, yes, I do recall that. The
[2] substance of the conversation I don't, however.
[3]      Q: Do you recall telling him that your
[4] employees were happy with the system?
[5]      A: Happy with the system. Pleased with
[6] the system. I don't recall the specific language
[7] used. I might have indicated that they thought it
[8] was user friendly.
[9]      Q: That they preferred using, do you
[10] recall telling him that your employees preferred
[11] using the DCMS system to the Banner system?
[12]      A: That I recall in terms of the layout
[13] of the information, yes, because the layout of
[14] the information brings together in one format
[15] information that is available in multiple places
[16] in Banner.
[17]      Q: Do you recall telling him that there
[18] were no complaints from your employees about the
[19] DCMS?
[20]      MR. THOMAS: I'm going to object to
[21] form. Again, I'm going to be interested to see
[22] how this relates to your copyright infringement

Page 70

[1] claim.
[2]      But in any event, Ms. Bell, you can
[3] answer the question.
[4]      THE WITNESS: I don't recall that
[5] language specifically.
[6]      BY MR. GITNER:
[7]      Q: Do you recall discussing with Mr.
[8] Gordon that he was catching flack from Mr. Bonig
[9] and wanted Mr. Katz to know that the system worked
[10] fine?
[11]      A: No, not specifically. I don't
[12] remember that specifically.
[13]      Q: Do you have a general recollection of
[14] discussing Mr. Bonig and Mr. Katz?
[15]      A: I remember sitting in the conference
[16] room talking to Mr. Gordon, because he showed up
[17] on our doorstep.
[18]      Q: Do you recall in that conversation
[19] Mr. Bonig's name coming up?
[20]      A: Not specifically.
[21]      Q: Mr. Katz's name coming up?
[22]      A: Not specifically.

Page 71

[1]      Q: Do you recall discussing any
[2] frustrations you and Mr. Gordon were having with
[3] this project?
[4]      A: Not specifically.
[5]      Q: Do you recall having any conversations
[6] with Mr. Gearing about your frustration in
[7] developing the requirements for the DCMS, James
[8] Gearing?
[9]      A: Developing the requirements?
[10]      Q: Right.
[11]      A: No, I don't.
[12]      Q: Do you recall having discussions with
[13] Mr. Gearing and Mr. Gordon in which you expressed
[14] the sentiment that ISS should allow you to meet
[15] directly with Richmar so that you could give them
[16] your direct input instead of going through ISS?
[17] Did you ever have that conversation?
[18]      MR. THOMAS: Objection to form.
[19]      THE WITNESS: I don't remember that
[20] language specifically. I may have articulated a
[21] desire to get the requirements done or get,
[22] articulate the user requirements by whatever

Page 72

[1] means.
[2]      BY MR. GITNER:
[3]      Q: Did you ever articulate to Mr. Gordon
[4] or Mr. Gearing a frustration with the development
[5] of the requirements list?
[6]      A: I don't recall that.
[7]      Q: Do you deny it, that it occurred?
[8]      MR. THOMAS: Objection.
[9]      BY MR. GITNER:
[10]      Q: Or you just don't recall?
[11]      A: I don't recall it.
[12]      Q: So you're not ruling out the
[13] possibility that a conversation occurred; is that
[14] correct?
[15]      MR. THOMAS: Objection. Asked and
[16] answered.
[17]      You can answer.
[18]      THE WITNESS: I don't recall it.
[19]      BY MR. GITNER:
[20]      Q: Mr. Swartz, what is his first name,
[21] Dave?
[22]      A: Dave.

Page 73

Q: The prior C —
A: CIO?
Q: — CIO, was it his opinion that there should be direct communications between you and Richmar?
A: I have no idea.
Q: Did you ever have any discussions with Mr. Gearing in which you discussed that you thought that the delivery schedule was unreasonable?
MR. THOMAS: Objection to form. Delivery schedule for what?
MR. GITNER: The schedule for delivery of the DCMS.
THE WITNESS: Yes.
BY MR. GITNER:
Q: Can you tell me, was there more than one conversation, or do you recall?
A: I don't recall. I recall a conversation. I don't recall the specifics of it.
Q: Do you recall when that was?
A: No.

Page 74

Q: Was it in 2006 or 2007?
A: No.
Q: But the gist of it was your belief that the delivery schedule was unreasonable?
MR. THOMAS: Objection to form. Asked and answered.
THE WITNESS: Yes.
MR. GITNER: Let me have this marked as Plaintiff's Exhibit Number 1.
(Thereupon, Plaintiff's/Bell Deposition Exhibit Number 1 was marked for identification.)
BY MR. GITNER:
Q: Ms. Bell, could you kindly take a look at Exhibit Number 1, take a look at it and familiarize yourself with that document?
(Witness reviewed document.)
BY MR. GITNER:
Q: Are you ready? Are you familiar with this document?
A: No, not specifically.
Q: On the third page it indicates that

Page 75

you were a Steering Committee attendee. Do you recall this meeting?
A: Absolutely not.
Q: Do you know who would have prepared this document?
A: The format is an ISS format, so I don't know who specifically.
Q: Who was the project manager for ISS at this time?
A: Marcy Day.
Q: What was Christina Griffin's position?
A: I don't quite know.
Q: If you look on the second page under Agenda, the second line says, Issues/Risks with Development.
A: Uh-huh.
Q: Can you tell me what the risks were with the development?
A: I cannot speak to much of this because, one, I can't recall the meeting, and, two, although it indicates that I was an attendee, I can't remember — there were many, many, many

Page 76

meetings, so I cannot speak to a specific meeting, meaning —
Q: Do you recall — were you finished? I'm sorry.
A: I can't speak to the content of any specific meeting on a particular date such as this.
Q: Putting aside particular dates, do you recall what the risks were with development that were addressed by the Steering Committee or discussed about the DCMS project?
A: No.
MR. THOMAS: Objection to form.
THE WITNESS: No, I do not recall.
BY MR. GITNER:
Q: Do you have any recollection of what the risks were with back scanning?
A: No, I do not.
Q: If you go to the fourth page, it says Development Issues/Risks, and under the first bullet, it says Requirements Document Addendum. Do you have any information as to what that means?

Page 77

[1] **A:** I don't recall what was covered in the

[2] addendum.

[3] **Q:** Do you recall whether or not Mr. Bonig

[4] ever signed a Requirements Document Addendum?

[5] **A:** No, I don't know.

[6] **Q:** Do you recall whether or not he

[7] refused to sign a Requirements Document Addendum?

[8] **A:** I have no knowledge of that.

[9] **Q:** Would you have ever known about that,

[10] it is just that you don't recall?

[11] **A:** I don't know whether it was presented

[12] to him for signature. I don't know whether he

[13] refused to sign it. I don't know what his

[14] knowledge of an addendum was.

[15] **Q:** Would you not have had to also sign

[16] the requirements document?

[17] **A:** In most cases, I would have, but I

[18] don't recall at this particular moment. The only

[19] way I would have known about Ron's exposure to

[20] this is if I saw his signature on the document,

[21] which I don't recall.

[22] **Q:** Do you recall whether he signed any

Page 78

[1] requirements documents?

[2] **A:** I recall having signed project

[3] definition documents, but I don't recall the

[4] dates.

[5] **Q:** Ms. Bell, if you would go back to the

[6] third page, which shows the attendees, it shows

[7] Dave Swartz as an attendee. I take it that in

[8] October, he was still the CIO?

[9] **A:** Yes.

[10] **Q:** Do you know when he left? I'm not

[11] asking for the exact date, but approximately.

[12] **A:** I want to say it was December. I

[13] think it was December or January. I don't know

[14] the exact date.

[15] **Q:** Mr. Bonig, what was his position at

[16] this time, October? I know it says chair, but —

[17] **A:** I believe he was the Deputy CIO.

[18] **Q:** Is Marcy Day still with GW?

[19] **A:** Yes.

[20] **Q:** What is her position now at GW?

[21] **A:** I believe she is a Project Manager.

[22] **Q:** With the ISS?

Page 79

[1] **A:** Yes.

[2] **Q:** If you go to the eighth page, there

[3] are some references to you.

[4] **A:** Uh-huh.

[5] **Q:** Do you have a recollection of these

[6] files that were needed from you?

[7] **A:** Yes. For purposes of the back

[8] scanning effort, I needed to provide files for

[9] manipulation by Richmar subcontractor.

[10] **Q:** Are these sample files? Is that what

[11] these are?

[12] **A:** Sample files?

[13] **Q:** In other words, you were supposed to

[14] give them a sample of a retirement file?

[15] **A:** No, it wasn't a sample. It was data

[16] to be included. It was essentially C dated to

[17] allow them to create, um —

[18] **Q:** Fields?

[19] **A:** — a bar coded sheet to associate the

[20] data within the system.

[21] **Q:** Was this needed for indexing?

[22] **A:** Yes.

Page 80

[1] **Q:** In other words, groupings so that they

[2] could, you and they could determine groupings?

[3] Let me ask this: How were you working

[4] with Richmar at that point as far as developing

[5] how the documents would be indexed? I know you

[6] were giving them like group names. I'll show you

[7] an e-mail you sent, if you want.

[8] **A:** Right.

[9] **Q:** But can you describe —

[10] **A:** ISS developed a program for us to

[11] provide select groupings to Richmar for purposes

[12] of creating these bar code sheets for the scanning

[13] effort, back scanning effort, and we provided them

[14] to the degree that we were able.

[15] **MR. GITNER:** Let's mark this as the

[16] next exhibit.

[17] (Thereupon, Plaintiff's/Bell

[18] Deposition Exhibit Number 2 was marked for

[19] identification.)

[20] **BY MR. GITNER:**

[21] **Q:** Ms. Bell, let me show you what has

[22] been marked as Plaintiff's Exhibit/Bell Exhibit 2,

---

Page 81

[1] and if you can, there is an e-mail from Mr.
[2] Gearing to you on December 8th, and right at the
[3] PS it says, Here is the list of form groups.
[4]     I take it that there was an attachment
[5] to this when you sent them some more form groups;
[6] is that it?
[7]   **A:** That was the response, apparently.
[8]   **Q:** My question is, you were working with
[9] him in coming up with these, the nomenclature for
[10] these form groups; is that it?
[11]   **A:** Yes.
[12]   **Q:** Apparently you sent him some on
[13] December 8th. I don't have the attachments. It
[14] says Attachments: Copy of Unknown form groups.
[15]   **MR. THOMAS:** Is the question did she
[16] send an attachment of form groups in this e-mail
[17] on December the 8th?
[18]   **MR. GITNER:** I'll take that. That's a
[19] good question.
[20]   **MR. THOMAS:** Do you recall having sent
[21] this e-mail and attaching additional —
[22]   **THE WITNESS:** I recall having had an

Page 82

[1] exchange regarding form groups, and I have no
[2] reason to believe that this isn't accurate.
[3]   **MR. GITNER:** Let me take a minute or
[4] two, if I could.
[5]     (Brief recess.)
[6]   **MR. GITNER:** Ms. Bell, thank you very
[7] much. I have no further questions at this time.
[8]   **MR. THOMAS:** I have no questions.
[9]
[10]     (Thereupon, at 11:00 a.m., the
[11] deposition was concluded.)
[12]
[13]     (Reading and signature not waived.)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]

Page 83

[1]         CERTIFICATE OF NOTARY PUBLIC
[2]         I, LU ANNE DAWSON, the officer before
[3] whom the foregoing deposition was taken,
[4] do hereby certify that the witness whose testimony
[5] appears in the foregoing deposition was duly sworn
[6] by me; that the testimony of said witness was
[7] taken by me in shorthand and thereafter reduced to
[8] typewriting by me; that said deposition is a true
[9] record of the testimony given by said witness;
[10] that I am neither counsel for, related to, nor
[11] employed by any of the parties to the action in
[12] which this deposition was taken; and, further,
[13] that I am not a relative or employee of any
[14] attorney or counsel employed by the parties
[15] thereto, nor financially or otherwise interested
[16] in the outcome of the action.
[17]
[18]
[19]
            LU ANNE DAWSON
[20]         Notary Public in and for
            the District of Columbia
[21]
    My Commission expires:
[22] November 30, 2009

Page 84

[1]       **READING AND SIGNING PROCEDURE**
[2]
[3]     The Deposition of TANYA K. BELL was
[4] taken in the matter, on the date, and at the time
[5] and place set out on the title page hereof.
[6]     It was requested that the deposition
[7] be taken by the reporter and that same be reduced
[8] to typewritten form.
[9]     It was agreed by and between counsel
[10] and/or the parties and/or the Deponent that the
[11] Deponent will read and sign the transcript of said
[12] deposition.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]

Page 85

[1]        CERTIFICATE

[2]

[3] STATE OF _____ :

[4] COUNTY/CITY OF _____ :

[5]

[6]      Before me, this day, personally

[7] appeared TANYA K. BELL, who, being duly sworn,

[8] states that the foregoing transcript of his/her

[9] Deposition, taken in the matter, on the date, and

[10] at the time and place set out on the title page

[11] hereof, constitutes a true and accurate transcript

[12] of said deposition.

[13]

[14]

[15]

[16] SUBSCRIBED and SWORN to before me this

[17] _____ day of _____,

[18] 2007, in the jurisdiction aforesaid.

[19]

[20]

[21]

[22] My Commission Expires      Notary Public

Page 86

[1]        DEPOSITION ERRATA SHEET

[2]

[3] CASE CAPTION: CUS4 d/b/a Richmar & Associates,

    et al. v. George Washington University

[4] DEPONENT:  TANYA K. BELL

[5] DEPOSITION DATE:  May 23, 2007

[6]      I have read the entire transcript of

[7] my Deposition taken in the captioned matter or the

[8] same has been read to me.  I request that the

[9] changes noted on the following errata sheet be

[10] entered upon the record for the reasons indicated.

[11]      I have signed my name to the Errata

[12] Sheet and the appropriate Certificate and

[13] authorize you to attach both to the original

[14] transcript.

[15]

[16] PAGE/LINE    CHANGE        REASON

[17]

[18]

[19]

[20]

[21] SIGNATURE:_____DATE:_____

[22]      TANYA K. BELL

Page 87

[1] PAGE/LINE    CHANGE        REASON

[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21] SIGNATURE:_____DATE:_____
[22]      TANYA K. BELL

# Exhibit 14

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3       -----------------------------------------------

 4       CUS4, INC. D/B/A          :

 5       RICHMAR & ASSOCIATES,     :

 6       et al.,                   :

 7                    Plaintiffs:

 8       v.                        :    No.1:CV-07-0841 (JR)

 9       GEORGE WASHINGTON         :

10       UNIVERSITY,               :

11                    Defendant.   :

12       -----------------------------------------------

13                         CONFIDENTIAL

14              Deposition of VIJAY PADMANABHAN, a witness

15       herein, taken by the Plaintiff, at the offices of

16       Arnold & Porter, 555 Twelfth Street, Northwest,

17       Washington, D.C., at 1:38 p.m., Thursday, May 31,

18       2007, and the proceedings being taken down by

19       Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and

20       transcribed under her direction.

21

22
```

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3       GEOFFREY P. GITNER, ESQUIRE.
4       LAW OFFICES OF GEOFFREY P. GITNER
5       Watergate, Twelfth Floor
6       600 New Hampshire Avenue, Northwest
7       Washington, D.C. 20037
8       (202) 772-5926
9
10 On behalf of the Defendant:
11      JAMES W. THOMAS, JR., ESQUIRE
12      KAVITA KUMAR PURI, ESQUIRE
13      ARNOLD & PORTER LLP
14      555 Twelfth Street, Northwest
15      Washington, D.C. 20004
16      (202) 942-6421
17
18 APPEARANCES:
19    Also Present: LINDA J. SCHUTJER, ESQUIRE
20              ISAAC ROSENBERG
21
22

Page 3

1       C O N T E N T S
2  VIJAY PADMANABHAN            PAGE
3    Examination By Mr. Gitner        4
4
5       E X H I B I T S
6     (Attached to the Transcript)
7  PLAINTIFF'S EXHIBIT NO.           PAGE
8     1 Answers to Interrogatories     50
9     2 Mantis Tickets Summary         58
10    3 DCMS Notes                     71
11    4 Mantis Ticket 363              78
12    5 Mantis Ticket 361              87
13    6 Mantis Ticket 358              92
14    7 Mantis Ticket 362              95
15    8 9/20/06 Document              100
16    9 Mantis Ticket                 110
17   10 DCMS Scan                     123
18   11 Mantis Ticket 364             127
19   12 Summary of Changes Document   131
20
21
22

Page 4

1            P R O C E E D I N G S
2            -  -  -  -
3  Whereupon--
4            VIJAY PADMANABHAN
5  a witness, called for examination, having been duly
6  sworn, was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8  BY MR. GITNER:
9       Q   Would you please state your name for the
10 record?
11      A   Vijay Padmanabhan.
12      Q   And, sir, where do you reside?
13      A   Herndon, Virginia.
14      Q   And what's your address?
15      A   13416 Burro Farm Drive.
16      Q   And, sir, do you live there with anybody?
17      A   I just got a new home, so I'll be moving
18 into the home.
19      Q   Are you married?
20      A   Yes.
21      Q   So do you have any children? I take it
22 none of them are over 21.

Page 5

1       A   No.
2       Q   What's the name of your wife?
3       A   Ramya Remganathan.
4       Q   And will anybody else reside in your new
5  home?
6       A   No.
7       Q   Is that the address you just gave me in
8  Herndon?
9       A   That's the current address.
10      Q   When are you moving to your new home?
11          MS. PURI: Objection, relevance.
12          THE WITNESS: I don't have a date yet.
13 BY MR. GITNER:
14      Q   I mean, is it in the near future?
15      A   Yes.
16      Q   What will be the address of your new home?
17      A   I just closed the house. I don't remember
18 the address right now.
19      Q   Do you know what street it's on?
20      A   Venturi Lane.
21      Q   And do you know what hundred block it is?
22      A   The number, I forgot, it's Venturi Lane,

2  (Pages 2 to 5)

Page 6

1    Herndon.
2        Q  Where are you employed, sir?
3        A  George Washington University.
4        Q  And how long have you been employed by
5    George Washington University?
6        A  From June 2006.
7        Q  How old are you?
8        A  30.
9        Q  And can you tell me what your educational
10   background is, starting with -- did you go to
11   college?
12       A  I went to college back in India.
13       Q  All right.
14       A  I have a Bachelor's in electronics and
15   communication engineering.
16       Q  From which university?
17       A  University of Madras.
18       Q  Have you done any postgraduate work here
19   in the United States?
20       A  I am doing my Master's currently.
21       Q  And where are you doing that?
22       A  George Mason.

Page 7

1        Q  And what degree are you seeking?
2        A  Master's in computational science.
3        Q  And what position do you presently hold at
4    George Washington?
5        A  I'm senior database applications
6    developer.
7        Q  And has that been your position since June
8    of 2006?
9        A  Yes.
10       Q  Who do you report to, who are your direct
11   reports?
12       A  Rick Gilchrist.
13       Q  Are you in the ISS division?
14       A  Yes.
15       Q  And are there any other senior data, are
16   there any other individuals who hold the same
17   position that you do?
18       A  In my current team?
19       Q  Yeah.
20       A  No.
21       Q  How many teams are there?
22       A  I used to report to a different team

Page 8

1    before.  They just had a reorg, so I had to move to a
2    different team.
3        Q  When did you move to the different team?
4        A  About a month back.
5        Q  What are the names of the teams that you
6    moved from and to?
7        A  The previous team was called -- was still
8    under ISS, called IMAG.
9        Q  I what?
10       A  I-M-A-G.
11       Q  All right.
12       A  And now, it's a group called -- it's a
13   newly formed group called ERP, imaging, document
14   imaging.
15       Q  Document imaging?
16       A  Uh-huh.
17       Q  You're a computer programmer?
18       A  Correct.
19       Q  That's what you do at GW?
20       A  Yes.
21       Q  That's what you've always done at GW?
22       A  Yes.

Page 9

1        Q  All right.  And have you received any
2    training in Documentum?
3        A  Yes.
4        Q  What training and when?
5        A  I had training from EMC, which is the
6    owner of Documentum early this year.
7        Q  Would that have been January, February?
8        A  Possibly January, yes.
9        Q  Okay.  Do you remember the dates?
10       A  No.
11       Q  Were you at the EMC building?
12       A  It was an online training.
13       Q  Pardon.
14       A  It was an online training.
15       Q  And how much online training did you
16   receive?
17       A  Five days.
18       Q  Were those five consecutive days?
19       A  Yes.
20       Q  Did you get certified in some manner?  Is
21   there a certification involved?
22       A  No.

3 (Pages 6 to 9)

Page 10

1    Q  Is there any kind of diploma, certificate,
2  did you receive anything?
3    A  No.
4    Q  Do you have something that you can put
5  down on your resume that you've accomplished this
6  five-day course?
7    A  If you're asking me in certificate form,
8  no.
9    Q  Is there anything -- have you added
10  anything to your resume, or will you add anything to
11  your resume showing this five days of training?
12    A  Yes.
13    Q  How will you show it, what will it say?
14    A  That I have received training from EMC.
15    Q  In Documentum?
16    A  Yes.
17    Q  And any particular aspect of Documentum?
18    A  WDK.
19    Q  All right.  What led to you receiving this
20  training?
21    A  My group needed training in Documentum, so
22  they asked me to take the training.

Page 11

1    Q  All right.  Is there anybody else in
2  your -- and what did you learn in Documentum?  What
3  aspects of Documentum did you learn?
4    A  Like you mentioned, DFC and WDK.
5    Q  So you can work with Documentum?
6    A  Yes.
7    Q  Is there any other members of your group
8  that have the same qualifications as you do with
9  Documentum?
10    A  Yes.
11    Q  Who would that be?
12    A  Nadya Rose.
13    Q  And who is she?
14    A  She is a database applications developer.
15    Q  And what's her experience in Documentum?
16    A  She took the training with me.
17    Q  Oh, she took it at the same time as you
18  did?
19    A  Correct.
20    Q  I see.  And was she also in the IMAG team?
21    A  Yes.
22    Q  And did she also report to Mr. Gilchrist?

Page 12

1    A  No.  IMAG team, I was reporting to Andrew
2  Smith.
3    Q  All right.  And now, as part of the ERP,
4  you're reporting to Gilchrist?
5    A  Correct.
6    Q  But that's only in the last month or so?
7    A  Yes.
8    Q  Have you taken any other training or
9  continuing education other than in Documentum since
10  you've been at GW?
11      MS. PURI:  Objection, vague.
12      THE WITNESS:  No.
13  BY MR. GITNER:
14    Q  Okay.  Prior to taking the training in
15  Documentum, had you worked with Documentum before?
16    A  No.
17    Q  Do you know if Ms. Rose ever worked with
18  Documentum before?
19    A  I don't know.
20    Q  You don't know, all right.  Do you know
21  what the DCMS system is?
22    A  Yes.

Page 13

1    Q  What is the DCMS system?
2    A  It's document content management system.
3    Q  Have you worked with or on the DCMS?
4    A  Can you state when?
5    Q  I don't know.  I was going to ask you
6  first, but first, I'm going to ask you if you've done
7  it, and then I'll ask you when.
8    A  Yes.
9    Q  Okay.  When did you first work with or on
10  the DCMS?
11    A  Fall of '06.
12    Q  Okay.  Have you worked on the DCMS
13  subsequent to that?  Did you work on it after that?
14    A  Yes.
15    Q  Is there a period of time on which you
16  have worked with the DCMS or on the DCMS, in other
17  words, from the fall of '06 to the present period of
18  time?
19    A  Have I worked on it?
20      MS. PURI:  Objection to form.
21  BY MR. GITNER:
22    Q  Yeah.

Page 14

1    A  Yes.
2    Q  And what would that period of time be?
3    A  From fall of '06 until present.
4    Q  Okay.  All right.  Can you describe to me
5  what things you have done with regard to the DCMS?
6    A  Can you be a little bit more specific?
7    Q  I don't know what you've done.  I'm asking
8  you what you've done.
9    A  Depending on the timeframe.
10    Q  Yeah.  Walk me through that, if you could,
11  the best you can from beginning, you know, from the
12  fall of '06 to the present.
13    A  Primarily involved having discussions with
14  our team regarding the DCMS with Rick Gilchrist,
15  deploying the --
16    Q  This would be in the fall of '06?
17    A  From fall of '06.
18    Q  Okay.  I'm sorry.  Discussions with your
19  team?
20    A  And Rick Gilchrist.
21    Q  Regarding?
22    A  The Documentum DCMS.

Page 15

1    Q  Okay.
2    A  Deployment of the code delivered by
3  Richmar.
4    Q  Okay.
5    A  Testing the code and reporting any issues
6  to Rick Gilchrist.
7    Q  Have you personally made any changes to
8  the DCMS computer code?
9    A  When?
10    Q  Ever.
11        MS. PURI:  Object to form.
12        THE WITNESS:  Yes.
13  BY MR. GITNER:
14    Q  And when would that have been?
15        MS. PURI:  Objection, not sure what DCMS
16  system is.
17  BY MR. GITNER:
18    Q  Go ahead.
19    A  After December 18th.
20    Q  What did you do to the DCMS code after
21  December 18th?
22    A  Error fixes and enhancements.

Page 16

1    Q  And have you done this continuously from
2  December 18th to the present time?
3    A  Correct.
4    Q  And to make these error fixes and
5  enhancement, I take it you have rewritten the source
6  code for the DCMS?
7        MS. PURI:  Object to form.
8        THE WITNESS:  Yes.
9  BY MR. GITNER:
10    Q  And is there a list of what rewrites
11  you've made to the source code for the DCMS?  Is
12  there a document that you could refer to that would
13  show what changes you've made to the DCMS since
14  December 18th?
15    A  The Mantas tickets.
16    Q  Is there a summary of the Mantas tickets
17  that you're aware of?  Or you'd have to have each
18  individual ticket?
19    A  Individual tickets.
20    Q  So there's no summaries, as far as you're
21  aware?
22        MS. PURI:  Objection, lack of foundation.

Page 17

1        THE WITNESS:  There might be summary.
2  BY MR. GITNER:
3    Q  Have you ever seen one?
4    A  I've seen the individual tickets.
5    Q  Sorry?
6    A  I've seen the individual tickets.
7    Q  But I take it, as far as you're aware,
8  you're not aware of any summary of the Mantas tickets
9  showing modifications or changes to the DCMS code?
10    A  Summarized by any particular person?
11    Q  Well, yeah, any particular person, just
12  something that shows all the changes.
13        MS. PURI:  Objection, lack of foundation,
14  and vague.
15  BY MR. GITNER:
16    Q  Instead of having to go through each
17  ticket?
18    A  Right, yes.  Indeed, there is a summary.
19    Q  There is a summary?  Okay.
20    A  Correct.
21    Q  And do you know the name of that document?
22    A  No.

5  (Pages 14 to 17)

Page 18

1   Q  When did you see that summary, when did
2   you last see the summary?
3      A  Yesterday.
4      Q  I take it this was preparing for your
5   deposition?
6      A  Yes.
7      Q  Okay.  How many pages approximately was
8   the summary?
9      A  One.
10     Q  One page.  Do you remember the name of the
11  document?
12     A  No, I just saw the document.  I don't know
13  the name of it.
14     Q  All right.  Were you asked to produce this
15  document at some point?  Did you produce this
16  document to the lawyers in this case?
17     MS. PURI:  Objection.
18     THE WITNESS:  No.
19  BY MR. GITNER:
20     Q  Do you know who produced this document,
21  who was the author of this document?
22     A  I don't know.

Page 19

1      Q  Do you know what division this document
2   would come from?
3      A  ISS.
4      MS. PURI:  Objection, lack of foundation.
5   BY MR. GITNER:
6      Q  Can you tell me, as best you recall, what
7   changes or modifications you have made to the DCMS
8   since December 18th, you, personally?
9      A  It should be in the summary.
10     Q  I don't have it.
11     MS. PURI:  Can you restate the question?
12     MR. GITNER:  There's no question pending.
13  He asked me if I have the summary.  I said I don't
14  have the summary.
15     MS. PURI:  Can you restate the question
16  before he asked his question?
17  BY MR. GITNER:
18     Q  Can you tell me what modifications or
19  changes you made to the DCMS code?
20     A  Multiple, there were primarily document
21  search, text search.
22     Q  Okay.

Page 20

1      A  Net ID search.
2      Q  Net ID?
3      A  Uh-huh.  Those are the ones I can recall
4   now.
5      Q  Were these enhancements to the DCMS code?
6      MS. PURI:  Objection, vague.
7      THE WITNESS:  These were the fixes.
8   BY MR. GITNER:
9      Q  These are the fixes.  Can you define for
10  me what you mean by, "fix"?
11     A  It was not working in the first phase.
12     Q  Can you tell me what you did with regard
13  to the document search feature?
14     A  Made it work.
15     Q  How did you do that?  What was lacking?
16  How did you make it work?  What was wrong with it?
17     A  It wasn't coded properly.
18     Q  How wasn't it coded properly?
19     A  They didn't have proper business logic.
20     Q  What do you mean by that, what wasn't the
21  proper business logic?
22     A  The code which is going to bring the

Page 21

1   results back when you do the document search, it
2   wasn't coded properly, it was missing.
3      Q  Did anybody else reprogram the -- has
4   anybody else, to your knowledge, reprogrammed the
5   DCMS since December 18th, other than yourself?
6      A  Yes.
7      Q  Who's that?
8      A  Nadya Rose.
9      Q  Do you know what changes she's made to the
10  DCMS code?
11     MS. PURI:  Objection, lack of foundation.
12     THE WITNESS:  Should be in the ticket
13  list.
14  BY MR. GITNER:
15     Q  Were they in the summary that you looked
16  at yesterday?
17     A  Should be.
18     Q  Was it?
19     A  Wasn't specified.
20     Q  What wasn't specified?
21     A  What changes she made.
22     Q  So there was a list of changes, but it

6 (Pages 18 to 21)

Page 22

1  didn't say whether you made them or she made them, is
2  that correct?
3      A  Correct.
4      Q  Was there a document only search function
5  in the code prior to December 18th, 2006?
6          MS. PURI:  Objection, vague.
7          THE WITNESS:  That's very vague.  Can you
8  state it in a much more specific way?
9  BY MR. GITNER:
10     Q  No.
11     A  They had very few lines of code.
12     Q  What didn't work about the document only
13 search function prior to December 18th that you
14 fixed?
15     A  The document only search did not work at
16 all.
17     Q  So it was totally inoperable, it was
18 present in the code, but it was totally inoperable?
19     A  Correct.
20     Q  And by that, it was unable to retrieve any
21 documents pursuant to a document only search?
22     A  Yes.

Page 23

1      Q  All right.  And the fixes that you made to
2  it, what is the document only search capable of doing
3  now?
4      A  It can retrieve documents.
5      Q  Can you give me an example of what would
6  be a document only search?
7      A  You can search on which department the
8  document belongs to, give me all the documents
9  belonging to HR benefits, it should bring the
10 documents belonging to HR benefits.
11     Q  Okay.  And can you tell me how much time
12 you spent on rewriting the code?
13         MS. PURI:  Objection, vague.
14         THE WITNESS:  I don't have any specific
15 time for that.
16 BY MR. GITNER:
17     Q  You couldn't tell me if it was an hour or
18 10 days or a month?
19         MS. PURI:  Which code?
20         THE WITNESS:  Which code?
21 BY MR. GITNER:
22     Q  The DCMS, the document only search rewrite

Page 24

1  that you did.
2      A  The document only search alone, about a
3  month.
4      Q  You spent a month on that, is that
5  correct?
6      A  Yes.
7      Q  All right.  And was that five days a week
8  for a month?
9      A  Correct.
10     Q  So approximately 40 hours a week for four
11 some odd weeks?
12     A  Correct.
13     Q  And when was that, January or February of
14 2007?
15     A  Probably end of February.
16     Q  Okay.  And I take it that you had to write
17 a fair number of lines of code, is that correct?
18         MS. PURI:  Objection, vague.
19         THE WITNESS:  Correct.
20 BY MR. GITNER:
21     Q  Can you tell me approximately how many
22 lines of code you added?

Page 25

1      A  About 80 lines of code.
2      Q  And you say that prior to your working on
3  the DCMS code on the document only search, there were
4  very few lines of code related to the document only
5  search in the DCMS, is that correct?
6          MS. PURI:  Objection, characterization.
7          THE WITNESS:  Correct.
8  BY MR. GITNER:
9      Q  About how many lines were there, less than
10 10?
11     A  Probably more than that, a little more
12 than that, maybe 15 lines of code, 10 to 15 lines of
13 code.
14     Q  And your testimony is that the document
15 only search, there was, in essence, no document only
16 search function, nothing worked with regard to the
17 document only search, correct?
18     A  Correct.
19     Q  All right.  So there was no capability
20 whatsoever to deliver any documents pursuant to the
21 document only search prior to December 18th?
22         MS. PURI:  Objection.

Page 26

1   BY MR. GITNER:
2       Q   Is that correct?
3       A   Correct.
4       Q   Okay.  The DCMS system has been in use
5   since December 18th, correct?
6       A   Correct.
7       Q   However, it does not have -- or it did not
8   have a document only search capability, correct?
9       A   Correct.
10      Q   So through your work, you were able to add
11  that capability, isn't that correct?
12      A   Yes.
13      Q   And that capability was added in -- was
14  that referred to as release number two or as part of
15  release number two?
16      MS. PURI:  Objection.
17      THE WITNESS:  Yes.
18      MS. PURI:  Was what referred to as release
19  number two?
20  BY MR. GITNER:
21      Q   And release number two went live in April,
22  is that correct?

Page 27

1       A   Early April.
2       Q   Early April, all right.  So from December
3   18th until early April, George Washington University
4   was using the document case management system,
5   correct, but without a document only search feature,
6   correct?
7       A   Correct.
8       Q   All right.  And through the changes that
9   you made to the source code, you were able to add a
10  document only search feature, correct?
11      A   Correct.
12      Q   All right.  Did Ms. Rose also work on the
13  document only search feature, or was that just your
14  work?
15      MS. PURI:  Objection, compound question.
16      THE WITNESS:  Document only search, I
17  worked on it.
18  BY MR. GITNER:
19      Q   What else was included in release number
20  two?
21      MS. PURI:  Objection, vague.
22      THE WITNESS:  Multiple, multiple error

Page 28

1   fixes and enhancements.
2   BY MR. GITNER:
3       Q   Can you tell me the best you can recall
4   those fixes and enhancements were that were included
5   in release number two?
6       A   I mentioned a few of them before, the
7   document search, net ID search, text search, few
8   regarding folder permissions.
9       Q   Folder permissions.
10      A   Regarding change presentation, there's
11  actually many other on the list, that's all I can
12  recall right now.
13      Q   You say there are many others?
14      A   Yes.
15      Q   When you say, "many others," is that more
16  than 10 other features, less than 10?
17      A   Including all these features, more than
18  10.
19      Q   All right.  So, okay, were any of these --
20  what do you mean by enhancements, as opposed to a
21  fix?
22      A   Fixes are something which is broken and

Page 29

1   doesn't work, like the document search enhancements
2   are something which I used, which are done to make
3   the code better.
4       Q   Those are add-ons, in other words?
5       MS. PURI:  Objection.
6       THE WITNESS:  Those are required.
7   BY MR. GITNER:
8       Q   Required by what?
9       A   Standards.
10      Q   Were any of the enhancements present in
11  the DCMS source code prior to or as of December 18th,
12  2006?
13      A   Enhancements are to the December 18th, but
14  I don't understand your question, when you asked what
15  happened before December 18th.
16      Q   What enhancements were added after
17  December 18th, that you're aware of?
18      A   There's a case when a particular link
19  could be hidden when you put a mouse over, we made
20  sure that the link was not hidden, that's probably
21  one example for enhancements.
22      Q   Did you have to rewrite the code?

8 (Pages 26 to 29)

Page 30

1    A  Yes.
2    Q  Were there other enhancements for which
3  you rewrote the code?
4    A  Yes.
5    Q  Can you tell me what those were?
6    A  I don't recall.
7    Q  You just saw the summary yesterday?
8    A  Yes.
9    Q  You don't recall?
10   A  Yes.
11   Q  Is that correct, you don't recall any of
12 them?
13   A  I mentioned one.
14   Q  Do you recall any others?
15   A  No.
16   Q  How much time have you spent preparing for
17 this deposition?
18   A  The counsel?
19   Q  Meeting with counsel, looking through
20 documents, whatever you needed to do to prepare for
21 this deposition?
22   A  A few hours yesterday.

Page 31

1    Q  And did you look at documents during that
2  preparation?
3    A  Yes.
4    Q  Did you look at the Mantis tickets during
5  that preparation?
6    A  Yes.
7    Q  What other documents did you look at?
8        MS. PURI:  Objection, covered by
9  attorney-client privilege.
10       MR. GITNER:  That's not covered by
11 attorney-client privilege, what documents you looked
12 at, what have you reviewed?
13       MR. THOMAS:  That's covered by the
14 attorney-client privilege.
15       MR. GITNER:  What you might advise him,
16 but what he did in preparation for this is not
17 covered by the attorney-client privilege.
18       MS. PURI:  You asked him about the broad
19 outline of the preparation.  I --
20       MR. GITNER:  I'm not asking what you told
21 him.  I'm asking what documents he looked at.
22 BY MR. GITNER:

Page 32

1    Q  Did you look at the Mantis tickets?
2    A  Yes.
3    Q  What other documents did you look at?
4        MS. PURI:  Objection.  You don't have to
5  answer the specific, you can ask him if he looked at
6  a particular document, but --
7        MR. GITNER:  How would I know?
8  BY MR. GITNER:
9    Q  What did you need?  There is, I
10 understand, a release number three plan?
11   A  Yes.
12   Q  And when is that plan to go live?
13   A  Summer of '07.
14   Q  That's almost upon us.  Is there any time
15 within the summer of '07, some point this summer, I
16 take it?
17   A  Yeah.
18   Q  And what is included, as of today, in
19 release number three, what is planned to be included
20 in release number three?
21       MS. PURI:  Objection, lack of foundation.
22       THE WITNESS:  Features that are required

Page 33

1  for business needs.
2  BY MR. GITNER:
3    Q  Features required for business needs.  And
4  can you be more specific than that?
5    A  Bulk scanning indexing.
6    Q  Any others?
7    A  That would be the major release, that
8  would be the major change.
9    Q  Have you made any modifications to the
10 DCMS source code with regard to bulk scanning and
11 indexing?
12   A  No.
13   Q  Has Ms. Rose?
14   A  No.
15   Q  Has anybody?
16   A  No.
17   Q  So this was planned for the future?
18   A  Correct.
19   Q  Will you have to make revisions to the
20 source code, the DCMS source code?
21       MS. PURI:  Objection.  What do you mean
22 by, "DCMS"?

9  (Pages 30 to 33)

Page 34

1      MR. GITNER: I think he understands what
2  the DCMS --
3      MS. PURI: If you understand.
4      THE WITNESS: The bulk scanning indexing
5  change.
6      MS. PURI: Does DCMS include DCMS scan for
7  any of your question?
8  BY MR. GITNER:
9      Q  Go ahead and answer the question.
10     MS. PURI: But does it include DCMS scan?
11 I'm not sure the witness can answer the question if
12 he doesn't know all the --
13     MR. GITNER: If you're going to make
14 talking objections, then I think you should ask him
15 to leave the room, and you can put whatever you want
16 on the --
17     MS. PURI: We can certainly do that. I'm
18 just asking you to clarify your question.
19     MR. GITNER: And he doesn't seem to need
20 clarification. I think you're trying to interfere
21 with the deposition.
22     MS. PURI: Certainly, I'm not trying to do

Page 35

1  that. My objection is short, and you can answer if
2  you understand.
3      MR. GITNER: He's been answering the whole
4  afternoon so far what the DCMS is. Are you
5  suggesting that he doesn't understand?
6      MS. PURI: It appeared to me, from your
7  current line of questioning, that you were being
8  unclear about DCMS.
9      MR. GITNER: When I mention the DCMS, I
10 mean the DCMS, okay? All right. Agreed.
11 BY MR. GITNER:
12     Q  Go ahead.
13     A  To make this change happen?
14     Q  Yeah.
15     A  Yes.
16     Q  You're going to have to rewrite the code?
17     MS. PURI: Objection. Which code?
18 BY MR. GITNER:
19     Q  Is that correct?
20     A  DCMS code?
21     Q  Yes.
22     A  Yes.

Page 36

1      Q  You knew I wasn't talking about Netscape's
2  code or Microsoft code, right?
3      MS. PURI: Objection. There are two parts
4  to DCMS. Which part of DCMS are you referring to?
5      MR. GITNER: All right.
6  BY MR. GITNER:
7      Q  Are you familiar with Crown Partners?
8      A  Yes.
9      Q  Can you tell me whether or not Crown
10 Partners has ever received a copy of the DCMS source
11 code?
12     A  You mean hard copy?
13     Q  Any copy, electronic or hard copy.
14     A  We have viewed the code.
15     Q  Have they received a copy of the code?
16 Was a copy of the code sent to them at their offices,
17 to your knowledge?
18     A  No.
19     Q  When you said they viewed the code, where
20 did they view the code?
21     A  At GW, the campus, Ashburn campus at GW.
22     Q  And when was that?

Page 37

1      A  Early February.
2      Q  And what specific person from Crown
3  Partners did that?
4      A  Kevin Burns.
5      Q  Was there anybody else from Crown Partners
6  with Mr. Burns?
7      A  No.
8      Q  How long was he at the campus viewing the
9  code?
10     A  Two days.
11     Q  Are you aware of any other individuals
12 that are not George Washington employees that have
13 viewed the DCMS source code other than Mr. Burns?
14     A  No.
15     Q  Okay. Can you tell me what were the
16 circumstances surrounding Mr. Burns viewing the code?
17 Why was he viewing the code?
18     A  He was there to evaluate the code.
19     Q  And why was he there to evaluate the code?
20     A  That's out of my work.
21     Q  Were you present when he was viewing the
22 code?

Page 38

1   A  Yes.

2   Q  Were you with him for the total time he

3 was viewing the code?

4   A  I was at the office when he was viewing

5 the code.

6   Q  Were you present in the same room with him

7 when he was viewing it?

8   A  Yes.

9   Q  Why were you present with him?

10   A  My desk is right next to him.

11   Q  Did you discuss what he was doing

12 evaluating the code?

13   A  No.

14   Q  Do you know who approved his evaluating

15 the code?

16   A  Rick Gilchrist.

17   Q  Were you privy to any conversations, in

18 which Mr. Gilchrist was present, as to the

19 circumstances for Mr. Burns evaluating the code?

20   A  Can you restate that?

21   Q  Yeah.  Were you privy to any conversation,

22 part of any conversation, overhear any conversation,

Page 39

1 do you have any knowledge of anything that was said

2 with regard to Burns viewing the code?

3   A  I knew from Rick that Kevin will be

4 evaluating the code.

5   Q  And why was he brought in to evaluate the

6 code?

7     MS. PURI:  Objection, asked and answered,

8 lack of foundation.

9     THE WITNESS:  That's not my job role.  I

10 just do what Rick asks me to.

11 BY MR. GITNER:

12   Q  So you have no knowledge whatsoever of why

13 Mr. Burns was viewing the code?

14   A  That was part of their work order.

15   Q  Part of their --

16   A  Part of Crown Partners' work.

17   Q  But you have no knowledge whatsoever of

18 why they were there?

19   A  I knew they're there for evaluation.

20   Q  Why were they there for evaluation?

21     MS. PURI:  Asked and answered.

22 BY MR. GITNER:

Page 40

1   Q  You don't have any knowledge of why they

2 were there?

3   A  For evaluation.

4   Q  Are you aware of any criticism there was

5 to the DCMS at that time?

6     MS. PURI:  Objection.  By whom?

7     THE WITNESS:  By who?

8 BY MR. GITNER:

9   Q  That's what I'm asking you.  Are you aware

10 of any criticism?  If you're not, then no, and if you

11 know, then I'll ask you who.

12   A  No.

13   Q  Your testimony is that, as of the

14 beginning of February, the time that Crown Partners

15 came in to do an evaluation of the DCMS computer

16 code, you were unaware of any criticism whatsoever

17 with regard to the DCMS computer code, correct?

18   A  I know there are errors in the DCMS code.

19   Q  Well, was that why Crown Partners was

20 brought in?

21   A  I don't know.

22   Q  Were you aware of any criticism of the

Page 41

1 DCMS as of February 2007?

2   A  I know the errors.

3   Q  What errors?

4   A  The list I mentioned before.

5   Q  Can you tell me again what errors?

6   A  The document only search, the net ID

7 search.

8   Q  Wait a minute.  The document only search,

9 what was wrong with it?

10   A  It wasn't working.

11   Q  All right.  The net ID?

12   A  Wasn't working.

13   Q  Go ahead.

14   A  Text search, those are a few, there are

15 many more.

16   Q  There were a few, there were many more,

17 I'm not certain what you mean by that.

18   A  Many more than what I have told.

19     MR. THOMAS:  I think he said those are a

20 few, there are many more.

21 BY MR. GITNER:

22   Q  The net ID did not work at all?

11 (Pages 38 to 41)

Page 42

1      A  No.
2      Q  Was there any net ID present in the DCMS
3  computer code as of December 18th?
4      A  I don't understand.
5         MS. PURI: Objection, vague.
6  BY MR. GITNER:
7      Q  Well, you say it wasn't working.  Was
8  there even anything present?  Was it present in the
9  computer code?
10        MS. PURI: Objection, vague.
11        THE WITNESS: What do you mean by,
12  "present"?
13  BY MR. GITNER:
14     Q  Was it part of the DCMS?
15        MS. PURI: Please restate the question in
16  a way he can understand.  He's asked you now twice.
17  BY MR. GITNER:
18     Q  Go ahead.
19     A  Can you please restate the question?
20     Q  Was the net ID present in the DCMS
21  computer code as of December 18th?
22        MS. PURI: Objection, he clearly didn't

Page 43

1  understand that question the first time.
2         MR. GITNER: He hasn't said anything.
3         THE WITNESS: The code for net ID search,
4  few lines of code.
5  BY MR. GITNER:
6      Q  And can you tell me what these lines of
7  code did?
8      A  They didn't do anything.
9      Q  And I take it you added lines of code to
10  make it work?
11     A  Correct.
12     Q  How many lines of code did you add?
13     A  I don't remember.
14     Q  Approximately how much time did you spend?
15     A  A couple of days.
16     Q  Did anybody else work with you on adding
17  lines with regard to the net ID?
18     A  No.
19     Q  Okay.  What does the net ID do now?
20     A  Brings back the document.
21     Q  So this is a part of the document only
22  search feature?

Page 44

1      A  It's part of the document search.
2      Q  This is part of the document search, and
3  so you can put in an identification for the document,
4  and it brings back the document, is that correct?
5      A  Identification for a person.
6      Q  Every person has a net ID?
7      A  Correct.
8      Q  And so what does this function do then?
9  Give me an example, if you could, please.
10     A  If you search for a particular net ID for
11  a person, it will bring back the documents for that
12  particular person.
13     Q  So you put in a particular net ID for John
14  Jones, and it brings back all his documents that are
15  in the system?
16     A  Correct.
17     Q  Is there also a feature to bring back only
18  certain documents with regard to Mr. Jones?  Can you
19  narrow it down, in other words?
20     A  Yes.
21     Q  Did you add that?
22     A  Part of text search and the NetID search.

Page 45

1      Q  But that was an addition you made to the
2  system, correct, to do that?
3      A  Correct.
4      Q  That wasn't there before, correct?
5         MS. PURI: Objection.
6         THE WITNESS: A few lines of code.
7  BY MR. GITNER:
8      Q  But those few lines of code were not
9  capable of doing this function, correct?
10     A  Which function?
11     Q  The NetID?
12     A  Yes.
13     Q  It was only with the addition of your
14  lines of code that it was capable of doing this,
15  correct?
16     A  Correct.
17     Q  What do you mean by text searches, is this
18  also a document search feature?
19        MS. PURI: Objection, compound question.
20        THE WITNESS: If you search on particular
21  text, it brings back documents which has those texts,
22  the words.

Vijay Padmanabhan                      CONFIDENTIAL                      May 31, 2007
                                       Washington, DC

Page 46

1  BY MR. GITNER:
2      Q  All right. So, for example, if you want
3  to find your name in every document that's in the
4  system, you can do a search by putting in your name,
5  and that'll retrieve the documents, is that correct?
6      A  If the document has my name, yes.
7      Q  Okay. And this was a feature that was not
8  in the DCMS on December 18th?
9      A  It wasn't working.
10     Q  It wasn't working. And how many lines of
11 code were there with regard to text search?
12     A  How many lines I wrote?
13     Q  No, how many were existing at the time?
14     A  15 to 20.
15     Q  And how many lines did you add?
16     A  About 40.
17     Q  And over what period of time did you add
18 these lines, how long did it take you?
19     A  For the text search?
20     Q  Right.
21     A  Two weeks.
22     Q  Okay. And did this Ms. Rose also work on

Page 47

1  this?
2      A  No.
3      Q  You also say that included in release
4  number two was folder permission?
5      A  Correct.
6      Q  What's folder permission, what does that
7  mean?
8      A  When the user searches for a particular
9  file name.
10     Q  File name?
11     A  Right, depending on their security
12 restrictions, you bring back the folder which
13 contains those files.
14     Q  Okay. So this is sort of a security
15 override?
16     A  Correct.
17     Q  And did you have to make changes to the
18 DCMS source code to add this functionality?
19     A  Yes.
20     Q  Did you have to change any other computer
21 code to bring about this function, for example, the
22 banner code?

Page 48

1      A  No.
2      Q  Were there any lines in the DCMS code as
3  of December 18th with regard to folder permission?
4      A  No.
5      Q  How many lines did you add to the DCMS
6  code with regard to folder permission?
7      A  15 to 20 lines of code.
8      Q  And how long did that take you?
9      A  About a week.
10     Q  And did Ms. Rose work on this?
11     A  Yes.
12     Q  And approximately how long did she work on
13 this?
14        MS. PURI: Objection, lack of foundation.
15        THE WITNESS: On the folder permission?
16 BY MR. GITNER:
17     Q  Uh-huh.
18     A  Two days.
19     Q  You also say that one -- another part of
20 change number two was change presentation? I may
21 have written it down wrong.
22     A  Correct.

Page 49

1      Q  Is that what it is, change presentation?
2  What did you mean by, "change presentation"?
3      A  When a user is viewing the documents, a
4  few of the document attributes will be listed.
5      Q  Okay.
6      A  And the user can modify those
7  presentation, what needs to be listed as the document
8  attributes.
9      Q  All right. So when you say, "document
10 attributes," you mean things like date, author,
11 possibly type of document?
12     A  Correct.
13     Q  All right. And were there any lines in
14 the DCMS source code as of December 18th with regard
15 to change presentation, or was this totally added
16 after December 18th?
17     A  It was there December 18th.
18     Q  And how many lines were there?
19     A  Approximately 50 or 60 lines of code.
20     Q  And how many did you add?
21     A  20 lines, 25 lines.
22     Q  And how long did that take you?

Page 50

1    A  A week-and-a-half.
2    Q  Did Ms. Rose work on any of these?
3    A  No.
4    Q  Have you ever been referred to as a GW web
5  application developer?
6    A  Yes.
7    Q  All right.  Other than yourself, were you
8  the GW web application developer on the DCMS?
9    A  I was one of them.
10    Q  And the other one was Ms. Rose, right?
11    A  Nadya Rose.
12    Q  And that's it, nobody else?
13    A  Initial phase of the project, Jennifer
14  Bond.
15    Q  That was for testing, you say?
16    A  Yes.
17    (Plaintiff's Exhibit Number 1 was marked
18  for identification.)
19  BY MR. GITNER:
20    Q  Let me show you what's marked as
21  Plaintiff's Exhibit 1.  In your preparation for this
22  deposition, did you review this document?

Page 51

1    A  Yes.
2    Q  And on page five, there is a chart, do you
3  see that?
4    A  Yes.
5    Q  Did you review this chart in preparation
6  for your deposition?
7    A  Yes.
8    Q  Did you have a role in preparing this
9  information?
10    MS. PURI:  Objection, that's covered by
11  attorney-client privilege.
12    MR. GITNER:  If he provided this
13  information?
14    MS. PURI:  If he provided it pursuant to a
15  request that's covered by attorney-client privilege.
16    MR. GITNER:  Well, first of all, we don't
17  know if he did or not, but if he's the guy that wrote
18  it, turns out that he wrote it, and you've already
19  provided it to me, how would that be covered by any
20  privilege, would that be a disclosure and a waiver of
21  the privilege?
22    MS. PURI:  If you look at page three,

Page 52

1  you'll notice that he was one of the people we
2  referred to for information.
3    MR. GITNER:  Well, don't I get to ask him
4  this question then?
5    MS. PURI:  No, that's covered by
6  privilege.
7    MR. GITNER:  I see.  So when you all asked
8  Mr. Gordon about his interrogatory answers, that's
9  okay, but I can't ask him, the person that gave
10  information with regard to the preparation of these
11  interrogatories?
12    MS. PURI:  You can't ask him questions
13  about the preparation.  You can ask him whether he's
14  seen the information.
15  BY MR. GITNER:
16    Q  Did you prepare this information, sir, did
17  you have a role in preparing this information?
18    A  Giving them some dates.
19    Q  Did you provide the dates that are in this
20  chart, page five?
21    A  Yes.
22    Q  And how did you go about retrieving these

Page 53

1  dates off the Mantis tickets?
2    A  From the server.
3    Q  From the server.  How did you go about
4  doing that?
5    A  We know when the file was deployed in the
6  server.
7    Q  Oh, there's like little --
8    A  A date.
9    Q  Yeah, right.  This is -- what do they call
10  these features, little windows that pop up, is that
11  what you're talking about, like a metatag data?
12    MS. PURI:  Objection, vague.
13    THE WITNESS:  Not a popup window.
14  BY MR. GITNER:
15    Q  But you're able to retrieve the dates from
16  the server.  Let me ask you, sir, the current version
17  of the DCMS source code, how many, to your knowledge,
18  how many copies are there of that?
19    A  Copies for the web developer have, the
20  copies in development environment, in QA environment,
21  and production environment.
22    Q  I'm sorry.  Can I ask you just to go

14  (Pages 50 to 53)

Page 54

1  through that list one more time? Copy with the web
2  developer, and then you said something after?
3      A  Development environment, QA environment.
4      Q  Wait a minute, is development environment
5  separate?
6      A  Correct.
7      Q  And then QA environment?
8      A  Correct.
9      Q  And was there any others after that?
10     A  Production.
11     Q  Do you know if you maintained a copy of
12 the DCMS source code as of December 18th?  When I
13 say, "you," does GW have a copy of the original
14 produced source code?
15     A  In the CVS.
16     Q  So that was preserved?
17     A  Yes.
18     Q  Do you know if GW preserved various copies
19 of the DCMS source code as revisions were made
20 historically to the code?
21     A  To individual files?
22     Q  Yes.

Page 55

1      A  In the CVS, yes.
2      Q  And how would one go about retrieving
3  those?  In other words, what's the organizational
4  format for those?
5      A  I don't understand.
6      Q  You say that they -- that in the CVS,
7  copies of the DCMS source code were retained as it
8  was changed --
9      A  Correct.
10     Q  -- from version-to-version -- I don't want
11 to use the word "version," I guess, but from
12 change-to-change, all right, why were those versions
13 retained?
14     A  That's how CVS will operate.
15     Q  I see.  So CVS can actually call up
16 versions as a particular date?
17     A  Correct.
18     Q  So if necessary or if we wanted to, we
19 could actually call up a version of the DCMS source
20 code as of February 1, March 1, and April 1?
21     A  Whenever the change was made.
22     Q  Whenever the change was made, all right.

Page 56

1  Every change to every line in the code?
2      A  Yes.
3      Q  All right.  Does the CVS have the ability
4  to prepare a report of when changes were made to the
5  code?
6      A  Visually?  Yes.
7      Q  But can you print it out what you see
8  visually?
9      A  I don't know of any printable format it
10 gives.
11     Q  Exists?
12        MS. PURI:  It gives.
13        THE WITNESS:  I don't know of anything.
14 BY MR. GITNER:
15     Q  Is there any screen capture capability?
16     A  It's available on the computer, yes.
17     Q  All right.  So you could capture and
18 prepare in hard copy what is on the computer screen?
19     A  Technically, yes.
20     Q  I take it that a comparison of the DCMS
21 source code as it exists today with how it exists on
22 December 18th would show what changes have been made,

Page 57

1  correct?
2      A  Correct.
3      Q  And how would you prepare a copy of that,
4  of the DCMS source code as of today, could you make a
5  duplicate copy of that?
6      A  Prepare a copy for what?
7      Q  Could you prepare a copy of it?
8        MS. PURI:  Objection, vague.
9        THE WITNESS:  For what reason?  I need to
10 know what reason.
11 BY MR. GITNER:
12     Q  To give it to me.  I'm not asking you if
13 you're allowed.  I'm just asking you could you do it.
14     A  Do I have the capability of doing it?
15     Q  Does GW have the capability of doing it?
16     A  If you take it from CVS, take a copy of
17 it, yes.
18     Q  And that would be in an electronic format?
19     A  Correct.
20     Q  And that could be printed out hard copy,
21 correct?
22     A  All the electronic formats can be printed

Page 58

1   out.
2       Q   Okay.
3       (Whereupon, a short recess was taken.)
4       (Plaintiff's Exhibit Number 2 was marked
5   for identification.)
6   BY MR. GITNER:
7       Q   Let me show you what's been marked as
8   Exhibit Number 2 and ask if you can identify this
9   document.
10      A   Yes.
11      Q   What is this?
12      A   Summary of the Mantis tickets.
13      Q   Is this the document you were referring to
14  earlier that you'd reviewed for the deposition?
15      A   No.
16      Q   Does this document, Exhibit Number 2, show
17  all of the modifications that were made -- that were
18  included in release number two, DCMS release number
19  two?
20      A   These are the changes for release two.
21      Q   Can you tell me when this document was
22  prepared?

Page 59

1       A   I don't know.
2       Q   In the upper left-hand corner, there's a
3   place for a date, but there is no date.  Do you know
4   why there's no date there?
5       A   I don't know.
6       Q   Are you aware of whether or not there were
7   any additional -- whether there was anything in
8   addition to what's listed here that was part of
9   release number two?  As far as you know, this is a
10  complete description of what was included in release
11  number two?
12      MS. PURI:  Objection, compound question.
13      THE WITNESS:  This is the list, as far as
14  I know.
15  BY MR. GITNER:
16      Q   Can you tell me what it means by rank?
17  There's apparently a ranking of between one and five
18  in the A column.  Can you tell me what that means,
19  refers to?
20      A   I didn't prepare this document.  From
21  looking at the document, it seems like ones, that has
22  to be completed.

Page 60

1       Q   Sooner, rather than later?
2       A   Correct.
3       Q   So there's a ranking as to when they
4   should be done?
5       MS. PURI:  Objection, lack of foundation.
6   BY MR. GITNER:
7       Q   Is that correct?
8       A   By looking at the document, that's what I
9   get.
10      Q   Who would have been the person that made
11  the ranking?
12      A   Rick Gilchrist.
13      Q   And under column B, I take it that's the
14  Mantis ticket number?
15      A   Correct.
16      Q   And where it says, "category," it says
17  either, "DCMS eInput banner or web S," what is that
18  referring to?
19      A   Banner web services.
20      Q   No, are those different computer codes?
21      A   Correct.  Different applications.
22      Q   Okay.  So, for example, 13 would be a

Page 61

1   change that would have to be necessitated in the
2   DCMS, but number 14 would be a change needed in the
3   eInput, is that correct?
4       A   Correct.
5       Q   To your knowledge, what is priority in
6   column E?
7       A   To my knowledge, priority is either an
8   error fix, which has to go right away.
9       Q   If you look at number 10, where it says,
10  "make changes to search screen for increased
11  functionality," I take it that there was a capability
12  to do a search, correct?
13      A   Correct.
14      Q   But this was a change to increase the
15  functionality, correct?
16      MS. PURI:  Objection.
17      THE WITNESS:  What search are you talking
18  about?
19  BY MR. GITNER:
20      Q   Number 10.
21      A   But what?
22      Q   It says, "make changes to search screen

Page 62

1  for increased functionality."
2       A  You have different searches.
3       Q  Do you know what's being referred to here?
4       A  Concludes employee search.
5       Q  And increased functionality was -- you
6  were able to do a search, correct, at this point?
7          MS. PURI:  Objection.
8          THE WITNESS:  What specific search he is
9  talking about.
10 BY MR. GITNER:
11      Q  Can you tell me what the increased
12 functionality was with regard to item number 10?
13      A  I don't recall what was there in the
14 ticket, what specific request was done in the ticket.
15      Q  Would you agree with me that a reference
16 to increased functionality means to add a feature so
17 it can have more functions?
18         MS. PURI:  Objection.
19         THE WITNESS:  I don't know.
20 BY MR. GITNER:
21      Q  Do you know what increased functionality
22 means?

Page 63

1       A  To make function better.
2       Q  Okay.  So I take it whatever function's
3  being referred to here was present, but this is to
4  make it better, correct?
5          MS. PURI:  Objection.
6          THE WITNESS:  Right.
7  BY MR. GITNER:
8       Q  Would you agree with me, when you increase
9  functionality that's not essential to the operation
10 of the system, it's just making it better, is that
11 correct?
12         MS. PURI:  Objection.  Is this in
13 reference to 10?
14         MR. GITNER:  Yeah.
15         MS. PURI:  He's already told you he
16 doesn't remember the ticket.
17         THE WITNESS:  I don't know what's inside
18 the ticket, what specific changes they're asking
19 about.
20 BY MR. GITNER:
21      Q  I'm asking you, generally, there's a
22 number of references here to increased functionality?

Page 64

1          MS. PURI:  Objection.
2  BY MR. GITNER:
3       Q  Would you agree with me that whatever
4  function it was, was operable, and increasing the
5  functionality is not necessary to make the system
6  work?
7          MS. PURI:  Objection, it would be more
8  helpful if you went line-by-line per ticket number.
9  BY MR. GITNER:
10      Q  Do you understand my question, sir?
11      A  I have to see what are the changes
12 referred inside the ticket, then I can get idea about
13 what increased the --
14      Q  Let me ask you, these are the changes that
15 were made for release number two, is listed here in
16 Exhibit 2, correct?
17      A  Correct.
18      Q  And these changes were made over a time
19 period from approximately January through April of
20 2007, correct?
21      A  Correct.
22      Q  During which period of time the DCMS was

Page 65

1  being used by the HR personnel division of GW,
2  correct?
3       A  As it was delivered?
4       Q  As it was delivered.  Correct?
5       A  Correct.
6       Q  So none of these changes were essential to
7  make the DCMS work or to be used by the HR personnel
8  division, isn't that correct?
9          MS. PURI:  Objection.
10         THE WITNESS:  No.  The document search did
11 not work, and it's part of this ticket, and that was
12 required.
13 BY MR. GITNER:
14      Q  By who?
15      A  By GW.
16      Q  Where?
17         MS. PURI:  Objection.
18 BY MR. GITNER:
19      Q  You're saying it was required.  What was
20 required?
21      A  For document only search to work.
22      Q  Are you saying all these things were

Page 66

1    required at some point in time by GW, is that your
2    testimony?
3        A  I'm not in a position to make that it's
4    required, it's the business decisions.
5        Q  Do you know what the requirement
6    specifications were for the DCMS as of December 18th,
7    2006?
8        A  I did not prepare it.
9        Q  Do you know what they were?
10       A  As told by Rick Gilchrist.
11       Q  Did you ever review what the requirement
12   specifications were as of December 18th, 2006?
13       A  No.
14       Q  So as you sit here today, you have no idea
15   whether or not any of these items as listed in
16   Exhibit Number 2 were part of the system requirements
17   for the DCMS as of December 18th, 2006?
18       MS. PURI:  Objection.
19       THE WITNESS:  As instructed by my manager.
20   BY MR. GITNER:
21       Q  As instructed by your manager.  Let me ask
22   the question again.  As you sit here today, were you

Page 67

1    aware, as of December 18th, 2006, what the system
2    requirements were for the DCMS?
3        A  Mentioned, yes, as instructed by my
4    manager.
5        Q  What did your manager instruct you?
6        A  What are the required functionalities.
7        Q  Pardon me?
8        A  What are the required functionality.
9        Q  What are the required?
10       A  Functionalities.
11       Q  What did he tell you?
12       A  Told me employee search, document search,
13   net ID search, the text search, combination search,
14   folder permissions are things required.
15       Q  And when did he tell you that?
16       A  Before December 18th.
17       Q  He told you that all those items that you
18   just listed were part of the systems, the
19   requirements specifications for the DCMS as of
20   December 18th or as part of release number one --
21       MS. PURI:  Objection.
22   BY MR. GITNER:

Page 68

1        Q  Is that correct?
2        A  Can you restate that now?
3        Q  Did he ever provide you with any
4    documentation showing you what the requirement
5    specifications were for release number one?
6        A  No.
7        Q  Have you ever seen any documentation of
8    what the system requirements were as of December 18th
9    for release number one?
10       A  No.
11       Q  Do you remember the date that you
12   discussed with Mr. Gilchrist prior to December 18th
13   what the system requirements were?
14       A  I don't remember.
15       Q  And before I asked you that question
16   today, when was the last time you had ever thought
17   about the conversation that you had had with
18   Mr. Gilchrist in which he told you what the system
19   requirements were?
20       A  Can you be specific about the system?
21       Q  Which system?
22       A  Yeah.

Page 69

1        Q  For DCMS.
2        A  Prior to December 18th?
3        Q  Yeah.
4        A  September, October timeframe.
5        Q  Where were you when he told you this?
6        A  The Ashburn campus.
7        Q  And was anybody else present?
8        A  I don't recall.
9        Q  After September or October, did you ever
10   have any conversations with Mr. Gilchrist in which he
11   told you what the requirement specifications were?
12       A  I don't recall.
13       Q  Can you go back to Exhibit Number 1, the
14   chart on page five?  Did you provide the dates that
15   are included in this chart?
16       A  Yes.
17       Q  And you got them off the server?
18       A  Correct.
19       Q  And there would be a copy on the CVS of
20   each version of the DCMS source code as of each one
21   of these dates, is that correct?
22       A  CVS will have only one copy, and that copy

18  (Pages 66 to 69)

Page 70

1  will be moved to development, QA, and production
2  environment.
3      Q  I thought you told me before that each
4  time there was a change made the CVS, you have the
5  capability of producing a copy of it?
6      A  Correct.
7      Q  And so I'm asking you, would you be able
8  to, for example, produce a copy of what the DCMS
9  looked like on December 27th, '06?
10     A  Yes.
11     Q  And also on April 2nd, '07?
12     A  You can certainly get it from CVS.
13     Q  As well as all the other dates that are
14 listed here, April 3rd, April 23rd, et cetera?
15     A  The dates mentioned here are the days when
16 the code was moved to the development system.
17     Q  Right.
18     A  Those are not the dates when the change
19 happened.
20     Q  Okay.  But we can still get a copy of the
21 code as of those dates, correct?
22     A  Yes.

Page 71

1      Q  As you sit here today, can you tell me
2  what modifications were made on each one of these
3  dates, or would you have to go back and review your
4  records or the Mantis tracking system?
5      A  I'd have to review those.
6          (Plaintiff's Exhibit Number 3 was marked
7  for identification.)
8  BY MR. GITNER:
9      Q  Let me show you what's been marked as
10 Exhibit Number 3 and, ask you, have you ever seen
11 this document before?
12     A  No.
13     Q  Are you familiar with this form of this
14 document, are you familiar with this type of
15 document?
16     A  Yes.
17     Q  And would you have been provided with
18 these DCMS notes on a regular basis?
19     A  I'm not involved in these matters.
20     Q  Under release number three, it says, the
21 second bullet, that, "A solution design has been
22 received from Crown Partners."  Do you see that?

Page 72

1      A  Yes.
2      Q  Have you seen the solution design from
3  Crown Partners?
4      A  No.
5      Q  Do you know who would have a copy of the
6  solution design?
7      A  Probably Rick Gilchrist.
8      Q  Are you aware what was included in Crown
9  Partners' solution design?
10     A  No.
11     Q  You have no information whatsoever of what
12 was included in Crown Partners' solution design, is
13 that correct?
14         MS. PURI:  Objection, vague.
15         THE WITNESS:  Restate that question,
16 please.
17 BY MR. GITNER:
18     Q  You have no knowledge whatsoever of what
19 was included in Crown Partners' solution design, is
20 that correct?
21         MS. PURI:  Objection.  What is solution
22 design?

Page 73

1          THE WITNESS:  I don't know the solution
2  design, I'm not involved in the solution design
3  process.
4  BY MR. GITNER:
5      Q  But, again, I'm asking you, you say you
6  know nothing about what was included in Crown
7  Partners' solution design?
8          MS. PURI:  Objection.  What are you
9  referring to, what solution design?
10         MR. GITNER:  The one we've been talking
11 about.
12         MS. PURI:  I know, but he already said he
13 doesn't know what this means.
14         THE WITNESS:  I have no idea of solution
15 design.  I'm not involved in the solution design
16 process.
17 BY MR. GITNER:
18     Q  Has Rick Gilchrist discussed with you
19 what was included in Crown Partners' solution design?
20     A  No.
21     Q  Have you ever seen any documents produced
22 by Crown Partners that relate to or refer to the

19 (Pages 70 to 73)

Vijay Padmanabhan                    CONFIDENTIAL                    May 31, 2007
Washington, DC

Page 74

1 DCMS?

2   A  Yes.

3   Q  And what document is that?

4   A  The evaluation of DCMS.

5   Q  Have you seen more than one document

6 prepared by Crown Partners? Have you seen more than

7 one?

8   A  One that I can recall.

9   Q  Do you know if Crown Partners entered into

10 any type of confidentiality agreement prior to

11 reviewing the DCMS code?

12   A  I was aware of it.

13   Q  You were aware of it? Can you describe

14 what type of agreement they entered into?

15     MS. PURI:  Objection.

16     THE WITNESS:  I'm not involved.

17 BY MR. GITNER:

18   Q  Well, what do you know about it?

19   A  That they have a nondisclosure agreement.

20   Q  With GW?

21   A  With GW.

22   Q  With regard to the DCMS code?

Page 75

1   A  I don't know what, I was just aware that

2 there was an NDA between GW and Crown Partners.

3   Q  Have you made any changes to the banner

4 computer code in order to make changes to the DCMS

5 computer system?

6     MS. PURI:  Objection.

7     THE WITNESS:  Yes.

8 BY MR. GITNER:

9   Q  Could you describe what those changes were

10 and the reasons why you made them?

11     MS. PURI:  Objection, compound.

12     THE WITNESS:  One of the Mantis tickets

13 referred here, Exhibit 2.

14 BY MR. GITNER:

15   Q  Go ahead.

16   A  In Exhibit 2 is changes to web service,

17 ticket 378.

18   Q  And what number is that, sir?

19   A  It's 378.

20   Q  I'm sorry, just the number on the

21 left-hand side?

22   A  22.

Page 76

1   Q  Okay.

2   A  "Error messages should all be reviewed and

3 written to accurately report the problem

4 encountered." That's one of the changes which was

5 done in the banner to give the error message to DCMS.

6   Q  Any others?

7     MS. PURI:  Objection to form.

8     THE WITNESS:  Any other changes to banner

9 web services?

10 BY MR. GITNER:

11   Q  Right. Well, it looks like 29.

12   A  I wasn't involved in that.

13   Q  I'm sorry?

14   A  I wasn't involved in that, I don't know.

15   Q  Number 22, the ticket 378, you had to

16 rewrite certain portions of the banner code, is that

17 correct?

18     MS. PURI:  Objection to form.

19     THE WITNESS:  Correct.

20 BY MR. GITNER:

21   Q  And did that necessitate then having to

22 make some changes to the DCMS computer code?

Page 77

1   A  No.

2   Q  With regard to any other changes that are

3 shown here with regard to the DCMS, is it your

4 testimony that you are not required to make any

5 changes to the banner system -- or code, rather?

6   A  There was some change in the banner code

7 for that.

8   Q  Are you referring to all of these DCMS

9 changes or some of them?

10   A  Not all.

11   Q  All right. Do you know how many of these

12 required that? Is it fair to say a substantial

13 number of these?

14     MS. PURI:  Objection, objection. It would

15 be easier to go ticket-by-ticket if you're asking

16 about the DCMS changes.

17     MR. GITNER:  Well, let's see how he does.

18     THE WITNESS:  It's not substantial.

19 BY MR. GITNER:

20   Q  It's not substantial?

21   A  No.

22   Q  So there were some, but not a great

Vijay Padmanabhan                CONFIDENTIAL                May 31, 2007
                              Washington, DC

Page 78

1  number, is that correct?
2      MS. PURI: Objection.
3      THE WITNESS: There are a few.
4  BY MR. GITNER:
5      Q  I'm sorry?
6      A  There are a few.
7      Q  Okay.
8      (Plaintiff's Exhibit Number 4 was marked
9  for identification.)
10 BY MR. GITNER:
11     Q  Sir, I just handed you what I understand
12 to be one of the Mantis tickets, is that correct?
13     A  Correct.
14     Q  And in fact, this is ticket number -- is
15 there a ticket number on here that we can refer to?
16 I guess it's right underneath the ID, 363, correct?
17     A  Yes.
18     Q  And this is one of the -- the summary, did
19 you prepare this document?
20     A  No.
21     Q  Who prepared this?
22     A  Rick G.

Page 79

1      Q  So it would be Rick Gilchrist?
2      A  Correct.
3      Q  So he prepared this?
4      A  Correct.
5      Q  And does he give it to you then to go to
6  work?
7      MS. PURI: Object to form.
8      THE WITNESS: This is a ticketing system.
9  It's done online.
10 BY MR. GITNER:
11     Q  Is this before or after you make the
12 changes to the code?
13     A  Before.
14     Q  All right. So Gilchrist prepares it --
15 basically, he's telling you what he wants to have
16 done, correct?
17     A  Correct.
18     Q  You get the ticket, and then you go to
19 work, correct?
20     A  Correct.
21     Q  On the computer system or computer code,
22 right?

Page 80

1      A  Correct.
2      Q  Okay. And this particular change was a
3  change to the front end wrapper, is that correct, of
4  the DCMS?
5      A  Correct.
6      Q  And these were his words, he wanted to
7  make changes to the add screens for increased
8  functionality, correct?
9      MS. PURI: Objection, lack of foundation.
10     THE WITNESS: That's what the ticket
11 states.
12 BY MR. GITNER:
13     Q  I'm saying that's from Mr. Gilchrist, he
14 wrote that?
15     A  Correct.
16     Q  So the DCMS system worked prior to making
17 this change, correct?
18     MS. PURI: Objection --
19     THE WITNESS: In what sense?
20     MS. PURI: -- to form.
21 BY MR. GITNER:
22     Q  People were using it, right?

Page 81

1      A  People were using it.
2      Q  It wasn't necessary to make this change
3  for the system to operate, was it?
4      MS. PURI: Object to form.
5      THE WITNESS: These changes are required
6  by the manager, management.
7  BY MR. GITNER:
8      Q  You're telling me, as you sit here now,
9  that you don't agree with me, that this was a change
10 that was made simply to make the system work?
11     MS. PURI: Objection to form.
12 BY MR. GITNER:
13     Q  In a different manner, but it was not
14 necessary to make the system work at all?
15     A  I'm in no place to decide what is required
16 for business.
17     Q  And you don't interpret increased
18 functionality as meaning to change, to add
19 functionality, or add a functioning capability to a
20 system that's already operable, you don't understand
21 that?
22     MS. PURI: Object to form.

21 (Pages 78 to 81)

Page 82

1　　　THE WITNESS:  In plain English?
2　BY MR. GITNER:
3　　　Q  Right.
4　　　A  Yes, but what are the business needs, what
5　is required?  If this is required, I don't know.  I'm
6　IN no place to make a decision.
7　　　Q  It says the resolution -- you were able to
8　do this, you accomplished this, correct?
9　　　A  Correct.
10　　　Q  Did you have an understanding that, unless
11　you were able to make this change, that no one would
12　ever be able to use the DCMS system?
13　　　MS. PURI:  Object to form.
14　　　THE WITNESS:  I want a more specific
15　question.  Can you restate it?
16　BY MR. GITNER:
17　　　Q  More specific than that?
18　　　A  Yes.
19　　　Q  Did you believe that unless you made this
20　change as specified in ticket number 363, that no one
21　could use the DCMS system in any manner?
22　　　A  It's a part of the system.

Page 83

1　　　Q  In March of 2007, at least 30 people were
2　using the system, weren't they, at GW University?
3　　　A  I don't know how many.
4　　　Q  But there were a lot, weren't there?
5　　　MS. PURI:  Object to form.
6　BY MR. GITNER:
7　　　Q  Weren't there?
8　　　A  There were people using it.
9　　　Q  Yeah, HR personnel was using it?
10　　　A  Correct.
11　　　Q  Student faculty was using it?
12　　　MS. PURI:  Objection, lack of personal
13　knowledge.
14　　　MR. GITNER:  Do you want to just put the
15　words in his mouth?
16　　　MS. PURI:  Sorry, objection.
17　　　MR. GITNER:  Is that sort of like, "I
18　don't know"?
19　　　MS. PURI:  Objection to form.
20　BY MR. GITNER:
21　　　Q  Would you like to adopt your counsel's --
22　　　A  There were many people using it.

Page 84

1　　　Q  And there were many stakeholders, as
2　they're called, using it different divisions?
3　　　A  Different divisions using it.
4　　　Q  And they were using it in January too,
5　weren't they?
6　　　A  I know HR was using it.
7　　　Q  And they were retrieving documents,
8　weren't they?
9　　　A  Without the functionalities.
10　　　Q  Were they using it or not?
11　　　A  Without the functionalities, yes.
12　　　Q  Let me ask you something, was the screen
13　in color?
14　　　MS. PURI:  Objection.  What screen?
15　BY MR. GITNER:
16　　　Q  Yeah, the DCMS screen, was it in color?
17　　　A  Yes.
18　　　Q  Was it in 3-D?
19　　　A  No.
20　　　Q  Would it being in 3-D increase its
21　functionality?
22　　　A  You're asking me to decide whether it

Page 85

1　makes functionalities?
2　　　Q  Uh-huh.
3　　　A  Makes business sense, yes.
4　　　Q  But it still worked without being in 3-D?
5　　　A  Like I say, I'm not in any position to
6　make the decision.
7　　　Q  All right.  Are you hesitant to agree with
8　me that the DCMS system was being used on a routine
9　daily basis by the HR personnel division, as well as
10　other divisions at GW University, are you hesitant
11　for some reason to admit that?
12　　　MS. PURI:  Objection to form.
13　　　THE WITNESS:  I agree that they are using
14　it, but with limited functionality.
15　BY MR. GITNER:
16　　　Q  Things can always be improved, can't they?
17　　　A  I guess.
18　　　Q  I mean, I could ask you what kind of car
19　you drive, and I'm sure you'd like additional
20　enhancements to that, right?
21　　　A  No.
22　　　Q  No.  You're satisfied with your car?

22  (Pages 82 to 85)

Page 86

1    A  Absolutely.
2    Q  All right.  And until release two came out
3  or went live, you don't deny that scores of people at
4  GW University were using the DCMS system, do you?
5       MS. PURI:  Objection to form.
6       THE WITNESS:  I know many people were, I
7  don't know how many.
8  BY MR. GITNER:
9    Q  Well, you know HR personnel was using it?
10    A  Yeah, I know the department was using it,
11  I don't know how many people.
12    Q  And they were using it on a daily basis,
13  correct?
14    A  Correct.
15    Q  They were relying on it, weren't they?
16       MS. PURI:  Objection.
17       THE WITNESS:  They were doing their work.
18  BY MR. GITNER:
19    Q  They were relying on the use of it for
20  their work, weren't they?
21    A  Depending on their work profile, probably,
22  yes.

Page 87

1    Q  And release number three hasn't come out
2  yet, correct?
3    A  No.
4    Q  And HR personnel people are continuing to
5  use the DCMS to this day, correct?
6    A  They are using it.
7    Q  So they don't need release number three to
8  come out to use it, do they?
9       MS. PURI:  Object to form.
10       THE WITNESS:  I don't know.
11  BY MR. GITNER:
12    Q  The DCMS went live on December 18th, you
13  agree with that, right?
14    A  Phase 1?
15    Q  Right.
16    A  Yes.
17    Q  There's a lot of other tickets here that
18  talk about increased functionality, make it more
19  functional -- well, let me ask you about this if I
20  could.
21       (Plaintiff's Exhibit Number 5 was marked
22  for identification.)

Page 88

1  BY MR. GITNER:
2    Q  Let me show you what's been marked as
3  Exhibit Number 5, and for the record, can you
4  describe what this document is, sir?  This is a
5  Mantis tracking ticket, correct?
6    A  Yes, it is.
7    Q  And this is ticket number 361, correct?
8    A  Correct.
9    Q  And apparently, changes were made to the
10  DCMS front end wrapper, correct?
11    A  Correct.
12    Q  And in order to make these changes, you
13  rewrote code, you rewrote part of the DCMS source
14  code, correct?
15       MS. PURI:  Objection, form.
16       THE WITNESS:  And modified the DCMS.
17  BY MR. GITNER:
18    Q  Right.  Is that correct?
19    A  Yes.
20    Q  All right.  And the reason you did that
21  was to make it more functional and easier to use,
22  correct?

Page 89

1       MS. PURI:  Objection to form.
2       THE WITNESS:  To fix this ticket.
3  BY MR. GITNER:
4    Q  Well, the ticket says, "several changes to
5  the navigational bar to make it more functional and
6  easy to use," correct?
7    A  If the ticket states, yes.
8    Q  And is there a difference between more
9  functional and easier to use, to you?
10    A  Yes.
11    Q  What's the difference?
12    A  Functional is a more business perspective,
13  easier, more user perspective.
14    Q  Functional in the more business
15  perspective, correct, is that what you said?
16    A  Correct.
17    Q  What do you mean by that, functional in
18  the more business perspective?
19    A  What the business dictates.
20    Q  What business dictates were implicated by
21  this change?
22    A  I think that's decided by the managers.

Page 90

1    Q  So you didn't have any understanding of
2  that when you were given this task?
3    A  I'm given the task to do it.
4    Q  And this was submitted to you on January
5  4th, '07, is that correct?
6    A  That's what the ticket says.
7    Q  And when it says last update, is that when
8  you finished it, or is that just some other date?
9    A  That's when the ticket was closed.
10    Q  So is that when you finished the task?
11    A  Correct.
12    Q  And it says, "product build 2.0," is that
13  how much time it took you, or is that some reference
14  to something else?
15    A  We were working on multiple tickets.
16    Q  What does that 2 mean, that product build
17  2.0?
18    A  Release two.
19    Q  Oh, release two, I see.  Do these tickets
20  show how much time you took to accomplish these
21  tasks?
22    A  Not outright.

Page 91

1    Q  I'm sorry?
2    A  It doesn't give the time.
3    Q  All right.  The first page under
4  description?
5    A  Uh-huh.
6    Q  That's written by -- that's not written by
7  you, correct, or is that written by you?
8    A  No.
9    Q  That's written by Gilchrist, is that
10  right?
11    A  Correct.
12    Q  And then what about on the second page,
13  which has a Bates stamp 4016 on it, did you make any
14  of these entries?
15    A  Which one are you referring to?
16    Q  Exhibit Number 5, the second page of
17  Exhibit Number 5.
18    A  No.
19    Q  So these are all Gilchrist, correct?
20    A  Correct.
21    Q  And if you go to page number three,
22  there's a second field where it says, please change

Page 92

1  hello for persons signed into, signed in as, was that
2  a change you were asked to make, is that correct?
3    A  Yes.
4    Q  Was this a bug, some defect in the system?
5    A  Enhancement.
6    Q  This was an enhancement.  All right.  And
7  what do you mean by, "enhancement," a change, right?
8        MS. PURI:  Objection.
9  BY MR. GITNER:
10    Q  Correct?
11    A  A change.
12    Q  Yeah, it's not an essential to make the
13  system operate, it's just a change?
14        MS. PURI:  Objection to form.
15        THE WITNESS:  I can't answer for that.
16  BY MR. GITNER:
17    Q  You can't?
18    A  It's not for operational purposes.
19        (Plaintiff's Exhibit Number 6 was marked
20  for identification.)
21  BY MR. GITNER:
22    Q  Let me show you what's been marked as

Page 93

1  Exhibit Number 6.  Again, this is one of the Mantis
2  tracking tickets.
3    A  Yes.
4    Q  And you were the person that made these
5  changes to the DCMS computer code -- no, strike that.
6        These are changes you made to the banner
7  web services code, correct?
8    A  Yes.
9    Q  And it makes reference to the summary,
10  modify search to accept selection of active, inactive
11  employees in jobs referring to code 358, correct?
12    A  Ticket 358.
13    Q  Right.  So you had to make a change to the
14  DCMS when you made a change to the banner web
15  services code, correct?
16    A  I didn't work on this ticket.
17    Q  Well, are you aware that a change was
18  made?
19    A  I was aware of it, but I didn't work on
20  this ticket.
21    Q  Okay.  But a change was made to the DCMS
22  source code because of the change that was

24  (Pages 90 to 93)

Page 94

1   necessitated to the banner code, correct?
2      A  A change was made in the banner code
3   necessitated by DCMS.
4      Q  So each one of these Mantis tracking
5   system tickets represents a change that was made to
6   either the DCMS code or to one of the codes that was
7   affiliated with the DCMS system, correct?
8      A  The exhibit you provided before.
9      Q  Exhibit Number 2?
10     A  Yes.
11     Q  And the first ticket that I've seen was
12  dated January 7th '07.  Are you aware of any tickets
13  prior to that time?
14     A  I'm not aware of it.
15     Q  Would that be about right, is that when it
16  started?
17        MS. PURI:  Objection to form.  When what
18  started?
19  BY MR. GITNER:
20     Q  Modifications to the DCMS.
21     A  Around that time.
22     Q  Were the modifications of the DCMS begun

Page 95

1   after you went to the Documentum online schooling?
2      A  Pardon me?
3      Q  Did your online education on Documentum,
4   was that before you began to make modifications to
5   the DCMS source code?
6      A  No.
7      Q  So you began to make changes before you
8   had taken a course?
9      A  For Documentum.
10        (Plaintiff's Exhibit Number 7 was marked
11  for identification.)
12  BY MR. GITNER:
13     Q  Let me show you what's been marked as
14  Exhibit Number 7, which is Mantis tracking ticket
15  number 362, right?
16     A  Yes.
17     Q  From Mr. Gilchrist, correct?
18     A  Yes.
19     Q  Make changes to the search screen for
20  increased functionality, correct?
21     A  Yes.
22     Q  And, again, can you tell me, number one,

Page 96

1   the first -- there were several things he was asking
2   you to do here, correct?
3      A  Correct.
4      Q  Looks like nine separate things, correct,
5   the first of which was change the label "employee
6   information" to "employee search criteria," correct?
7      A  Correct.
8      Q  How did this increase functionality,
9   making that change?
10     A  Business need.
11     Q  What business need?
12     A  I'm not in a position to say who, given by
13  a manager.
14     Q  As I understand, your position is, when
15  you were asked to make a change to increase
16  functionality, that that was something that had
17  originated with the business need from the users of
18  the system, is that correct?
19     A  I know it from a manager.  I don't meet
20  with the users.
21     Q  Right.  And you're not aware of what the
22  business needs were, you're just aware that that came

Page 97

1   from the business end of the University, is that
2   correct?
3      A  All the business needs comes from them.
4      Q  All right.  So as far as how it increased
5   the functionality, you're unable to respond to that,
6   you don't have knowledge about that?
7      A  Correct.
8      Q  You just took that as a given, correct?
9      A  Correct.
10     Q  Were you ever part of a conversation --
11  participant in a conversation in which it was
12  discussed whether or not GW was permitted to make
13  changes to the DCMS source code?
14     A  Please be specific.
15     Q  Whether they were permitted, whether they
16  were allowed to?
17     A  Were they a part of the conversation?
18     Q  Yeah, were you ever part of a conversation
19  where there was discussion about, you know, we really
20  can't do this, or we shouldn't do this, it's not
21  legal, or it's illegal, it's copyrighted, or it's not
22  copyrighted, anything like that?

25 (Pages 94 to 97)

Page 98

1    A  No.
2    Q  Were you ever told not to discuss what you
3  were doing with regard to the DCMS, were you ever
4  told not to discuss your work on the DCMS code, were
5  you ever told that?
6    A  To who?
7    Q  To anybody.
8    A  It's a common practice to discuss within
9  the team.
10   Q  I know, but I'm asking were you ever told,
11  listen, Vijay, do not discuss this, don't ever tell
12  this person or anybody what it is you're doing in the
13  DCMS computer code, that you weren't to discuss this,
14  you weren't to tell anybody?
15      MS. PURI:  Object to form.
16      THE WITNESS:  DCMS changes as it relates
17  to today?
18  BY MR. GITNER:
19   Q  Ever.
20   A  No.
21   Q  Were you ever asked not to discuss your
22  changes, your modifications to the DCMS code with

Page 99

1  anybody from Richmar or anybody affiliated with
2  Richmar?
3    A  When?
4    Q  Ever.
5    A  No.
6      MS. PURI:  Can we take a five-minute
7  recess?
8      MR. GITNER:  Sure.
9      (Whereupon, a short recess was taken.)
10  BY MR. GITNER:
11   Q  Are you familiar with the term "user
12  acceptance testing"?
13   A  Yes.
14   Q  Were you aware that the user acceptance
15  testing had occurred prior to release number one
16  going live on December 18th?
17   A  That's a standard practice.
18   Q  Are you aware that the user acceptance
19  testing for release number one had been successfully
20  accomplished?
21      MS. PURI:  Objection to form.
22      THE WITNESS:  I guess.

Page 100

1  BY MR. GITNER:
2    Q  It's a prerequisite to going live, isn't
3  it?
4    A  Yes.
5    Q  And user acceptance testing for the DCMS
6  was conducted by GW University, correct?
7    A  The users at GW University.
8      (Plaintiff's Exhibit Number 8 was marked
9  for identification.)
10  BY MR. GITNER:
11   Q  Let me show you Exhibit Number 8, if I
12  could.  Have you seen this document before today?
13   A  No.
14   Q  Are you familiar with this type of
15  document?
16   A  Yes.
17   Q  And do you know what relation Marcy Day
18  had to the DCMS project?  She was the project
19  manager, correct?
20   A  Correct.
21   Q  And are you familiar with any of the other
22  attendees on this list which are marked off with Xes?

Page 101

1    A  No.
2    Q  The date of this document is September
3  20th, 2006, correct?
4    A  Right.
5    Q  And under HR personnel implementation
6  plans, HR personnel were the users of the DCMS
7  release one, correct?
8    A  Under HR personnel?
9    Q  Yes.
10   A  The users of HR personnel.
11   Q  Great.  And the first bullet says, "HR go
12  live is going well.  There have been a few minor
13  issues which have been resolved."  Do you see that?
14   A  Yes.
15   Q  Were you aware that, as of December 20th,
16  2006, the HR personnel department felt that the DCMS
17  release number one was "going well"?
18      MS. PURI:  Objection to form.
19      THE WITNESS:  I wasn't involved in this
20  meeting, so I don't know.
21  BY MR. GITNER:
22   Q  Well, had you heard it through any source?

26  (Pages 98 to 101)

Page 102

1    A  Not that I can recall.
2    Q  As of December 20th, 2006, were you the GW
3  employee that was assigned to making program changes
4  to the DCMS?
5    A  I was on the project.
6    Q  As a programmer, computer programmer?
7    A  Correct.
8    Q  And it says here, "There have been a few
9  minor issues which have been resolved." Can you tell
10  me what those minor issues were?
11    A  I'm not aware of this document, so I don't
12  know what they're talking about.
13    Q  It then goes on to say, "Stakeholder
14  rollout tentatively planned for January 22. There
15  will be no code changes." Are you aware that, in the
16  month of January, other divisions at George
17  Washington began to implement and utilize the DCMS
18  system?
19    A  I know this is tentatively rolled out for
20  multiple departments. I don't know the timeframe.
21    Q  By the way, can you tell me, Exhibit
22  Number 2, the Mantis tracking summary -- or, excuse

Page 103

1  me, the DCMS release two Mantis ticket ranking?
2    A  Correct.
3    Q  These were all envisioned as being part of
4  release number two, correct?
5    A  Correct.
6    Q  Can you tell me why they weren't
7  considered to be updates to release number one, that
8  is, part of a version 1.1 or 1.2?
9    A  I don't understand.
10    Q  Well, you say they were contemplated to be
11  part of release number two?
12    A  It's an error fixing enhancements for
13  release one.
14    Q  Let me show you in the exhibit I just gave
15  you, Exhibit Number 8, the third bullet under HR
16  personnel implementation, it says, "Release two is
17  being evaluated to determine what will be in the
18  release." Do you see that?
19    A  Yes.
20    Q  I notice that many of the tickets you
21  received that we've gone over this afternoon were
22  dated January 4th and 5th, all right?

Page 104

1    A  Okay.
2    Q  Were you part of a group that was
3  determining what would be included in release number
4  two as of late December, early January 2007?
5    A  No.
6    Q  Can you tell me who it was that decided
7  what was to be included in release number two?
8    A  I don't know who everybody is. I know
9  Rick would be involved because I know he was one of
10  the main guys there.
11    Q  And Christina Griffin, you know who she
12  is?
13    A  PMO, project management office, she works
14  in project management office.
15    Q  All right. That's in the ISS group?
16    A  Yes.
17    Q  Is she assistant to Mr. Bonig?
18    A  Yes, to my knowledge, yes.
19    Q  And can you tell me what role she had in
20  improving the modifications to DCMS after September
21  18th?
22    A  I don't know.

Page 105

1    Q  Do you know what role Mr. Bonig played,
2  Ronald Bonig played with regard to approval of
3  changes to the DCMS?
4    A  He is the top guy in ISS.
5    Q  Would he have had to approve these
6  changes?
7    A  I presume.
8    Q  This third bullet goes on to say, "The
9  release will contain bug fixes, cosmetic changes, and
10  some enhancements." When we look at some of these
11  Mantis tickets that talk about changing the screens,
12  would you agree that's a cosmetic change?
13    A  It depends on the business needs. It can
14  fall under enhancements.
15    Q  Okay. Can you tell me why it was that you
16  received so many of these tickets on January 4th and
17  5th, '07?
18    A  I just created them.
19      MS. PURI: Objection, foundation.
20  BY MR. GITNER:
21    Q  Were you aware, prior to January 4th, that
22  you would be receiving a number of requests to revise

Page 106

1  or modify the DCMS?  In other words, did you know
2  that right after the 1st of the year, you were going
3  to start working on this thing?
4      A  I was always involved with the DCMS
5  project, so error fixes and everything, I know could
6  be coming on the way.
7      Q  And how did you know that, how did you
8  become aware of that?
9      A  Through my manager and Rick Gilchrist.
10     Q  And who is your manager?
11     A  Andrew Smith.
12     Q  What did they tell you?
13     A  I don't recall exactly the same words, but
14  they said something about, you will have error fixes
15  and enhancements coming on.
16     Q  And when did they tell you that, how much
17  before January 4th of the beginning of 2007?
18     A  I don't recall when.
19     Q  Was it a week, a month, a couple days?
20     A  I don't know.
21     Q  You don't remember one way or the other?
22     A  No.

Page 107

1      Q  So as far as you know, it could have been
2  a couple days, it could have been a week, correct?
3      MS. PURI:  Objection, form.
4      THE WITNESS:  Probably.
5  BY MR. GITNER:
6      Q  Do you have any information or knowledge
7  as to why Richmar was not kept on to continue with
8  release number two?
9      A  No, I was not involved in the business
10  decisions.
11     Q  You may not have been involved, but do you
12  have any information, do you have any knowledge,
13  whether it was somebody told you or you saw something
14  in writing?
15     A  I know Richmar is not involved in DCMS
16  phase two, but I don't know why.
17     Q  Were you aware of whether or not there
18  were any budget issues with regard to how much money
19  GW had to spend on the DCMS project?
20     MS. PURI:  Objection, foundation.
21     THE WITNESS:  Again, I'm not involved in
22  any money or business decisions, I don't know.

Page 108

1  BY MR. GITNER:
2      Q  So you have no information with regard to
3  whether or not GW did not have any more money
4  budgeted for the DCMS project for outside vendors, is
5  that correct?
6      A  I have no idea.
7      Q  Are you aware that there's a list of users
8  of the DCMS system?
9      A  Can you be more specific?
10     Q  A list of people at GW who used the DCMS
11  system and have used the DCMS system?
12     A  Different departments?
13     Q  Right.  Have you seen that?
14     A  No.
15     Q  All right.  Is that on the computer, is
16  that on the system somewhere?
17     A  I don't know any system having that kind
18  of information, but my knowledge is limited.
19     Q  There would have to be a list of users,
20  would there not?
21     A  Yes.
22     Q  And there would have to be a list of users

Page 109

1  with regard to their security clearance for specific
2  documents, correct?
3      A  Correct.
4      Q  And I take it that a, for example,
5  somebody at GW, if they wanted to get that list,
6  could retrieve it in some form, correct?
7      A  Yes.
8      Q  And that would show when people began to
9  use the system and how many people began to use the
10  system, correct?
11     MS. PURI:  Objection, foundation.
12     THE WITNESS:  You're asking about when the
13  user started using the system? I don't know.
14  BY MR. GITNER:
15     Q  Are you aware that, in July of 2006,
16  further work on the document only search feature was
17  suspended by GW?
18     A  Please state the question again.
19     Q  Yeah.  Were you aware that, as of July of
20  2006, further work by Richmar on the document only
21  search system was suspended?
22     A  No.

Page 110

```
 1    Q  Was that something in your position you
 2  would have been aware of?
 3    A  I recall that I was involved in the
 4  project in -- I started involving in the DCMS project
 5  only by the fall of '06.
 6      (Plaintiff's Exhibit Number 9 was marked
 7  for identification.)
 8  BY MR. GITNER:
 9    Q  Let me show you what's been marked as
10  Exhibit Number 9, ask you to take a look at that if
11  you could.  Apparently, you logged it in, so I take
12  it this was sent to you or developed by you?
13    A  It's reported by Rick G.
14    Q  What does it mean, where you logged it in?
15    A  Logged what?
16    Q  Pardon me?
17    A  Logged what?
18    Q  Right at the left-hand corner, it says,
19  "logged in as"?
20    A  I logged in to this ticket tracking system
21  to the application.
22    Q  Can you tell when you would have logged
```

Page 111

```
 1  in?  Oh, this could be -- go ahead.  I see.
 2    A  When I logged in to get this ticket?
 3    Q  Was it May 21, is that what this is?
 4    A  Yes.
 5    Q  I see.  So you may not have received this
 6  on July 28th, '06?
 7    A  It was created by Rick G.
 8    Q  I see.  But it says it was assigned to
 9  you?
10    A  Correct.
11    Q  Would that have been as of July 28th, '06?
12  Right on the first page, it says, "assigned to."
13    A  If you actually look in the end of this
14  ticket, we have the issue history.
15    Q  Yeah.
16    A  It wasn't assigned to me until 3rd of
17  January '07.
18    Q  What does it mean then, where it says date
19  submitted, "July 28th, '06"?
20    A  When the ticket was created.
21    Q  And when would the resolution have been
22  added, suspended?
```

Page 112

```
 1    A  It should have this information in the
 2  history.
 3    Q  All right.  If you could, I'd ask you to
 4  point it out to me, if you know.
 5    A  End of this ticket, they have a resolution
 6  by Rick G., it says January 5th, 2007.
 7    Q  And the field that you just referred to,
 8  that's an update history, that's when it was updated,
 9  the history, is that correct?
10    A  This is the issue history.
11    Q  Correct.
12    A  Correct.
13    Q  That doesn't necessarily mean that was the
14  date that work was suspended, that just shows when
15  this particular work ticket was updated, correct?
16      MS. PURI:  Yeah, which field are we
17  talking about?  Also, I think there's a
18  misunderstanding between --
19      MR. GITNER:  He didn't say there's any
20  misunderstanding.
21      MR. THOMAS:  I think you have a
22  misunderstanding.
```

Page 113

```
 1      MS. PURI:  I think you're
 2  misunderstanding.
 3      MR. THOMAS:  Let him ask his questions.
 4      THE WITNESS:  Can you restate the question
 5  again?
 6  BY MR. GITNER:
 7    Q  You referred to a entry on January 5th,
 8  '07, correct?
 9    A  Yes.
10    Q  It says, "reopened suspended," correct?
11    A  Correct.
12    Q  Is it your testimony that that's when work
13  on the document only was suspended?
14    A  That's not document only.
15    Q  Or was this just when this particular
16  record was updated?
17    A  When this particular ticket was updated.
18    Q  Can you tell me, what is Struts?
19    A  It's a Java architecture.
20    Q  Have you personally used Struts?
21    A  Yes.
22    Q  Can you tell me on what projects you have
```

Page 114

1  used Struts?
2      A  Within GW?
3      Q  Uh-huh.  I'm sorry, GW, right.  Let me ask
4  you this -- let me withdraw that.
5          Has GW used Struts for any project or
6  systems other than the DCMS?
7          MS. PURI:  Objection, foundation.
8  BY MR. GITNER:
9      Q  To your knowledge.
10     A  In the projects I have worked, DCMS is the
11 project that are using Struts.
12     Q  Okay.  Do you have any knowledge as to
13 whether or not -- well, is Struts being used in any
14 other system, to your knowledge, at GW, other than
15 DCMS?
16     A  Yes.
17     Q  Which systems?
18     A  What do you mean by, "system"?
19     Q  Where it's being used.
20     A  It's one of the projects, I know, in GW.
21     Q  What project?
22     A  It's called Student Hire.

Page 115

1      Q  And what is a Student Hire system?
2      A  It's an intern project, what GW does.
3      Q  Student Hire?
4      A  Yes.
5      Q  And have you personally worked on this?
6      A  No.
7      Q  Can you tell me who works on this?
8      A  Jennifer Bond.
9      Q  Can you tell me when GW first utilized
10 Struts on the Student Hire program?
11     A  It's an ongoing project.
12     Q  And when did it first begin, was it this
13 year?
14     A  Yeah.
15     Q  Can you tell me when this year?
16     A  I don't know when it began.
17     Q  And can you tell me how large a program
18 this is?  Is this a very large program, small
19 program, experimental program?
20         MS. PURI:  Objection.
21         THE WITNESS:  You can't quantify.  It's
22 not a -- you can't quantify a project that way.

Page 116

1  BY MR. GITNER:
2      Q  Well, you can quantify a project in how
3  many people were working on it or how many dollars
4  were spent or how many months were spent?
5          MS. PURI:  Objection, relevance.  What
6  does this have to do with copyright infringement
7  claim?
8          MR. GITNER:  That's your objection, fine.
9          THE WITNESS:  It's a decent sized project.
10 BY MR. GITNER:
11     Q  And is this an experimental project?
12     A  No.
13     Q  And can you tell me what considerations
14 were included in determining whether or not to use
15 the Struts?
16     A  Like I say, I'm not involved in that
17 project.
18     Q  So you have no knowledge about that?
19     A  I'm not involved in that project.
20     Q  Do you have any knowledge as to what role
21 Christina Griffith played in formulating the
22 modifications that you made to the DCMS?

Page 117

1          MS. PURI:  Objection, form.
2          THE WITNESS:  What is her role in DCMS
3  phase two changes, is that your question?
4  BY MR. GITNER:
5      Q  I'll take that, fine.
6      A  I don't know her role.
7      Q  Do you know what role Rick Gilchrist
8  played in formulating the modifications to the DCMS
9  release number two?
10         MS. PURI:  Objection, form.
11         THE WITNESS:  I know he is definitely
12 involved in that because involved in the DCMS phase
13 two specifications, modifications.
14 BY MR. GITNER:
15     Q  Do you know what individuals were involved
16 in approving the modifications that you made to the
17 DCMS system?
18     A  Who Rick reports to.
19     Q  Those would be the only persons that you
20 would know?
21     A  And the users.
22     Q  And who does Mr. Gilchrist report to?

30 (Pages 114 to 117)

Page 118

1    A  He reports to Ron.
2    Q  And who are the users, is that Ms. Bell?
3    A  Tanya Bell.
4    Q  Are you aware of any document that
5  contains the requirement specifications for release
6  number two?
7    A  Yes.
8    Q  And do you recall what the name of that
9  document was?
10    A  DCMS release two specifications.
11    Q  And who gave you that document?
12    A  Rick.
13    Q  Did he give you that on or about January
14  2007?
15    A  I don't recall the dates.
16    Q  Do you recall the months, in relation to
17  today, do you recall when you received it?
18    A  Late December, early January.
19    Q  And in preparing your deposition, did you
20  review that document?
21    A  No.
22    Q  Do you have a copy of that document -- not

Page 119

1  with you, in your personal records at your office
2  there, location?
3    A  Yes.
4    Q  And how did you utilize that document?
5    A  To make the changes.
6    Q  Who formulated that document?
7    A  My assumption is Rick Gilchrist.
8    Q  Do you know what process he went through
9  to formulate that?
10    A  No.
11    Q  Do you know if he consulted with anybody,
12  for example, Ms. Bell or any of the end users?
13    A  I don't know, but I presume yes.
14    Q  You don't know, but you're just assuming?
15    A  I don't know.
16    Q  Do you know when he formulated that
17  document?
18    A  No.
19    Q  Do you know if anybody has reviewed
20  whether any of the modifications that have been made
21  to the DCMS would constitute copyright infringements?
22    MS. PURI:  Objection, foundation.

Page 120

1    THE WITNESS:  No.
2  BY MR. GITNER:
3    Q  Can you tell me whether you've seen any,
4  signatures with regard to approval for the
5  requirement specifications?  In other words, has
6  anybody signed off on the requirement specifications
7  for release number two?  And who would those
8  individuals be?
9    A  I don't know who signed off the documents.
10    Q  Do you recall whether or not there were
11  any sign-offs?
12    A  Like I say, I'm not involved in that
13  process, I would receive those specifications from
14  Rick.
15    Q  As part of your custom and practice in
16  your job, would you not want to verify that there has
17  been approval for the requirement specifications?
18    A  Well, I've also seen that when my manager
19  gave specifications, that it's been approved.
20    Q  Your testimony is that release number
21  three is envisioned to contain the bulk scanning, is
22  that correct?

Page 121

1    A  Correct.
2    Q  And nothing else?
3    A  That's the major change.
4    Q  That's the major change, but are there any
5  others?
6    A  Reindexing.
7    Q  Sorry?
8    A  Reindexing.
9    Q  What do you mean by, "reindexing"?  Does
10  that mean more fields, or you're going to do
11  everything over?
12    A  How we reindex the document, change the
13  document parameters.
14    Q  All right.  Changing the document
15  parameters, changing the index parameters, I take it?
16    A  Correct.
17    Q  And your testimony is no work has begun on
18  implementing release number three as far as making
19  changes, modifications to the DCMS computer code?
20    A  We have discussed things within the team.
21  There's many modifications which are done.
22    Q  Is there, to your knowledge, a requirement

31 (Pages 118 to 121)

Vijay Padmanabhan                    CONFIDENTIAL                    May 31, 2007
                                   Washington, DC

Page 122

1  specification document for release number three?
2      A  Correct.
3      Q  And have you seen this?
4      A  Yes.
5      Q  When did you receive this?
6      A  This May.
7      Q  And do you recall if there were any
8  signatures on the requirements document?
9      A  I get an electronic version of it.
10     Q  Well, there still could be electronic
11  signatures or?
12     A  It wasn't involved there.
13     Q  Is Crown Partners going to play any role
14  in release number three?
15     A  The modifications will be done by DCMS, by
16  the GW group.
17     Q  My question was --
18     A  Based on the recommendations from --
19     Q  Crown Partners?
20     A  Crown Partners.
21     Q  This is the solution design?
22     A  I don't know if it is a solution design.

Page 123

1  I have the recommendation documents.
2      Q  Do you have recommendation documents from
3  Crown Partners, correct?
4      A  Correct.
5      Q  Let me just show you this, I don't think
6  we have to have it marked, I just want to see if this
7  was the document you were referring to.  I have a
8  document from George Washington University, Crown
9  Partners DCMS application, dated March 2nd, 2007.  Is
10  this the document you're referring to, or is this
11  something else?  Those are multiple copies of the
12  same document.
13     A  Yes.
14     Q  That's the document you're referring to?
15     A  That's the evaluation document.
16     Q  Have you seen any other documents from
17  Crown Partners?
18     A  No.
19         (Whereupon, a short recess was taken.)
20         (Plaintiff's Exhibit Number 10 was marked
21  for identification.)
22  BY MR. GITNER:

Page 124

1      Q  Let me show you what's been marked as
2  Exhibit Number 10, and let me ask you, who is Mike
3  Ng, who is that?
4      A  He is another developer working on the
5  DotNet side.
6      Q  On the what side?
7      A  The DotNet technology.
8      Q  The DotNet technology?
9      A  Correct, ASP DotNet.
10     Q  And what does that have to do with DCMS?
11     A  This is DCMS scan.
12     Q  I see.  And are you envisioning any
13  support to you with regard to modifications made to
14  the DCMS code for release number three for Crown
15  Partners?
16     A  I don't understand.
17     Q  Are you expecting to get -- will you
18  need -- are you going to have any support from Crown
19  Partners for release number three?
20     A  Yes.
21     Q  And what would that be, what support are
22  you envisioning?

Page 125

1      A  I don't envision anything.  It's been
2  given to me that they will be, they will be involved
3  in keeping the recommendations, the, doing the
4  document.
5      Q  So they're going to work with you?
6      A  I'll be the DCMS contact.
7      Q  And are they actually going to do the
8  computer coding?
9      A  From DCMS changes, I will be doing it.
10  They'll not be doing it, I'll be doing it.
11     Q  What will they be doing?
12     A  They give some recommendations on how to
13  work.  Supervision is done by Rick Gilchrist.
14     Q  But they're going to give you direction in
15  what to do?
16         MS. PURI:  Objection to form.
17         THE WITNESS:  They're going to recommend
18  certain things.
19  BY MR. GITNER:
20     Q  They're going to recommend certain things.
21  What types of things?
22     A  Probably follow up with the documents you

Alderson Reporting Company
1-800-FOR-DEPO

Page 126

1  gave.
2      Q  You mean solution design?
3      A  No.
4        MS. PURI:  Objection to form.
5        THE WITNESS:  The document Exhibit
6  Number --
7  BY MR. GITNER:
8      Q  The recommendations?
9      A  The recommendations document.
10     Q  But you're actually going to work with
11  them, is that correct?
12     A  That is my understanding.
13     Q  And will they be on-site here at Ashburn
14  in Washington?
15     A  I don't know how that's going to be.
16     Q  Will they be required to have access to
17  the DCMS code to do their part of the work?
18     A  The modification is done by the GW team,
19  so I don't see a reason why they should have access
20  to the GW code.
21     Q  Are they going to provide you with some
22  written materials?

Page 127

1      A  Yes.
2      Q  What are they going to provide you with?
3      A  Solution for the --
4      Q  Bulk scanning?
5      A  Bulk scanning, I think, based on that.
6      Q  In order to provide you with their
7  recommendations for the bulk scanning, are they going
8  to need access to the DCMS source code?
9      A  No.
10     Q  That it's based on the access they've
11  already had?
12     A  Correct.
13     Q  And you said you're aware that there's a
14  nondisclosure agreement with Crown Partners?
15     A  Correct.
16     Q  Are you aware whether or not that
17  nondisclosure agreement provides that Crown Partners
18  still not utilize in any manner its knowledge of the
19  DCMS source code?
20     A  I'm not aware of the contents.
21        (Plaintiff's Exhibit Number 11 was marked
22  for identification.)

Page 128

1  BY MR. GITNER:
2      Q  Before we get into 11, I believe you
3  testified before that Crown Partners, to your
4  knowledge, was on-site for two days, correct?
5      A  Correct.
6      Q  Are you aware of any documentation that
7  would show -- that would verify or confirm that they
8  were on-site for two days or more?  In other words,
9  would there be time tickets?  Would there be invoice
10  for a bill?
11     A  My presumption is, yes, they had a work
12  order for the evaluation.
13     Q  And would that show when they were
14  on-site?  I guess it would show their travel and all
15  that?
16     A  Yes.
17        MS. PURI:  Objection.
18  BY MR. GITNER:
19     Q  With regard to Plaintiff's Exhibit Number
20  11, take a look at that ticket, this is another
21  Mantis ticket, number 364, and under description, it
22  refers to an advanced search capability, do you see

Page 129

1  that?  Do you see that, sir?
2      A  Right, yes.
3      Q  Isn't it true that release number one did
4  not have an advanced search capability?
5      A  What they are mentioning is the document
6  search.
7      Q  Did release number one have an advanced
8  search capability?
9      A  No, because they are mentioning document
10  only search there.
11     Q  Correct.  So this advanced search -- there
12  was an advanced search capability that was integrated
13  or added on to the DCMS sometime after January 5th
14  '07, correct?
15        MS. PURI:  Objection, form.
16        THE WITNESS:  This is the error fix for
17  the document search.
18  BY MR. GITNER:
19     Q  Well, what is the advanced search
20  capability?
21     A  It's a document search and the employee
22  and document search, the combination search, the

Page 130

1  document only search and the employee plus document
2  search.
3      Q  Yeah.
4      A  That's what the search mentions here.
5      Q  The employee and document search?
6      A  Correct.
7      Q  Was that part of release number one?
8      A  This part wasn't working, this ticket was
9  the fix for that.
10     Q  You say it wasn't working?
11     A  Yes.
12     Q  In what way wasn't it working?
13     A  The document only search wasn't working in
14 release one.
15     Q  That's what you referred to in your
16 earlier testimony, same thing?
17     A  Exactly and this is the fix for that.
18     Q  What is the reference here to advanced
19 search capability?
20     A  The document only search.
21     Q  Is it your testimony that the document
22 only search is the same thing as the advanced search

Page 131

1  capability?
2      A  As mentioned in this ticket.
3      (Plaintiff's Exhibit Number 12 was marked
4  for identification.)
5  BY MR. GITNER:
6      Q  Let me ask you, is there an advanced
7  search function on release number two?
8      MS. PURI:  Objection, form.
9      THE WITNESS:  Like I mentioned, the
10 document only search.
11 BY MR. GITNER:
12     Q  Is there a field called advanced search?
13     A  No.
14     Q  Your testimony is advanced search is
15 equivalent to document only search?
16     A  From the ticket that I was given, yes.
17     Q  Can you tell me why it doesn't say
18 document only search, instead of advanced search
19 capability?
20     A  Can I have the ticket, please?
21     MS. PURI:  I'm showing him Exhibit 11
22 again.

Page 132

1      THE WITNESS:  The summary says, "Fix
2  document search for both document only and for
3  employee plus document search," that's the summary.
4  BY MR. GITNER:
5      Q  So what you referred to in this ticket was
6  an advanced search capability over what had been
7  delivered by Richmar, correct?
8      MS. PURI:  Objection to form.
9      THE WITNESS:  It is not advanced, if this
10 word is supposed to be there.
11 BY MR. GITNER:
12     Q  Can you tell me why they used the word
13 "advanced"?
14     A  I cannot because I didn't create this
15 ticket.
16     Q  It doesn't say, "search capability," it
17 says, "advanced search capability"?
18     A  The ticket says, yes.
19     Q  Would you go back to Exhibit Number 9?
20     A  Sure.
21     Q  Now, according to the summary and to
22 ticket, Mantis ticket 228, which we have, which is

Page 133

1  Exhibit Number 9, the document only search was
2  suspended?
3      A  The ticket was suspended.
4      Q  Right.
5      A  Because, for some reason, they moved 364,
6  which is this ticket.
7      MS. PURI:  Which is Exhibit Number?
8      THE WITNESS:  Exhibit Number 11.
9  BY MR. GITNER:
10     Q  Exhibit Number 12, did you prepare this?
11     A  No.
12     Q  What?
13     A  No.
14     Q  Do you know who did?
15     A  Rick Gilchrist.
16     Q  And do you know why this was prepared?
17     A  For release two.
18     Q  For what use?
19     A  For the group, being developers, and to
20 create test scripts based on the notes.
21     Q  And to create what?
22     A  Test scripts.

Page 134

1      Q  Is this a summary of what the changes were
2   to release number two?
3          MS. PURI:  Objection, form.
4          THE WITNESS:  Details the changes.
5   BY MR. GITNER:
6      Q  And was this an attempt to summarize all
7   of the changes as of April 1st, 2007, which is the
8   date of the document?
9      A  Yes.
10     Q  And you testified, to your knowledge, it
11  was prepared by Rick Gilchrist, who was your
12  supervisor or direct report?
13     A  Correct.
14     Q  And his position was what -- is what?
15     A  Director, ERB group.
16     Q  And he has supervisory responsibilities
17  for the DCMS?
18     A  Correct.
19         MR. GITNER:  I have no further questions
20  at this time.  However, I would request the following
21  materials be provided to us, and that is the
22  revisions to the code, copies of the code, the

Page 135

1   snapshot of the changes to the code that the witness
2   has testified to earlier, the requirement documents
3   containing the specifications for release.
4          MS. PURI:  Can you go more slowly?
5          MR. GITNER:  I'm sorry.  Requirement
6   documents for releases two and three, Crown Partners'
7   solution design for release three, and also the
8   summary of modifications that the witness referred to
9   earlier.  I'm assuming that -- I don't believe we
10  have the first four that I requested.  We may have
11  the summary of modifications.  If we already have
12  that, I would just like you to let me know that.
13         Also, I'd like to get the nondisclosure
14  agreement with Crown Partners, as well as the work
15  order, which would show the work order for Crown
16  Partners.
17         MS. PURI:  We'll take the request under
18  advisement and get back to you.
19         MR. GITNER:  All right.  Thank you.
20         (Whereupon, at 4:44 p.m., the deposition
21  was concluded.)
22

Page 136

1              ACKNOWLEDGEMENT
2
3
4    _____
5            Vijay Padmanabhan
6
7
8   SUBSCRIBED AND SWORN to before me this _____ day of
9   _____, 20_____.
10
11   _____
12            Notary Public
13
14  My Commission Expires:_____
15
16
17
18
19
20
21
22

35  (Pages 134 to 136)

# Exhibit 15





THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

OFFICE OF THE CHIEF INFORMATION OFFICER

4 January 2007

**Via First Class Mail and Fax**

Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

**Re: Closeout of Contract with The George Washington University**

Dear Mr. Gordon:

The George Washington University ("GWU") and Richmar & Associates ("Contractor") entered into a Contractual Agreement dated December 22, 2005 (the "Contract"). By its terms, the Contract terminates January 8, 2007. Certain work remains to be completed by Contractor under the Contract. The purpose of this letter is to evidence the agreement of GWU and Contractor with respect to the closeout of the Contract.

Attached to this letter, and made a part hereof by reference, is the "DCMS Closeout List" (the "List"). The parties agree that Contractor will undertake to complete the tasks set forth on the List by the dates set forth for completion with respect to each task. To allow for the completion of these tasks, the term of the Contract will remain in full force and effect until the earlier of the date that all tasks are completed to the reasonable satisfaction of GWU or February 15, 2007. Upon satisfactory completion of the tasks, Contractor may invoice GWU for these services and payment will be made by GWU in accordance with Section 7 of the Contract.

Except as modified by this letter, the Contract remains in full force and effect. In the event of a conflict between the terms of the Contract and the terms of this letter, the terms of this letter shall govern.

PPI358

JAN. 3. 2007  3:25PM  (    :ER-APPLICATIONS                    NO. 6665  P. 3

December 22, 2006
Page 2

I ask that you sign and return a copy of this letter to me to evidence your consent to its
terms.  Of course if there are questions, please do not hesitate to let me know.

Sincerely,

Ronald C. Bonig
Interim Chief Information Officer

Agreed and Accepted this ____ day of January, 2007

_____
Richard Gordon, Jr.
President and CEO
Richmar & Associates

Attachment: DCMS Closeout List

PPI359

# Exhibit 16



*Advisors and Consultants*

725 East Capitol Street, SE
Washington, DC 20003
Phone (202) 544-2015
Facsimile (202) 544-2016

January 5, 2007

Ronald C. Bonig
Interim Chief Information Officer
801 22 Street, NW
Suite B-151
Washington, DC 20052

Dear Mr. Bonig:

We have reviewed the proposed contract extension for work that needs to be completed under the Contract. It was our understanding that the purpose of the contract extension was for the continuation of back scanning and indexing of HR documents that were recently delivered. However, based on our review, the proposal does not address the issues of continued back scanning and indexing.

Many of the items in the DCMS closeout our list have been accomplished or are almost complete. In cases where we have completed or scheduled the completion of an item it is indicated on the modified DCMS closeout checklist. However, RICHMAR is under no obligation to fulfill the requests in items 8-10 and we do not agree with those items.

Given the contract between the parties expires January 8, 2007, Sunday night at midnight, it is imperative that we resolve any outstanding issues between us concerning continued back scanning and indexing as soon as possible. Absent an agreement between the parties before the expiration of the existing contract, RICHMAR will terminate all work effective Sunday night at midnight and a new contract will be required.

We will be more than pleased to discuss this matter further. In the meantime, please do not hesitate to let me know if I can be of any other service.

Best regards

Richard Gordon, Jr.
President/CEO

Enclosure

*"We Protect Your Investment In Intellectual Capital"* SM                    **PPI360**

| | DCMS Closeout List | |
|---|---|---|
| | | |
| 1 | Provide Solution Design Document, and all other DCMS documentation prepared by Richmar. Documents should be provided in their current state; no other work should be done on documentation. Documents include the project notebook, documentation/working papers prepared by developers, any documentation prepared by Jim, etc. | Agree - Completed January 4, 2007 |
| 2 | Ensure all source code developed by Richmar is delivered to GW. It is believed that all DCMS release 1source code has been received; Richmar asked to validate. | Agree - Completed December 5, 2007 |
| 3 | Turn over all source code developed for release 2 but not delivered. Source code to be delivered as is; no additional development should be done. Code to be delivered on DVD, with face-to-face turnover to review what is being delivered. | Agree - Completed December 5, 2007 |
| 4 | Turn over all source code developed for Flexible Framework (Jae said configuration modules was 90% complete). Source code to be delivered as is; no additional development should be done. Code to be delivered on DVD, with face-to-face turnover to review what is being delivered. | Agree - Completed December 5, 2007 |
| 5 | Deliver final list of form group/form names (back scan and go-forward names). Richmar will provide an updated list on 12/15/06 for go-live. Updates will be delivered as needed through 1/31/07 to ensure DCMS is in sync with delivery of indexed files/DVDs. A final list will be delivered once all indexing is completed and validated. | Agree |
| 6 | Deliver VPN tokens being used by Jae Lim, Wei, and Jim Gearing. Tokens to be retuned before 1/8/07 with exception of Jim's, his token will remain active through 1/31/07. | Agree |
| 7 | Deliver DVDs (original and a duplicate copy) of all indexed documents, and scanned images; along with Chain of Custody forms for each DVD. Associated master list updates to be provided with each DVD delivery. | Agree |
| 8 | Copies of code developed as part of the DCMS project must be erased from all developer machines, from backup media, etc. Erasure must ensure files are destroyed and un-retrievable. | Do Not Agree |
| 9 | Copies of documentation prepared as part of the DCMS project must be erased from all computers, backup medium, etc. Erasure must ensure files are destroyed and un-retrievable. | Do Not Agree |
| 10 | Paper copies of Project documents, files, DCMS code, etc., must be turned over to GW for destruction, or Richmar may choose to shred. | Do Not Agree |
| 11 | Erase all GW data that may on hard drives, portable backup drives, thumb drives, CDs, DVDs, etc., (i.e. files used to print PIDM pages, backups of images taken to MD, portable drives used to provide backups of images to GW, etc.). Erasure must ensure files are destroyed and un-retrievable. | Agree |

PPI361

| | | |
|---|---|---|
| 12 | Erase all back scan images from hard drives used at both scan operations. Erasure must ensure files are destroyed and un-retrievable. Erasure should not be done until GW has validated and accepted delivery; Final delivery to be validated by GW within two weeks of delivery. | Agree |
| 13 | Erase all indexed images and other files from hard drives used at both indexing operations. Erasure must ensure files are destroyed and un-retrievable. Erasure should not be done until GW has validated and accepted delivery; Final delivery to be validated by GW within two weeks of delivery. | Agree |
| **Note:** All agreed upon items on the Closeout List are to be completed as follows. All DCMS related items to be completed on or before 1/8/07. All back scan related items to be completed on or before 1/31/07 unless specifically specified on the closeout list. | | |

# Exhibit 17

JAN. 5. 2007  4:10PM      INER-APPLICATIONS                           NO. 0070   P. 2



THE GEORGE
**WASHINGTON**
UNIVERSITY
WASHINGTON DC

RONALD C. BONIG
DEPUTY CHIEF INFORMATION OFFICER

INFORMATION SYSTEMS AND SERVICES

January 5, 2007

Via E-Mail
Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

Re:     Closeout of Contract with
        The George Washington University

Dear Mr. Gordon:

It appears that my letter of January 4th to you was not as clear as it should have been
resulting in unwarranted concerns. Please let me allay those concerns now as there was
never any intention on the part of the University to require RICHMAR to destroy any of
its own intellectual property. It was simply our intent to document the extension of the
term of the Agreement to allow for the completion of the back scanning and indexing
and, while we were at it, to address practical issues associated with the wind-down of this
project.

Under the terms of the Agreement between RICHMAR and GW, RICHMAR agrees to
prepare certain documents and documentation. Section 3.5.2 of the Statement of Work
provides that such documents and documentation may not be provided to anyone other
than GW without the review and written approval of GW. Further, Section 10 of the base
Agreement requires that information obtained by RICHMAR from GW be held as
confidential which again would mean it could not be released without the consent of GW.
Given that the term of the Agreement is to end, rather than expect RICHMAR to store
this information, we thought it made sense for us to say that it should be destroyed. That
was the intent of items 8 – 10.

Subject to the foregoing, we had expected that item 8 would be read as encompassing
code that was provided or developed by GW and/or its employees – not code that was
developed solely by RICHMAR. As I said above, it was not our intention to make
RICHMAR erase its own intellectual property – which legally we would have no right to
do anyway.

I hope this addresses your concerns.

*I concur 1/5/07*

*1/5/06*

801 22ND STREET, NW • SUITE B148 • WASHINGTON, DC 20052 • 202-994-3380 • FAX 202-994-5551

PPI363

# Exhibit 18

# THE GEORGE
# WASHINGTON
# UNIVERSITY
WASHINGTON DC

VICE PRESIDENT AND GENERAL COUNSEL

March 16, 2007

Via Fax and Regular Mail
Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

Re:     Contract with The George Washington University

Dear Mr. Gordon:

I am writing in response to your communications with Executive Vice President and Treasurer Louis H. Katz. While Mr. Katz has been briefed about this matter, his office has been instructed to forward all communications to Ron Bonig, Interim Vice President and Chief Information Officer, and to me for further handling. Mr. Katz will not meet with you given the potential for litigation.

I have had occasion over the last month or so to review this situation with the individuals involved at GW and have had the opportunity to review various emails between the parties with respect to work under the contract. Based on this, it is clear that Richmar was very aware of its failures under the contract. While there is no requirement under the contract that Richmar be given a notice and opportunity to cure its breached under the contract, you and Jim Gearing were copied on numerous emails which identified Richmar's mistakes and failings. For you now to say that you were somehow unaware of GW's dissatisfaction with Richmar's work is disingenuous.

Our preliminary review of this matter shows that the University suffered damages well in excess of $500,000 due to the failings of Richmar. We are not inclined at this time to pursue a claim for our additional damages, however, we will not be paying Richmar any additional amounts.

I know that you will not be happy with this response to your email to Mr. Katz. However, the University cannot pay you any additional amounts for work that was either not done or was done improperly.  If you do decide to pursue legal action against the University, rest assured that the University will pursue all of its damage claims against

PPI398

APR. 2. 2007  5:00PM     VP GENERAL COUN GWU                    NO. 478    P. 3

Richmar and nothing in this letter should be read as limiting the amount we may eventually determine we are due.

Linda Schutjer
Associate General Counsel

cc:   Ron Bonig

PPI399

# Exhibit 19



**THE GEORGE**
**WASHINGTON**
**UNIVERSITY**
WASHINGTON DC

OFFICE OF THE CHIEF INFORMATION OFFICER

March 23, 2007

**ALSO SENT VIA FAX:** 202-544-2016

Mr. Richard Gordon, Jr.
President and CEO
Richmar & Associates
1513 Vermont Avenue, NW
Washington, DC 20005

Re: Contract with The George Washington University

Dear Mr. Gordon:

I am writing in response to your various inquiries about payment – including a recent inquiry to our
Executive Vice President and Treasurer, Lou Katz.

Over the past weeks as work under Richmar's contract with GW has drawn to a close, I have asked
my staff to review Richmar's performance under the agreement and discuss our concerns about that
performance (or non-performance in many cases) with the University's legal counsel. Their
preliminary findings show that Richmar failed miserably in its attempts to perform under the
contract. Our initial review of billings suggests that GW was billed for work that was not delivered,
work that was done incorrectly and had to be re-done by Richmar (for which we were then billed
again), for work that was not within the scope of the agreement and, perhaps most seriously, for
work that resulted in delivery of seriously flawed work product – which my staff has had to spend
countless hours fixing. In the end, much of what Richmar delivered will only be patched sufficiently
to let us use it until such time as the work can be done properly. It will then be abandoned.

In light of these finding, I cannot authorize payment of your final invoices. You are clearly not
entitled to any more payments. My staff will continue to work with counsel and the University's
audit team to evaluate the damages we sustained as a result of Richmar's numerous breaches of the
contract. Based on those findings, a decision will be made as to our next steps.

Ron Bonig
Interim Vice President
and Chief Information Officer

**PPI400**

# Exhibit 20

D. Ex 8     J. 31.
(VS)

π Ex 4
(Boeing)



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

**DCMS Project**
**Training and Help Desk Meeting**
**12/20/2006**



## Agenda & Meeting Minutes

| | | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | | Carolyn Chase | | Christina Huszcza |
| | Christina Griffin | X | Claire Mooney | | Chris Megill |
| | Scott McVey | X | Chris Peacor | X | Lindsey Heitman |
| X | Jodie Song | | | | Curtis Carwise |

| | |
|---|---|
| HR Personnel implementation plans<br>• Status of HRS go-live<br>• Stakeholder release<br>• Release 2; bug fixes and enhancements | Christina |
| Training issues and concerns | Meeting Attendees |
| Desktop issues and concerns<br>• Icons<br>• Training room scan station<br>• HRS Stakeholder Site Survey Results; next steps | Meeting Attendees |
| Help Desk issues and concerns | Meeting Attendees |
| Next Meeting | Christina |

**HR Personnel Implementation Plans**
- HRS go-live is going well. There have been a few minor issues; which have been resolved.
- Stakeholder rollout tentatively planned for 1/22; there will be no code changes. Claire will need to schedule training for Stakeholders; should be limited changes to the Training Manual. Desktop Support will need to complete scan station installs of the 4 stakeholder offices and the code push by mid-January.
- Release 2 is being evaluated to determine what will be in the release; tentatively planning release for mid-March. The release will contain bug fixes, cosmetic changes, and some enhancements. Should not impact Desktop Support but there will be training requirements.

**Training Issues and Concerns**
- Would like to move scan station to 2100 M Street now that there is a way to lock down the scan station ; scheduling B109 is difficult.
  - Need site survey done
  - Buy lock for scan station
  - Have Facilities complete the move

**Desktop Issues and Concerns**
- Stakeholder site surveys are complete except for Research Services; this needs to be scheduled immediately.
- There are 12 scanners ordered and 11 PCs for the scan station; do not have a PC for Research Services.
- Marcy is asking Stakeholders to update their list of users; will distribute the list after the New Year.

**Help Desk Issues and Concerns**
- None

| | | |
|---|---|---|
| Setup HRS scan stations<br>**20061213:** Marcy/Christina confirmed that setup of EEO, Benefits and Ashburn scan stations remain on hold. | Desktop Support | On hold; pending authorization from Tanya |
| Prepare MOU for use of scan stations<br>**20061220:** Draft received from Charlie.  Updates need to be given to Charlie so MOU can be finalized | Marcy/Christina | 12/22 |
| Complete Stakeholder site surveys<br>**20061220:** Need to complete Research Services site survey; all others have been completed. | Desktop Support | 12/22 |
| Distribute updated stakeholder user list | Marcy | 1/5 |
| Complete setup of HR Personnel Stakeholder scan stations; Kris Moen, Barbara Marshall, Sarah Fayle, Monica Partsch | Desktop Support | 1/12 |
| Resolve what to do about having 1 less PC than needed for scan stations; Need a PC for Research Services | Marcy | 1/22 |
| Send list of Scan Station locations and contacts.  In addition to Barbara Marshall, for Faculty Personnel; include Valerie Evans and Yvonne Jones.<br>Valerie 4-5963   Yvonne 4-8994 | Marcy | 1/5 |
| Plan Stakeholder code push<br>**20061220:**  Provide user list to Desktop support | Marcy | 1/5 |
| Schedule Stakeholder training | Claire | TBD |
| Complete site survey for moving scan station to M Street training room | Desktop Support | 1/5 |
| Order lock for Training Room scan station | Claire | 1/5 |
| Schedule Facilities to move scan station from B109 to M Street | Marcy | TBD |

GW000106

 THE GEORGE WASHINGTON UNIVERSITY WASHINGTON DC

**DCMS Project**
**Training and Help Desk Meeting**
**1/10/2007**

## Agenda & Meeting Minutes

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| X | Marcy Day | | | Carolyn Chase | | X | Christina Huszcza |
| X | Christina Griffin | X | | Claire Mooney | | X | Chris Megill |
| | Scott McVey | X | | Chris Peacor | | X | Lindsey Heitman |
| X | Jodie Song | | | | | | Curtis Carwise |

| | |
|---|---|
| HR Personnel implementation plans<br>• Stakeholder release (Jan 29 and Feb 5)<br>• Release 2; bug fixes and enhancements (mid-March) | Christina |
| Training issues and concerns | Meeting Attendees |
| Desktop issues and concerns<br>• Training room scan station<br>• HRS Stakeholder Site Survey follow-up actions<br>   c   Validate MC has working jack<br>   o   Inform Barbara which file cabinet needs to be moved | Meeting Attendees |
| Help Desk issues and concerns | Meeting Attendees |
| Next Meeting 1/17/07 | Christina |

GW000110

**HR Personnel implementation and release schedules**
- MC Faculty Affairs, Faculty Personnel, and Student Employment are scheduled to go-live 1/29. Research Services will go-live 2/5. The stakeholder rollout will add more users to the system; does not require a code release.
- HR Personnel Release 2 will contain bug fixes and enhancements that were originally planned for HRS go-live. This release is being planned for mid-March. This release will be given to all HR Personnel users; including HRS and the 4 stakeholder offices. At this point we do not anticipate training will be required; however, updates to the manual will be needed.
- HR Personnel release 3 will most likely include implementation of Brava and allow indexing to be done from DCMS rather than EInput; this is tentatively planned to be done in April. Plans for this release are very tentative at this time. It is likely this release could require training; but it is too early to determine how much training will be required.
- Future releases include migration of ORS/GCAS to V5.3 and flexible framework; impacts to Desktop, Help Desk, and Training have not been assessed.

**Training**
- Claire needs to schedule training for the remaining HRS users who have not been trained.
- Claire will contact 4 stakeholder offices to schedule go-live training; MC Faculty Affairs, Faculty Personnel, and Student Employment should be schedule the week of 1/22. Research Services training should start the week of 1/29; we do not anticipate that all Research Services will be training that week so additional training will need to be scheduled in February.

**Desktop Support**
- Jodie me with Monica and confirmed her network jack is not active. Jodie has submitted a ticket for this work to be done.
- Desktop Support has been told by Jim Whetzel, there is an active jack behind file cabinets in the cube that will be used by Faculty Personnel for scanning; Chris Megill confirmed there should be plenty of active jacks in that cube. Chris also mentioned there has been a power issue, in that cube in the past; too many things plugged in will cause the circuit to break.
- Desktop Support needs to start setting up scan stations for the 4 stakeholder offices. Marcy mentioned that one of the PCs sent to Ashburn will be returned for Kris Moen.
- The code push for the 4 stakeholder offices will need to be done after the scan stations are setup.

| | | |
|---|---|---|
| **Setup HRS scan stations**<br>**20081213:** Marcy/Christina confirmed that setup of EEO, Benefits and Ashburn scan stations remain on hold. | Desktop Support | On hold; pending authorization from Tanya |
| **Prepare MOU for use of scan stations**<br>**20060110:** Christina needs to plug in serial numbers for HRS and give to Tanya to review; HRS should be ready for signature this week. The other stakeholder MOUs will follow. | Marcy/Christina | In Progress |
| **Complete setup of HR Personnel Stakeholder scan stations; Barbara Marshall, Sarah Fayle, Monica Partsch** | Desktop Support | 1/19 |
| **Complete setup of HR Personnel Stakeholder scan stations; Kris Moen** | Desktop Support | 1/26 |
| **Plan Stakeholder code push**<br>**20060110:** Push code to Faculty Personnel, MC Faculty Affairs, and Student Employment by 1/24. Push to Kris Moen by 1/31. | Desktop support | 1/24 |
| **Schedule Stakeholder training**<br>**20060110:** MC Faculty Affairs, Faculty Personnel, and Student Employment training will be scheduled the week of 1/22. Research Services training will begin the week of 1/29. | Claire | 1/19 |
| Complete site survey for moving scan station to M Street training room | Desktop Support | Complete |

GW000111

| Schedule Facilities to move scan station from B109 to M Street | Christina | In Progress |
| --- | --- | --- |
| Check with Tanya to determine why printers are needed at scan stations | Christina | Complete |

CONFIDENTIAL

GK 5
Bonig



**DCMS**
**HR Personnel**
**1/31/07**
(877) 214-0402 access code 327717



INFORMATION
SYSTEMS &
SERVICES

| **Agenda & Meeting Minutes** | | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | | Claire Mooney |
| X | Tony Ford | X | Monica Partsch | X | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | | Ron Bonig |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| | |
|---|---|
| Status of back scanning/indexing/production load; review load schedule | |
| DCMS HR Personnel; HRS go-live issues | |
| DCMS HR Personnel release schedule<br>• Stakeholder go live scheduled for 1/29 and 2/5<br>• Release 2 - HR Personnel bug fixes, cosmetic changes and enhancements; go-live schedule | |
| Training Update<br>o Stakeholder training needs to be scheduled for Kris | |
| Desktop Support update<br>• HRS EEO, Benefits and Ashburn offices scan stations on hold?<br>• Scan Station Setup schedule<br>   o MC Faulty Affairs – on hold until table arrives<br>   o Research Services - This week | |
| Review task list | Team |
| Next Meeting; 2/7/07 | |

**Status of Back Scanning**
- Currently 85% complete. We received a delivery on Tuesday; once these are loaded we will be about 90% complete. All documents should be loaded by the end of next week; depending on when we get final delivery of documents from Richmar.

**Go Live/Production Issues**
- Future date problem resolved; can now search for future dated employees. You cannot see jobs of future dated employees; this fix will be added to Release 2.
- DCMS Scan save/edit function is not working; will be fixed in next two days.

**Reports**
- Tanya requested input form Stakeholders regarding types of reports they would like. Tanya is working with Data Warehouse to develop Activity Reports; Org within DCMS.

**Training Update**
- Kris is working with Claire to reschedule Research Services training for next week Monday or Tuesday.
- Claire is working with Stakeholders to schedule scan training in the offices.

CONFIDENTIAL

- Claire planning to offer 2 DCMS HR Personnel training sessions next week for anyone who missed their scheduled training.

**Desktop Support**
- Kris Moen's scan station has not been setup.  **Update:** Setup complete
- Monica's scan station will be setup as soon as her furniture is ready.

**MOU**
- Barbara's MOU has not been sent; need to make changes based on use of Novell.  Christina will get clarification from Desktop Support regarding Barbara's use of Novell.  Barbara stated she does use Novell.
- Monica had several questions regarding the MOU.  Users are responsible for maintenance contracts on the scanners; Marcy will check on scanner warranty.  Users are responsible for maintaining scanners; a class will be setup on how to care for scanners.
- Stakeholders may submit help desk tickets for assistance with scan station problems.  User PCs remain the responsibility of each Stakeholder office.
- Users are responsible for data stored on the scan station PC.
    o  If the PC needs to be re-imaged, Desktop Support will put it back to the way it was delivered.  Any documents scanned and saved but not sent, would have to be rescanned; draft procedures have encouraged Stakeholders to maintain a file of scanned documents until they have been validated in DCMS.
    o  If your scan station PC is used for anything other than DCMS Scan functions, any data, software, etc., resulting from these activities will not be restored by Desktop Support if your scan station PC is re-imaged. Note: Users are encouraged not to install or store anything on the PC, outside of DCMS Scan functions, as this could result in scan station failure.

**Release 2**
- The project schedule has not been finalized. The User Acceptance Testing schedule needs to be revisited; current plan conflicts with other user activities. Marcy will talk with Tanya offline to determine how to adjust project plan.

**Other**
- Tanya reported her office is waiting to hear from OGC regarding what can be done with back scanned documents once the documents are validated in DCMS; can they be destroyed?  No documents should be destroyed until a ruling from OGC has been received.
- ISS is working on laying rollout plans for future DCMS projects.  At this point there is not enough information for departments to budget for future scanning and document management implementations.

| | | |
|---|---|---|
| Setup HRS scan stations (PC and scanners)<br>**20061206:** Tanya anticipates she will be ready to setup Ashburn scan station next week. | Desktop Support | On hold |
| Setup Scan Station for Kris  Moen | Desktop Support | 2/2 |
| Code push to Research Services | Desktop Support | 2/2 |
| Setup scan station for Monica<br>**20070130:**  Waiting for a table | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders | Rick | 3/4 |
| Investigate scanner warranty | Marcy | 2/14 |

CONFIDENTIAL

| | | |
|---|---|---|
| Review HRS and Stakeholder business process and procedures; especially those that cross division boundaries. Stakeholders reminded to review process and procedures guideline document from Marcy. <br><br> **20070117:** Process and procedures needs to remain as an agenda item at weekly meeting. Following issues were brought up at 1/17 Overview Session <br><br> • Monica asked how to handle entry of documents for which her office does not have Banner access to employee. This is a process and procedure issue that needs to be resolved between HRS and Stakeholders. Issue put on hold and will be discussed later. Note: Monica has 50-75 people for which she does not have Banner access. <br> • I9s will be scanned in HRS. <br> • Benefit documents will be scanned in HRS. | Tanya, Monica, Kris, Sarah, Barbara | Ongoing |
| Administrative process and procedures need to be documented. A document needs to be published ASAP and then updated as needed <br><br> **20070117:** the following issues were raised at the Stakeholder Overview Session. These processes need to be documented and distributed to HRS and Stakeholders <br><br> • How do you handle documents that were misfiled (i.e. index with wrong GWid, assign to wrong organization level, or other indexing errors)? Answer: Send an email to Tony Ford asking him to correct indexing error(s). <br> • How to add new users? Answer: Send email to Tony Ford requesting person be added to DCMS; must provide NetID and Banner id. <br> • How to setup DCMS access on new desktops; put in a Help Ticket. | Tony | 02/09 |



**DCMS
HR Personnel
12/13/06**



INFORMATION
SYSTEMS &
SERVICES

| Date: | **12/13/06** |
|---|---|
| Time: | **1:00 – 2:00** |
| Locations: | **(877)214-0402\\327717** |

## Agenda & Meeting Minutes

| | Attendees | | | | | |
|---|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| | Tony Ford | | Monica Partsch | X | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | X | Ron Bonig |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| Agenda Items | Presenter |
|---|---|
| Status of back scanning/indexing/production load<br>• Faculty Personnel<br>    o Status of Academic Center collation effort; to be completed by 12/15<br>• ORS; return of documents<br>    o Original, 10 boxes<br>    o Additional 2 boxes<br>    o Load of HRS documents to production | |
| DCMS HR Personnel release schedule<br>• HRS go-live 12/18<br>• Near Term releases<br>    o Stakeholder release<br>    o HR Personnel bug fixes, and enhancements | |
| HRS and Stakeholder business process procedures | |
| Training Update | Claire |
| Desktop Support update<br>• Stakeholder offices; site survey<br>• HRS EEO and Ashburn offices scan station install | |
| Review task list | Team |
| Other? | |

Back Scanning
- Faculty Personnel collation, being done at Academic Center will be completed 12/15/06; completion of scanning and indexing TBD
- OCRO files; initial 10 boxes should be returned by 12/15
- **44 of 450 total HR Personnel boxes have been loaded for to production for HRS go-live**

DCMS HR Personnel Release
- HRS will go-live on 12/1820
    o Mantis ticket 343 will be added to the go-live release if approved by Tanya
- Stakeholder release not defined; but will hopefully be in January, 2007
- An HR Personnel enhancement/bug fix release is also being planned.

Training Update
- HRS Training scheduled for Friday, 12/15
- Rick will provide a Known Issue List prior to Training; list will be distributed at training
- DCMS and DCMS manuals have been updated and are ready to distribute at training
- On-demand demo ready for distribution to HR Personnel; Marcy will email URL to Stakeholders

Desktop Support Update
- Site Surveys in progress; planned to be completed by 12/15
- EEO and Ashburn scan station setup remain on hold
- VPN issues encountered during UAT have been resolved

| | | |
|---|---|---|
| ORS back scanning; when will original boxes be returned?<br>**20061212:** QA of original 10 boxes delayed; should be ready for return by 1215.<br>**20061206:** GW Facilities is being asked to pick and return file to Rice Hall on 12/11 | Marcy | 12/15 |
| Provide DCMS demo for Stakeholders<br>**20061212:** demo ready for distribution. Marcy will send out URL. | Marcy | 12/20 |
| Setup HRS scan stations (PC and scanners)<br>**20061206**: Tanya anticipates she will be ready to setup Ashburn scan station next week. | Desktop Support | hold |
| Desktop Support; HR Stakeholder offices Site Survey<br>**20061215**: Surveys completed | Desktop Support | Complete |
| Requirements Addendum<br>**20061215**: Richmar contract closeout in progress; signoff will not be done. | GW | Close |

Ex- 6



## DCMS
## HR Personnel
## 2/07/07
(877) 214-0402 access code 327717



# Agenda & Meeting Minutes

| | ATTENDEES | | ATTENDEES | | ATTENDEES |
|---|---|---|---|---|---|
| X | Marcy Day | | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | X | Monica Partsch | X | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | | Ron Bonig |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| AGENDA ITEMS | PRESENTER |
|---|---|
| Status of back scanning/indexing/production load; review load schedule<br>Validation of back scan documents | |
| Form groups and from names update | |
| GW online services outage beginning at 6pm on Friday, March 2, through 6am on Monday, March 5. | |
| DCMS HR Personnel; HRS go-live/production issues | |
| DCMS HR Personnel release schedule<br>• Status of Stakeholder go live<br>• Release 2 - HR Personnel bug fixes, cosmetic changes and enhancements; Review/approve major milestone schedule | |
| Training Update | |
| Desktop Support Update<br>• HRS EEO, Benefits and Ashburn offices scan stations on hold?<br>• Scan Station Setup schedule<br>   o MC Faulty Affairs – on hold until table arrives<br>• Scanner locks<br>• Scanner warranty | |
| Review task list | Team |
| Next Meeting; 2/14/07 | |

| MINUTES |
|---|
| |

**Back Scanning**
- All documents should be loaded into production by end of week.
- Kris Moen reported he was unable to see any back scan documents. Tony will work with Kris to resolve the issue.
- HRS and Stakeholders need to validate back scan documents before moving files offsite. Tanya has found a few cases were multiple documents were scanned as one. In Release 3 users will be given the ability to split a document into two or more documents; will also have the ability to join several documents into one.

**Form Group/Form Names**
- All updates have been made. Requests for additional form groups and/or form names should be submitted to Tanya via email. Tanya will review and pass the request to Tony. In a future release, an HR administrator will have the ability to make these updates.

CONFIDENTIAL

*[handwritten: Was this a software problem?]*

**Outage**
- DCMS will not be available March 2nd at 6pm – 6am March 5; during the Banner upgrade.

**Go-live/Production Issues**
- Most of the problems are related to DCMS Scan; sending documents to DCMS without indexes.  A fix has been given to Tanya to test.  Stakeholders will be notified when this fix is moved to production. ①
- A future release will provide the ability to bulk scan and to index from user desktops.  ISS is currently working with a vendor to determine how to do this.  Progress updates, on availability of these capabilities, will be provided as information is available.

*[handwritten: Crown Partners – DCMS Scan is part of the copy up list]*

**DCMS HR Personnel Release Schedule**
- Release 2 user a
  mark their calend

*[handwritten: ① Could not do w/o giving access to Crown Partners.]*

**Training**
- Research Servic
- Scan training will
- Claire will be sch

**Desktop Support**
- MC Faculty Affai
  and ask them to
- HRS scan station
- Scanner warrant
  extending scann
- Tony will contact

**Other**
- MOUs have bee
- Richmar contract
  issues should be
- Tanya reported t
  Tanya encouraged Stakeholders to begin this practice as soon as possible.
- Tanya reminded everyone to send documents, requiring further action, to the appropriate office for scanning.  Questions regarding when to scan a document versus sending to another office for scanning will remain an ongoing issue and will require communications with HRS and the 4 Stakeholder offices.

| Action Item | Person Responsible | Due Date |
|---|---|---|
| Setup HRS scan stations (PC and scanners)<br>20061206: Tanya anticipates she will be ready to setup Ashburn scan station next week. | Desktop Support | On hold |
| Setup Scan Station for Kris Moen | Desktop Support | complete |
| Code push to Research Services | Desktop Support | complete |
| Setup scan station for Monica<br>20070207: Marcy will contact Desktop Support to arrange the scan station be setup on Friday the 9th.l | Desktop Support | 2/9 |
| Setup a care and maintenance training session for HRS and Stakeholders<br>20070207: Tony will research this topic and prepare training. | Tony | 3/4 |
| Investigate scanner warranty<br>20070207: Investigate and report to Stakeholders information on extending scanner warranties<br>20070206: There is a 1 year warranty on scanners.  Scanners were purchased 7/31/2006. | Christina/Marcy | 2/14 |

CONFIDENTIAL

| | | |
|---|---|---|
| Review HRS and Stakeholder business process and procedures; especially those that cross division boundaries. Stakeholders reminded to review process and procedures guideline document from Marcy.<br><br>**20070117:** Process and procedures needs to remain as an agenda item at weekly meeting. Following Issues were brought up at 1/17 Overview Session<br><br>• Monica asked how to handle entry of documents for which her office does not have Banner access to employee. This is a process and procedure issue that needs to be resolved between HRS and Stakeholders. Issue put on hold and will be discussed later. Note: Monica has 50-75 people for which she does not have Banner access.<br>• I9s will be scanned in HRS.<br>• Benefit documents will be scanned in HRS. | Tanya, Monica, Kris, Sarah, Barbara | Ongoing |
| Administrative process and procedures need to be documented. A document needs to be published ASAP and then updated as needed<br><br>**20070117:** the following issues were raised at the Stakeholder Overview Session. These processes need to be documented and distributed to HRS and Stakeholders<br><br>• How do you handle documents that were misfiled (i.e. index with wrong GWid, assign to wrong organization level, or other indexing errors)? Answer: Send an email to Tony Ford asking him to correct indexing error(s).<br>• How to add new users? Answer: Send email to Tony Ford requesting person be added to DCMS; must provide NetID and Banner id.<br>• How to setup DCMS access on new desktops; put in a Help Ticket. | Tony | Ongoing |

GW000136



**DCMS**
**HR Personnel**
**2/21/07**
(877) 214-0402 access code 327717



INFORMATION
SYSTEMS &
SERVICES

| | Agenda & Meeting Minutes | | | | | |
|---|---|---|---|---|---|---|
| | ATTENDEES | | | ATTENDEES | | ATTENDEES |
| X | Marcy Day | X | Barbara Marshall | | Claire Mooney | |
| X | Tony Ford | X | Monica Partsch | X | Christina Griffin | |
| X | Rick Gilchrist | X | Kris Moen | | Christina Huszcza | |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin | |

| | | |
|---|---|---|
| | GW online services outage beginning at 6pm on Friday, March 2, through 6am on Monday, March 5; **DCMS HR Personnel will be down while Banner is down.** | FYI |
| | Back Scan Status | |
| | • Validation of back scan documents; error files | |
| | • Faculty Personnel vs MC Faculty Affairs indexing | |
| | DCMS HR Personnel; HRS go-live/production issues | |
| | • Tanya validating fixes to production issues | |
| | • Faculty Personnel and ORS unable to scan | |
| | DCMS HR Personnel release schedule | |
| | • Release 2 - HR Personnel bug fixes, cosmetic changes and enhancements | |
| | • Release 3; Indexing at user desktop, bulk scanning, annotation | |
| | Training Update | |
| | Desktop Support Update | |
| | • HRS Benefits scan station setup being scheduled | |
| | • Student Employment scanner working | |
| | • Scanner warranty | |
| | MOU Status | |
| | Review task list | Team |
| | Next Meeting; 2/28/07 | |

**Back Scan Status**
- All documents are loaded and should be viewable by HRS and Stakeholders.
- Monica unable to view documents scanned for Faculty Personnel; Rick and Tony are investigating. Tanya validated the documents are in DCMS
- Stakeholders reminded to continue validating back scan documents. Tanya will be sending copy of OGC HR Personnel document destruction ruling (per discussion at last week's meeting).

**Go Forward Scanning**
- Kris Moen raised concern regarding the back log of documents that need to be scanned; documents that have come in since Richmar quit scanning and the time HRS and Stakeholder offices given the ability to scan. Kris estimates it would take his office about 40 hours to scan the backlog.

- The backlog is an issue that HRS and all the Stakeholder offices face. Tanya suggested everyone keep their management informed of the situation. Management needs to recognize there was a gap in time when no scanning could be done; creating the backlog. Management also needs to be reminded DCMS is a new application; there is a learning curve, the system is being tweaked for efficiency of use and problems that have arisen since go-live, and process and procedures are still being worked out.

**DCMS HR Personnel; Production Issues**
- Tanya will be working with ISS/Admin Apps Thursday the 22nd, 10:30-11:30 to test DCMS Scan production issues.
- Production issue preventing scanning for Faculty Personnel and ORS is being tested by analysts.
- An email will be sent to Stakeholders when the DCMS Scan fixes are moved to production.

**DCMS HR Personnel release schedule**
- HRS and Stakeholders agreed Release 2 and Release 3 will remain separate; it was acknowledged both releases require user acceptance testing. Release 2 go-live is planned for April 30th; Release 3 go-live date has not been determined.

**Training Update**
- ORS training held last week. Users raised concern that documents are not being made available in a timely manner; under current manual (non digital) process.. Kris Moen is addressing this issue. Kris stated that much of the problem is due to the many copies that need to be made and distributed. Kris feels DCMS should provide some efficiencies since everyone will have online access to documents; so distribution of paper copies should be reduced.
- Training for HRS is being provided today; as we meet; Claire is providing training at 2100 M St for HRS.
- ORS viewer training has bee rescheduled; from 2/27 to 3/2; anyone who missed scheduled training is welcome to attend.
- All Release 1 training is planned to be completed within next two weeks; additional training sessions will need to be scheduled with Claire.
- Sherida Huff, in Faculty Personnel, is unable to open documents due to a problem with pop-up blocker; Tony Ford asked to investigate.
- MC Faculty, DCMS Scan Training
  - Ricardo unable to login to VPN (on scan station and at desktop); Chris Peacor asked to investigate.
  - Monica unable to login to scam station using Novell Login; Chris Peacor asked to investigate.
  - Tony able to log into the VPN but cannot login to DCMS; Tony Ford asked to investigate.

**Desktop Support**
- HRS Benefits scan station setup in progress.
- Marcy continuing to investigate scanner warranty. Several options are being investigated; all options will be presented to Stakeholders for approval. Distribution of this information is critical for FY2008 budget requests.

**MOU Status**
- Two MOUs remain to be signed; Research Services and MC Faculty Personnel.

| Description | Tanya/Office Responsible | Deadline |
|---|---|---|
| Validate access to Faculty Personnel collated documents | Barbara | 2/28 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. | Monica | 2/28 |
| Send OGC ruling on destruction of HR Personnel documents to stakeholders | Tanya | 2/28 |
| MC Faculty desktop issues to be resolved:<br>• Ricardo unable to login to VPN (on scan station and at desktop)<br>• Monica unable to login to scam station using Novell Login | Chris Peacor | 2/23 |

| | | |
|---|---|---|
| MC Faculty DCMS access issue to be resolved:<br>• Tony able to log into the VPN but cannot login to DCMS<br>• Monica unable to view documents that were scanned for Faculty Personnel | Tony Ford | 2/23 |
| Faculty personnel issues to be resolved:<br>• Sherida Huff unable to open documents due to a problem with pop-up blocker | Tony Ford | 2/23 |
| Setup HRS scan stations (PC and scanners)<br>**20070221:**<br>• Waiting on EEO to order table.<br>• Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | 3/15 |
| Investigate scanner warranty<br>**20070213:** Working with Desktop Support to understand options for extending warranty.<br>**20070207:** Investigate and report to Stakeholders information on extending scanner warranties<br>**20070206:** There is a 1 year warranty on scanners. Scanners were purchased 7/31/2006. | Marcy | In Progress |
| Review HRS and Stakeholder business process and procedures; especially those that cross division boundaries. Stakeholders reminded to review process and procedures guideline document from Marcy.<br>**20070117:** Process and procedures needs to remain as an agenda item at weekly meeting. Following issues were brought up at 1/17 Overview Session<br>• Monica asked how to handle entry of documents for which her office does not have Banner access to employee. This is a process and procedure issue that needs to be resolved between HRS and Stakeholders. Issue put on hold and will be discussed later. Note: Monica has 50-75 people for which she does not have Banner access.<br>• I9s will be scanned in HRS.<br>• Benefit documents will be scanned in HRS. | Tanya, Monica, Kris, Sarah, Barbara | Ongoing |
| Administrative process and procedures need to be documented. A document needs to be published ASAP and then updated as needed<br>**20070117:** the following issues were raised at the Stakeholder Overview Session. These processes need to be documented and distributed to HRS and Stakeholders<br>• How do you handle documents that were misfiled (i.e. index with wrong GWid, assign to wrong organization level, or other indexing errors)? Answer: Send an email to Tony Ford asking him to correct indexing error(s).<br>• How to add new users? Answer: Send email to Tony Ford requesting person be added to DCMS; must provide NetID and Banner id.<br>• How to setup DCMS access on new desktops; put in a Help Ticket. | Tony | Ongoing |

GW003909



# DCMS
# Architecture Meeting



| Date: | **02/28/07** |
|-------|--------------|
| Time: | **11:00** |
| Locations: | **FB149; 202-242-4605\\ 012407** |

## Agenda & Meeting Minutes

| | | | | | | |
|---|---|---|---|---|---|---|
| X | Marcy Day | X | Andy Navarrete | | Bob Leidich |
| X | Rick Gilchrist | X | Ken Fischer | | Adam Stone |
| | Jonathon Piersol | | Michele Chubirka | X | Travis Barker |
| X | Mark Harris | X | Rehan Khan | | Christina Griffin |
| | Dave Druther | | Tony Ford | | Ron Bonig |
| | Farhan Khan | X | Raoul Gabiam | | Dinesh Nangia |
| | Chris Zurich | | James Pierce | | Bill Zeledon |
| X | Steve Hoydilla | | | | Clarke Bishop |

| | |
|---|---|
| ✓ Planned Leave:<br>   • Travis   3/12 – 3/16 | **Team Updates** |
| ✓ Status of DCMS HR Personnel Implementation<br>   • Release 2; fix/enhancement release-- go-live planned for April 30<br>   • Release 3; indexing at desktop, bulk scanning, and annotation—Go-live not scheduled | FYI |
| ✓ Daylight Savings Time patches (servers, desktops) | |
| ✓ VMWare tools, and SAN upgrade | |
| ✓ Status of eRoom security issue resolution update (if available) | |
| ✓ Input Management Console (IMC) Setup; interface with Micromuse | |
| ✓ Centera Migration | |
| ✓ Review status of action items from last meeting | |
| ✓ Next Meeting; 3/7/07 | |

Daylight savings time patches have been pushed to servers in both QA environments; production push is scheduled for 3/3. Rick will contact Chris Peacor to see when the V5.2 desktop patch will be pushed. **Update:** The desktop update has been completed.

VMWare tools upgrade is scheduled to be done tonight in both QA environments. Andy will add the Novell client to DCTMIAQ tonight when he does the VMWare tools upgrade. **Update:** VMWare tools upgrade to dev and QA environments completed; prod updates scheduled for 3/13. The Novell client was installed; Andy working with Novell team to resolve connection issues.

Centera migration in progress; per an email from Adam, EMC will be ready to start replication the week of March 12. Prior to starting replication, we need to determine if hardware retention will be turned on.  Marcy will setup a meeting with Rick, Raoul, and Adam. **Update:** meeting scheduled for 3/8 at 1pm.

| | | |
|---|---|---|
| eRoom install (for new machines)<br>**20070221:** Tech Ops working with Security; there are a number of tasks being worked on. There is another meeting 3/6. | Tech Ops | On hold |
| eRoom enterprise; EMC has told Rick to setup and test 1 eRoom to use with eRoom Enterprise<br>**20061213:** Bob will setup for Rick to test | Bob/Tony | On hold |
| eRoom failover testing<br>**20061108:** Failover testing will be part of the eRoom install 'next steps' | Bob | On hold |
| ERoom Backups; is current backup method adequate for production? Should additional processes be added to have a backup of each eRoom? | Team | On hold |
| Follow-up on IMC interface with Micromuse. Check with consultant on sending heartbeat.<br>**20070221:** Rick is escalating within EMC | Rick | 2/28 |
| Daylight Saving Time patches<br>**20070228:** QA environments have received the patch. Prod update will be done this weekend. | Rehan | 3/3 |
| ORS/GCAS desktop client, DST patch<br>**20070228:** Rick will contact Chris to find out when the patch will be pushed to desktops. | Rick | complete |
| Index Server monitoring; Rehan making changes to use new monitoring account<br>**20070228:** Rehan to work with Travis today. Note: this needs to be rescheduled | Rehan | 3/7 |
| VMWare Tool Upgrade<br>**20070302:** The VMW tools upgrade was successfully completed on the Documentum dev and QA/DR vms. The Novell has been installed on DCTMIAQ, **however I am having trouble connecting to the Novell farm and will consult with the Novell team**. | Andy | 2/28 |
| SAN Maintenance<br>**20070228:** Per Dave Druther, this task is cancelled and will be rescheduled at a later date. | Dave | Closed |
| Centera Migration<br>**20070307:** Adam to work with EMC to schedule replication; based on results of hardware retention meeting on 3/8.<br>**20070228:** Meeting scheduled with Raoul, Adam and Rick to talk about what can be done with hardware retention to protect against data loss. Need to document a decision to go/no go with hardware retention. This must be done prior to starting replication to the new Centera. | Adam | 3/12 |
| Schedule DCMS backups; Oracle DB, Docbroker and Index server; test restore<br>**20061215:** Backups setup and scheduled by Dave. **Rehan needs to test/validate restore.** | Rehan/Tony | TBD |
| Prime OCR, DCTMOCRP2, has blue screened several times.<br>  1  Rick will try to get a temporary license to use to setup another machine.<br>  2  A request also needs to be sent to Mark Harris to setup another machine. | Rick | On hold |
| Move 1 of the production PRIME OCR machines from V5.2 to V5.3<br>**20061220:** Add to agenda on 01/02 for discussion | Marcy | On hold |
| Broadway rebuild | Andy | Hold |
| Need policy/SLA regarding backup/recovery/failover | Rehan | Hold |

GW000095



**DCMS
HR Personnel
3/07/07
(877) 214-0402 access code 327717**



INFORMATION SYSTEMS & SERVICES

## Agenda & Meeting Minutes

| | | | | | | |
|---|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | | Claire Mooney | |
| X | Tony Ford | | Monica Partsch | X | Christina Griffin | |
| X | Rick Gilchrist | X | Kris Moen | | Christina Huszcza | |
| X | Tanya Bell | | Sarah Fayle | | Tom Breslin | |

| | |
|---|---|
| Back Scan Status<br>• Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups. | |
| DCMS HR Personnel; HRS go-live/production issues | |
| DCMS access for new users; Banner setup requirements | |
| Process and procedure for adding new users and/or requesting desktop push | |
| Process/procedure for reporting DCMS issues | |
| Release 2 - HR Personnel bug fixes, cosmetic changes and enhancements<br>• Status<br>• Review UAT, Training, and go-live schedule | |
| Training Update<br>• OCRO Training; lots of process questions, especially about scanning<br>• MC Faculty scan training | |
| Desktop Support Update<br>• See action items | |
| MOU Status | |
| Review task list | Team |
| Next Meeting; 3/14/07 | |

**Back Scanning**
- Tony investigating scope of problem related to scanning multiple forms into one document, without ability to pair multiple form group/form names.
- Barbara reported there is still a scanner at her office from the rescan effort; Marcy will contract Richmar.

**DCMS Access/Banner Setup**
- Some users are unable to gain access to DCMS; the problem is their Banner access! Tanya, Tony, and Marcia Sleight met with Peter Sabela to find resolution. Rick will also work with Mike Alford to ensure that a script is run, during Banner Setup, to ensure all table entries for Banner setup are completed.

**Problem Reporting and DCMS Access Requests**
A help desk ticket should be submitted for the following.

- Request to add a new user to DCMS and DCMS Scan; include GWID, Banner ID, and NetID
- Request to have the DCMS icon put on desktop
- Any problems encountered using DCMS and DCMS Scan
- Any problems encountered operating the scanner
- Any problems with the scan station (PC or scanner)

**DCMS HR Personnel Release 2**
- DCMS Scan changes will be tested by Tanya and then moved to production. A transmittal defining all the changes to will be provided.
- New Milestones for DCMS
  User Acceptance Testing (UAT) 3/26 – 3/29  and retest on 4/5 – 4/6
  Go-Live Training    (demo)       4/09 – 4/13
  Go-Live                          4/16
- Rick proposed there be 2, 1/2 day group UAT sessions; with option to then spend a few days in user offices to do additional testing. Test scripts are expected to take no more than 4 hours to execute.
- Go-live training will be a demo; no hands on. Minimal training requirements anticipated for Release 2; most of the changes in Release 2 are cosmetic. New search functionality will require some explanation/training.
- Rick suggested an Elluminate session be setup for next Stakeholder meeting to show everyone some of the changes that will be in Release 2.

**Training Update**
- OCRO user ( viewers) training last week had lots of OCRO process questions; these were forwarded to Kris Moen.
- Faculty Personnel scan training scheduled for 3/7 in afternoon.
- MC Faculty Scan training being rescheduled for next week.

| | | |
|---|---|---|
| Signoff on Release 2 scope (see Release 2 Status and Ranking spreadsheet)<br>**20070306:** Rick has sent updated list to Tanya; Marcy has requested from Tanya, confirmation of changes to Release 2 content in writing. | Tanya | 3/14 |
| Confirm UAT, UAT retest, and Training plans; update Claire or Justin on training room schedule. | Marcy | 3/14 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. | Monica | 2/28 |
| Bessie Ashworth needs VPN client<br>**20070308:** Per Chris Peacor this task has been completed. Tanya has said it has not been done. Chris needs to call Bessie. | Chris Peacor | 3/14 |
| MC Faculty desktop issues to be resolved:<br>• Ricardo unable to login to VPN (on scan station and at desktop)<br>• ~~Monica unable to login to scan station using Novell Login~~ (Resolved)<br>**20070309:** Ricardo unable to login to VPN on his workstation. Chris Peacor has submitted a help ticket for one of the Med Ctr techs to take care of this. | Med Ctr Tech | 3/14 |

| | | |
|---|---|---|
| Validate code push for following Research Services people.<br><br>   • **Gary Reynolds (garryen)**<br>   • ~~Rashelle Sanon (rsanon)~~ Complete<br>   • ~~Leah Dyson(ldyson)~~ Complete<br>   • **Marilyn Villanueva (marilynv)**<br>   • ~~Ed Donis (edonis)~~ Complete<br><br>**20070309:** Chris Peacor has done the push; needs to call **Gary Reynolds, Marilyn Villanueva, and Angela Perry** to walk thru finding the icon. Have requested this be done by COB 3/13. | Chris Peacor | 3/13 |
| MC Faculty DCMS access issue to be resolved:<br><br>   • Tony able to log into the VPN but cannot login to DCMS; Note, this is a Banner issue.<br>   • Monica unable to view documents that were scanned for Faculty Personnel (ex Vincent Chiappilnelli; has documents but cannot be viewed by Monica) | Tony Ford | 3/14 |
| Faculty Personnel; Sherida Huff unable to open documents due to a problem with pop-up blocker<br>**20070227:** Sherida on vacation until 3/2 | Tony Ford | 3/14 |
| Research Services; Leah Dyson access issues<br><br>   • She entered a GWid and received no match for a student employee however when she entered the SSN the employee header information came up w/ no records. | Tony ford | complete |
| Prepare/update Help Desk responsibility matrix to include adding new users to DCMS, DCMS code push/icons and VPN code push to user desk top, | Tony | 3/14 |
| Setup HRS scan stations (PC and scanners)<br>**20070221:**<br>   • Waiting on EEO to order table.<br>   • Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | 4/1 |
| Investigate scanner warranty<br>**20070213:** Working with Desktop Support to understand options for extending warranty.<br>**20070207:** Investigate and report to Stakeholders information on extending scanner warranties<br>**20070206:** There is a 1 year warranty on scanners. Scanners were purchased 7/31/2006. | Marcy | In Progress |
| Investigate use of Documentum workflow for requesting user access to DCMS. | Rick/Tony | TBD |

| | | |
|---|---|---|
| Review HRS and Stakeholder business process and procedures; especially those that cross division boundaries. Stakeholders reminded to review process and procadures guideline document from Marcy.<br><br>**20070117:** Process and procedures needs to remain as an agenda item at weekly meeting. Following issues were brought up at 1/17 Overview Session<br>  • Monica asked how to handle entry of documents for which her office does not have Banner access to employee. This is a process and procedure issue that needs to be resolved between HRS and Stakeholders. Issue put on hold and will be discussed later. Note: Monica has 50-75 people for which she does not have Banner access.<br>  • I9s will be scanned in HRS.<br>  • Benefit documents will be scanned in HRS. | Tanya, Monica, Kris, Sarah, Barbara | Ongoing |
| Administrative process and procedures need to be documented. A document needs to be published ASAP and then updated as needed<br><br>**20070117:** the following issues were raised at the Stakeholder Overview Session. These processes need to be documented and distributed to HRS and Stakeholders<br>  • How do you handle documents that were misfiled (i.e. index with wrong GWid, assign to wrong organization level, or other indexing errors)? Answer: Send an email to Tony Ford asking him to correct indexing error(s).<br>  • How to add new users? Answer: Send email to Tony Ford requesting person be added to DCMS; must provide NetID and Banner id.<br>  • How to setup DCMS access on new desktops; put in a Help Ticket. | Tony | Ongoing |

CONFIDENTIAL



**DCMS
HR Personnel
3/14/07**
**(877) 214-0402 access code 327717**



| | Agenda & Meeting Minutes | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | | Claire Mooney |
| X | Tony Ford | | Monica Partsch | X | Christina Griffin |
| X | Rick Gilchrist | | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | X | Tom Breslin |

| | |
|---|---|
| Back Scan Status<br>• Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups.<br>• Correcting documents scanned/indexed incorrectly | |
| DCMS HR Personnel; HRS go-live/production issues | |
| Release 2 - HR Personnel bug fixes, cosmetic changes and enhancements<br>• Status<br>• Review UAT, Training, and go-live schedule | |
| Training Update | |
| Desktop Support Update<br>• See action items | |
| Scanner Warranty | |
| Scanner locks | |
| Review task list | Team |
| Next Meeting; 3/21/07 | |

**Back Scan Status**
- Multiple forms scanned into one document does not allow multiple form group/form name pairing for lookups. A solution has been identified; will take several weeks to write program, test, and complete cleanup.

**Production issues**
- An emergency fix to DCMS Scan was put into production last week; to take care of a problem Student Employment found.
- Release 2, DCMS Scan was put into production 3/13 at 5pm.

**Release 2**
- User Acceptance Testing (UAT) is on schedule to begin the week of 3/26. The training room will be reserved on 3/28 & 3/29 to review/execute test scripts.
- Go-live training will be scheduled the week of 4/9. Go-live on target for 4/16.

**Training Update**
- Release 1 training complete with the following exceptions:
  o Tony is providing DCMS Scan training to Faculty Personnel this afternoon.

- o DCMS Scan training for MC Faculty Affairs needs to be scheduled. This is dependent upon working out access issues being encountered by Tony Arrington and document access issues being encountered by Monica.

- Release 2 Training will be scheduled the week of 4/9. Training will consist of a demo of Release 2 content; no hands-on is planned. Marcy will email training dates/times. Contact Marcy immediately, upon receipt of email, if the proposed dates/times will not meet your needs.

**Desktop Support**
- All outstanding issues have been assigned a Help Desk ticket; any questions on status of these tickets should be made to the Help Desk.

**Scanner Warranty**
- HRS and Stakeholder offices are responsible for scanner maintenance. Maintenance options and costs will be sent out under separate cover.

**Scanner Locks**
- Locks, previously recommended for scanners, will not work. Ricoh has no locks that will work with the scanners being used for DCMS HR Personnel. The only option available is an Anchor Plate; this is a permanent lock. It is a pad applied to a desktop; once the scanner is adhered to the pad it cannot be removed.

| | | |
|---|---|---|
| Signoff on Release 2 scope (see Release 2 Status and Ranking spreadsheet)<br>**20070305:** Rick has sent updated list to Tanya; Marcy has requested from Tanya, confirmation of changes to Release 2 content in writing. | Tanya | 3/14 |
| Send out training schedule for Release 2 DCMS | Marcy | 3/19 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. | Monica | 2/28 |
| Schedule scan training for MC Faculty Affairs after resolution of access issues being encountered by Tony Arrington and document access issues being encountered by Monica. | Tony | 3/21 |
| Scanner warranty<br>**20070314:** Scanner maintenance is responsibility of HRS and Stakeholder offices. Information on maintenance options will be emailed to HRS and Stakeholder representatives. | Marcy | 3/21 |
| Setup HRS scan stations (PC and scanners)<br>**20070221:**<br>   • Waiting on EEO to order table. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |
| Bessie Ashworth needs VPN client<br>**20070313:** Desktop Support called Bessie and walked her through connecting to VPN. Help Tick HD 279884 may be referenced.<br>**20070308:** Per Chris Peacor this task has been completed. Tanya has said it has not been done. Chris needs to call Bessie. | HD 279884 | complete |

| | | |
|---|---|---|
| Validate code push for following Research Services people.<br><br>• **Gary Reynolds** (garyryen)<br>• ~~Rashelle Sanon (rsanon)~~ Complete<br>• ~~Leah Dyson(ldyson)~~ Complete<br>• **Marilyn Villanueva** (marilynv)<br>• ~~Ed Denis (edenis)~~ Complete<br><br>**20070313:** Help desk ticket entered to validate/fix code push.<br>**20070309:** Chris Peacor has done the push; needs to call **Gary Reynolds, Marilyn Villanueva, and Angela Perry** to walk thru finding the icon. Have requested this be done by COB 3/13. | Contact Help Desk for status; ticket number **HD0000000279880** | closed |
| MC Faculty DCMS access issue to be resolved:<br><br>• Tony able to log into the VPN but cannot login to DCMS; Note, this is a Banner issue.<br>• Monica unable to view documents that were scanned for Faculty Personnel (ex Vincent Chiappiinelli); has documents but cannot be viewed by Monica | Peter Sabela should be contacted for additional issues | closed |
| Confirm UAT, UAT retest, and Training plans; update Claire or Justin on training room schedule.<br>**20070315:** UAT startup will be 3/28 & 3/29 in training room. | Marcy | close |
| Investigate use of Documentum workflow for requesting user access to DCMS.<br><br>**20070314:** Will be added to Mantis as a future enhancement. | Rick | Close |
| Review HRS and Stakeholder business process and procedures; especially those that cross division boundaries. Stakeholders reminded to review process and procedures guideline document from Marcy.<br>**20070313:** Closing task; this is an ongoing task that needs to be worked out between HRS and the Stakeholder offices.<br>**20070117:** Process and procedures needs to remain as an agenda item at weekly meeting. Following Issues were brought up at 1/17 Overview Session<br>• Monica asked how to handle entry of documents for which her office does not have Banner access to employee. This is a process and procedure issue that needs to be resolved between HRS and Stakeholders. Issue put on hold and will be discussed later. Note: Monica has 50-75 people for which she does not have Banner access. | Tanya, Monica, Kris, Sarah, Barbara | close |
| Administrative process and procedures need to be documented. A document needs to be published ASAP and then updated as needed<br>**20070313:** Closing task; specific tasks will be added as documentation is identified.<br>**20070117:** the following issues were raised at the Stakeholder Overview Session. These processes need to be documented and distributed to HRS and Stakeholders<br>• How do you handle documents that were misfiled (i.e. index with wrong GWid, assign to wrong organization level, or other indexing errors)? Answer: Send an email to Tony Ford asking him to correct indexing error(s).<br>• How to add new users? Answer: Send email to Tony Ford requesting person be added to DCMS; must provide NetID and Banner id.<br>• How to setup DCMS access on new desktops; put in a Help Ticket. | Tony | Close |

GW000149



**DCMS**
**HR Personnel**
**3/21/07**
**(877) 214-0402 access code 327717**



INFORMATION
SYSTEMS &
SERVICES

| Agenda & Meeting Minutes | | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| | |
|---|---|
| **Back Scan Status** <br> • Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups. <br> • Correcting documents scanned/indexed incorrectly (ORS) <br> • MC Faculty documents <br>   o  Full-time Medical scanned as Faculty Personnel <br>   o  Part-time/never held GW job <br>   o  Held position in past; now works for another GW department | |
| DCMS production issues (No new, major, issues reported) <br> DCMS Scan production issues (No new, major, issues reported ) | |
| Release 2 - HR Personnel  bug fixes, cosmetic changes and enhancements <br> • Review UAT, Training, and go-live schedule | |
| Training Update <br> • Training schedule | |
| Desktop Support Update <br> • See action items | |
| Scanner Warranty (on hold; options under review) | |
| Scanner locks | |
| Review task list | Team |
| Next Meeting; 3/28/07 | |

**Back Scan Status**
- Multiple forms in one document will not allow multiple form group/form name pairing for lookups.   Solution identified and tested.  Implementation of fix on hold; wait until MC Faculty back scan issues are fixed.
- Full-time MC Faculty scanned as Faculty Personnel.   A program will be run to identify full-time MC Faculty employees; still investigating how to fix the indexes.
- Part-time/Limited Service Faculty does not have a GW job position so the documents cannot be retrieved. Update:  A web service has been written to retrieve these documents; testing in progress.
- Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline.

**DCMS HR Personnel Release 2**
- UAT training will begin Wednesday, March 28th. We will meet at the 2100 M Street training room at 1:00.

**Training**
- Go live training will be April 11th and 12th. There will be 4 training sessions; 1 in the morning and 1 in the afternoon each day. Training will consist of a demo of Release 2 content; there will be no hands-on training. Claire will provide updated training materials. Rick will prepare a transmittal listing all the DCMS Release 2 content.
- Marcy is planning to reserve a room in the Marvin Center for go-live training. Tanya mentioned that not all of her users will attend training; the changes are not so significant that time out of the office can be justified during her busy time.
- Monica needs to schedule scan training now that DCMS access issues have been resolved.

**Desktop Support**
- Barbara mentioned she was interested in getting a second monitor for the scan station. During scanning, her staff will sometimes need to do Banner look-ups which require them to go to their desktop. Rick will talk with Barbara offline; it is not necessary for staff to go to their desktops for this.

| | Resource Responsible | Deadline |
|---|---|---|
| Signoff on Release 2 scope (see Release 2 Status and Ranking spreadsheet)<br>**20070305:** Rick has sent updated list to Tanya; Marcy has requested from Tanya, confirmation of changes to Release 2 content in writing. | Tanya | 3/14 |
| Send out training schedule for Release 2 DCMS<br>**20070323:** Go live training will be April 11 and 12. There will be 4 training sessions; 1 in the morning and 1 in the afternoon each day. Marcy will reserve a room in the Marvin Center. | Marcy | 3/28 |
| DCMS Release 2 training material updates | Claire | 4/9 |
| DCMS Release 2 transmittal | Rick | 4/9 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. | Monica | 2/28 |
| Scheduled scan training for MC Faculty Affairs | Monica | |
| Talk with Barbara offline regarding the desire/need for a second monitor to prevent her staff from needing to leave the scan station to go to their desktop to do Banner lookups. | Rick/Tony | 3/28 |
| Scanner warranty<br>20070323: Additional information being investigated. Will send out maintenance information as soon as all information is available.<br>**20070314:** Scanner maintenance is responsibility of HRS and Stakeholder offices. Information on maintenance options will be emailed to HRS and Stakeholder representatives. | Marcy | 3/28 |
| Setup HRS scan stations (PC and scanners)<br>**20070221:**<br>• Waiting on EEO to order table.<br>• Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |

CONFIDENTIAL

 THE GEORGE WASHINGTON UNIVERSITY WASHINGTON DC

**DCMS**
**HR Personnel**
**4/4/07**
(877) 214-0402 access code 327717

 INFORMATION SYSTEMS & SERVICES

## Agenda & Meeting Minutes

| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
|---|---|---|---|---|---|
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| | | |
|---|---|---|
| | Scheduled Outages<br>• April 26th after 7pm (to upgrade hardware) | FYI |
| | Back Scan Status<br>• Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups.<br>• MC Faculty documents<br>  o Full-time Medical scanned as Faculty Personnel<br>  o Part-time/never held GW job (fixed)<br>  o Held position in past; now works for another GW department | |
| | DCMS production/DCMS Scan production issues | |
| | Release 2 - HR Personnel<br>• Review UAT, Training, and go-live schedule | |
| | Training Update<br>• Training schedule | |
| | Desktop Support Update<br>• See action items | |
| | Scanner Warranty | |
| | Scanner locks | |
| | Review task list | Team |
| | Next Meeting; 4/11/07 | |

**Release 2**
- UAT signoffs completed and approved to move to production.
- Will be moved to production at 3pm on April 4th; there will be a 5-15 minute production outage.
- Tanya, Monica, Sarah, Kris, and Barbara will be given link to production Release 2; it will be at their discretion to distribute. Marcy will send an email with the link, along with an updated Release 2 Notes document.
- The Release 2 link will be activated on all desktop icons on April 12th after 7pm; until then users will continue to access production using through Release 1.x unless given the Release 2 link to use (see above).

**Training**
- Release 2 training will be April 11th and 12th. There will be four sessions available; 10:00 – 12:00 and 1:00 – 3:00 each day.
- Everyone should signup for training through GLearn; Marcy will send an email with instructions to Tanya, Monica, Sarah, Kris, and Barbara; they will distribute to their staff.

**Scanner Warranty/Maintenance**
- Scanners are under warranty through July 2007.
- ISS will purchase the first year of maintenance for the 12 scanners that were purchased for the project.

**Other**
- Tony asked to schedule an addition scan training session for Barbara's team.
- Outage approved for April 26th after 7pm; purpose is to switch to new Centera boxes.

| | | |
|---|---|---|
| Send out training communication to users; training dates/times and instructions on how to signup for training. **20070404:** Marcy sent to HRS and Stakeholders; they will distribute to their staff. | Marcy/Claire | complete |
| DCMS Release 2 training material updates | Claire | 4/10 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. **20070404:** Monica approved documents as indexed (in correspondence; Barbara's are in appointment group) | Monica | close |
| Schedule additional scan training for Faculty Personnel | Tony | 4/11 |
| Prepare a procedure; for requesting a document scanned/indexed to the wrong person be moved to the correct person. | Rick/Tony | 4/11 |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline. | Monica/Tanya | 4/6 |
| Talk with Barbara offline regarding the desire/need for a second monitor to prevent her staff from needing to leave the scan station to go to their desktop to do Banner lookups. **20070404:** Tony and Barbara are working together on this. | Tony | close |
| Setup HRS scan stations (PC and scanners) **20070221:** <br>• Waiting on EEO to order table. <br>• Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders **20070207:** Tony will research this topic and prepare training. | Tony | TBD |

 THE GEORGE WASHINGTON UNIVERSITY WASHINGTON DC

**DCMS**
**HR Personnel**
**3/21/07**
**(877) 214-0402 access code 327717**

 INFORMATION SYSTEMS & SERVICES

## Agenda & Meeting Minutes

| | | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |

| | | |
|---|---|---|
| | **Back Scan Status** <br> • Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups. <br> • Correcting documents scanned/indexed incorrectly (ORS) <br> • MC Faculty documents <br>   o Full-time Medical scanned as Faculty Personnel <br>   o Part-time/never held GW job <br>   o Held position in past; now works for another GW department | |
| | DCMS production issues (No new, major, issues reported) <br> DCMS Scan production issues (No new, major, issues reported ) | |
| | Release 2 - HR Personnel  bug fixes, cosmetic changes and enhancements <br> • Review UAT, Training, and go-live schedule | |
| | Training Update <br> • Training schedule | |
| | Desktop Support Update <br> • See action items | |
| | Scanner Warranty (on hold; options under review) | |
| | Scanner locks | |
| | Review task list | Team |
| | Next Meeting; 3/28/07 | |

**Back Scan Status**
- <u>Multiple forms in one document will not allow multiple form group/form name pairing for lookups.</u>   Solution identified and tested.  Implementation of fix on hold; wait until MC Faculty back scan issues are fixed.
- <u>Full-time MC Faculty scanned as Faculty Personnel</u>.   A program will be run to identify full-time MC Faculty employees; still investigating how to fix the indexes.
- <u>Part-time/Limited Service Faculty does not have a GW job position so the documents cannot be retrieved</u>. Update:  A web service has been written to retrieve these documents; testing in progress.
- <u>Monica has documents that cannot be retrieved because she does not have Banner access for employee</u>. Monica and Tanya will discuss offline.

GW000150

**DCMS HR Personnel Release 2**
- UAT training will begin Wednesday, March 28th. We will meet at the 2100 M Street training room at 1:00.

**Training**
- Go live training will be April 11th and 12th. There will be 4 training sessions; 1 in the morning and 1 in the afternoon each day. Training will consist of a demo of Release 2 content; there will be no hands-on training. Claire will provide updated training materials. Rick will prepare a transmittal listing all the DCMS Release 2 content.
- Marcy is planning to reserve a room in the Marvin Center for go-live training. Tanya mentioned that not all of her users will attend training; the changes are not so significant that time out of the office can be justified during their busy time.
- Monica needs to schedule scan training now that DCMS access issues have been resolved.

**Desktop Support**
- Barbara mentioned she was interested in getting a second monitor for the scan station. During scanning, her staff will sometimes need to do Banner look-ups which require them to go to their desktop. Rick will talk with Barbara offline; it is not necessary for staff to go to their desktops for this.

| | Person Responsible | Deadline |
|---|---|---|
| Signoff on Release 2 scope (see Release 2 Status and Ranking spreadsheet) **20070305:** Rick has sent updated list to Tanya; Marcy has requested from Tanya, confirmation of changes to Release 2 content in writing. | Tanya | 3/14 |
| Send out training schedule for Release 2 DCMS **20070323:** Go live training will be April 11 and 12. There will be 4 training sessions; 1 in the morning and 1 in the afternoon each day. Marcy will reserve a room in the Marvin Center. | Marcy | 3/28 |
| DCMS Release 2 training material updates | Claire | 4/9 |
| DCMS Release 2 transmittal | Rick | 4/9 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. | Monica | 2/28 |
| Scheduled scan training for MC Faculty Affairs | Monica | |
| Talk with Barbara offline regarding the desire/need for a second monitor to prevent her staff from needing to leave the scan station to go to their desktop to do Banner lookups. | Rick/Tony | 3/28 |
| Scanner warranty **20070323:** Additional information being investigated. Will send out maintenance information as soon as all information is available. **20070314:** Scanner maintenance is responsibility of HRS and Stakeholder offices. Information on maintenance options will be emailed to HRS and Stakeholder representatives. | Marcy | 3/28 |
| Setup HRS scan stations (PC and scanners) **20070221:** <br>• Waiting on EEO to order table. <br>• Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders **20070207:** Tony will research this topic and prepare training. | Tony | TBD |

GW000151

 THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

**DCMS
HR Personnel
4/4/07
(877) 214-0402 access code 327717**

 INFORMATION
SYSTEMS &
SERVICES

## Agenda & Meeting Minutes

| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
|---|---|---|---|---|---|
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| | | |
|---|---|---|
| | Scheduled Outages <br> • April 26th after 7pm (to upgrade hardware) | FYI |
| | Back Scan Status <br> • Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups. <br> • MC Faculty documents <br>     o Full-time Medical scanned as Faculty Personnel <br>     o Part-time/never held GW job (fixed) <br>     o Held position in past; now works for another GW department | |
| | DCMS production/DCMS Scan production issues | |
| | Release 2 - HR Personnel <br> • Review UAT, Training, and go-live schedule | |
| | Training Update <br> • Training schedule | |
| | Desktop Support Update <br> • See action items | |
| | Scanner Warranty | |
| | Scanner locks | |
| | Review task list | Team |
| | Next Meeting; 4/11/07 | |

**Release 2**
- UAT signoffs completed and approved to move to production.
- Will be moved to production at 3pm on April 4th; there will be a 5-15 minute production outage.
- Tanya, Monica, Sarah, Kris, and Barbara will be given link to production Release 2; it will be at their discretion to distribute. Marcy will send an email with the link, along with an updated Release 2 Notes document.
- The Release 2 link will be activated on all desktop icons on April 12th after 7pm; until then users will continue to access production using through Release 1.x unless given the Release 2 link to use (see above).

**Training**
- Release 2 training will be April 11th and 12th. There will be four sessions available; 10:00 – 12:00 and 1:00 – 3:00 each day.
- Everyone should signup for training through GLearn; Marcy will send an email with instructions to Tanya, Monica, Sarah, Kris, and Barbara; they will distribute to their staff.

**Scanner Warranty/Maintenance**
- Scanners are under warranty through July 2007.
- ISS will purchase the first year of maintenance for the 12 scanners that were purchased for the project.

**Other**
- Tony asked to schedule an addition scan training session for Barbara's team.
- Outage approved for April 26th after 7pm; purpose is to switch to new Centera boxes.

| | | |
|---|---|---|
| Send out training communication to users; training dates/times and instructions on how to signup for training. **20070404:** Marcy sent to HRS and Stakeholders; they will distribute to their staff. | Marcy/Claire | complete |
| DCMS Release 2 training material updates | Claire | 4/10 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed. **20070404:** Monica approved documents as indexed (in correspondence; Barbara's are in appointment group) | Monica | close |
| Schedule additional scan training for Faculty Personnel | Tony | 4/11 |
| Prepare a procedure; for requesting a document scanned/indexed to the wrong person be moved to the correct person. | Rick/Tony | 4/11 |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline. | Monica/Tanya | 4/6 |
| Talk with Barbara offline regarding the desire/need for a second monitor to prevent her staff from needing to leave the scan station to go to their desktop to do Banner lookups. **20070404:** Tony and Barbara are working together on this. | Tony | close |
| Setup HRS scan stations (PC and scanners) **20070221:** <br> • Waiting on EEO to order table. <br> • Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders **20070207:** Tony will research this topic and prepare training. | Tony | TBD |

CONFIDENTIAL



**DCMS
HR Personnel
4/4/07**

(877) 214-0402 access code 327717



INFORMATION
SYSTEMS &
SERVICES

## Agenda & Meeting Minutes

| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
|---|-----------|---|------------------|---|---------------|
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | X | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |
| | | | | | |

| | |
|---|---|
| **Scheduled Outages**<br>• April 26th after 7pm (to upgrade hardware) | FYI |
| **Back Scan Status**<br>• Multiple indexes for a document (multiple forms within a document)—Does not allow multiple form group/form name pairing for lookups.<br>• MC Faculty documents<br>   o Full-time Medical scanned as Faculty Personnel<br>   o Part-time/never held GW job (fixed)<br>   o Held position in past; now works for another GW department | |
| DCMS production/DCMS Scan production issues | |
| **Release 2 - HR Personnel**<br>• Review UAT, Training, and go-live schedule | |
| **Training Update**<br>• Training schedule | |
| **Desktop Support Update**<br>• See action items | |
| Scanner Warranty | |
| Scanner locks | |
| Review task list | Team |
| Next Meeting; 4/11/07 | |

**Back Scanning**
- MC Faculty part-time/never held GW job is fixed; Monica can now see documents for her part-time people.
- Multiple forms in one document indexes; program written to fix indexes and is being tested.
- Rick will be sending out a plan for fixes to all outstanding back scanning problems next week.
- Monica mentioned she found back scanned documents that were scanned under the wrong GWID; she will send these to Tony and Rick.
- Tanya mentioned the need to be able to change the GWid index of a document; Rick said this is being looked at as a possible deliverable in Release 3 through the bulk scanning function.

CONFIDENTIAL

**Release 2**
- UAT signoffs completed and approved to move to production.
- Will be moved to production at 3pm on April 4th; there will be a 5-15 minute production outage.
- Tanya, Monica, Sarah, Kris, and Barbara will be given link to production Release 2; it will be at their discretion to distribute. Marcy will send an email with the link, along with an updated Release 2 Notes document.
- The Release 2 link will be activated on all desktop icons on April 12th after 7pm; until then users will continue to access production using through Release 1.x unless given the Release 2 link to use (see above).

**Training**
- Release 2 training will be April 11th and 12th. There will be four sessions available; 10:00 – 12:00 and 1:00 – 3:00 each day.
- Everyone should signup for training through GLearn; Marcy will send an email with instructions to Tanya, Monica, Sarah, Kris, and Barbara; they will distribute to their staff.

**Scanner Warranty/Maintenance**
- Scanners are under warranty through July 2007.
- ISS will purchase the first year of maintenance for the 12 scanners that were purchased for the project.

**Other**
- Tony asked to schedule an addition scan training session for Barbara's team.
- Outage approved for April 26th after 7pm; purpose is to switch to new Centera boxes.

| | | |
|---|---|---|
| Send out training communication to users; training dates/times and instructions on how to signup for training.<br>**20070404:** Marcy sent to HRS and Stakeholders; they will distribute to their staff. | Marcy/Claire | complete |
| DCMS Release 2 training material updates | Claire | 4/10 |
| Review Part-time MC Faculty appointment/reappointment documents. Recommendations were indexed as correspondence. Monica to review and determine if indexes need to be changed.<br>**20070404:** Monica approved documents as indexed (in correspondence; Barbara's are in appointment group) | Monica | close |
| Schedule additional scan training for Faculty Personnel | Tony | 4/11 |
| Prepare a procedure; for requesting a document scanned/indexed to the wrong person be moved to the correct person. | Rick/Tony | 4/11 |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline. | Monica/Tanya | 4/6 |
| Talk with Barbara offline regarding the desire/need for a second monitor to prevent her staff from needing to leave the scan station to go to their desktop to do Banner lookups.<br>**20070404:** Tony and Barbara are working together on this. | Tony | close |
| Setup HRS scan stations (PC and scanners)<br>**20070221:**<br>- Waiting on EEO to order table.<br>- Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |

GW000153



**DCMS**
**HR Personnel**
**4/11/07**
(877) 214-0402 access code 327717



INFORMATION
SYSTEMS &
SERVICES

| Agenda & Meeting Minutes | | | | |
|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | | Kris Moen | | Christina Huszcza |
| | Tanya Bell | | Sarah Fayle | | Tom Breslin |

| | FYI |
|---|---|
| Scheduled Outages<br>• April 26th after 7pm (to upgrade hardware) | FYI |
| Back Scan Status<br>• Plan to fix back scanning issues<br>   o  Multiple forms within a document; does not allow multiple form group/form name pairing for lookups.<br>   o  Full-time Medical scanned as Faculty Personnel | |
| DCMS production/DCMS Scan production issues | |
| Release 2 - HR Personnel<br>• Training and go-live schedule<br>• Date (4/12)/time to move to prod | |
| Training Update<br>• Training schedule | |
| Release 3; indexing at desktop and bulk scanning<br>• Status (Crown deliverable & next steps)<br>• Charter being prepared<br>• Project plan needs to be prepared | |
| Desktop Support Update<br>• See action items | |
| Review task list | Team |
| Next Meeting; 4/18/07 | |

**Scheduled Outages**
- Barbara, Sarah, Kris and Monica approved an outage at 5pm on 4/12 to move Release 2 code to production. Still need approval from Tanya for the outage; Marcy will try to contact her.

**Back Scan Status**
- Tony and Rick are working a plan to fix all remaining back scan issues; this will be distributed as soon as it is available.

CONFIDENTIAL

GW000154

- Barbara approved a temporary solution to allow Monica to see full-time Medical documents that were scanned as Faculty Personnel. Monica's group will be given DCMS Faculty Personnel access permission; Banner will limit their access to MC Faculty documents.

**Release 2**
- Training is April 11th and 12th. There were 3 people at the morning session today and none in the afternoon. Registration for tomorrow (April 12th) indicated both sessions will be better attended.
- Those in attendance were reminded to sign up for training through GLearn.
- Training materials will be sent to Tanya, Kris, Sarah, Monica, and Barbara for distribution to any staff who do not attend training.

**Release 3**
- The focus of Release 3 is to move indexing from the scan station to user desktops and to provide bulk scanning.
- Rick provided an overview for those in attendance. Rick will provide a written overview within the next few weeks.
- Marcy will be working on a project plan over the next two week.

| | | |
|---|---|---|
| DCMS Release 2 training material updates **20070410:** Training materials are being handed out at training. Claire will send training materials to HR and the Stakeholder representatives for distribution to their users. | Claire | 4/13 |
| Schedule additional scan training for Faculty Personnel **20070410:** Scheduled for 3pm today. | Tony | complete |
| Prepare/distribute a procedure on how to request fixing a document that was scanned/indexed to the wrong person be moved to the correct person. **20070410:** No update. | Rick/Tony | 4/11 |
| Provide plan for fixing all back scan issues. **20070410:** Work in progress. Will be sent to HR and Stakeholder representatives when available. | Tony | In progress |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline. **20070410:** Monica will email Tanya to request a meeting. | Monica/Tanya | 4/17 |
| Provide a written overview of Release 3 content | Rick | 4/24 |
| Prepare Release 3 Project Plan | Marcy | 4/24 |
| Setup HRS scan stations (PC and scanners) **20070221:** <br> • Waiting on EEO to order table. <br> • Ashburn office remains on hold. | Desktop Support | On hold |
| Setup a care and maintenance training session for HRS and Stakeholders **20070207:** Tony will research this topic and prepare training. | Tony | TBD |

GW000155



## DCMS
## HR Personnel
## 4/18/07
(877) 214-0402 access code 327717



INFORMATION SYSTEMS & SERVICES

| | Agenda & Meeting Minutes | | | | | | |
|---|---|---|---|---|---|---|---|
| X | Marcy Day | | X | Barbara Marshall | | X | Claire Mooney |
| X | Tony Ford | | | Monica Partsch | | | Christina Griffin |
| X | Rick Gilchrist | | X | Kris Moen | | | Christina Huszcza |
| X | Tanya Bell | | X | Sarah Fayle | | | Tom Breslin |

| | | |
|---|---|---|
| Scheduled Outages<br>• April 26th after 7pm (to upgrade hardware) | FYI |
| Back Scan Status<br>• Plan to fix back scanning Issues | |
| DCMS production/DCMS Scan production issues | |
| Training Update<br>• Training schedule | |
| Release 3; indexing at desktop and bulk scanning<br>• Status (Crown deliverable & next steps)<br>• Charter being prepared<br>• Project plan needs to be prepared | |
| Desktop Support Update<br>• See action items | |
| Review task list | Team |
| Next Meeting; 4/25/07 | |

Back Scanning
- Rick reviewed plan to resolve outstanding back scan issues with project team. Monica was not at meeting but sent an email approving the plan. Barbara stated she had not issues with the plan. Tanya is reviewing plan.

Production Issues
- Kris reported a DCMS Scan outage on 4/17 around 4pm. Rick acknowledged there was a network blip that affected DCMS and DCMS Scan. Networking is looking into the issue. Note: there is a Help Desk ticket for this problem; called in by Kris Moen.

Release 2
- In production; no issues reported.
- Kris stated he felt Release 2 has a much better look and feel. Barbara mentioned here team was very happy with new release.

CONFIDENTIAL

GW000156

**Release 3**
- Rick provided an overview of Release 3 content; focus of the release is indexing. The three major deliverables are indexing at user desktop, bulk scanning, and re-indexing. Re-indexing will allow users to change org level and/or employee if indexed incorrectly.
- Rick is preparing a Release 3 requirements/design document for HRS and Stakeholder review.
- A draft Charter has been prepared; a copy will be distributed once approved.
- Project plan is being drafted; should have a better idea of project schedule within next two weeks.

Training
- Claire provided two days of Release 2 training last week. Many attendees were from OCRO; some had not attended the initial training. Claire was able to adjust training to accommodate users unfamiliar with DCMS. Training was well received.

Desktop Support
- Tanya reported that EEO is ready to have scanner setup. Tanya will submit a Help Desk ticket.

| Task | Resource Requested | Design |
|---|---|---|
| DCMS Release 2 training material updates<br>**20070418:** Marcy sent out training materials to HRS and Stakeholders immediately following the 1pm meeting. | Marcy | Complete |
| Back Scan plan to fix outstanding issues<br>**20070418:** Need approval from Tanya. Approval received from Barbara and Monica. Note; does not affect Kris or Sarah. | Tanya | 4/25 |
| Prepare/distribute a procedure on how to request fixing a document that was scanned/indexed to the wrong person be moved to the correct person.<br>**20070410:** No update. | Rick/Tony | 4/11 |
| Provide plan for fixing all back scan issues.<br>**20070410:** Work in progress. Will be sent to HR and Stakeholder representatives when available. | Tony/Rick | Complete |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee. Monica and Tanya will discuss offline.<br>**20070410:** Monica will email Tanya to request a meeting. | Monica/Tanya | 4/17 |
| Provide a written overview of Release 3 content (Requirements/design document) | Rick | 4/24 |
| Prepare Release 3 Project Plan | Marcy | 4/24 |
| Setup HRS scan stations (PC and scanners)<br>20070418:<br>   • EEO ready to have scanner setup<br>   • Ashburn office remains on hold. | Desktop Support | TBD |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |

GW000157



**DCMS**
**HR Personnel**
**4/25/07**
(877) 214-0402 access code 327717



INFORMATION
SYSTEMS &
SERVICES

| Agenda & Meeting Minutes | | | | | |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | X | Kris Moen | | Christina Huszcza |
| X | Tanya Bell | | Sarah Fayle | | Tom Breslin |

| | | |
|---|---|---|
| Scheduled Outages<br>• April 26th after 7pm (to upgrade hardware) | | **FYI** |
| Back Scan Status<br>• Plan to fix back scanning issues | | |
| DCMS production/DCMS Scan production  issues | | |
| Training Update | | |
| Release 3; indexing at desktop and bulk scanning<br>• Status (Crown deliverable & next steps)<br>• Charter being prepared<br>• Project plan needs to be prepared | | |
| Desktop Support Update<br>• See action items | | |
| Review task list | | Team |
| Next Meeting; 5/2/07 | | |

**Back Scan Status**
- Another set of Faculty Personnel documents have been identified as having been scanned as HRS; this issue will be added the back scan resolution plan.
- Multiple forms scanned in one document; without indexing each form are being fixed.  Currently 35% - 40% complete.

**Production Issues**
- Some form names/groups were not correctly aligned with org levels.  This was fixed, tested by Faculty Personnel and Research Services, and then moved to production.

**Release 3**
- Rick reported that Tanya has reviewed requirements.
- Solution Design received from Crown Partners.
- Rick will provide an overview document next week.
- Rick plan to provide screen shots on DCMS Scan by the end of next week.
- Project Charter and project plan being prepared; will be shared with Team within the next couple weeks.

| | Resource Responsibility | When/Date |
|---|---|---|
| Back Scan plan to fix outstanding issues<br>**20070418:** Need approval from Tanya.  Approval received from Barbara and Monica.  Note; does not affect Kris or Sarah. | Tanya | 4/25 |
| Prepare/distribute a procedure on how to request fixing a document that was scanned/indexed to the wrong person be moved to the correct person.<br>**20070410:** No update. | Rick/Tony | 4/11 |
| Monica has documents that cannot be retrieved because she does not have Banner access for employee.  Monica and Tanya will discuss offline.<br>**20070430:** Closing; this is an issue for Monica and Tanya to resolve offline. | Monica/Tanya | Close |
| Provide a written overview of Release 3 content (Requirements/design document) | Rick | 5/2 |
| Prepare Release 3 Project Plan | Marcy | 5/2 |
| Setup HRS scan stations (PC and scanners)<br>20070418:<br>   • EEO ready to have scanner setup  (work in progress)<br>   • Ashburn office remains on hold. | Desktop Support | TBD |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |

CONFIDENTIAL

 THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

**DCMS**
**HR Personnel**
**5/02/07**
(877) 214-0402 access code 327717

 INFORMATION
SYSTEMS &
SERVICES

## Agenda & Meeting Minutes

| | ATTENDEES | | ATTENDEES | | ATTENDEES |
|---|---|---|---|---|---|
| X | Marcy Day | X | Barbara Marshall | X | Claire Mooney |
| X | Tony Ford | X | Monica Partsch | | Christina Griffin |
| X | Rick Gilchrist | | Kris Moen | | Christina Huszcza |
| X | Tanya Bell | X | Sarah Fayle | | Tom Breslin |

| AGENDA | | |
|---|---|---|
| Scheduled Outages<br>• None | | **FYI** |
| Back Scan Status<br>• Plan to fix back scanning issues | | |
| DCMS production/DCMS Scan production issues | | |
| Release 3; indexing at desktop and bulk scanning<br>• Status<br>• Project Milestones | | |
| Training Update | | |
| Review task list | | Team |
| Next Meeting; 5/16/07 | | |

Back Scan Status
- Multiple forms scanned as one document without appropriate indexes: 60-70% complete, will be completed by COB 5/4. Documents fixed will have ownerid=backscan3
- Barbara has been given VIEW capability to help debug back scan issues (she cannot find documents that were back scanned for her). Barbara is very please with VIEW capability; allows her to see document titles but does not allow her to see the document. View will allow Barbara to work with Rick and Tony to identify back scan documents/batches that were indexed incorrectly.

Production Issues
- Form names not displaying correctly fixed and moved to production; ORS and Faculty Personnel validated fix before production move.
- Monica has some documents she cannot see; she has access in Banner but gets DCMS access error. Monica will email employee name and GWid to Rick and Tony.
- Barbara reported problem with mis-aligned scan document. Tony will contact Barbara staff (responsible for scanning) to explain how this may have happened. Issue emphasizes need to QA scanned documents.
- Access issues for employee with multiple jobs discussed at length. Rick will investigate possible long-term solutions; eventually may need to loosen security. Note; this is an issue that occurs in all Stakeholder offices. Following is concern/example raised by Sarah.
  - Sarah raised concern that she does not have access to Student Employment records if student is hired as faculty or staff. Sarah cannot scan updated student documents because she no longer has Banner

CONFIDENTIAL

access (this is primarily a back scan issue for Sarah). However, student information cannot be scanned by hiring organization because of access issues (example; student hired by ORS. ORS can scan/access ORS employment documents for hired student. ORS cannot scan updated student records for their new employee. Student Employment cannot see student records or scan updated student documents).

Release 3
- Release will provide scanning/indexing productivity enhancements for HR Personnel. All enhancements will be added to the Framework and available to all GW Documentum users when Framework release is complete.
- Charter prepared for HR signoff
- Project plan to be confirmed next week; Marcy will email confirmed milestone dates once plan is confirmed by Admin Apps. Will need HRS and Stakeholders to approve milestones dates; specifically availability to complete users acceptance testing and for user training.
- Rick presented plan to do UAT and user training on-site at each user location; everyone in attendance agreed to the plan. Note: UAT and training will only affect user responsible for scanning and indexing.
- Release 3 content reviewed.
   o Move indexing to user desktop: majority of indexing will be done at user desktop rather than at scan station. Note: there will be a requirement for high level indexes to be done at scan station.
   o Bulk scanning will allow like documents to be scanned in a batch (today a batch = 1 document). Bulk scanning will also provide the ability to apply like indexes to all documents within the batch; all document specific indexing will be done at the user desktop.
   o Re-indexing will allow user to re-index documents that were indexed incorrectly (documents indexed to wrong org level, indexed to wrong employee).

Flexible Framework Release
- Split/join will be made available with Framework Release.
- Framework Release date has not been determined; will probably be early 2008.

Next Meeting
- Meeting will be scheduled every 2 weeks.
- Next meeting will be 5/16/07 at 1pm.
- Everyone asked to keep weekly meeting slot available in case we need to meet more often than every two weeks.

| Action | Person Responsible | Target Date |
|---|---|---|
| Back Scan plan to fix outstanding issues **20070418:** Need approval from Tanya. Approval received from Barbara and Monica. Note; does not affect Kris or Sarah. | Tanya | 4/25 |
| Prepare/distribute a procedure on how to request fixing a document that was scanned/indexed to the wrong person be moved to the correct person. **20070410:** No update. | Rick/Tony | 4/11 |
| Monica has some documents she cannot see; she has access in Banner but gets DCMS access error. **Monica will email employee name and GWid to Rick and Tony.** | Monica | 5/4 |
| Project plan to be confirmed by 5/11. Marcy will email confirmed milestone dates once plan is confirmed by Admin Apps. Will need HRS and Stakeholders to approve milestones dates; specifically availability to complete users acceptance testing and for user training. | Marcy | 5/11 |
| Provide a written overview of Release 3 content (Requirements/design document) | Rick | 5/16 |
| Provide Release 3 DCMS Scan screen shots | Rick | 5/16 |

GW000161

| | | |
|---|---|---|
| Setup HRS scan stations (PC and scanners)<br>20070418:<br>• EEO ready to have scanner setup (work in progress)<br>• Ashburn office remains on hold. | Desktop Support | TBD |
| Setup a care and maintenance training session for HRS and Stakeholders<br>**20070207:** Tony will research this topic and prepare training. | Tony | TBD |
| Investigate how to handle employees with multiple jobs. Banner access limits document access to HR Stakeholder for primary position. Note; primary has document access to their documents. Documents for previous positions are only accessible by HRS. Also, primary cannot can HR documents for previous job positions | Rick | TBD |

CONFIDENTIAL