## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CUS4, Inc. d/b/a
Richmar & Associates, et al.

      Plaintiffs,

v.

      Case No. 07-0841 (JR)

George Washington University,

      Defendant.

## PLAINTIFFS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT ON
## COUNTS II AND VI

Plaintiffs CUS4, Inc. ("Richmar") and Federal National Commercial, Inc., ("Federal

National"), respectfully move this Court to enter partial summary judgment on Counts II and VI.

1.     Under Counts II and VI, Richmar and Federal National have sued defendant

George Washington University, for monies owed under Richmar's time and materials contract

and assigned to Federal National as part of a factoring agreement.

2.     As shown in the attached Statement of Facts as to Which There Are No Genuine

Disputes, GWU owes plaintiffs $233,424.17 for scanning work performed by Richmar.

3.     As explained more fully in Plaintiffs' Memorandum of Points and Authorities is

Support of their Motion for Partial Summary Judgment, George Washington has waived any

defense or set off against the sum owed. GW could have terminated the Richmar agreement upon

thirty (30) days notice. GW's Bonig testified at deposition that as early as September, 2006, he

believed that Richmar was not producing a satisfactory product. Yet, Bonig decided to keep

moving forward with Richmar, never informing them of his dissatisfaction, or that he was

reserving a claim for a set off. Rather, Boning allowed Richmar, and its lender, Federal National

to believe, Richmar would be paid if it just continued to complete development of the DCMS

and complete scanning the 1,000,000 records that would serve as a database for the DCMS.

4.    Not until GW and Bonig has received all the benefits that could be squeezed from

Richmar and Federal National, did Bonig first claim that Richmar was in breach under the time

and materials agreement.

5.    There is no genuine factual dispute that Bonig and GW's conduct constitutes a

waiver of their belated attempt to assert a breach. The general rule, stated in such authorities as 5

W*lliston on Contracts*, 3d ed. §741 at 514 (1961) provides:

> "If there has been a breach of the agreement sufficient to cause a
> forfeiture, and the party entitled thereto, either expressly or by his conduct
> waives it or acquiesces in it, he will be precluded from enforcing the
> forfeiture, and equity will aid the defaulting party by relieving against it, if
> necessary."

WHEREFORE, Plaintiffs request that judgment be entered against Defendant on

Counts II and VI of the Complaint.

DATED: September 24, 2007                    Respectfully submitted,

Geoffrey P. Gitner (Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926
*Counsel for Plaintiff CUS4, Inc.*

Leslie J. Polt (D.C. Bar/No./496179)
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600

2

Baltimore, MD 21202
Ph:
*Counsel for Federal National Corporation*

**EXHIBITS TO PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

| | | |
|---|---|---|
| 1 | | Declaration of Richard Gordon |
| 2 | | Declaration of Judith Shaw |
| 3 | 1.4.06 | Richmar-GW Agreement |
| 4 | 3.30.06 | Scanning Task Order |
| 5 | | FNC Assignment Notices |
| 6 | | Ronald Bonig Deposition |
| 7 | 1.4.07 | Letter, Bonig to Gordon |
| 8 | 1.5.07 | Letter, Bonig to Gordon |
| 9 | 1.2.07 | Agreement, Crown Partners -GW |
| 10 | 1..4.07 – 2.21.07 | Outstanding Invoices |
| 11 | 3.07 | Emails, FNC to GWU |
| 12 | 3.23.07 | Letter, Bonig to Gordon |
| 13 | 4.2.07 | Letter, Schutjer to Gordon |

## CERTIFICATE OF SERVICE

I certify that on September 24, 2007 a copy of the foregoing Plaintiffs' Motion for Partial

Summary Judgment was hand-delivered to:

James Thomas, Esq.
Arnold & Porter, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Counsel for Defendant

Leslie J. Polt, Esq.
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202-1612
Counsel for Federal National

Geoffrey P. Gitner

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

CUS4, Inc. d/b/a
Richmar & Associates, et al.

        Plaintiffs,

v.

                                     Case No. 07-0841 (JR)

George Washington University,

        Defendant.

**PLAINTIFFS'**
**STATEMENT OF FACTS NOT IN GENUINE DISPUTE**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

1.      Plaintiff, CUS4, Inc. d/b/a RICHMAR & Associates ("Richmar") is a District of Columbia corporation. It is a developer and seller of custom software products and programs. (Declaration of Richard Gordon ["Gordon Dec."] at ¶ 1, attached as Ex. 1 hereto).

2.      Plaintiff, Federal National Commercial, Inc., ("FNC") is a Delaware corporation based in Bethesda, MD that provides business credit, including the purchase of accounts receivable and the making of commercial loans secured by accounts receivable and other business assets. (Declaration of Judy Shaw ["Shaw Dec.] at ¶ 1, attached as Ex. 2 hereto).

3.      Defendant, George Washington University ("GW") is a District of Columbia corporation.

4.      On or about January 4, 2006, Plaintiff Richmar entered into a time and materials contract with GW (the "Agreement"), under which Richmar, an independent contractor, would render technical and management support to GW's Information Systems and Services Department ("ISS") in the development of computer software to manage electronic documents

for GW. This included designing a computer system architecture, which would permit GW to convert its hard copy records to digital form, and to be able to retrieve information in these digitized documents by certain searches, including by name, subject matter and classification. (Gordon Dec. at ¶ 2). Pursuant to the Agreement GW would provide the requirements of the system to Richmar. A copy of the Agreement is attached hereto as Exhibit 3 and incorporated herein by reference.

5.    Under the Agreement, either party had the right to terminate the Agreement upon thirty (30) days notice, or immediately upon any breach. (Ex. 3 at ¶ 3). Upon termination, GW's obligations were limited to payment for services performed prior to termination and reimbursement of expenses. (*Id.*). The Agreement by its terms did not contain a liquidated damage provision or provide for any remedy for breach by Richmar, other than termination. The Agreement stated that it was the final and entire agreement between Richmar and GW. (*Id.* at ¶ 13).

6.    On March 30, 2006, GW issued a task order under the Agreement (the "Task Order,") for Richmar to convert over 1,000,000 hard copy documents to digital form and for scanning and indexing these images with predefined document attributes. (Gordon Dec. at ¶ 3). A copy of the Task Order is attached hereto as Ex. 4 and incorporated herein by reference.

7.    Pursuant to the Agreement, Richmar assisted GW in the development of a program referred to as the Document Case Management System ("DCMS"). (Gordon Dec. at ¶ 4).

8.    Previously, on February 13, 2004, FNC and Richmar had entered into a Master Factoring Agreement, under which FNC provided working capital financing to Richmar by purchasing from time to time accounts receivable due to Richmar for services performed by

2

Richmar. (Shaw Dec. at ¶ 3). Richmar also executed a Security Agreement in favor of FNC covering all existing and future accounts receivable, as well as other collateral. (*Id.*). Pursuant to this financing arrangement, FNC agreed to purchase from Richmar its accounts receivable due from GW for services rendered under the Agreement. Accordingly, as part of the financing arrangement, on or about January 25, 2006, FNC and Richmar both provided GW with written and authenticated notices of the assignment, directing GW to send all remittances for billings under the Agreement directly to FNC. (*Id.*). Said notices have not been rescinded or revoked, and remain in full force and effect. (*Id.*). Copies of said notices of assignment are collectively attached hereto as Ex. 5 and incorporated herein by reference.

9.      After receipt of the notices and pursuant thereto, GW complied with the instruction by remitting payments directly to FNC for not less than twenty two (22) Richmar invoices to GW that were purchased by FNC under the Master Factoring Agreement during the period between February 2006, and December 2006. (*Id.* at ¶ 4).

10.     From the inception of Richmar's billings to GW, representatives of GW, including Christina L. Griffin, Assistant Director of ISS, Marcella ("Marcy") Day (an Applications Project Manager), Richard Gilchrist (ISS Director of Enterprise Management), and others, were in continuous direct email and telephonic contact with Richmar and with the operations staff at FNC reconciling the invoice backup and discussing the status of payments of Richmar's invoices submitted to GW. (*Id.* at ¶ 6).

11.     In September 2006, GW's head of ISS left the University and Ronald C. Bonig ("Bonig") was named GW's Interim Chief Information Officer. Bonig testified at his June 5, 2007 deposition that he had determined shortly after his appointment in September that

Richmar's DCMS work was "over budget", "under-performing", and "late" (Deposition of Ronald Bonig ["Bonig Dep. at 83-84) [Bonig Deposition transcript attached hereto as Exhibit 6].

12.    Between the time of Bonig's appointment in September 2006 and December 2006, GW made a determination that Richmar's performance under the Agreement was unsatisfactory. (*Id.* at 26). According to GW's Bonig, the system as delivered on December 18, 2006 barely worked and did not solve the problems the university was attempting to solve. (*Id.* at 28, 154).

13.    In November, 2006, GW informed Richmar that for budgeting reasons and because they did not want to delay implementation of the DCMS, GW would not require the initial version to include two features that had been considered by GW for inclusion in the DCMS, a "Document Only" search feature and a "Multiple Document Scanning" function. (Gordon Dec. at ¶ 7). It was also agreed by Richmar and GW that after release of the First Version (the "First Release"), Richmar would not continue working on the development aspects of the DCMS, but would complete the scanning and indexing services under the March 30, 2006 Task Order. (*Id.*).

14.    Bonig knew that GW could have terminated Richmar at any time for its alleged failure to perform, or by giving 30 days notice. (Bonig Dep. at 131-132). As far back as October 2006, Bonig and other project staff at GW considered giving Richmar notice of termination, but did not, because GW wanted Richmar to complete and deliver the First Release. (*Id.* at 132-133). The decision was made by GW not to terminate Richmar, "since we'd already poured so much money down the rat hole," and that the only reasonable approach was to finish out the base contract and "get what we could". (*Id.* at 134).

15.     At the time the First Release of the DCMS was delivered in December 2006, Bonig concluded that it was essential to preserve any defenses to further payment, and for that reason he declined to formally "sign off" on the First Release. (*Id.* at 96-97). Nevertheless, on December 18, 2006, the First Release of DCMS was accepted by GW. (*Id.* at 45).

16.     The term of the Agreement expired on January 8, 2007, but GW retained an option to renew or extend the Agreement. (Ex. 3 at ¶). Notwithstanding that GW had the right under the Agreement to terminate Richmar if, in fact, it had breached the Agreement, Bonig met with Richmar's Richard Gordon in December 2006, to discuss the extension of the Agreement for an additional five (5) week period, in order for Richmar to complete the document scanning. (*Id.* at 109-111; Gordon Dec. ¶ at 13). Neither Bonig, nor to his knowledge anyone else at GW, informed Richmar that it was in default under the Agreement or that GW was reserving rights and remedies against Richmar. (*Id.* at 79-80, 111; Gordon Dec. at ¶ 13).

17.     At some point between December 2006 and February 2007, Bonig made the decision to withhold further payment to Richmar. That position was communicated by Bonig to Christina Griffin, Marcy Day, Rich Gilchrist and others at GW, but not to Richmar. (*Id.* at 90; Gordon Dec. at ¶ 13).

18.     On January 4, 2007, Bonig sent a letter to Richard Gordon, Richmar's president. (Ex. 7, attached hereto). The letter requested that Richmar agree to a contract extension in order to complete the scanning work on the DCMS. The letter stated that upon "satisfactory completion" of closeout items on the punch list attached to the letter, including scanning in of documents, payment would be made by GW in accordance with the Agreement. A copy of the January 4, 2007 letter is attached hereto as Exhibit E and incorporated herein by reference. (*Id.*).

5

19.     On January 5, 2007 Bonig wrote to Gordon and informed him that GW was extending the Agreement in order to permit Richmar to complete the scanning and indexing of GW's hard copy records. (Ex. 8, attached hereto). Based upon Bonig's representations, Richmar agreed to complete the punch list on the First Release and complete the document scanning. (Gordon Dec. at ¶ 15-16).

20.     By the time the extension letter for Richmar's Agreement was sent out, January 4, 2007, GW had already entered into another software development contract with Crown Partners, dated December 3, 2006, for the purpose of further expanding the development and application of Richmar's DCMS program. A copy of the Crown Partners agreement is attached hereto as Ex. 9 and incorporated herein by reference. GW did not inform Richmar of the existence of the Crown Partners agreement. (Gordon Dec. at ¶ 16).

21.     Between December 18, 2006 and until on or about February 26, 2007, Richmar continued to complete scanning and indexing the GW documents into the DCMS system. (Gordon Dec. at ¶ 17).

22.     Richmar completed its punch list work and its scanning and indexing and sent the following four (4) invoices (the "Unpaid Invoices"), totaling Two Hundred Thirty Three Thousand Four Hundred Twenty Four Dollars and Seventeen Cents ($233,424.17), to GW for the scanning project:

| | | |
|---|---|---|
| • January 4, 2007 | Invoice 23-S | $71,350.80 |
| • January 16, 2007 | Invoice 24-S | 71,476.67 |
| • February 2, 2007 | Invoice 25-S | 69,715.69 |
| • February 21, 2007 | Invoice 26-S | 20,881.01 |

(Gordon Dec. at ¶ 18). Each of these invoices was accompanied by an Invoice Verification Form, as with the previous invoices. (*Id.* at ¶) The same GW representative, Christina Griffin, promptly signed and returned to FNC the Invoice Verification Form, in the same manner as with

6

all previous invoices, indicating that the invoice had been received by GW. (Shaw Dec. at ¶ 18). At no time did GW inform Richmar or FNC that it held any claims or defenses to payment of the Unpaid Invoices, or that it had determined to make no further payments to Richmar for its services. (Gordon Dec. at ¶ 19; Shaw Dec. at ¶ 9). Accordingly, the Unpaid Invoices were purchased by FNC under the Master Factoring Agreement. (*Id.* at ¶ 3). They remain unpaid. (*Id.*). Copies of the four invoices described above are attached hereto collectively as Ex. 10, and incorporated herein by reference.

23.    On February 15, 2007, FNC emailed Christina Griffin at GW (copying Richmar), inquiring into the status of payment on invoices 23-S and 24-S. GW responded the same day by email that the invoices were being reviewed and that no pay dates had been assigned. (Gordon Dec. at ¶ 20). GW made no mention of any default by Richmar under the Agreement, and did not indicate in any manner to FNC that GW considered Richmar to be in default, or that the invoices would not be paid. (*Id.*).

24.    On February 22, 2007, Richard Gordon, of Richmar, with copy to FNC, again emailed GW's Christina Griffin, inquiring as to the status of invoices 23-S, 24-S, 25-S and 26-S, the Unpaid Invoices. (Gordon Dec. at ¶ 18). GW did not respond until February 27, when a Ken Soper, stated that Ms. Griffin was away until March 1. (*Id.*). On Friday, March 2, Gordon again inquired by email into the status of the 4 invoices. (*Id.*). Ms. Griffin did not reply until Monday, March 5, stating that the 4 invoices were to be discussed at a meeting on Friday, March 6. (*Id.*). GW made no mention of any default by Richmar under the Agreement, and did not indicate in any manner that GW considered Richmar to be in default, or that the invoices would not be paid. Copies of the emails referred to in Paragraphs 23 and 24 are collectively attached hereto as Ex. 11 and incorporated herein by reference.

25.     After further requests to GW for information on the status of payments went unanswered, by letter dated March 23, 2007 GW's Bonig informed Richmar that "over the past weeks", he had requested staff reviews of Richmar's performance under the Agreement and had discussed his concerns with GW's legal counsel. He then stated that Richmar had "failed miserably" to perform, and had delivered "seriously flawed work product." Bonig then stated that Richmar was not entitled to further payments, and that he would not authorize payment of the final Unpaid Invoices for the scanning work. A copy of the March 23, 2007 letter is attached hereto as Ex. 12 and incorporated herein by reference.

26.     Therefore, GW has asserted a right to offset its claimed damages for Richmar's failure to develop the DCMS to GW's satisfaction, against its obligations to pay Richmar for its document scanning work invoiced in January and February, 2007.

27.     At no time prior to the March 23 letter identified as Exhibit 12 did GW assert any breach or event of default by Richmar under the Agreement.

28.     Richmar's Gordon then wrote on March 29, 2007 to Louis H. Katz, GW's Executive Vice President and Treasurer (and GW's signatory on the Agreement), requesting a meeting with GW. GW's response was a letter dated March 16, 2007, but faxed to Richmar on April 2, 2007, from Linda Schutjer, Associate General Counsel for GW, whose responsibility includes GW's ISS department, stating that Mr. Katz would not meet with Richmar, and that GW had "suffered damages in excess of Five Hundred Thousand Dollars ($500,000) due to the failings of Richmar." A copy of that letter is attached hereto as Ex. 13 and incorporated herein by reference.

8

**DATED**: September 24, 2007

Respectfully submitted,

Geoffrey P. Gitner (Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926
*Counsel for Plaintiff CUS4, Inc.*

Leslie J. Polt (D.C. Bar No. 496179)
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202
Ph:
*Counsel for Federal National Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CUS4, Inc. d/b/a
Richmar & Associates, et al.

      Plaintiffs,

v.

      Case No. 07-0841 (JR)

George Washington University,

      Defendant.

## PLAINTIFFS' MEMORANDUM OF
## POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.  INTRODUCTION

The Plaintiffs move for partial summary judgment on Counts II and VI (breach of contract) of their joint complaint. Each count alleges that defendant, George Washington University ("GW") is in breach of contract for refusing to pay to Richmar and Federal National $233,424.17.

As shown in the attached Statement of Facts Not in Genuine Dispute, GW has waived any defense it may have. The agreement between Richmar and GW was clear, that it was a time and materials contract that could be terminated by GW with thirty days notice if GW was not satisfied with Richmar's work.

In his deposition, Ronald Bonig, the interim Chief Information Officer, was equally clear that he was dissatisfied with Richmar from the moment he took command in September, 2006. Bonig believed that Richmar was not delivering the product envisioned by GW, and was failing "miserably" in developing the document management

system. There is no dispute that despite his dislike for Richmar's development, Bonig never informed Richamr or its lender, who GW knew was lending Richmar the money to enable it to work on GW's project, that he believed Richmar was in breach or that GW was being damaged. Or, that if Richmar continued to perform work, it would have to do so knowing that GW was reserving a right to seek a set off or damages from Richmar once the work was completed.

And, likewise, without dispute, on January 5, 2007, after having (secretly) hired a new software developer to replace Richmar and having formulated the idea of not paying Richmar, Bonig agreed---in writing--- to pay Richmar to complete the 1,000,000 document scanning project. Yet when the time came for payment, Bonig resurrected his complaints (now claiming breach) for Richmar's work done in 2006 in developing the document management system, and refused to pay for the scanning work.

As shown below, the law finds such conduct to be a waiver of a known breach, and rectifies the inherent unfairness of conduct such as Bonig's and George Washington University.

## II.   SUMMARY JUDGMENT STANDARDS

Under Rule 56, a court must grant summary judgment if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact is one that is determinative of the claim or a defense and could thus affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All inferences drawn from the record must be viewed in light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 ( 1986). The burden is on the moving party to make the initial showing of the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must support its position by providing more than "a scintilla of evidence"; the quantum of evidence must be such that a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 252. The moving party is consequently entitled to a judgment as a matter of law if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. ARGUMENT

### A. GW Waived Any Default By Richmar Under the Agreement

#### 1. In the Absence of District of Columbia Law on Point Maryland Law Is Persuasive

By accepting the benefits under the Agreement, failing to timely inform Richmar that it considered Richmar to be in breach of the Agreement or to reserve its rights under the Agreement, and agreeing to an extension of the Agreement, GW has waived the alleged breach. There is little case law in the District of Columbia (outside of government procurement contracts[1]), on waiver of a contract breach by acquiescence, delay or inducement. However, it is the practice and custom, in such instances, for courts of the District of Columbia to look to the case law in Maryland for guidance. Most recently, as this Court stated: "If there is no D.C. law on point, the District of Columbia Courts should look to the law of Maryland for guidance." *Sigmund v. Progressive*

---

[1] *See, e.g., Dano Resource Recovery, Inc. v District of Columbia*, 620 A.2d 1346 (D.C.App. 1993), discussed at page 8 *infra.*

*Northern Ins. Co.*, 374 F.Supp.2d 33 (D.D.C. 2005), *quoting Conesco Indus., Ltd. v.*

*Conforti & Eisele, Inc.*, 627 F.2d 312, 316 (D.C.Cir.1980). *See also Brown v. Green*, 767

F.Supp. 273, 274 (D.D.C. 1991) (citing cases), which states:

> As a general rule of thumb, the decisions of nearby jurisdictions
> are the most persuasive indication of how a particular state will
> decide a common law issue, and, at least with respect to Maryland
> law, that rule of thumb has been elevated into a formal
> principle...Consequently, the D.C. Courts of appeals has found
> Maryland law to be 'especially persuasive authority.' . . . Indeed,
> the D.C. Court of Appeals may have a statutory obligation to look
> to the laws of Maryland for guidance when a question novel to our
> law is before us.' . . . Whatever the precise authority of Maryland
> law, in the absence of any evidence of the D.C. Court of Appeals'
> opinion, it is the best indicator of how the D.C. Court of Appeals
> will rule upon a particular question.

## 2. Applicable Law

Maryland courts have consistently ruled that when a non-defaulting party to an

executory contract keeps the contract in existence after a known breach by the other

party, and accepts further performance from the party committing the breach, it has

waived the breach unless the non-defaulting party makes an express reservation of rights.

In *John B. Robeson Associates, Inc. v. Gardens of Faith, Incorporated*, 172 A2d

529 (Md. 1961), a cemetery developer knew that its sales representative had failed to

meet numerous quotas for sale of burial plots, the agreement was terminable for cause,

and the developer had in fact spoken with the salesman about his performance

deficiencies. However, the agreement was not terminated. The sales representative's

performance dramatically improved, but he nevertheless was terminated for cause. In

holding that the acceptance of performance amounted to a waiver of the breach, the Court

stated:

> There are few principles of contract law better established, or more
> uniformly acknowledged, than that a party to an executory bilateral
> contract, who keeps the same in existence after a known breach by
> the other party and accepts further performance from the party who
> has committed the breach, waives the breach, in the absence of an
> assertion of his intention to retain the rights accruing to him as a
> result of said breach, assented to by the other party; and if the
> injured party thereafter does not make good his promises of
> performance he is responsible for such failure. . . 'The principal is
> general that whenever a contract not already fully performed on
> either side is continued in spite of a known excuse, the defense
> thereupon is lost and the injured party is himself liable if he
> subsequently fails to perform, unless the right to retain the excuse
> is not only asserted but assented to.'

172 A.2d at 533.

*Robeson* was followed in *Pumphrey v. Pelton*, 245 A.2d 301 (Md. 1968), where a

franchiser of Dairy Queen ice cream stores failed to object to its franchisee's breach of

the franchise agreement by selling non-Dairy Queen products, and thereafter attempted to

enjoin the breach. Injunctive relief was denied, the court stating:

> Having agreed by his conduct to a modification of the contract or,
> in the alternative, by his conduct having waived Pumphrey's
> breach, Pelton may not now terminate the contract on the ground
> of Pumphrey's sale of non-Dairy Queen products without the
> written consent of Pelton.

245 A.2d at 306.

This principle has continuously been part of Maryland jurisprudence. In *Bargale*

*Industries, Inc. v. Robert Realty Company, Inc.*, 343 A.2d 529 (Md. 1975), a mortgage

broker was promised a $10,000 fee from the property owner for obtaining a $200,000

financing commitment. He obtained a $193,000 loan instead, which was accepted by the

property owner without objection. In ruling that the default had been waived by

acquiescence, the court observed:

> When appellants were advised that a mortgage commitment for
> $193,000 had been secured, it seems the oft-quoted adage that
> '(h)e who is silent when he ought to have spoken, will not be heard
> to speak when he ought to be silent' became particularly apropos.
> (*Citing Pumphrey v. Pelton*, 245 A.2d 301, 304 (Md. 1968)."

343 A.2d at 534.

*See also Spectrum Holobyte California, Inc. v. Stealey*, 885 F. Supp. 138 (D.Md,

1995), where the holder of a stock option was permitted to exercise the option despite its

performance default under other provisions of their arrangement, which deficient

performance was accepted by Stealey, the selling stockholder. The District Court stated:

> By accepting the full benefit of the bargain, and by failing to notify
> Spectrum that he considered it in breach for its failure to make the
> loan payment timely, Stealey waived any alleged breaches.
> Stealey's obligation to transfer his shares in Microprose pursuant
> to the Option Agreement was not relieved by any alleged breaches
> by Spectrum of its duties under the Consulting Agreement.

885 F.Supp. at 140-141; *Deyesu v. Donhauser*, 856 A.2d 28 (Md. App. 2004)

(homeowner waived a homebuilder's breach by accepting late delivery without expressly

objecting to the delay).

Maryland case law is consistent with prevailing legal principles of contract

enforcement. As set forth in 17 A Am.Jur.2d, *Contracts*, § 640 (2004):

> The acceptance of a partial performance or performance after a
> breach ordinarily waives the right to rely on the default.... [A]
> party who accepts the other's performance without objection is
> assumed to have received the performance contemplated by the
> agreement....
>
> The foundation of this rule undoubtedly is that it would be unfair
> that a party should receive and keep a part of the benefits of the
> contract and pay nothing for it, because he or she has not received
> the whole. The technical reason given is that a promisee dispensed
> with the performance of a condition precedent, if with knowledge
> that the condition was not fully performed, that person treats the
> contract as continuing and takes the benefit of a part performance.

> In addition, it is unfair to lull another into a false believe that strict
> compliance with a contract provision will not be required and then
> sue for a breach. Furthermore, one may not accept a defective
> performance of a condition without objection and then seek to
> excuse his or her own failure to perform obligations under the
> contract, by denying that the condition was adequately performed.

17A Am.Jur.2d. *Contracts*, §640 (2004) (collecting cases).

This rule applies to acceptance of performance under service and material

contracts:

> Where work is accepted with knowledge that it has not been done
> according to the contract or under such circumstances that
> knowledge of the defects may be imputed, acceptance will generally
> be deemed a waiver of the defective performance, but this rule does
> not apply to latent defects....

17A Am.Jur.2d *Contracts*, §642 (2004).

A party may be deemed to have waived a default by its acquiescence or by its

actions inducing the defaulting party into taking action to its detriment in the belief that

the default was waived. As stated in *Williston*:

> 'If there has been a breach of the agreement sufficient to cause a
> forfeiture, and the party entitled thereto, either expressly or by his
> conduct waives it or acquiesces in it, he will be precluded from
> enforcing the forfeiture, and equity will aid the defaulting party by
> relieving against it, if necessary.'

5 *Williston on Contracts*, §741 at 514 (3d ed. 1961).

This principle is also the prevailing rule in federal government contract litigation

before the Court of Claims. For example, in *DeVito v. United States*, 413 F.2d 1147,

1154 (Ct. Cl.1969), after the supplier to the government defaulted in meeting a delivery

schedule, the agency accepted certain late deliveries and delayed in sending a termination

notice. The Court ruled that the contractor justifiably relied on the government's inaction

by continuing to accept performance and failing to timely terminate, and that this

amounted to a constructive waiver of the default. In order to preserve the claim, the non-

7

defaulting party must either expressly reserve rights or take action consistent with such preservation, such as assessing liquidated damages. *See also Abcom Associates, Inc., v. United States*, 44 Fed. Cl. 625 (Ct. Cl. 1999); *Tiedman et al. v. American Pigment Corporation*, 253 F.2d 803 (4th Cir., 1958) (in order to preserve its claim for damages, the aggrieved party to a continuing (i.e., executory) contract must unequivocally inform the defaulting party of the nature and extent of the breach and obtain assurance of future performance).

This rule has been followed by the District of Columbia Court of Appeals. In procurement contract litigation the government may be held to have impliedly waived a default where: (1) the government has failed to terminate within a reasonable time, and (2) the contractor relies on the failure to terminate and continues to perform under the contract with the Government's knowledge and implied or expressed consent. See *Dano Resource Recovery, Inc. v District of Columbia*, 620 A. 2d 1346 (D.C. App. 1993).

Waiver may be imputed not only by delay in terminating or declaring a default, but also by affirmative action by the aggrieved party that is inconsistent with a default, such as accepting future performance, extending the agreement or continuing to make payments. In *Vecco Construction Industries, Inc. v. Century Construction Company of Washington, D.C., Inc.*, 30 B.R. 945 (Bkrtcy E.D. Va., 1983), Bankruptcy Judge Bostetter adopted the Fourth Circuit ruling in *Tiedman supra* and the Court of Claims in *DeVito supra*, quoting from the latter:

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance

> by him under the contract, with the [terminating party's]
> knowledge and express or implied consent. 30 B.R. at 951.

Applying that rule, Judge Bostetter held that the non-defaulting party misled the debtor by *initiating* a proposed supplemental Agreement, funding payroll, and paying suppliers, all actions aimed at assisting the debtor to stay on the job. These actions of the counter-party, rather than the mere passage of time, indicated waiver of the default.

## C.    Application of Law to Undisputed Facts

Solely for purposes of this Motion, the uncontested facts must be viewed in a light most favorable to GW. Thus, it may be assumed that Richmar's performance under the Agreement was deficient and constituted a breach, giving GW the right to terminate Richmar at any time between September and December 2006. The uncontroverted testimony is that as early as September 2006, certainly no later than December 18, 2006, GW had concluded that Richmar was not performing under the Agreement. According to GW, Richmar had failed "miserably" to perform its development work. (Bonig Dep. at 149-150). Because of this, Bonig conferred with others at GW in December regarding possible termination of Richmar.

Yet, despite these alleged deficiencies, and knowing that the Agreement gave the University the absolute rights to terminate Richmar at that time, GW made a conscious and purposeful decision not only to not declare Richmar to be in default and exercise its contractual termination rights, but, quite the opposite, to extend the Agreement in order that Richmar might complete an essential task, the document scanning and indexing. The reason for this decision was that GW had already made a substantial monetary investment in the DCMS, or to use Bonig's testimony: "we'd already poured so much money down the rat hole." As he further explained: "We accepted Release 1 as it currently existed

because it was the only thing we could do if we wanted to be able to read the electronic documents, which were in 400-and-some boxes." (Bonig Dep. at 45-46).

At that point, December 2006, GW met with Richmar, discussed extension of the Agreement, shortly thereafter submitted to Richmar an extension letter, and subsequently paid Richmar's invoices for the DCMS work, other than the four (4) Unpaid Invoices for the scanning work (against which it has asserted a full offset claim for alleged, but as yet unspecified, damages for Richmar's breach in rendering its development services).

Not only did GW pay for the DCMS work and extend the Agreement, but at no time prior to Bonig's March 23, 2007 letter did GW express to Richmar that it was in breach of the Agreement, of the nature and extent of its then existing claims for breach, or that GW, notwithstanding the extension of the Agreement, reserved all rights and claims. Even later, GW failed to place Richmar in default. When asked why GW did not terminate Richmar in January or February, 2007, or even warn Richmar of possible termination, Bonig's response was merely that "it was too close to the end" and that he "did not know why one would give a warning to someone who already knew when the clock was running out." (Bonig Dep. at 79-80).

So, GW did not declare Richmar to be in default or reserve rights against Richmar for breach of the contract. As Bonig testified, it was not his duty to communicate deficiencies to a contractor, and, in fact, GW might choose not to. (Bonig Dep. at 38). That last statement well describes GW's approach to its issues over Richmar's performance deficiencies.

Further, there is no factual issue over the time period in which the alleged damage claim arose. GW asserts setoff against January and February invoices in order to recoup

its alleged losses and costs arising from breaches in Richmar's DCMS development,

breaches that existed and which GW was well-aware of at the time of contract extension

in January, 2007.

This is evident from the record:

- The system did not work as delivered; not a single release or delivery operated when it first arrived (Bonig Dep. at 26);

- The system as delivered on December 18, 2006, barely worked and did not solve problems GW was attempting to solve. (*Id.* at 28) and was barely functional (*Id.* at 154);

- It did not have efficiency or functionality, such as smoothness in navigation between screens (*Id.* at 46);

- In December, people were complaining about incorrect scanning (*Id.* at 78-79);

- In December, GW had concluded that the project was over budget, underperforming and late (*Id.* at 83);

- GW did not sign off on the First Release in December 2006 in order to preserve defenses against Richmar.

Most revealing is Bonig's acknowledgement that GW's requirement that Richmar

complete the back-scanning under Task Order 1 was a factor in GW's decision not to

assert an offset claim until March 2007, when the scanning work was completed. (*Id.* at

159). Bonig virtually concedes that GW harbored the notion of recouping its losses from

later payment obligations ("the irritation at GW...developed over a period of time, and

the idea of re-compensating or compensating ourselves, in effect, for all the work we had

to do came about") (*Id.* at 139). It is apparent that GW was motivated to not inform

Richmar that it was in default under the Agreement, or provide Richmar with a detailed

listing of deficiencies in its performance or in the DCMS system. Indeed, the testimony

of Bonig is that no such itemization was prepared until a later release, and even then it

was circulated internally and not given to Richmar. (*Id.* at 37-40). To this day, GW has failed to provide Richmar with a written itemization of damages supporting its offset. (Gordon Dec. at ¶ 23).

## V. CONCLUSION

From these undisputed facts, presented by the pleadings, declarations and Bonig's deposition, the conclusion is inescapable that GW waived any default by Richmar and in fact misled Richmar by (i) remaining silent as to Richmar's alleged material defaults under the Agreement from October, 2006 until Bonig's March 23, 2007 letter, (ii) paying Richmar through the December, 2006 invoices, and (iii)  at the same time inducing Richmar, to its substantial detriment, to complete its work by initiating, in December, 2006, an extension of the Agreement. Accordingly, GW, by its inaction, acquiescence and inducement, is deemed as a matter of law to have waived any default alleged by GW for which it is claiming damages and may not assert setoff and recoupment rights against the Unpaid Invoices, and Richmar and its assignee, Federal National, are entitled to judgment as a matter of law on their contract claim of $233, 424.17.

DATED: September 24, 2007                Respectfully submitted,

                                          Geoffrey P. Gitner (Bar No. 176479)
                                          Law Offices of Geoffrey P. Gitner
                                          Watergate, Twelfth Floor
                                          600 New Hampshire Ave., N.W.
                                          Washington, D.C.  20037
                                          Ph: (202) 772-5926
                                          *Counsel for Plaintiff CUS4, Inc.*

Leslie J. Polt (D.C. Bar No. 496179)
Adelberg, Rudlow, Dorf & Hendler, LLC
7 St. Paul Street, Suite 600
Baltimore, MD 21202
Ph: (410) 986-0832
*Counsel for Federal National Corporation*

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CUS4, Inc. d/b/a                          |
Richmar & Associates, et al.              |
                                          |
     Plaintiffs,       |
                                          |
v.                                        |    Case No. 07-0841 (JR)
                                          |
George Washington University,             |
                                          |
     Defendant.        |
_____|

## ORDER

UPON CONSIDERATION of the Plaintiffs' Motion for Partial Summary Judgment as to

Counts II and VI of the Complaint, it is this ____ day of _____,

    ORDERED that the motion is GRANTED.

    AND IT IS FURTHER ORDERED that judgment be entered for $233,424.17 against the

defendant in favor of the plaintiffs.

_____

COPIES TO:

Geoffrey P. Gitner (Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
*Counsel for Plaintiff CUS4, Inc.*

Leslie J. Polt
Adelberg, Rudlow, Dorf & Hendler, LLC
St. Paul Street, Suite 600
Baltimore, MD 21202

*Counsel for Federal National Corporation*

James Thomas, Esq.
Arnold & Porter, LLP
555-twelfth Street, N.W.
Washington, D.C. 20004
*Counsel for George Washington University*

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CUS4, Inc. d/b/a

Richmar & Associates, et al.

       Plaintiffs,

v.                                           Case No. 07-0841 (JR)

George Washington University,

       Defendant.

## DECLARATION OF RICHARD GORDON

I, Richard Gordon, Jr. depose and declare as follows:

1.   I am the President of CUS4, Inc., which does business under the name of

Richmar & Associates. Richmar is an independent management consulting and software

development company. The company was started in December 1995. We are a Small and

Disadvantaged Business Enterprise certified to participate in the Small Business

Administration's Section 8(a) Development Program, specializing in custom, software

development for government agencies and large institutions.

2.   On January 4, 2006 Richmar entered into a one-year time and materials

contract (the "Agreement") with the George Washington University ("GW") to work

with GW in its development of a computer software program to manage its electronic

documents. This included designing a computer system architecture which would permit

GW to convert its hard copy records (covering over one million documents) to digital

form and to be able to retrieve information in these digitized documents by certain

-1

searches, including by name, subject matter and classification. (See Ex.3, attached to

Plaintiff's Statement of Facts Not in Genuine Dispute ["Fact Statement"]

3.     On March 30, 2006, GW issued a task order under the Agreement (the

"Task Order,") for Richmar to scan and convert GW's hard copy documents to digital

form and for loading these images with predefined document attributes. (Ex, 4, attached

to the Fact Statement).

4.     Pursuant to the Agreement Richmar developed a program named the

Document Case Management System ("DCMS").

5.     Under the Agreement, either party had the right to terminate the

Agreement upon thirty (30) days notice, or immediately upon any breach. (See Ex. 3 at ¶

3).

6.     Richmar's performed work under the Agreement from January 9, 2006

through December 18, 2006. During this period of time Richmar was in constant

communications with GW's staff. At no point while performing under either the

Agreement (or Task Order) did GW ever advise Richmar that GW sought to terminate

either the Agreement or that Richmar was in breach. At no point while performing under

the Agreement did GW advise Richmar that GW contended that Richmar was in breach;

had failed to perform under the Agreement; that GW believed it had been damaged by

Richmar's work; or that GW intended to preserve a claim against Richmar as a set-off

for damages or Richmar's failure to perform under the Agreement.

7.     In November, 2006, I met with Ronald Bonig, GW's Interim Chief

Information Officer. During that meeting Mr. Bonig informed me that for budgeting

reasons and because GW did not want to delay implementation of the DCMS, GW would

-2-

not require the initial version of the DCMS to include features that had been previously considered by GW. During this meeting, Bonig and I agreed that after the release of the "First Version," Richmar would not continue to work on the development aspects of the DCMS, but would complete the scanning services under the March 30, 2006 Task Order. We further agreed that the deadline for the release of the First Version would be on December 18, 2006.

8.     On December 18, 2006, the First Release of DCMS was activated and has been in use by GW since that date.

9.     Subsequent to December 18, 2006, Richmar discontinued further development of the DCMS, but continued to work on the scanning project.

10.     Under the Agreement, it expired on January 8, 2007, but GW retained an option to renew or extend the Agreement. (Ex. 3 at ¶ 3). On January 4, 2007, I received a letter from Mr. Bonig requesting that Richmar agree to a contract extension (beyond the one year expiration date of January 8, 2007 in the Agreement) in order to complete the scanning project. Bonig also attached a punch list of items to be completed before the expiration of the Agreement. (Letter attached as Ex, 7 to Fact Statement).

11.     In his January 4, 2007 letter, Bonig promised that if Richmar would perform the close out punch list items, including the scanning project, that "[u]pon satisfactory completion of the tasks . . . payment would be made by GWU in accordance with section 7 of the Contract." (Ex. 7).

12.     Included in Bonig's punch list was a request that Richmar remove all code and requirements and design documents regarding the DCMS from Richmar's computers. This was a strange request and one I and my colleagues in the software development field

-3-

had never seen. In hindsight, I now realize that neither could we have prosecuted nor defended a lawsuit as we would have had no documentary history of the project or proof of how we created the DCMS. Accordingly, for this (and other reasons related to the ownership of the copyright to the DCMS) I objected to these provisions.

13.    I met with Bonig in December 2006, to discuss the extension of the Agreement for an additional five (5) week period, in order for Richmar to complete the document scanning. Neither Bonig, nor did anyone else at GW, inform me that Richmar was in default under the Agreement or that GW was reserving rights and remedies against Richmar.

14.    By letter of January 5, 2007, I advised Bonig that Richmar was under no obligation to return the DCMS codes, requirement and design documents. I also informed Bonig that I would not agree to giving up the source code and our documentation on our development work and that if there was no agreement as of January 8, 2007 to extend the Agreement, Richmar would cease providing services to GW for the scanning project.

15.    In response to my January 5 letter, Bonig wrote to me again on January 5, 2007. In this letter, Bonig agreed to give up his request for all copies of the source code and our documentation but requested that we complete the scanning work. (Letter attached as Ex, 8 to Fact Statement.) The scanning work was completed between December 18, 2006 and February 26, 2007.

16.    Based on Bonig's representations that we would be paid for the DCMS and scanning project if we agreed to extend the agreement and I agreed to complete the scanning, I understood Bonig to mean that if Richmar completed the scanning work that

-4-

Richmar would be paid. I also understood him to mean that GW was satisfied with the DCMS.

17.    After Bonig's second letter of January 5, 2007, we finished the scanning on or about February 26, 2007. At no time prior to completion of the scanning project did GW advise Richmar that it believed that the invoices were not justified, supported, or earned or that GW was dissatisfied with the system. Nor was I, or anyone associated with Richmar, advised that on January 2, 2007, GW has entered into a new software development contract with Crown Partners.

18.    As of the end of the scanning project the following invoices---all for scanning work---were unpaid for a total of $233,424.17.

| • | January 5, 2007 | Invoices 23-S | $71,350.80 |
| • | January 18, 2007 | Invoice 24-S | 71,476.67 |
| • | February 5, 2007 | Invoice 25-S | 69,715.69 |
| • | February 26, 2007 | Invoice 26-S | $20,881.01^{1}$ |

19.    Each of these invoices was accompanied by an Invoice Verification Form, as with the previous invoices. The same GW representative, Christina Griffin, promptly signed and returned to FNC the Invoice Verification Form, in the same manner as with all previous invoices, indicating that the invoice had been received by GW. At to time did GW inform Richmar that it held any claims or defenses to payment of the Unpaid Invoices, or that it had been determined to make no further payments to Richmar for its services. These invoices remain unpaid.

---

[1] Invoices attached as collective Ex. 10 to the Factual Statement.

-5

20. On February 15, 2007, FNC emailed Christina Griffin at GW (copying me), inquiring into the status of payment on invoices 23-S and 24-S. GW responded the same day by email that the invoices were being reviewed and that no pay dates had been assigned. On February 22, 2007 I emailed GW's Christina Griffin, inquiring as to the status of invoices 23-S,24-S,25-S and 26-S, the Unpaid Invoices. GW did not respond until February 27, when a Ken Soper, stated that Ms. Griffin was away until March 1. On Friday, March 2, I again inquired by email into the status of the 4 invoices. Ms. Griffin did not reply until Monday, March 5, stating that the 4 invoices were to be discussed at a meeting on Friday, March 6. GW made no mention of any default by Richmar under the Agreement, and did not indicate in any manner that GW considered Richmar to be in default, or that the invoices would not be paid. (Emails collectively attached as Ex. 11 to the Fact Statement. and incorporated herein by reference.)

21. On March 23, 2007 GW's Bonig wrote to me and for the first time informed Richmar that GW was not satisfied with Richmar's work in developing the DCMS and would therefore refuse to honor the outstanding invoices for the scanning work. (Ex. 12, attached to Fact Statement).

22. On March 29, 2007 I wrote to Louis H. Katz, GW's Executive Vice President and Treasurer (and GW's signatory on the Agreement), requesting a meeting with GW. GW's response was a letter dated *March 16*, 2007, but faxed to Richmar on *April 2*, 2007, from Linda Schutjer, Associate General Counsel for GW, whose responsibility includes GW's ISS department, stating that Mr. Katz would not meet with Richmar, and that GW had "suffered damages in excess of Five Hundred Thousand Dollars ($500,000) due to the failings of Richmar." (Ex. 13, attached to Fact Statement).

-6

23.   Thereafter, Richmar sought on numerous occasions, including twice on April 5 and 9, 2007 by letter from our counsel, to have GW inform Richmar of what their specific grievances were regarding the DCMS. GW has refused to provide this information. As such, Richmar was unable to determine if there is a possibility to cure any alleged grievance, or otherwise inform itself of GW's complaints. To this date, Richmar has been unable to learn the specifics of GW's alleged claim.

The foregoing is true and accurate to the best of my knowledge and belief.

DATED: 7/20/07

Richard Gordon

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

CUS4, Inc. d/b/a                                    |
Richmar & Associates, et al.                        |
                                                    |
     Plaintiffs,                                  |
                                                    |
v.                                                  |          Case No. 07-0841 (JR)
                                                    |
George Washington University,                       |
                                                    |
     Defendant.                                  |
_____|

**DECLARATION OF JUDITH ANNE SHAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

    I, Judith Anne Shaw, depose and declare as follows:

    1.    I am a Vice-President and Assistant Secretary of Federal National

Commercial, Inc. ("Federal National"), a plaintiff in this action. Federal National is a

Delaware corporation based in Bethesda, MD that provides business credit, including the

purchase of accounts receivable and the making of commercial loans secured by accounts

receivable and other business assets. Federal National's affiliates are Federal National

Payables, Inc., that provides similar credit products to contractors to federal agencies, and

Federal National Services, Inc., which acts as collateral agent and loan servicer to its

affiliate companies.

    2.    In my official capacity I serve as a director of operations at Federal

National, and also participate in underwriting and credit decisions.

    3.    On February 13, 2004, Federal National and CUS4, Inc., d/b/a Richmar &

Assoc. ("Richmar") entered into a Master Factoring Agreement, under which Federal

National provided working capital financing to Richmar by purchasing from time to time

accounts receivable due to Richmar for services performed by Richmar.  Richmar also executed a Security Agreement in favor of Federal National covering all existing and future accounts receivable, as well as other collateral.  Pursuant to this financing arrangement, Federal National agreed to purchase from Richmar its accounts receivable due from George Washington University ("GW")  for services rendered to GW.  Accordingly, as part of the financing arrangement, on or about January 25, 2006, Federal National provided GW with written and authenticated notices of the assignment, directing GW to send all remittances for billings under the Agreement directly to Federal National.  Said notices have not been rescinded or revoked, and remain in full force and effect.

4.      After receipt of the notices and pursuant thereto, GW complied with the instruction by remitting payments directly to Federal National for not less than twenty-two (22) Richmar invoices to GW that were purchased by Federal National under the Master Factoring Agreement during the period between February 2006 and December 2006.

5.      Nsona Whiteman  is an employee of Federal National, serving as the relationship manager for the Richmar account.  Ms. Whiteman reports to me, as her direct supervisor.

6.      From the inception of Richmar's billings to GW,  Ms. Whiteman, at my direction, and I were in frequent, almost weekly telephone and email contact with representatives of GW, including Christina L. Griffin, Assistant Director of ISS, Marcella ("Marcy") Day (an Applications Project Manager), and Richard Gilchrist (ISS Director of Enterprise Management), and others.  In most instances, these communications related to

-2-

billing and collection, such as reconciliation of invoice backup and status of Richmar's invoices to GW and status of payments.

7.     Sometime in January 2007, Richard Gordon of Richmar provided Federal National with a copy of the letter dated January 4, 2007, extending Richmar's agreement with GW and signed on behalf of GW by Ronald C. Bonig. This letter from GW to Richmar was instrumental in Federal National's credit decision to finance Richmar by purchasing the accounts due to Richmar from GW described below.

8.     Federal National financed Richmar by purchasing and taking an assignment of and security interest in, the following Richmar invoices to GW for scanning and indexing services, totaling $233,424.17:

| | | |
|---|---|---|
| • January 5, 2007 | Invoices 23-S | $71,350.80 |
| • January 18, 2007 | Invoice 24-S | 71,476.67 |
| • February 5, 2007 | Invoice 25-S | 69,715.69 |
| • February 26, 2007 | Invoice 26-S | 20,881.01 |
| • | | |

Those four invoices are attached to the Motion as Exhibits, and have not been paid by GW.

9.     In none of the conversations or email exchanges between GW and either myself or Nsona Whiteman, or to my knowledge, anyone else at Federal National, did any representative of GW represent to Federal National, or make any statement that would reasonably lead Federal National to conclude: (i) that GW sought to terminate the Agreement with Richmar; (ii) that GW considered Richmar to be in breach of the Agreement; (iii) that Richmar had failed to perform under the Agreement; (iv) that GW was dissatisfied with the DCMS system or Richmar's scanning and indexing of documents; (v) that GW believed it had been damaged by Richmar; or (vi)  that GW intended to assert a claim against Richmar.

-3-

I hereby declare and state under penalty of perjury that the foregoing is a true and correct statement and is made on personal knowledge. Executed this $\underline{13}^{th}$ day of August, 2007.

Judith Anne Shaw

# Exhibit 3

## CONTRACTUAL AGREEMENT

This contractual agreement is entered into on December 22, 2005 between The George
Washington University, hereafter referred to as GWU, with offices at 2121 Eye Street N.W.,
Washington, D.C. 20052, and RICHMAR & Associates, hereafter referred to as Contractor, with
offices at 220 F Street N.W., Washington, D.C. 20002.

WHEREAS, GWU desires to employ the services of Contractor to perform certain tasks; and

WHEREAS, Contractor desires to perform certain tasks for GWU,

NOW, THEREFORE, GWU and Contractor agree as follows:

### 1. DESCRIPTION OF SERVICES
Contractor will perform certain services such as helping to design a computer system
architecture for GWU, installing and configuring the Documentum package for use by the
Human Resources and Contract Management departments, and other tasks that may be specified
by GWU.

GWU shall issue task orders against this contract for specific projects. Task orders shall be
added to this contract as appendices.

Services Ordered (BASE) - The statement of work identifies the work to be accomplished. (See
Appendix A)  The cost includes estimated labor hours (by labor mix) at a fixed rate per hour for
the applicable labor category. The minimum order shall be 80 hours.

### 2. PERIOD OF SERVICES
GWU retains Contractor to provide services and support for a period beginning January 9, 2006
and terminating January 8, 2007. This agreement may be renewed for additional one year
periods upon the mutual agreement of the parties.

### 3. TERMINATION
This agreement shall end upon the termination date; or upon 30 day written notice from one
party to the other; or upon the breach of any of the requirements contained herein. In the event
of such termination, GWU's obligations shall be limited to payment for services performed prior
to such termination and reimbursement of expenses incurred.

### 4. CONTRACTOR PERSONNEL
Contractor shall provide personnel to provide services to GWU, after approval of proposed
personnel by GWU.

### 5. REPORTS
When requested, Contractor agrees to furnish written letter reports covering the results of its
services, including services on tasks not completed due to termination of this agreement, and
recommendations based thereon. Such reports shall be written and prepared in such fashion as to
give GWU full and free use thereof, without limitation of any sort.

PPI347

## 6. PROFESSIONAL CAPACITY OF CONTRACTOR

It is understood that the services Contractor will perform hereunder will be in its professional capacity as a Contractor and as an independent contractor; and that at no time shall any employee or subcontractor of Contractor be deemed to be an employee or agent of GWU, nor shall any employee or subcontractor of Contractor have authority to obligate GWU in any manner.

## 7. INVOICING

Payments for services shall be made upon receipt of invoices from Contractor on which Contractor will certify that services were rendered. Contractor shall render invoices on a monthly basis following the month in which services were rendered.

Any expenses to be incurred by Contractor shall be approved in advance in conformance with the usual and customary expense guidelines of GWU. Expense reimbursements will be submitted with itemized expenses and receipts for airline tickets, hotel expenses, and other expenses which GWU may reasonably require.

All invoices shall be submitted to: GWU, Attention: Accounts Payable. Contractor shall maintain appropriate time and expense records pertaining to the services performed under this agreement. Said records shall be subject to examination and audit by GWU.

## 8. ASSIGNMENT

No rights under this agreement may be assigned, and no obligations hereunder may be assumed by any person, agent, or company other than Contractor without the prior written approval of GWU. Contractor agrees to provide Jim Gearing as its representative.

## 9. INSURANCE

Contractor shall carry business liability insurance in the face amount of $4 million. Contractor shall also provide worker's compensation insurance and unemployment insurance for its employees.

## 10. CONFIDENTIAL INFORMATION

In the course of this agreement, Contractor may become familiar with confidential and sensitive information about the operation of GWU, GWU's employees, or GWU's students. Contractors recognizes the sensitivity and confidentiality of this information and agrees that its employees and subcontractors shall not at any time, during or after the term of this agreement, disclose to any person, firm, or other agent any confidential information, except under court order.

## 11. FULL FORCE

Contractor declares that there is no agreement between it and any other person, firm, or corporation which could cause this agreement not to have full force and effect.

## 12. GOVERNING LAW

This agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

PPI348

21 06 01:36p        Richard Gordon, Jr.···                                         202 5··:2016

## 13. ENTIRE AGREEMENT
The parties of this agreement mutually agree that this agreement contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.

## 14. WRITTEN AGREEMENT
This agreement shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

**The George Washington University**

By: _____
Louis H. Katz

Title:  Executive Vice President and Treasurer

Date: ___1/4/06___

**RICHMAR and Associates**

By: _____
Richard Gordon, Jr.

Title: President/CEO

Date: _12/22/05_

PPI349

## APPENDICES

### APPENDIX A

**Statement of Work (SOW) for Record Management System, Upgrades and Enhancements**

#### 1.0    Introduction

This effort requires the Contractor to provide technical and management support to The George Washington University for the System Architecture and Documentum package system upgrades and enhancements.

The George Washington University needs the ability to readily account for critical Human Resource Management documents and records that may be maintained across the enterprise, and to establish better accountability for the costs and support of corporate goals and objectives for Contracts reaching the funding stage.   A workgroup with members from the enterprise applications group are tasked with enhancing the University's records management system with additional functions, storage/retrieval capabilities and multiple search/report functions.   The workgroup has identified enhancements and upgrades to be made to the University's computer system architecture and Documentum package.

#### 2.0    Scope

The contractor shall provide quality technical, engineering, analytical, planning, and administrative support to GWU's enterprise application workgroup's Record Management systems. The contractor shall furnish and make available all personnel, supplies, equipment, materials, data, facilities, and services necessary to assist the GWU Workgroup in accomplishing its mission. As directed by GWU, the contractor may also be required to interface with system integration contractors, equipment manufacturers, University personnel, and various GWU organizations.

#### 3.0    Requirements

The contractor shall provide all of the necessary technical engineering, operations research, business, and administrative support such as: planning, organizing, managing, coordinating, and tracking (e.g., report management, cost/schedule/performance measurement, risk management, component procurement management, system engineering management, resource management, data management) required to perform all of the activities successfully as required in accordance with this SOW.

#### 3.1    Technical Support Tasks

A. The Contractor shall set up the System Architecture and Documentum application workspace, users and permissions. This shall include the development of impact statements relating to technical feasibility, cost and schedule considerations, along with supporting documentation associated with those functions.

B. The Contractor shall set up organizational and document attributes for the database structure.

C. The Contractor shall design data entry workflow and entry forms that represent the user interface.

## 3.2    Managerial Support Tasks

A. The Contractor shall attend weekly progress meetings with the GWU Workgroup.

B. The Contractor may be required to attend an initial "kick-off" meeting prior to regular weekly progress meetings to where the GWU Project Manager (PM) will provide necessary technical direction within the scope of the statement of work. If any questions arise as to whether any prescribed direction is not within the SOW, the Contractor must contact the GWU PM immediately prior to expending any effort, which is believed to be outside the scope of the SOW.

## 3.3    Administrative Support

A. The Contractor shall develop and prepare briefing packages, brochures, handouts and other information materials in various media. The Contractor shall plan and schedule conferences and meetings including the administration of background and support material.

B. The Contractor shall organize, prepare and execute GWU Workgroup displays and exhibits for technical conferences and shall make project briefings as required. The Contractor shall provide and/or conduct briefings or briefing material on any project information. The Contractor shall take minutes of all project meetings attended. The contractor shall include in the minutes the names of attendees/positions, organizations, phone numbers, and addresses of all persons attending meetings. All minutes of meetings shall be reviewed and approved by the GWU. The contractor shall incorporate all GWU comments into minutes and forward the minutes to the GWU for distribution. The contractor shall not distribute meeting minutes unless directed in writing by the GWU. The contractor's attendance on all meetings shall first be approved by the GWU prior to attendance.

C. The contractor shall perform the GWU Workgroup routine office administration as directed.

D. The Contractor shall arrange and facilitate meetings as directed by the GWU.

## 3.4    Program Management

The contractor shall efficiently and effectively manage the performance under this contract to ensure all the necessary technical, business, and administrative planning; organizing; managing; coordinating; and tracking (e.g., cost, schedule, deliverables), performance management, risk management, component procurement management, system engineering management, resource management, data management, and subcontract management required to perform all the activities successfully as required in the SOW. The Contractor representative is the primary point of contact for work to be performed under the resultant contract. The Contactor shall keep

the GWU Workgroup informed of any potential problems and make recommendations for solutions.

The Contractor shall ensure that assignments are completed in a thorough and timely manner and prepare written documentation of accomplishments. The GWU requirements in performing this contract demand that the Contractor's engineering, technical, analytical, and administrative support and the level of expertise, experience, and demonstrated performance of contractor personnel providing the services must be at the highest level of providing quality support.

The Contractor shall provide sufficient personnel, both in number and qualification to perform work described herein.

The Contractor shall provide sufficient oversight and supervision of the contract in order to ensure all employees are functioning within their designated labor categories and at acceptable levels of performance, and are performing their designated assignments in a timely manner and that all reporting requirements are honored. The Contractor shall provide a quality assurance system to ensure the University receives quality services as specified in the SOW.

## 3.5    Documentation

### 3.5.1    General Requirements

The Contractor shall coordinate with the GWU Workgroup on all reports, letters, memoranda, project documentation, minutes of meetings, steering committee reports, weekly reports, telephone conversation reports, trip reports and other written material. All documents shall be coordinated through the PM or designee prior to distribution. Further, all documents that will be distributed outside the GWU shall be reviewed for sensitive and/or classified information prior to any distribution of draft or final versions of those documents.

### 3.5.2    Document Review

The Contractor shall provide support to the GWU in the writing and/or reviewing of GWU program documentation. All documents prepared by the contractor shall be on the behalf of the GWU and the contractor may not independently publish or distribute any document without prior written permission from the GWU. The contractor shall review and provide written comments on the technical accuracy and completeness of each document. No documents, reports, information, etc., may be released to the public or provided to any party other than the GWU and it's contractors without review and written approval of the GWU.

## 3.6    Reporting Requirements

The Contractor shall provide a monthly steering report to the PM in letter format. The report shall describe the work accomplished during the reporting period, discuss problems encountered and corrective action taken, pending issues and work planned for the next period. In particular, the report shall address the extent to which any problems or circumstances will cause conflicts with the GWU project schedule.

Page A4 of 4

The Contractor shall provide a monthly detailed breakdown of funds expended during the reporting period, including a breakdown of labor hours utilized by the contractor and any subcontractor, associated labor costs, material costs and other direct costs incurred.

The Contractor shall deliver each steering report no later than the fifth working day of the month following the reporting period.

The Contractor shall provide a weekly briefing to the PM, which will be followed by a written narrative/summary of any agreements/resolutions. The briefing may include alternatives, findings and recommendations concerning problems encountered and corrective action taken, pending issues and work planned for the next week. In particular, the briefing shall address the extent to which any problems or circumstances may cause conflicts with the GWU project schedule.

## 3.7    Deliverables

| Deliverable | Delivery Date |
| --- | --- |
| System Requirements and Design | March 06, 2006 |
| Upgrade Documentum to version 5.3 | March 20, 2006 |
| Develop General Use Documentum module | April 03, 2006 |
| Develop Human Resources Documentum module | April 24, 2006 |
| Load Human Resources Documents and Records | May 08, 2006 |
| Develop Contract Administration Documentum module | May 29, 2006 |
| Load Contract Administration Documents and Records | June 12, 2006 |
| Develop enhanced system user interface | TBD |
| Develop enhanced reporting capabilities | TBD |
| Modify database tables and attribute structures | TBD |
| Develop archival database subsystem | TBD |
| Develop and deliver long term system support plan | TBD |
| Develop Training Package for Administrators/Webmasters | TBD |
| Deliver Training to Administrators/Webmasters | TBD |

PPI353

## A. PERSONNEL

| Labor Category | Rates | Hours | Cost |
|---|---|---|---|
| Executive Management Consultant | $ 150.00 | | |
| Senior Engineer | $ 144.00 | | |
| Senior Management Consultant | $ 125.00 | | |
| Systems Analyst | $  98.00 | | |
| Quality Analyst | $  85.05 | | |
| Help Desk Specialist | $  45.00 | | |
| Administrative Assistant | $  33.67 | | |
| **Total** | | | |

## B. TASK ORDERS

# Exhibit 4

# TASK ORDER

This task order is issued on March 29, 2006 by the George Washington University, hereafter referred to as GW, with offices at 2121 Eye Street N.W., Washington, D.C. 20052, to RICHMAR & Associates, hereafter referred to as Contractor, with offices at 220 F Street N.W., Washington, D.C. 20002.

Special provisions attached to and hereby made part of thereof, the contract dated December 22, 2005 to design the computer system architecture for GW, installing and configuring the Documentum package for use by the Human Resources.

WHEREAS, GW desires to employ the services of Contractor to perform certain additional tasks; and

WHEREAS, Contractor desires to perform certain additional tasks for GW,

NOW, THEREFORE, GW and Contractor agree as follows:

## DESCRIPTION OF SERVICES
Contractor will perform additional services such as helping to convert paper document to digital images and loading these images with predefined document attributes into the GW Documentum package for use by the Human Resources.

## WRITTEN AGREEMENT
The parties of this agreement mutually agree that this task order contains the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.
This task order shall not be varied in its terms by any oral agreement or representation or otherwise than by an instrument in writing of subsequent date by both parties hereto.

**George Washington University**

By: _____
(name)

Title: _DEO. CFO_

Date: _3/29/06_

**RICHMAR and Associates**

By: _____
Richard Gordon, Jr.

Title: President/CEO

Date: _3/30/06_

**PPI355**

# Exhibit 5

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is not a request for payment

**Customer:    George Washington University**

**Contract or Purchase Order No:**

**FNP Client/Supplier:      CUS4, Inc. d/b/a RICHMAR & Associates**
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| | ED-06-GWU-ISS-DOC-21-D | December 18, 2006 | $  37,750.00 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:

Signature

Assistant Director Administrative
Applications Project Office
Print Title

(703) 726-1911
Telephone Number

Christina Griffin
Print Name

December 18, 2006
Date

202-994-5250
Fax Number

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is not a request for payment

**Customer:    George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:        CUS4, Inc. d/b/a RICHMAR & Associates**
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | ED-06-GWU-ISS-DOC-23-S | January 4, 2007 | $ 71,350.80 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:

_Christina L Griff_
Signature

Assistant Director Administrative
Applications Project Office
Print Title

(703) 726-1911
Telephone Number

Christina Griffin
Print Name

Jan 4, 2007
~~December 18, 2006~~
Date

202-994-5250
Fax Number

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is <u>not</u> a request for payment

<u>**Customer:    George Washington University**</u>

<u>**Contract or Purchase Order No: 1000082157**</u>

<u>**FNP Client/Supplier:        CUS4, Inc. d/b/a RICHMAR & Associates**</u>
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Appr oved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | ED-06-GWU-ISS-DOC-24-8 | January 16, 2007 | $ 71,476.87 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:


_Christina L. Gu___
Signature                                    <u>Christina Griffin</u>
                                             Print Name

Assistant Director Administrative
<u>Applications Project Office</u>            <u>January 16, 2007</u>
Print Title                                  Date

<u>(703) 726-1911</u>                        <u>202-994-5250</u>
Telephone Number                             Fax Number

# FEDERAL NATIONAL PAYABLES, INC.

## INVOICE VERIFICATION FORM

This is not a request for payment

**Customer:    George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:        CUS4, Inc. d/b/a RICHMAR & Associates**
When completed please fax to FNP at 301-961-6460.
Questions please call FNP at 301-961-6450.

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Appr oved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | ED-06-GWU-ISS-DOC-25-S | February 2, 2007 | $ 69,718.69 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:


*Christina Griff* _____
Signature

Assistant Director Administrative
Applications Project Office
Print Title

(703) 726-1911
Telephone Number

Christina Griffin
Print Name

February 2, 2007
Date

202-994-5250
Fax Number

FEB. 23. 2007  3:47PM    BANNER-APPLICATIONS                    NO. 6740   P. 1

### FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is not a request for payment

**Customer:  George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:      CUS4, Inc. d/b/a RICHMAR & Associates**
When completed please fax to FNP at 301-961-6460.
Questions please call FNP at 301-961-6450.

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | BD-06-GWU-ISS-DOC-26-S | February 21, 2007 | $  20,881.01 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:


_Christina Griffin_
Signature

Assistant Director Administrative
Applications Project Office
Print Title

(703) 726-1911
Telephone Number

Christina Griffin
Print Name

February 21, 2007
Date

202-994-5250
Fax Number

# Exhibit 6

# In The Matter Of:

*CUS4, Inc. d/b/a Richmar & Associates, et al. v.*
*George Washington University*

---

*Ronald G. Bonig*
*June 5, 2007*

---

*Gagliardi Reporting Company*
*P.O. Box 7306*
*Arlington, VA  22207*
*(703) 243-4333*

*Original File 0605BONI.V1, 172 Pages*
*Min-U-Script® File ID: 3667576289*

# Word Index included with this Min-U-Script®

CUS4, Inc. v. Richmar & Associates, et al.
George Washington University

Case 1:07-cv-00841-JR   Document 22-10   Filed 09/25/2007   Page 3 of 45

Ronald G. Bonig
June 5, 2007

Page 1

[1]      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
[2]              CIVIL DIVISION
[3]
[4]
[5] CUS4, INC., d/b/a
      RICHMAR & ASSOCIATES, et al.,
[6]
            Plaintiffs,
[7]
      v.          Case No:
[8]                 1:CV-07-0841 (JR)
      GEORGE WASHINGTON UNIVERSITY,
[9]
            Defendant.
[10]
[11]
                  Tuesday, June 5, 2007
[12]              Washington, D.C.
[13] Deposition of:
[14]        RONALD G. BONIG
[15] called for examination by counsel for the
[16] Plaintiffs, pursuant to Notice, taken at the
[17] Law Offices of Geoffrey P. Gitner, Watergate,
[18] Eleventh Floor, 600 New Hampshire Avenue, N.W.,
[19] Washington, D.C. 20037, beginning at 10:08 a.m.,
[20] before Lu Anne Dawson, Notary Public in and for
[21] the District of Columbia, when were present on
[22] behalf of the respective parties:

Page 2

[1] APPEARANCES:
[2]
[3] FOR THE PLAINTIFFS:
[4] GEOFFREY P. GITNER, ESQ.
[5] The Law Offices of Geoffrey P. Gitner
[6] Watergate, Eleventh Floor
[7] 600 New Hampshire Avenue, N.W.
[8] Washington, D.C. 20037
[9] (202) 295-6035
[10]
[11] FOR THE DEFENDANT:
[12] JAMES W. THOMAS, JR., ESQ.
[13] Arnold & Porter
[14] 555 Twelfth Street, N.W.
[15] Washington, D.C. 20004-1206
[16] (202) 942-6421
[17] Fax (202) 942=5999
[18] James_Thomas@aporter.com
[19]
[20]
[21]
[22]

Page 3

[1] ALSO PRESENT:
[2]          RICHARD GORDON, JR.
[3]          LINDA J. SCHUTJER, ESQ.
[4]          Associate General Counsel
[5]          George Washington University
[6]
[7]
[8]
[9]
[10]           CONTENTS
[11]
[12] Witness:                Page:
[13] RONALD G. BONIG
[14]    Examination by Mr. Gitner      5
[15]    Examination by Mr. Thomas     —
[16]
[17]
[18]
[19]
[20]
[21]
[22]

Page 4

[1]          EXHIBITS
[2]
[3] Marked for identification:      Page:
[4] BONIG DEPOSITION EXHIBIT NOS.
[5]     No. 1           25
[6]     No. 2           42
[7]     No. 3           48
[8]     No. 4           67
[9]     No. 5           72
[10]    No. 6           77
[11]    No. 7           83
[12]    No. 8          105
[13]    No. 9          113
[14]    No. 10         120
[15]    No. 11         139
[16]    No. 12         163
[17]
[18]
[19]
[20]        (Exhibits attached to original.)
[21]
[22]

Page 5

[1]                **PROCEEDINGS**

[2]

[3]

[4]     Thereupon,

[5] RONALD G. BONIG

[6] was called for examination by counsel for the

[7] Plaintiffs and, after being sworn by the Notary,

[8] was examined and testified as follows:

[9]                **EXAMINATION**

[10]              **BY MR. GITNER:**

[11]    **Q:** Would you please state your name,

[12] sir?

[13]    **A:** Ronald Charles Bonig, B-o-n-i-g.

[14]    **Q:** Mr. Bonig, where do you reside?

[15]    **A:** Ellicott City, Maryland.

[16]    **Q:** What is your address?

[17]    **A:** 2904 Concord Court, Ellicott City.

[18]    **Q:** Do you reside there with anybody?

[19]    **A:** Yes. My wife and daughter.

[20]    **Q:** What is your wife's name?

[21]    **A:** None of your business.

[22]    **Q:** That's her name, none of your

Page 6

[1] business?

[2]    **A:** No, but my wife is not involved in

[3] this.

[4]    **Q:** Well, that is for us to decide. Could

[5] you please give me her name?

[6]    **A:** No.

[7]    **MR. GITNER:** Mr. Thomas, do you

[8] want to instruct your witness to provide that

[9] information in the event that we have to serve a

[10] subpoena on this witness and identify the people

[11] that are living in that house?

[12]    **MR. THOMAS:** I can't imagine under

[13] what circumstances you would need to serve a

[14] subpoena on Mr. Bonig's wife.

[15]    But I think under the circumstances,

[16] you can tell him your wife's name.

[17]    **THE WITNESS:** My wife's name is

[18] Judith.

[19]              **BY MR. GITNER:**

[20]    **Q:** How old is your daughter, sir?

[21]    **A:** Just about 20.

[22]    **Q:** What is her name?

Page 7

[1]    **A:** Susanna.

[2]    **Q:** Sir, how long have you worked at GW?

[3]    **A:** Oh, about six and a half years.

[4]    **Q:** What is your current position?

[5]    **A:** Interim Vice President and Chief

[6] Information Officer.

[7]    **Q:** What was your position when you

[8] started there?

[9]    **A:** When I started there? Executive

[10] Director for Technology Operations.

[11]    **Q:** Were you always in the ISS Division?

[12]    **A:** Yes.

[13]    **Q:** What does ISS stand for?

[14]    **A:** Information Systems and Services.

[15]    **Q:** When were you placed in your present

[16] position?

[17]    **A:** When? January 1st.

[18]    **Q:** Did you have any interim positions?

[19]    **A:** Yes. I was a deputy prior to that,

[20] Deputy CIO.

[21]    **Q:** In your positions as Deputy CIO and

[22] Interim Chief CIO, what are your responsibilities?

Page 8

[1]    **A:** The vast majority of IT operations and

[2] all the infrastructure in the university, about

[3] 260 people, all the networks, computer centers,

[4] except for the research that the professors do,

[5] all the phone systems, Internet access, storage,

[6] desktop support, et cetera.

[7]    **Q:** So ISS is in charge of developing

[8] those systems for the University?

[9]    **A:** Developing or purchasing, modifying,

[10] installing, everything from the main —

[11]    **Q:** Maintaining?

[12]    **A:** — big systems to the network

[13] switches.

[14]    **Q:** Can you give me a, starting with high

[15] school, what has been your education, formal

[16] education?

[17]    **A:** A degree from Frostburg State College,

[18] Master's degree in Systems from George Washington

[19] University in the early seventies, a year of

[20] post-graduate work at the University of Washington

[21] in the mid-seventies.

[22]    **Q:** In what field?

**Page 9**

[1]    **A:** Public affairs/finance, in effect.

[2]    **Q:** Can you tell me what your experience

[3] has been, your employment experience has been?

[4]    **A:** I worked for the Federal Government,

[5] municipal government, private industry and now the

[6] University.

[7]    **Q:** In what capacities did you work for

[8] each one of those?

[9]    **A:** IT, Information Technology, under

[10] its various names of it, from data control or

[11] systems development, et cetera. For the Federal

[12] Government, my last Federal Government position

[13] was as —

[14]    **Q:** Maybe we should start at the beginning

[15] and work forward, if you could. What positions

[16] have you held, what companies have you worked for,

[17] government agencies have you worked for and what

[18] was your position with each one of them?

[19]    **A:** I can't even remember the details

[20] of some of that stuff 35 years ago. I worked

[21] in various positions in systems in the General

[22] Services Administration, worked for a while at

**Page 10**

[1] the Executive Office of the President, worked

[2] the longest and most recent — and I left there

[3] in 1995 — was as the National Director of

[4] Administrative Systems for the Social Security

[5] Administration.

[6]    **Q:** Have you had any private —

[7]    **A:** Yes. I worked for Systems and

[8] Computer Technology Corporation as a consultant,

[9] as Assistant Director of the site in Indianapolis

[10] and as the Director of the outsourcing arrangement

[11] with the George Washington University.

[12]    **Q:** What was your position with Systems

[13] and Computer Technology?

[14]    **A:** Principal consultant in one spot,

[15] Assistant Director at Indianapolis and Executive

[16] Director/Account Director or Account Manager at

[17] George Washington University.

[18]    **Q:** How long were you there?

[19]    **A:** With SCT? About six years.

[20]    **Q:** Is it SCT?

[21]    **A:** Yes.

[22]    **Q:** Did they develop computer systems for

**Page 11**

[1] clients?

[2]    **A:** Yes. Yes, they did. The contract we

[3] had was an outsourcing contract. We ran the

[4] computer center for them. But they used, GW used

[5] SCT called Banner.

[6]    **Q:** Do you have any prior experience in

[7] negotiating computer system development contracts?

[8]    **A:** Yes.

[9]    **Q:** How extensive is your experience?

[10]    **A:** A number of different companies,

[11] Lockheed Martin, et cetera.

[12]    **Q:** In your past experience, have you been

[13] involved in negotiating licensing fees for

[14] computer systems?

[15]    **A:** Yes.

[16]    **Q:** How extensive?

[17]    **A:** Off the shelf. Not too extensive.

[18] Off the shelf licensing fees, operating system

[19] software, et cetera.

[20]    **Q:** In your position with GW, I take it

[21] that ultimately you are in charge of the contracts

[22] that are let between the University and outside

**Page 12**

[1] vendors?

[2]    **A:** Now I am, yes.

[3]    **Q:** Within the ambit of those

[4] responsibilities, have you advised yourself

[5] what the creative rights are between the

[6] University and its vendors?

[7]    **MR. THOMAS:** Object to form.

[8]    **THE WITNESS:** Pardon?

[9]    **MR. THOMAS:** Objection to form.

[10] You can answer.

[11]    **THE WITNESS:** Okay. I have a general

[12] understanding and rely on my legal counsel.

[13]               BY MR. GITNER:

[14]    **Q:** Do you have practical experience

[15] yourself?

[16]    **A:** Practical experience, yes.

[17]    **Q:** How many contracts have you been

[18] involved with that have addressed the rights to

[19] creative works, copyright works? Hundreds, tens?

[20]    **A:** No. In the tens. Probably in the

[21] tens.

[22]    **Q:** And you have been in the computer

CUS4, Inc. vs. Richmond & Associates, et al., Case 1:05-cv-2-10    Filed 09/25/2007    Page 6 of 16

George Washington University

Ronald G. Bonig
June 5, 2007

**Page 13**

[1] development field for 35 years?

[2] A: Operations and development.

[3] Q: Operations and development.

[4] Approximately how many contracts have you been

[5] involved with that have involved licensing fees?

[6] A: Well, every time we buy a piece of

[7] off-the-shelf software, there's a licensing fee.

[8] Q: Have you been involved in the

[9] negotiation of those licensing fees?

[10] A: To some degree.

[11] Q: Have you been involved in negotiating

[12] licensing fees for George Washington University?

[13] A: Yes.

[14] Q: Are you familiar with the company SC

[15] Foster?

[16] A: SC Foster? I believe they work in the

[17] Documentum area. I'm not that familiar with them

[18] directly.

[19] Q: Are you familiar with the fact that

[20] they installed a computer Documentum system for

[21] GW University?

[22] A: I believe they did, yes.

**Page 14**

[1] Q: Were you involved in supervising that

[2] particular project?

[3] A: Only in the hardware side at that

[4] point. That was prior to me becoming Deputy and

[5] prior to being in my current position, so I was

[6] Executive Director for Operations at that point.

[7] The only contact that I would have

[8] had directly or my folks would have had directly

[9] with them was the physical installation of the

[10] hardware.

[11] Q: Their hardware is still being or their

[12] system is still being used at the University, is

[13] it not?

[14] A: As far as I know.

[15] Q: What does ORS stand for?

[16] A: Office of Research Services, I think.

[17] Q: And GCAS?

[18] A: Grants and Contract Accounting.

[19] Q: Is there a license agreement between

[20] SC Foster and GW University?

[21] A: Don't know. I would assume so, but

[22] I don't know.

**Page 15**

[1] Q: Why would you assume so?

[2] A: Well, because if we're buying

[3] software, off-the-shelf software, there would be

[4] a licensing agreement as opposed to paying an

[5] hourly group to do work for us.

[6] Q: Do you know if there was a written

[7] contract with SC Foster?

[8] A: At GW we won't do business without a

[9] written contract.

[10] Q: Do you know whether or not in the

[11] contract between GW and SC Foster whether or not

[12] SC Foster or who retained the rights, creative

[13] rights?

[14] A: I do not know.

[15] Q: You just testified that when I guess

[16] a customer pays for a custom designed computer

[17] system, that there is no need for licensing fees?

[18] A: I don't believe I said that.

[19] MR. THOMAS: Objection to form.

[20]                    BY MR. GITNER:

[21] Q: Is that your belief?

[22] A: If I'm buying ours from someone, we're

**Page 16**

[1] specifying what needs to be done and a programmer

[2] is programming something for the University, they

[3] are acting as if they were our staff. They're

[4] being paid for their hours.

[5] There's two ways to pay for something,

[6] pay for a physical piece of equipment or a

[7] physical piece of software off the shelf or pay

[8] hours for someone to do some work.

[9] If we're paying hours for someone,

[10] it's just like a staff augmentation, as if I was

[11] contracting with a third party body shop.

[12] Q: And if you pay hours to an independent

[13] contractor, is that your belief, that you as the

[14] University would own the creative rights that are

[15] created by the independent consultant?

[16] A: We would certainly own or have the

[17] rights to use what the consultant developed for us

[18] since we paid for that development.

[19] Q: I'm asking you, though, who would own

[20] the copyright? Who would own the right to get the

[21] copyrights?

[22] MR. THOMAS: Objection to form. That

---

Page 17

[1] is asking him a legal question.

[2] **BY MR. GITNER:**

[3] **Q:** What is your understanding?

[4] **A:** Generally, GW doesn't copyright

[5] software that they develop, whether it's by our

[6] own staff or by our own folks or whether it's

[7] by a staff augmentation.

[8] **Q:** Do you understand that under an

[9] independent consultant agreement for the

[10] implementation and design of a custom designed

[11] computer system that it would be the independent

[12] consultant who would have the right to the

[13] copyright?

[14] **MR. THOMAS:** Objection to form of

[15] the legal question.

[16] **BY MR. GITNER:**

[17] **Q:** Is that your understanding?

[18] **A:** My understanding is if we're paying

[19] for the hours, we have the right to use it.

[20] **Q:** I'm not asking you if you have the

[21] right to use it. I'm asking you, would not the

[22] creator, the independent consultant as the

---

Page 18

[1] creator, have the right to own the copyright —

[2] **MR. THOMAS:** Objection.

[3] **BY MR. GITNER:**

[4] **Q:** — to the system?

[5] **MR. THOMAS:** Objection. Asked and

[6] answered. Calls for a legal conclusion.

[7] **THE WITNESS:** I don't know.

[8] **BY MR. GITNER:**

[9] **Q:** You don't know? Have you ever sought

[10] that advice? Let me ask you, have you sought

[11] advice from anyone in this case as to whether or

[12] not GW or Richmar is entitled to own the copyright

[13] to the DCMS?

[14] **A:** I have not asked that question.

[15] **Q:** You haven't asked it of a single soul?

[16] **A:** I don't remember. I don't think so.

[17] **Q:** You haven't asked that of any of your

[18] staff?

[19] **A:** I don't remember it. I have 260

[20] people. This is one of two dozen projects all

[21] going at the same time.

[22] **Q:** So you haven't had this discussion

---

Page 19

[1] with Ms. Day, Ms. Griffin?

[2] **A:** I may have. I don't remember.

[3] **Q:** Or Rick Gilchrist?

[4] **A:** What I said stands. I may have. I do

[5] not remember specifically asking that, no.

[6] **Q:** Have you ever sought legal advice?

[7] Have you ever sought legal advice?

[8] **A:** On what?

[9] **MR. THOMAS:** You can answer that —

[10] **MR. GITNER:** I'm just asking if he

[11] ever sought it. I'm not asking what it is.

[12] **MR. THOMAS:** Wait. You can answer

[13] that question yes or no.

[14] **THE WITNESS:** Have I sought legal

[15] advice? Yes.

[16] **BY MR. GITNER:**

[17] **Q:** Can you tell me when you sought legal

[18] advice?

[19] **A:** I do it all the time.

[20] **Q:** Well, we are talking about legal

[21] advice with regard to who owns the copyright for

[22] the DCMS. When did you seek legal advice for

---

Page 20

[1] that?

[2] **A:** I'm not sure I have ever asked that

[3] question.

[4] **Q:** Well, you just answered yes to the

[5] question, did you seek legal advice with regard to

[6] the copyright ownership?

[7] **A:** No. I answered the question, have I

[8] sought legal advice. I said yes.

[9] **Q:** All right. Have you ever sought legal

[10] advice?

[11] **A:** Yes.

[12] **Q:** Let me ask you, have you ever sought

[13] legal advice with regard to ownership of the

[14] copyright to the DCMS?

[15] **MR. THOMAS:** Again, you can answer

[16] that question yes or no, if you have a

[17] recollection beyond, of course, retention of

[18] counsel to defend this lawsuit.

[19] **THE WITNESS:** Let me talk to you for

[20] a minute.

[21] **MR. THOMAS:** Let's go off the record.

[22] (Brief recess.)

---

Page 21

[1] THE WITNESS: Back on the record.

[2] BY MR. GITNER:

[3] Q: Okay?

[4] A: Yes. I have not, I have not discussed

[5] those issues with counsel except in light of this

[6] dispute.

[7] Q: Prior to December 18th, 2006, is it

[8] your testimony that you sought no legal guidance

[9] with regard to what rights GW had retained to the

[10] copyright for the DCMS system?

[11] A: I do not remember seeking counsel or

[12] advice on that specific question, no. I speak

[13] with the lawyers all the time.

[14] Q: Prior to December 18th, 2006, what was

[15] your understanding of whether or not Richmar was

[16] entitled to own the copyright to the DCMS?

[17] A: I'm not sure I had any belief other

[18] than a firm belief that if we pay for it, we can

[19] use it and modify it as necessary.

[20] Q: And what is the basis or what is the

[21] background of your knowledge for your statement

[22] that you would have the right, you being GW, to

Page 22

[1] modify the system?

[2] A: We didn't buy a license. We bought

[3] hours.

[4] Q: I understand what you're saying. I'm

[5] asking you, what is the basis?

[6] A: The basis is we bought hours. They

[7] would not have done the work had they not done it

[8] for us and being paid by us for those hours.

[9] Q: Your testimony is that for that

[10] opinion, you did not seek any legal advice to

[11] back it up; is that correct?

[12] A: No. That's a general — in the

[13] business, you're buying somebody's hours. You

[14] rent a programmer, you get to use whatever they

[15] did.

[16] Q: Are you familiar with the Work for

[17] Hire Doctrine?

[18] A: Not as stated.

[19] Q: Have you ever reviewed the copyright

[20] statute, Section 106, to see what rights a

[21] copyright owner has?

[22] A: No.

Page 23

[1] Q: So your opinion that GW had the right

[2] to modify the system was based upon your prior

[3] experience and knowledge, not anything specific?

[4] A: Correct.

[5] Q: It wasn't based upon book learning

[6] that you had done, correct?

[7] A: Correct.

[8] Q: It wasn't based upon any legal advice

[9] that you had sought?

[10] A: Past practice.

[11] Q: Past practice, okay.

[12] A: Any time I've hired programmers, we

[13] used their work product as we saw fit.

[14] Q: You are aware that Richmar has

[15] obtained a certificate of copyright to the DCMS,

[16] correct? ·

[17] A: No.

[18] Q: You are not aware of that?

[19] A: No.

[20] Q: No one has ever told you that?

[21] A: No.

[22] Q: You have never looked at the pleadings

Page 24

[1] in this case?

[2] A: No. I don't have time.

[3] Q: How many projects do you supervise?

[4] A: Dozens at any one time and not just

[5] projects. All the day-to-day operations. I've

[6] got several levels of management below me.

[7] Q: Did you have a Project Manager for the

[8] DCMS system?

[9] A: Yes.

[10] Q: Who was that?

[11] A: I believe Marcy Day was the Project

[12] Manager for the majority of the time that I was

[13] involved with it.

[14] Q: What kind of decisions would you need

[15] to or whom would she have to come to you for your

[16] input as to the decisions and the development of

[17] DCMS?

[18] A: Change of schedules, change of overall

[19] scope. However, those would get to my level. I

[20] was not involved at this level for the entire

[21] duration of the project.

[22] Q: When were you involved at that level

Page 25

[1] with the DCMS project?

[2]    A: Somewhere around —

[3]    Q: When did you start?

[4]    A: — mid-October of 2006. Prior to

[5] that, it was under the control of Admin Apps,

[6] reporting to the CIO.

[7]    Q: Have you ever seen a Certificate of

[8] Registration of Copyright?

[9]    A: Probably not on this system.

[10]    MR. GITNER: Let's make that Exhibit

[11] Number 1.

[12]    (Thereupon, Bonig Deposition Exhibit

[13] Number 1 was marked for identification.)

[14]    BY MR. GITNER:

[15]    Q: Mr. Bonig, let me show you what has

[16] been marked as Exhibit Number 1. I know you are

[17] not familiar with this document. This is a

[18] Certificate of Registration filed with the

[19] Department of Patents and Trademarks —

[20]    MR. THOMAS: No.

[21]    BY MR. GITNER:

[22]    Q: The Registrar of Copyrights — I'm

Page 26

[1] sorry — for the DCMS system. What is your

[2] understanding, sir, of what modifications GW is

[3] permitted to make to the DCMS system if, in fact,

[4] it has been copyrighted by Richmar?

[5]    MR. THOMAS: Objection to form.

[6]    THE WITNESS: I didn't hear that,

[7] James. Sorry.

[8]    MR. THOMAS: Objection to form.

[9]    THE WITNESS: To form. That means I

[10] can answer the question?

[11]    MR. THOMAS: You can answer the

[12] question.

[13]    THE WITNESS: Well, to get it to work,

[14] number one. Otherwise we paid $1 million for

[15] nothing.

[16]    BY MR. GITNER:

[17]    Q: To get it to work?

[18]    A: Yeah, because the system didn't work

[19] as delivered. Not a single release or a single

[20] delivery operated when it first arrived.

[21]    Q: Once it works, is GW entitled to make

[22] any additional modifications?

Page 27

[1]    A: Sure.

[2]    Q: Can you tell me what the scope is

[3] of your belief as to what modifications GW is

[4] permitted to make to the DCMS system if, in fact,

[5] it's copyrighted?

[6]    MR. THOMAS: Objection to form.

[7] Relevance. Legal question.

[8]    You can answer.

[9]    THE WITNESS: That's a legal question

[10] so —

[11]    MR. THOMAS: You can answer it if you

[12] have an understanding.

[13]    THE WITNESS: My understanding is if

[14] we paid for work product, we can do what we need

[15] to do to get it working and enhance around it to

[16] enlarge it for our use.

[17]    BY MR. GITNER:

[18]    Q: When you —

[19]    A: This was not an off-the-shelf piece of

[20] software. If I'm buying a license from Sun, for

[21] example, for an operating system, it's a different

[22] issue.

Page 28

[1]    Q: Richmar completed its work on the

[2] Release Number 1 of the DCMS on December 18th,

[3] correct, approximate date?

[4]    A: That's a date I've heard as a, you

[5] know, stake in the sand type date.

[6]    Q: And there was what GW calls a Release

[7] Number 2 in April, correct?

[8]    A: Yes.

[9]    Q: Release Number 2, what was included in

[10] Release Number 2 that went live in April?

[11]    A: I don't know exactly. I believe there

[12] were some screen changes, a few things making it

[13] more efficient.

[14]    Q: Were those changes necessary to make

[15] the system operate as of December 18th?

[16]    MR. THOMAS: Objection to form.

[17]    THE WITNESS: The system as delivered

[18] on December 18th barely worked. It did not solve

[19] the problems we were attempting to solve with the

[20] whole system.

[21]    My staff made some modifications to

[22] try to get it to do the things that we needed

CyS4, inc. as a Richman & Associates, et al. Document 22-10    Filed 09/25/2007    Page 10 of 15

George Washington University                                                    Ronald G. Bonig
                                                                                June 5, 2007

**Page 29**

[1] to do and we'll continue to make changes as we
[2] develop the system.
[3]                          **BY MR. GITNER:**
[4]    **Q:** From December 18th until April 2nd,
[5] Release Number 1 was operating at GW University,
[6] correct?
[7]    **MR. THOMAS:** Objection to form.
[8] Foundation.
[9]    **THE WITNESS:** Minimally.
[10]                         **BY MR. GITNER:**
[11]    **Q:** It was being used by the HR Personnel
[12] Division, correct?
[13]    **A:** Minimally.
[14]    **Q:** Correct?
[15]    **A:** Minimally.
[16]    **Q:** It had been rolled out in January to
[17] the Medical Faculty Division?
[18]    **A:** Yes.
[19]    **Q:** Correct?
[20]    **A:** Yes.
[21]    **Q:** It had rolled out to EEO,
[22] correct?

**Page 30**

[1]    **A:** Yes.
[2]    **Q:** It had been rolled out to the Student
[3] Faculty Division, correct?
[4]    **A:** I believe so, yes.
[5]    **Q:** And I believe it was rolled out to the
[6] Faculty Personnel Research Services, correct?
[7]    **A:** I believe so.
[8]    **Q:** All of those groups were using the
[9] DCMS, correct?
[10]    **A:** To simply pull a document, yes.
[11]    **Q:** Well, they were also adding documents,
[12] weren't they?
[13]    **A:** In some places, yes.
[14]    **Q:** And they were searching for legacy
[15] documents, weren't they?
[16]    **A:** I don't have personal knowledge of
[17] that. I would assume so, but I don't have
[18] personal knowledge.
[19]    **Q:** You approved the task order to
[20] complete the inputting of all of the legacy
[21] documents or records from —
[22]    **A:** Right.

**Page 31**

[1]    **Q:** — these divisions, correct?
[2]    **A:** Right.
[3]    **MR. THOMAS:** Let him finish his
[4] question.
[5]                          **BY MR. GITNER:**
[6]    **Q:** Correct?
[7]    **THE WITNESS:** Pardon?
[8]    **MR. THOMAS:** I said let him finish his
[9] question.
[10]    **THE WITNESS:** Sorry.
[11]    **MR. THOMAS:** Then answer.
[12]                         **BY MR. GITNER:**
[13]    **Q:** Did you authorize the modifications to
[14] Release 1 that resulted in GW's Release Number 2?
[15]    **A:** Yes.
[16]    **Q:** And when did you do that?
[17]    **A:** I don't remember the exact date.
[18]    **Q:** You say that these were some fixes to
[19] some screen changes?
[20]    **MR. THOMAS:** Objection to form. Those
[21] are two different things, but you can answer.
[22]    **THE WITNESS:** I believe some screen

**Page 32**

[1] form changes were included in it, yes.
[2]                          **BY MR. GITNER:**
[3]    **Q:** Do you have plans, and when I say you,
[4] does ISS have plans to expand the DCMS system to
[5] other divisions and organizations within the
[6] University, such as Financial Services?
[7]    **A:** Yes.
[8]    **Q:** Will that expansion require
[9] modifications to be made to the source code for
[10] the DCMS?
[11]    **MR. THOMAS:** Objection to form.
[12]    **THE WITNESS:** I don't know. I would
[13] have to talk to one of my architectural
[14] programmers about that.
[15]                         **BY MR. GITNER:**
[16]    **Q:** If, indeed, it requires changes to the
[17] source code, is it your opinion that GW has the
[18] right to make those changes even if Richmar is the
[19] owner to the copyright of the DCMS?
[20]    **MR. THOMAS:** Objection. Form. Calls
[21] for a legal conclusion.
[22]    You can state your understanding.

Page 33

[1] THE WITNESS: A large part of the
[2] code, what makes DCMS work, was written by GW
[3] personnel, so without architectural diagrams,
[4] et cetera, I don't know what pieces have to be
[5] changed.
[6]                    BY MR. GITNER:
[7] Q: Have you authorized the expansion
[8] of the DCMS to the other new departments?
[9] A: Yes.
[10] Q: When did you do that?
[11] A: When you say authorized, it was the
[12] plan, it's the plan to expand into the other
[13] departments. None have actually been brought on
[14] board at the moment.
[15] Q: That's what I asked you. Do you have
[16] a plan? Is there a time specific that you plan on
[17] doing that?
[18] A: Within this calendar year we want to
[19] start expanding into other departments, yes.
[20] Q: Have any specific actions been taken
[21] to implement that plan?
[22] A: Yes.

Page 34

[1] Q: Can you tell me what those are?
[2] A: Planning with the departments, working
[3] on requirements of the departments, modifying the
[4] scanning so that we can take mass documents at
[5] once into a scanner and then index them at an
[6] individual's desk as opposed to the way it was
[7] delivered, where someone has to sit at the
[8] scanning terminal and do every single sheet.
[9] Q: Is it your position, Mr. Bonig, that
[10] GW has the right to make whatever changes it wants
[11] to the DCMS code?
[12] A: Yes.
[13] Q: Including changing the code to bring
[14] on new divisions; is that correct?
[15] A: We paid for the development of the
[16] code.
[17] Q: Is there any limitation in your mind
[18] as to what GW can do as far as modifying that
[19] code?
[20] MR. THOMAS: Objection to form.
[21] THE WITNESS: No.
[22] The limitation is we can't sell it to

Page 35

[1] somebody else, sure.
[2]                    BY MR. GITNER:
[3] Q: Why do you say that?
[4] A: Because it's our code or code for our
[5] purposes.
[6] Q: What's the basis of your knowledge
[7] that you can't sell it?
[8] A: We just don't do that. It's a matter
[9] of practice with GW.
[10] Q: Is it true, sir, that between December
[11] 18th and I believe the date was April 2nd, when
[12] GW Release 2 went live, that these five personnel
[13] divisions utilized the DCMS?
[14] A: Did they use it?
[15] Q: Yes.
[16] A: Yes.
[17] Q: And that the DCMS operated without
[18] any of the fixes that were included in Release
[19] Number 2?
[20] MR. THOMAS: Objection to form.
[21] You can answer.
[22] THE WITNESS: It operated but not

Page 36

[1] effectively or efficiently.
[2]                    BY MR. GITNER:
[3] Q: What do you mean by not effectively or
[4] efficiently?
[5] A: It was laborious to put documents in,
[6] and that was one of the things we wanted to
[7] change.
[8] Q: Anything else?
[9] A: There were — I was getting complaints
[10] or the team was getting complaints about different
[11] things that didn't work effectively or
[12] efficiently, and they logged those for future
[13] corrections.
[14] Q: Do you remember any specifics?
[15] A: Some of the screen things, the
[16] navigation in some of the screens that I mentioned
[17] in 2 or that you mentioned in 2, Release 2, the
[18] mass scanning change that we needed to make in
[19] Release 3 to make it more efficient.
[20] Q: Anything else?
[21] A: We're trying to improve the process
[22] across the board, not just one part of it.

**Page 37**

[1]   **Q:** You were aware that Release 1 went

[2] through User Acceptance Training in November?

[3]   **A:** Yes.

[4]   **Q:** It went through UAT for three weeks?

[5]   **A:** Yes. I believe it was three weeks.

[6]   **Q:** And in your mind, was that UAT

[7] successful?

[8]   **A:** In what was delivered, yes.

[9]   **Q:** And you authorized release of Release

[10] Number 1, didn't you?

[11]   **A:** Yes.

[12]   **Q:** Prior to authorizing the release of

[13] Release Number 1, did you inform Richmar that you

[14] had any concerns about the efficiency of the

[15] system?

[16]   **A:** I don't remember specifically.

[17]   **Q:** Do you recall preparing any document

[18] and providing them with that?

[19]   **A:** I don't remember, but it's not my —

[20]   **Q:** Have you ever?

[21]   **A:** — it's not my duty.

[22]   **MR. THOMAS:** Let him finish his

**Page 38**

[1] answer.

[2]      **BY MR. GITNER:**

[3]   **Q:** Go ahead.

[4]   **A:** That's not my duty.

[5]   **Q:** Whose duty is it?

[6]   **A:** To communicate with the contractor

[7] on something, we may choose not to.

[8]   **Q:** Are you aware of whether or not

[9] anybody communicated with Richmar that there

[10] were any problems in operability prior to Release

[11] Number 1?

[12]   **A:** Oh, we had meetings, yes, where we

[13] talked about things not being delivered on time

[14] or things didn't work as delivered, things were

[15] developed on a different system at Richmar than we

[16] had at GW and that's why things didn't happen when

[17] they — didn't work when they arrived the first

[18] time.

[19]      Richmar staff were not on site, as we

[20] hoped, so, therefore, any coordination with the

[21] pieces that my folks had to do was not smooth.

[22]      Yeah, there were a lot of problems

**Page 39**

[1] that were discussed, yes.

[2]   **Q:** Did you ever have a document prepared

[3] subsequent to December 18th, 2006 of what you

[4] believed were the failures of Richmar in

[5] developing the system?

[6]   **A:** Could have. That would be not

[7] uncommon.

[8]   **Q:** Well, did you?

[9]   **A:** I don't remember, but it would not be

[10] uncommon.

[11]   **Q:** So as you sit here today, you can't

[12] recall having such a listing prepared; is that

[13] correct?

[14]   **A:** Not specifically. We on our own

[15] systems or on contractor built systems always do

[16] during UAT and different stages what did not get

[17] done correctly that we wanted to fix later things

[18] that came up that were additions that we wanted to

[19] add later or deficiencies in what was delivered

[20] that we wanted to decide whether it was a show

[21] stopper or not or whether we could fix it later.

[22]      Creating that kind of list occurs on

**Page 40**

[1] virtually all systems. I do not specifically

[2] remember telling the staff to do it on this one,

[3] but I would assume that it happened.

[4]   **Q:** Well, you have made some allegations

[5] that Richmar has failed to properly act under the

[6] contract and I'm asking you, have you ever, you

[7] yourself, prepared or have you directed someone on

[8] your staff to prepare a description of what these

[9] failures are?

[10]   **A:** Stated that way, yes. The way you

[11] stated it before is a list. I'm not sure it was

[12] in a memo, but yes.

[13]   **Q:** What document did you ask to be

[14] prepared?

[15]   **MR. THOMAS:** Objection.

[16] Let's go off the record.

[17]   **THE WITNESS:** Do you want me to go?

[18]   **MR. THOMAS:** Yes.

[19]      (Brief recess.)

[20]   **MR. GITNER:** Read the last question.

[21]      (The record was read by the reporter

[22] as follows:

Page 41

[1] **Question:** Well, you have made
[2] some allegations that Richmar has failed
[3] to properly act under the contract and I'm
[4] asking you, have you ever, you yourself,
[5] prepared or have you directed someone on
[6] your staff to prepare a description of what
[7] these failures are?
[8] **Answer:** Stated that way, yes.
[9] The way you stated it before is a list.
[10] I'm not sure it was in a memo, but yes.
[11] **Question:** What document did you
[12] ask to be prepared?)
[13]
[14] **MR. THOMAS:** And I'm going to instruct
[15] the witness to limit your answer to any document
[16] that was prepared in the ordinary course of
[17] business rather than any document that may have
[18] been requested by counsel in anticipation of
[19] litigation.
[20] You can answer.
[21] **THE WITNESS:** It is very common, and
[22] whether I specifically asked or not, what would be

Page 42

[1] prepared is a list of deficiencies in any system
[2] that is released or any release of a system to
[3] create a list of deficiencies that needed to be
[4] either bypassed, corrected, lived with, et cetera.
[5] That's a common practice.
[6] **BY MR. GITNER:**
[7] **Q:** That's a yes or no question. Did you
[8] prepare such a list or not?
[9] **A:** Did I prepare? No. I did not prepare
[10] a list.
[11] **Q:** Did you ask that such a list be
[12] prepared?
[13] **A:** I do not remember asking. Was a list
[14] prepared? Probably. It would be standard
[15] practice to prepare a list.
[16] (Thereupon, Bonig Deposition Exhibit
[17] Number 2 was marked for identification.)
[18] **MR. GITNER:** Sorry. I don't have an
[19] extra copy of this one.
[20] **BY MR. GITNER:**
[21] **Q:** Let me show you what has been marked
[22] as Exhibit Number 2. Are you familiar with this

Page 43

[1] document or this type of document?
[2] **A:** This type of document. I'm not sure
[3] I saw this specific one, but this is a Mantis
[4] ticket list, okay? This is how we document all
[5] inadequacies, changes, problems, et cetera, to a
[6] system. It happens on all systems.
[7] **Q:** My understanding from prior testimony
[8] in this case is that this is a list of what was
[9] included in GW Release Number 2. Are you familiar
[10] with that?
[11] **A:** I can't say that.
[12] **Q:** Do you know whether or not these are
[13] the modifications that were made to Release Number
[14] 1 of the DCMS as part of Release Number 2?
[15] **A:** It's too detailed for my knowledge.
[16] At my level, I would not get into this.
[17] **Q:** Do you know whether or not any of
[18] these modifications were required to make the
[19] Release Number 1 of the DCMS operate?
[20] **MR. THOMAS:** Objection to form. I
[21] assume you're not asking him to sit here and read
[22] ticket by ticket and try to guess.

Page 44

[1] **THE WITNESS:** I would not know. You
[2] need to talk to the detailed programmer staff
[3] about that.
[4] **BY MR. GITNER:**
[5] **Q:** Are you aware of whether any of these
[6] particular items were fixes to modifications that
[7] had been attempted by GW but had failed?
[8] **A:** I do not know.
[9] **Q:** Were you satisfied with the operation
[10] of the DCMS Release Number 1 as of December 20th,
[11] 2006?
[12] **MR. THOMAS:** Objection to form.
[13] **THE WITNESS:** I have not been
[14] satisfied with the operation to date.
[15] **BY MR. GITNER:**
[16] **Q:** Was your staff satisfied with its
[17] operation?
[18] **A:** No. There are many things we still
[19] want to change.
[20] **Q:** You signed off on the UAT, correct?
[21] **A:** I don't have any knowledge that I
[22] signed off directly myself on it.

LUS4, Inc. a/b/a Richman & Associates, et al. Case 2:06-cv-00284-JLR Document 32-10    Filed 09/25/2007    Page 14 of 34

George Washington University                                                                    **Ronald G. Bonig**
                                                                                                June 5, 2007

**Page 45**

[1] **Q:** Well, GW agreed to sign off on the

[2] UAT, correct?

[3] **A:** GW agreed to implement Release 1.

[4] **Q:** And when did they do that?

[5] **A:** In December.

[6] **Q:** At that point in time had GW agreed to

[7] what would be included in Release Number 1?

[8] **A:** De facto by accepting what was there.

[9] **Q:** What do you mean de facto by accepting

[10] what was there?

[11] **A:** We accepted Release 1 as it currently

[12] existed because it was the only thing we could do

[13] if we wanted to be able to read the electronic

[14] documents, which were in 400-and-some boxes. If

[15] we had not, we'd have had 400-some-boxes of

[16] documents that were needed for day-to-day

[17] operations that there was no way to get to.

[18]     So regardless of the functionality

[19] of the system, of the efficiency or effectiveness

[20] of the system, we were between a rock and a hard

[21] spot.

[22] **Q:** So you had 400 cases of documents that

**Page 46**

[1] you wanted to be able to retrieve electronically,

[2] right?

[3] **A:** We wanted to be able to get to them.

[4] **Q:** Release Number 1 allowed you to do

[5] that?

[6] **A:** Allowed us to get to the document,

[7] yes.

[8] **Q:** When you say it didn't have the

[9] efficiency or functionality that you envisioned,

[10] specifically what are you talking about?

[11] **A:** The smoothness between screens, the

[12] navigation of the screens I heard user complaints

[13] on.

[14] **Q:** The smoothness in navigation between

[15] screens?

[16] **A:** Navigation between screens, too

[17] difficult to use.

[18]     Another one was obviously the

[19] scanning thing I mentioned earlier in that to

[20] scan a document under Release 1, you had to be

[21] at a scanner and scan the document and index it

[22] at that point, which doesn't do anything for the

**Page 47**

[1] process.

[2]     Hundreds of documents come into HR.

[3] It's very difficult for the people in the middle

[4] of the process to leave their station, go over,

[5] scan a document, index it and then go back.

[6]     It's not efficient, not effective

[7] and not achieving the results that we wanted with

[8] buying the whole document system in the first

[9] place.

[10] **Q:** Any others?

[11] **A:** Those are the two big ones that I know

[12] of. There's, by this Mantis list, I would assume

[13] there are many, many others.

[14] **Q:** The screens that were included in

[15] Release Number 1 were the screens that were part

[16] of the UAT, right?

[17] **A:** Correct.

[18] **Q:** And the screens that were part of

[19] Release Number 1 were the screens that GW de facto

[20] agreed would be part of Release Number 1?

[21] **A:** Yes.

[22] **Q:** And the scanning capability of the

**Page 48**

[1] DCMS and its indexing capability were part of the

[2] UAT, correct?

[3] **A:** The Release 1 were, yes.

[4] **Q:** And the scanning and indexing

[5] capability of the DCMS, that was part of the

[6] Release Number 1, correct?

[7] **A:** What went live was part of 1, yes.

[8] **Q:** When you talk about scanning and

[9] index, are you talking about the bulk scanning

[10] capability, in other words, to scan in a document

[11] or to scan in a number of documents at one time as

[12] opposed to pages of a document?

[13] **A:** You scan in a number of documents at

[14] one time and then, at the individual's work

[15] station, index them.

[16] **Q:** You knew those items would not be

[17] included in Release Number 1, correct?

[18] **A:** Correct.

[19]     (Thereupon, Bonig Deposition Exhibit

[20] Number 3 was marked for identification.)

[21]     **BY MR. GITNER:**

[22] **Q:** Let me show you what has been marked

Page 49

[1] as Exhibit Number 3. Do you recall in December of
[2] 2006 that GW requested that Richmar turn over all
[3] of its copies of its computer code to GW?
[4]    MR. THOMAS: Objection to form.
[5]    THE WITNESS: Yes. We made a request
[6] to turn over anything that was GW's because we did
[7] not want GW specific information, test data,
[8] documents, et cetera, on someone else's machines.
[9]                    BY MR. GITNER:
[10]    Q: Well, the close-out checklist that was
[11] given to Richmar, however, requested that they
[12] turn over the computer source code, did it not?
[13]    A: I believe at that time it did.
[14]    Q: GW also requested that Richmar turn
[15] over all design and development work papers with
[16] regard to the DCMS; isn't that true?
[17]    A: Yes, because the system was
[18] inadequately documented. It's the only way we
[19] knew what the architecture of it was, was to get
[20] some of the work papers.
[21]    Q: Why did you request that Richmar
[22] provide to GW all of its copies of the source

Page 50

[1] code?
[2]    A: At the time we didn't — the thinking
[3] was to test source code, you use, in effect, live
[4] documents in many cases, and we didn't want our
[5] documents sitting on other systems.
[6]    Q: You didn't want your documents —
[7] well, there's a difference between the database,
[8] which Richmar gave back to GW, but you also asked
[9] for the computer source code and I'm asking, why
[10] did you ask for that to be returned?
[11]    MR. THOMAS: Objection. Asked and
[12] answered.
[13]                    BY MR. GITNER:
[14]    Q: That wouldn't have GW material on it.
[15]    MR. THOMAS: You can answer it again.
[16]    THE WITNESS: Pardon?
[17]    MR. THOMAS: You can answer the
[18] question again.
[19]    THE WITNESS: Okay. Okay.
[20]    When brought to our attention with
[21] this memo, we corrected and said that we did not
[22] intend to have individual — have any rights to

Page 51

[1] the software that Richmar may have interfered
[2] with, so to speak. I'm trying to come up with the
[3] right word.
[4]    But that we wanted the code that we
[5] paid for for our uses.
[6]                    BY MR. GITNER:
[7]    Q: And Richmar agreed to give you a copy
[8] of the code, did it not?
[9]    A: Correct.
[10]    Q: And you had discussions with Richmar
[11] that they were giving you a copy of the code so
[12] that you can maintain and fix any bugs in the
[13] system; isn't that correct?
[14]    A: Yes.
[15]    Q: Did you ever receive any permission
[16] from Richmar that you could modify the code, to
[17] make enhancements to the code?
[18]    MR. THOMAS: Objection to form.
[19]    THE WITNESS: No. Did not consider it
[20] necessary.
[21]                    BY MR. GITNER:
[22]    Q: In your letter, you recognize in the

Page 52

[1] final paragraph that Richmar has certain ownership
[2] rights in the intellectual property, correct?
[3]    MR. THOMAS: Objection to form. The
[4] document speaks for itself.
[5]    THE WITNESS: It was our intention not
[6] to — it was our intention to recognize that if
[7] someone developed something, their knowledge of
[8] that, how they developed it, et cetera, we could
[9] not, in effect, erase.
[10]                    BY MR. GITNER:
[11]    Q: Let me read this paragraph into the
[12] record, the last paragraph, full paragraph.
[13] Subject to the foregoing we had expected that
[14] item 8 would be read as encompassing code that was
[15] provided or developed by GW and/or its employees -
[16] not code that was developed solely by Richmar. As
[17] I said above, it was not our intention to make
[18] Richmar erase its own intellectual property -
[19] which legally we have to right to do anyway.
[20]    What were you referring to as
[21] Richmar's intellectual property in this letter?
[22]    MR. THOMAS: Objection to form. Legal

Page 53

[1] conclusion.

[2]    THE WITNESS: I'm not actually sure,

[3] because this isn't my letter, as far as I know.

[4] My name doesn't appear here anywhere.

[5]                BY MR. GITNER:

[6]    Q: Did you prepare this letter?

[7]    A: I don't believe so.

[8]    Q: Did you have it prepared?

[9]    (Witness reviewed document.)

[10]    THE WITNESS: By counsel, I think.

[11]                BY MR. GITNER:

[12]    Q: You had it prepared by counsel; is

[13] that correct?

[14]    A: I believe so.

[15]    Q: As of January 5th, I would like to

[16] ask you again, what was your understanding, if you

[17] had any, as to what ownership Richmar had of the

[18] intellectual property in the DCMS?

[19]    MR. THOMAS: Objection to form. Asked

[20] and answered.

[21]    THE WITNESS: I can't hear you, James.

[22] I have a hearing problem.

Page 54

[1]    MR. THOMAS: Objection to form. Asked

[2] and answered. If you had a personal understanding

[3] of what Richmar's intellectual property was, you

[4] can answer.

[5]    THE WITNESS: Okay. My understanding

[6] was anything they wrote for us we had rights to

[7] and could modify but we could not, obviously, take

[8] out of their minds anything that they had created

[9] or anything they learned about the system while

[10] they were doing it, and they obviously had some

[11] rights to what they created mentally and

[12] intellectually.

[13]                BY MR. GITNER:

[14]    Q: But you didn't write this letter,

[15] counsel wrote this letter, correct?

[16]    MR. THOMAS: Objection to form.

[17] That's asked and answered, and I don't want to

[18] stray into privileged areas.

[19]    MR. GITNER: That's not privileged

[20] if you write a letter that is disclosed to the

[21] public, to the world.

[22]    MR. THOMAS: He has already asked and

Page 55

[1] answered that. I'm just warning you not to stray

[2] further into potential areas.

[3]                BY MR. GITNER:

[4]    Q: But you didn't write this letter, your

[5] counsel wrote this letter; is that correct?

[6]    A: I don't believe I wrote the substance

[7] of this letter, no.

[8]    Q: Well, again, was it counsel who wrote

[9] the letter, GW counsel?

[10]    MR. THOMAS: Objection to form. Asked

[11] and answered.

[12]    If you have a recollection.

[13]    THE WITNESS: I don't recall writing

[14] this letter myself, no.

[15]                BY MR. GITNER:

[16]    Q: Who do you recall writing the letter?

[17] You just testified a little while ago it was your

[18] legal counsel.

[19]    A: I —

[20]    MR. THOMAS: Now you're testifying,

[21] Geoff.

[22]    THE WITNESS: I believe it was either

Page 56

[1] written by counsel or written for me in

[2] conjunction with counsel.

[3]                BY MR. GITNER:

[4]    Q: This letter went out with your

[5] authorization, correct, Exhibit Number 3?

[6]    A: Yes. I did see it in advance.

[7]    Q: Again, I'll ask you when you wrote

[8] or when this letter went out, was it your

[9] understanding that Richmar would have the right

[10] to copyright the DCMS?

[11]    A: No. It was not my understanding.

[12] They had some intellectual rights to some of

[13] the work product that they developed but not

[14] copyright, in effect stopping GW from doing

[15] anything with the code because we paid for the

[16] development of the code.

[17]    Q: I'm not asking that. I'm asking you

[18] whether or not you understood as of January 5th.

[19] I'm asking you whether or not you understood as

[20] of January 5th that Richmar had the right to

[21] copyright the code?

[22]    MR. THOMAS: Objection. Asked and

Page 57

[1] answered. You may not like his answer.

[2]     But you can answer the question

[3] again.

[4]                    **BY MR. GITNER:**

[5]     **Q:** Well, give me a yes or a no and then

[6] you can explain it however you want.

[7]     **A:** No. I did not equate intellectual

[8] property with a copyright which would reduce GW's

[9] right to use the code any way they saw fit.

[10]     **Q:** So as of the date you wrote this

[11] letter, January 5th, it was your opinion, your

[12] understanding, that GW could make whatever changes

[13] it wanted to the DCMS code?

[14]     **A:** Correct, since we paid for the

[15] development of the code.

[16]     **Q:** And your position is that it could

[17] make whatever changes it wants. It doesn't have

[18] to be just a bug fix. It can be an alteration, a

[19] modification. It can be —

[20]     **A:** Or throw it out and not use it.

[21]     **Q:** Or expand it to other parts of the

[22] University, correct?

Page 58

[1]     **A:** Correct. That was my understanding.

[2]     **Q:** Let's go back, if we could, to GW's

[3] organization. ISS is what, a division or a

[4] department?

[5]     **A:** It's called a division, department,

[6] however. A large entity, a major entity within

[7] the University.

[8]     **Q:** And when you, for example, supervised

[9] the development of the DCMS for Personnel, where

[10] did you get the money for that? Was it out of

[11] Personnel's budget?

[12]     **A:** I was not deeply involved in the

[13] beginning of the process, like I said.

[14]     **Q:** Your —

[15]     **A:** I got into the process later as of my

[16] promotion, but —

[17]     **Q:** I don't care if —

[18]     **A:** — from knowing the budget, the

[19] budget, I believe, came from central funds, not

[20] from HR.

[21]     **Q:** From what?

[22]     **A:** Central funds, not HR's budget.

Page 59

[1]     **Q:** Central funds?

[2]     **MR. THOMAS:** I'm going to request,

[3] Geoff, that you give Mr. Bonig a chance to finish

[4] his answer before you follow up with the next

[5] question.

[6]                    **BY MR. GITNER:**

[7]     **Q:** I'm sorry. I guess my question to you

[8] is, when a division or an organization within GW

[9] wants to develop a computer system, do you have to

[10] get that out of your budget or do they have to get

[11] that out of their budget?

[12]     **A:** It works both ways, depending upon

[13] size, who wants it, how it happens, et cetera.

[14]     **Q:** Give me some for instances.

[15]     **A:** Okay. Minor modifications to a system

[16] might be funded either way. Major systems are

[17] generally funded centrally. It is a general,

[18] because I've seen all different funding mechanisms

[19] occur.

[20]     **Q:** When you say centrally, what do you

[21] mean by that?

[22]     **A:** In that it may serve a department but

Page 60

[1] it's paid for out of the beginning, I mean, the

[2] central funds because the University as a whole

[3] wants to support a specific system.

[4]     In other cases, where an individual

[5] department wants to have a system, for example, if

[6] Advancement wants to have a new system to solicit

[7] funds, they may pay for a new system.

[8]     If the University as a whole wants to

[9] make a modification to or purchase a system for

[10] broad use, it's generally but not always centrally

[11] funded.

[12]     There is no written specific rule on

[13] how that occurs. It occurs based on negotiations

[14] and funding and timing and the entity that is

[15] doing it, the use of the system, et cetera.

[16]     **Q:** For example, with the HR project,

[17] were you given — was ISS given a budget?

[18]     **A:** Correct.

[19]     **Q:** What if it went over that budget?

[20] What would you do?

[21]     **MR. THOMAS:** Objection.

[22]                    **BY MR. GITNER:**

CUS4, Inc. d/b/a Richman & Associates, et al.
George Washington University

Case 1:07-cv-00841-JR    Document 22-10    Filed 09/25/2007    Page 18 of 34

Ronald G. Bonig
June 5, 2007

Page 61

[1] Q: And you wanted to continue with the
[2] project?
[3] MR. THOMAS: Objection to form. Is
[4] that a hypothetical or is that a —
[5] MR. GITNER: It's a hypothetical.
[6] THE WITNESS: Generally, if we go over
[7] budget on a system, if it is because the user has
[8] driven the system larger, then the user pays, I
[9] think, most cases.
[10] If it's because we've mis-estimated
[11] the system or underestimated the system, we have
[12] to find the money inside ISS.
[13] That's the general rule. We eat our
[14] own mistakes, in effect.
[15] Q: Do each one of these divisions operate
[16] as a separate profit center?
[17] A: No. They're budgeted separately.
[18] Q: They're each budgeted separately?
[19] A: Yes.
[20] Q: So they do act as a separate profit
[21] center?
[22] A: Well, in a non-profit university,

Page 62

[1] profit center doesn't have the same meaning.
[2] Q: All right. But there are still —
[3] A: Your intent is the same.
[4] Q: — balance sheets at the end of the
[5] year, correct?
[6] A: Yes.
[7] Q: Would funds be earmarked for major
[8] development projects, for example, like the Human
[9] Resource project, in central funds?
[10] A: Generally, yes, but not always.
[11] Departments have leeway in their own budget to
[12] fund certain things.
[13] Q: These expansions in the future, for
[14] example, for financial aid, how will that be
[15] financed internally through the University?
[16] MR. THOMAS: Objection to form.
[17] BY MR. GITNER:
[18] Q: Will that go into Financial Aid's
[19] budget and then be shifted over to ISS?
[20] A: Could be.
[21] MR. THOMAS: Objection to form.
[22] Relevance. Since we're discussing internal

Page 63

[1] GW processes here, I want to designate for the
[2] record this transcript as confidential under
[3] the anticipated stipulated order governing
[4] confidential documents.
[5] BY MR. GITNER:
[6] Q: You said it could be. What do you
[7] mean by that?
[8] A: It could go either way. It could be
[9] centrally funded. It could be funded by the
[10] department. It happens multiple ways.
[11] Q: So it happens. And this is how these
[12] various procedures have occurred through your
[13] tenure with the ISS?
[14] A: Yes.
[15] Q: So, for example, let's just take
[16] Student Affairs. Let's take Admissions of the
[17] University, all right?
[18] If, for example, Admissions wants to
[19] have a DCMS system installed within their group,
[20] they could seek to have part of their budget
[21] allocated to that expansion, correct?
[22] A: They could.

Page 64

[1] Q: Would that money be physically
[2] transferred from their group to ISS, or is it
[3] a bookkeeping transfer?
[4] A: It could be either. It's happened
[5] both ways. We draw on their funds or we have a
[6] transfer into a project fund. I don't see the
[7] relevance of any of this, but —
[8] MR. THOMAS: Me, either.
[9] BY MR. GITNER:
[10] Q: Where will you get the manpower, ISS,
[11] if, indeed, the plans to expand the DCMS to other
[12] divisions and organizations at GW goes forward?
[13] You will have to expand your ISS, correct?
[14] A: We have done both in the past. We
[15] have hired supplemental programmers or we have
[16] done it internally. We always have the option of
[17] hiring folks in a surge or we have the option of
[18] stretching things out and doing them ourselves.
[19] That's always the case.
[20] Q: Well, what is the plan for expanding
[21] the DCMS to the other organizations?
[22] A: A little of both. Some things that

Page 65

[1] specifically have to do with the portions of any
[2] expansion that are related to other areas at GW or
[3] other systems in GW would probably be mostly done
[4] by my own staff.
[5]     If there were some specific things
[6] that had to do with another department, we may
[7] outsource that to a different group.
[8]     Q: Your position that as long as GW pays
[9] for the development of a system that GW has the
[10] ability do whatever it wants with that system,
[11] is that the same for employees as well as for
[12] independent consultants?
[13]     A: Yes.
[14]     Q: And in this case, Richmar was an
[15] independent consultant, correct? He wasn't an
[16] employee?
[17]     A: Correct.
[18]     Q: Did you ever investigate whether or
[19] not GW could obtain a copyright for the DCMS
[20] system?
[21]     A: No.
[22]     Q: Did anybody on your staff ever

Page 66

[1] investigate?
[2]     A: Not to my knowledge. No intention to.
[3]     Q: Did you ever investigate whether or
[4] not you would have to enter into a license
[5] agreement with Richmar in the event that you
[6] sought to make any type of modification, be it
[7] large or small?
[8]     A: No.
[9]     THE WITNESS: I'm just going to get a
[10] drink.
[11]     MR. THOMAS: Why don't we take a
[12] break, go off the record for a couple of minutes.
[13]     MR. GITNER: Sure.
[14]     (Brief recess.)
[15]             BY MR. GITNER:
[16]     Q: Can you tell me what the training and
[17] help desk is?
[18]     A: The what?
[19]     Q: Training and help desk.
[20]     A: There's two different things. I mean,
[21] training is a group that we have that trains our
[22] users on systems, all kinds of systems, everything

Page 67

[1] from Excel to Banner to EAS, et cetera.
[2]     Help desk is a call center where
[3] someone calls and says, I've got a problem with
[4] X, Y and Z.
[5]     Q: So it's like a support organization?
[6]     A: It's a support function, yes.
[7]     Q: Let me show you what has been
[8] previously marked as Plaintiff's Exhibit 8 from
[9] Vijay's deposition.
[10]     MR. GITNER: Actually, let's have that
[11] marked.
[12]     THE WITNESS: There's two things here.
[13]     MR. GITNER: Let me have that marked,
[14] please.
[15]     (Thereupon, Bonig Deposition Exhibit
[16] Number 4 was marked for identification.)
[17]             BY MR. GITNER:
[18]     Q: Let me show you what has been marked
[19] as Exhibit Number 4, which is DCMS Project
[20] Training and Help Desk Meeting, December 20th,
[21] 2006. Marcy Day is shown as an attendee. She was
[22] the Project Manager, correct?

Page 68

[1]     A: Correct.
[2]     Q: For the DCMS?
[3]     A: Correct.
[4]     Q: Under Meeting Notes, HR Personnel
[5] Implementation Plans, the DCMS was first released
[6] with HR Personnel, correct?
[7]     A: Yes.
[8]     Q: And then it was rolled out during
[9] January to what are called stakeholders?
[10]     A: Uh-huh. Yes.
[11]     Q: Where does that term stakeholders come
[12] from?
[13]     A: It's a common term in IT. In effect,
[14] the people who have an interest in the system.
[15]     Q: The people who paid for the system?
[16]     A: No, not paid, that have an interest in
[17] it.
[18]     Q: Let me read the first bullet point, if
[19] I could. HRS go-live is going well. There have
[20] been a few minor issues, which have been resolved.
[21]     Do you have any information that you
[22] are aware of that this statement on December 20th,

Page 69

[1] 2006 was not an accurate statement?

[2] **A:** No. For what was in Release 1, no.

[3] Release 1 was substantially less than we wanted,

[4] but they were pulling documents.

[5] **Q:** Was there an agreement between GW

[6] and Richmar that was prior to the UAT that the

[7] Document Only Search function would not be

[8] required to be included in Release Number 1?

[9] **A:** I don't have direct knowledge of

[10] that, no.

[11] **Q:** Is that one of your criticisms of the

[12] work that Richmar did, that a Document Only Search

[13] feature was not included in Release Number 1?

[14] **A:** I don't remember the specific Document

[15] Only Search.

[16] **Q:** Well, I'm asking you if that is one of

[17] your criticisms?

[18] **A:** I don't — no.

[19] **Q:** The second bullet point is, Stake-

[20] holder roll-out tentatively planned for January

[21] 22; there will be no code changes.

[22] Mr. Bonig, do you agree with that,

Page 70

[1] that no code changes were necessary to roll out

[2] the DCMS to the other stakeholders by January 22?

[3] **MR. THOMAS:** Objection to form. That

[4] misstates what is in the document.

[5] **BY MR. GITNER:**

[6] **Q:** Was that your understanding?

[7] **MR. THOMAS:** If you have an

[8] understanding, you can tell him.

[9] **THE WITNESS:** That's what it says.

[10] It's common, regardless of how good, bad or

[11] indifferent the system is, it's common to freeze

[12] the code at one point because you don't want to

[13] roll out multiple different versions.

[14] So even if it's got a hole in it,

[15] if you know where the hole is, you freeze the

[16] code and fix the hole until you get to another

[17] release.

[18] **BY MR. GITNER:**

[19] **Q:** Is that what happened with the DCMS

[20] Release Number 1?

[21] **A:** I believe so, yes.

[22] **Q:** And you approved that freeze, correct?

Page 71

[1] **A:** Yes.

[2] **Q:** The third bullet reads, Release 2

[3] is being evaluated to determine what will be in

[4] the release; tentatively planning release for

[5] mid-March. The release will contain bug fixes,

[6] cosmetic changes, and some enhancements.

[7] Based upon your prior experience,

[8] isn't that typical when you're rolling out a new

[9] design and development?

[10] **A:** Yes.

[11] **Q:** The paragraph goes on to read, Should

[12] not impact Desktop Support, but there will be

[13] training requirements.

[14] I take it Desktop Support are the

[15] users?

[16] **A:** Yes. In the — how the users use the

[17] system from their workstations. Sometimes there

[18] need to be changes in a workstation for a system,

[19] an agent put on the machine, et cetera. And there

[20] shouldn't be changes to the setup to the machines

[21] to use them.

[22] **Q:** So this appears to be a training and

Page 72

[1] help desk meeting where they're talking about

[2] essentially training people to use the system and

[3] if there are going to be any problems or not,

[4] right?

[5] **A:** Yes, and they're not assessing the

[6] functionality of the system.

[7] **Q:** Right, but apparently, they were able

[8] to train people to utilize the system?

[9] **A:** Yes.

[10] (Thereupon, Bonig Deposition Exhibit

[11] Number 5 was marked for identification.)

[12] **BY MR. GITNER:**

[13] **Q:** Let me show you what has been marked

[14] as Exhibit Number 5. This is a DCMS HR Personnel

[15] January 31, 2007. Are you familiar with this type

[16] of form?

[17] **A:** Yes.

[18] **Q:** What is the purpose of this?

[19] **A:** This is just agenda meeting notes.

[20] They're used all the way down at the lower

[21] technical levels and up to senior levels.

[22] **Q:** Your name is on here although it

Page 73

[1] doesn't appear you attended.

[2] **A:** Yes, if there is no X.

[3] **Q:** Why would your name be on this list?

[4] **A:** Well, there are a lot of committees

[5] and a lot of projects I'm interested in, and they

[6] notify me electronically of the meetings of all

[7] these different things. Some are overlaid three

[8] and four deep, and if I go, then an X appears and

[9] shows that I was at the meeting.

[10] **Q:** Would you as a matter of course review

[11] these notes?

[12] **A:** No.

[13] **Q:** After they were taken?

[14] **A:** Sometimes yes, sometimes no. There

[15] are dozens of meetings a week on different

[16] projects, and I can't possibly spend the time to

[17] read them all. I rarely read them at this level.

[18] **Q:** The first bullet shows that back

[19] scanning currently 85 percent complete. Do you

[20] see that?

[21] **A:** Uh-huh. Yes. Sorry.

[22] **Q:** So you were aware that Richmar was

Page 74

[1] continuing to scan in legacy documents as of

[2] January 31, right?

[3] **A:** Yes.

[4] **Q:** And you needed those legacy documents

[5] in the system so that you could more effectively

[6] utilize the system, correct?

[7] **A:** Sure, because the system didn't have

[8] all the documents in. They were very late on the

[9] schedule.

[10] **Q:** So you wanted to make sure those

[11] documents got in there, correct?

[12] **A:** Yep. We subsequently discovered that

[13] many of them were indexed wrong and had to go

[14] back.

[15] **Q:** Can you give me a percentage on how

[16] many were indexed wrong?

[17] **A:** No, I can't.

[18] **Q:** Have you —

[19] **A:** Most of the ones for Barbara Marshall,

[20] which was Faculty HR.

[21] **Q:** Have you asked anybody to determine

[22] how many were indexed improperly?

Page 75

[1] **A:** I don't believe so. I don't remember

[2] so.

[3] **Q:** Do you know if there is a written

[4] document that shows how many of them were indexed

[5] improperly?

[6] **A:** There may be. I don't have it.

[7] **Q:** So you don't know if it was 1 percent

[8] or .1 percent or 10 percent, correct, as you sit

[9] here now?

[10] **A:** Correct.

[11] **Q:** There are over a million documents

[12] that were scanned into the system, weren't there?

[13] **A:** I do not know. I know the box count

[14] was around 450 boxes. I don't know it by

[15] documents.

[16] **Q:** Would you expect there to be absolute

[17] perfection in indexing those documents?

[18] **A:** No.

[19] **Q:** Do you have any kind of standard

[20] margin of error for a project like that —

[21] **MR. THOMAS:** Objection to form.

[22] **THE WITNESS:** No.

Page 76

[1] **BY MR. GITNER:**

[2] **Q:** — that would be acceptable to you?

[3] **A:** Very small.

[4] **Q:** What is very small?

[5] **A:** Under a percent.

[6] **Q:** Do you know whether or not that is a

[7] best practice that is utilized by —

[8] **A:** I don't know what other people's

[9] standards are.

[10] **Q:** So that's just a subjective opinion on

[11] your part?

[12] **A:** Correct.

[13] **Q:** Have you been a project manager on a

[14] back scanning project?

[15] **A:** No.

[16] **Q:** Have you ever run a back scanning

[17] project?

[18] **A:** No.

[19] **Q:** Have you ever had a back scanning

[20] project of this magnitude operate under your

[21] supervision before?

[22] **A:** No.

Page 77

[1] **Q:** So you really don't have any
[2] experience with what the error rate would be
[3] on a back scanning project like this, do you?
[4] **A:** Microfilm a long time ago. I don't
[5] remember the error rate.
[6] **Q:** Microfilm is a little different than
[7] back scanning; would you agree with me?
[8] **A:** Yes.
[9] **Q:** So you don't have any prior
[10] experience?
[11] **A:** No.
[12] (Thereupon, Bonig Deposition Exhibit
[13] Number 6 was marked for identification.)
[14] **BY MR. GITNER:**
[15] **Q:** Let me show you what has been marked
[16] as Exhibit Number 6. This is another HR Personnel
[17] agenda meeting minutes, correct?
[18] **A:** Yes.
[19] **Q:** It shows that you are on the list but
[20] apparently you did not attend?
[21] **A:** True.
[22] **Q:** It shows that on the back scanning,

Page 78

[1] All documents should be loaded into production by
[2] the end of the week; do you see that?
[3] **A:** Yes.
[4] **Q:** Was that about when all the documents
[5] were loaded into the system?
[6] **A:** Approximately.
[7] **Q:** Middle of February?
[8] **A:** Some errors were found after that, but
[9] that was about the time when they were initially
[10] loaded.
[11] **Q:** Had any errors been found before this?
[12] **A:** Yes.
[13] **Q:** How many?
[14] **A:** Don't have a count.
[15] **Q:** Any complaints to Richmar about those
[16] errors?
[17] **A:** Yes.
[18] **Q:** Who made the complaints?
[19] **A:** I remember them at a meeting, a
[20] project meeting, probably in December. Maybe
[21] later, a little later than that.
[22] **Q:** A project meeting late in December?

Page 79

[1] **A:** Somewhere near the go-live date.
[2] **Q:** And what was the message that was
[3] conveyed to Richmar?
[4] **A:** I just remember that there was some —
[5] some people were complaining about the incorrect
[6] scanning and there were sheets called a PIDM
[7] sheet, which is — we were trying to get rid of
[8] SSNs, Social Security numbers, and PIDM sheets
[9] were sheets that were used instead of an SSN to
[10] identify someone and some people's documents were
[11] scanned under wrong PIDMs and things.
[12] **Q:** Did you terminate Richmar at that
[13] point?
[14] **A:** No.
[15] **Q:** From the back scanning project?
[16] **A:** No.
[17] **Q:** Did you terminate it at any point in
[18] January-February, when mistakes were found?
[19] **A:** No.
[20] **Q:** Did you warn them that if further
[21] mistakes were found, that you would have to
[22] terminate them? Did you give them any warning?

Page 80

[1] **A:** It was too close to the end anyway.
[2] **Q:** Did you ever give them any warnings?
[3] **A:** That what, we were going to terminate?
[4] **Q:** Yes.
[5] **A:** The clock was already running out.
[6] **Q:** I guess that's a no, you never gave
[7] them any warnings?
[8] **A:** No. I don't know why you would give a
[9] warning to someone who already knew when the clock
[10] was running out.
[11] **Q:** Do you know what percentage of
[12] documents had been loaded into the DCMS as of
[13] December 18?
[14] **A:** No. I don't recall.
[15] **Q:** Would you disagree that it was about
[16] 45 percent of the documents?
[17] **A:** Don't recall. I knew it wasn't 100
[18] percent, but I don't know how low.
[19] **Q:** Exhibit Number 6, if you have that in
[20] front of you, under Form Group/Form Names at the
[21] bottom, it says, All updates have been made.
[22] I guess in order to add a Form Group

Page 81

[1] or a Form Name, you would have to change the or
[2] make a modification to the DCMS?
[3] **MR. THOMAS:** Objection to form.
[4] If you know.
[5] **THE WITNESS:** There are tables that
[6] list the kind of forms, whether it's a form to
[7] change your W-4 or change your withholding or
[8] whether it's a form to elect benefits, et cetera.
[9] You have to establish a form type.
[10] **BY MR. GITNER:**
[11] **Q:** Right.
[12] **A:** This is Form 1, 2, 3, 4 or Form 5, 6,
[13] 7, 8, and it should be a table function that you
[14] just add to the code or add to the system.
[15] **Q:** So the system was being modified to
[16] have additional form groups and form names added
[17] to it, correct?
[18] **A:** I would assume, based on these notes,
[19] that that was correct.
[20] **Q:** Was this envisioned at the time that
[21] you approved Release Number 1, that additional
[22] modifications would be made for more form groups

Page 82

[1] and form names?
[2] **A:** Otherwise this is useless. Yes.
[3] **Q:** So there was —
[4] **A:** What's the use of a system where you
[5] can't add another form?
[6] **Q:** So there was nothing wrong with the
[7] DCMS for you to want to add these additional form
[8] groups or form names. This was just part of a
[9] matter of course, correct?
[10] **A:** Correct. That part was normal
[11] operations.
[12] **Q:** Did you see anything in any of these
[13] prior notes as of February 7th that there was any
[14] criticism of Richmar's development of the DCMS?
[15] **A:** Did I see them? No.
[16] **Q:** Did you believe as of December 7th,
[17] 2007, that Richmar had performed improperly in
[18] some manner in developing the DCMS?
[19] **MR. THOMAS:** Objection to form. I'm
[20] not sure what the latest 20 minutes of questions
[21] have to do with your motion for a preliminary
[22] injunction, but I've been pretty patient.

Page 83

[1] You can answer the question.
[2] **THE WITNESS:** Under function, over
[3] budget and late, and a trainer who is in this
[4] meeting or someone working a desktop in this
[5] meeting is not privy to those kinds of
[6] discussions.
[7] **BY MR. GITNER:**
[8] **Q:** Was that your opinion on December
[9] 18th, 2006?
[10] **A:** Yes.
[11] **Q:** I didn't get it. Under budget? I'm
[12] sorry. Over budget?
[13] **A:** Over budget, underperforming and late.
[14] We got less than we wanted later than we wanted it
[15] and more expensive than we wanted to spend.
[16] We had to go live because our
[17] documents were sitting in a warehouse and being
[18] scanned, so we were caught between a rock and a
[19] hard spot.
[20] (Thereupon, Bonig Deposition Exhibit
[21] Number 7 was marked for identification.)
[22] **BY MR. GITNER:**

Page 84

[1] **Q:** Let me show you what has been marked
[2] as Exhibit Number 7 and ask you if that is your
[3] signature on the second page.
[4] **A:** Yes.
[5] **Q:** Were you the author of this letter or
[6] did somebody else write this for you?
[7] **A:** I believe it was me and counsel.
[8] **Q:** On January 4th, was it your opinion
[9] that Richmar had over-estimated and — what were
[10] the three things you said before?
[11] **A:** I couldn't hear that. What?
[12] **MR. THOMAS:** Let's let the court
[13] reporter read back.
[14] (The record was read by the reporter
[15] as follows:
[16] Over budget, underperforming and
[17] late.)
[18] **BY MR. GITNER:**
[19] **Q:** When you wrote this letter, was that
[20] your opinion, that Richmar had been over budget,
[21] underperforming and late?
[22] **A:** Yes.

CUS4, Inc. d/b/a Richmar & Associates v. Ronald G. Bonig
CU34, Inc d/b/a Richmar Associates et al 22-10    Filed 09/25/2007    Page 24 of 43
George Washington University
June 5, 2007

Page 85

[1] **Q:** Was it your intention to withhold
[2] funds from Richmar as of January 4th, 2007?
[3] **A:** I don't believe so at that point.
[4] **Q:** Was it your intention on January 4th,
[5] 2007 to pay Richmar for its scanning work?
[6] **MR. THOMAS:** Objection to form.
[7] If you know.
[8] **THE WITNESS:** At that time, yes,
[9] before the problems were discovered.
[10]                    **BY MR. GITNER:**
[11] **Q:** And when were the problems discovered?
[12] **A:** When the documents were completed. I
[13] believe the last document was February the 7th or
[14] so.
[15] **Q:** The last scanned document, you mean?
[16] **A:** The prior — wait a minute.
[17] **MR. THOMAS:** While you are looking at
[18] that, Geoff, I would just like to ask you on the
[19] record how much longer you intend to utilize
[20] Mr. Bonig's time with respect to your contract
[21] claim as opposed to the motion for preliminary
[22] injunction and copyright claim.

Page 86

[1] **MR. GITNER:** I have read your implied
[2] license defense this morning. I think these all
[3] go to that.
[4] **MR. THOMAS:** Not in the least bit.
[5] **THE WITNESS:** The notes that you
[6] showed me, Exhibit 6 note that on the 7th of
[7] February, quote, All documents should be loaded
[8] into production by the end of the week.
[9]     Also, the next one says, Kris Moen
[10] reported he was unable to see any back scanned
[11] documents, et cetera, Tanya found a few cases
[12] where multiple documents were scanned as one.
[13]                    **BY MR. GITNER:**
[14] **Q:** So until approximately February 7th,
[15] you were unaware of these problems, the over
[16] budget, the underperforming and the late; is that
[17] correct?
[18] **A:** No. We were not unaware of those
[19] problems. We were aware of those problems.
[20] **Q:** But even though you were aware of
[21] those problems, you had not formulated an
[22] intention to withhold any payments from Richmar,

Page 87

[1] is that correct, until February 7?
[2] **MR. THOMAS:** Objection to form.
[3] **THE WITNESS:** They were still
[4] invoicing us. We hadn't discovered the problems
[5] yet.
[6]     It's not uncommon for us to hold
[7] payment until the end of the contract because they
[8] work up to the end of the contract, not withhold,
[9] but the normal payment cycle, and you pay at the
[10] end of the contract the final invoices.
[11]                    **BY MR. GITNER:**
[12] **Q:** I'm asking you when you found these
[13] problems. Was it as of February 7?
[14] **A:** The problems were, the problems were
[15] from the fall on.
[16] **Q:** But you have said that you found some
[17] problems that caused you to determine that you
[18] were going to withhold payment on or about
[19] February 7th.
[20] **A:** The back scanning problems, yes.
[21] **Q:** Those were the back scanning problems?
[22] **A:** Correct.

Page 88

[1] **Q:** That is what caused you to formulate
[2] that intention, correct?
[3] **MR. THOMAS:** Objection to form.
[4] **THE WITNESS:** One of them. One of
[5] them, yes.
[6]                    **BY MR. GITNER:**
[7] **Q:** Did you make any written record of
[8] that?
[9] **A:** I don't remember. I could have.
[10] I don't remember.
[11] **Q:** Do you remember what triggered that,
[12] what triggered you to come to that conclusion,
[13] that you should do that?
[14] **A:** The hours that my staff and the
[15] users had to spend dealing with and fixing
[16] problems that were occurring with the system,
[17] the fact that Barbara Marshall, for example,
[18] couldn't see anything, found that things were
[19] indexed incorrectly and a number of those problems
[20] that the technicians of the project staff have
[21] more detailed knowledge of that were causing GW
[22] to expend more and more time and money just to

Page 89

[1] get what had been delivered into production
[2] accurately.
[3]    Q: Do you know whether her inability to
[4] see the screen was a result of Richmar's work or
[5] GW's work to enhance the system?
[6]    A: Part of it was the scanning was
[7] incorrect, a major portion. I know that.
[8]    Q: The scanning of new documents?
[9]    A: Scanning of her historical, the way
[10] I understand it, the scanning of her historical
[11] faculty documents were done incorrectly and a
[12] large number were as delivered useless.
[13]    Q: Did you make a written memorandum
[14] of what it was that you felt were the problems
[15] that were Richmar's failures when you decided to
[16] withhold payment? Did you make any written record
[17] of that, of what those problems were?
[18]    A: Nothing formal.
[19]    Q: Have you ever made that, a written
[20] record of that?
[21]    MR. THOMAS: I'm going to instruct the
[22] witness to answer the question only insofar as it

Page 90

[1] was made in the ordinary course of business as
[2] opposed to in anticipation of litigation.
[3]    MR. GITNER: Well, I think he has
[4] answered that already.
[5]    THE WITNESS: Well, I don't recall
[6] specifically making a list of that, no.
[7]                 BY MR. GITNER:
[8]    Q: Did you tell anybody at the time that
[9] you came to this decision on or about February 7th
[10] that you were going to withhold payments from
[11] Richmar?
[12]    A: Yes.
[13]    Q: Did you tell anybody else?
[14]    A: The people who would issue the
[15] payment.
[16]    Q: And who would that be?
[17]    A: Well, it would be certified by the
[18] project staff, Marcy Day, or one of her folks, and
[19] probably reviewed by Christina Griffin and then it
[20] would go to the financial staff.
[21]    Q: I'm asking who you told.
[22]    A: Christina for sure. I don't know if

Page 91

[1] the other ones were at the meeting or were told at
[2] that time. Christina would be the key, because
[3] that's where I could intervene in the payment
[4] process and stop payment prior to it being issued.
[5]    Q: I'm asking you if you have a specific
[6] recollection of talking to them, not an assumption
[7] based on your past business practices.
[8]    Do you have a specific recollection
[9] of telling her that you were going to withhold
[10] payment?
[11]    A: I said, Hold them. I know I told her,
[12] Hold them for future discussion, Christina
[13] Griffin.
[14]    Q: Was anybody else present?
[15]    A: I do not recall.
[16]    Q: Where were you?
[17]    A: I don't recall exactly where. I have
[18] multiple offices. I don't remember exactly where
[19] I was.
[20]    Q: Do you remember the date you told her?
[21]    A: No, not firmly.
[22]    Q: Did you tell her why you were

Page 92

[1] withholding payment?
[2]    A: Yes.
[3]    Q: What did you tell her?
[4]    A: Errors, and we were spending too much
[5] of our own time and money fixing induced errors.
[6]    Q: How much money had you spent as of
[7] February 7th —
[8]    A: I don't know.
[9]    Q: — of your own money fixing these
[10] errors?
[11]    A: I don't know. As of February 7, I do
[12] not know.
[13]    Q: Did you look to see? Did you
[14] investigate to see?
[15]    A: In detail? No. I asked how the staff
[16] was working, what kinds of fixes and changes they
[17] were doing.
[18]    (Witness' phone ringing.)
[19]    THE WITNESS: Sorry. I should have
[20] done it in advance, but if I pick it up to do it
[21] now, I'm going to answer it.
[22]                 BY MR. GITNER:

Page 93

[1]  **Q:** Did you have any idea of how much
[2]  money your division had spent on these fixes, any
[3]  order of magnitude?
[4]  **A:** Oh, at that time I would say probably
[5]  low six figures.
[6]  **Q:** Well, did you investigate?
[7]  **A:** In detail, no.
[8]  **Q:** Did you ever ask to see the records so
[9]  you can make a determination?
[10]  **A:** Eventually, I did. At that time
[11]  period that you're asking about, I do not know.
[12]  I believe I asked for details later.
[13]  **Q:** How long did this conversation with
[14]  Christina last?
[15]  **A:** I have no idea. Christina is a
[16]  project office manager. I talk to her all the
[17]  time. I couldn't go back and reconstruct out of
[18]  my mind how long a specific conversation months
[19]  ago happened.
[20]  **Q:** You had a budget for the HR Personnel
[21]  project, correct?
[22]  **A:** Yes.

Page 94

[1]  **Q:** Had that been exceeded as of December
[2]  20th, 2006?
[3]  **A:** I believe so.
[4]  **Q:** So there was no more money in that
[5]  budget to make any fixes to the DCMS; is that
[6]  correct?
[7]  **A:** No. We were taking money out of the
[8]  Admin Apps budget, the other project budget,
[9]  reallocating money out of other projects.
[10]  **Q:** When had you met your budget? When
[11]  had you met the money that you had allocated for
[12]  the HR Personnel project?
[13]  **A:** In the fall sometime. Exact date, I
[14]  don't know. I believe we were over budget when I
[15]  came on the scene in October.
[16]  **Q:** Have you caused any investigation to
[17]  determine whether or not going over the budget,
[18]  what responsibility GW had for that, if any?
[19]  **A:** I asked some general questions. As to
[20]  looking at this function versus that function, no.
[21]  **Q:** There was an agreement, was there not,
[22]  I believe in October, to freeze what would be

Page 95

[1]  included in the release, correct?
[2]  **A:** Correct.
[3]  **Q:** Was there a requirement specification
[4]  document that set forth what was to be included in
[5]  Release Number 1?
[6]  **A:** There were draft documents. I had
[7]  seen memos. I believe Richmar put together a
[8]  document which documented what was in Release 1.
[9]      There was no formal approval of it.
[10]  It was accepted as de facto because there wasn't
[11]  enough time if we were going to go up and get our
[12]  documents on-line in December, there wasn't enough
[13]  time to do any major fixes or changes or anything
[14]  at that point anyway, so we accepted what was
[15]  there, knowing it wasn't what we desired or
[16]  expected originally.
[17]  **Q:** When you say what you expected or
[18]  desired originally, part of the project for
[19]  Richmar or with Richmar was to determine what
[20]  could be delivered and what was capable of being
[21]  delivered, correct?
[22]  **A:** Correct.

Page 96

[1]  **Q:** So things that you might have wanted
[2]  might not have been possible to deliver within
[3]  your budget; isn't that correct?
[4]  **A:** Correct.
[5]  **MR. THOMAS:** Objection to form.
[6]  **THE WITNESS:** All of them, correct.
[7]          **BY MR. GITNER:**
[8]  **Q:** In other words, it's a process, it's
[9]  an evolving process, correct?
[10]  **A:** Yes.
[11]  **Q:** Did Richmar present to GW a
[12]  requirements specification document setting forth
[13]  what it believed would be included in Release
[14]  Number 1?
[15]  **A:** I believe so, yes.
[16]  **Q:** Did they ask that you sign off on that
[17]  document?
[18]  **A:** I believe they did.
[19]  **Q:** Did you sign off on that document?
[20]  **A:** No, I did not.
[21]  **Q:** Why not?
[22]  **A:** Because I did not want to give

**Page 97**

[1] credence to the fact that that was what GW —

[2] that was all the requirements that GW had.

[3] **Q:** And why did you do that?

[4] **A:** Because what was developed was

[5] developed at that point and we froze the code as

[6] it was. Signing off on the document would have no

[7] effect.

[8] **Q:** Well, did you believe or did you lead

[9] Richmar to believe that if they provided that,

[10] that would be acceptable, what was in Release

[11] Number 1?

[12] **A:** That was Release 1.

[13] **Q:** So you didn't want to sign it because

[14] you didn't want to give any credence that you

[15] really agreed to it; is that it?

[16] **MR. THOMAS:** Objection to form.

[17] **THE WITNESS:** That it was the original

[18] specifications.

[19]             **BY MR. GITNER:**

[20] **Q:** You wanted to save your options for a

[21] future date; is that what you were doing?

[22] **A:** That was done from what was there.

**Page 98**

[1] It's documenting what had been done, not

[2] documenting what was desired. It was —

[3] **Q:** I'm asking —

[4] **A:** — post creation of the code.

[5] **Q:** By I'm asking you why you didn't sign

[6] off on it, and you said you didn't want to give it

[7] any credence.

[8] **A:** I didn't want to have anyone,

[9] including my own staff or my own managers, believe

[10] that we accepted that as it was everything that we

[11] wanted out of the system.

[12] **Q:** Was one of the reasons you didn't sign

[13] off on the document that you wanted to preserve

[14] your ability later on to seek a set-off against

[15] Richmar for the work that they had done?

[16] **A:** No, not at that time.

[17] **Q:** But you wanted to preserve a defense

[18] that what you were getting was not what you had

[19] envisioned; is that it?

[20] **A:** Yes.

[21] **MR. THOMAS:** Objection to form.

[22]             **BY MR. GITNER:**

**Page 99**

[1] **Q:** And once you had preserved that

[2] defense, what were you intending to do with it?

[3] **A:** If my boss had said, Why did you sign

[4] off on these requirements for a system that is

[5] inadequate, okay, my answer is, These requirements

[6] are as developed, not prior to the development.

[7] They're documenting what is there, not what we

[8] desired.

[9] **Q:** Mr. Bonig, do you have Exhibit

[10] Number 7 in front of you?

[11] **A:** Yes.

[12] **Q:** Exhibit Number 7, essentially, that

[13] you were saying to Richmar if they agreed on the

[14] DCMS close-out list, then they could go ahead and

[15] complete the tasks, I take it, the back scanning

[16] at that point; is that correct?

[17] **A:** Yes.

[18] **Q:** And that that would remain in full

[19] force and effect until February 15th, 2007?

[20] That's in the second paragraph.

[21] **A:** Second paragraph, yes.

[22] **Q:** And you then wrote, Upon satisfactory

**Page 100**

[1] completion of the tasks, contractor may invoice

[2] GWU for these services and payment will be made by

[3] GWU in accordance with Section 7 of the contract.

[4] You wrote that, correct?

[5] **A:** Yes.

[6] **Q:** Now, at the time that you wrote that,

[7] was it your contemplation to consider whether or

[8] not at a future date you would determine whether

[9] or not Richmar's work on the DCMS had been

[10] acceptable or not and whether or not you should

[11] withhold payments from them; is that correct?

[12] **MR. THOMAS:** Objection to form.

[13] **THE WITNESS:** I believe after the fact

[14] you're putting words in my mouth.

[15]             **BY MR. GITNER:**

[16] **Q:** At the time you wrote this letter in

[17] your mind did you retain this defense that Richmar

[18] had not delivered to GW everything that had been

[19] contemplated?

[20] **MR. THOMAS:** Objection to form. I

[21] don't know what you mean by defense.

[22] **THE WITNESS:** Richmar was paid for

Page 101

[1] what they did deliver. There were items that we
[2] had wanted in the system that were not delivered,
[3] and we agreed with Release 2 and 3 that those
[4] things would be added in the future.
[5]     We did not penalize, in effect,
[6] Richmar for not delivering those items that were
[7] agreed before UAT that weren't going to be in
[8] Release 1.
[9]                 BY MR. GITNER:
[10]    Q: When you wrote this, were you in your
[11] mind contemplating that at some future date, you
[12] would determine whether or not to pay Richmar for
[13] all of its invoices, on all of its invoices that
[14] were presented?
[15]    MR. THOMAS: Objection to form. Asked
[16] and answered. That's the last question on the
[17] contract item I am going to allow him to answer,
[18] Geoff. It is about 45 minutes on the contract
[19] claim.
[20]    You can answer the question.
[21]    THE WITNESS: I do not know exactly
[22] when I decided that the errors and the effort that

Page 102

[1] my staff had to expend fixing and altering and
[2] modifying the work to make it for useful required
[3] GW to, in effect, recover some of its own costs
[4] because of the poor performance discovered later
[5] in some places of Richmar's product.
[6]                 BY MR. GITNER:
[7]    Q: So you don't know whether or not you
[8] had that thought before or after you wrote this
[9] letter?
[10]    A: I don't remember the timing.
[11]    Q: So it could have been before?
[12]    A: Could have been before. It could have
[13] been after.
[14]    Q: I don't understand your testimony.
[15] You say that you got everything that you agreed to
[16] when the freeze was put on.
[17]    A: Delivered code.
[18]    Q: True?
[19]    A: As documented.
[20]    Q: Right.
[21]    A: When the freeze was put on.
[22]    Q: And you went through the UAT training

Page 103

[1] and it worked. You approved the UAT training?
[2]    A: Yes.
[3]    Q: Went into operation in December with
[4] Personnel?
[5]    A: Yes.
[6]    Q: Went into operation with the four
[7] other stakeholders in January?
[8]    A: With problems.
[9]    Q: Well, you say problems.
[10]    A: You say it went smoothly.
[11]    Q: Can you show me any documentation that
[12] said that there were any problems?
[13]    MR. THOMAS: Objection to form.
[14]    You can answer the question and after
[15] this question, we're going to take a lunch break
[16] and when we get back from lunch, you can decide to
[17] continue asking questions on your motion for
[18] copyright or we can discontinue, adjourn the
[19] deposition.
[20]    You can answer that question.
[21]    THE WITNESS: I do not have that
[22] documentation with me.

Page 104

[1]    MR. THOMAS: Okay. Let's take lunch
[2] unless you think you can finish before lunch, and
[3] if you think you can finish in the next little
[4] bit, we'll finish before lunch, or we can go ahead
[5] and take a lunch break.
[6]    MR. GITNER: I would like to know when
[7] we're going to get our code and all the other
[8] documents we have requested and you agreed to
[9] provide the other day.
[10]    MR. THOMAS: We can certainly discuss
[11] it off the record.
[12]    MR. GITNER: Okay. We'll go off the
[13] record for a second until we get an answer.
[14]    (Discussion held off the record.)
[15]
[16]    (Thereupon, at 12:02 p.m., a luncheon
[17] recess was taken.)
[18]
[19]
[20]
[21]
[22]

Page 105

[1]                    **AFTERNOON SESSION**

[2]      1:13 p.m.

[3]      **MR. GITNER:** Let's mark this as the

[4] next exhibit.

[5]      (Thereupon, Bonig Deposition Exhibit

[6] Number 8 was marked for identification.)

[7]      **MR. THOMAS:** Can you put the time on

[8] the record, please?

[9]      **THE REPORTER:** I did.

[10]     **MR. THOMAS:** Thanks.

[11]                    BY MR. GITNER:

[12]     **Q:** Let me show you what has been marked

[13] as Exhibit Number 8, Mr. Bonig. Do you recognize

[14] what that type of document is?

[15]     **A:** Code of some kind. It's copied into

[16] Wordpad. It's code copied into Wordpad, a way of

[17] presenting it instead of Word.

[18]     **Q:** On the last page there is a copyright.

[19] Do you see that? It says Copyright George

[20] Washington University 2006?

[21]     **A:** Uh-huh. Yes.

[22]     **Q:** Did you instruct anybody on your staff

Page 106

[1] to insert that copyright?

[2]      **A:** Nope.

[3]      **Q:** Do you know who inserted that?

[4]      **A:** No.

[5]      **Q:** Do you have any information about how

[6] that got on there?

[7]      **A:** No. First time I've seen it. First

[8] time I'm aware of.

[9]      **Q:** If you look on the first page of the

[10] exhibit, you see there is a copyright which says,

[11] Copyrighted by Richmar & Associates for GW

[12] University.

[13]     **MR. THOMAS:** Object to form. That's

[14] not what the document says.

[15]                    BY MR. GITNER:

[16]     **Q:** Could you read to me what it says

[17] since I don't have a copy in front of me?

[18]     **A:** HR.mainform.signature info.

[19]     **Q:** Let me have the document.

[20]     **MR. THOMAS:** He's reading the document

[21] correctly.

[22]                    BY MR. GITNER:

Page 107

[1]      **Q:** All right. Do you want to read —

[2]      **A:** I was reading that line. The next

[3] thing on the line was an at sign or a copyright

[4] sign, and then I was reading that specific line.

[5]      **Q:** Where it says, Copyright 2006,

[6] Developed by Richmar @ Associates for George

[7] Washington University, were you aware that that

[8] copyright characteristic was being added to the

[9] DCMS code?

[10]     **A:** No.

[11]     **Q:** Had you ever viewed the DCMS code?

[12]     **A:** Oh, hell, no. It's a decade since

[13] I've coded. I wouldn't know how to read the

[14] modern code.

[15]     **Q:** You testified earlier that the reason

[16] that you asked Richman to return to you all their

[17] design documents is so that you would know what is

[18] in the design; is that correct?

[19]     **A:** Yes.

[20]     **Q:** You also asked, however, in the

[21] checklist for Richmar to destroy its copy of the

[22] design documents; is that correct?

Page 108

[1]      **A:** I believe so.

[2]      **Q:** Why would you ask them to or how would

[3] it help you know what is in the design of the DCMS

[4] to have Richmar destroy its documents?

[5]      **MR. THOMAS:** Objection to form.

[6]      **THE WITNESS:** It wouldn't — pardon?

[7] It wouldn't.

[8]                    BY MR. GITNER:

[9]      **Q:** Why did you ask that they destroy

[10] their copy of the document?

[11]     **A:** Finished, they were — we'd paid them

[12] and they were finished with it, as far as I

[13] understood.

[14]     **Q:** When you asked them to destroy their

[15] copy of the development documents, was that

[16] because you were aware that GW did not own the

[17] copyright?

[18]     **A:** No.

[19]     **Q:** Or that you had not entered into a

[20] license agreement with them?

[21]     **A:** No.

[22]     **Q:** Are you aware of an application known

Page 109

[1] as Student Hire?

[2] **A:** Yes.

[3] **Q:** Can you tell me what the architecture

[4] of that system is?

[5] **A:** No.

[6] **Q:** Do you know when that program was

[7] conceived and developed?

[8] **A:** Somewhere in the last year. I don't

[9] have any tighter dates than that. It was not a

[10] major system.

[11] **Q:** Do you know whether Richmar was

[12] instructed to use struts as part of its

[13] development methodology?

[14] **A:** To use what?

[15] **Q:** Struts.

[16] **A:** Stress?

[17] **Q:** Struts.

[18] **A:** Struts?

[19] **Q:** Yes.

[20] **A:** No. No idea.

[21] **Q:** Do you recall having a meeting with

[22] Richard Gordon in the middle of December 2006?

Page 110

[1] **A:** We met multiple times. I don't — I

[2] assume we had one about that time.

[3] **Q:** Do you recall having a meeting with

[4] Mr. Gordon in which you discussed the extension

[5] of the contract or the lack of extension of the

[6] contract?

[7] **A:** We talked about the possibility of

[8] having a few people for a few weeks after we went

[9] live, yes.

[10] **Q:** And as part of that discussion,

[11] did you and he talk about whether or not the

[12] January 6, 2006 contract would be extended?

[13] **A:** We talked about that briefly because

[14] the scanning was also outstanding and would be

[15] historically for another five weeks or so, so we

[16] had no contract mechanism.

[17] They weren't going to complete on

[18] time regardless of what the original contract

[19] was.

[20] **Q:** Do you recall Mr. Gordon asking you

[21] if GW wanted to extend the contract, the January 6

[22] contract?

Page 111

[1] **A:** I believe at that time we said yes.

[2] **Q:** You recall him saying that, correct?

[3] **A:** Yes.

[4] **Q:** Do you recall telling him that you

[5] felt that you could not extend the contract?

[6] **A:** I don't believe so.

[7] **Q:** Did you tell him that you would extend

[8] the contract?

[9] **A:** I said I think we'd consider it.

[10] **Q:** Did you ever tell him —

[11] **A:** Or probably. Either probably or

[12] consider it.

[13] **Q:** Did you ever tell him that you felt

[14] that there were problems with the contract?

[15] **A:** With the contract?

[16] **Q:** Yes.

[17] **A:** No, not with the document.

[18] **Q:** Do you deny that you told him that?

[19] **A:** Do I deny it?

[20] **Q:** Yes.

[21] **A:** I don't remember, so I guess I

[22] deny it.

Page 112

[1] **Q:** Were you aware when you had that

[2] conversation with Mr. Gordon that the contract,

[3] the January 6 contract, had failed to retain

[4] the copyright interests for George Washington

[5] University?

[6] **MR. THOMAS:** Objection to form.

[7] Could you read me that question,

[8] please?

[9] (The record was read by the reporter

[10] as follows:

[11] Were you aware when you had

[12] that conversation with Mr. Gordon that

[13] the contract, the January 6 contract,

[14] had failed to retain the copyright interests

[15] for George Washington University?)

[16]

[17] **MR. THOMAS:** Same objection.

[18] **THE WITNESS:** No.

[19] **BY MR. GITNER:**

[20] **Q:** Does George Washington University have

[21] a standard computer system development contract?

[22] **A:** No.

Page 113

[1] Q: Do you know whether or not your
[2] division, ISS, and George Washington have ever
[3] entered into a contract in which they retained the
[4] copyright's interests?
[5] A: I do not know.
[6] Q: Do you have a written policy regarding
[7] contracting for computer program development?
[8] A: Not for specific computer program
[9] development, no. We have procurement rules.
[10] Q: Pardon me?
[11] A: Normal, standard procurement rules but
[12] not for specific program development.
[13] Q: So you have a policy manual for
[14] procurement?
[15] A: General contracting, buying,
[16] et cetera.
[17] Q: And in that policy, are there
[18] provisions with regard to ownership of the
[19] creative works and the intellectual property?
[20] A: I do not know.
[21] (Thereupon, Bonig Deposition Exhibit
[22] Number 9 was marked for identification.)

Page 114

[1]                    BY MR. GITNER:
[2] Q: Let me show you what has been marked
[3] as Exhibit Number 9.
[4] MR. THOMAS: Do you have a copy?
[5] MR. GITNER: I'm sorry.
[6]                    BY MR. GITNER:
[7] Q: Mr. Bonig, this is the contract with
[8] Richmar that was signed off by GW on January 6.
[9] Have you ever seen a copy of this before?
[10] A: Yes, I have.
[11] Q: When was the first time you saw a copy
[12] of this contract?
[13] A: I do not know. I was not involved in
[14] it early on in the process. I don't remember
[15] exactly where down the road I saw it.
[16] Q: Do you recall, was it in 2006?
[17] A: Yes, in 2006.
[18] Q: Do you recall the circumstances in
[19] which you first reviewed this document?
[20] A: No. No, I do not.
[21] Q: You are unaware of whether or not it
[22] was in the first half of 2006, the second half of

Page 115

[1] 2006, the fall of 2006? You couldn't be able to
[2] pinpoint it?
[3] A: It was not early in 2006. I would say
[4] it was in the second half of 2006.
[5] Q: And why do you say that?
[6] A: That's my —
[7] Q: Is that just a guess?
[8] MR. THOMAS: Don't guess. If you
[9] don't know, you don't know.
[10] THE WITNESS: I had virtually no
[11] involvement in it early on. I did not become
[12] involved until budgeting issues later in the year,
[13] so it had to be summer of 2006.
[14]                    BY MR. GITNER:
[15] Q: Can you tell me why you would have
[16] been looking at this contract?
[17] A: Originally, budgetary responsibility.
[18] The contract, as we said, was running hot, meaning
[19] if you draw a straight line on a graph, at the
[20] current burn rate, we're going to run out of
[21] money.
[22] And so I got involved on the financial

Page 116

[1] side to see what the burn rate was and a few
[2] things like that. I was not involved at that
[3] point in any substantive part of the Documentum or
[4] the DCMS system, only in the, you now, what the
[5] burn rate was, where are we going to find money to
[6] complete it, et cetera.
[7] Q: And do you recall what the status was
[8] of the budget that had been set aside for the HR
[9] project from the first review of the contract?
[10] A: Still had money, but running hot. If
[11] we continued at the same rate, we'd overrun the
[12] budget.
[13] Q: Had you been appointed the interim CIO
[14] at that point?
[15] A: No. No. That was approximately six
[16] months before then.
[17] Q: When you became the interim CIO, had
[18] the budget been exceeded?
[19] A: Yes.
[20] Q: Had the budget been exceeded prior to
[21] your appointment as the interim?
[22] A: Yes. I believe it went red somewhere

Page 117

[1] around October the 1st, approximately. But in
[2] that time, short — in that period.

[3]   **Q:** Do you know how it was that Richmar
[4] was selected for this contract?

[5]   **A:** I was not involved. I've only heard
[6] hearsay type comments.

[7]   **Q:** Were they selected because of their
[8] expertise in Documentum?

[9]   **A:** I can't say that.

[10]   **Q:** Do you have any information as to why
[11] they were or what capabilities they had that led
[12] to their being hired by GW?

[13]   **A:** No.

[14]   **Q:** Based upon your knowledge and custom
[15] and practice, who would have been in charge of
[16] selecting Richmar?

[17]   **A:** Anne Marie Taylor.

[18]   **Q:** And she was the Project Manager on
[19] this project?

[20]   **A:** She was the Executive Director for
[21] Administrative Applications. The project teams
[22] reported to her.

Page 118

[1]   **Q:** Do you know what the process would
[2] have been to select a vendor for this contract?

[3]   **A:** The process normally would be check
[4] Dun & Bradstreet, check references, get a — at
[5] least interview several companies, compare their
[6] capabilities and bids, et cetera.

[7]      There are, under GW's procurement
[8] rules, there are ways to sole source. There are
[9] ways to compete.

[10]   **Q:** But one qualification would have
[11] to have been Richmar's capability and expertise
[12] in this area, Documentum, and putting together
[13] large-scale document retrieval and management
[14] systems, correct?

[15]   **MR. THOMAS:** Objection to form. Are
[16] you asking him hypothetically, or are you asking
[17] him based on his knowledge of what happened here?

[18]      You can have him clarify the question
[19] before you answer.

[20]   **THE WITNESS:** Yeah. Would you clarify
[21] the question?

[22]              **BY MR. GITNER:**

Page 119

[1]   **Q:** Was Richmar hired or was one of the
[2] reasons Richmar was hired was its experience and
[3] expertise in the area of designing and developing
[4] document management systems?

[5]   **A:** That's what I was told by Anne Marie
[6] Taylor.

[7]   **Q:** Did GW have the expertise in-house to
[8] build a document management system such as DCMS,
[9] build and, I should say, design and build?

[10]   **A:** Probably could have. We've done many
[11] similar systems of similar size, not specific
[12] document systems. The decision is always a choice
[13] as to whether to build in-house or go outside,
[14] depending upon other priorities, staffing,
[15] in-house knowledge, training, et cetera.

[16]   **MR. THOMAS:** Can we go off the record?

[17]      (Discussion held off the record.)

[18]   **MR. THOMAS:** Can we take a break,
[19] please?

[20]      (Brief recess.)

[21]              **BY MR. GITNER:**

[22]   **Q:** Did GW have any Documentum or Captiva

Page 120

[1] expertise on staff?

[2]   **A:** Some.

[3]   **Q:** What would that have been?

[4]   **A:** Oh, one of our project leaders, Rick
[5] Gilchrist, had experience from a prior position.

[6]   **Q:** Had he ever done any programming
[7] utilizing Documentum or Captiva?

[8]   **A:** I don't know the details of his exact
[9] experience.

[10]   **MR. GITNER:** Let's have this marked as
[11] the next exhibit.

[12]      (Thereupon, Bonig Deposition Exhibit
[13] Number 10 was marked for identification.)

[14]              **BY MR. GITNER:**

[15]   **Q:** Let me show you what has been marked
[16] as Exhibit Number 10 and ask if you can identify
[17] that document.

[18]   **MR. THOMAS:** Just for the record, this
[19] document has been marked by GW as Attorneys' Eyes
[20] Only pursuant to the draft confidentiality order I
[21] have provided to counsel and expect to be signed
[22] forthwith.

Page 121

[1] **MR. GITNER:** I'll tell you right now
[2] I'm not agreeing Attorneys' Eyes Only for
[3] technical documents.
[4] **MR. THOMAS:** In that case, I'm going
[5] to ask on the record that the documents that
[6] were produced earlier in order to expedite the
[7] preliminary injunction hearing be returned to GW
[8] immediately insofar as they are marked Attorneys'
[9] Eyes only.
[10] **MR. GITNER:** You should have brought
[11] this up before the court. We'll take it up with
[12] the court.
[13] **BY MR. GITNER:**
[14] **Q:** Can you identify this document?
[15] **A:** Oh, I can read it. It says Master
[16] Services Agreement with Crown Partners and GW.
[17] **Q:** And that was entered on January 2nd,
[18] 2007?
[19] **A:** That's what it says.
[20] **Q:** Can you tell me who was involved in
[21] negotiating that contract from ISS?
[22] **A:** I can't tell you exactly who was

Page 122

[1] involved.
[2] **Q:** Were you aware that ISS was going to
[3] enter into that contract?
[4] **A:** I knew that they were talking to Crown
[5] Partners, yes.
[6] **Q:** How far in advance of January 2nd were
[7] you aware that somebody was talking to Crown
[8] Partners?
[9] **A:** Don't remember.
[10] **Q:** When was Crown Partners first
[11] contacted?
[12] **A:** Don't know.
[13] **Q:** Did you approve the hiring of Crown
[14] Partners?
[15] **A:** Ultimately, I had to.
[16] **Q:** Whose idea was it to seek their help?
[17] **A:** Don't know.
[18] **Q:** Were you involved in the decision to
[19] hire Crown Partners?
[20] **A:** Only in effect, only as much as it's
[21] in ISS and I'm involved — everything that expends
[22] money in ISS ultimately I have to approve, but

Page 123

[1] as to the details of that relationship or that
[2] contract or who talked to them first, no, I don't
[3] know.
[4] **Q:** Where did the money come from to pay
[5] Crown Partners, what division?
[6] **A:** Out of Application, Administrative
[7] Application funds and lapsed salary that we were
[8] allowed to reuse.
[9] **Q:** And what were they hired to do?
[10] **MR. THOMAS:** If you know. If you
[11] don't know, you don't —
[12] **THE WITNESS:** Exactly, I don't know.
[13] **BY MR. GITNER:**
[14] **Q:** Generally, what were they hired to
[15] do? You don't know at all what they were going to
[16] do?
[17] **A:** Work on — work with EMC's Documentum.
[18] They were an EMC partner. That, I know.
[19] **Q:** Would you look at paragraph 5 of the
[20] exhibit?
[21] **A:** Okay.
[22] **Q:** Well, strike that.

Page 124

[1] So they were hired to work with
[2] Documentum; is that correct?
[3] **A:** Yes.
[4] **Q:** And help develop the DCMS system?
[5] **A:** They, from what I remember, they were
[6] specifically — I can't even say that.
[7] It was my impression from remembering
[8] certain project meetings that they were hired to
[9] help in the expansion of the Documentum product
[10] from EMC to other departments later in the year.
[11] **Q:** Would you take a look at paragraph
[12] number 5?
[13] **A:** Uh-huh.
[14] **Q:** Paragraph number 5 provides, does it
[15] not, that GW will retain all rights to any
[16] intellectual property that is created under the
[17] Crown Partners contract, correct?
[18] **A:** I'm not a lawyer, so —
[19] **Q:** Are you aware of what the substance —
[20] **A:** I'd have to read these four or five
[21] paragraphs. You're not allowing me time to.
[22] Would you like me to read them?

**Page 125**

[1]    Q: If you think you need to, go ahead.
[2] Are you not aware of that as you sit here right
[3] now, that under the Crown Partners contract with
[4] GW, GW retained all of the creative rights and
[5] intellectual property rights?
[6]    A: I was not aware that specific
[7] provision was in this contract.
[8]    Q: Did you review this contract before
[9] it was executed?
[10]    A: Probably went through it quickly, yes.
[11]    Q: Can you tell me —
[12]    A: Probably. I do not remember exactly.
[13]    Q: Who was in charge of this contract for
[14] ISS?
[15]    A: I do not know. I know the area. It
[16] would be in the Administrative Applications area.
[17]    Whether the subject matter specialist
[18] the way it's organized under the programming side
[19] would have done it versus the project side, I
[20] don't remember.
[21]    Q: Well, can you tell me why in this
[22] GW would have needed to have a specific clause

**Page 126**

[1] retaining to itself the intellectual property
[2] rights for an expansion of the DCMS when the
[3] Richmar contract did not include it?
[4]    MR. THOMAS: Objection to form.
[5]             BY MR. GITNER:
[6]    Q: Why was there a need now to have it?
[7]    A: Do not know.
[8]    Q: You were paying Crown Partners for its
[9] work, right?
[10]    A: Yes.
[11]    Q: Your position is if you pay for it,
[12] you own it, right?
[13]    A: Yes.
[14]    Q: Why would it be necessary to have this
[15] intellectual property provision in the contract?
[16]    MR. THOMAS: Objection to form.
[17] If you know. You've already
[18] testified —
[19]    THE WITNESS: I'm not a lawyer. I
[20] don't know.
[21]             BY MR. GITNER:
[22]    Q: Did you have any discussions with

**Page 127**

[1] anyone to make sure that the contract with Crown
[2] Partners retained the intellectual property rights
[3] for GW?
[4]    A: Do not remember any such discussions.
[5]    Q: Pardon me?
[6]    A: I do not remember any such discussion.
[7]    Q: You don't remember it. Do you deny
[8] that it occurred?
[9]    A: I don't remember it.
[10]    Q: Crown Partners was given access to
[11] GW's — what do you call it — CVS computer
[12] system?
[13]    A: Is that a statement or a question?
[14]    Q: That's a question.
[15]    A: I do not know.
[16]    Q: You don't know?
[17]    A: I would not be involved at that level.
[18]    Q: His declaration, Mr. Gilchrist says,
[19] In order to review the code, Kevin Burns from
[20] Crown Partners was given access to GW's Virtual
[21] Private Network.
[22]    Were you aware of that?

**Page 128**

[1]    A: No, but it would be very common for
[2] any of our contractors to be given access or they
[3] couldn't work on our network.
[4]    Q: Were you aware that prior to Mr. Burns
[5] being given access, that he was going to review
[6] the DCMS code?
[7]    A: No.
[8]    Q: Has GW taken any steps to prevent
[9] Crown Partners from making a copy of the DCMS
[10] code?
[11]    A: I do not know.
[12]    Q: Would you consider Crown Partners to
[13] be a competitor of Richmar in the Documentum area,
[14] development area?
[15]    A: Not really.
[16]    Q: Why not?
[17]    A: Because they're a much larger, more
[18] functional and certified company.
[19]    Q: Why didn't you hire them, then, in
[20] January of 2006?
[21]    A: Good question for someone else.
[22]    Q: Do you know why?

Page 129

[1] **A:** No.

[2] **Q:** Do you believe that Richmar charged

[3] prevailing market rates for its work, or did it

[4] give GW a discount under the contract?

[5] **A:** I'd have to go back and look at the

[6] rates. I don't know.

[7] **MR. THOMAS:** And what in the world —

[8] **BY MR. GITNER:**

[9] **Q:** Are you aware —

[10] **MR. THOMAS:** — does that have to

[11] do with your copyright infringement claim, Geoff?

[12] **BY MR. GITNER:**

[13] **Q:** Are you aware of whether or not

[14] Richmar made an investment in time to provide

[15] George Washington with the DCMS, develop the DCMS?

[16] **MR. THOMAS:** Objection to form.

[17] **THE WITNESS:** What do you mean by

[18] investment of time?

[19] **BY MR. GITNER:**

[20] **Q:** Gave their time at no cost?

[21] **MR. THOMAS:** At no cost?

[22] **THE WITNESS:** They got paid.

Page 130

[1] **BY MR. GITNER:**

[2] **Q:** They gave some of their time at no

[3] cost, correct?

[4] **A:** Not aware.

[5] **Q:** Did you ever have any conversations

[6] with Mr. Gordon in which you discussed the

[7] investment that Richmar was making in the DCMS?

[8] **A:** By investment, are you talking about

[9] something free?

[10] **Q:** No. Investment could be sweat equity,

[11] reduced rates. An investment, do you recall

[12] having any discussion with him in which —

[13] **A:** No, I do not.

[14] **Q:** — you and he discussed that Richmar

[15] was making an investment in the DCMS?

[16] **A:** Not in those words, no.

[17] **Q:** Exhibit Number 9, if you could?

[18] **A:** Uh-huh.

[19] **Q:** Are you aware that this contract ran

[20] or had a one-year term to it, paragraph 2?

[21] **MR. THOMAS:** If you're not aware —

[22] **THE WITNESS:** I wasn't aware at the

Page 131

[1] time.

[2] **BY MR. GITNER:**

[3] **Q:** Did you ever become aware of it?

[4] **A:** Yes.

[5] **Q:** Obviously, by the time you got —

[6] **A:** Yeah. By the time we were in December

[7] and talking about it, whether we were going to

[8] have the folks, some of the folks work a little

[9] past that or not, yes, I was involved with that.

[10] **Q:** Do you see paragraph 3?

[11] (Witness reviewed document.)

[12] **BY MR. GITNER:**

[13] **Q:** Could you just look at paragraph 3?

[14] **A:** Uh-huh.

[15] **Q:** And that states, The agreement shall

[16] end upon termination date or upon 30-day written

[17] notice from one party to the other.

[18] Do you see that?

[19] **A:** Yes.

[20] **Q:** Were you aware prior to December 18th,

[21] 2006 that you could terminate the contract with 30

[22] days' written notice?

Page 132

[1] **A:** Yes.

[2] **Q:** When did you first become aware of

[3] that?

[4] **A:** Sometime in the fall when we

[5] discussed — when I got involved in it on a more

[6] detailed basis, when I looked at this in detail.

[7] **Q:** Did you ever consider giving Richmar

[8] notice in terminating them?

[9] **A:** Absolutely.

[10] **Q:** When did you consider that?

[11] **A:** Almost immediately upon taking over

[12] in October.

[13] **Q:** Did you ever give them 30-day notice?

[14] **A:** No, I did not.

[15] **Q:** Why not?

[16] **A:** Because we were so far in, we had

[17] invested so much already, the only reasonable

[18] approach we had was to try to finish it out and

[19] get Release 1, whatever Release 1 could consist

[20] of.

[21] **Q:** And at the time that you made that

[22] decision did you consider that once Release 1,

Page 133

[1] the work on Release 1 was finished, that you would
[2] then approach Richman about being compensated
[3] for their inadequate work, that GW would be
[4] compensated?

[5]    A: Not at that time no.

[6]    Q: The thought never crossed your mind?

[7]    MR. THOMAS: Objection to form.

[8]                        BY MR. GITNER:

[9]    Q: Is that correct?

[10]    A: Not then, no.

[11]    Q: Did you have any discussions with
[12] anybody prior to December 18th, 2006, anybody on
[13] your staff, about whether or not you should
[14] terminate Richman?

[15]    A: Yeah. Around the October time frame,
[16] like I said.

[17]    Q: Who did you talk to?

[18]    A: My boss.

[19]    Q: Who is your boss?

[20]    A: Dave Swartz, who was the CIO at that
[21] time. I believe Christina Griffin. Maybe Marcy
[22] Day, also.

Page 134

[1]    Q: Were these people all present at the
[2] same time?

[3]    A: No.

[4]    Q: When you talked to Mr. Swartz, was it
[5] just you and he?

[6]    A: Yes.

[7]    Q: Do you recall when you spoke with him?

[8]    A: Within ten days after being appointed
[9] to take over from Anne Marie Taylor.

[10]    Q: Can you tell me the substance of your
[11] conversation with Mr. Swartz?

[12]    A: That I thought the project was in
[13] trouble and we had a couple of options. One was
[14] play it out since we'd already poured so much
[15] money down the rat hole or, you know, pay them off
[16] and try to take over ourselves. We discussed the
[17] various options.

[18]    Q: What did you decide?

[19]    A: That the only reasonable approach
[20] given how much we already had put into it was to
[21] try to finish out the base contract and get what
[22] we could.

Page 135

[1]    Q: Was there any discussion between you
[2] and Mr. Swartz at that time of withholding any
[3] payments to Richman?

[4]    A: No.

[5]    Q: So the contemplation at that point was
[6] to pay them off for their work; is that correct?

[7]    A: And get Release 1.

[8]    Q: With Ms. Griffin, do you recall, when
[9] did you speak to her?

[10]    A: In the same time frame. I don't know
[11] the exact date.

[12]    Q: What was the substance of your
[13] conversation with her?

[14]    A: Basically the same. We were sitting
[15] around trying to figure out what the possibilities
[16] were, what the options were.

[17]    Q: And what were the options that you
[18] discussed with her?

[19]    A: Basically the same thing. Finish it
[20] as it was, terminate the contract or follow
[21] through, finish out the contract as it existed
[22] and try to get something useful out of the

Page 136

[1] project.

[2]    Q: So your testimony is you didn't find
[3] out until mid-February that there were sufficient
[4] problems that you felt it would be reasonable to
[5] withhold payment; is that your testimony?

[6]    A: No.

[7]    MR. THOMAS: Objection to form.

[8]    THE WITNESS: Problems existed then
[9] with how items were being resolved between the
[10] teams with Richman not on-site; problems with how
[11] the code was, quote, unquote, dropped, meaning
[12] changes to the code were brought in by Richman's
[13] employees or contractors and given to us; problems
[14] in some of the interfaces where we thought that it
[15] would be best if we had Richman and GW staff
[16] working together to shorten the time frame and
[17] not, in effect, cost us more money as we went back
[18] and forth and back and forth.

[19]    Problems were in the process at that
[20] point, later as we got closer to testing, closer
[21] to the User Acceptance Testing, when we looked at
[22] the kind of problems we had and had to decide

Page 137

[1] whether or not we could do work-arounds, whether
[2] we could accept it as it was, whether it had
[3] enough functionality to go live; would users be
[4] upset, et cetera, and then eventually into
[5] problems with performance; the problems with the
[6] systems; the problems with the scanning, with the
[7] indexing, et cetera.
[8]          BY MR. GITNER:
[9]     Q: But other than the indexing and the
[10] scanning, the other problems you just discussed
[11] you knew about in 2006? As a matter of fact —
[12]    A: Some of them.
[13]    Q: — apparently around October of 2006.
[14]    A: Some of them in 2006, some of them as
[15] the system was installed, some of them as we
[16] developed, as people started, as began to use the
[17] system, other things popped up.
[18]     That's why the Mantis tickets were
[19] created for the specific things that you pointed
[20] out in your other exhibit.
[21]    Q: But what were the problems that popped
[22] up in February that broke the camel's back, in

Page 138

[1] other words?
[2]    MR. THOMAS: Objection to form.
[3] Again, we are now an hour back into this
[4] deposition. You have done about five minutes
[5] on copyright infringement and the rest on some
[6] type of contract claim or contractual defenses.
[7]     You can answer the question, but I
[8] think we're getting close to having to cut this
[9] off, Geoff.
[10]     You can answer.
[11]    THE WITNESS: Can you read it back?
[12]    (The record was read by the reporter
[13] as follows:
[14]     But what were the problems that
[15] popped up in February that broke the camel's
[16] back, in other words?)
[17]
[18]    THE WITNESS: There were a list of
[19] problems. I don't have all of them right in front
[20] of me, so I can't give you an exact. Which one of
[21] the Mantis tickets we got this February versus we
[22] found out earlier, I don't know which is which.

Page 139

[1]          BY MR. GITNER:
[2]    Q: So up until that point, you were going
[3] to pay Richmar for all its work on the scanning,
[4] and after that you decided not to, correct?
[5]    A: That developed. The irritation at GW
[6] on the lack of functionality of the system and the
[7] problems we had with the scanning developed over a
[8] period of time, and the idea of re-compensating or
[9] compensating ourselves, in effect, for all the
[10] work we had to do came about.
[11]    MR. GITNER: Give me a few minutes, if
[12] you could, to take a break.
[13]    (Brief recess.)
[14]    (Thereupon, Bonig Deposition Exhibit
[15] Number 11 was marked for identification.)
[16]    MR. GITNER: All set?
[17]    MR. THOMAS: Geoff, I would encourage
[18] you to conclude your examination before 2:30, when
[19] we adjourn to speak to the court, so to the extent
[20] you have additional items that are relevant to the
[21] motion for preliminary injunction, I would suggest
[22] that you do that and complete those by 2:30.

Page 140

[1] Thanks.
[2]          BY MR. GITNER:
[3]    Q: Let me show you what has been marked
[4] as Exhibit Number 11, Mr. Bonig.
[5]    A: Yes.
[6]    Q: Do you recognize this letter? Can you
[7] identify this letter?
[8]    A: Yes.
[9]    Q: And what is this letter?
[10]    A: A letter to Richard because he had
[11] been writing to Lou Katz and calling Lou Katz's
[12] office about the fact that he hadn't gotten paid
[13] and this is basically saying our analysis showed
[14] that, You didn't perform. We're not going to pay
[15] you for some of the invoices.
[16]    Q: Is that your signature, sir?
[17]    A: Yes.
[18]    Q: Did you author this letter?
[19]    A: Yes.
[20]    Q: You say that over the past few weeks
[21] or the past weeks, you had asked your staff to
[22] review Richmar's performance. Can you tell me

Page 141

[1] when you asked them to first do that?

[2] A: Well, they review the performance of

[3] a contract all the way along the process.

[4] This was done specifically as to what

[5] we were billed for, when we were billed for it,

[6] what changes had to be made that we were re-billed

[7] for and what changes had to be made to the

[8] indexing for the scanned documents, et cetera.

[9] Q: But I'm asking you, it says here,

[10] Over the past weeks I have asked my staff.

[11] I'm asking you, when did you ask them

[12] to do this review?

[13] A: Well, in those past weeks, I assume.

[14] This is dated March 23rd.

[15] Q: What would you have meant by past

[16] weeks? One week? Two weeks? Three weeks?

[17] A: Probably end of February, beginning

[18] of March, in that time frame.

[19] Q: And what caused you to ask that your

[20] or what caused you to request your staff to do

[21] that?

[22] A: An increasing awareness of all the

Page 142

[1] problems that had been dumped on our laps, in

[2] effect, because of the Richmar code and the

[3] scanning and the inadequacy of the system.

[4] Q: Was it just a coincidence that your

[5] review coincided with Richmar's finishing its work

[6] on the back scanning project?

[7] MR. THOMAS: Objection to form.

[8] THE WITNESS: Don't know. Don't know

[9] what the timing was.

[10] BY MR. GITNER:

[11] Q: Did you start your review after

[12] Richmar had completed all its work on the back

[13] scanning project?

[14] A: Don't remember the exact timing.

[15] Q: Can you tell me who you asked to

[16] perform this review?

[17] A: The financial and the project people,

[18] who were aware of what was delivered and when it

[19] was delivered and the problems in the Mantis

[20] tickets, et cetera.

[21] Q: Well, did you put somebody in charge

[22] of reporting back to you what the results of the

Page 143

[1] review were?

[2] A: Yes. I believe that was Christina

[3] Griffin.

[4] Q: Did she ever give you a written

[5] report?

[6] A: I believe she showed me one. I don't

[7] remember if I have a copy.

[8] Q: When did she show you one?

[9] A: In this time frame. Don't know

[10] exactly when, what date.

[11] Q: How many pages was it, approximately?

[12] A: Don't remember.

[13] Q: What was the caption? What was the

[14] title?

[15] A: I don't remember.

[16] Q: Do you know what it contained?

[17] MR. THOMAS: You can answer that

[18] question yes or no. I think we're starting to

[19] stray into privileged areas in anticipation of

[20] litigation.

[21] THE WITNESS: I agree.

[22] MR. THOMAS: You can answer the

Page 144

[1] question yes or no.

[2] THE WITNESS: Yes, I remember some of

[3] the things.

[4] BY MR. GITNER:

[5] Q: Was this document prepared for your

[6] lawyers?

[7] MR. THOMAS: Let's go off the record.

[8] There's potential privilege issues.

[9] We're off.

[10] (Brief recess.)

[11] MR. GITNER: What is the question?

[12] (The record was read by the reporter

[13] as follows:

[14] Was this document prepared for

[15] your lawyers?)

[16]

[17] THE WITNESS: It was prepared for me

[18] and for counsel. For me and for counsel.

[19] BY MR. GITNER:

[20] Q: Oh, counsel. You and for counsel?

[21] A: Yes.

[22] Q: I couldn't hear what you said. Your

Page 145

[1] testimony is that until a few weeks prior to the
[2] date of this letter, March 23rd, 2007, you had
[3] never contemplated withholding money from Richman
[4] for alleged inadequacies in its development of the
[5] system; is that correct?
[6]     **MR. THOMAS:** Objection to form. The
[7] record speaks for itself.
[8]     You can answer the question.
[9]           **BY MR. GITNER:**
[10]   **Q:** Is that correct?
[11]   **A:** No, it's not correct.
[12]   **Q:** When did you?
[13]   **A:** I told you before I don't remember
[14] exactly when. It wasn't this late. It wasn't as
[15] early as your prior question, which was in the
[16] fall, October, November or whatever it was.
[17]   **Q:** Well, was it before you entered — I
[18] believe you testified you had not formulated that
[19] position at the time you wrote your January 5th
[20] letter, correct?
[21]   **A:** I believe that's true.
[22]   **Q:** So you formulated this position

Page 146

[1] somewhere between January 5th and March 23rd,
[2] correct, or actually, weeks before March 23rd?
[3]   **A:** I believe that's the time frame.
[4]   **Q:** So that would be somewhere between
[5] January 5th and, let's say, end of February?
[6]   **A:** I believe so.
[7]   **Q:** But you don't recall whether or not
[8] it was before or after Richman finished working on
[9] the scanning project?
[10]   **A:** I do not remember specifically.
[11]   **Q:** Did you discuss your position with
[12] Mr. Katz before you wrote this on March 23rd?
[13]     **MR. THOMAS:** Objection to form.
[14]     **THE WITNESS:** Yes.
[15]           **BY MR. GITNER:**
[16]   **Q:** In here you say, Their preliminary
[17] findings. Whose preliminary findings? Would that
[18] be Christina Griffin?
[19]   **A:** And her team.
[20]   **Q:** And who is her team?
[21]   **A:** It would Marcy Day, Rick Gilchrist
[22] and individual programmers that worked across

Page 147

[1] different —
[2]   **Q:** When you —
[3]   **A:** — versions.
[4]   **Q:** Sorry. When you wrote this on March
[5] 23rd, did you have a document that included their
[6] preliminary findings?
[7]   **A:** I had seen a document, yes.
[8]   **Q:** What did these preliminary findings
[9] contain?
[10]     **MR. THOMAS:** Objection to form.
[11]     Actually, I think I'm going to object
[12] to that on the basis of attorney-client privilege,
[13] because the document, he testified, had been
[14] prepared for himself and counsel.
[15]     I instruct the witness not to answer.
[16]           **BY MR. GITNER:**
[17]   **Q:** Was this document anything other than
[18] a listing of alleged defects in the DCMS system?
[19]     **MR. THOMAS:** You can answer that
[20] question yes or no.
[21]     **THE WITNESS:** Yes.
[22]           **BY MR. GITNER:**

Page 148

[1]   **Q:** Was there a request for advice in this
[2] document from counsel?
[3]   **A:** I'm sorry?
[4]   **Q:** Was there a request for legal advice
[5] in this list, in this document, the preliminary
[6] findings?
[7]     **MR. THOMAS:** You can answer that
[8] question yes or no.
[9]     **THE WITNESS:** I don't believe so.
[10]     **MR. GITNER:** Why is it privileged?
[11]     **MR. THOMAS:** Because he testified that
[12] the document was prepared —
[13]     **MR. GITNER:** For him.
[14]     **MR. THOMAS:** — for himself and for
[15] counsel and it is prepared for counsel in order to
[16] receive legal advice, whether or not there is a
[17] specific request for legal advice in the document
[18] itself.
[19]     It doesn't have to be a specific
[20] request for legal advice in order for the document
[21] to be privileged.
[22]           **BY MR. GITNER:**

Page 149

[1] **Q:** Is that the only list that you are
[2] aware of that shows or critiques the alleged
[3] malfunctions?
[4] **MR. THOMAS:** Objection to form.
[5] **BY MR. GITNER:**
[6] **Q:** Is that the only list?
[7] **A:** No.
[8] **Q:** What other lists are there?
[9] **A:** Mantis tickets, programmer notes,
[10] those types of things.
[11] **Q:** In your letter, you say that Richmar
[12] failed miserably in its attempts to perform under
[13] the contract. How did they attempt to fail
[14] miserably?
[15] **MR. THOMAS:** How did they attempt to
[16] fail miserably? Was that the question?
[17] **MR. GITNER:** Bad question.
[18] **BY MR. GITNER:**
[19] **Q:** How did they fail miserably in its
[20] attempts — it's his letter — to perform under
[21] the contract?
[22] **A:** Let me count the ways. Start from the

Page 150

[1] beginning in the original analysis of what was
[2] required in the HR department; how that was
[3] translated into requirements; how those were
[4] programmed; how they were interfaced with the
[5] Banner; how the scanning was established; the
[6] procedures for providing the documents back to us.
[7] The quality control procedures that
[8] were used in the scanning area didn't even pick up
[9] the fact that there were bad scanners being used.
[10] People scanned hundreds if not thousands of
[11] documents on a scanner that you couldn't read.
[12] The PIDM sheets weren't in the right
[13] area to identify documents by individual. The
[14] indexing was completely wrong in a major area.
[15] Those are the ones I can remember offhand.
[16] **Q:** What evidence did you have that they
[17] had billed for work not delivered?
[18] **A:** We had some indications or some
[19] comments from some of the subcontractors that
[20] had worked on X or Y functionality that was not
[21] delivered at the end.
[22] **Q:** Have you ever computed or calculated

Page 151

[1] how much you contend Richmar has billed for work
[2] not delivered?
[3] **A:** No.
[4] **Q:** Had you made such a calculation at the
[5] time you wrote this letter on March 23rd?
[6] **A:** I don't believe so.
[7] **Q:** What evidence do you have of work that
[8] they did incorrectly?
[9] **A:** Well, rework tickets through Mantis
[10] where something was delivered, didn't work, had to
[11] be sent back, it was delivered again, didn't work,
[12] had to be sent back.
[13] **Q:** Had you reviewed those Mantis tickets
[14] as of the date you wrote this letter, March 23rd?
[15] **A:** I had reviewed some of them, yes. Not
[16] every one.
[17] **Q:** Which ones? How did you decide which
[18] ones to review?
[19] **A:** Speaking with the staff said, Show me
[20] an example of where something occurred.
[21] **Q:** So you were shown examples?
[22] **A:** Yes.

Page 152

[1] **Q:** Did you make a record of which Mantis
[2] tickets you reviewed?
[3] **A:** No.
[4] **Q:** What evidence do you have of work
[5] outside the scope of the engagement by Richmar?
[6] **MR. THOMAS:** Objection to form.
[7] Sitting here today.
[8] **THE WITNESS:** Pardon?
[9] **MR. THOMAS:** If you recall sitting
[10] here today, then that's fine. Again, I struggle
[11] to understand what this has to do with the motion
[12] for preliminary injunction on copyright
[13] infringement.
[14] **THE WITNESS:** Okay. Tasks that were
[15] in excess of the requirements that were frozen in
[16] October.
[17] **BY MR. GITNER:**
[18] **Q:** Such as?
[19] **A:** I don't remember specifically right
[20] now.
[21] **Q:** Did you ever make a list of these?
[22] **A:** Pardon?

CUSA, Inc. d/b/a Richmar & Associates, et al.
George Washington University

Ronald G. Bonig
June 5, 2007

Page 153

[1]   **Q:** Do you have a list of these somewhere?

[2]   **A:** No. I don't have a list.

[3]   **Q:** Did you ever calculate how much time

[4] Richmar spent on these tasks outside the scope of

[5] the engagement?

[6]   **A:** I didn't. I don't know if somebody

[7] else did.

[8]   **Q:** Have you ever seen them?

[9]   **A:** I don't remember if I've seen it in

[10] that form.

[11]   **Q:** What form have you seen it in?

[12]   **MR. THOMAS:** Objection to form. I'm

[13] going to instruct the witness not to —

[14]                 **BY MR. GITNER:**

[15]   **Q:** Would this be in the docket of

[16] so-called privileged document?

[17]   **MR. THOMAS:** You can answer the

[18] question yes or no.

[19]   **THE WITNESS:** Yes.

[20]                 **BY MR. GITNER:**

[21]   **Q:** How did Richmar deliver a seriously

[22] flawed work product? Would it be anything other

Page 154

[1] than what you testified to a few seconds ago,

[2] minutes ago?

[3]   **A:** Just what I testified before, in that

[4] Release 1 was a barely functional system that

[5] allowed the simple pulling of a document when we

[6] had expected, desired and hopefully contracted for

[7] a much more functional system at that time and

[8] cost.

[9]   **Q:** But you knew all that in November and

[10] December of 2006, didn't you?

[11]   **A:** We knew what was planned at that

[12] point. It hadn't been delivered until December.

[13]   **Q:** Well, you knew it was —

[14]   **A:** It hadn't been tested and used

[15] extensively until after that.

[16]   **Q:** So you knew what the work product was

[17] in November and December of 2006?

[18]   **A:** Not all.

[19]   **Q:** Not all.

[20]   **A:** You buy a car. You find later the

[21] transmission doesn't clink right. You don't know

[22] it the day you buy it.

Page 155

[1]   **Q:** Well, when did you find out what was

[2] flawed in the work product that you didn't know

[3] about on December 18th, 2006 as of March 23rd

[4] here?

[5]   **MR. THOMAS:** Objection to form.

[6]   **THE WITNESS:** I don't remember some of

[7] the specific details.

[8]   **MR. THOMAS:** If you know the details

[9] that were determined after December 18th — is

[10] that the date in your question?

[11]   **MR. GITNER:** Yes.

[12]   **MR. THOMAS:** — of what was determined

[13] to be problems with the deliverables, then —

[14]   **THE WITNESS:** I don't have that in

[15] memory.

[16]                 **BY MR. GITNER:**

[17]   **Q:** Do you remember any of them? I mean,

[18] it is a seriously flawed work product.

[19]   **MR. THOMAS:** If you recall sitting

[20] here today. It's not a memory test.

[21]   **THE WITNESS:** I don't.

[22]                 **BY MR. GITNER:**

Page 156

[1]   **Q:** You were aware when you wrote this

[2] letter that GW owed Richmar some over $230,000,

[3] weren't you?

[4]   **A:** About that.

[5]   **Q:** And you were aware, were you not,

[6] that GW did not have a license to make any

[7] modifications to the DCMS system?

[8]   **MR. THOMAS:** Objection to form.

[9]   **THE WITNESS:** No.

[10]                 **BY MR. GITNER:**

[11]   **Q:** You weren't aware? Did you have a

[12] license?

[13]   **MR. THOMAS:** Calls for a legal

[14] conclusion.

[15]   You can answer the question if you

[16] know one way or the other.

[17]                 **BY MR. GITNER:**

[18]   **Q:** Did you have a license from Richmar

[19] in March? Did you have a written license from

[20] Richmar in March of 2007?

[21]   **A:** No.

[22]   **Q:** And you knew that you had a written

Page 157

[1] contract with Crown Partners at that same time
[2] that provided that you would retain or GW would
[3] retain all the ownership rights to any creative
[4] works or intellectual property, right?
[5]    **MR. THOMAS:** Objection to form. I
[6] think that misstates his testimony —
[7]                **BY MR. GITNER:**
[8]    **Q:** Is that correct?
[9]    **MR. THOMAS:** — concerning that
[10] contract.
[11]    But you can answer.
[12]    **THE WITNESS:** You reminded me by
[13] showing me the contract.
[14]                **BY MR. GITNER:**
[15]    **Q:** Right. You've seen it today. GW had
[16]
[17]    **A:** Correct.
[18]    **Q:** Right.
[19]    **A:** Today.
[20]    **Q:** And you knew Richmar was a small
[21] company. It's not a big company, correct?
[22]    **A:** Yes.

Page 158

[1]    **Q:** And you were aware, were you not, that
[2] by alleging that Richmar had developed a seriously
[3] flawed work product, that Richmar would have to
[4] instigate legal proceedings if it wanted to get
[5] paid, correct?
[6]    **MR. THOMAS:** Objection to form.
[7] If that was your understanding.
[8]    **THE WITNESS:** I guess I assume so.
[9]                **BY MR. GITNER:**
[10]    **Q:** And the reason or a reason that you
[11] withheld that money was in order to exert leverage
[12] over Richmar in the event that they sought to
[13] protect their copyright interests; isn't that
[14] correct?
[15]    **A:** Nope.
[16]    **Q:** Is it your testimony it's all just a
[17] big coincidence that right after Richmar completes
[18] the back scanning contract that you withhold
[19] further payment for that work; that is just a
[20] coincidence?
[21]    **MR. THOMAS:** Objection to form.
[22]                **BY MR. GITNER:**

Page 159

[1]    **Q:** Is that your testimony?
[2]    **A:** No.
[3]    **MR. THOMAS:** He answered your
[4] question.
[5]                **BY MR. GITNER:**
[6]    **Q:** So the fact that Richmar had completed
[7] the work was a factor in your timing, was it not,
[8] of informing them that they would no longer be
[9] paid or withholding payment, correct?
[10]    **A:** Yes.
[11]    **Q:** And you knew this and you had
[12] formulated this opinion or position at the same
[13] time that Richmar was completing its work on the
[14] back scanning project; isn't that correct?
[15]    **A:** When they had our documents, yes.
[16]    **Q:** Have you had any discussions with
[17] anyone on your staff as to whether or not GW will
[18] be required to enter into a license agreement with
[19] Richmar in the event that the court finds that GW
[20] has improperly made modifications to the DCMS
[21] system?
[22]    In other words, have you considered

Page 160

[1] that if GW is found to have infringed or may
[2] infringe in the future, that you may have to enter
[3] into a license arrangement with Richmar in the
[4] event that you want to make further modifications
[5] to the system?
[6]    **A:** I don't recall any opportunity or time
[7] that I've discussed that with the staff.
[8]    **Q:** What is your understanding of what
[9] will happen if it is found that GW is not
[10] permitted to make modifications to the DCMS system
[11] in order to roll it out to other divisions of the
[12] University?
[13]    **MR. THOMAS:** Objection to form. That
[14] calls for a hypothetical. Who knows until we
[15] litigate this case?
[16]    If you have made contingency plans,
[17] you can testify. If not, I'm not clear how you
[18] can answer that question.
[19]    **THE WITNESS:** I have not made
[20] contingency plans, didn't think it likely.
[21]                **BY MR. GITNER:**
[22]    **Q:** Are you aware of whether or not GW

Page 161

[1] ISS Division reviewed Exhibit Number 9, the
[2] contract, before it was executed? Do you know if
[3] anybody in your group reviewed it? That's the
[4] contract, the Richmar contract.
[5]    A: Yes. It would have gone through a
[6] normal review process.
[7]    Q: What would that have entailed?
[8]    A: Different people review the contract
[9] for different things. At the time that I saw
[10] the contract, if I saw it earlier, and I don't
[11] remember having seen it, but if I saw it earlier
[12] than when I got involved, I would have seen it and
[13] probably, now that I think about it, did see it
[14] for budgetary implications, not as to what — the
[15] provisions of the contract. Do we have the money?
[16]    Because at the time this contract was
[17] issued, I had no responsibility for Docmentum or
[18] DCMS. My only responsibilities were that I
[19] budget management in ISS, so any review that I
[20] did prior to October would have been, Do we have
[21] money that's been cited by the manager who is
[22] citing funds, in effect, to pay for this?

Page 162

[1]    Other people would have reviewed it
[2] for other aspects, legal review, or are the right
[3] signature places in the right boxes? That kind of
[4] thing.
[5]    Q: Was it a matter of course to have
[6] these types of contracts reviewed by legal? Did
[7] they have legal review on them?
[8]    A: Generally.
[9]    Q: Is there like a cut-off level, a
[10] certain sum?
[11]    A: There are criteria. It has to do
[12] with a number of things, the kind of thing,
[13] purchase versus contract versus agreements versus
[14] a standard, like a service level agreement, which
[15] is like a user agreement.
[16]    Q: In any case, ISS had the opportunity
[17] to have this reviewed by legal, should they want
[18] to, correct?
[19]    A: It's always an option.
[20]    Q: You have an in-house legal staff that
[21] does this sort of thing?
[22]    A: Yes.

Page 163

[1]    Q: So there weren't any prohibitions on
[2] getting legal review here?
[3]    A: No.
[4]    MR. THOMAS: It is a couple of minutes
[5] before 2:30. If you have any additional questions
[6] on your contract copyright infringement claim, you
[7] should probably wind it up.
[8]    MR. GITNER: We can adjourn here. Let
[9] me just look through my outline and see if we have
[10] any further things, but I think this would be a
[11] good spot.
[12]    I think I have actually a couple more.
[13]    MR. THOMAS: You can't review those
[14] documents. We'll read and sign.
[15]    MR. GITNER: Wait. Wait. I just said
[16] I had a couple more.
[17]    MR. THOMAS: Oh. I thought you said
[18] you didn't have any.
[19]    MR. GITNER: Let's mark this.
[20]    (Thereupon, Bonig Deposition Exhibit
[21] Number 12 was marked for identification.)
[22]        BY MR. GITNER:

Page 164

[1]    Q: Let me show you what has been marked
[2] as Exhibit Number 12 and ask if you can identify
[3] this document.
[4]    (Witness reviewed document.)
[5]    THE WITNESS: I saw something like
[6] this. I have to make an assumption it's this one.
[7]        BY MR. GITNER:
[8]    Q: Do you recall going over this document
[9] with Mr. Gordon personally, face-to-face?
[10]    A: In detail, no.
[11]    Q: Having a session with him in which
[12] this document was present?
[13]    A: A document similar to this. I don't
[14] know if this was the exact one.
[15]    Q: And that was in around October of
[16] 2006?
[17]    A: Middle of October.
[18]    Q: And that was a time when a freeze was
[19] put on further development of the Document Only
[20] Search function, correct?
[21]    A: Yes.
[22]    Q: And Mr. Gordon asked you to sign off

**Page 165**

[1] on this document, correct?

[2] **A:** I don't remember on this one.

[3] **Q:** You don't remember that?

[4] **A:** No.

[5] **Q:** Do you remember telling him you

[6] wouldn't sign off on the document?

[7] **A:** No.

[8] **Q:** Do you remember ever telling Mr.

[9] Gordon to the effect that the reason why you

[10] didn't want to sign off on the document is that

[11] you'll know it when you see it or, Let me know

[12] when it's soup? Are either one of those

[13] characterizations familiar to you?

[14] **A:** No.

[15] **Q:** Is that a term that you would use,

[16] that you have used in the past, Let me know when

[17] it's soup?

[18] **A:** I don't think so. I don't recall

[19] that, no.

[20] **Q:** Well, do you recall expressing to

[21] Mr. Gordon the sentiment essentially that you

[22] didn't want to sign off on this document but you

**Page 166**

[1] would know what it would be that you would want in

[2] Release Number 1 when you saw it?

[3] **A:** No, I don't remember that sentiment.

[4] **Q:** How is Richmar supposed to know what

[5] GW wanted in Release Number 1 unless GW signed off

[6] on a requirements specification?

[7] **A:** The reason that we froze the system at

[8] that time is because we wanted to freeze the

[9] requirements that they were working to at that

[10] time.

[11] **Q:** Well, how —

[12] **A:** So, so that the scope would not creep

[13] past the point where we had any hope of delivering

[14] a usable system in a reasonable amount of time.

[15] **Q:** Is there any written document that

[16] shows what was to be included in Release Number 1

[17] at the time it was frozen, as you just testified

[18] to?

[19] **A:** I believe there was a document that

[20] was an after fact documentation of what Release 1

[21] entailed. It's not this document.

[22] **Q:** There was an after the fact document

**Page 167**

[1] after Release 1?

[2] **A:** Not after it went live but after the

[3] freeze. There was documentation of what was in

[4] Release 1.

[5] **Q:** Do you know what the name of that

[6] document was?

[7] **A:** No, I don't. It's similar to this,

[8] I believe. I don't think it's this one, but I

[9] believe there is another document.

[10] **Q:** Was that prepared by Richmar?

[11] **A:** Yes.

[12] **Q:** Did GW sign off on that?

[13] **A:** No.

[14] **MR. GITNER:** I have no further

[15] questions at this time.

[16] **MR. THOMAS:** We'll read and sign.

[17]

[18]     (Thereupon, at 2:28 p.m., the

[19] deposition was adjourned.)

[20]

[21]     (Reading and signature not waived.)

[22]

**Page 168**

[1]      CERTIFICATE OF NOTARY PUBLIC

[2]      I, LU ANNE DAWSON, the officer before

[3] whom the foregoing deposition was taken,

[4] do hereby certify that the witness whose testimony

[5] appears in the foregoing deposition was duly sworn

[6] by me; that the testimony of said witness was

[7] taken by me in shorthand and thereafter reduced to

[8] typewriting by me; that said deposition is a true

[9] record of the testimony given by said witness;

[10] that I am neither counsel for, related to, nor

[11] employed by any of the parties to the action in

[12] which this deposition was taken; and, further,

[13] that I am not a relative or employee of any

[14] attorney or counsel employed by the parties

[15] thereto, nor financially or otherwise interested

[16] in the outcome of the action.

[17]

[18]

[19]

              LU ANNE DAWSON

[20]         Notary Public in and for

              the District of Columbia

[21]

     My Commission expires:

[22] November 30, 2009

Page 169

[1]        **READING AND SIGNING PROCEDURE**

[2]

[3]        The Deposition of RONALD G. BONIG was

[4] taken in the matter, on the date, and at the time

[5] and place set out on the title page hereof.

[6]        It was requested that the deposition

[7] be taken by the reporter and that same be reduced

[8] to typewritten form.

[9]        It was agreed by and between counsel

[10] and/or the parties and/or the Deponent that the

[11] Deponent will read and sign the transcript of said

[12] deposition.

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]                    · ·

[22]

Page 170

[1]        CERTIFICATE

[2]

[3] STATE OF _____ :

[4] COUNTY/CITY OF _____ :

[5]

[6]        Before me, this day, personally

[7] appeared RONALD G. BONIG, who, being duly sworn,

[8] states that the foregoing transcript of his/her

[9] Deposition, taken in the matter, on the date, and

[10] at the time and place set out on the title page

[11] hereof, constitutes a true and accurate transcript

[12] of said deposition.

[13]

[14]

[15]

[16] SUBSCRIBED and SWORN to before me this

[17] _____ day of _____,

[18] 2007, in the jurisdiction aforesaid.

[19]

[20]

[21]

[22] My Commission Expires       Notary Public

Page 171

[1]        DEPOSITION ERRATA SHEET

[2] CASE CAPTION: CUS4, Inc. d/b/a Richmar Associates

         v. George Washington University, et al.

[3]

[4] DEPONENT: RONALD G. BONIG

[5] DEPOSITION DATE: June 5, 2007

[6]        I have read the entire transcript of

[7] my Deposition taken in the captioned matter or the

[8] same has been read to me. I request that the

[9] changes noted on the following errata sheet be

[10] entered upon the record for the reasons indicated.

[11]        I have signed my name to the Errata

[12] Sheet and the appropriate Certificate and

[13] authorize you to attach both to the original

[14] transcript.

[15]

[16] PAGE/LINE     CHANGE         REASON

[17]

[18]

[19]

[20]

[21] SIGNATURE:_____ DATE:_____

[22]        RONALD G. BONIG

Page 172

[1] PAGE/LINE     CHANGE         REASON

[2]

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21] SIGNATURE:_____ DATE:_____

[22]        RONALD G. BONIG

# Exhibit 7

JAN. 3. 2007  3:25PM  |  'ER-APPLICATIONS  NO. 6665  P. 2



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

OFFICE OF THE CHIEF INFORMATION OFFICER

4 January 2007

**Via First Class Mail and Fax**

Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

**Re: Closeout of Contract with The George Washington University**

Dear Mr. Gordon:

The George Washington University ("GWU") and Richmar & Associates ("Contractor")
entered into a Contractual Agreement dated December 22, 2005 (the "Contract"). By its
terms, the Contract terminates January 8, 2007. Certain work remains to be completed by
Contractor under the Contract. The purpose of this letter is to evidence the agreement of
GWU and Contractor with respect to the closeout of the Contract.

Attached to this letter, and made a part hereof by reference, is the "DCMS Closeout List"
(the "List"). The parties agree that Contractor will undertake to complete the tasks set
forth on the List by the dates set forth for completion with respect to each task. To allow
for the completion of these tasks, the term of the Contract will remain in full force and
effect until the earlier of the date that all tasks are completed to the reasonable
satisfaction of GWU or February 15, 2007. Upon satisfactory completion of the tasks,
Contractor may invoice GWU for these services and payment will be made by GWU in
accordance with Section 7 of the Contract.

Except as modified by this letter, the Contract remains in full force and effect. In the
event of a conflict between the terms of the Contract and the terms of this letter, the terms
of this letter shall govern.

December 22, 2006
Page 2

I ask that you sign and return a copy of this letter to me to evidence your consent to its
terms. Of course if there are questions, please do not hesitate to let me know.

Sincerely,

Ronald C. Bonig
Interim Chief Information Officer

Agreed and Accepted this ____ day of January, 2007

Richard Gordon, Jr.
President and CEO
Richmar & Associates

Attachment: DCM8 Closeout List

# Exhibit 8



**THE GEORGE
WASHINGTON
UNIVERSITY**
WASHINGTON DC

RONALD C. BONIG
DEPUTY CHIEF INFORMATION OFFICER

INFORMATION SYSTEMS AND SERVICES

January 5, 2007

Via E-Mail
Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

Re:    Closeout of Contract with
       The George Washington University

Dear Mr. Gordon:

It appears that my letter of January 4th to you was not as clear as it should have been resulting in unwarranted concerns. Please let me allay those concerns now as there was never any intention on the part of the University to require RICHMAR to destroy any of its own intellectual property. It was simply our intent to document the extension of the term of the Agreement to allow for the completion of the back scanning and indexing and, while we were at it, to address practical issues associated with the wind-down of this project.

Under the terms of the Agreement between RICHMAR and GW, RICHMAR agrees to prepare certain documents and documentation. Section 3.5.2 of the Statement of Work provides that such documents and documentation may not be provided to anyone other than GW without the review and written approval of GW. Further, Section 10 of the base Agreement requires that information obtained by RICHMAR from GW be held as confidential which again would mean it could not be released without the consent of GW. Given that the term of the Agreement is to end, rather than expect RICHMAR to store this information, we thought it made sense for us to say that it should be destroyed. That was the intent of items 8 – 10.

Subject to the foregoing, we had expected that item 8 would be read as encompassing code that was provided or developed by GW and/or its employees – not code that was developed solely by RICHMAR. As I said above, it was not our intention to make RICHMAR erase its own intellectual property – which legally we would have no right to do anyway.

I hope this addresses your concerns.

*[signature]* 1/5/67
1/5/06

801 22ND STREET, NW • SUITE B148 • WASHINGTON, DC 20052 • 202-994-3380 • FAX 202-994-5551

# Exhibit 9

Case 1:07-cv-00841-JR    Document 22-13    Filed 09/25/2007    Page 2 of 2
From: 9372997831    Page: 2/2    Date: 12/22/2006 11:18:16 AM

DEC. 22. 2006  9:45AM    BANNER-APPLICATIONS                    NO. 6652   P. 3

6. **Return of Confidential Information.** Upon the Disclosing Party's request, the Receiving Party will (a) promptly return to the Disclosing Party all copies of the Disclosing Party's Confidential Information, (b) destroy all notes, abstracts and other documents containing the Disclosing Party's Confidential Information and (c) provide to the Disclosing Party a written certification of an officer of the Receiving Party that it has done so.

7. **No License.** Nothing in this Agreement is intended to grant any rights to the Receiving Party in or to (a) any of the Disclosing Party's Confidential Information except as expressly set forth in this Agreement or (b) any patent, copyright, trade secret or other intellectual property right of the Disclosing Party.

8. **No Obligation.** Nothing in this Agreement shall obligate either party to proceed with any contemplated transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity.

9. **Term.** The term of this Agreement shall end on the three-year anniversary of the date first set forth above. This Agreement shall only apply to information disclosed during the term. The confidentiality obligations set forth in this Agreement shall expire five years after the end of the term of this Agreement.

10. **Injunctive Relief.** The Receiving Party acknowledges that the unauthorized use or disclosure of the Disclosing Party's Confidential Information would cause irreparable harm to the Disclosing Party and that monetary damages would be inadequate to compensate the Disclosing Party for any such unauthorized use or disclosure. Accordingly, the Receiving Party agrees that the Disclosing Party will have the right to obtain immediate injunctive relief against any breach or threatened breach of this Agreement, without the necessity of proving actual damages, as well as the right to pursue any and all other rights and remedies available at law, in equity or otherwise for such a breach or threatened breach.

11. **Miscellaneous.** This Agreement shall be governed by the laws of the State of Delaware, without giving effect to the conflict of law provisions thereof. This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. If any term of this Agreement is found by any court to be void or otherwise unenforceable, the remainder of this Agreement shall remain valid and enforceable as though such term were absent on the date of this Agreement. This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed original, and both together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

CROWN PARTNERS, LLC

By: _____

Print Name: Richard Brown

Print Title: Managing Partner

THE GEORGE WASHINGTON UNIVERSITY

By: _____

Print Name: Ronno C. Botac

Print Title: Interim CIO

2

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

CONFIDENTIAL                                                                    GW004103

# Exhibit 10



RICHMAR

**INVOICE**

Award Number:
Invoice Number: ED-06-GWU-ISS-DOC-23 - S
Tax ID Number: 54-1827536
CLIN 0001
Purchase Order Number 1000082157

The George Washington University
ISS - Administrative Applications
44983 Knoll Square Drive, Suite 380
Ashburn, VA 20147

Billing Date:    04-Jan-07
Due Date:        Net 30 days

Billing Period:
12/16/06 - 12/31/06

| Labor Categories | | Current Rate | Current Hours | | Current Amount |
|---|---|---|---|---|---|
| Executive Management Consultant | $ | 150.00 | 102.50 | $ | 15,375.00 |
| Senior Engineer | $ | 144.00 | 0.00 | $ | - |
| Senior Management Consultant | $ | 125.00 | 52.50 | $ | 6,562.50 |
| Jr. Project Manager II | $ | 100.00 | 0.00 | $ | - |
| Jr. Project Manager | $ | 75.00 | 0.00 | $ | - |
| Systems Analyst | $ | 98.00 | 20.00 | $ | 1,960.00 |
| Quality Analyst | $ | 86.05 | 0.00 | $ | - |
| Help Desk Specialist | $ | 45.00 | 0.00 | $ | - |
| Administrative Assistant | $ | 33.67 | 1366.50 | $ | 46,010.06 |
| | | | | | |
| Totals Hours | | | 1541.50 | | |
| Total Direct Labor | | | | $ | 69,907.56 |
| Other Direct Costs - Scanning 8,018 pages at 0.18/page | | | | $ | 1,443.24 |
| Total Costs | | | | $ | 71,350.80 |
| | | Total Amount Due | | $ | 71,350.80 |

This is to certify that the services set forth herein were performed during the period stated, and that incurred
costs billed were actually expended.

Richard Gordon, Jr.
President

Remit Payment to:

Federal National Commercial, Inc.
Fao: CUS4/Richmar Associates
P.O. Box 403826
Atlanta GA 30384-3826

# Richmar & Associates
## Time Accounting Sheet

| | | |
|---|---|---|
| Work days in period | 9 | |
| Holidays in period | 1 | |
| Hours in period | 80 | |
| Hours unaccounted for | 8 | |

| | | |
|---|---|---|
| Reg Hrs | 64. | |
| Pers Time Off | 8. | |
| Holiday | 8. | |
| Total Hours | 72. | |

Employee/Contractor Name: Alex Belcht
Period: December 16 - 31, 2006

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1-16 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Upgrade to 6.3 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | | 3. | 3. | 3. | 3. | | | | | 3. | | 5. | | | | 34. | 20. | 54. |
| GWU - Docu - Backscan, Index, Load | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Training | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |
| **Non-Billable** | | | | | | | | | | | | | | | | | | | |
| Overhead | | | 5. | 5. | 5. | 5. | 8. | | | | 5. | | 3. | 8. | | | 48. | 44. | 90. |
| Personal Time Off | | | 3. | 3. | 3. | 3. | | | | 8. | 3. | | 5. | | | | 8. | 8. | 8. |
| Holiday | | | | | | | | | 8. | | | | | | | | | | 8. |
| **TOTAL Billable** | | | 3. | 3. | 3. | 3. | | | | | 3. | | 5. | | | | 34. | 20. | 64. |
| **TOTAL** | | | 8. | 8. | 8. | 8. | 8. | | | 8. | 8. | | 8. | 8. | | | 88. | 72. | 160. |

Employee/Contractor Signature: _____

Supervisor Signature: _____    Date: _____

Date: 4/4/07

Please purchase the Print PDF Driver on http://www.verypdf.com/artprint/index.html to remove this message.

**Richmar & Associates**

**Time Accounting Sheet**

Employee/Contractor Name:
Period:

Worldwide Digital
December 16 - 31, 2006

| | | | | | | |
|---|---|---|---|---|---|---|
| Work days in period | | 8 | | Reg hrs | | 64. |
| Holidays in period | | | | Pers Time Off | | |
| Hours in period | | 64 | | Holiday | | |
| Hours unaccounted for | | 0 | | Total Hours | | 64. |

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 15 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - Nicholas Mann | | | 4.5 | 6. | | | | | | | | | | | | | 70. | 10.5 | 80.5 |
| GW Scan - Subramanian Muthukaruppan | | | | | | | | | | | | | | | | | | | |
| GW Scan - Xuen-Huong Nguyen | | | | | | | | | | | | | | | | | | | |
| GW Scan - Diane Hamer | | | | | | | | | | | | | | | | | | | |
| GW Scan - Michelle Barnes | | | | | | | | | | | | | | | | | | | |
| GW Scan - Unique Quarles | | | | | | | | | | | | | | | | | | | |
| GW Scan - Bernedette Dixon | | | | | | | | | | | | | | | | | | | |
| GW Scan - Laquinda Selby | | | 7.75 | | 8.5 | 4.25 | | | | | | | | | | | 78.5 | 20.5 | 100. |
| GW Scan - Dominique Roberts | | | | 8. | 8. | 8.5 | 8.5 | | | | | | | | | | 77.76 | 33. | 110.76 |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |

| Non-Billable | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | | | | | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | | | | | |
| TOTAL_Billable | | | | | 12.25 | 14. | 16.5 | 12.75 | 8.5 | | | | 227.25 | | 64. | | 291.25 |
| TOTAL | | | | | 12.25 | 14. | 16.5 | 12.75 | 8.5 | | | | 227.25 | | 64. | | 291.25 |

Employee/Contractor Signature: _____    Date: _____

Supervisor Signature: _____    Date: 1/4/07

**Richman & Associates**

**Time Accounting Sheet**

| Work days in period | 9 |
| Holidays in period | 1 |
| Hours in period | 80 |
| Hours unaccounted for | 7.5 |

| Reg Hrs | 64.5 |
| Pers Time Off | |
| Holiday | 8. |
| Total Hours | 72.5 |

Employee/Contractor Name: Jim Gearing

Period: December 16 - 31, 2006

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1-15 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | | . | . | . |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | | . | . | . |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | | . | . | . |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | | . | . | . |
| 0 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | | . | . | . |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | | 89. | . | 89. |
| GWU - Docu - Upgrade to 5.3 | | | | | | | | | | | | | | | | | . | . | . |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | | . | . | . |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Backscan, Index, Load | | | 7. | 8. | 7.5 | 8. | 5. | | | | 7. | 8. | 7. | 7. | | | . | 64.5 | 64.5 |
| GWU - Docu - Training | | | | | | | | | | | | | | | | | . | . | . |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | | . | . | . |
| tbd | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Non-Billable | | | | | | | | | | | | | | | | | . | . | . |
| Overhead | | | | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | 8. | | | | | | | . | 8. | 8. |
| | | | | | | | | | | | | | | | | | | | |
| TOTAL Billable | | | 7. | 8. | 7.5 | 8. | 5. | | | . | 7. | 8. | 7. | 7. | | | 89. | 64.5 | 153.5 |
| TOTAL | | | 7. | 8. | 7.5 | 8. | 5. | | | 8. | 7. | 8. | 7. | 7. | | | 89. | 72.5 | 161.5 |

Employee/Contractor Signature:

Supervisor Signature:

Date:

Date: 1/4/07

**Richmar & Associates**

**Time Accounting Sheet**

| | |
|---|---|
| Work days in period | 8 |
| Holidays in period | |
| Hours in period | 64 |
| Hours unaccounted for | 0 |

| | |
|---|---|
| Reg Hrs | |
| Pers Time Off | |
| Holiday | 1333. |
| Total Hours | 1333. |

Employee/Contractor Name: Central Data Processing

Period: December 16 - 31, 2005

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1-15 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan Manager - Mike Holt | 2 | 2 | 2 | 2 | 2 | 2 | 8 | 2 | 2 | | 2 | 2 | | 8 | 2 | | | 38 | 38 |
| GW Scan Manager - Dottie Holoubek | | | | | | | | | | | | | | | | | | | |
| GW Scan Manager - Dan Holoubek | 4 | 3.5 | 4 | 3.5 | 4 | 3.5 | 4 | 3.5 | 4 | | | 3.5 | 4 | 3.5 | 4 | 3.5 | | 52.5 | 52.5 |
| 0 | | | | | | | | | | | | | | | | | | | |
| GW Scan - A J Bacchus | | 16.5 | | 8.5 | 7.5 | 10 | 8 | 17 | | | | | | | | | | 67.5 | 67.5 |
| GW Scan - Amir Lotfi | | | 8 | 6 | 7.5 | 6 | 4.5 | | | | | 7 | 7 | 8 | | | | 46 | 46 |
| GW Scan - Chanteau Benton | | | | | | | | | | | | | | | | | | | |
| GW Scan - Cherie Babb | | | | | | | | | | | | | | | | | | | |
| GW Scan - Davida Potts | | | | | | | | | | | | | | | | | | | |
| GW Scan - Ethel Marsteller | | | | | | | | | | | | | | | | | | | |
| GW Scan - Issac Hughes | 8 | 8.5 | 12 | 15 | 10 | 13.5 | 14 | | | 16 | 12.5 | 14 | 13 | 13 | 13 | | | 162.5 | 162.5 |
| GW Scan - Leila Aghazadeh | | | | 8 | 7 | 8.5 | 8.5 | | | | 6.5 | 6.5 | 6.5 | 8 | | | | 54.5 | 54.5 |
| GW Scan - Megan Bradley | | | | 8 | 6.5 | 6.5 | 7 | | | | 6.5 | 6.5 | 8 | 7 | | | | 54 | 54 |
| GW Scan - Michael Brown | | | | | | | | | | | | | | | | | | | |
| GW Scan - Nancy Goff | 16.5 | 21 | 11 | | 11 | 10 | 9 | 11.5 | 8 | | 12.5 | | 16 | 15 | 9 | 18 | | 187.5 | 187.5 |
| GW Scan - Ngoc Dang | | | | | | | | | | | | | | | | | | 5.5 | 5.5 |
| GW Scan - Nguyet Dang | | | | | | | | | | | | | | | 1.5 | 4 | | 55.5 | 55.5 |
| GW Scan - Nikki McKinney | | | 8 | 8 | 8 | 8 | | | | | 7.5 | 8 | 8 | 8 | | | | 63.5 | 63.5 |
| GW Scan - Steve Clark | | | 7.5 | 8 | 10.5 | 7.5 | 8.5 | | | | 8 | 8 | 8 | 8 | | | | 67.5 | 67.5 |
| GW Scan - Tiffany Johnson | | | 7.5 | 8 | 11 | 10 | 7.5 | | | | 8 | 8 | 10 | 10 | | | | 91.5 | 91.5 |
| GW Scan - Virgina Hawkins | | | 8 | 10 | 11 | 10 | 13 | | | | 8 | 10.5 | 10 | 10 | | | | 90.5 | 90.5 |
| GW Scan - Vernetta Knight | | | 9 | 10 | 11 | 10 | | | | | 10 | 10.5 | 10 | 10 | | | | 62.5 | 62.5 |
| GW Scan - Yvonne Morrison | | | 11 | 10 | 11 | 11.5 | | | | | 10 | 10 | 10 | 10 | | | | | |
| GW Scan - Zandra Curran | | | | | | | | | | | | | | | | | | | |
| GW Scan - Lucille Ratliff | | | 4 | 8 | 4 | 3.5 | 4 | | | | 4 | 4 | 5 | 5 | | | | 33.5 | 33.5 |
| GW Scan - Bernesteen Best | | | 6.5 | 8 | 9 | 7 | 7 | 4 | | | 9.5 | 10.5 | 11.5 | 8 | | | | 81 | 81 |
| GW Scan - Jide Dada | | | 12.5 | 12.5 | | 12 | 12.5 | 5.5 | | | 7.5 | 12.5 | 12.5 | 14 | | 6 | | 101.5 | 101.5 |
| GW Scan - Dominique Selby | | | | | 6 | | | | | | 8 | 11 | 12 | 12 | 5 | | | 53 | 53 |
| GW Scan - Jesse Gillespie | 2.5 | | 9.5 | | | | | | | | 6 | 6 | 9.5 | 13.5 | | | | 55 | 55 |
| GW Scan - | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-Billable | | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | | |
| TOTAL Billable | 33. | 51.5 | 123.3 | 124.5 | 122. | 128.5 | 107.5 | 43.5 | 22. | 16. | 102. | 127. | 160. | 161. | 34.5 | 30.5 | | | | | 1393. |
| TOTAL | 33. | 51.5 | 123.5 | 124.5 | 122. | 128.5 | 107.5 | 43.5 | 22. | 16. | 102. | 127. | 160. | 161. | 34.5 | 30.5 | | | | | 1393. |

Employee/Contractor Signature:

Supervisor Signature:

Date:

Date: 1/4/07

Jan 05 07 10:25a    Richard Gordon, Jr.                    202 544-2016          p.1

# FEDERAL NATIONAL PAYABLES, INC.

## INVOICE VERIFICATION FORM

This is <u>not</u> a request for payment

**Customer:    George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:    CUS4, Inc. d/b/a RICHMAR & Associates**
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Appr oved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | ED-06-GWU-ISS-DOC-23-S | January 4, 2007 | $ 71,350.80 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:

_Christina L. Griff_
Signature

_Christina Griffin_
Print Name

Assistant Director Administrative
Applications Project Office
Print Title

Jan 4, 2007
~~December 18, 2006~~
Date

(703) 726-1911
Telephone Number

202-994-5250
Fax Number



RICHMAR

**INVOICE**

Award Number:
Invoice Number: ED-06-GWU-ISS-DOC-24 - S
Tax ID Number: 54-1827538
CLIN 0001
Purchase Order Number 1000082157

Billing Date:    16-Jan-07
Due Date:        Net 30 days

The George Washington University
ISS - Administrative Applications
44983 Knoll Square Drive, Suite 380
Ashburn, VA 20147

Billing Period:
1/1/07 - 1/15/07

| Labor Categories | | Current Rate | Current Hours | | Current Amount |
|---|---|---|---|---|---|
| Executive Management Consultant | $ | 150.00 | 108.00 | $ | 16,200.00 |
| Senior Engineer | $ | 144.00 | 0.00 | $ | - |
| Senior Management Consultant | $ | 125.00 | 54.00 | $ | 6,750.00 |
| Jr. Project Manager II | $ | 100.00 | 0.00 | $ | - |
| Jr. Project Manager | $ | 75.00 | 0.00 | $ | - |
| Systems Analyst | $ | 98.00 | 8.00 | $ | 784.00 |
| Quality Analyst | $ | 85.05 | 0.00 | $ | - |
| Help Desk Specialist | $ | 45.00 | 0.00 | $ | - |
| Administrative Assistant | $ | 33.67 | 1323.50 | $ | 44,562.25 |
| | | | | | |
| Totals Hours | | | 1493.50 | | |
| Total Direct Labor | | | | $ | 68,296.25 |
| Other Direct Costs - Scanning 17,669 pages at 0.18/page | | | | $ | 3,180.42 |
| Total Costs | | | | $ | 71,476.67 |

| Total Amount Due | $ | 71,476.67 |
|---|---|---|

This is to certify that the services set forth herein were performed during the period stated, and that incurred
costs billed were actually expended.

_signature_

Richard Gordon, Jr.,
President

Remit Payment to:

Federal National Commercial, Inc.
Fao: CU84/Richmar Associates
P.O. Box 403826
Atlanta GA 30384-3826

**Richmar & Associates**

**Time Accounting Sheet**

Employee/Contractor Name: _Jun Berry_ ~~Your Name Here~~

Period: January 1 - 15, 2007

| | | | | | | | | | | | | | | | | Reg Hrs | 66. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Work days in period | | | | | | | | 8 | | | | | | | | Pers Time Off | . |
| Holidays in period | | | | | | | | 3 | | | | | | | | Holiday | 24. |
| Hours in period | | | | | | | | 88 | | | | | | | | Total Hours | 90. |
| Hours unaccounted for | | | | | | | | 0 | | | | | | | | | |

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | |
| GWU - Docu - Upgrade to 5.3 | | | | | | | | | | | | | | | | |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | 7. | 8. | 9. | 6. | | | 7. | 7. | 7. | 8. | 7. | | | | 66. |
| GWU - Docu - Backscan, Index, Load | | | | | | | | | | | | | | | | |
| GWU - Docu - Training | | | | | | | | | | | | | | | | |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| Non-Billable | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | |
| Holiday | 8. | 8. | | | | | | | | | | | | | 8. | 24. |
| **TOTAL Billable** | | 7. | 8. | 9. | 6. | | | 7. | 7. | 7. | 8. | 7. | | | | 66. |
| **TOTAL** | 8. | 15. | 8. | 9. | 8. | | | 7. | 7. | 7. | 8. | 7. | | | 8. | 90. |

Employee/Contractor Signature: _Jun Berry_    Date: 1/16/07

Supervisor Signature: _____    Date: 1/16/07

# Richmar & Associates

## Time Accounting Sheet

Employee/Contractor Name: Alex Bakht

Period: January 1 - 15, 2007

| | |
|---|---|
| Work days in period | 8 |
| Holidays in period | 3 |
| Hours in period | 88 |
| Hours unaccounted for | 0 |

| | |
|---|---|
| Reg Hrs | 56. |
| Pers Time Off | 8. |
| Holiday | 24. |
| Total Hours | 88. |

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | |
| GWU - Docu - Upgrade to 5.3 | | | | | | | | | | | | | | | | |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | | | | 5. | | | 3. | | | | | | | | 8. |
| GWU - Docu - Backscan, Index, Load | | | | | | | | | | | | | | | | |
| GWU - Docu - Training | | | | | | | | | | | | | | | | |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |

**Non-Billable**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | | | 8. | 3. | 8. | | | 5. | 8. | 8. | 8. | | | | | 48. |
| Personal Time Off | 8. | 8. | | | | | | | | | | | | | | 8. |
| Holiday | 8. | | | | | | | | | | | 8. | | | 8. | 24. |
| | | | | | | | | | | | | | | | | |
| TOTAL Billable | | | | 5. | 6. | | | 3. | 8. | 8. | 8. | | | | 8. | 8. |
| TOTAL | 8. | 8. | 8. | 8. | 8. | | | 8. | 8. | 8. | 8. | 8. | | | 8. | 88. |

Employee/Contractor Signature: _____  Date: 1/16/07

Supervisor Signature: _____  Date: _____

# Richmar & Associates
## Time Accounting Sheet

Employee/Contractor Name: Worldwide Digital

Period: January 1 - 15, 2007

| | Work days in period | 9 |
|---|---|---|
| | Holidays in period | 1 |
| | Hours in period | 80 |
| | Hours unaccounted for | 0 |

| | |
|---|---|
| Reg Hrs | 81. |
| Pers Time Off | . |
| Holiday | . |
| Total Hours | 81. |

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - Nicholas Mann | | 2. | 6. | 8. | 8. | | | 4. | 8. | 8. | 8. | 6. | 6. | | | 58. |
| GW Scan - Bernedette Dixon | | | | | | | | | | | | | | | | |
| GW Scan - Dione Hamer | | | | | | | | | | | | | | | | |
| GW Scan - Dominique Roberts | | | | | | | | | | 8. | 7. | 8. | | | | 23. |
| GW Scan - Evelyn Wheeler | | | | | | | | | | | | | | | | |
| GW Scan - Laquinda Selby | | | | | | | | | | | | | | | | |
| GW Scan - Michelle Barnes | | | | | | | | | | | | | | | | |
| GW Scan - Subramanian Muthukaruppan | | | | | | | | | | | | | | | | |
| GW Scan - Unique Quaries | | | | | | | | | | | | | | | | |
| GW Scan - Xuan-Huong Nguyen | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Non-Billable | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | |
| TOTAL Billable | . | 2. | 6. | 8. | 8. | | | 4. | 8. | 16. | 15. | 14. | | | | 81. |
| TOTAL | . | 2. | 6. | 8. | 8. | | | 4. | 8. | 16. | 15. | 14. | | | | 81. |

Employee/Contractor Signature: _____ Date: 1/16/07

Supervisor Signature: _____ Date: _____

# Richmar & Associates

## Time Accounting Sheet

Employee/Contractor Name: Central Data Processing
Period: January 1 - 15, 2007

Work days in period: 9
Holidays in period: 2
Hours in period: 88
Hours unaccounted for: 0

Reg Hrs
Pers Time Off
Holiday
Total Hours: 1369.

1369.

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan Manager - Mike Holt | | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 3. | 42. |
| GW Scan Manager - Dottie Holoubek | | | | | | | | | | | | | | | | . |
| GW Scan Manager - Dan Holoubek | | 4. | 4. | 4. | 4. | 3. | 3. | 4. | 4. | 4. | 4. | 4. | 4. | 4. | 4. | 54. |
| GW Scan - A J Bacchus | | | | | | | | | | | | | | | | . |
| GW Scan - Amir Lotfi | | | | | | | | 6. | 8. | | | | | | | 14. |
| GW Scan - Bernesteen Best | 4. | 8.5 | 9.5 | 9. | 8. | 4.5 | | 7.5 | 11.5 | 8. | 9.5 | | | | | 80. |
| GW Scan - Chanteau Benton | | | | | | | | | | | | | | | | |
| GW Scan - Charie Babb | | | | | | | | | | | | | | | | |
| GW Scan - Davida Potts | | | | | | | | | | | | | | | | . |
| GW Scan - Dominique Roberts | | 8.5 | 10. | 8. | 10. | | | 2.5 | 8.5 | 4. | 10. | 5. | 6. | | 8. | 80.5 |
| GW Scan - Ethel Marsteller | 8. | 8. | 13. | 11.5 | 8. | 15. | 8. | 14.5 | 15. | 12. | 12.5 | 13.5 | 12. | | 10. | 161. |
| GW Scan - Isaac Hughes | | | | | | | | | | | | | | | | 24. |
| GW Scan - Jesse Gillespie | | | 3. | 10. | | | | | | | | | | | | 118. |
| GW Scan - Jide Dada | | 10. | 11. | 14. | 14. | 7. | | 14. | | 12.5 | 13.5 | 14. | 8. | | | 40.5 |
| GW Scan - Leila Aghazadeh | | | 8. | 8. | 8.5 | | | 8. | 8. | | | | | | | 64.5 |
| GW Scan - Lucille Ratliff | | | 7. | 13. | 8.5 | 4. | | 11.5 | 8.5 | | 8. | | | | | 64. |
| GW Scan - Megan Bradley | 6. | 6. | 5. | | 6. | | | 5.5 | 8.5 | 5. | 8. | | | | | 136.5 |
| GW Scan - Micheal Brown | | | | | | | | | | | | | | | | . |
| GW Scan - Nancy Goff | 8.5 | 11. | 8. | 13. | 12.5 | 11. | 8. | 10. | 2.5 | 15. | 10.5 | 13.3 | 13. | | | 64.5 |
| GW Scan - Ngoc Dang | | | | | | | | | | | | | | | | 55. |
| GW Scan - Nguyet Dang | | | | | | | | | | | | | | | | 66. |
| GW Scan - Nikki McKinney | 8. | 8. | 8. | | 8. | | | 8.5 | 8. | 8. | 8. | | | | 8. | 86. |
| GW Scan - Steve Clark | | | 7.5 | 5.5 | 4.5 | 6. | | 8. | 7. | 8. | 8.5 | | | | | 99. |
| GW Scan - Tiffany Johnson | | 9. | 8. | 10. | 10. | 6. | | 10. | 7. | 10. | 10. | 10. | 9. | | | 89. |
| GW Scan - Vergina Hawkins | | 10. | 10. | 10. | 10. | | | 10. | 7. | 10. | 11. | 10. | 9. | | | . |
| GW Scan - Vernette Knight | | 10. | 10. | 10. | 10. | 8. | | 6. | 13. | 12. | 11. | 10. | 9. | | | . |
| GW Scan - Yvonne Morrison | 10. | 10. | 10. | 11. | 11. | 8. | | 6. | 9. | 12. | 12. | 11. | 9. | | 2. | . |
| GW Scan - Zandra Curran | | | | | | | | | | | | | | | | . |
| GW Scan - | | | | | | | | | | | | | | | | . |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | |

30.5

1538.5
1369.

| Non-Billable | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | | | | 6. | 10. | 8.5 | | | | | | | | | 6. | |
| Personal Time Off | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | |

| TOTAL Billable | 12.5 | 86. | 137. | 156. | 126. | 61.5 | 22. | 139.5 | 135. | 136.5 | 128.5 | 84. | 64. | 16. | 35. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 12.5 | 86. | 137. | 160. | 132. | 71.5 | 30.5 | 139.5 | 135. | 136.5 | 128.5 | 84. | 64. | 15. | 41. |

Employee/Contractor Signature: _____    Date: 11/6/07

Supervisor Signature: _____    Date: _____

JAN. 17. 2007  3:03PM    BANNER-APPLICATIONS                    NO. 6690    P. 1

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is **not** a request for payment

**Customer:   George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:      CUS4, Inc. d/b/a RICHMAR & Associates**
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | ED-06-GWU-ISS-DOC-24-8 | January 16, 2007 | $ 71,476.87 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:


_Christina L. Griff_
Signature

Assistant Director Administrative
Applications Project Office
Print Title

(703) 726-1911
Telephone Number

Christina Griffin
Print Name

January 16, 2007
Date

202-994-5250
Fax Number



INVOICE

Award Number:
Invoice Number: ED-06-GWU-ISS-DOC-25 - S
Tax ID Number: 54-1827538
CLIN 0001
Purchase Order Number 1000082157

Billing Date:        02-Feb-07
Due Date:           Net 30 days

The George Washington University
ISS - Administrative Applications
44983 Knoll Square Drive, Suite 380
Ashburn, VA 20147

Billing Period:
1/16/07 - 1/31/07

| Labor<br>Categories | | Current<br>Rate | Current<br>Hours | Current<br>Amount |
|---|---|---|---|---|
| Executive Management Consultant | $ | 150.00 | 120.00 | $ | 18,000.00 |
| Senior Engineer | $ | 144.00 | 0.00 | $ | - |
| Senior Management Consultant | $ | 125.00 | 60.00 | $ | 7,500.00 |
| Jr. Project Manager II | $ | 100.00 | 0.00 | $ | - |
| Jr. Project Manager | $ | 75.00 | 0.00 | $ | - |
| Systems Analyst | $ | 98.00 | 4.00 | $ | 392.00 |
| Quality Analyst | $ | 85.05 | 0.00 | $ | - |
| Help Desk Specialist | $ | 45.00 | 0.00 | $ | - |
| Administrative Assistant | $ | 33.67 | 1087.50 | $ | 36,616.13 |

| | | | | |
|---|---|---|---|---|
| Totals Hours | | | 1271.50 | |
| Total Direct Labor | | | $ | 62,508.13 |
| Other Direct Costs - Scanning 40,042 pages at 0.18/page | | | $ | 7,207.56 |
| Total Costs | | | $ | 69,715.69 |

| | Total Amount Due | | $ | 69,715.69 |
|---|---|---|---|---|

This is to certify that the services set forth herein were performed during the period stated, and that incurred
costs billed were actually expended.

Richard Gordon Jr.
President

Remit Payment to:

Federal National Commercial, Inc.
Fao: CUS4/Richmar Associates
P.O. Box 403826
Atlanta GA 30384-3826

# Richmar & Associates
## Time Accounting Sheet

Employee/Contractor Name: Alex Baikht

Period: January 16 - 31, 2006

| | |
|---|---|
| Work days in period | 12 |
| Holidays in period | 90 |
| Hours in period | 0 |
| Hours unaccounted for | |

| | |
|---|---|
| Reg Hrs | 96. |
| Pers Time Off | |
| Holiday | |
| Total Hours | 96. |

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 16 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | 1. | | | | | | | | 1. | 1. |
| 0 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Upgrade to 5.3 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | | | | | | | 4. | | | | | | | | | 8. | 4. | 12. |
| GWU - Docu - Backscan, Index, Load | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Training | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |

**Non-Billable**

| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 16 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | 8. | 8. | 8. | 8. | | | 8. | 4. | 8. | 7. | 8. | | | 8. | 8. | 8. | 43. | 91. | 139. |
| Personal Time Off | | | | | | | | | | | | | | | | | 8. | | 8. |
| Holiday | | | | | | | | | | | | | | | | | 24. | | 24. |

| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 16 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL Billable | | | | | | | | 4. | | 1. | | | | | | | 8. | 5. | 13. |
| TOTAL | 8. | 8. | 8. | 8. | | | 8. | 8. | 8. | 8. | 8. | | | 8. | 8. | 8. | 88. | 96. | 184. |

Employee/Contractor Signature: _____   Date: 2/2/07

Supervisor Signature: _____   Date: _____

# Richmar & Associates

## Time Accounting Sheet

Employee/Contractor Name: Central Data Processing
Period: January 16 - 31, 2007

| Work days in period | 12 |
| Holidays in period | |
| Hours in period | 96 |
| Hours unaccounted for | 0 |

| Reg Hrs | 1038. |
| Pers Time Off | |
| Holiday | |
| Total Hours | 1038. |

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 15 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan Manager - Mike Holt | 2. | 2. | 2. | 2. | 2. | 2. | 2. | 2. | 4. | 2. | 3. | 2. | 2. | 3. | 2. | 2. | 42. | 36. | 78. |
| GW Scan Manager - Dottie Holoubek | | | | | | | | | | | | | | | | | | | . |
| GW Scan Manager - Dan Holoubek | 3. | 3. | 3. | 3. | 9. | 4. | 3. | 6. | 3. | 3. | 3. | 4. | 4. | 3. | 3. | 3. | 54. | 60. | 114. |
| 0 | | | | | | | | | | | | | | | | | | | . |
| GW Scan - A J Bacchus | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Amir Lotfi | | 7. | 8. | 8. | | | 8.5 | 8. | | | | | | | | | 14. | 39.5 | 53.5 |
| GW Scan - Bernasteen Bast | | | | | | | | | | | | | | | | | 80. | | 80. |
| GW Scan - Chanbau Benton | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Cheric Babb | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Davida Potts | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Dominique Roberts | 5.5 | | | 8. | 4. | | | | | | | | | | | | 90.5 | 17.5 | 108. |
| GW Scan - Ethel Marsteller | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Isaac Hughes | 12. | 15.5 | 11. | 10.5 | 14. | | 11.5 | 8. | 14. | 12. | 13. | 9. | 8. | 12. | 16.5 | 11.5 | 161. | 179.5 | 340.5 |
| GW Scan - Jesse Gillespie | | 9. | | | | | | | | | | | | | | | 24. | 9. | 33. |
| GW Scan - Jide Dada | 10. | | 15. | 14.5 | 8.5 | | 11. | 8. | 13. | 10. | 15. | 8. | | 15. | 7.5 | 15. | 118. | 143.5 | 261.5 |
| GW Scan - Leila Aghazadeh | 8. | 7. | 8. | 8. | | | 8. | 8. | 5.5 | | | | | | | | 40.5 | 52.5 | 93. |
| GW Scan - Lucille Ratliff | | | | | | | | | | | | | | | | | 64.5 | | 64.5 |
| GW Scan - Megan Bradley | | | | | | | | | | | | | | | | | 54. | | 54. |
| GW Scan - Micheal Brown | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Nancy Goff | 4. | 15.5 | 1. | 1.5 | 5. | | 9. | 12.5 | 15.5 | 8.5 | 12. | 11.5 | 5. | 10. | 11.5 | 4.5 | 136.5 | 127. | 263.5 |
| GW Scan - Ngoc Dang | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Nguyet Dang | | | | | | | | | | | | | | | | | | | . |
| GW Scan - Nikki McKinney | 7.5 | 8. | 8. | | | | | 8. | 8.5 | 8. | | 7.5 | | 9. | 8. | 9. | 64.5 | 81.5 | 148. |
| GW Scan - Steve Clark | 6. | | | | | | 9.5 | 12.5 | 3. | | | | | | | | 55. | 33. | 88. |
| GW Scan - Tiffany Johnson | | | | | | | | | | | | | | | | | 66. | | 66. |
| GW Scan - Vergina Hawkins | 8. | 9. | 9. | 10. | | | 7. | 9. | 10. | | | | | | | | 86. | 62. | 148. |
| GW Scan - Vernette Knight | 10. | 12. | 11.5 | 11. | 8. | | 9.5 | 11.5 | 10. | | | | | | | | 99. | 83.5 | 182.5 |
| GW Scan - Yvonne Morrison | 10. | | 10.5 | 11. | | | | 9. | 10.5 | 9.5 | | | | 9. | 9. | | 89. | 78.5 | 167.5 |
| GW Scan - Zandra Curran | | | | | | | | | | | | | | | | | | | . |
| GW Scan - | | | | | | | | | | | | | | | | | | | . |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |

| Non-Billable | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | 5.5 | 17. | 4.5 | 8. | | 50.5 | 6. | 79. | 94.5 | 97. | 53. | 46. | 43. | 20. | 61. | 57.5 | 45. | 30.5 | 35. | 85.5 |
| Personal Time Off | | | | | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL Billable | 88. | 88. | 87. | 87.5 | 50.5 | 6. | 79. | 94.5 | 97. | 53. | 46. | 43. | 20. | 61. | 57.5 | 45. | 1558.5 | 1003. | 2341.5 |
| TOTAL | 93.5 | 105. | 91.5 | 95.5 | 50.5 | 6. | 79. | 94.5 | 97. | 53. | 46. | 43. | 20. | 61. | 57.5 | 45. | 1369. | 1038. | 2407. |

Employee/Contractor Signature: _____    Date: 2/2/07

Supervisor Signature: _____    Date: _____

# Richmar & Associates

## Time Accounting Sheet

| Work days in period | 12 |
|---|---|
| Holidays in period | 0 |
| Hours in period | 96 |
| Hours unaccounted for | 0 |

| Reg Hrs | 180.5 |
|---|---|
| Pers Time Off | |
| Holiday | |
| Total Hours | 180.5 |

Employee/Contractor Name: Worldwide Digital

Period: January 16 - 31, 2007

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 - 15 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan - Nicholas Mann | 6. | 8. | 8. | 8. | | | 7. | 8. | 8. | 6. | 8. | | 8. | 8. | 8. | 2. | 58. | 85. | 143. |
| GW Scan - Bernadetta Dixon | | | | | | | | | | | | | | | | | | | |
| GW Scan - Dione Hamer | | | | | | | | | | | | | | | | | | | |
| GW Scan - Dominique Roberts | 8. | 7.5 | 8. | 8. | | | 8. | 8. | 8. | 8. | 8. | | 8. | 8. | 8. | 8. | 23. | 95.5 | 118.5 |
| GW Scan - Evelyn Wheeler | | | | | | | | | | | | | | | | | | | |
| GW Scan - Laquinda Selby | | | | | | | | | | | | | | | | | | | |
| GW Scan - Michelle Barnes | | | | | | | | | | | | | | | | | | | |
| GW Scan - Subramanian Muthukaruppan | | | | | | | | | | | | | | | | | | | |
| GW Scan - Unique Quarles | | | | | | | | | | | | | | | | | | | |
| GW Scan - Xuan-Huong Nguyen | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | | | | |
| Non-Billable | | | | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | | | | |
| TOTAL Billable | 14. | 15.5 | 16. | 16. | | | 15. | 16. | 16. | 14. | 16. | | 16. | 16. | 16. | 10. | 81. | 180.5 | 261.5 |
| TOTAL | 14. | 15.5 | 16. | 16. | | | 15. | 16. | 16. | 14. | 16. | | 16. | 16. | 16. | 10. | 81. | 180.5 | 261.5 |

Employee/Contractor Signature: _____  Date: 2/2/07

Supervisor Signature: _____  Date: _____

# Richmar & Associates

## Time Accounting Sheet

| Work days in period | 12 |
| Holidays in period | |
| Hours in period | 98 |
| Hours unaccounted for | 4 |

| Reg Hrs | 84. |
| Pers Time Off | 8. |
| Holiday | |
| Total Hours | 92. |

Employee/Contractor Name: Jim Gearing
Period: January 16 - 31, 2006

| Charge To: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1-16 Total | 16-31 Total | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | | 1. | | 1. |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Meetings | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Reqs/Design | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Upgrade to 5.3 | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Architecture Framework | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - HR Module | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Requirements | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | | | | | | | | | | | | | | | | | 66. | | 66. |
| GWU - Docu - Backscan, Index, Load | 8. | 7. | 8. | 6. | | | 8. | 7. | 8. | 8. | 8. | | | 8. | 7. | 9. | | 84. | 84. |
| GWU - Docu - Training | | | | | | | | | | | | | | | | | | | |
| GWU - Docu - Phase 2 | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | | |
| Non-Billable | | | | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | 8. | | | | 8. | 7. | 9. | | 8. | 8. |
| Holiday | | | | | | | | | | | | | | | | | 24. | | 24. |
| TOTAL Billable | 8. | 7. | 8. | 6. | | | 8. | 7. | 8. | 8. | 8. | | | 8. | 7. | 9. | 67. | 84. | 151. |
| TOTAL | 8. | 7. | 8. | 6. | | | 8. | 7. | 8. | 8. | 8. | | | 8. | 7. | 9. | 91. | 92. | 183. |

Employee/Contractor Signature: _____  Date: 2/1/07

Supervisor Signature: _____  Date: 2/2/07

## Nsona Whiteman

| | |
|---|---|
| **From:** | Richard Gordon, Jr. [richard@cus4.com] |
| **Sent:** | Friday, February 02, 2007 8:57 AM |
| **To:** | 'Christina L. Griffin' |
| **Cc:** | 'Nsona Whiteman' |
| **Subject:** | Invoice Verification Form |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

**Attachments:** invoice acceptancefnp 3-02 - number 25 - S.doc; ED-06-GWU-ISS-SOC-25 - S.pdf

Hello Christina

Attached is invoice 25-S along with the Invoice Verification Form.

Will you sign the Invoice Verification Form and fax to Nsona at the fax number on the form by 9:30 a.m.?  There is no need for a cover sheet.

Thanks for your assistance
Best regards

Richard Gordon, Jr.
President/CEO
RICHMAR & Associates
220 F Street NE
Washington, DC 20002
Office (202) 544-2015
Fax   (202) 544-2016
Cell   (202) 669-6122

This communication contains information from RICHMAR & Associates that may be confidential. Except for personal use by the intended recipient, or as expressly authorized by the sender, any person who receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have received this communication in error, please immediately delete it and all copies, and promptly notify the sender. Nothing in this communication is intended to operate as an electronic signature under applicable law.

FEB. 2. 2007  3:15PM    BANNER-APPLICATIONS                     NO. 6713    P. 1

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is <u>not</u> a request for payment

<u>Customer:</u>    <u>George Washington University</u>

<u>Contract or Purchase Order No: 1000082157</u>

<u>FNP Client/Supplier:</u>        <u>CUS4, Inc. d/b/a RICHMAR & Associates</u>
When completed please fax to FNP at 301-961-6460.
Questions please call FNP at 301-961-6450.

| Customer's Contract, P.O. No, or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | BD-06-GWU-ISS-DOC-25-S | February 2, 2007 | $  60,715.60 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:


*Christina Griff*
Signature

<u>Christina Griffin</u>
Print Name

<u>Assistant Director Administrative</u>
<u>Applications Project Office</u>
Print Title

<u>February 2, 2007</u>
Date

<u>(703) 726-1911</u>
Telephone Number

<u>202-994-5250</u>
Fax Number



**·INVOICE**

Award Number:
Invoice Number: ED-06-GWU-ISS-DOC-20 - S
Tax ID Number: 54-1827538
CLIN 0001
Purchase Order Number 1000082157

| | |
|---|---|
| Billing Date: | 21-Feb-07 |
| Due Date: | Net 30 days |

The George Washington University
ISS - Administrative Applications
44983 Knoll Square Drive, Suite 380
Ashburn, VA 20147

**Billing Period:**
· 2/1/07 - 2/15/07

| Labor Categories | | Current Rate | Current Hours | Current Amount |
|---|---|---|---|---|
| Executive Management Consultant | $ | 150.00 | 60.00 $ | 9,000.00 |
| Senior Engineer | $ | 144.00 | 0.00 $ | - |
| Senior Management Consultant | $ | 125.00 | 35.50 $ | 4,437.50 |
| Jr. Project Manager Ii | $ | 100.00 | · 0.00 $ | - |
| Jr. Project Manager | $ | 75.00 | 0.00 $ | -· |
| Systems Analyst | $ | 98.00 | 0.00 $ | - |
| Quality Analyst | $ | 85.05 | 0.00 $ | - |
| Help Desk Specialist | $ | 45.00 | 0.00 $ | - |
| Administrative Assistant | $ | 33.67 | 205.00 $ | 6,902.35 |
| | | | | |
| **Totals Hours** | | | 300.50 | |
| **Total Direct Labor** | | | $ | 20,339.85 |
| Other Direct Costs - Scanning 3007pages at 0.18/page | | | $ | 541.16 |
| **Total Costs** | | | $ | 20,881.01 |

| | Total Amount Due | | $ · | 20,881.01 |
|---|---|---|---|---|

This is to certify that the services set forth herein were performed during the period stated, and that incurred
costs billed were actually expended.

Richard Gordon, Jr.,
President

Remit Payment to:

Federal National Commercial, Inc.
Fao: CUS4/Richmar Associates
P.O. Box 403826
Atlanta GA 30384-3826

# Richmar & Associates

## Time Accounting Sheet

Employee/Contractor Name: Jim Gearing
Period: Feb 1 - 15, 2007

| | |
|---|---|
| Work days in period | 11 |
| Holidays in period | |
| Hours in period | 88 |
| Hours unaccounted for | 38 |

| | |
|---|---|
| Reg Hrs | |
| Pers Time Off | 50. |
| Holiday | |
| Total Hours | 50. |

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAA - GETS - Meetings | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 1 | | | | | | | | | | | | | | | | |
| FAA - GETS - Changes Batch 2 | | | | | | | | | | | | | | | | |
| FAA - GETS - Arbitrations | | | | | | | | | | | | | | | | |
| GWU - Docu - Back Scan Design/Prog. | 10. | 6. | | | 8. | 8. | 2. | 3. | 3. | | | 2. | 4. | 1. | 3. | 50. |
| GWU - Docu - Backscan, Index, Load | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |
| tbd | | | | | | | | | | | | | | | | |

| Non-Billable | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overhead | | | | | | | | | | | | | | | | |
| Personal Time Off | | | | | | | | | | | | | | | | |
| Holiday | | | | | | | | | | | | | | | | |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL Billable | 10. | 6. | | | 8. | 8. | 2. | 3. | 3. | | | 2. | 4. | 1. | 3. | 50. |
| TOTAL | 10. | 6. | | | 8. | 8. | 2. | 3. | 3. | | | 2. | 4. | 1. | 3. | 50. |

Employee/Contractor Signature: _[signature]_    Date: 2/22/07

Supervisor Signature:    Date:

# Richmar & Associates
## Time Accounting Sheet

Employee/Contractor Name: Central Data Processing
Period: February 1 - 15, 2007

| | |
|---|---|
| Work days in period | 9 |
| Holidays in period | 2 |
| Hours in period | 88 |
| Hours unaccounted for | 0 |

| | |
|---|---|
| Reg Hrs | 250.5 |
| Pers Time Off | |
| Holiday | |
| Total Hours | 250.5 |

| Charge To: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GW Scan Manager - Mike Holt | | 2. | 2. | 2. | 2. | | | | | | | | | | | 10. |
| GW Scan Manager - Dottie Holoubek | | | | | | | | | | | | | | | | |
| GW Scan Manager - Dan Holoubek | | 7. | 7.5 | 7. | 7. | | | | | | | | | | | 35.5 |
| GW Scan - A J Bacchus | | | | | | | | | | | | | | | | |
| GW Scan - Amir Lotfi | | | | | | | | | | | | | | | | |
| GW Scan - Bernesteen Best | | | | | | | | | | | | | | | | |
| GW Scan - Chanteau Benton | | | | | | | | | | | | | | | | |
| GW Scan - Cheric Babb | | | | | | | | | | | | | | | | |
| GW Scan - Davida Potts | | | | | | | | | | | | | | | | |
| GW Scan - Dominique Roberts | | | | | | | | | | | | | | | | |
| GW Scan - Ethel Marsteller | | 14.5 | 10. | | | | | | | | | | | | | 32. |
| GW Scan - Isaac Hughes | | | | | | | | | | | | | | | | |
| GW Scan - Jesse Gillespie | | 11. | 9.5 | | | | | | | | | | | | | 29. |
| GW Scan - Jide Dada | | | | | | | | | | | | | | | | |
| GW Scan - Leila Aghazadeh | | | | | | | | | | | | | | | | |
| GW Scan - Lucille Rattliff | | | | | | | | | | | | | | | | |
| GW Scan - Megan Bradley | | | | | | | | | | | | | | | | |
| GW Scan - Micheal Brown | | | | | | | | | | | | | | | | |
| GW Scan - Nancy Goff | | 13.5 | 11.5 | 2.5 | 12.5 | | | | | | | | | | | 52. |
| GW Scan - Ngoc Dang | | | | | | | | | | | | | | | | |
| GW Scan - Nguyet Dang | | | | | | | | | | | | | | | | |
| GW Scan - Nikki McKinney | | | 7.5 | | 8. | | | | | | | | | | | 15.5 |
| GW Scan - Steve Clark | | | 7.5 | 8. | 8. | | | 8.5 | 7. | 8. | 8. | | | | | 55. |
| GW Scan - Tiffany Johnson | | | | | | | | | | | | | | | | |
| GW Scan - Vergina Hawkins | | | | | | | | | | | | | | | | |
| GW Scan - Vernette Knight | | | | | | | | | | | | | | | | |
| GW Scan - Yvonne Morrison | | | | | 9. | | | | | | | | | | | 21.5 |
| GW Scan - Zandra Curran | | | | | | | | | | | | | | | | |
| GW Scan - | | | | | | | | | | | | | | | | |



| | | | | | | | | 250.5 |
| | | | | | | | | 250.5 |

GW Scan -
GW Scan -
GW Scan -
GW Scan -
GW Scan -
GW Scan -
GW Scan -
GW Scan -
GW Scan -

Non-Billable
Overhead
Personal Time Off
Holiday

| | | | | 48. | 55.5 | 19.5 | 38.5 | | 8.5 | 7. | 8. | 8. | | TOTAL Billable |
| | | | | 48. | 55.5 | 19.5 | 38.5 | | 8.5 | 7. | 8. | 8. | | TOTAL |

Employee/Contractor Signature:                    Date:

Supervisor Signature:                    Date: 2/21/07

FEB. 23. 2007  3:47PM    BANNER-APPLICATIONS                NO. 6740   P. 1

## FEDERAL NATIONAL PAYABLES, INC.

### INVOICE VERIFICATION FORM

This is **not** a request for payment

**Customer:    George Washington University**

**Contract or Purchase Order No: 1000082157**

**FNP Client/Supplier:       CUS4, Inc. d/b/a RICHMAR & Associates**
**When completed please fax to FNP at 301-961-6460.**
**Questions please call FNP at 301-961-6450.**

| Customer's Contract, P.O. No. or Act No. | Invoice Number | Invoice Date | Invoice Amount | Invoice Approved | Invoice Approved with Indicated Discount | Invoice Acknowledged or Received | Invoice Has Been Paid |
|---|---|---|---|---|---|---|---|
| 1000082157 | HD-06-GWU-188-DOC-26-S | February 21, 2007 | $ 20,881.01 | | | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

The undersigned authorized representative of the Customer hereby certifies the status of the above listed invoice(s) submitted by the Supplier.

Comments:

_Christina Griffin_ (signature)
Signature

Christina Griffin
Print Name

Assistant Director Administrative
Applications Project Office
Print Title

February 21, 2007
Date

(703) 726-1911
Telephone Number

202-994-5250
Fax Number

## Nsona Whiteman

| | |
|---|---|
| **From:** | Richard Gordon, Jr. [richard@cus4.com] |
| **Sent:** | Wednesday, February 21, 2007 12:53 PM |
| **To:** | 'Christina L. Griffin' |
| **Cc:** | 'Nsona Whiteman' |
| **Subject:** | Invoice 26-S |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

**Attachments:** ED-06-GWU-ISS-SOC-26 - S.pdf; invoice acceptancefnp 3-02 - number 26 - S.doc

Hello Christina

Attached is Invoice 26-S, our final invoice on this project. It has been a pleasure working with you and the GW team and we wish you the greatest success with DCMS. We are confident that the system design and its. scalability will benefit GW for years to come.

Please sign and fax the Invoice Verification Form to the number on the front of the form 301-961-6460.

Thanks for all of your help.
Best regards

Richard Gordon, Jr.
President/CEO
RICHMAR & Associates
220 F Street NE
Washington, DC 20002
Office (202) 544-2015
Fax    (202) 544-2016
Cell   (202) 669-6122

This communication contains information from RICHMAR & Associates that may be confidential. Except for personal use by the intended recipient, or as expressly authorized by the sender, any person who receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have received this communication in error, please immediately delete it and all copies, and promptly notify the sender. Nothing in this communication is intended to operate as an electronic signature under applicable law.

# Exhibit 11

## Nsona Whiteman

| From: | Christina L. Griffin [cgriffin@gwu.edu] |
|---|---|
| Sent: | Monday, March 05, 2007 5:30 PM |
| To: | 'Richard Gordon, Jr.' |
| Cc: | 'Nsona Whiteman'; ggitner@gitner.com; 'Ken Soper'; 'Linda Schutjer' |
| Subject: | RE: RICHMAR's invoices - 3rd Request |
| Attachments: | Christina L Griffin (cgriffin@gwu.edu).vcf |

Richard,

I have a meeting this Friday to discuss the invoices you mention below.

Regards,

Christina

**From:** Richard Gordon, Jr. [mailto:richard@cus4.com]
**Sent:** Friday, March 02, 2007 2:03 PM
**To:** 'Christina L. Griffin'
**Cc:** 'Nsona Whiteman'; ggitner@gitner.com; 'Ken Soper'
**Subject:** RE: RICHMAR's invoices - 3rd Request
**Importance:** High

Hello Christina

I understand you were out until yesterday.  Will you please provide me with a status of invoices 23-S, 24-S, 25-S and 26-S, totaling approximately $250K.

Best regards

Richard Gordon, Jr.
President/CEO
RICHMAR & Associates
Cell    (202) 669-6122

This communication contains information from RICHMAR & Associates that may be confidential. Except for personal use by the intended recipient, or as expressly authorized by the sender, any person who receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have received this communication in error, please immediately delete it and all copies, and promptly notify the sender. Nothing in this communication is intended to operate as an electronic signature under applicable law.

**From:** Ken Soper [mailto:ksoper@gwu.edu]
**Sent:** Tuesday, February 27, 2007 7:31 AM
**To:** Richard Gordon, Jr.
**Cc:** 'Christina L. Griffin'; 'Nsona Whiteman'; ggitner@gitner.com
**Subject:** Re: Richmar invoices - 2nd Request

Hi Richard,
Christina is out until I believe Thursday.

I will see what I can find out for you in the meanwhile.
Ken

Richard Gordon, Jr. wrote:
Christina

Please provide me with a status of invoices 23-S, 24-S, 25-S and 26-S, totaling approximately $250K.
Best regards

Richard Gordon, Jr.
President/CEO
RICHMAR & Associates
Cell   (202) 669-6122

This communication contains information from RICHMAR & Associates that may be confidential. Except
for personal use by the intended recipient, or as expressly authorized by the sender, any person who
receives this information is prohibited from disclosing, copying, distributing, and/or using it. If you have
received this communication in error, please immediately delete it and all copies, and promptly notify the
sender. Nothing in this communication is intended to operate as an electronic signature under applicable
law.

> **From:** Richard Gordon, Jr. [mailto:richard@cus4.com]
> **Sent:** Thursday, February 22, 2007 6:22 PM
> **To:** 'Christina L. Griffin'; 'Nsona Whiteman'
> **Subject:** RE: Richmar invoices
> **Importance:** High
>
> Hello Christina
>
>
> Will you please provide me with the status of the recently submitted Invoice Verification Form for
> Invoice 26-S, whether it has been faxed?
>
> Also, please provide me with the status of invoices 23-S through 25-S. You last message to
> Nsona indicated invoices 23-S and 24-S were still being reviewed, yet Invoice 23-S was
> submitted on January 4, 2007.
> Best regards
>
> Richard Gordon, Jr.
> President/CEO
> RICHMAR & Associates
> Cell   (202) 669-6122
>
> This communication contains information from RICHMAR & Associates that may be confidential.
> Except for personal use by the intended recipient, or as expressly authorized by the sender, any
> person who receives this information is prohibited from disclosing, copying, distributing, and/or
> using it. If you have received this communication in error, please immediately delete it and all
> copies, and promptly notify the sender. Nothing in this communication is intended to operate as
> an electronic signature under applicable law.
>
>> **From:** Christina L. Griffin [mailto:cgriffin@gwu.edu]
>> **Sent:** Thursday, February 15, 2007 3:41 PM
>> **To:** 'Nsona Whiteman'
>> **Cc:** richard@cus4.com
>> **Subject:** RE: Richmar invoices
>>
>> Nsona,

No, pay dates have not yet been assigned.  These invoices are still being reviewed.

Christina

---

**From:** Nsona Whiteman [mailto:nwhiteman@fedserve.com]
**Sent:** Thursday, February 15, 2007 9:40 AM
**To:** 'Christina L. Griffin'
**Cc:** richard@cus4.com
**Subject:** Richmar Invoices

Good morning Christina,

I hope that you are doing well, especially given the weather. I am just checking to see whether pay dates have been assigned for invoices 23-S - $71350.80 and 24-S - $71476.67 for Richmar. Thanks a lot.

Nsona

## Nsona Whiteman

| From: | Christina L. Griffin [cgriffin@gwu.edu] |
|---|---|
| Sent: | Thursday, February 15, 2007 3:41 PM |
| To: | 'Nsona Whiteman' |
| Cc: | richard@cus4.com |
| Subject: | RE: Richmar invoices |

**Attachments:** Christina L Griffin (cgriffin@gwu.edu).vcf

Nsona,

No, pay dates have not yet been assigned. These invoices are still being reviewed.

Christina

---

**From:** Nsona Whiteman [mailto:nwhiteman@fedserve.com]
**Sent:** Thursday, February 15, 2007 9:40 AM
**To:** 'Christina L. Griffin'
**Cc:** richard@cus4.com
**Subject:** Richmar invoices

Good morning Christina,

I hope that you are doing well, especially given the weather. I am just checking to see whether pay dates have been assigned for invoices 23-S - $71350.80 and 24-S - $71476.67 for Richmar. Thanks a lot.

Nsona

# Exhibit 12

THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

OFFICE OF THE CHIEF INFORMATION OFFICER

March 23, 2007

**ALSO SENT VIA FAX: 202-544-2016**

Mr. Richard Gordon, Jr.
President and CEO
Richmar & Associates
1513 Vermont Avenue, NW
Washington, DC 20005

Re: Contract with The George Washington University

Dear Mr. Gordon:

I am writing in response to your various inquiries about payment – including a recent inquiry to our Executive Vice President and Treasurer, Lou Katz.

Over the past weeks as work under Richmar's contract with GW has drawn to a close, I have asked my staff to review Richmar's performance under the agreement and discuss our concerns about that performance (or non-performance in many cases) with the University's legal counsel. Their preliminary findings show that Richmar failed miserably in its attempts to perform under the contract. Our initial review of billings suggests that GW was billed for work that was not delivered, work that was done incorrectly and had to be re-done by Richmar (for which we were then billed again), for work that was not within the scope of the agreement and, perhaps most seriously, for work that resulted in delivery of seriously flawed work product – which my staff has had to spend countless hours fixing. In the end, much of what Richmar delivered will only be patched sufficiently to let us use it until such time as the work can be done properly. It will then be abandoned.

In light of these finding, I cannot authorize payment of your final invoices. You are clearly not entitled to any more payments. My staff will continue to work with counsel and the University's audit team to evaluate the damages we sustained as a result of Richmar's numerous breaches of the contract. Based on those findings, a decision will be made as to our next steps.

Ron Bonig
Interim Vice President
and Chief Information Officer

# Exhibit 13

APR. 2. 2007  4:59PM____VP GENERAL COUN GWU                    NO. 478    P. 2

**THE GEORGE
WASHINGTON
UNIVERSITY**
WASHINGTON DC

VICE PRESIDENT AND GENERAL COUNSEL

March 16, 2007

Via Fax and Regular Mail
Richard Gordon, Jr.
President and CEO
Richmar & Associates
220 F Street, N.W.
Washington, D.C. 20002

Re:    Contract with The George Washington University

Dear Mr. Gordon:

I am writing in response to your communications with Executive Vice President and Treasurer Louis H. Katz. While Mr. Katz has been briefed about this matter, his office has been instructed to forward all communications to Ron Bonig, Interim Vice President and Chief Information Officer, and to me for further handling. Mr. Katz will not meet with you given the potential for litigation.

I have had occasion over the last month or so to review this situation with the individuals involved at GW and have had the opportunity to review various emails between the parties with respect to work under the contract. Based on this, it is clear that Richmar was very aware of its failures under the contract. While there is no requirement under the contract that Richmar be given a notice and opportunity to cure its breached under the contract, you and Jim Gearing were copied on numerous emails which identified Richmar's mistakes and failings. For you now to say that you were somehow unaware of GW's dissatisfaction with Richmar's work is disingenuous.

Our preliminary review of this matter shows that the University suffered damages well in excess of $500,000 due to the failings of Richmar. We are not inclined at this time to pursue a claim for our additional damages, however, we will not be paying Richmar any additional amounts.

I know that you will not be happy with this response to your email to Mr. Katz. However, the University cannot pay you any additional amounts for work that was either not done or was done improperly.  If you do decide to pursue legal action against the University, rest assured that the University will pursue all of its damage claims against

Richmar and nothing in this letter should be read as limiting the amount we may eventually determine we are due.

Linda Schutjer
Associate General Counsel

cc:    Ron Bonig

PPI399